**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ITEM DEVELOPMENT AB,<br>ASTELLAS US LLC and<br>ASTELLAS PHARMA US, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>SICOR INC. and<br>SICOR PHARMACEUTICALS, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.: 05-0336-SLR |

## PLAINTIFFS' OPENING BRIEF ON CLAIM CONSTRUCTION

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS, JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C. 20001-4413
(202) 408-4000

Paul M. Lukoff #96
David E. Brand #201
PRICKETT, JONES & ELLIOTT, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
(302) 888-6500
debrand@prickett.com

John Scheibeler
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8830

Dated: August 23, 2006

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................1

    A.  Summary of the Case ................................................................................1

    B.  Construction of Disputed Terms ...............................................................2

II.  TECHNICAL BACKGROUND .............................................................................5

    A.  The Circulatory System ............................................................................6

    B.  Preload and Afterload ...............................................................................7

    C.  Vasodilators ..............................................................................................8

    D.  Adenosine ...............................................................................................10

III.  THE '296 PATENT AND PROSECUTION HISTORY......................................11

    A.  The '296 Patent.......................................................................................11

    B.  Prosecution History.................................................................................13

IV.  ARGUMENT .......................................................................................................15

    A.  The Term *"method of selectively vasodilating the arteries . . . without inducing significant venous dilation"* Should Be Given Its Ordinary Meaning .................................................................................................15

        1.  The Disputed Terms Must Be Construed in the Context in Which They Are Used ................................................................16

        2.  Dictionary Definitions of "Selective" and "Significant" Are Highly Informative of the Ordinary Meaning of the Disputed Claim Term ......................................................................17

        3.  Comparisons to Other Known Vasodilators in the Intrinsic Record and Relevant Treatises Further Demonstrate that Plaintiffs' Proposed Construction is Correct ...............................20

        4.  Sicor's Proposed Construction Contradicts the Ordinary Meaning and Renders the Portion of the Claim Concerning Venous Dilation Meaningless .................................................23

    B.  The Term *"inducing a reduced afterload . . . without reducing the preload"* Should Also Be Given Its Ordinary Meaning ........................25

1.     The '296 Patent Specification Describes the Ordinary Meaning
       of *"inducing a reduced afterload . . . without reducing the
       preload"* ....................................................................................................25

2.     Despite Acknowledging the Reference to *"inducing a reduced
       afterload . . . without reducing the preload"* in the '296 Patent
       Specification, Sicor Asserts that the Term Should Be Broken
       Into Two Parts and Subject to a More Limiting Construction...................26

C.     Sicor's Baseless Suggestion that Item and Astellas Failed to Timely
       Disclose Their Claim Construction is Contrary to the Court's
       Scheduling Order ...................................................................................27

V.     CONCLUSION.....................................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.,*
    257 F.3d 1364 (Fed. Cir. 2001)..................................................................................25

*Gillette Co. v. Energizer Holdings, Inc.,*
    405 F.3d 1367 (Fed. Cir. 2005)..................................................................................23

*K-2 Corp. v. Salomon S.A.,*
    191 F.3d 1356 (Fed. Cir. 1999)..................................................................17, 26, 29

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)..................................................15, 16, 17, 22, 23

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,*
    520 U.S. 17 (1997).....................................................................................................24

## I.    INTRODUCTION

### A.    Summary of the Case

Plaintiff Item Development AB owns U.S. Patent No. 5,731,296 (the '296 patent) (attached as Exhibit 1). The '296 patent represents the pioneering work of Dr. Alf Sollevi, who discovered medically beneficial uses for the natural chemical compound, adenosine, at a time when most in the field believed it could not be administered safely to humans except in tiny "bolus" doses. Dr. Sollevi discovered that adenosine could be safely administered by a continuous intravenous infusion and used in patients for a variety of purposes involving the reduction of blood pressure. Of particular importance, Dr. Sollevi recognized that adenosine could be administered to "selectively" vasodilate arteries as compared to veins in human patients. This selective arterial vasodilation had applications in surgical methods and treatment of pulmonary and cardiac conditions.

Today, intravenous infusion of adenosine is used in diagnosing coronary artery disease because the adenosine infusion will "stress" the heart by selectively vasodilating the arteries. Plaintiffs Astellas US LLC and Astellas Pharma US, Inc. (collectively "Astellas") are the exclusive licensees of rights under the '296 patent and market adenosine as a highly successful pharmaceutical product, Adenoscan®, for use in conjunction with methods of detecting and diagnosing coronary artery disease.

Defendants Sicor Inc. and Sicor Pharmaceuticals, Inc. (collectively "Sicor") are manufacturers of generic pharmaceuticals and corporate affiliates of Teva Industries, Ltd. (not a party). Item and Astellas brought suit for patent infringement under the '296 patent after Sicor

filed an abbreviated new drug application ("ANDA") and Paragraph IV certification seeking to market a generic version of Adenoscan® prior to expiration of the '296 patent.[1]

Asserted claims 1, 3, and 7 of the '296 patent concern methods of using adenosine in human patients involving "*selectively vasodilating the arteries . . . without inducing significant venous dilation*." Asserted claim 9 recites a method of treating patients by "*inducing a reduced afterload . . . without reducing the preload*." Afterload and preload are hemodynamic terms relating to arterial and venous dilation that will be discussed further below.

The parties do not dispute that Sicor's proposed generic product will consist of adenosine for use in the same indications as the Adenoscan® product marketed by Astellas. However, Sicor has submitted contentions suggesting that use of its product will not infringe the methods claimed in the '296 patent because the proposed product labeling refers to vasodilating effects on "vascular beds" rather than explicitly referring to selective arterial vasodilation, and because there is reference in the label to adenosine-induced vasoconstriction in certain arteries and veins of the kidney. Notably, Sicor did not offer this theory in its Paragraph IV certification to the FDA and it has declined to submit expert testimony on <u>any</u> theory of noninfringement.[2]

### B.    Construction of Disputed Terms

Item and Astellas assert that the disputed claims should be construed according to their ordinary meaning. Sicor, by contrast, proposes more complicated constructions, presumably in

---

[1]    Astellas is also the exclusive licensee of rights under U.S. Patent No. 5,070,877 (the '877 patent), which concerns specific methods of using adenosine in conjunction with the detection and diagnosis of coronary artery disease. Astellas joined with King Pharmaceuticals Research and Development, Inc. ("King"), the owner of the '877 patent, and brought a separate action for patent infringement which is copending in this Court. *See* CV No. 05-0337-SLR

[2]    Sicor also recently sought to amend its Answer to aver that it does not infringe "any valid or enforceable" claim of the '296 patent rather than maintain its unequivocal denial of infringement. *See* Defendant Sicor's Motion for Leave to Amend Its Answer, filed March 30, 2006 (DI #70).

support of its purported theory of noninfringement, that require splitting single phrases into multiple pieces and reading them in an internally inconsistent manner.

There are two claim terms for which the parties seek construction. The first term, "*selectively vasodilating the arteries . . . without inducing significant venous dilation,*" is shown below in connection with asserted claim 1 of the '296 patent[3]:

> 1. A method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering into the blood stream of said patient adenosine at a rate of administration of 0.35 milligrams of adenosine per kilogram body weight per minute, or less.

