# TAB 4

# *Circulation Research*

*An Official Journal of the American Heart Association*

DECEMBER    1980
VOL. 47    NO. 6

## BRIEF REVIEWS

# The Role of Adenosine in the Regulation of Coronary Blood Flow

ROBERT M. BERNE

THE coronary vasculature is influenced by physical (arterial pressure, extravascular compression, hematocrit), neural, and chemical factors, and although there is considerable interplay among these various factors, the predominant one is chemical. Furthermore, the chemical factors of greatest importance are those that take origin from the cardiac parenchymal tissue and serve as a link between myocardial oxygen needs and supply. One of the principal contenders that can serve as a mediator of coronary blood flow (CBF) regulation in response to cardiac metabolic activity is the nucleoside, adenosine (Berne, 1963).

### Criteria for Adenosine as a Mediator of Metabolic Regulation of CBF

For adenosine, or any other vasoactive substance, to play a key role in the metabolic regulation of CBF, certain criteria must be met. (1) The substance must be a potent dilator of the coronary resistance vessels. (2) There must be an endogenous source of the mediator. (3) The substance should have access to the arterioles and be present under basal physiological conditions. (4) The concentration reached in the interstitial fluid (ISF) must be capable of eliciting vasodilation, and there should be a close relationship between the ISF concentration and CBF (dose-response relationship). (5) The time course of oxygen deficit (either decreased oxygen supply or increased oxygen demand) should parallel the increment in CBF. (6) The physiological effect at different concentrations of the endogenous mediator should be mimicked by exogenous administration of the substance. (7) Agents that potentiate or attenuate the action of administered mediator should elicit a similar effect on endogenously liberated mediator. (8) A direct cause-and-effect relationship should be established under all physiological and pathophysiological conditions between change in CBF and adenosine release.

Currently, many but not all of these criteria are fulfilled with respect to the hypothesis that adenosine is indeed the primary mediator in the regulation of CBF. Adenosine is a very active vasodilator. When injected intraarterially in the isolated perfused heart, it elicits marked coronary dilation from $10^{-7}$ to $10^{-5}$M and maximum dilation at $10^{-5}$M concentrations (Schrader et al., 1977a). Even in the blood-perfused heart, adenosine produces marked coronary dilation at concentrations less than those reached with ischemia, despite rapid inactivation by the cellular elements in the blood (Rubio et al., 1969). Furthermore, strips of dog coronary arteries caused to contract with norepinephrine or KCl, relax when adenosine ($10^{-8}$M) is added to the tissue bath and the nucleoside does not exhibit tachyphylaxis (Herlihy et al., 1976).

The source of adenosine is myocardial ATP and possibly to some extent via cyclic AMP (Schrader and Gerlach, 1976). However, little if any change is observed in tissue ATP levels because small and immeasurable decreases in tissue ATP can result in a several-fold increment in adenosine, when oxygen supply is inadequate for cardiac needs (Rubio et al., 1974). It has been reported that ATP, which also is a potent vasodilator, is released from isolated adult rat heart cells subjected to hypoxia (Forrester and Williams, 1977) and isolated perfused guinea pig heart (Paddle and Burnstock, 1974). However, studies in our laboratory have failed to reveal release of ATP from skeletal muscle (Bockman et al., 1975) or into cardiac effluents (Jacob and Berne, 1961), even when the tissues have been subjected to intense, unphysiological conditions, such as contraction during ischemia. Actually, it is virtually impossible to make accurate measurements of ATP in venous blood since the nucleotide is rapidly degraded in blood and also can be released from the cellular elements of the blood (Bockman et al.,

From the Department of Physiology, University of Virginia School of Medicine, Charlottesville, Virginia.

Address for reprints: Robert M. Berne, M.D., Department of Physiology, University of Virginia School of Medicine, Jordan Building, Box 449, Charlottesville, Virginia 22908.

AST0008462

808                              CIRCULATION RESEARCH                    Vol. 47, No. 6, December 1980

1975). In contrast to ATP, it has been demonstrated that adenosine readily crosses the myocardial cell membrane, and hence could reach the arterioles and induce vasodilation (Jacob and Berne, 1960).

The enzyme that produces adenosine from ATP is 5'-nucleotidase. This enzyme, which is thought to be a membrane bound or an "ectoenzyme" is histochemically localized at the myocardial cell margins (sarcolemma, intercalated discs, transverse tubules, and flattened sarcoplasmic reticulum) (Rostgaard and Behnke, 1965; Rubio et al., 1973). However, 5'-nucleotidase may also exist within the external cell membranes and, possibly, within the myocardial cell, since exposure of the external surface of the cardiac cells to an inhibitor of 5'-nucleotidase failed to reduce the production of adenosine by the hypoxic heart (Schrader and Schütz, 1979). Since most, if not all, of the 5'-nucleotidase is associated with the external cell membrane, the latter is the primary site of dephosphorylation of AMP, and adenosine is released into the ISF where it can reach and dilate arterioles without being inactivated by intracellularly located adenosine deaminase. Some of the adenosine in the ISF crosses the capillary wall where a significant fraction is degraded to inosine and hypoxanthine (Rubio et al., 1972), whereas a large fraction of the adenosine in the ISF is taken up by the myocardial cells, rephosphorylated by adenosine kinase to AMP, and reincorporated into the myocardial adenine nucleotides (Wiedmeier et al., 1972). Adenosine enters the cells by facilitated diffusion, and at low extracellular concentrations ($<3$ $\mu$M) it is primarily phosphorylated to AMP rather than deaminated to inosine, presumably because of the lower $K_m$ of adenosine kinase than of adenosine deaminase for the nucleoside (Schrader et al., 1972; Olsson et al., 1972).

Unfortunately, actual levels of adenosine in ISF cannot be measured directly, and also cannot be determined from assay of cardiac lymph because of the degradative enzymes in the cellular elements of lymph, and the prolonged contact with these enzymes as a result of the slow lymph flow (Berne, unpublished observations; Belloni et al., 1977). Calculations of ISF adenosine concentrations based on estimates of the size of the ISF compartment, and pericardial fluid and coronary sinus blood levels of adenosine have been made in the dog, and suggest that there is normally a low concentration of adenosine in the ISF during basal conditions (Rubio and Berne, 1969), and that this increases to levels capable of inducing maximal coronary arteriolar dilation after brief periods of ischemia (Rubio et al., 1969). However, from measurements of adenosine levels in the oxygenated dog heart (Olsson et al., 1978a) and in the isolated perfused guinea pig heart (Schrader and Gerlach, 1976), it was concluded that if all the adenosine were restricted to the ISF, the concentration would be great enough to produce maximal coronary dilation. Existence of an intracellular pool of adenosine in cardiac cells has been

suggested (Schrader and Gerlach, 1976; Olsson et al., 1978a; Frick and Lowenstein, 1978). This pool could be in the form of S-adenosylhomocysteine (Schrader and Schütz, 1979), but it is difficult to understand how this source of adenosine could result in the release of free adenosine into the ISF without the nucleoside being subjected to deamination by the ubiquitous cytosolic adenosine deaminase. One would have to postulate a protective compartment and conveyor of adenosine from the cytosol to the exterior of the myocardial cell. Furthermore, experiments with red cell ghosts (Schrader et al., 1972) and cultured embryonic chick heart cells (Mustafa et al., 1975) indicate that free adenosine is not present within the cells. These disparate results have not been reconciled, and tissue adenosine levels probably do not accurately reflect ISF adenosine concentrations. It is possible that a large fraction of the adenosine is bound to membrane or intracellular protein and is not vasoactive. Studies on dispersed liver cells indicate that there is an adenosine fraction associated with the cells that is not destroyed by incubation of the cells with adenosine deaminase in the medium (Belloni et al., 1980).

With as little as 5 seconds of ischemia, myocardial adenosine levels increase almost 3-fold (Berne et al., 1971; Olsson, 1970), and with progressive hypoxia the adenosine content of the myocardium of the isolated heart, as well as the adenosine released by the heart, correlates well with the increment in coronary flow (Rubio et al., 1974). Furthermore, during reactive hyperemia following 5- and 15-second coronary occlusions, there is a close correlation between the CBF following release of the occlusion and the myocardial adenosine levels (Olsson et al., 1978b). Hence, the time course of the oxygen deficit is reflected in the myocardial adenosine levels. Moreover, in isolated perfused hearts, adenosine infusion shows a dose-response relationship that closely resembles that observed with induced endogenous adenosine release (Schrader et al., 1977a).

The methylxanthines, theophylline and aminophylline, attenuate the vasodilator effects of intraarterially administered adenosine and act as competitive inhibitors of the nucleoside (Bünger et al., 1975). Some investigators have also observed attenuation of reactive hyperemia after the administration of either theophylline or aminophylline (Juhran et al., 1971; Curnish et al., 1972), whereas most investigators have observed either no effect or minimal attenuation (Bittar and Pauly, 1971; Juhran and Dietmann, 1970). One group (Merrill et al., 1978) observed that a reduction in perfusion fluid pH potentiated the vasodilator response to adenosine and proposed that theophylline's inability to attenuate reactive hyperemia regularly might be related to enhanced adenosine-induced dilation caused by decreased tissue pH. The effect of a reduction in pH may in fact augment coronary

091327

AST0008463

vasodilation by increasing myocardial release of adenosine, since a decrease in pH to 7.1 or 6.8 induced by elevation of $Pco_2$ or by HCl in the isolated perfused rabbit heart, significantly increased cardiac adenosine levels and coronary flow (Mustafa and Mansour, 1980).

There are also discrepant results with respect to the potentiating effect of dipyridamole during reactive hyperemia (Miura et al., 1967; Bittar and Pauly, 1970; Juhran et al., 1971). This drug blocks adenosine uptake by cells and thus prevents intracellular metabolism, and hence, disappearance of adenosine, when both dipyridamole and adenosine are administered intraarterially. However, dipyridamole and lidoflazine (a drug with a similar mode of action) have often failed to potentiate reactive hyperemia (Bittar and Pauly, 1970; Bittar and Pauly, 1971; Juhran et al., 1971). In brief, the results with these attenuating and potentiating drugs are controversial and inconclusive, and considerably more work is necessary if these discordant results are to be reconciled.

It is of interest, however, that adenosine deaminase of small molecular size that is capable of crossing the capillary membrane reduces reactive hyperemia in the dog heart by 40% when administered intra-arterially (Olsson, personal communication). This latter observation, as well as many of those cited above, suggests a cause and effect relationship between myocardial adenosine formation and CBF. Nevertheless, absolute proof of this relationship is still lacking.

## Adenosine Production with Increased Cardiac Performance

Some additional support is given the adenosine hypothesis by recent studies on cardiac adenosine formation and release under conditions of increased cardiac work. Most of the early studies dealt with inadequate myocardial oxygen supply, and it was originally proposed that hypoxia was the only stimulus for adenosine production by the heart (Berne, 1963; Rubio et al., 1969). However, increased cardiac pressure work produced by constriction of the aorta in the rat elicited a significant increment in the myocardial adenosine levels (Foley et al., 1978). In these experiments, the animals were not hypoxic, and CBF was undoubtedly enhanced by the high coronary perfusion pressure as well as by a metabolic mechanism. Whether there was some degree of subendocardial ischemia as a result of the increased afterload was not determined.

Aortic constriction also was performed in the open-chest dog and produced an inverse relationship between coronary vascular resistance and the log of the myocardial adenosine content (McKenzie et al., in press). Associated with these changes were significant increases in CBF, myocardial oxygen consumption, peak left ventricular pressure, and peak dP/dt. However, there was no significant increase in lactate content of the myocardium or

decrease in coronary sinus blood pH during aortic constriction, suggesting that the hearts were not hypoxic. In these studies (McKenzie et al., in press), a gradient for adenosine across the free wall of the left ventricle did not occur with aortic constriction. However, administration of isoproterenol changed the endocardial-to-epicardial ratio for adenosine from 0.96 to 2.58 as a result of a reduction in coronary perfusion pressure (blood pressure) in the face of an increase in myocardial oxygen demand. A similar change in the transmural gradient for adenosine occurred in the dog heart subjected to a 50% constriction of the left coronary artery, but was not observed in the normal dog heart (Foley et al., 1979). Hence, there is no evidence to support the hypothesis that the reduced resistance (and vasodilator reserve) of the endocardial vessels that compensates for the greater extravascular resistance and results in equal endocardial and epicardial blood flow is attributable to adenosine. However, it is quite possible that the relatively slow methods of myocardial sampling and inactivation of degradative enzymes mask detection of small differences in the endocardial and epicardial adenosine levels. Obviously, improved methodology is needed, especially since changes in myocardial adenosine levels can occur with extreme rapidity (Berne et al., 1971; Olsson et al., 1970; Thompson et al., 1980).