The second term, "*inducing a reduced afterload . . . without reducing the preload,*" is shown below in connection with asserted claim 9:

> 9. A method for inducing a reduced afterload in the vascular system of a human without reducing the preload and without pretreatment with dipyridamole, the method comprising continuously administering into the blood stream of said patient adenosine at a rate of administration of 0.35 milligrams of adenosine per kilogram body weight per minute, or less.

Both claim terms refer to adenosine's preferential vasodilating effect on arteries versus veins and the magnitude of that preference. Thus, in claims 1, 3, and 7, "*selectively vasodilating the arteries . . . without inducing significant venous dilation*" refers to a method of causing vasodilation characterized by selective action on arteries without inducing "significant" (i.e., an "important, weighty, or notable") vasodilation of veins. This plain English reading is consistent with the '296 patent specification, which contrasted the action of adenosine and its preference for arterial dilation against known prior art vasodilators that preferentially dilated veins or significantly dilated both veins and arteries.

---

[3]     This term also appears in claims 3 and 7 of the '296 patent.

Sicor asserts that the words "selectively vasodilating the arteries" should mean "dilating only arteries and not veins" and should be construed separately from "without inducing significant venous dilation." *See* Joint Proposed Claim Construction Statement, filed August 11, 2006 (DI #96) at 1-2. According to Sicor, "without inducing significant venous dilation" must be construed without reference to the first half of the phrase to mean "the veins are not dilated to any extent that is detectable by conventional means." Sicor's two-part construction is clearly wrong because it renders the second portion of the phrase superfluous at best. If the first half of the phrase alone required dilating <u>only</u> arteries and not veins, then there would be no need to specify without <u>significant</u> venous dilation in the second half of the phrase. Sicor's proposed construction also erroneously attempts to replace the words "without...significant" with "without . . . any" or "without . . . detectable." In fact, the ordinary meaning of the claim clearly contemplates that a method that results in venous dilation, but only an insignificant amount, would still be covered by the claim, a result that Sicor apparently wishes to avoid.[4]

The parties' opposing constructions of the second disputed term, "*inducing a reduced afterload . . . without reducing the preload,*" reflect similar disagreements. Both parties agree that the phrase is based on a portion of the specification of the '296 patent that refers to effects of adenosine infusion, stating:

> It has selective vasodilation activity, in that its effect is limited to a cardiac after-load effect. That is, its activity is limited to dilation of arteries and it has little or no effect on cardiac pre-load, i.e. as a dilator of veins.

---

[4]     Since Sicor has not offered expert testimony to suggest that its product would not infringe if the Court were to adopt its proposed construction and its validity positions do not seem to depend on its proffered construction, it is not clear why Sicor is disputing the meaning of the claims.

Exh. 1 at col. 2, lines 39-42. Item and Astellas submit, therefore, that the ordinary meaning of the claim term refers to a method of causing vasodilation of the arteries with little or no effect as a dilator of veins.

By contrast, Sicor again proposes that the single phrase in the claim should be construed in two parts, with "inducing a reduced afterload" meaning "activity of adenosine is limited to dilation of arteries" and "without reducing preload" meaning "adenosine has little or no effect as a dilator of veins." *See* Joint Proposed Claim Construction Statement (DI #96) at 3. Yet this divided construction makes even less sense in the context of claim 9 than it does in claims 1, 3, and 7. Sicor's construction of the first half of the phrase requires that, in the claimed method, adenosine would not have any effect on veins (i.e., its effect is limited to arteries). Yet Sicor's construction of the second half of the phrase would encompass a method where adenosine has a "little" effect on the veins. Clearly the two parts of the phrase must be construed together with the first half indicating that the method involves inducing a preferential dilation of arteries and the second half defining the magnitude of the preference--i.e., there is little or no dilation of veins.

## II.    TECHNICAL BACKGROUND

The ordinary meanings of the claim terms in the '296 patent are understood in the context of principles of anatomy and physiology of the heart and circulatory system. Accordingly, these principles are reviewed below based on publications and treatises, both contemporary and from the early-1980s.[5] These principles are also discussed in Section II of the Expert Statements of

---

[5]    As indicated by expert reports submitted by Item and Astellas in this matter, the Plaintiffs intend to present more detailed information on these topics at trial and any absence of such detail here should not be construed as a waiver.

Dr. Barry L. Zaret and Dr. Richard E. Klabunde, with citations to relevant treatise chapters and scientific publications (attached as Exhibits 2 and 3, respectively).[6]

## A.     The Circulatory System

The circulatory system can be divided into two parts: the pulmonary circulation, which carries blood through the lungs, and the systemic circulation, which carries blood to all parts of the body except the lungs. *See Yale Heart Book* Plate 4A, 4B (Barry Zaret et al., eds., Consumer Reports Books 1992) ("*Yale Heart Book*") (attached as Exhibit 4). The heart lies at the center of the circulatory system, receiving blood depleted of oxygen, delivering it to the lungs to be oxygenated, and pumping oxygenated blood throughout the body.[7] The blood vessels of the systemic circulation consist of generally two types, arteries, which carry oxygenated blood away from the heart, and veins, which carry relatively unoxygenated blood back to the heart.

The main arteries of the systemic circulation branch to form smaller vessels called "arterioles." Arterioles deliver oxygenated blood to a web of even smaller vessels, the capillaries. Capillaries lack the muscular sheath that surrounds arteries, allowing oxygen from

---

[6]     According to Dr. Zaret, the major treatise on cardiology is Braunwald's Heart Disease: A Textbook on Cardiovascular Medicine. *See* Exh. 2 at 9. Exhibits 9, 12, and 14 are excerpts of chapters from the 1984 edition of this treatise, while Exhibits 6, 7, 10, 11, 13, and 15 are excerpts of chapters from the 2005 edition of this treatise.

[7]     While not critical for understanding the claim terms, we note that the heart has four chambers, the right atrium, right ventricle, left atrium, and left ventricle. *See* Exh. 4 at Plate 3B. Although it is a single organ, the heart can be thought of functionally and anatomically as two separate pumps. The right side of the heart pumps blood flowing from the systemic venous circulation into the pulmonary circulation, and the left side of the heart pumps blood flowing from the pulmonary circulation into the systemic circulation. *See id.* at Plate 4A. In an overall diagram of the heart and lungs within the thorax, the flow of blood is as follows: unoxygenated blood returning from the veins is pooled in the vena cavae. This relatively unoxygenated blood enters the right atrium and proceeds through the right ventricle and into the lungs, where it is oxygenated. Oxygenated blood returns via the pulmonary veins to the left atrium and then to the left ventricle, from which it is pumped to the body. *Id.* at Plate 1.

the blood to pass through thin capillary walls and into adjacent tissues. Once the blood has delivered its oxygen in the capillaries, a network of small post-capillary "venules" collects blood from the capillaries and delivers it into larger veins, which complete the return circuit to the heart. *See* Richard R. Miller et al., *Differential Systemic Arterial and Venous Actions and Consequent Cardiac Effects of Vasodilator Drugs*, 24 Progress in Cardiovascular Diseases 353-74, 354, Fig. 1 (1982) ("*Miller et al., 1982*") (attached as Exhibit 5).