In another study in the open-chest dog it has been demonstrated that adenosine release parallels cardiac metabolic activity when the latter is increased by stimulation of the stellate ganglia (Miller et al., 1979). In these experiments, 40 ml of Krebs-Henseleit solution were introduced into the pericardial sac via a silastic tube, removed after 4.5-minute contact with the epicardial surface of the heart, and analyzed for adenosine and its degradation products. Control experiments indicated that adenosine levels in the pericardial infusates (although considerably lower than those of the epicardium) served as an accurate index of adenosine production and release by the epicardium. Furthermore, the volume and the contact time of the infusate with the cardiac surface in these experiments did not alter the rate of adenosine release during control or experimental periods. There was a high rate of adenosine turnover between tissue and infusate, as measured with $^{14}C$-labeled adenosine, but enzymes that metabolize adenosine were not leached out of the myocardium. With graded stellate ganglia stimulation, there was excellent correlation among CBF, myocardial oxygen consumption, and adenosine release into the pericardial infusate under conditions in which arterial blood was fully saturated with oxygen. Lactate concentration in myocardium and pericardial infusates increased (possibly in part due to increased arterial lactate levels), but there was no significant change in lactate extraction by the heart with stellate ganglia stimulation. Nor was there a significant change in coronary sinus blood $Po_2$ during periods of experimentally increased cardiac ac-

810                    CIRCULATION RESEARCH            VOL. 47, No. 6, DECEMBER 1980

tivity. Hence, there was no evidence for myocardial hypoxia. Also, the levels of prostaglandin E in the infusate were unchanged with alterations of cardiac metabolic rate.

With a similar technique for assessment of adenosine release, studies were performed in the trained unanesthetized dog (Watkinson et al., 1979). In these experiments, the tube connected to the pericardial sac contained wires for recording of the electrocardiogram and was exteriorized posteriorly and covered by a cloth jacket around the dog's thorax. After complete recovery from the operation, the pericardial infusate was introduced and removed for analysis during control periods (rest), treadmill exercise, and recovery (1 hour after cessation of exercise). Adenosine levels in control and recovery samples were equal, but there was a 2- to 3-fold increase in the adenosine concentration of the infusate collected during exercise. More recent studies of exercise in the dog revealed about a 2-fold increase in heart rate, cardiac output, CBF and myocardial oxygen consumption associated with a decrease in coronary vascular resistance and a 3-fold increase in myocardial adenosine levels after 10 minutes of treadmill exercise at 5 mph and a grade of 20% (McKenzie et al., 1980). These observations strongly support the concept that adenosine is released under physiological conditions in the absence of hypoxia.

The studies with aortic constriction in the rat and dog, and stellate ganglia stimulation and treadmill exercise in the dog, indicate a close relationship between myocardial metabolic activity and CBF. However, they deal with steady state conditions, and if there is a very tight linkage between CBF and cardiac metabolism, and if adenosine serves the role of mediator, then one might expect to observe changes in myocardial adenosine levels during a single cardiac cycle. Therefore, experiments were conducted on the isolated perfused guinea pig heart in which heart rate was reduced to 40-60 beats per minute by crushing the S-A node, substituting $Sr^{2+}$ for a major fraction of the $Ca^{2+}$ in the perfusion fluid, and applying lidocaine to the region of the S-A node (Thompson et al., 1980). In addition, an apparatus was designed to freeze the heart within 50 msec at any desired phase of the cardiac cycle. Myocardial adenosine levels were higher in midsystole than in diastole but the difference was not significant, whereas the sum of adenosine and its degradative products, inosine and hypoxanthine, showed a significant increase during systole. When an adenosine deaminase inhibitor [erythro-9-2(2-hydroxy-3-nonyl) adenine] or a blocker of cellular uptake of adenosine (dipyridamole) was added to the perfusion fluid, so as to prevent adenosine loss, the increment of adenosine during ventricular systole was significant, as was the sum of adenosine, inosine, and hypoxanthine. Hence, it appears that adenosine formation and release is very tightly coupled to cardiac metabolic activity and can serve to produce rapid adjustments of CBF. The steady state changes observed with reduced oxygen supply

or with enhanced oxygen usage could represent the sum of the changes taking place within single cardiac cycles. A summary of the production, action, and fate of adenosine in the heart is schematically shown in Figure 1.

## Regulation of Adenosine Formation

As mentioned earlier in this review, adenosine is formed from 5'-AMP by dephosphorylation catalyzed by the enzyme 5'-nucleotidase, which is located at the cardiac cell margins. This enzyme is about 100 times more active in vitro than in vivo, indicating that it is greatly inhibited in the intact heart (Olsson et al., 1973). A number of substances inhibit 5'-nucleotidase, such as ATP, ADP, and phosphocreatine (Pcr). Since changes in ATP and ADP are essentially undetectable with alterations in cardiac performance, and since ADP is a more potent inhibitor of 5'-nucleotidase than is ATP (Burger and Lowenstein, 1970; Sullivan and Alpers, 1971), increments of ADP at the expense of ATP cannot account for enhanced 5'-nucleotidase activity. Therefore, attention has been focused on Pcr. In vitro studies with purified 5'-nucleotidase from snake venom or from crude enzyme prepared from cardiac tissue indicate that Pcr is a potent inhibitor



FIGURE 1  *Schematic diagram of two myocardial cells, an arteriole and a capillary, to illustrate the formation, action, and fate of adenosine in the heart. Adenosine formed by 5'-nucleotidase at the cell margins can enter the interstitial fluid where it can induce arteriolar dilation, pass through the pericytes and capillary endothelial cells where it is in large part degraded to inosine and hypoxanthine by adenosine deaminase and nucleoside phosphorylase. Further degradation occurs in the erythrocytes by these enzymes. A large fraction of the adenosine is reincorporated into myocardial nucleotide via the salvage pathway, namely by direct phosphorylation catalyzed by adenosine kinase or by synthesis from hypoxanthine. Only a small fraction of the cardiac adenine nucleotides is derived by de novo synthesis from small molecule precursors (Zimmer et al., 1973). ... duced by permission fro*

of the enzyme (Rubio et al., 1979). However, small amounts of free $Mg^{2+}$ (ca 0.4 mM) are capable of reversing the inhibition exerted by Pcr. Extrapolation of these observations to the in vivo situation suggest that with increased myocardial metabolism 5'-nucleotidase activity is increased by a combination of three factors. (1) The most important is probably an increase in free $Mg^{2+}$ that was originally chelated to ATP and is released when enhanced ATP use (the small decrease in the large total cellular pool of ATP is undetectable by present methods). (2) Phosphorylation of ADP by Pcr which results in a reduction of the 5'-nucleotidase inhibitor, Pcr. (3) A small increase in AMP (via the myokinase reaction), the substrate for 5'-nucleotidase in the formation of adenosine. This hypothesis for the regulation of 5'-nucleotidase activity, which requires validation in the in vivo situation, is presented schematically in Figure 2.

## Mechanism of Action of Adenosine

How adenosine elicits relaxation of the coronary vascular smooth muscle is still unknown. One possible mechanism is via production of an increase in



FIGURE 2  *Schematic representation of proposed regulation of 5'-nucleotidase activity and, hence, adenosine formation in the myocardium. Increased energy utilization results in dephosphorylation of ATP to ADP and subsequent rephosphorylation of ADP by phosphocreatine (Pcr). Some of the ADP is dephosphorylated to AMP via the myokinase reaction and, hence, provides more substrate for 5'-nucleotidase. The decrease in Pcr results in less inhibition of 5'-nucleotidase as does a decrease in energy charge (minus sign at input of integrator). However, the key modulator of these input signals is free $Mg^{2+}$ (depicted as a variable resistor). Release of chelated $Mg^{2+}$, as might occur by ATP breakdown, yields free $Mg^{2+}$ which is a powerful disinhibitor of the Pcr effect on 5'-nucleotidase. Hence, the increase in AMP, the decrease in Pcr, and the increase in free $Mg^{2+}$ act together to increase 5'-nucleotidase activity and adenosine formation, which in turn increase CBF to improve oxygen supply to meet the myocardial oxygen requirements. (Reproduced by permission from Rubio et al., 1979.)*

vascular smooth muscle cyclic AMP which has been reported to be associated with vascular smooth muscle relaxation (Triner et al., 1971). In brain slices, adenosine elicits a significant increase in cyclic AMP (Sattin and Rall, 1970), but in strips of media of hog carotid arteries or dog coronary arteries, an increase in cyclic AMP could be produced only at pharmacological concentrations of adenosine (Herlihy et al., 1976). Furthermore, adenosine failed to increase cyclic AMP levels in dispersed smooth muscle cells from rat aorta (Nickols and Brooker, personal communication). Hence, it does not seem likely that this relaxing effect of adenosine on coronary arterioles is via an increment in cyclic AMP.

A more likely possibility is that adenosine blocks calcium uptake by the vascular smooth muscle cells, or that it interferes with calcium utilization in the contractile machinery of the tissue. Studies on skeletal muscle have indicated that adenosine inhibits caffeine-induced rigor which is attributed to excess $Ca^{2+}$ (DeGubareff and Sleator, 1965; Berne et al., 1976). Furthermore, in superfused guinea pig atrium in which the fast sodium channels were blocked with tetrodotoxin or by partial depolarization with $K^+$, and in which the slow inward $Ca^{2+}$ current was evident when the tissue was electrically stimulated in the presence of norepinephrine, the addition of adenosine ($10^{-6}M$) to the bath abolished the induced action potential (Schrader et al., 1974). Destruction of the adenosine by addition of adenosine deaminase promptly restored the slow action potential. Finally, in guinea pig atria, where the overshoot of the slow action potential has a slope of 30 mV per decade change in $Ca^{2+}$, adenosine produced a downward displacement of the curve without changing its slope (Belardinelli et al., 1979). This could be caused by a decrease in the number of $Ca^{2+}$ channels or a decrease in their permeability to $Ca^{2+}$. We have carried out $^{45}Ca^{2+}$ flux studies with media strips of hog carotid and dog coronary arteries and with dispersed vascular smooth muscle cells in the presence and absence of physiological concentrations of adenosine ($10^{-7}M$), but the results to date have been inconclusive. Therefore, although the evidence is suggestive of an adenosine effect via blockage of $Ca^{2+}$ uptake and/or intracellular interference, the mechanism of action of the nucleoside on vascular smooth muscle remains unclear.

It appears that the vasodilator effect of adenosine is initiated by attachment to an adenosine receptor on the coronary myocytes. High molecular weight conjugates of adenosine and AMP that pass through the coronary vascular bed intact fail to enter the myocardial cells, are not inactivated by adenosine deaminase, and are antagonized by theophylline—produce coronary dilation comparable to equimolar concentrations of adenosine or AMP (Olsson et al., 1976; Schrader et al., 1977c). Furthermore, adenosine-induced dilation of the coronary resistance vessels is not affected by adrenergic blocking agents, indicating that the adenosine receptor is separate from the ad

812                    CIRCULATION RESEARCH              VOL. 47, No. 6, DECEMBER 1980

## Interaction of Adenosine with Other Agents

To what extent adenosine acts alone in altering coronary vascular resistance, and to what extent other factors play a significant role, either independently or in conjunction with adenosine, is still obscure. As noted earlier in this review, an increase in hydrogen ion concentration has been found to potentiate the vasodilator action of adenosine (Merrill et al., 1978), probably by increasing the rate of adenosine production by the myocardium (Mustafa and Mansour, 1980). Hence, under conditions of inadequate myocardial oxygenation and acidosis, more adenosine is released by the heart, which results in a greater increase in CBF and restoration of the oxygen balance of the myocardium. Strong evidence for participation of $Po_2$ per se, potassium, calcium, inorganic phosphate, or increase in osmolarity in the regulation of CBF is lacking.

Adenosine also inhibits isoproterenol-induced increases in cardiac contractility (dP/dt) and cyclic AMP, as well as inhibiting adenylate cyclase activity in a membrane fraction of guinea pig heart (Schrader et al., 1977b), and shows similar effects in the isolated perfused rat heart in addition to an inhibition of cyclic AMP-dependent protein kinase and glycogen phosphorylase (Dobson, 1980). Adenosine release is also increased by catecholamines (Katori and Berne, 1966; Wiedmeier and Spell, 1977; McKenzie et al., 1980a, in press), presumably by their enhancment of myocardial metabolism. Hence, adenosine, in addition to increasing CBF, may aid in achieving oxygen balance by opposing the increased contractility and hence the additional oxygen needs of the heart that result from catecholamines or cardiac sympathetic nerve stimulation.

In summary, adenosine fulfills almost all of the criteria for a mediator of metabolic regulation of the coronary circulation and appears to function as the agent that can rapidly adjust CBF to changing oxygen requirements of the heart under different physiological and pathophysiological conditions. However, there are certain problems that still need resolution, such as, (1) whether free and/or bound adenosine is normally in the myocardial cell, and if so, to what extent it arises from 5'-nucleotidase and from S-adenosylhomocysteine, (2) the reason for the different effects of dipyridamole and theophylline (and like compounds) on exogenous and endogenous adenosine, (3) the true ISF concentration of adenosine under different physiological conditions, (4) elucidation of the mechanism of action of adenosine, (5) the means whereby adenosine production by the myocardium is controlled, and (6) definitive evidence for a direct cause-and-effect relationship between cardiac adenosine release and CBF.