Precapillary arterioles are referred to as "resistance" vessels because they regulate the resistance to blood flow from the heart through their degree of vasodilation. *See* Morton J. Kern, *Chapter 44: Coronary Blood Flow and Myocardial Ischemia*, *in* 1 *Braunwald's Heart Disease*, 1103, 1105-06 (Douglas P. Zipes et al., eds., 7th ed. 2005) (attached as Exhibit 6). Greater dilation of the resistance vessels reduces resistance to blood flowing out of the heart by increasing the size of the "pipe" through which the blood must flow. *See* James E. Udelson et al., *Chapter 13: Nuclear Cardiology*, *in* 1 *Braunwald's Heart Disease* 287, 301-05 (Douglas P. Zipes et al., eds., 7th ed. 2005) (attached as Exhibit 7). The post-capillary vessels (the venules and veins) are highly elastic and are termed "capacitance" vessels. *See, e.g.,* Richard E. Klabunde, *Cardiovascular Physiology Concepts* 93 (Lippincott Williams & Wilkins 2004) (attached as Exhibit 8). They act as a reservoir for the majority of the blood in the circulatory system. Through dilation and contraction, the capacitance vessels can regulate the rate of return of unoxygenated blood to the heart. *See, e.g.*, William Grossman & Eugene Braunwald, *Chapter 24: High Cardiac Output States*, *in* 1 *Heart Disease* 807, 808 (Eugene Braunwald, ed., W.B. Saunders Co., 2d ed. 1984) (attached as Exhibit 9); Exh. 8 at 104-05.

### B.    Preload and Afterload

The terms "preload" and "afterload" are derived from *in vitro* physiologic studies and can be thought of as terms that describe the *effects* of arterial and venous dilation. As applied in a

human patient, preload is reflected, in general, by hemodynamic parameters that reflect the pressure of the blood entering and filling the heart. *See* Lionel H. Opie, *Chapter 19: Mechanisms of Cardiac Contraction and Relaxation, in* 1 *Braunwald's Heart Disease*, 457, 476-78 (Douglas P. Zipes et al., eds., 7th ed. 2005) (attached as Exhibit 10); John D. Carroll & Otto M. Hess, *Assessment of Normal and Abnormal Cardiac Function, in* 1 *Braunwald's Heart Disease* 491, 492-94 (Douglas P. Zipes et al., eds., 7th ed. 2005) (attached as Exhibit 11). Thus, preload can be thought of as a measure of the distending force or stretch on the wall of the heart as it fills with blood returning through the veins. *See* Exh. 10 at 476-77; Exh. 8 at 71. Consequently, the extent of venous dilation is an important determinant of preload, and dilation of the veins can cause large reductions in preload. *See* Exh. 5 at 353-55; Exh. 8 at 71.

Afterload can be thought of as the force against which the ventricle contracts to pump blood out of the heart and into the arteries. *See* Exh. 11 at 492-94. This force depends to a large extent on the radius of the arteries into which the blood must be pumped (i.e., it takes more force to pump into a narrow arterial vessel than a wide one). Thus, an important determinant of afterload is the extent of arterial dilation with greater dilation of arteries causing reduced afterload. *See* Exh. 5 at 355; Exh. 8 at 78.

C.    **Vasodilators**

Vasodilators have a long history of use in the treatment of hypertension (high blood pressure) and heart failure. As described in the major treatise on cardiology, they generally fall into three categories, those that are predominantly arterial vasodilators, such as hydralazine, those that are predominantly venodilators, such as nitroglycerine, and those that have mixed effects, such as sodium nitroprusside. *See* Thomas W. Smith & Eugene Braunwald, *Chapter 16: The Management of Heart Failure, in* 1 *Heart Disease*, 503, 534-39 (Eugene Braunwald, ed., 2nd ed. 1984) (attached as Exhibit 12); Michael R. Bristow et al., *Chapter 23: Drugs in the*

*Treatment of Heart Failure, in* 1 *Braunwald's Heart Disease*, 569, 576-78 (Douglas P. Zipes et al., eds., 7th ed. 2005) (attached as Exhibit 13).

It was well understood among cardiologists, even in the early 1980's, that it is "helpful to categorize vasodilators with regard to their site of predominant action, since the resultant cardiac effects are highly dependent on the relative magnitude of arterial and venous dilation." *See* Exh. 5 at 353. For example, it has long been known that selectively dilating arteries versus veins induces different effects on the output of the heart. *See id.* at 353-55. Selectively dilating the veins will tend to reduce cardiac output while selectively vasodilating the arteries will tend to cause cardiac output to increase. *Id.*

Hydralazine is a selective arterial vasodilator that was known as such to cardiologists in the early 1980s. *Id.* at 363-64; Exh. 12 at 538-39; Norman M. Kaplan, *Chapter 27: Systemic Hypertension: Therapy, in* 1 *Heart Disease*, 902, 919 (Eugene Braunwald, ed., 2nd ed. 1984) (attached as Exhibit 14). The primary effect of hydralazine is to decrease the resistance in the arterial system through vasodilation of arterioles. Consequently, its predominant effect is on "afterload." The major cardiology treatise describes the effects of hydralazine as having "little or no effect" on venous circulation. Norman M. Kaplan, *Chapter 38 Systemic Hypertension: Therapy, in* 1 *Braunwald's Heart Disease*, 989, 1003 (Douglas P. Zipes et al., eds., 7th ed. 2005) (attached as Exhibit 15). However, despite its predominant effect on arterial dilation, hydralazine may well have some small effect on veins, but that venous effect is without functional significance. *See* Exh. 13 at 576. In the early 1980's, cardiologists understood that hydralazine's selective effect on arteries caused "an increase in cardiac output with relatively minor reductions in ventricular filling pressure and arterial pressure." Exh. 12 at 538.

The nitrates exert their predominant effect on the venous system, causing venodilation, which leads to reduced preload. As in the case of the selective arterial vasodilator, hydralazine, the venous effect of nitrates is not absolute. The major treatise characterizes nitrates as "powerful venodilators" and "mild" arteriolar vasodilators. Exh. 13 at 577.

In contrast to these agents, sodium nitroprusside manifests a more balanced response, and exerts effects on both the arterial and venous systems, consequently reducing both preload and afterload. According to the treatise, "[i]ntravenous nitroprusside is an effective venous and arterial vasodilator that acts to reduce both ventricular preload and afterload." *Id.*

### D.    Adenosine

Adenosine is now generally regarded by cardiologists as an arterial vasodilator, i.e., it dilates resistance vessels. *See, e.g.,* Barry L. Zaret & Frans J. Wackers, *Medical Progress: Nuclear Cardiology,* 329 New Eng. J. Med. 775, at 775 (1993) (attached as Exhibit 16) ("In patients who cannot perform physical exercise, pharmacological stress in conjunction with myocardial imaging represents an alternative means of evaluation. Intravenous dipyridamole or adenosine causes vasodilation of the coronary resistance vessels.") It is this ability to increase myocardial flow through arterial vasodilation that makes adenosine a highly effective agent for use by continuous infusion in conjunction with myocardial imaging. As discussed in the major treatise:

> The major determinants of coronary blood flow include the perfusion pressure at the head of the system (principally aortic diastolic pressure) and the downstream resistance, residing predominantly in the coronary *arteriolar* bed. . . . During *pharmacological* stress to minimize coronary arteriolar resistance, with intravenous coronary arteriolar vasodilator agents such as dipyridamole or adenosine (discussed further later), coronary blood flow can increase up to four to five times over resting levels."