## References

Belardinelli L, Rubio R, Berne RM (1979) Blockade of Ca$^{++}$ dependent rat atrial slow action potentials by adenosine and lanthanum. Pfluegers Arch 380: 19–27

Belloni FL, Blair D, Sparks HV (1977) Cardiac lymph and pericardial fluid adenosine concentration in the dog (abstr). Physiologist 20: 7

Belloni FL, Rubio R, Berne RM (1980) Location of adenosine produced by hypoxic liver cells (abstr). Fed Proc 39: 270

Berne RM (1963) Cardiac nucleotides in hypoxia: possible role in regulation of coronary blood flow. Am J Physiol 204: 317–322

Berne RM, Rubio R (1979) Coronary circulation. In Handbook of Physiology, The Cardiovascular System, edited by RM Berne, N Sperelakis. Bethesda, Am Physiol Society pp 873–972

Berne RM, Rubio R, Duling BR (1971) Vasoactive substances affecting the coronary circulation. In Myocardial Ischemia, edited by RS Ross, F Hoffman. Amsterdam Excerpta Medica (Excerpta Medica Foundation. International Congress Series No. 225), pp 28–43

Berne RM, Herlihy JT, Schrader J, Rubio R (1976) Effect of adenosine on contraction of vascular smooth muscle. In Ionic actions on Vascular Smooth Muscle, edited by E Betz. Berlin, Springer-Verlag, pp 137–140

Bittar N, Pauly TJ (1970) Potentiation by dipyridamole of myocardial reactive hyperemia in the dog. Pharm Res Commun 2: 231–242

Bittar N, Pauly TJ (1971) Myocardial reactive hyperemia responses in the dog after aminophylline and lidoflazine. Am J Physiol 220: 812–815

Bockman EL, Berne RM, Rubio R (1975) Release of adenosine and lack of release of ATP from contracting skeletal muscle. Pfluegers Arch 355: 229–241

Bunger R, Haddy FJ, Gerlach E (1975) Coronary responses to dilating substances and competitive inhibition by theophylline in the isolated perfused guinea pig heart. Pfluegers Arch 358: 213–224

Burger RM, Lowenstein JM (1970) Preparation and properties of 5'-nucleotidase from smooth muscle of small intestine. J Biol Chem 245: 6274–6280

Curnish RR, Berne RM, Rubio R (1972) Effect of aminophylline on myocardial reactive hyperemia. Proc Soc Exp Biol Med 141: 593–598

DeGubareff T, Sleator W Jr (1965) Effects of caffeine on mammalian atrial muscle and its interaction with adenosine and calcium. J Pharmacol Exp Ther 148: 202–214

Dobson JG Jr (1980) Adenosine inhibition of catecholamine-elicited contractile and glycogenolytic responses in rat heart (abstr). Fed Proc 39: 1173

Foley DH, Herlihy JT, Thomson CI, Rubio R, Berne RM (1978) Increased adenosine formation by rat myocardium with acute aortic constriction. J Mol Cell Cardiol 10: 293–300

Foley DH, Miller WL, Rubio R, Berne RM (1979) Transmural distribution of myocardial adenosine content during coronary constriction. Am J Physiol 236: H833–H838

Forrester T, Williams CA (1977) Release of adenosine triphosphate from isolated adult heart cells in response to hypoxia. J Physiol (Lond) 268: 371–390

Frick GP, Lowenstein JM (1978) Vectorial production of adenosine by 5'-nucleotidase in the perfused rat heart. J Biol Chem 253: 1240–1244

Herlihy JT, Bockman EL, Berne RM, Rubio R (1976) Adenosine relaxation of isolated vascular smooth muscle. Am J Physiol 230: 1239–1243

Jacob MI, Berne RM (1960) Metabolism of purine derivatives by the isolated cat heart. Am J Physiol 198: 322–326

Jacob MI, Berne RM (1961) Metabolism of adenosine by the isolated anoxic cat heart. Proc Soc Exp Biol Med 107: 738–739

Juhran W, Dietmann K (1970) Zur Regelung der Coronardurchblutung im akuten Sauerstoffmangel. Pfluegers Arch 315: 105–109

Juhran W, Voss EM, Dietmann K, Schaumann W (1971) Pharmacological effects on coronary reactive hyperemia in conscious dogs. Naunyn Schmiedebergs Arch Pharmacol 269: 32–47

Katori M, Berne RM (1966) Release of adenosine from anoxic hearts: Relationship to coronary flow. Circ Res 19: 420–425

McKenzie JE, Steffen RP, West EJ, Haddy FJ (1980) Myocardial adenosine content —

AST0008467

exercising dog (abstr). Fed Proc 39: 1002

McKenzie JE, McCoy FP, Bockman EL (in press) Myocardial adenosine and coronary resistance during increased cardiac performance. Am J Physiol

Merrill GJ, Haddy FJ, Dabney JM (1978) Adenosine, theophylline and perfusate pH in the isolated, perfused guinea pig heart. Circ Res 42: 225–229

Miller WL, Belardinelli L, Bacchus A, Foley DH, Rubio R, Berne RM (1979) Canine myocardial adenosine and lactate production, oxygen consumption and coronary blood flow during stellate ganglia stimulation. Circ Res 45: 708–718

Miura M, Tominaga S, Hashimoto K (1967) Potentiation of reactive hyperemia in the coronary and femoral circulation by the selective use of 2,6-Bis (diethanolamine)-4,8-dipiperidino-pyrimido [5,4]pyrimidine. Arzneim Forsch 17: 976–979

Mustafa SJ, Mansour MM (1980) Relationship between H⁺ and adenosine in the regulation of coronary blood flow (abstr). Fed Proc 39: 1002

Mustafa SJ, Rubio R, Berne RM (1975) Uptake of adenosine by dispersed chick embryonic cardiac cells. Am J Physiol 228: 62–67

Olsson RA (1970) Changes in content of purine nucleoside in canine myocardium during coronary occlusion. Circ Res 26: 301–306

Olsson RA, Snow JA, Gentry MK, Frick GP (1972) Adenosine uptake by canine heart. Circ Res 31: 767–778

Olsson R, Gentry MK, Townsend RS (1973) Adenosine metabolism: Properties of dog heart microsomal 5'-nucleotidase. In Current Topics in Coronary Research, edited by CM Bloor, RA Olsson. New York, Plenum Press, pp 27–39

Olsson RA, Davis CJ, Khouri EM, Patterson RE (1976) Evidence for an adenosine receptor on the surface of dog coronary myocytes. Circ Res 39: 93–96

Olsson RA, Vomacka RM, Nixon DG (1976a) Adenosine-binding factors in cardiac muscle (abstr). Fed Proc 37: 416

Olsson RA, Snow JA, Gentry MK (1978b) Adenosine metabolism in canine myocardial reactive hyperemia. Circ Res 42: 358–362

Paddle BM, Burnstock G (1974) Release of ATP from perfused heart during coronary vasodilatation. Blood Vessels 11: 110–119

Rostgaard J, Behnke O (1965) Fine structured localization of adenine nucleoside phosphatase activity in the sarcoplasmic reticulum and the T system of rat myocardium. J Ultrastruc Res 12: 579–591

Rubio R, Berne RM (1969) Release of adenosine by the normal myocardium in dogs and its relationship to the regulation of coronary resistance. Circ Res 25: 407–415

Rubio R, Berne RM, Katori M (1969) Release of adenosine in reactive hyperemia of the dog heart. Am J Physiol 216: 56–62

Rubio R, Wiedmeier VT, Berne RM (1972) Nucleoside phosphorylase: localization and role in the myocardial distribution of purines. Am J Physiol 222: 550–555

Rubio R, Berne RM, Dobson JG Jr (1973) Sites of adenosine production in cardiac and skeletal muscle. Am J Physiol 225: 938–953

Rubio R, Wiedmeier VT, Berne RM (1974) Relationship between coronary blood flow and adenosine production and release. J Mol Cellular Cardiol 6: 561–566

Rubio R, Belardinelli L, Thompson CI, Berne RM (1979) Cardiac adenosine: Electrophysiological effects, possible significance in cell function, and mechanisms controlling its release. In Physiological and Regulatory Functions of Adenosine and Adenine Nucleotides, edited by HP Baer, GI Drummond. New York, Raven Press, pp 167–182

Sattin A, Rall TW (1970) The effect of adenosine and adenine nucleotides on the cyclic adenosine 3',5'-phosphate content of guinea pig cerebral cortex slices. Mol Pharmacol 6: 13–23

Schrader J, Gerlach E (1976) Compartmentation of cardiac adenine nucleotides and formation of adenosine. Pfluegers Arch 367: 129–135

Schrader J, Schutz W (1979) Sites of adenosine production in the hypoxic heart (abstr). Fed Proc 38: 1037

Schrader J, Berne RM, Rubio R (1972) Uptake and metabolism of adenosine by human erythrocyte ghosts. Am J Physiol 223: 159–166

Schrader J, Rubio R, Berne RM (1974) Inhibition of slow action potentials of guinea pig atrial muscle by adenosine: a possible effect of Ca²⁺ influx. J Mol Cell Cardiol 7: 427–433

Schrader J, Haddy FJ, Gerlach E (1977a) Release of adenosine, inosine and hypoxanthine from the isolated guinea pig heart during hypoxia, flow-autoregulation and reactive hyperemia. Pfluegers Arch 369: 1–6

Schrader J, Baumann G, Gerlach E (1977b) Adenosine as inhibitor of myocardial effects of catecholamines. Pfluegers Arch 372: 29–35

Schrader J, Nees S, Gerlach E (1977c) Evidence for a cell surface adenosine receptor on coronary myocytes and atrial muscle cells: Studies with an adenosine derivative of high molecular weight. Pfluegers Arch 369: 251–257

Sullivan JM, Alpers JB (1971) In vitro regulation of rat heart 5'-nucleotidase by adenine nucleotides and magnesium. J Biol Chem 246: 3057–3063

Thompson CI, Rubio R, Berne RM (1980) Changes in adenosine and glycogen phosphorylase activity during the cardiac cycle. Am J Physiol 238: H389–H398

Triner L, Nahas GG, Vulliemoz Y, Overweg, NIA, Verosky M, Habif DV, Ngai SH (1971) Cyclic AMP and smooth muscle functions. Ann NY Acad Sci 185: 458–476

Watkinson WP, Foley DH, Rubio R, Berne RM (1979) Myocardial adenosine formation with increased cardiac performance in the dog. Am J Physiol 236: H13–H21

Wiedmeier VT, Spell LH (1977) Effects of catecholamines, histamine and nitroglycerin on flow, oxygen utilization, and adenosine production in the perfused guinea pig heart. Circ Res 41: 503–508

Wiedmeier VT, Rubio R, Berne RM (1972) Incorporation and turnover of adenosine-U-¹⁴C in perfused guinea pig myocardium. Am J Physiol 223: 51–54

Zimmer HG, Trendelenburg C, Kammermeier H, Gerlach E (1973) De novo synthesis of myocardial adenine nucleotides in the rat. Circ Res 32: 635–642

091332

AST0008468

# TAB 5

# Congestive Heart Failure

*Pathophysiology, Diagnosis, and*
*Comprehensive Approach to Management*

## Second Edition

**Editors**

**Jeffrey D. Hosenpud, M.D.**
*Northwestern Mutual Life Professor of Medicine*
*Division of Cardiovascular Medicine*
*Medical College of Wisconsin*
*Milwaukee, Wisconsin*

**Barry H. Greenberg, M.D.**
*Professor of Medicine*
*Director, Heart Failure/Cardiac Transplantation Program*
*University of California, San Diego*
*San Diego, California*

LIPPINCOTT WILLIAMS & WILKINS

*Congestive Heart Failure*, Second Edition,
edited by Jeffrey D. Hosenpud and
Barry H. Greenberg.
Published by Lippincott Williams & Wilkins,
Philadelphia 2000.

## CHAPTER 4

# Abnormalities in Cardiac Contraction: Systolic Dysfunction

Blase A. Carabello

To sustain life, the heart must pump a cardiac output adequate to supply the tissues' needs for nutrients. In providing this perfusion, the ventricles must generate enough pressure to overcome the resistance offered by the systemic and pulmonary circulations. This vital function of the heart as a pump is best described by Ohm's law as it applies to the circulation, where $BP = CO \times TR$, where $BP$ = blood pressure, $CO$ = cardiac output, and $TR$ = total resistance. Cardiac output in turn is maintained by the cyclical contraction and relaxation of the ventricles, which generate pressure and propel blood forward. If the heart fails to perform its function, failure can only occur in three ways: (a) failure of proper cycle generation (i.e., arrhythmia), (b) failure to relax properly (diastolic dysfunction), or (c) failure to contract properly (systolic function). This chapter will address systolic dysfunction. It will define the components of systolic mechanics and ways of measuring abnormalities of these components in the overall assessment of systolic dysfunction.