Exh. 7 at 301 (emphasis in original).

The treatise also notes that "[e]xogenously administered adenosine acts directly on its receptor to result in coronary arteriolar vasodilation and thus an increase in myocardial blood flow (MBF) as resistance is minimized. The adenosine $A_{2a}$ receptor mediates coronary arteriolar vasodilation, which is the basis for pharmacological stress testing." *Id.* at 304.

## III.    THE '296 PATENT AND PROSECUTION HISTORY

### A.    The '296 Patent

The '296 patent discusses adenosine's effects on the circulatory system in the context of the effects of other vasodilators known at the time of the invention. For example, the patent refers to "commonly used" vasodilators, including drugs such as sodium nitroprusside, nitroglycerine, and hydralazine, which represent the same three functional categories discussed above. *See* Exh. 1 at col. 2, lines 7-10. The patent states that "nitroprusside reduces both after-load and pre-load, and nitroglycerine is effective principally (90%) on reducing pre-load, and has only a marginal effect on afterload." *Id.* at col. 12, lines 54-57.

The patent describes the effects of adenosine according to the hemodynamic effects of the known vasodilators. Thus, the patent reports that the invention is "based on the further discovery that adenosine has a unique, and heretofore unappreciated, activity profile in humans which differs significantly from the profiles of heretofore commonly used vasodilators" and that "[a]s a consequence of this discovery, it has been discovered that adenosine may be employed for the treatment of a variety of conditions by continuous intravenous infusion techniques." *Id.* at col 2, lines 30-36. The '296 patent describes adenosine's vasodilating properties in terms of afterload and preload as "limited to a cardiac after-load effect," explaining that "its activity is limited to dilation of arteries and it has little or no effect on cardiac preload, i.e. as a dilator of veins." *Id.* at col. 2, lines 39-42. This description is similar to the description of the effects of

hydralazine in the major cardiology treatise at the time. Exh. 14 at 919 ("The drug acts directly to relax the smooth muscle in precapillary resistance vessels [i.e., arterioles] with little or no effect on postcapillary venous capacitance vessels." However, the potency and side effect profile of adenosine allowed it to be used for purposes for which hydralazine is unsuitable. Exh. 2 at 17.

The data presented in the '296 patent from patients who received intravenous infusions of adenosine reflect adenosine's selective vasodilating effect on arteries as opposed to veins. Table II and the corresponding discussion in the '296 patent specification present measurements of central hemodynamic variables before, during, and after adenosine infusion in patients. Exh. 1 at col. 8. These data show that while parameters reflecting afterload (e.g., diastolic blood pressure, systolic blood pressure, and mean arterial blood pressure) decreased during adenosine infusion, those reflecting preload (*e.g.,* right atrial pressure (RAP) and pulmonary capillary wedge pressure (PCWP)), remained essentially unchanged. In addition, cardiac output increased and systemic vascular resistance decreased. These hemodynamic characteristics are indicative of a selective arterial vasodilator. For example, as mentioned above, in 1984, the major treatise in cardiology described effects for the selective arterial vasodilator, hydralazine, stating that "[h]ydralazine's predominant action on the arterial bed results in an increase in cardiac output with relatively minor reductions in ventricular filling pressure and arterial pressure or increases in heart rate in patients with heart failure." Exh. 12 at 538. The '296 patent also notes that adenosine infusion at a particular dose range can "reduce after-load without significantly increasing heart rate" as opposed to "agents previously used to reduce cardiac after-load, for example, hydralazine and prazosin," which increase heart rate. Exh. 1 at col. 13, lines 5-9.

The '296 patent compares the hemodynamic effects of adenosine infusion in patients undergoing aneurysm surgery to hemodynamic effects seen in earlier studies on such patients using nitroglycerin or sodium nitroprusside to induce hypotension. *Id.* at Table IV, cols. 9-10. The '296 patent further states that "[t]he enhanced cardiac output obtained with adenosine, in combination with the maintained right and left heart filling pressures, is in contrast with the hemodynamic effects of controlled hypotension with sodium nitroprusside or nitroglycerine, as is shown in Table IV." *Id.* at col. 9, lines 47-51. Table IV shows that although adenosine, nitroglycerine, and sodium nitroprusside each reduced arterial blood pressure, they had very different effects on right atrial pressure and PCWP (i.e., right and left filling pressures) and hence preload and afterload. The effects of sodium nitroprusside and nitroglycerine on preload (seen as changes in right atrial pressure and PCWP) reflect classic effects of venous dilation. *Id.* at col. 9, lines 62-64.

The effect of each of the three drugs on cardiac output also reflects the differences in their vasodilating properties. While adenosine increased cardiac output--as is characteristic of a selective arterial vasodilator--nitroglycerine caused a decrease of 24%. *Id.* at col. 9, line 66. Sodium nitroprusside, having effects on both arteries and veins, also caused cardiac output to decrease in surgical patients, albeit to a lesser extent. *Id.*

Although the data described in Table II and Table IV was collected in patients who had been pretreated with dipyridamole prior to adenosine infusion, the patent reports that similar hemodynamic effects were observed in patients receiving adenosine at dosages of 0.2 to 0.35 mg per kg per minute without pretreatment with dipyridamole. *Id.* at col. 9, lines 41-47.

### B.    Prosecution History

The most significant arguments relevant to the construction of the disputed terms were first presented in a paper filed November 8, 1996. First Submission After Final Rejection,

13

November 8, 1996 (attached as Exhibit 17). In this Submission, the applicant added new claim 66, which recited a method for "inducing a reduced afterload . . . without reducing the preload." *Id*. at 3. This language appears in claim 9 of the '296 patent. *See* Exh. 1, col. 22, lines 55-61. As support for this claim, the applicant cited to page 4, lines 2-9 of the specification, which states that adenosine "has little or no effect on cardiac pre-load, i.e., as a dilator of veins." Exh. 17 at 3.

In addition, the applicant also presented for the Examiner technical information similar to that discussed above in the tutorial section of this brief. In particular, the applicant explained that dilation of the veins resulted in a reduced preload to the heart, which in turn reduced cardiac output. *Id*. at 9. The applicant defined nitroglycerine as an example of a venous dilator, stating that nitroglycerine "produces arterial hypotension by dilating *primarily* the veins." *Id*. at 10 (emphasis added). In contrast, the applicant referred to adenosine as an arterial dilator. *Id*. at 10-11. The applicant went on to state that, in humans, adenosine dilates arterial resistance vessels, reduces afterload, and does not "*significantly* affect preload." *Id*. at 12 (emphasis added). Moreover, the applicant explained that "adenosine infusion in healthy volunteers causes a dose-dependent reduction of the peripheral vascular resistance paralleled by dose-dependent elevation of cardiac output, with no influence on cardiac filling pressure, and with minor influence on arterial blood pressure." *Id*.