## DETERMINANTS OF CARDIAC OUTPUT

Cardiac output is the product of the volume ejected from either ventricle during one beat (stroke volume) and the heart rate. Stroke volume is obtained by measuring cardiac output using a variety of means (e.g., Fick, dye dilution, and thermodilution) and dividing by heart rate or by analyzing cardiac images to obtain end-diastolic and end-systolic volumes. Certainly maintenance of an adequate stroke volume is important to the pa-

tient, but obtaining the value for stroke volume gives little information about overall cardiac function or about whether systolic dysfunction exists. For instance, in hemorrhagic shock the underfilled ventricles have a greatly reduced stroke volume even though the ventricles themselves may be perfectly normal. Conversely, in dilated cardiomyopathy a left ventricle ejecting only 20% of an end-diastolic volume of 400 mL maintains a normal stroke volume (80 mL) despite what is obviously severe systolic dysfunction.

To evaluate systolic function, one must take into account the four basic properties that determine stroke volume: preload, afterload, contractility, and myocardial mass. Stroke volume varies directly with preload and contractility and inversely with afterload. Additionally, the innate size (mass) of the muscle composing the ventricle is a key determinant of stroke volume; that is, an elephant's heart produces a greater stroke volume than a rat's heart, regardless of preload, afterload, or contractility. Furthermore, when the myocardium is overloaded by requirements to generate excess pressure or volume, the major form of long-term compensation is the development of hypertrophy. When the stress is a volume overload, new sarcomeres are laid down in series, producing an increase in myocardial mass as well as chamber volume (eccentric hypertrophy). When the stress is a pressure overload, new sarcomeres are laid down in parallel, producing increased wall thickness (concentric hypertrophy), which increases myocardial mass but not chamber volume. In evaluating overall cardiac function, myocardial mass and hypertrophy must be considered together with preload, afterload, and contractility. For instance, in aortic stenosis, the left ventricle may be able to develop a systolic pressure of 270 mm Hg by a doubling of left ventricular mass.

B. A. Carabello: Department of Medicine, Baylor College of Medicine and Houston Veterans Affairs Medical Center, Houston, Texas.

68 / PATHOPHYSIOLOGY OF HEART FAILURE

However, even though the pressure-generating ability of the entire chamber is increased, individual units of myocardium actually may have depressed contractility (1,2).

### Preload and Measures of Preload

The Frank-Starling law of the heart indicates that as end-diastolic volume and diastolic sarcomere stretch increase, force generation increases (3). According to the sliding filaments theory, increased force generation occurs with increased sarcomere stretch up to 2.2 μm. At this sarcomere length, the thin actin filaments are stretched to a configuration allowing maximal cross-bridge interaction with the thick myosin filaments (Fig. 4.1) (4,5). The term *preload* is intimately linked to the Frank-Starling concept, although no exact definition of preload is universally accepted. Most authorities define preload as the actual sarcomere stretch that exists at the end of diastole. However, others define preload

as the force that causes this sarcomere stretch. The difference in definition can lead to real discrepancies in the concept of preload. For instance, in hypertrophic states where ventricular compliance can be reduced, increased diastolic distending force actually may cause less than normal sarcomere stretch (6). In this case, preload increased or decreased? Because it is the actual presystolic sarcomere stretch that affects systolic contraction, I favor end-diastolic sarcomere length as the most precise definition of preload. Thus, in the case above, preload is reduced despite increased filling pressure. Unfortunately, defined in this way, preload is difficult to evaluate except in research settings where actual sarcomere length can be obtained. In clinical practice, preload is inferred from end-diastolic pressure, end-diastolic stress, or end-diastolic dimension or volume. Each has its inherent limitation in the assessment of preload. For instance, an end-diastolic pressure of 15 mm Hg might cause near-maximum sarcomere stretch in one patient with a compliant ventricle and much





**FIG. 4.1.** Top panel (**A**) is a schematic of a sarcomere. The thin filaments (actin) are attached at the Z band. The length of two actin filaments as they extend from the Z band is denoted by *b*. The length of a thick filament (myosin) is denoted by *a*. Tension is correlated with sarcomere stretch in panels **B** and **C**. Position number 1 shows extreme sarcomere stretch where neither actin filament can interact with the myosin filament; thus, tension development is zero. Positions 2 and 3 demonstrate situations of maximum actin myosin overlap; thus, tension production is maximal. In positions 4 and 5, the sarcomere has been shortened such that the actin filaments overlap one another, preventing cross-bridge attachment in the overlapping areas, reducing tension development. In position 6 there is complete actin overlap, preventing any cross-bridging with the myosin, and the tension development again is zero. Reproduced from Braunwald et al. (57).

less sarcomere stretch in another patient with a less compliant ventricle. In these two patients the same end-diastolic pressure produces different preload (sarcomere stretch). End-diastolic stress that takes into account geometry and chamber thickness examines the force producing sarcomere stretch. Although more sophisticated, it shares the same limitations as end-diastolic pressure. A given end-diastolic stress will stretch the sarcomeres to a greater degree in more compliant ventricles than in less compliant ventricles. Fortunately, both end-diastolic pressure and end-diastolic stress may be used as relative indicators of preload if compliance in a given patient has not changed. Thus, although one cannot be certain what the sarcomere stretch is in a given patient, if end-diastolic pressure is increased from 15 to 20 mm Hg it is likely that preload has increased unless compliance has become reduced.

End-diastolic dimension or volume is obviously in part dependent on sarcomere stretch. As stretch goes up, end-diastolic dimension (or volume) must also go up. However, if eccentric cardiac hypertrophy has intervened, more sarcomeres stretched to a lesser degree produce the same end-diastolic dimension as fewer sarcomeres stretched to a greater degree in the normal heart. Thus, neither dimension nor volume is a precise measurement of preload. Like end-diastolic pressure and stress, end-diastolic dimension and volume can be used as relative indicators of preload. If end-diastolic dimension in a given patient is increased acutely, it is certain that preload has increased. On the other hand, if in the same patient a volume overload has been interposed and end-diastolic dimension is examined 3 months after volume overloading, an increased diastolic dimension could be due to either increased preload, eccentric hypertrophy (increased number of series sarcomeres), or both.

In summary, sarcomere stretch probably is the best definition for preload because it is this property that is one of the key determinants of systolic function. However, no precise, easily obtained method is available for determining this property. End-diastolic pressure, stress, dimension, and volume if increased acutely in a given patient usually indicate that preload is increased. Unfortunately, because compliance differs from ventricle to ventricle and because the presence of eccentric cardiac hypertrophy may alter end-diastolic length or volume independent of sarcomere stretch, none of these measures can be used as an absolute measure of preload when comparing one patient or one ventricle with another.

## Afterload and Measures of Afterload

Afterload is the force that the ventricular myocardium must overcome in order to shorten. It is the force that resists contraction. As this force increases, a ventricle of given strength will be less capable of overcoming the force and will shorten less completely to a greater end-systolic dimension or volume. Thus, evaluation of afterload is important in assessing overall ventricular performance. For instance, under high afterload, a ventricle of normal strength may be unable to shorten normally and thus will appear to have depressed function. This situation has been termed *afterload mismatch* (7). It can cause the erroneous judgment that ventricular muscle strength is reduced when in fact excess afterload is the cause for the poor ventricular performance.

Peripheral resistance, systolic pressure, systolic stress, and systolic impedance all have been used to assess afterload. Total peripheral resistance has several limitations as an indicator of afterload. Mathematically, peripheral resistance = mean arterial pressure ÷ cardiac output. In turn, mean arterial pressure = (2 × diastolic pressure + systolic pressure) ÷ 3.

Thus, mean arterial pressure is predominantly determined by a *diastolic* property. Consequently, total peripheral resistance makes a significant departure from the definition of afterload—the *systolic* force against which the heart contracts. Although flow occurs only during systole in the proximal aorta, in the periphery flow is less pulsatile and is present during both systole and diastole. Because most of the peripheral resistance occurs distally at the arteriolar level, some of the flow opposed by this resistance occurs during diastole. Thus, total peripheral resistance is inherently limited as an indicator of afterload by dependence on a diastolic factor. This is probably a key reason why Lang and his colleagues have demonstrated that there may be significant discrepancies between total peripheral resistance and other more succinct indicators of afterload (8).

Systolic pressure also is used as an indicator of afterload. Because pressure is equal to force divided by area, systolic force is incorporated into the expression of pressure; thus, systolic pressure does relate to afterload. Pressure is an expression of the total force that the ventricle must overcome; thus, systolic pressure represents chamber afterload. However, pressure is not normalized for the myocardial mass present. If ventricular hypertrophy is present, there is more muscle to bear the load. In this case, normalization for the amount of myocardium present is needed to examine afterload on individual muscle fibers in assessing myocardial strength. Here, examination of wall stress is a better indicator of myocardial load than pressure. Wall stress in its simplest definition is stated by the Laplace relationship: stress = $(p \times r) \div 2h$, where $p$ = pressure, $r$ = radius, and $h$ = thickness. Stress normalizes the pressure in the ventricle for its radius and thickness and thus examines the force that a unit of myocardium must generate during systole in order to shorten.

Although wall stress examines forces occurring in the ventricle itself, stress neglects coupling with vasculature,

which is the actual source of the resistance (afterload) against which the ventricle must contract. In this respect, aortic impedance is a useful indicator of afterload. Descriptively, aortic impedance is the vascular resistance against which the ventricle contracts in systole and differs from total peripheral resistance, which as noted above is both a systolic and diastolic phenomenon. Impedance can be measured by examining the Fourier analysis of the instantaneous relationship between systolic aortic pressure and flow. Unfortunately, impedance loses its usefulness as a descriptor of afterload in aortic stenosis or in situations such as mitral regurgitation, where ejection from the left ventricle into more than one chamber occurs. During mitral regurgitation, ejection from the ventricle occurs both into the left atrium as well as into the aorta; thus, aortic impedance only examines partial afterload. In many severe cardiac diseases, ventricular dilatation leads to some mitral regurgitation and diminishes impedance as a useful tool for measuring afterload.

## CONTRACTILITY

Contractility is the ability of the myocardium to develop force independent of loading conditions. In essence, it is the strength of the ventricle. It is this property that is best related to prognosis. Diseases that lead to a reduction in contractility lead to progressive cardiovascular deterioration and eventually to death. Thus, it is not surprising that there have been multiple attempts to measure this prognostic property in both experimental and clinical settings. However no "contractilometer" exists; that is, there is no simple, precise way to measure ventricular contractility. The ideal index of contractility should be independent of preload, afterload, and myocardial mass but also should be sensitive to small changes in inotropic state. No currently available index entirely fulfills these criteria. The following section reviews some of the indices of contractility that have been used and examines their assets and limitations.

### Isovolumic Indices of Ventricular Contractility

As the name implies, isovolumic indices examine ventricular contraction during the period of isovolumic systole; that is, after the atrioventricular valves have closed but before the semilunar valves have opened. The cornerstone of the isovolumic indices of contractile function is the rate of change of ventricular pressure ($P$) development ($dp/dt$). In theory, this rate of change reflects the velocity of contractile element shortening before the elastic elements are stretched to the point where they cause overall ventricular shortening (the point at which the semilunar valves open and volume is ejected from the ventricle). Examination of left ventricular $dp/dt/P$ (velocity of shortening) at various pressures before the opening of the aortic valve can be used to extrapo-



FIG. 4.2. Velocity of shortening of a papillary muscle is plotted against load in the control state and in the presence of norepinephrine at several different loads. Extrapolation of these curves to zero load would give the velocity of shortening at zero load ($V_{max}$). Norepinephrine (NE) obviously increased $V_{max}$, indicating increased contractility. Reproduced from Braunwald et al. (57).

late to the velocity that might have occurred if no pressure were present in the ventricle (9). This property, termed $V_{max}$, is equivalent to the maximum velocity of contractile element shortening if no load were present (Fig. 4.2); it was originally thought to be a good indicator of contractile function. $V_{max}$ is sensitive to changes in contractile state (10). However, some dependence on preload and the need to extrapolate to a theoretical, unconfirmable state has reduced enthusiasm for its use (11). Furthermore, the index was unable to separate patients with clear contractile dysfunction from normal subjects in two important clinical studies, obviously raising questions about the clinical usefulness of $V_{max}$ as an accurate index of contractile function (12,13).