Following the submission of this paper, the Examiner allowed all of the pending claims, mailing a Notice of Allowance on January 23, 1997. *See* Notice of Allowance, January 23, 1997 (attached as Exhibit 18). After payment of the issue fee, however, the applicant filed a Submission After Final Rejection along with two prior art references, one of which was of record in a parent application and the other of which had not been previously submitted. *See*

14

Submission After Final Rejection, November 4, 1997 (attached as Exhibit 19).  This Submission

led to a further Office Action, in which the Office summarized the instant claims as follows:

> The instant claims are directed to a method of treatment comprising the administration of adenosine to effect arterial vasodilation in a human patient without induction of *significant* venous dilation.

Final Office Action, November 26, 1997, at 3 (emphasis added) (attached as Exhibit 20).

Following this Final Office Action, the applicant amended the claims to include a term

relating to dipyridamole pretreatment, the meaning of which is not in dispute.  *See* Submission

After Final Rejection, November 26, 1997 at 4-5 (attached as Exhibit 21).  In response to this

amendment, the Examiner again allowed all of the pending claims, mailing a second Notice of

Allowance on January 7, 1998.  *See* Notice of Allowance, January 7, 1998 (attached as Exhibit

22).  The application issued as the '296 patent on March 24, 1998.

## IV. ARGUMENT

### A. The Term "*method of selectively vasodilating the arteries . . . without inducing significant venous dilation*" Should Be Given Its Ordinary Meaning

The Federal Circuit has recently reaffirmed that words of a patent claim should be given

their ordinary and customary meaning as understood by a person of ordinary skill in the art at the

time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en

banc).  In restating that principle, the Court acknowledged that "[i]n some cases, the ordinary

meaning of claim language as understood by a person of skill in the art may be readily apparent

even to lay judges, and claim construction in such cases involves little more than the application

of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  However,

because terms may have a specific meaning in the relevant field and because patentees may use

words idiosyncratically, the Court must also look at public sources that would show how a

person of ordinary skill in the art would understand a claim term. *Id.* Such sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (citations omitted).

The term at issue in claims 1, 3, and 7 of the '296 patent, "*method of selectively vasodilating the arteries . . . without inducing significant venous dilation*," uses common words whose meaning in the context of the patent specification comports with their everyday usage. While the exact phrase to be construed is not found *verbatim* in the patent specification, the everyday usage of these words and their use in the context of the '296 patent and its claims leads to the conclusion that the claimed method involves a predominant vasodilation of the arteries, resulting in hemodynamic effects typical of arterial dilation, while allowing for an insignificant amount of venous dilation. Accordingly, the ordinary meaning of the phrase can be construed as a method of causing vasodilation characterized by selective action on arteries without inducing "significant" (i.e., an "important, weighty, or notable") amount of vasodilation of veins.

## 1.    The Disputed Terms Must Be Construed in the Context in Which They Are Used

The Federal Circuit has mandated that the "claims themselves provide substantial guidance as to the meaning of particular claim terms" and that "the context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314. Here, the specification demonstrates that the term "*method of selectively vasodilating the arteries . . . without inducing significant venous dilation*" must be read as a single phrase in which the term "without inducing significant venous dilation" defines the magnitude of the selective vasodilation of arteries in the claimed method. To separate the phrases and attempt to define each independently would deprive them of the context that gives them meaning.

The Federal Circuit rejected a patentee's claim construction in *K2 Corp. v. Salomon S.A.*, where that construction was contrary to the context of the words in the claim and would have rendered certain words superfluous. *K-2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1363-64 (Fed. Cir. 1999). The patentee had sought to read a claim to an inline skate referring to a "shoe portion being permanently affixed to said base portion . . . for substantially preventing movement therebetween at least in a horizontal plane" to mean that the shoe was affixed in a way that prevented movement in a horizontal plane without regard to the permanency of fixture. The Court rejected the construction because it "would effectively expunge the term 'permanently' from the claim language." *Id.* at 1363. The Federal Circuit held that "[a] more natural construction reads the two clauses as complementary, recognizing that 'permanently affixed' requires an unremovable attachment, while the functional language requires that the attachment prevent sliding." *Id.*

Similarly here, the two clauses in the claim are naturally read in context as being complementary, with the clause "without inducing significant venous dilation" defining the magnitude of the selectivity in the phrase "selectively vasodilating the arteries."

### 2.    Dictionary Definitions of "Selective" and "Significant" Are Highly Informative of the Ordinary Meaning of the Disputed Claim Term

The Federal Circuit's opinion in *Phillips* explicitly acknowledges the benefits of consulting dictionary definitions and authorized courts to "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322-23. Here, the dictionary definitions of "selective" and "significant" align with the meaning given to those terms in the claims, the patent specification, and the prosecution history.

The relevant general purpose dictionary definition of "selective" is as follows:

> **selective** . . . of, relating to, or characterized by selection; selecting or tending to select  < buyers of retail stores have become more and more ~ - Glen Fowler> <some dyes were highly ~ in their action  - S. F. Mason> < monetary controls may be either general or ~ - Jules Backman> < an exceptionally quick and ~ reader - John Mason Brown>.

*Webster's Third New International Dictionary of the English Language Unabridged*, Volume III, S to Z 2058 (Encyclopedia Britannica, Inc. 1981) (1961) (attached as Exhibit 23).

This definition confirms that the ordinary meaning of the word connotes a preference or tendency rather than an all-or-nothing choice. Specifically, the *Webster's* definition notes that a selective effect may be characterized by "tending to select" and not just selecting. Moreover, *Webster's* includes a usage example involving the term "highly selective," in reference to dyes. Use of such an adverb concerning the magnitude or degree of the selective preference also demonstrates that the words "selective" or "selectively" alone do not indicate an exclusive choice.

In the context of the patent claims, the dictionary definition of "selective" also demonstrates that "selectively vasodilating the arteries" is not equivalent to the phrases "exclusively vasodilating the arteries" or "dilating only arteries and not veins." Instead, the word merely indicates an effect characterized by selective action on arteries as opposed to veins, with the degree of selectivity defined by the remainder of the phrase "without inducing significant venous dilation."

The degree of the selective arterial dilation as compared to venous dilation that is contemplated by the methods of claims 1, 3, and 7 is illustrated by the relevant general dictionary definition of the word "significant" as used in those claims. That definition is:

> **significant** . . . having or likely to have influence or effect: deserving to be considered: IMPORTANT, WEIGHTY, NOTABLE < even though the individual results may seem small, the total of them is ~ - F. D. Roosevelt>.

18

*Webster's Third New International Dictionary of the English Language Unabridged*, Volume III, S to Z 2116 (Encyclopedia Britannica, Inc. 1981) (1961) (attached as Exhibit 24). Thus, the claim term refers to causing vasodilation characterized by selective action on arteries without inducing important, weighty, or notable vasodilation of veins.