### Ejection Phase Indices of Contractile Function

The ejection phase indices of contractile function examine ventricular performance from end-diastole to end-systole. The two most popular such indices are ejection fraction and the mean velocity of circumferential fiber shortening. Ejection fraction is equal to the stroke volume divided by the end-diastolic volume. Descriptively, it is the percentage of the end-diastolic volume that is ejected during systole. As such, it does not examine force generation (which is part of the definition of contractility), but rather examines the global shortening performance of the ventricle. Ejection fraction has two



**FIG. 4.3.** Ejection fraction (*EF*, left hand panel) and the mean velocity of circumferential fiber shortening (*V*ct, right hand panel) are plotted against end-systolic stress (*ESS*). The slope of the normal relationship and the 95% confidence limits are demonstrated. Patients with valvular disease who had a satisfactory outcome at surgery (○) and those patients with a poor outcome (▲) are plotted against the normal relationships. As can be seen, most patients with a poor outcome fell down and to the left of the normal relationship, indicating that they had reduced contractile function prior to surgery. Reproduced from Caraballo et al. (27).

First, in a large variety of clinical and experimental circumstances it has been an excellent prognostic indicator of outcome and thus has clinical relevance (14). Second, it is easy to obtain and dimensionless and thus can be applied to virtually any patient or experimental subject. Its major drawback (besides the theoretic consideration that it does not examine force generation) is that it is not dependent only on contractility (the property one wishes to measure) but is also dependent on preload and afterload (15,16). This fact may cause ejection fraction to lead to erroneous conclusions regarding contractility. For example, in mitral regurgitation, where preload is greatly increased and afterload is normal or reduced (17,18), ejection fraction is enhanced by these favorable loading conditions and will overestimate contractility (19). Conversely, in aortic stenosis, where afterload may be increased, ejection fraction may be reduced by afterload mismatch rather than by depressed contractility; thus, ejection fraction may underestimate contractile function in this disease (20).

The mean velocity of circumferential fiber shortening is defined as the shortening fraction divided by ejection time [$(EDD - ESD) \div (EDD \times ET)$, where $EDD$ = end-diastolic dimension, $ESD$ = end-systolic dimension, and $ET$ = ejection time]. This index depends less on preload than does ejection fraction (21). However, like ejection fraction, the mean velocity of circumferential fiber shortening ($V_{cf}$) is also afterload dependent.

### Afterload-Corrected Ejection Phase Indices

Because ejection fraction and $V_{cf}$ are afterload dependent, plotting them against existing afterload (Fig. 4.3) helps correct for the afterload present. As shown, ejec-

tion fraction and $V_{cf}$ are inversely but linearly related to afterload (wall stress). A given individual can be plotted against the normal ejection fraction–end-systolic stress or $V_{cf}$–end-systolic stress relationship to examine contractile function (1,22). A patient whose plot is downward and to the left of this relationship demonstrates decreased ejection performance for a given amount of afterload. In this circumstance, excess afterload cannot explain reduced ejection performance (because excess afterload is not present) and the reduced ejection performance is thus likely due to reduced contractile function. This relationship has been used in many studies effectively to imply contractile function. However, to date no universal slope, intercept, and confidence intervals for these relationships have been agreed. Therefore, each laboratory must develop its own relationship from normal subjects against which patients will be plotted.

### END-SYSTOLIC INDICES OF CONTRACTILITY

#### End-Systolic Volume

End-systolic volume or dimension is dependent on contractile state, afterload, and left ventricular myocardial mass but is not dependent on preload (23). Therefore, by examining end-systolic dimension or end-systolic volume instead of the entire ejection phase, preload is removed as a confounding influence in the determination of contractile function. Not surprisingly, in disease states where preload is exaggerated, such as in aortic and mitral regurgitation, end-systolic volume or end-systolic dimension have been valuable indicators regarding the timing of surgery (24–27). As end-systolic dimension or volume increases there is a proportion-

# EXHIBIT E



2006 WL 1731192                                                                                Page 1
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
**(Cite as: 2006 WL 1731192 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
CIBA SPECIALTY CHEMICALS
CORPORATION, Plaintiff,
v.
HERCULES, INC., and Cytec Industries, Inc.,
Defendants.
**No. CIV.A.04-293-KAJ.**

June 20, 2006.

**Background:** Patentee brought patent infringement action against alleged infringers, who jointly marketed product that allegedly infringed patents for composition, methods of production, and uses of polymeric microparticles, or microbeads. Patentee filed motion for partial summary judgment of infringement, and one alleged infringer filed motions for summary judgment of noninfringement and partial summary judgment limiting damages.

 **Holdings:** The District Court, Jordan, J., held that:
 (1) patent for composition and methods of production of polymeric microparticles was not infringed, and
 (2) patent for uses of polymeric microparticles was not infringed.
 Motion for summary judgment of infringement denied; summary judgment of noninfringement granted.

**[1]** Patents ⛎**226.6**

291k226.6 Most Cited Cases
A patent infringement analysis involves two steps, claim construction and then the application of the construed claim to the accused process or product; the first step, claim construction, has been held to be purely a matter of law, while the second step, application of the claim to the accused product, is a fact-specific inquiry.

**[2]** Patents ⛎**312(4)**
291k312(4) Most Cited Cases

A patent owner has the burden of proving infringement by a preponderance of the evidence.

**[3]** Patents ⛎**323.2(2)**
291k323.2(2) Most Cited Cases
Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury.

**[4]** Patents ⛎**314(5)**
291k314(5) Most Cited Cases
Patent claims are construed as a matter of law.

**[5]** Patents ⛎**161**
291k161 Most Cited Cases
The words of a patent claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.

**[6]** Patents ⛎**159**
291k159 Most Cited Cases

**[6]** Patents ⛎**161**
291k161 Most Cited Cases

**[6]** Patents ⛎**165(1)**
291k165(1) Most Cited Cases

**[6]** Patents ⛎**168(2.1)**
291k168(2.1) Most Cited Cases
To determine the ordinary meaning of a patent term, the court should review the same resources as would a person of ordinary skill in the art, including the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

**[7]** Patents ⛎**165(3)**
291k165(3) Most Cited Cases
Patent claims themselves provide substantial guidance as to the meaning of particular claim terms, including both the context in which a term is used in the asserted claim and the other claims of the patent in question which are useful for understanding the ordinary meaning.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1731192                                                                                                    Page 2
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
**(Cite as: 2006 WL 1731192 (D.Del.))**

**[8]** Patents 🔑167(1)

291k167(1) Most Cited Cases

A patent specification is always highly relevant to the claim construction analysis, and usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

**[9]** Patents 🔑167(1)

291k167(1) Most Cited Cases

Patent claims must be read in view of the specification, of which they are a part.

**[10]** Patents 🔑165(3)

291k165(3) Most Cited Cases

The construction of a patent claim that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

**[11]** Patents 🔑162

291k162 Most Cited Cases

**[11]** Patents 🔑167(1.1)

291k167(1.1) Most Cited Cases

On occasion, a patent specification may reveal a special definition given to a claim term that differs from the meaning it would otherwise possess, and in such cases, the inventor's lexicography governs.

**[12]** Patents 🔑167(1.1)

291k167(1.1) Most Cited Cases

A patent specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor, which is regarded as dispositive.

**[13]** Patents 🔑168(2.1)

291k168(2.1) Most Cited Cases

In construing patent claims, a court should consider the patent's prosecution history, which, like the specification, provides evidence of how the Patent and Trademark Office and the inventor understood the patent.

**[14]** Patents 🔑159

291k159 Most Cited Cases

In construing patent claims, a court may rely on extrinsic evidence, which is all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises; in particular, dictionaries, and especially technical dictionaries, have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology.

**[15]** Patents 🔑159

291k159 Most Cited Cases

In construing patent claims, extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of claim language.

**[16]** Patents 🔑157(1)

291k157(1) Most Cited Cases

During patent claim construction, the sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.

**[17]** Patents 🔑101(2)

291k101(2) Most Cited Cases

The term "cross-linking agent," within meaning of patent for polymeric microparticle composition and methods of production, meant a chemical agent that was polyfunctional in that it had at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together, and did not include polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate, nor compounds containing only polyethylene oxide groups or impurities with double bonds or hydroxyl groups; narrow definition of cross-linking did not refer to only particular embodiment of invention, broader definition of cross-linking was not imported from other patent, as claimed by patentee, and statements made during prosecution history demonstrated a narrow understanding of cross-linking.

**[18]** Patents 🔑161

291k161 Most Cited Cases

**[18]** Patents 🔑167(1)

291k167(1) Most Cited Cases

A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim but in the context of the entire patent, and therefore the patent specification is the single best guide to the meaning of a disputed term.

**[19]** Patents 🔑167(1.1)

291k167(1.1) Most Cited Cases

To decide whether a patent's language should be read as a description of the invention or of a particular embodiment of the invention, the language must be read in context; the manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1731192                                                                                    Page 3
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
(Cite as: 2006 WL 1731192 (D.Del.))

**[20]** Patents 🔑168(2.1)

291k168(2.1) Most Cited Cases
The prosecution history of a patent can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

**[21]** Patents 🔑168(2.1)

291k168(2.1) Most Cited Cases
The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.

**[22]** Patents 🔑101(2)

291k101(2) Most Cited Cases

**[22]** Patents 🔑168(3)

291k168(3) Most Cited Cases
Patents.

The term "microbead," within the meaning of patent for uses of polymeric microparticles, or microbeads, in making paper, was a product formed by the polymerization of monomers, and microbead was required to be an integral unit which could be separated from any emulsifier present; statements in prosecution history distinguishing "microbead" as described in patent from similar product in previously existing patent limited scope of the term "microbead."

**[23]** Patents 🔑323.2(5)

291k323.2(5) Most Cited Cases
Sua sponte summary judgment of noninfringement was warranted as to second alleged infringer upon grant of summary judgment of noninfringement to first alleged infringer, even though only first alleged infringer had moved for summary judgment of noninfringement, since patentee's infringement action applied to one product jointly marketed by alleged infringers, and therefore first infringer's arguments applied equally to action against second infringer, and patentee had notice and opportunity to respond to all arguments.

**[24]** Patents 🔑229

291k229 Most Cited Cases

**[24]** Patents 🔑250

291k250 Most Cited Cases
Patent for composition and methods of production of polymeric microparticles, or "microbeads," was not infringed by product jointly marketed by alleged infringers; chemical groups present in accused product were not "cross-linking" agents within meaning of patent in that those chemical groups were also present in molecules specifically disclaimed as being "cross-linking" agents during prosecution of patent, and even if impurities were present in accused product, and accused product reacted differently than products discussed in prosecution history, the impurities also did not qualify as "cross-linking" agents, and the differences between accused product and product in prosecution history did not raise issue of fact as to infringement.

**[25]** Patents 🔑237

291k237 Most Cited Cases
In a patent infringement case, evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement.

**[26]** Patents 🔑250

291k250 Most Cited Cases
Patent for uses of polymeric microparticles, or "microbeads," was not infringed by product jointly marketed by alleged infringers; accused product was an emulsifier which formed covalent cross-links with polymeric microparticles, whereas patent required that microparticles be integral units that could be separated from emulsifier.

Patents 🔑328(2)

291k328(2) Most Cited Cases
4,659,431, 4,681,912. Cited as Prior Art.

Patents 🔑328(2)

291k328(2) Most Cited Cases
5,167,766, 5,171,808. Not Infringed.

Frederick L. Cottrell, III, Jeffrey L. Moyer, Chad M. Shandler, Richards, Layton & Finger, P.A., Wilmington, DE, Leydig, Voit & Mayer, Ltd., Chicago, IL (Gordon R. Coons, Eley O. Thompson, Gregory C. Bays, of counsel), Counsel for Plaintiff.

Richard L. Horwitz, David E. Moore, Potter Anderson & Corroon LLP, Wilmington, DE, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC (Ford F. Farabow, Jr., Joann M. Neth, Eric J. Fues, A. Neal Seth, of counsel), Thomas L. Creel, Marta E. Gross, Goodwin Procter LLP, New York, NY, Counsel for Defendants.

### MEMORANDUM OPINION

JORDAN, District Judge.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1731192                                                                                    Page 4
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
(Cite as: 2006 WL 1731192 (D.Del.))

## I. INTRODUCTION

**\*1** This is a patent infringement case. Ciba Specialty Chemicals Corp. ("Ciba") has sued Hercules, Inc. ("Hercules") and Cytec Industries, Inc. ("Cytec") (collectively "Defendants"), alleging infringement of two patents: U.S. Patent Nos. 5,167,766 (issued Dec. 1, 1992) (the " '766 patent") and 5,171,808 (issued Dec. 15, 1992) (the " '808 patent"). Before me now are the parties' requests for construction of the disputed claim language in those two patents, as well as the following motions. Ciba has filed a Motion for Partial Summary Judgment of Infringement of the '766 and '808 patents. (D.I.277.) Hercules has filed a Motion for Summary Judgment of Noninfringement (D.I.289) and a Motion for Partial Summary Judgment Limiting Damages (D.I.284). [FN1] Jurisdiction is proper under 28 U.S.C. § § 1331 and 1338.