This definition of the word "significant," is also clearly supported by the '296 patent specification, which uses the word in a variety of contexts according to its ordinary everyday meaning. *See, e.g.,* Exh. 1 at col. 2, lines 27-29 ("[A]denosine can be administered to human patients under conditions such that significant vasodilation is achieved without the occurrence of significant heart blockage."); col. 2, lines 30-32 ("[A]denosine has a unique, and heretofore unappreciated, activity profile in humans which differs significantly from the profiles of heretofore commonly used vasodilators."); col. 2, lines 48-49 ("Adenosine has significant hypotensive activity without the occurrence of significant tachyphylaxis . . . ."); col. 2, lines 57-58 ("Adenosine is capable of significantly increasing cardiac output without significantly increasing cardiac work."). Particularly noteworthy, the patent specification refers to an approximately 43 percent decrease in blood pressure by stating, "it is evident that continuous infusion of adenosine during anesthesia is capable of significantly reducing blood pressure." *Id.* at col. 10, lines 16-18. By contrast, the patent refers to "infusion at rates which do not induce significant hypotension" in connection with an adenosine infusion that causes an "approximately 10% reduction of mean arterial blood pressure." *See id.* at col. 11, lines 28-29 and col. 11, line 67 to col. 12, line 1.[8] These uses of the word significant, as well as the others in the patent

---

[8]     The '296 patent specification also refers to "statistical significance," but the use of "significant" in that context clearly refers only to specific instances where data is measured and compared in terms of statistical units, such as t-tests and p-values. The general use of the word "significant" is plainly not limited to its statistical meaning. For example, the mention in column 11 of "infusion at rates which do not induce significant hypotension" cites to Table V,
(continued...)

specification, make clear that when the word is used as part of the term "*method of selectively vasodilating the arteries . . . without inducing significant venous dilation*" it is meant to have its ordinary and generally understood meaning.

### 3. Comparisons to Other Known Vasodilators in the Intrinsic Record and Relevant Treatises Further Demonstrate that Plaintiffs' Proposed Construction is Correct

Comparisons to other known vasodilators in the intrinsic record and relevant treatises further demonstrate that Plaintiffs' proposed construction is correct. Vasodilators were generally characterized in the prior art into three categories based on their hemodynamic profiles -- as selective arterial vasodilators, selective venous dilators, and dilators with significant effects on both arteries and veins. *See* Exh. 12 at 534-39; *see also* Exh. 13 at 576-78. More importantly, it was well known that, despite the hemodynamic categorization of these compounds as "selective" for arteries or veins, they could, under some circumstances, be capable of causing a small amount of non-selective vasodilation. *See, e.g.,* Exh. 12 at 538; *see also* Exh. 13 at 576. When the claim term "*method of selectively vasodilating the arteries . . . without inducing significant venous dilation*" is viewed in the context of the '296 patent specification, it is apparent that the patented method is intended to cover a method characterized by vasodilation of arteries (i.e., resulting in the hemodynamic effects of arterial dilation), regardless of whether venous dilation is detectable, so long as the amount of venous dilation is insignificant, and that examples of "significant" venous dilation include venous dilation caused by prior art vasodilators, such as sodium nitroprusside and nitroglycerine.

_____

(...continued)
which shows a statistically significant (P<0.01) drop in mean arterial blood pressure, even though it was only approximately 10% and not physiologically significant. One of ordinary skill would have no difficulty distinguishing these two divergent meanings based on context.

Thus, the '296 patent describes the effects of certain doses of adenosine infusion as compared to treatment with the prior art vasodilators, sodium nitroprusside and nitroglycerine, stating:

> [A]denosine can be used to stimulate cardiac output in patients with low cardiac output states, due for example, to heart surgery, infarct and the like. This apparently is due to adenosine's ability to reduce after-load, without having significant effect on pre-load. In contrast, nitroprusside reduces both after-load and pre-load, and nitroglycerine is effective principally (90%) on reducing pre-load, and has only a marginal effect on after-load.

Exh. 1 at col. 12, lines 49-57.  As discussed above, the terms afterload and preload are hemodynamic references reflecting dilation of arteries and veins respectively. Accordingly, the reference to adenosine's ability to reduce afterload, without having significant effect on preload is a direct reference to the concept of *selectively vasodilating the arteries . . . without inducing significant venous dilation*.  Likewise, the statements concerning nitroprusside ("reduces both after-load and pre-load") refer to that compound's significant vasodilating effects on both arteries and veins and the statement concerning nitroglycerine ("effective principally (90%) on reducing pre-load, and has only a marginal effect on after-load") refers to the predominant venodilating ability of that drug.

In another example, the patent states:

> The enhanced cardiac output obtained with adenosine, in combination with the maintained right and left heart filling pressures, is in contrast with the hemodynamic effects of controlled hypotension with sodium nitroprusside or nitroglycerine, as is shown in Table IV.

> From the foregoing, it is evident that continuous infusion of adenosine during anesthesia is capable of significantly reducing blood pressure without evidence of tachyphylaxis while, at the same time, causing a decrease in peripheral vascular resistance, an increase in cardiac output and a moderate increase in heart rate. This suggests that adenosine acts as a hypotensive agent through dilation of the arterial resistance vasculature. In contrast, sodium

21

nitroprusside and nitroglycerine induce hypotension by both pre-
and post-capillary dilatation.

*Id.* at col. 10, lines 17-25. This passage also refers to the hemodynamic effects of the selective

action of adenosine--which reflect insignificant venous dilation--as opposed to effects of

nitroglycerine and sodium nitroprusside, which involved significant venous (i.e., post-capillary)

vasodilation.

The Federal Circuit has mandated that claims "must be read in view of the specification,

of which they are part" and that the specification remains "the single best guide to the meaning

of a disputed term." *Phillips*, 415 F.3d at 1315. Here, the specification demonstrates that the use

of the term "*method of selectively vasodilating the arteries . . . without inducing significant*

*venous dilation*" is meant to contrast the effect of infusing adenosine in the claimed method to

the effects of the known prior art vasodilators. The claimed method of using adenosine causes,

as discussed above, vasodilation characterized by selective action on arteries without inducing

"significant" (i.e., an "important, weighty, or notable" amount of ) vasodilation of veins. The

selective action on arteries is reflected in hemodynamic parameters such as the "enhanced

cardiac output obtained with adenosine, in combination with the maintained right and left heart

filling pressures" whereas sodium nitroprusside and nitroglycerine resulted in significant

vasodilation of veins, and caused large decreases in those same parameters. *See id.* at col. 9,

lines 46-51, Table IV.[9]

The prosecution history also supports the construction of "*method of selectively*

*vasodilating the arteries . . . without inducing significant venous dilation*," according to its

---

[9]    The data presented in Table IV is based on Dr. Sollevi's initial studies, in which
adenosine was administered following pretreatment with a separate drug, dipyridamole, which
was used to decrease the required dose of adenosine. Dr. Sollevi subsequently learned that
similar effects could be obtained without dipyridamole pretreatment. *See, e.g.,* Exh. 1 at col. 9,
lines 45-47.