For the reasons that follow, including my decision on claim construction, I will grant Hercules's Motion for Summary Judgment of Noninfringement (D.I.289). Accordingly, I will deny Ciba's Motion for Summary Judgment of Infringement (D.I.277) and grant summary judgment of noninfringement for Cytec. I will deny as moot Hercules's Motion for Partial Summary Judgment Limiting Damages (D.I.284). [FN2]

## II. BACKGROUND

### A. Procedural Background

Ciba filed a complaint for patent infringement against Hercules and Cytec on May 7, 2004. (D.I.1.) In its complaint, Ciba alleges infringement of the '766 and '808 patents, which were originally assigned to American Cyanamid Company ('766 patent; '808 patent) and are now owned by Ciba (D.I. 1 at ¶ 8). Hercules and Cytec filed answers and counterclaims on November 17, 2004. (D.I. 9; D.I. 10.) Hercules has counterclaimed for declaratory judgments of noninfringement, invalidity, and unenforceability of the '766 and '808 patents. (D.I.67.) Cytec has counterclaimed for declaratory judgments of noninfringement and that it is licensed under the '766 and '808 patents. (D.I.10.) The parties are scheduled to try this case before a jury beginning on August 21, 2006. (D.I.383.)

Ciba is asserting claims 1, 3, 5, 7, 9, 11, 13, 17, 19, 21, 23, and 25 of the '766 patent and claims 1, 6-8, 11, 13, 15, 17, and 20-21 of the '808 patent. (D.I. 286

at 1 n. 2.) Claim 1 of each patent is an independent claim from which all other claims for each patent depend.

### B. The Disclosed Technology

The two patents in this case disclose methods and compositions relating to polymeric microparticles, also called microbeads. ('766 patent, 3:15-19; '808 patent, 2:3-12.) The patents disclose how such microparticles may be prepared using polymerization chemical reactions taking place in a water-in-oil inverse emulsion. ('766 patent, 3:40-68; '808 patent, 3:43-58.) Those polymeric microparticles may be used in solid-liquid separation processes, including papermaking. ('766 patent, 2:67-3:1; '808 patent, 1:13-19.)

Specifically, the '808 patent claims the microparticle compositions and the method for their production ('808 patent, 9:50-12:17); and the '766 patent claims methods for using microparticles in papermaking and the paper produced by those methods ('766 patent, 29:38-30:51).

## III. APPLICABLE LAW / STANDARD OF REVIEW

### A. Patent Infringement

**\*2** [1][2][3] A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. Markman, 52 F.3d at 976. The first step, claim construction, has been held to be purely a matter of law. Cybor, 138 F.3d at 1454-56. The second step, application of the claim to the accused product, is a fact-specific inquiry. See Kustom Signals, Inc. v. Applied Concepts, Inc., 264 F.3d 1326, 1332 (Fed.Cir.2001) (Patent infringement, "whether literal or under the doctrine of equivalents, is a question of fact."). The patent owner has the burden of proving infringement by a preponderance of the evidence. Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 758 (Fed.Cir.1984) (citing Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1361 (Fed.Cir.1983)). Summary judgment is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. See Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed.Cir.2001).

### B. Claim Construction

[4][5] Patents claims are construed as a matter of law. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454-56 (Fed.Cir.1998) (en banc). "[T]**he words of a claim 'are generally given their ordinary and customary meaning.'** " *Phillips v. AWH Corp.,* **415 F.3d 1303, 1312 (Fed.Cir.2005)** (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). That ordinary meaning "**is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention**." *Id. at 1313.*

[6] To determine the ordinary meaning of a term, the court should review "the same resources as would" the person of ordinary skill in the art. *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed.Cir.1998). Those resources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed.Cir.2004).

[7] "[T]**he claims themselves provide substantial guidance as to the meaning of particular claim terms.**" *Phillips, 415 F.3d at 1314.* Both "**the context in which a term is used in the asserted claim**" and the "[o]**ther claims of the patent in question**" are useful for understanding the ordinary meaning. *Id.*

[8][9][10] "[T]**he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term**.' " *Id. at 1315* (quoting *Vitronics,* 90 F.3d at 1582). In short, the claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Thus, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed.Cir.1998).

**\*3** [11][12] On occasion, "**the specification may reveal a special definition given to a claim term ... that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.**" *Phillips, 415 F.3d at 1316* (citing *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002)). The specification may also

"**reveal an intentional disclaimer, or disavowal, of claim scope by the inventor ... [, which] is regarded as dispositive.**" *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343-44 (Fed.Cir.2001)).

[13] The court "should also consider the patent's prosecution history." *Markman,* 52 F.3d at 980. "**Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent.**" *Phillips, 415 F.3d at 1317* (citing *Lemelson v. Gen. Mills, Inc.,* 968 F.2d 1202, 1206 (Fed.Cir.1992)).

[14][15] The court may rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980. In particular, "**dictionaries, and especially technical dictionaries, ... have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology.**" *Phillips, 415 F.3d at 1318* (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002)). However, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.' " *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed.Cir.2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1318 (Fed.Cir.2004)).

[16] During claim construction, "[t]**he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.**" *Phillips, 415 F.3d at 1324*

### C. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moving party. _Goodman v. Mead Johnson &_ _Co., 534 F.2d 566, 573 (3d Cir.1976)._ However, a court should not make credibility determinations or weigh the evidence. _Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)._ To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)_ (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." _Fed.R.Civ.P. 56(c)._ "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." _Matsushita, 475 U.S. at 587, 106 S.Ct. 1348_ (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)._

## IV. DISCUSSION

A. _Claim Construction_

**\*4** The parties seek the construction of several claim terms, but here I will limit the discussion to the terms that are dispositive for the pending summary judgment motions as to infringement. For the '808 patent, the parties dispute the meaning of "cross-linking agent." For the '766 patent, the parties dispute the meaning of "microbead."

1. _The '808 Patent_

[17] Ciba's case for infringement of the '808 patent turns on the meaning of "cross-linking agent," a term that is present in all of the claims of that patent. Claim 1 of the '808 patent, from which all the other claims depend, reads:

A composition comprising cross-linked anionic or amphoteric polymeric microparticles derived solely from the polymerization of an aqueous solution of at least of [sic] one monomer, said microparticles having an unswollen number average particle size diameter of less than about 0.75 micron, a solution viscosity of at least about 1.1 mPa.s, a **cross-linking agent** content of about 4 molar parts to about 4000 parts per million, based on the monomeric units present in the polymer, and an ionicity of at least about 5 mole percent.

('808 patent, 9:51-60 (emphasis added).)

a. _The Parties' Proposed Constructions_

Hercules contends that a "cross-linking agent" is: "A chemical agent that is polyfunctional in that it has at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together." (D.I. 286 at 19.) That construction is based on statements made in the '808 patent specification and prosecution history that, according to Hercules, limit the types of chemicals that may be used as cross-linking agents according to the patent.

By contrast, Ciba contends that nothing in the written description or prosecution history should be read to limit the scope of "cross-linking agent." Ciba argues that the term should mean "an agent that links the polymer chains together in use to constrain the size of the microparticle. Cross-linking agent does not dictate the specific method by which the link is established, e.g., covalently, hydrophobically, ionically etc." (D.I. 275 at 36.)

b. _The Court's Construction_

I conclude, based on unambiguous statements made in the '808 patent specification and prosecution history, that Hercules's construction of "cross-linking agent" is correct. Furthermore, during the patent prosecution, the patentee argued that two specific chemicals, polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate, were not cross-linking agents because they did not contain the necessary double bonds or reactive groups. Therefore, the term "cross-linking agent" will be construed as: "A chemical agent that is polyfunctional in that it has at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together. Polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate, as well as compounds containing only polyethylene oxide groups or impurities with double bonds or hydroxyl groups, are not cross-linking agents."

i. _Specification_

**\*5** [18] In arguing for their proposed constructions, the parties both rely on the specification of the '808 patent to show the ordinary meaning of "cross-linking agent." (D.I. 275 at 15; D.I. 286 at 19.) Indeed, because "**the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim ... but in the context of the entire patent,**" _Phillips, 415 F.3d at 1313,_ the patent specification is "**the single best guide to the meaning of a disputed term,**" _id. at_

2006 WL 1731192                                                                    Page 7
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
**(Cite as: 2006 WL 1731192 (D.Del.))**

**1315** (quoting *Vitronics,* 90 F.3d at 1582).

  According to the '808 patent, the "[p]olymerization of the monomers [to produce a polymeric microparticle] is conducted in the presence of a polyfunctional crosslinking agent to form the crosslinked composition. The polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups." ('808 patent, 4:45-50.) Hercules's proposed construction is based on that description. (D.I. 286 at 19.)

  [19] Ciba argues that the passage that Hercules relies on refers only to preferred embodiments of the invention, and that the claims should not be limited to those embodiments. (D.I. 325 at 27 (quoting **Phillips, 415 F.3d at 1323).**) To decide whether the patent's language should be read as a description of the invention or of a particular embodiment, the language must be read in context: "**The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent.**" *Phillips,* **415 F.3d at 1323.** Here, there is nothing in the specification that suggests that the above description of "cross-linking agent" refers only to specific embodiments. Rather, the language refers generally to the process of making the cross-linked compositions claimed by the patent, and is clearly separated from the "Description of the Preferred Embodiments" included elsewhere ('808 patent, 6:46-9:39). Thus, contrary to Ciba's argument, Hercules is not trying to import a limitation from a particular embodiment. [FN3]

  Ciba also points to another part of the specification that it contends is evidence of a broader definition for cross-linking agent. The "Background" section of the '808 patent refers to a description of cross-linking found in a published patent application from the European Patent Office, EP 0,202,780 (the " '780 application") as follows: "EP 0,202,780 describes the preparation of polymeric, crosslinked, cationic acrylamide polymer beads by conventional inverse emulsion polymerization techniques. Crosslinking is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide, into the polymer. This crosslinking technology is well known in the art." ('808 patent, 1:23-29.) The '780 application states that:
    [C]ross linking ... may be brought about by controlled spontaneous conditions such as heating or irradiation, provided the degree of chain branching or other cross linking is reproducible and controllable, but preferably is brought about by

reaction of the monomer or monomer blend, or the final polymer, with a covalent or ionic cross linking agent.
  **\*6** (D.I. 316, Ex. 12 at 9:19-27.) According to Ciba, the statement that cross-linking was "well known in the art" refers to the entire collection of methods listed in the '780 application, and so the '808 patent specification does not limit itself to any particular form of cross-linking. (D.I. 275 at 15, 36-37; D.I. 325 at 27.)

  I do not agree with Ciba that the reference to the '780 application imports a broad definition of "cross-linking agent" into the '808 patent. While the ' 780 application does indeed describe cross-linking broadly, the '808 patent specification refers to that application in language that narrows the cross-linking being referred to. According to the '808 patent, the '780 application discloses cross-linking that "is accomplished by the incorporation of a difunctional monomer, such as methylenebisacrylamide, into the polymer," and it is "*[t]his* crosslinking technology that is "well known in the art." ('808 patent, 1:26-29 (emphasis added).) A difunctional monomer like methylenebisacrylamide ("MBA") is a "polyfunctional crosslinking agent" according to the '808 patent. (*Id.* at 4:47-52 (listing MBA as one possible cross-linking agent).) A particular method of cross-linking is singled out from the '780 application and described as being well known in the art. Thus, the reference to the '780 application, taken in context, is more narrow than Ciba contends and is consistent with Hercules's proposed construction.

  ii. *Prosecution History*

  [20][21] Hercules also relies on the '808 patent prosecution history to support its proposed construction of "cross-linking agent." "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips,* **415 F.3d at 1317.** "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." *Springs Window Fashions LP v. Novo Indus., L.P.,* 323 F.3d 989, 995 (Fed.Cir.2003). Here, statements were made during the '808 patent prosecution that demonstrate a narrow understanding of "cross-linking agent."

  During the examination of the parent application of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1731192                                                          Page 8
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
(Cite as: 2006 WL 1731192 (D.Del.))

the '808 patent, U.S. Application 07/535,626, the patent examiner rejected several claims, including the claim that issued as claim 1, as anticipated by or obvious over U.S. Patent No. 4,681,912 (issued July 21, 1987) (the "Durand reference," D.I. 316, Ex. 7). (D.I. 316, Ex. 3 at CIBA 000515.) According to the examiner, the Durand reference discloses microparticles that are polymerized "in the presence of poly-oxyethylene sorbitol hexaoleate and sorbitan sequioleate. Since oleate contains a double bond, [the examiner argued,] it is reasonable to expect these oleates functioning to some degree as a cross-linking agent in addition to being a surfactant." (Id.) The applicants responded that the Durand reference

**\*7** fail[ed] to indicate the incorporation of a cross-linking agent into the polymer produced therein.... [While the examiner] points out that the oleate surfactants of Durand etal [sic] contain an unsaturated group [i.e., a double bond] [FN4] and thus would reasonably be expected to function as a cross-linker ... [that] assumption is erroneous in that the oleates of Durand etal [sic] are monounstaurated and if any reaction thereof with the acrylamide and/or acrylate were to occur it would occur linearly because a cross-linking agent must contain *two* functional groups to act as such, see page 7, lines 11- 26 of the instant specification.