ordinary meaning, so as to encompass methods of adenosine infusion that would induce an insignificant amount of venous dilation, as well as those that would not. Although, the prosecution history is considered "less useful for claim construction purposes" than the specification, the Court may consult it to illuminate how the inventor understood the invention and to determine whether the inventor limited the invention during prosecution in a way that would cause the claim scope to be "narrower than it would otherwise be." *See Phillips*, 415 F.3d at 1317. However, the Court must decline to "import limitations to the claims from the specification absent a 'manifest' or explicit exclusion." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

Here, in the relevant exchange between examiner and applicant, the applicant sought to educate the examiner about the three categories of vasodilators known in the art and to describe the hemodynamic changes associated with those categories. *See* Exh. 17 at 3-12. While neither the applicant nor the examiner necessarily recited every word of every limitation during their exchanges, none of the applicants' statements rose to the level of "manifest" or "explicit" exclusion. Indeed, the examiner's continued reference, particularly in the final Office Action to the use of the words "without inducing significant venous dilation" demonstrates that both the applicant and the examiner understood that the claims encompassed methods that would selectively vasodilate arteries yet induce an insignificant amount of venous dilation. *See* Exh. 20 at 3.

### 4. Sicor's Proposed Construction Contradicts the Ordinary Meaning and Renders the Portion of the Claim Concerning Venous Dilation Meaningless

Sicor proposes a construction of *"method of selectively vasodilating the arteries . . . without inducing significant venous dilation"* that contradicts the ordinary meaning of the words in the claim and renders the phrase "without inducing significant venous dilation" meaningless.

Sicor's construction requires breaking the claim term into two parts and construing the parts separately, which leads to absurd results. Specifically, Sicor asserts that the phrase "selectively vasodilating the arteries" means "dilating only arteries and not veins" and that "without inducing significant venous dilation" should be construed separately to mean "the veins are not dilated to any extent that is detectable by conventional means." *See* Joint Proposed Claim Construction Statement (DI #96) at 1. But this proposed construction is, at best, inconsistent and, at worst, improper because it renders the entire portion of the term referring to venous dilation meaningless. *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention.").

Sicor cannot reasonably explain why the claim mentions "without inducing significant venous dilation" if the first half of the claim requires that only arteries and not veins be dilated. Moreover, Sicor's construction would seem to indicate that the first half of the phrase would preclude coverage of a method in which there was a small, albeit undetectable, amount of venous dilation, whereas the second half of the phrase would allow such a method to be covered. Contrary to Sicor's assertion, the only logical way to construe the phrase "*method of selectively vasodilating the arteries . . . without inducing significant venous dilation*" is as a single, coherent claim term.

Sicor apparently believes that claims 1, 3, and 7 should not cover a method of using adenosine for selective arterial vasodilation in which *any* venous dilation occurs. But, as discussed in detail above, the ordinary meaning of the claim language allows for varying degrees of selectivity and only requires that venous dilation be insignificant, not completely absent. Moreover, the Federal Circuit has made clear that a claim construction that excludes preferred

embodiments will rarely, if ever, be correct. *See, e.g., Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.*, 257 F.3d 1364, 1377 (Fed. Cir. 2001) ("We note with great significance that the district court's construction would exclude many of the preferred embodiment experiments.") Sicor's claim construction would preclude coverage of preferred embodiments such as that described in Example V, in which adenosine is administered so as to "reduce after-load, without having significant effect on pre-load," referring to selective arterial vasodilation without significant venous dilation. *See* Exh. 1 at col. 12, lines 52-54.

The Court should reject Sicor's flawed construction in favor of the construction offered by Item and Astellas.

**B.    The Term *"inducing a reduced afterload . . . without reducing the preload"* Should Also Be Given Its Ordinary Meaning**

**1.    The '296 Patent Specification Describes the Ordinary Meaning of *"inducing a reduced afterload . . . without reducing the preload"***

Claim 9 of the '296 patent does not contain the term "*method of selectively vasodilating the arteries . . . without inducing significant venous dilation*" found in claims 1, 3, and 7 and instead refers to a method of "*inducing a reduced afterload . . .without reducing the preload.*" As discussed above, "afterload" and "preload" are hemodynamic terms that relate to parameters that are affected by vasodilation of arteries and veins. The ordinary meaning of "*inducing a reduced afterload . . .without reducing the preload*" in claim 9 is unequivocally set forth in the '296 patent specification, which states, in the context of the invention, that the effect of adenosine is "limited to a cardiac after-load effect. That is, its activity is limited to dilation of arteries and it has little or no effect on cardiac pre-load, i.e., as a dilator of veins." *Id.* at col. 2, lines 39-42. Thus, the meaning of the claim term is similar to the "selectively vasodilating" term in claims 1, 3, and 7 except for the degree of venous dilation, which is referred to as "little or no"

venous dilation in claim 9, as opposed to "without . . . significant" venous dilation in claims 1, 3, and 7. This interpretation and the distinction between the scope of claim 9 and claims 1, 3, and 7 is further supported by the separate reference in the specification to adenosine's ability, through methods of the invention to "reduce after-load, without having significant effect on pre-load." *See id.* at col. 12, lines 52-54.

The prosecution history also supports the reference to Col. 2, lines 39-42, in construing the phrase "*inducing a reduced afterload . . .without reducing the preload.*" Indeed, at the time the claim that matured into claim 9 was added by amendment, the applicant explicitly referred to that same portion of the patent specification as providing support for the amendment. Exh. 17 at 3. Thus, both the specification and the prosecution history reflect the applicant's understanding that the term refers to "dilation of arteries" with "little or no effect" as a dilator of veins.

> **2.      Despite Acknowledging the Reference to *"inducing a reduced afterload . . . without reducing the preload"* in the '296 Patent Specification, Sicor Asserts that the Term Should Be Broken Into Two Parts and Subject to a More Limiting Construction**

Sicor cites to the same portion of the patent specification as Item and Astellas in construing the meaning of "*inducing a reduced afterload . . . without reducing the preload*" but, as with the previous term, Sicor asserts that this term should be broken into two parts, each to be construed separately. *See* Joint Proposed Claim Construction Statement (DI #96) at 3. However, it makes no sense to construe two halves of the same phrase without reference to each other, and Sicor's construction is consequently internally contradictory and flawed. Sicor's construction is also contrary to the Federal Circuit mandate, discussed above, that claim terms be construed in the context in which they are used. *See K-2 Corp.*, 191 F.3d at 1363-64. Sicor asserts that the words "inducing a reduced afterload" should be construed to mean "activity of adenosine is limited to dilation of arteries," but the words "without reducing the preload" should mean

"adenosine has little or no effect as a dilator of veins."  Joint Proposed Claim Construction Statement (DI #96) at 3.  This construction is internally contradictory in that the first part of the term would purport to exclude methods that resulted in "little" venous dilation while the last part of the term would encompass them.