(Id. at CIBA 000526 (emphasis in original).) The reference to page seven of the specification points to the following:

The polyfunctional crosslinking agent comprises molecules having either at least two double bonds, a double bond and a reactive group, or two reactive groups. Illustrative of those containing at least two double bonds are N,N-methylenebisacryiamide, N,N-methylenebismethacrylamide, polyethyleneglycol diacrylate, polyethyleneglycol dimethacrylate, N-vinyl acrylamide, divinylbenzene, triallylammonium salts, N-methylallylacrylamide and the like. Polyfunctional branching agents containing at least one double bond and at least one reactive group include, glycidyl acrylate, acrolein, methylolacrylamide and the like. Polyfunctional branching agents containing at least two reactive groups include aldehydes such as glyoxal, diepoxy compounds, epichlorohydrin and the like.

(Id. at CIBA 000486.) That passage is in the specification of the issued '808 patent. (See '808 patent, 4:47-62.) The examiner withdrew the rejection, in apparent reliance on that argument. (D.I. 316, Ex. 3 at CIBA 000532.)

Ciba argues that the prosecution history does not reveal any "special definition" of "cross-linking agent" (D.I. 325 at 28) or include "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" (id. (quoting NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1308-09 (Fed.Cir.2005))). According to Ciba, the Durand reference is not relevant prior art because the composition disclosed there is not cross-linked by any method. (D.I. 325 at 23, 28.) Thus, according to Ciba, the argument during prosecution should be understood as simply a response to the examiner's hypothesis about the presence of cross-linking agents in the Durand composition, a response that goes no further than demonstrating that "under the examiner's theory," the Durand surfactants, poly-oxyethylene sorbitol hexaoleate and sorbitan sequioleate, could not be cross-linking agents. (Id. at 8.)

Ciba's argument fails. Whether or not it would have been sufficient to overcome the Durand reference by arguing only that the composition was not cross-linked, the argument that the applicants actually made went further. The applicants argued that the chemicals disclosed in the Durand reference were not cross-linking agents "because a cross-linking agent must contain *two* functional groups to act as such." (D.I. 316, Ex. 3 at CIBA 000526 (emphasis in original).) That statement was followed by a reference to the portion of the specification that forms the basis for Hercules's proposed construction. Contrary to Ciba's assertion, there is nothing hypothetical about that response. In the face of a rejection, the applicants described what they view as a "cross-linking agent," and they stated that the Durand reference did not disclose one. That must be read as a disclaimer of claim scope.

**\*8** The '808 patent prosecution history does two things. First, the statement that a cross-linking agent must contain two functional groups is consistent with the portion of the '808 patent specification already cited. (Supra Section IV.A.1.b.ii.) Indeed, the prosecution history explicitly refers to that portion of the specification. Second, the prosecution history states that the surfactants disclosed by the Durand reference do not have the necessary double bonds or reactive groups. Polyoxyethylene sorbitol hexaoleate contains polyethylene oxide ("PEO") groups (D.I. 291, Ex. D at 90:1-18), and both Durand surfactants contain impurities with double bonds and hydroxyl groups (id. at 97:13-100:1). Thus, those surfactants, as well as compounds that contain only PEO groups and/or impurities with double bonds or hydroxyl groups, are not cross-linking agents under the '808 patent. Therefore, the term "cross-linking agent" will

be construed as: "A chemical agent that is polyfunctional in that it has at least two double bonds, a double bond and a reactive group, or two reactive groups to link polymer chains together. Polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate, as well as compounds containing only polyethylene oxide groups and/or impurities with double bonds or hydroxyl groups, are not cross-linking agents."

2. *The '766 Patent*

[22] Ciba's case for infringement of the '766 patent turns on the meaning of "microbead," a limitation that is present in all of the claims of that patent. Claim 1 of the '766 patent, from which all the other claims depend, reads:
  A method of making paper which comprises adding to an aqueous paper furnish from about 0.05 to about 20 lbs/ton, based on the dry weight of paper furnish solids, of an ionic, organic, cross-linked polymeric **microbead**, the microbead having an unswollen particle diameter of less than about 750 nanometers and an ionicity of at least 1%, but at least 5%, if anionic and used alone.
  ('766 patent, 29:39-46 (emphasis added).)

a. *The Parties' Proposed Constructions*

Ciba and Hercules agree that a microbead, as claimed by the '766 patent, is a product formed by the polymerization of monomers. (D.I. 275 at 28; D.I. 286 at 33.) The dispute centers on whether or not an additional limitation applies. Hercules contends that a "microbead" is limited by the following definition: "The microbead must be an integral unit which can be separated from any emulsifier [FN5] present." (D.I. 286 at 33-35.) That construction is based on statements made during the '766 patent prosecution in response to an examiner's rejection.

By contrast, Ciba contends that the statements in the prosecution history were made in the context of a discussion about the requirement that the microbead be "ionic," and so the statements should not be read as a general description of the microbead. (D.I. 325 at 16-17.) Ciba further contends that the claims were not amended in response to that particular rejection, and that the statements merely describe the prior art. (*Id.* at 18.) Thus, according to Ciba, those statements do not limit the scope of the term "microbead" as claimed.

b. *The Court's Construction*

*9 I conclude that the statements made during the '766 patent prosecution are descriptions of the patentee's invention, and that those statements do limit the scope of the claimed "microbead." Therefore, "microbead" will be construed as: "A product formed by the polymerization of monomers. The microbead must be an integral unit which can be separated from any emulsifier present."

During the examination of the application that issued as the '766 patent, U.S. Application 07/540,667, the patent examiner rejected several claims, including the claim that issued as claim 1, as obvious over U.S. Patent No. 4,659,431 (issued Apr. 21, 1987) (the "Probst reference," D.I. 316, Ex. 11). (D.I. 316, Ex. 6 at HERC0076011.) The Probst reference discloses a "Cationic Sizing Agent for Paper, and a Process for its Preparation." (D.I. 316, Ex. 11 at CIBA 000218.) In response, the applicants made the following argument:
  Applicants' claims require that the organic, polymeric microbeads be *ionic* Probst employs ionic group containing emulsifiers in order to create dispersion stability in the solution. The ionic groups remain part of the emulsifier and are not chemically bonded to the hydrophobic copolymers. The Probst product, therefore, is a *nonionic* hydrophobic polymer mixture stabilized by cationic surfactants.
  Applicants' invention resides in the use of the polymer microbead having an ionic charge covalently bonded to the polymer, whereas, in Probst, the only ionic charge present is on a different molecule i.e. a surfactant which can dissolve out of and/or migrate from the polymer microbeads. Applicants' microbead does not require the use of an emulsifier. It is an integral unit which can be separated from any emulsifier present if made in emulsion form.
(D.I. 316, Ex. 6 at HERC0076020 (emphasis in original).) The examiner maintained the rejection, arguing that the backbone of the microbead disclosed by the Probst reference was ionic. (*Id.* at HERC0076028.) The applicants responded that the chemical referred to by the examiner was part of the emulsifier, and that by contrast, "Applicants' microbead has an ionic charge covalently bonded thereto and is an integral unit which can be separated as such." (*Id.* at HERC0076038.) According to the applicants, "it is only the emulsifier which is ionic in the Probst composition." (*Id.*) One week later, the claims were allowed. (*Id.* at HERC0076046.)

Ciba contends that the prosecution history should not limit the scope of "microbead" in this case. First,

2006 WL 1731192                                                                                    Page 10
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
**(Cite as: 2006 WL 1731192 (D.Del.))**

Ciba argues that the statements are only relevant to the construction of "ionic," a term whose meaning is not disputed in this case. (D.I. 325 at 17.) I disagree. The examiner argued that the invention was obvious in light of the Probst reference, and the applicant responded that the only part of the Probst composition that was ionic was the emulsifier. To overcome the rejection, the applicants argued, in two separate responses, that its microbead was an integral unit that could be separated from any emulsifier in the composition. (D.I. 316, Ex. 6 at HERC0076020, HERC0076038.) The applicants further argued that their "microbead does not require the use of an emulsifier." (*Id.* at HERC0076020.) While those arguments were used to support a position about the ionicity of the Probst composition, they are not limited to ionicity. The applicants described, in unambiguous terms, features of the claimed microbead.

*10 Second, Ciba argues that the statements in the '766 prosecution history are simply a discussion of the prior art. (*Id.* at 18 (citing *Gemstar-TV Guide Int'l, Inc. v. ITC,* 383 F.3d 1352, 1375 (Fed.Cir.2004)).) Again, the applicants' statements are not so limited. The applicants describe the "invention." (D.I. 316, Ex. 6 at HERC0076020.) According to the applicants, the invention requires that the microbead be "an integral unit which can be separated from any emulsifier present if made in emulsion form." (*Id.*) That unambiguous statement limits the claimed invention.

Therefore, Hercules's proposed construction is correct. A "microbead" is defined as: "A product formed by the polymerization of monomers. The microbead must be an integral unit which can be separated from any emulsifier present."

B. *Summary Judgment of Noninfringement*

[23] Hercules has moved for summary judgment of noninfringement as to the ' 808 and '766 patents. (D.I.289.) Because I conclude that, under the proper claim construction, no genuine issues of material fact remain as to infringement, I will grant Hercules's motion. Accordingly, I will deny Ciba's Motion for Summary Judgment of Infringement (D.I.277), and will also grant summary judgment of noninfringement for Cytec. [FN6]

1. *Noninfringement as to the '808 Patent*

[24] Hercules and Cytec do not infringe the '808 patent because the accused product does not contain a

"cross-linking agent" as required by all of the claims of the '808 patent.

Ciba asserts that a composition jointly marketed by Hercules and Cytec (D.I. 317 at 5) infringes the '808 patent. That composition, marketed under the name PerForm®, is alleged by Ciba to contain a cross-linking agent in the form of a chemical marketed under the name Hypermer® B246SF ("Hypermer"). (D.I. 292, Ex. O at ¶ 22; D.I. 317 at 17.) According to Ciba's expert witness, Hypermer is a cross-linking agent, because Hypermer contains impurities with double bonds and hydroxyl groups that may react to form cross-links. (D.I. 291, Ex. D at 78:11-79:12; *see also id.* at 55:7-16, 56:14-59:15.) In addition, Ciba contends that PEO groups in Hypermer are involved in reactions that lead to cross-linking. (*Id.* at 143-45.) Thus, Ciba has proposed specific chemical groups present in Hypermer, the PEO groups as well as the double bonds and hydroxyl groups found in impurities, that qualify Hypermer as a cross-linking agent under the court's construction.

Ciba's infringement theory fails, however, because those chemical groups alleged to be involved in cross-linking in the Hypermer molecules are also present in the polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate molecules that were disclaimed during prosecution of the '808 patent. Ciba's expert witness agreed that polyoxyethylene sorbitol hexaoleate contains PEO groups. (*Id.* at 90:1-18.) That witness further agreed that polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate contain impurities with double bonds and hydroxyl groups. (*Id.* at 97:13-100:1.)

*11 As discussed above, *supra* Section IV.A.1.b.ii, the applicants for the '808 patent argued during prosecution that polyoxyethylene sorbitol hexaoleate and sorbitan sesquioleate were not cross-linking agents, because those chemicals did not contain the necessary double bonds or reactive groups. By choosing to define "cross-linking agent" based on the reactive groups present, and by disclaiming the surfactants disclosed in the Durand reference, the applicant disclaimed chemicals that contain those types of reactive groups and no others. Hypermer is such a chemical. (D.I. 291, Ex. D at 78:11-79:12, 143-45; *see also id.* at 55:7-16, 56:14-59:15.) Here, as in *Springs Window,* 323 F.3d 989, "a reasonable competitor, reviewing the amendments and statements made by the applicant[s] to distinguish the claimed invention from [the Durand reference], would conclude that the claimed invention did not cover a device like [that found in the Durand

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 1731192                                                                                          Page 11
--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)
**(Cite as: 2006 WL 1731192 (D.Del.))**

reference]." 323 F.3d at 995. Thus, Hypermer is not a cross-linking agent under the '808 patent.

Ciba argues that genuine issues of fact remain that make summary judgment improper, even under the construction of "cross-linking agent" that I have adopted. (D.I. 317 at 34-35.) First, Ciba disputes that Hercules's representations of the Hypermer molecule are correct. (Id. at 34.) However, Ciba's contention is simply that impurities are present in Hypermer. (Id. at 19-21.) Those impurities do not qualify as cross-linking agents under the patent, because they are present in the disclaimed Durand surfactants. Second, Ciba argues that Hypermer reacts differently than the surfactants disclosed by the Durand reference. (Id. at 34-35.) While that may be true, it does not raise an issue as to infringement. The applicants for the '808 patent defined "cross-linking agent" in terms of the chemical groups present, i.e., double bonds and reactive groups. Thus, the accused product must contain the claimed groups. The parties do not dispute that the groups present in Hypermer are the same as those that were disclaimed during the applicants' discussion of the Durand reference. According to the applicants' statements, Hypermer is not a cross-linking agent.