Moreover, Sicor's suggestion that the phrase "inducing a reduced afterload" on its own implies arterial exclusivity makes no sense in view of the fact that the specification describes a prior art vasodilator, sodium nitroprusside, that reduces *both* afterload and preload (i.e., significantly dilates both arteries and veins.) *See, e.g.,* Exh. 1 at col. 12, line 54-55.  Because the patent specification demonstrates that both adenosine and sodium nitroprusside reduce afterload (i.e., dilate arteries), but only adenosine "has little or no effect on cardiac pre-load," the words "inducing a reduced afterload" alone cannot be construed as meaning vasodilation limited to dilation of arteries.  Consequently, the entire claim term *"inducing a reduced afterload . . . without reducing the preload"* must be construed as a single phrase according to the ordinary meaning in the patent specification at col. 2, lines 39-42.

### C.    Sicor's Baseless Suggestion that Item and Astellas Failed to Timely Disclose Their Claim Construction is Contrary to the Court's Scheduling Order

Sicor's objection to Plaintiffs' proposed claim constructions on grounds of timeliness is part of a continuing pattern by Sicor of needlessly multiplying these proceedings and consuming the resources of the parties and the Court by maintaining baseless positions.[10]  Against that

---

[10]    In this and the parallel *King v. Sicor* litigation, Sicor refused to provide initial noninfringement contentions, telling the Court that "defendants had been seriously looking at and assessing the development of a non-infringement position, but doing that requires some scientific analysis" (Disc. Tr. at 7, Dec. 8, 2005) (attached as Exhibit 25).  Yet no such scientific analysis has apparently been done, and indeed none has ever been disclosed. *See, e.g.,* First Notice of Deposition of Sicor, Inc., and Sicor Pharmaceuticals, Inc., pursuant to Fed. R. Civ. P. Rule 30(b)(6) at topics 10 and 11 (DI #37) and April 19, 2006 30(b)(6) Dep. at 93:17-105:21.
(continued...)

backdrop, and contrary to the Court's Scheduling Order and the purpose of the Joint Claim

Construction Statement, Sicor objects to Item and Astellas proffering "any proposed

constructions" of the claim terms on grounds that those constructions "were not timely

disclosed" pursuant to the Scheduling Order in this case. *See* Joint Proposed Claim Construction

Statement (DI #96). During the meet and confer session in connection with the Joint Proposed

Claim Construction Statement, Sicor asserted that the only appropriate entry for Item and

Astellas to include in the Statement would be the words "ordinary meaning," but that no

description of that meaning should be proffered.

Sicor, in effect, suggests that because Item and Astellas believed that the now-disputed

terms should be construed according to their ordinary meaning and did not identify them as "in

need of construction" in the initial exchange of terms each party sought to have construed, they

should not be allowed to offer a description of the ordinary meaning of those terms. But Sicor's

assertion contradicts the Scheduling Order in this matter. That Order contains only two relevant

dates:  a March 2006 date for the parties to "exchange lists of those claim terms they believe

---

(...continued)

*See also* March 17, 2006 30(b)(6) Dep. at 29:20-31:20; and April 19, 2006 30(b)(6) Dep. at 66:10-68:10, 84:14-85:5 (attached as Exhibits 26 (March 17, 2006 30(b)(6) Dep.) and 27 (April 19, 2006 30(b)(6) Dep.). Instead, Sicor filed a meritless motion to amend its noninfringement pleading (Defendant Sicor's Motion for Leave to Amend, Mar. 30, 2006, DI #70) and chose not to offer an expert report on the issue of noninfringement (E-mail from Annemarie Hassett, Esq., Sicor Litigation Counsel, Goodwin Procter LLP, to David Frazier, Esq., Astellas Litigation Counsel, Finnegan, Henderson, Farabow, Garrett & Dunner L.L.P. (July 20, 2006) (attached as Exhibit 28)). While it has conceded infringement in the *King v. Sicor* litigation, Sicor refuses such a concession here (stating that it will not stipulate to infringement *at this time* (Letter from Melanie R. Rupert, Esq., Sicor Litigation Counsel, Goodwin Procter LLP, to Susan Griffen, Esq., Astellas Litigation Counsel, Finnegan, Henderson, Farabow, Garrett & Dunner L.L.P. (August 3, 2006) (emphasis added) (attached as Exhibit 29)) and instead is proceeding to brief its claim construction position despite the fact that no expert will testify that Sicor's product would not infringe if it obtains its desired construction. Likewise, Sicor's expert witness on invalidity issues has not identified claim construction as relevant to any of Sicor's positions.

need construction and their proposed claim construction of those terms" and an August 2006 date for the parties to "agree upon and file the Joint Claim Construction Statement." *See* Scheduling Order (DI #27). Since only Sicor, and not Item or Astellas, believed the terms needed to be construed, only Sicor identified them and provided proposed constructions in March. In August, Plaintiffs Item and Astellas met and conferred telephonically with Sicor to develop the Joint Proposed Claim Construction Statement, and Sicor for the first time raised its current objection. Sicor seems to suggest that Item and Astellas should have responded to Sicor's initial identification of claim terms with a counter proposal. But no such response was called for by the Scheduling Order, which was stipulated to by the parties.

Sicor's suggestion that Item and Astellas should merely recite the phrase "ordinary meaning" in the Joint Claim Construction Statement ignores the fact that even ordinary meanings are often disputed between the parties. *See, e.g., K2 Corp.*, 191 F.3d at 1365 ("We, of course, recognize that the 'ordinary and accustomed' meaning of a claim term will often be in dispute, irrespective of the clarity of the terms used . . . But a dispute over the ordinary and accustomed meaning does not imply that such a meaning does not exist."). The Joint Proposed Claim Construction Statement would be of limited value if, as Sicor suggests, parties relying on the ordinary meaning of a claim term did not actually set forth that meaning in the Statement.

Consequently, Sicor's objection to Item and Astellas describing the ordinary meaning of the terms in question should be overruled as baseless and contrary to the Scheduling Order.

## V.     CONCLUSION

For the reasons set forth above, the Court should adopt the constructions set forth by Item and Astellas in the Joint Claim Construction Statement.


Dated:  August 23, 2006



*Mary Matterer*
Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

   /s/ David E. Brand
Paul M Lukoff #96
David E. Brand #201
PRICKETT JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6520
debrand@prickett.com

John Scheibeler
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 819-8200

*Attorneys for Plaintiff*
*Item Development AB*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of August, 2006, I electronically filed the foregoing document, **PLAINTIFFS' OPENING BRIEF ON CLAIM CONSTRUCTION**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Paul M. Lukoff
David E. Brand
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE 19801

Josy W. Ingersoll
John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 23rd day of August, 2006, the foregoing document was served via email and hand delivery on the above counsel and via email (on 8/23/2006) and federal express (on 8/24/2006) on the following non-registered participants:

John Scheibeler
White & Case, LLP
1155 Avenue of the Americas
New York, NY 10036
212.819.8830
jscheibeler@whitecase.com

Annemarie Hassett
Goodwin Procter LLP
599 Lexington Avenue
New York, NY 10022
212.813.8800
ahassett@goodwinprocter.com

_Mary Matterer_

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Attorneys for Plaintiffs
ASTELLAS US LLC and
ASTELLAS PHARMA US, INC.