[25] In summary, I will grant Hercules's motion for summary judgment as to noninfringement of the '808 patent. [FN7] Accordingly, I will deny Ciba's summary judgment motion as to infringement of the '808 patent. I will also grant summary judgment for Cytec as to infringement of the '808 patent.

2. *Noninfringement as to the '766 Patent*

[26] Hercules and Cytec do not infringe the '766 patent because the accused product does not contain a "microbead" as required by all of the claims of the '766 patent.

Ciba argues that Hypermer acts to form covalent cross-links in the polymeric microbeads produced by Hercules and Cytec. (D.I. 291, Ex. D at 116:8-122:7; *see also* D.I. 291, Ex. O at ¶ 22.) If those cross-links are formed, the Hypermer becomes covalently attached to the accused microbeads. Importantly, according to Ciba's expert witness, Hypermer is also

an emulsifier. (D.I. 291, Ex. D at 71:16-17, 72:9-75:13.) Thus, under Ciba's theory of infringement, the accused microbeads are covalently attached to an emulsifier, namely Hypermer. However, that theory is contrary to statements made by the applicants during the prosecution of the '766 patent. The '766 patent requires that the microbead "must be an integral unit which can be separated from any emulsifier present." *See supra* Section IV.A.2.b. Therefore, the accused product does not contain this limitation, because, according to Ciba, the microbeads at issue are attached to, not separated from Hypermer, which is an emulsifier.

*12 Again, Ciba argues that genuine issues of fact remain that make summary judgment improper, even under the construction of "microbead" that I have adopted. (D.I. 317 at 28-29.) However, none of the issues raised by Ciba change the conclusion as to infringement. First, Ciba's dispute as to the molecular structure of Hypermer (id. at 28) is again focused on the presence of impurities in the product, and that dispute is irrelevant to whether the Hypermer is separable from the accused microbeads. Second, whether Hypermer acts as a cross-linking agent in addition to acting as an emulsifier (id. at 29) is also irrelevant. Ciba does not dispute that Hypermer is an emulsifier. The requirement that the microbead be separable from any emulsifier present arises from an unambiguous description of the microbeads in the prosecution history for the '766 patent. (D.I. 316, Ex. 6 at HERC0076020, HERC0076038.) According to that description, the accused microbeads do not infringe.

In summary, I will grant Hercules's motion for summary judgment as to noninfringement of the '766 patent. [FN8] Accordingly, I will deny Ciba's summary judgment motion as to infringement of the '766 patent. I will also grant summary judgment for Cytec as to infringement of the '766 patent.

**V. CONCLUSION**

For the reasons set forth herein, the disputed claim terms will be construed as follows:

```
Claim Term                  The Court's Construction

"cross-linking agent"       The court construes "cross-linking agent" to mean:
                               "A chemical agent that is polyfunctional in that
                               it has at least two double bonds, a double bond
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
                              and a reactive group, or two reactive groups to
                              link polymer chains together. Polyoxyethylene
                              sorbitol hexaoleate and sorbitan sesquioleate, as
                              well as compounds containing only polyethylene

                              oxide groups and/or impurities with double bonds
                              or hydroxyl groups, are not cross-linking agents."

"microbead"                   The court construes "microbead" to mean: "A product
                              formed by the polymerization of monomers. The
                              microbead must be an integral unit which can be
                              separated from any emulsifier present."
```

 Ciba's Motion for Claim Construction (D.I.274) will be granted-in-part to the extent it relates to the above claim terms and denied-in-part without prejudice to the extent it relates to other claim terms.

 In addition, I will grant Hercules's Motion for Summary Judgment of Noninfringement (D.I.289); I will deny Ciba's Motion for Summary Judgment of Infringement (D.I.277); and I will grant summary judgment of noninfringement for Cytec. I will deny as moot Hercules's Motion for Partial Summary Judgment Limiting Damages (D.I.284).

 I will deny as moot Cytec's Motion to Join in Hercules's Answering Brief in Opposition to Ciba's Motion for Summary Judgment (D.I.314) and Hercules's Motion for a Postponement of Trial (D.I.343).

 The parties should confer and inform the court within ten days as to whether the case will proceed to trial on Hercules's and Cytec's counterclaims, as well as which, if any, additional claim terms must be construed prior to trial. The parties must also, within five days, provide recommendations for redactions to this opinion and accompanying order so that a public version may be filed. Proposed redactions must be kept to an absolute minimum.

### ORDER

 **\*13** For the reasons set forth in the Memorandum Opinion issued in this matter today,

 IT IS HEREBY ORDERED that the following disputed claim terms of U.S. Patent Nos. 5,167,766 (issued Dec. 1, 1992) and 5,171,808 (issued Dec. 15, 1992) are construed as follows:

```
Claim Term                    The Court's Construction

"cross-linking agent"         The court construes "cross-linking agent" to mean:
                              "A chemical agent that is polyfunctional in that
                              it has at least two double bonds, a double bond
                              and a reactive group, or two reactive groups to
                              link polymer chains together. Polyoxyethylene
                              sorbitol hexaoleate and sorbitan sesquioleate, as
                              well as compounds containing only polyethylene
                              oxide groups and/or impurities with double bonds

                              or hydroxyl groups, are not cross-linking agents."

"microbead"                   The court construes "microbead" to mean: "A product
                              formed by the polymerization of monomers. The
                              microbead must be an integral unit which can be
                              separated from any emulsifier present."
```

 IT IS FURTHER ORDERED that the Motion for Claim        Construction (D.I.274) will be GRANTED-IN-PART to

the extent it relates to the above claim terms and DENIED-IN-PART without prejudice to the extent it relates to other claim terms.

 IT IS FURTHER ORDERED that Hercules, Inc.'s Motion for Summary Judgment of Noninfringement (D.I.289) is GRANTED.

 IT IS FURTHER ORDERED that Ciba Speciality Chemicals Corporation's Motion for Summary Judgment of Infringement (D.I.277) is DENIED.

 IT IS FURTHER ORDERED that summary judgment of noninfringement is GRANTED for Cytec Industries, Inc.

 IT IS FURTHER ORDERED that the Motion for Partial Summary Judgment Limiting Damages (D.I.284), the Motion to Join in Hercules's Answering Brief in Opposition to Ciba's Motion for Summary Judgment (D.I.314), and the Motion for a Postponement of Trial (D.I.343) are DENIED as moot.

 IT IS FURTHER ORDERED that the parties will inform the court within ten days as to whether the case will proceed to trial on Hercules's and Cytec's counterclaims, as well as which, if any, additional claim terms must be construed prior to trial.

 IT IS FURTHER ORDERED that, within five days, the parties will provide recommendations for redactions to this opinion and accompanying order so that a public version may be filed. Proposed redactions must be kept to an absolute minimum.

 FN1. Other motions are pending in this case. First, Cytec has filed a Motion to Join in Hercules's Answering Brief in Opposition to Ciba's Motion for Summary Judgment. (D.I.314.) Because Ciba's motion is denied, Cytec's motion will be denied as moot. Second, Hercules has filed a Motion for a Postponement of Trial. (D.I.343.) I note that the trial date has since been reset for August 21, 2006 (D.I.383), and Hercules's motion will therefore be denied as moot. Finally, Ciba has filed a Motion for Claim Construction (D.I.274), which asks that I construe the disputed claim terms found in the patents-in-suit. That motion will be granted-in-part to the extent that I will construe the claim terms necessary for deciding the pending summary judgment motions. As to the other claim terms, the motion will be denied-in-part without prejudice. If the case will proceed to trial on the counterclaims of Hercules and Cytec, *see infra* note 2, the parties will inform the court of

which additional terms must be construed prior to trial.

 FN2. Hercules's counterclaims as to invalidity and unenforceability and Cytec's counterclaims that it is licensed under the '766 and '808 patents remain to be considered, after this opinion. As noted in the accompanying order, the parties should confer and inform the court as to whether the case will proceed to trial on those counterclaims, as well as which, if any, additional terms of the two patents must be construed prior to trial.

 FN3. I note that each of the preferred embodiments uses methylenebisacrylamide ("MBA") (*see* '808 patent, 6:46-9:39), which is a polyfunctional cross-linking agent according to the specification (*id.* at 4:50-52). Thus, the description of embodiments is consistent with the general description of cross-linking agent that Hercules relies on.

 FN4. A long-standing definition of "unsaturated" is "of or relating to an organic compound, especially a fatty acid, containing one or more double or triple bonds between the carbon atoms." *Am. Heritage Dictionary of the English Language* (4th ed.2000). Here, the term refers to the double bond discussed by the examiner. (*See* D.I. 316, Ex. 3 at CIBA 000515.)

 FN5. An "emulsifier" is "an agent used to make an emulsion of a fixed oil." *Am. Heritage Stedman's Medical Dictionary* (2002). In turn, an "emulsion" is "a suspension of small globules of one liquid in a second liquid with which the first will not mix." *Id.*

 FN6. Ciba's infringement case against Cytec is based on the same product as is its case against Hercules. Thus, because Hercules's arguments apply with equal force to the claims against Cytec, and because Ciba had sufficient notice and adequate opportunity to respond to those arguments, I will grant summary judgment for Cytec as to infringement of the '808 and '766 patents. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Rouse v. City of Aurora,* 901 F.Supp. 1533, 1539 (D.Colo.1995) (granting

summary judgment for one defendant based on arguments made by other defendants where the plaintiffs "had sufficient notice and adequate opportunity" to respond); *see also* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3d § 2720 (noting that grant of summary judgment sua sponte is proper where losing party has "sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted").

FN7. Ciba argues that it may still show infringement of the '808 patent under the doctrine of equivalents. (D.I. 317 at 37-38.) However, it only provides evidence as to literal infringement and argues that "[t]here is no doubt" that that evidence shows infringement under the doctrine of equivalents. (*Id.*) That is insufficient to support a doctrine of equivalents claim. *See Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1210 (Fed.Cir.2001) ("The doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for which is the responsibility of the proponent."). Furthermore, "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Lear Siegler, Inc. v. Sealy Mattress Co.,* 873 F.2d 1422, 1425 (Fed.Cir.1989).

FN8. Again, Ciba argues that it may show infringement of the '766 patent under the doctrine of equivalents. (D.I. 317 at 29-31.) As for the '808 patent, it only provides evidence as to literal infringement and argues that that evidence shows infringement under the doctrine of equivalents. (*Id.*) That is insufficient to support a doctrine of equivalents claim. *See supra* note 7.

--- F.Supp.2d ----, 2006 WL 1731192 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 809096 (Trial Motion, Memorandum and Affidavit) Ciba's Reply Brief in Support of its Motion for Partial Summary Judgment that the Accused Perform(R) System Infringes U. S. Patent Nos. 5,167,766 and 5,171,808 (Feb. 17, 2006)Original Image of this Document (PDF)

• 2006 WL 809097 (Trial Motion, Memorandum and Affidavit) Defendant Cytec's Reply Brief in Response to Ciba's Answering Brief in Opposition to Hercules' Motion for Partial Summary Judgment holding that Hercules is not Precluded from Asserting Invalidity and Unenforceability of the Patents in Suit Because of Alleged Privity between Cytec and Hercules (Feb. 17, 2006)Original Image of this Document (PDF)

• 2006 WL 1085365 (Trial Pleading) Hercules' Responsive Brief on Claim Construction (Jan. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 809094 (Trial Motion, Memorandum and Affidavit) Ciba's Answering Brief in Opposition to Hercules' Motion Forpartial Summary Judgment Limiting Damages under 35 U.S.C. s 287(a) (Jan. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 809095 (Trial Motion, Memorandum and Affidavit) Ciba's Answering Brief in Opposition to Hercules' Motion for Partial Summary Judgment holding that Hercules is not Precluded from Asserting Invalidity and Unenforceability of the Patents in Suit Because of Alleged Privity between Cytec and Hercules (Jan. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 819644 (Trial Pleading) Plaintiff Ciba Specialty Chemicals Corporation's Response to Hercules' Opening Claim Construction Brief (Jan. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 819646 (Trial Motion, Memorandum and Affidavit) CIBA's Opposition to Hercules' Motion for Summary Judgment of Non-Interingement (Jan. 27, 2006)Original Image of this Document (PDF)

• 2004 WL 3568364 (Trial Pleading) Plaintiff Ciba Specialty Chemicals Corporation's Reply to the Amended Counterclaims of Defendant Hercules, Incorporated (Sep. 15, 2004)Original Image of this Document (PDF)

• 2004 WL 3656205 (Trial Pleading) Complaint (May 7, 2004)Original Image of this Document (PDF)

• 1:04cv00293 (Docket) (May 7, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.