**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **ITEM DEVELOPMENT AB, ASTELLAS US LLC, and ASTELLAS PHARMA US, INC.** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 05-336 SLR** |
| **SICOR INC. and SICOR PHARMACEUTICALS, INC.** | ) ) ) | |
| **Defendants.** | ) ) ) ) | |

**DEFENDANTS SICOR'S POST-TRIAL BRIEF**

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

*Attorneys for Defendants Sicor Inc. and
Sicor Pharmaceuticals, Inc.*

Dated:    May 9, 2007

## TABLE OF CONTENTS

I.     Introduction..........................................................................................................1
       A.    The Sollevi Prior Art ...............................................................................2
       B.    The Fukunaga Prior Art.............................................................................4
       C.    No Secondary Factors Support Non-Obviousness.....................................4
II.    Factual Background ...............................................................................................6
       A.    The '296 Patent .........................................................................................6
             1.    General Background ........................................................................6
             2.    The Asserted Claims .......................................................................6
       B.    State of the Art ..........................................................................................8
             1.    Vasodilators Generally....................................................................8
             2.    Hemodynamic Parameters Relevant to Vasodilation ..............8
             3.    Adenosine Was A Well-Known Vasodilator ...........................10
             4.    Dipyridamole Was Known To Act By Increasing The
                   Concentration Of The Body's Own Adenosine........................10
             5.    Vasodilating Effects Of ATP Were Also Due To The Effects Of
                   Adenosine ...................................................................................11
III.   Argument...........................................................................................................14
       A.    The Asserted Claims Are Invalid As Obvious Under 35 U.S.C. § 10314
             1.    The Law Of Obviousness ............................................................14
             2.    The Sollevi Prior Art, In Combination With The Knowledge
                   Of A Person Of Ordinary Skill In The Art, Renders The
                   Asserted Claims Obvious.............................................................24
             3.    The Fukunaga Abstract, In Combination With The Knowledge
                   Of A Person Of Ordinary Skill, Renders The Asserted Claims
                   Obvious........................................................................................27
             4.    No Secondary Factors Support Non-Obviousness ...................30
       B.    The Asserted Claims Are Invalid As Anticipated................................38
             1.    The Law Of Anticipation .............................................................38
             2.    The Asserted Claims Are Inherently Anticipated By The
                   Fukunaga Abstract......................................................................39
IV.    Conclusion ........................................................................................................41

# TABLE OF AUTHORITIES

PAGE

CASES

*Abbott Labs. v. Baxter Pharmaceutical Prods., Inc.*,
   471 F.3d 1363 (Fed. Cir. 2006) ................................................................. 38-40

*Alza Corp. v. Mylan Labs., Inc.*,
   464 F.3d 1286 (Fed. Cir. 2006) .................................................................... 15

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
   246 F.3d 1368 (Fed. Cir. 2001) .................................................................... 38

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
   229 F.3d 1120 (Fed. Cir. 2000) ................................................................. 15-16

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006) ........................................................... 14-15, 23

*Eli Lilly & Co. v. Barr Labs, Inc.*,
   251 F.3d 955 (Fed. Cir. 2001) ................................................................. 38, 40

*In re O'Farrell*,
   853 F.2d 894 (Fed. Cir. 1988) ...................................................................... 16

*In re Peterson*,
   315 F.3d 1325 (Fed. Cir. 2003) .................................................................... 27

*In re Rouffet*,
   149 F.3d 1350 (Fed. Cir. 1998) .................................................................... 16

*KSR Int'l Co. v. Teleflex Inc.*,
   No. 04-1350, 2007 WL 1237837 (U.S. Apr. 30, 2007) ................................. passim

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) .................................................................... 14

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
   864 F.2d 757  (Fed. Cir. 1989) .................................................................... 38

*Ormco Corp. v. Align Tech., Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006) ............................................................... Passim

*Pfizer Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ........................................................... 16, 22, 27

*Richardson-Vicks Inc. v. Upjohn Co.*,
  122 F.3d 1476 (Fed. Cir. 1997) ......................................................................... 16

*Schering Corp. v. Geneva Pharm., Inc.*,
  339 F.3d 1373 (Fed. Cir. 2003) .................................................................... 38, 40

### STATUTES

35 U.S.C. § 102 ........................................................................... 6, 17, 38

35 U.S.C. § 103 ........................................................................2, 13, 14, 15

## I.    __INTRODUCTION__

U.S. Patent No. 5,731,296 ("the '296 patent") is directed to a method of administering adenosine by continuous intravenous infusion to produce selective arterial vasodilation. The asserted claims 1, 3, 7 and 9 are invalid because their claimed invention is the predictable result of inferences that persons of ordinary skill would make and ordinary creative steps that persons of ordinary skill would take in view of the prior art and the background knowledge that they possessed at the relevant time. *See KSR Int'l Co. v. Teleflex Inc.*, No. 04-1350, 2007 WL 1237837, at *13 (U.S. Apr. 30, 2007) (concluding that "[a]s our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill would employ").

The evidence at trial showed clearly and convincingly that the claimed invention would have been obvious to a person of ordinary skill in the art at the relevant time. In the '296 patent, adenosine performs the same function of selective arterial vasodilation that it had been known to perform in the prior art. Adenosine, a naturally-occurring compound that can be found in nearly every cell of the human body, acts within the body in the same manner as is recited in the asserted claims. As persons of ordinary skill well knew at the time, when the body demands more oxygen, adenosine dilates arteries without inducing significant venous dilation. S*ee*, *e.g.*, DTX 3014-C-E. The '296 patent yields no more than one would expect from the prior art.

A.    **The Sollevi Prior Art**

The '296 patent simply eliminated the use of dipyridamole, a known inhibitor of

adenosine uptake in the bloodstream, as a treatment step prior to the continuous intravenous

infusion of adenosine.  In the prior art that constitutes the inventor's own disclosures (TX 37 &

TX 1170, collectively "the Sollevi prior art"), dipyridamole was injected intravenously in a

preliminary step 10 to 30 minutes before the administration of adenosine.

Dr. Alf Sollevi, the sole inventor listed on the '296 patent, pretreated with dipyridamole

because his goal was to use the selective arterial vasodilation caused by adenosine to induce and

maintain an extreme state, controlled hypotension, in patients undergoing certain a type of

surgery.  TX 275 at col. 2, lines 33-65.  To that end, Dr. Sollevi employed dipyridamole (a known

adenosine uptake inhibitor) to reduce the overall dose of adenosine that would be administered

later by continuous intravenous infusion to cause and sustain the controlled hypotension over the

course of the surgery.

The inventor's motivation, however, does not control the Court's obviousness analysis

here.  In *KSR*, the Supreme Court spoke clearly:  "In determining whether the subject matter of a

patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee

controls.… if the claim extends to what is obvious, it is invalid under § 103."  *See KSR*, 2007

WL 1237837, at *15.

As Sicor's expert Dr. Binkley explained, despite Dr. Sollevi's focus on controlled

hypotension, a person of ordinary skill would have been motivated to use adenosine's

demonstrated ability to cause selective arterial vasodilation for uses other than controlled

hypotension disclosed in the Sollevi prior art.  And as Plaintiffs' expert Dr. Klabunde confirmed,

while the controlled hypotension described in the Sollevi prior art demonstrated conclusively that

adenosine caused selective arterial vasodilation (Tr. 1059:19-22), persons of ordinary skill would

have understood that lesser degrees of selective arterial dilation caused by adenosine would not

result in controlled hypotension.  The evidence is clear and convincing that persons of ordinary skill would have understood that selective arterial dilation occurs over a range – it is not an "all or nothing" phenomena – and that selective arterial vasodilation less than that necessary to induce and maintain controlled hypotension in surgery would have value for other medical uses. [1]  Tr. 1079:21-1080:2

Other practical reasons would also have led persons of ordinary skill to seek to eliminate the pretreatment with dipyridamole.  It was well known in the art that dipyridamole had a longer half life than adenosine.  Persons of ordinary skill would have understood that pretreatment with dipyridamole could potentiate any harmful side effects of subsequently-administered adenosine and would prolong the duration of any negative side effects that might occur with adenosine.  In addition, a person of ordinary skill in the art at the relevant time would believe that it is better, in general, to administer one drug rather than two, at least in order to reduce the possible risk of unfavorable or dangerous drug interactions.

Here, ordinary creative insights would have led the person of ordinary skill in the art to eliminate the pretreatment with dipyridamole.  *See KSR*, 2007 WL 1237837, at *15 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").  In 1985, a person of ordinary skill in the art would have known that the effect of the administration of adenosine and dipyridamole was the same: an increase in the adenosine concentration in the blood.  Such a person would understand that the adenosine was the direct-acting agent for vasodilation, and that she could obtain selective arterial vasodilation by administering adenosine alone.  The Sollevi prior art suggests as much, concluding with statements concerning the use of adenosine to achieve controlled hypotension – which make no mention of dipyridamole.  No hindsight bias or *ex post* reasoning is necessary to arrive at the conclusion that it would be obvious to the person of ordinary skill that the continuous intravenous administration of adenosine in the amounts used in

---

[1]      There is no requirement in the asserted claims that a specific amount of selective arterial vasodilation be achieved.

the Sollevi prior art, without pretreatment with dipyridamole, would cause some degree of selective arterial vasodilation without the accompanying complications of dipyridamole.

**B.**    **The Fukunaga Prior Art**

The prior art story does not end with the Sollevi prior art.  An abstract published in 1982 by Dr. Fukunaga (TX 42, "the Fukunaga Abstract") taught the administration of a continuous intravenous infusion of adenosine triphosphate **without** dipyridamole to induce controlled hypotension in human patients.  The asserted claims of the '296 patent are **also** rendered invalid as obvious and inherently anticipated by the Fukunaga Abstract.

As Dr. Binkley explained, and Plaintiffs' expert Dr. Klabunde did not effectively dispute, a person of ordinary skill in the art in 1985 would understand that ATP rapidly and virtually entirely converts to adenosine following its administration.  Based on the Fukunaga Abstract, a person of ordinary skill would understand that the adenosine formed by the breakdown of the ATP – not the ATP itself – is responsible for the reported selective arterial vasodilation.  And in the Fukunaga Abstract, the amount of adenosine formed from the ATP that was administered falls squarely within the ranges of adenosine in the asserted '296 patent claims, thus inherently disclosing the claimed ranges of adenosine.

A subsequent publication by Fukunaga (TX 51, "Fukunaga 1984") on the effects of pretreatment with dipyridamole on the administration of ATP confirmed the core teaching of the Fukunaga Abstract.  Fukunaga 1984 demonstrated that dipyridamole reduced the amount of ATP required for inducing controlled hypotension, just as it reduced the amount of adenosine.  This result made it obvious to a person of ordinary skill that adenosine was the agent of the selective arterial vasodilation in both the Fukunaga Abstract and Fukunaga 1984.

**C.**    **No Secondary Factors Support Non-Obviousness**

Plaintiffs have asserted secondary considerations in support of the non-obviousness of the '296 patent, chief among them the alleged teaching away and skepticism of experts, as well as the

commercial success of its commercial Adenoscan® product.  The scant record of secondary considerations, however, does not undermine Defendants' *prima facie* case of obviousness.

Plaintiffs touted the risk of AV block, uric acid build-up, and excessive fluid load as concerns that would discourage person of skill from doing the obvious: using adenosine without pretreatment with dipyridamole.  Yet neither the Sollevi prior art nor the Fukunaga Abstract reports the occurrence of any of these problems.  And as Defendants' expert Dr. Binkley explained, persons of skill in the art would have known to administer allopurinol to avoid uric acid buildup and that using a more concentrated adenosine solution would ameliorate whatever concern might exist about excessive fluid load.

More importantly, Plaintiffs have failed to demonstrate a nexus between the '296 patent claimed invention and the alleged commercial success of the Adenoscan® product.  *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299 (Fed. Cir. 2006) ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").  Adenoscan® was marketed not on the basis of its ability to selectively dilate arteries rather than veins without pretreatment with dipyridamole (*i.e.*, the claimed '296 patent invention), but on the basis of its short half life and the concomitant rapid cessation of side effects.  In short, the nexus is with characteristics of adenosine that were long known in the prior art, and not the claimed invention.

Finally, Adenoscan® sales levels do not suggest any non-obviousness.  The commercial sales of Adenoscan® are explained by the confluence and interaction of four economic factors: (1) the existence of just one other FDA-approved competitor in the pharmacological stress testing market at the time of Adenoscan® market entry; (2) the absence of marketing and promotion by the manufacturers of drugs that are competitive alternatives to Adenoscan®; (3) extensive marketing and promotional campaigns; and (4) growth in demand for myocardial perfusion imaging employing pharmacological stress agents occurring for demographic and marketing reasons unrelated to the asserted invention.

In sum, the asserted claims are the result of (at best) ordinary innovation. But such ordinary innovation is not the subject of exclusive rights under the patent laws. *See KSR*, 2007 WL 1237837, at *19. In view of the prior art references and the knowledge in the art, defendant Sicor has proved by clear and convincing evidence the facts that demonstrate the asserted claims of the '296 patent are invalid as anticipated and obvious. Plaintiffs have failed to successfully rebut this evidence by proof of any secondary considerations that demonstrate the non-obviousness of the asserted claims. This Court should find the '296 patent invalid as obvious and inherently anticipated by the prior art.

## II.     FACTUAL BACKGROUND

### A.     The '296 Patent

#### 1.     General Background

The '296 patent (TX 275), entitled "Selective Vasodilation by Continuous Adenosine Infusion," issued on March 24, 1998, from U.S. Application No. 08/031,666, which was filed on March 15, 1993. The '296 patent lists Alf Sollevi as its sole inventor and is assigned on its face to Item. The priority date is September 24, 1985.

The relevant date for prior art to the '296 patent, as prior art is defined under 35 U.S.C. § 102(b), is on or before September 24, 1984.

#### 2.     The Asserted Claims

Plaintiffs have asserted claims 1, 3, 7, and 9 of the '296 patent against Sicor. Claims 1, 3, and 7 of the asserted '296 patent are generally directed to a method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering adenosine into the blood stream of the patient at various recited rates. Specifically, claims 1, 3, and 7 recite as follows:

**Claim 1:**
A method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering into the blood stream of said patient

adenosine at a rate of administration of 0.35 milligrams of adenosine per kilogram body weight per minute, or less

**Claim 3:**
A method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering into the blood stream of said patient by intravenous administration about 0.05 milligrams to about 0.30 milligrams of adenosine per kilogram body weight per minute

**Claim 7:**
A method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering into the blood stream of said patient by intravenous administration about 0.01 milligrams to about 0.15 milligrams of adenosine per kilogram body weight per minute.

Claim 9 recites "a method for inducing a reduced afterload in the vascular system of a human without reducing the preload and without pretreatment with dipyridamole," comprising continuously administering adenosine at a rate of 350 µg/kg/min or less into the blood stream of the patient. Specifically, claim 9 recites as follows:

**Claim 9:**
A method for inducing a reduced afterload in the vascular system of a human without reducing the preload and without pretreatment with dipyridamole, the method comprising continuously administering into the blood stream of said patient adenosine at a rate of administration of 0.35 milligrams of adenosine per kilogram body weight per minute, or less

The specification of the '296 patent uses the term "preload" as equivalent to dilating veins and the term "afterload" as equivalent to dilating arteries (col. 2, lines 39-42). If these equivalents were substituted for the terms "afterload" and "preload" in claim 9, claim 9 would read as follows (substitutions in brackets):

**Claim 9**
A method for [dilating arteries] in the vascular system of a human without [dilating veins] and without pretreatment with dipyridamole, the method comprising continuously administering into the blood stream of said patient adenosine at a rate of administration of 0.35 milligrams of adenosine per kilogram body weight per minute, or less

Therefore, claim 9 is virtually identical to claim 1 for purposes of an invalidity analysis.[2]

**B.    State Of The Art**

The field of art relevant to the '296 patent can be described broadly as the field of vasodilators and the related hemodynamic parameters, with a focus on three vasodilators known in the art to result in selective arterial vasodilation: adenosine, dipyridamole, and ATP.

### 1.    Vasodilators Generally

The '296 patent is generally directed to the use of adenosine as a vasodilator. In general, a vasodilator is a substance that dilates veins, arteries, or both. Tr. 84:5-11. Certain vasodilators (*e.g.*, adenosine and dipyridamole) dilate primarily arteries (Tr. 84:23-85:9; Tr. 97:8-11; Tr. 131:6-10), while other vasodilators dilate primarily veins (*e.g.*, nitrogen compounds) (Tr. 85:10-15) or dilate arteries and veins equally (*e.g.*, nitroprusside) (Tr. 86:5-13).

Vasodilators are used in medicine for the treatment and diagnosis of many different diseases. For example, since the early 1950s, vasodilators have been used to treat hypertension by "relaxing" the blood vessels. Tr. 86:17-87:9. Later, in the 1970s and early 1980s, vasodilators were also used to treat congestive heart failure and lower blood pressure during surgical procedures. Tr. 87:13-24. Vasodilators have also been used to treat limb ischemia (Tr. 1372:11-24) and to diagnose coronary artery disease (*e.g.*, myocardial perfusion imaging) (Tr. 1374:4-1375:7).

### 2.    Hemodynamic Parameters Relevant To Vasodilation

Certain measurements are evaluated by a person of ordinary skill to determine whether vasodilation has occurred.[3] The relationship between these measurements is represented by the following equation:

---

[2]    The Court has not issued a formal claim construction of the terms "afterload" and "preload." However, Plaintiffs did not identify in their claim construction briefs or at trial any substantive difference between claims 1 and 9 that has any impact on the validity analysis in view of the relevant prior art. Thus, any prior art that would render claim 1 anticipated and/or obvious will also be considered to render claim 9 anticipated and/or obvious. In Sicor's post-trial briefs, the validity analysis as to claim 1 applies with equal force to claim 9, and vice versa.

$$\text{Pressure (P)} = \text{Blood Flow (F)} \cdot \text{Resistance (R)}$$

Tr. 87:25-88:16; *see also* DTX 3006-A.  Each of the elements of this equation provides specific information about vasodilation.  Pressure (P) may be defined as the pressure that blood is exerting against the arterial walls.  Differences in pressure are responsible for pushing blood through the arteries.  Tr. 89:4-13.  Blood flow (F) may be defined as the volume of blood that is passing a given point in an artery per unit time (*e.g.*, ml/min).  Tr. 89:14-90:1.  Resistance (R) may be defined as the resistance by the arterial wall against blood flow.  Tr. 90:6-90:11.  Vasodilation is essentially a decrease in resistance.  Tr. 90:12-19.

In practice, each of these measurements is represented by specific hemodynamic parameters that are readily measurable by a person of ordinary skill in the art.  Pressure is usually described in terms of "blood pressure" or "mean arterial blood pressure" ("MABP"), which is the average blood pressure in a vessel during the entire cardiac cycle.  Tr. 91:13-17.[4]  Blood flow is usually described in terms of "cardiac output" ("CO"), which is equal to the amount of blood that the heart pumps per beat multiplied by the heart rate.  Tr. 92:18-93:8.  Resistance is often described in terms of systemic vascular resistance ("SVR"), which is the resistance of the systemic blood vessels.  Tr. 90:6-11, 94:6-16; DTX 3006-D; DTX 3011-A-C.

Vasodilation can be detected though changes in these related hemodynamic parameters.  Tr. 88:5-16; DTX 3006-A-E.  For example, MABP and cardiac output can be measured to determine changes in arterial and venous resistance.  If MABP decreases and cardiac output increases or remains the same, than resistance in the arteries must have also decreased.  Tr. 94:22-7.  This basic equation would have been understood by a person of ordinary skill at the relevant time: if arterial resistance decreases, then arterial vasodilation has occurred.  Tr. 88:5-11.

---

[3]  As discussed *infra*, a person of ordinary skill is a cardiologist with a residency in internal medicine and two years of a cardiology fellowship, whose experience could also include nuclear cardiology imaging.

[4]  The "cardiac cycle" is defined as the time period from when the heart begins to contract to pump blood to the rest of the body, to the time it is fully relaxed and filled with blood.  Tr. 91:18-23.

Furthermore, since cardiac output did not decrease, a person of ordinary skill would conclude that there was little or no venous dilation.  Tr. 95:5-13.

### 3. Adenosine Was A Well-Known Vasodilator

Although the potent vasodilator effects of adenosine were recognized in the art as early as 1929 (TX 35 at 236; *see also* TX 113 at 321), its widespread use in the treatment of medical conditions did not occur for several more decades, in part due to the lack of an approved pharmaceutical-grade product suitable for human injection.  Tr. 331:22-332:2.  From the early 1970s to the 1980s, there was an increasing focus on the use of selective arterial vasodilators, such as adenosine, for the treatment of a number of cardiovascular conditions, including congestive heart failure and hypertension.  Tr. 1370:15-1372:10; Tr. 1372:25-1374:3.  A seminal publication in 1980 in Circulation Research (TX 228) placed adenosine squarely at the forefront of this research, resulting in numerous animal and clinical studies to explore adenosine's medical uses.  *See, e.g.*, TX 36, TX 37, TX 40, TX 45, TX 88, TX 236, TX 1170, TX 1187, TX 5000.

### 4. Dipyridamole Was Known To Act By Increasing The Concentration Of The Body's Own Adenosine

At the same time, another well-known vasodilator was being studied for new uses.  Dipyridamole had long been known in the art as a vasodilator, and its mechanism of action had also been understood since the late 1970s.  Tr. 355:16-356:8; TX 101 at 21; TX 228 at 809.  In fact, a person of ordinary skill in the art in 1985 would have known that the administration of dipyridamole and the administration of adenosine yield the same net result – an increase of adenosine in the bloodstream.  *Id.*  Dr. Klabunde confirmed that such a person would also have understood that dipyridamole functions as a "middle man" by blocking adenosine deaminase, the enzyme responsible for adenosine uptake and metabolism.  Tr. 1165:2-9.  When the adenosine deaminase cannot metabolize the adenosine naturally occurring in the body (*i.e.*, "endogenous" adenosine), the concentration of adenosine in the bloodstream increases, thereby leading to

selective arterial vasodilation.[5]  Tr. 356:1-8; Tr. 1095:11-14; DTX 3020-A-D.  This scientific

knowledge was well known to persons of ordinary skill in the art at the relevant time.  Tr.

119:15-22; Tr. 131:1-133:16.

But the medical use of dipyridamole came with drawbacks.  First, the onset of the effects

of dipyridamole occurs more slowly than the onset of the effects of adenosine.  Since

dipyridamole acts by increasing the concentration of endogenous adenosine, the accumulation of

adenosine – and its resultant effects – builds up more gradually.  Tr. 133:21-134:9; DTX 3022.

Second, the effects of dipyridamole – including any negative side effects – last longer than the

effects of adenosine, due to the much longer "half life" of dipyridamole.[6]  Tr. 1096:11-25;

TX 5000 at 1195.  The functional half life of dipyridamole is 30 to 40 minutes (Tr. 1381:18-22;

Tr. 1400:6-1042:14; TX 1173 at 167; TX 1177 at 1080), whereas the half life of adenosine is

about 10 to 30 seconds (Tr. 107:11-21).

## 5.    Vasodilating Effects Of ATP Were Also Due To The Effects Of Adenosine

Adenosine triphosphate ("ATP") was also being investigated as a vasodilator in the early

1980s.  ATP, which is also a naturally occurring substance in humans, is composed of an

adenosine molecule bound to a "tail" of three phosphate molecules.  Tr. 106:14-18; Tr.

107:22-108:24; DTX 3016-A.  ATP is constantly converted to adenosine by a reaction that is

fundamental to human metabolism, in which the phosphate groups are sequentially removed by

nucleotidase enzymes.  Tr. 108:10-24; Tr. 1083:9-16; Tr. 1107:3-7; DTX 3016-A-H.  This

conversion is nearly immediate, as noted in several references published in the early 1980s,

including one co-authored in 1984 by Dr. Sollevi:

---

[5]    At high concentrations, dipyridamole may cause vasodilation though other mechanisms of action. However, Dr. Klabunde testified that doses of dipyridamole administered in the prior art discussed *infra* were too low to "implement" these other mechanisms of action.  Tr. 1105:1-12.

[6]    The term "half life" refers to the amount of time that will elapse before half of the concentration of a given drug will break down.  Tr. 503:12-16.

> Using a quantitative HPLC method for purine determination, we recently have demonstrated that ATP given by the iv route is degraded entirely to adenosine and its breakdown products during the transpulmonary passage.

*See* TX 236 at 547; *see also* Tr. 109:10-15; TX 51 at A39; TX 228 at 807-08, TX 5000 at 1196.

This reaction would have been known to a person of ordinary skill in the art in 1985.  Tr.

107:22-109:20.

Not only is the conversion of ATP to adenosine extremely rapid, but the conversion is

also equimolar.[7]  This fact, too, was well known in the art.  A number of references disclosed that

exogenous ATP is converted rapidly and completely to adenosine following the administration of

ATP:

> The arterial plasma adenosine concentration during ATP infusions was similar to that found during an equimolar infusion of adenosine.  Moreover, similar arterial plasma concentrations of adenosine were found at similar hypotensive levels, whether adenosine or ATP was given . . .

*See* TX 88 at 174-75; Tr. 167:20-169:17; Tr. 1125:23-1126:13; *see also* TX 36 at 1262.

Due to ATP's rapid and complete conversion to adenosine, the intravenous

administration of ATP also causes selective arterial vasodilation – a property which led to the use

of ATP to induce controlled hypotension in surgical patients.  TX 42 at A65.  By the early 1980s,

these vasodilative effects of ATP were attributed in the art to ATP's breakdown to adenosine –

not the direct action of ATP itself:

> In the guinea pig heart the AV conduction delay and block caused by adenosine triphosphate is due to its degradative product, adenosine.  Thus, it is probable that in humans, as in the case of the guinea pig, adenosine triphosphate must be hydrolyzed to adenosine to exert its effect.  ***Hence, it is adenosine that is the active agent.***  TX 5000 at 1196, emphasis added.[8]

> ATP, a purine nucleotide, when administered parenterally is rapidly hydrolyzed to Ad[enosine] . . . Most of the hemodynamic effects of ATP, however, are

---

[7]     In these case, "equimolar" means that a certain number of ATP molecules are converted to the same number of molecules of adenosine.  Tr. 1416:4-9.

[8]     Plaintiffs objected to the use of TX 5000 at trial, but their objection has no sound basis.  TX 5000 appears to be the publication referenced in the private correspondence that Plaintiffs seek to introduce in support of certain secondary considerations arguments, and should be considered for the sake of completeness.

>           attributed to Ad[enosine] because of the speed of this hydrolysis in the blood.
>           TX 51 at A39.

*See also* Tr. 1107:3-12.

Dr. Sollevi himself published several papers in the early 1980s that plainly stated that the vascular effects of ATP were due to its conversion to adenosine. One of these papers expressly recommended the use of adenosine **instead** of ATP to include controlled hypotension:

>           We therefore consider it more appropriate to use adenosine instead of ATP to
>           induce controlled hypotension.

*See* TX 236 at 547. In another paper, Dr. Sollevi repeatedly stated that the effects of ATP were due to adenosine:

>           Hence the vascular effects of parenterally administered ATP are due mainly to
>           adenosine.

>           [T]he present data suggest that adenosine mediates the vasodilatory effects of
>           exogenously administered ATP.

>           In conclusion, the present experiments demonstrate that intravenously
>           administered ATP is eliminated from plasma before reaching the arterial vascular
>           bed where it may cause hypotension. Furthermore, the vasodilatory effect of
>           ATP and adenosine was directly proportional to the arterial adenosine level.

*See* TX 88 at 174-175; *see also* Tr. 396:4-23; Tr. 1128:15-17. Even Plaintiffs' expert, Dr. Klabunde, testified that "as was well-known at the time, one of the major breakdown products of ATP when it's administered to the blood is going to be the formation of adenosine." Tr. 1043:21-23. In fact, a person of ordinary skill in the art would understand that any vasodilation that occurred following ATP administration was due to the breakdown of ATP to adenosine and the subsequent binding of **adenosine** (not ATP) to the A2A receptors that were linked to vasodilation. Tr. 1434:4-1435:6; Tr. 1435:12-1438:2; TX 151 at 110-111; TX 152 at 195, 196.

### III.    ARGUMENT

#### A.    The Asserted Claims Are Invalid As Obvious Under 35 U.S.C. § 103

Claims 1, 3, 7, and 9 of the '296 patent are invalid as obvious in view of each of the

following references in combination with the general knowledge of a person of ordinary skill in

the art in 1985:

> A. Sollevi *et al.*, *Cardiovascular effects of adenosine during controlled hypotension in cerebral artery aneurysm surgery*, Anesthesiology (Circulation II) 59(3): A9 (Sept. 1983) (TX 1170, "Sollevi I");
>
> A. Sollevi *et al.*, *Cardiovascular effects of adenosine in man*, Acta Physiol. Scan. 120(2): 11A (Feb. 1984) (TX 37, "Sollevi II");[9] and
>
> A.F. Fukunaga *et al.*, *ATP-induced hypotensive anesthesia during surgery,* Anesth. & Anesthesiology, 57(3): A65 (1982) (TX 42, "Fukunaga Abstract").

#### 1.    The Law Of Obviousness

A claimed invention is not patentable "if the differences between the subject matter

sought to be patented and the prior art are such that the subject matter as a whole would have

been obvious at the time the invention was made to a person having ordinary skill in the art to

which the subject matter pertains."  35 U.S.C. § 103(a); *see also Ormco*, 463 F.3d at 1306.

Obviousness is a legal conclusion, based on underlying factual findings.  *See Medichem, S.A. v.*

*Rolabo, S.L.*, 437 F.3d 1157 (Fed. Cir. 2006).

The factual inquiries underlying the legal determination of obviousness include the

following four factors: (1) the level of ordinary skill in the art; (2) the scope and content of the

prior art; (3) the differences between the claimed invention and the prior art; and (4) the relevant

secondary considerations.  *See Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356

(Fed. Cir. 2006).

Any obviousness inquiry must address the subsidiary question of whether the art provides

a suggestion or motivation to combine the references.  The Supreme Court recently rejected the

---

[9]    Sollevi I and Sollevi II are referred to collectively as "the Sollevi prior art."

rigid application of the "teaching-suggestion-motivation" ("TSM") test that has previously been employed by the Federal Circuit:

> The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasizing the importance of public articles and the explicit content of issued patents . . . . In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends.

*See KSR*, 2007 WL 1237837, at *14. In its stead, the Court adopted a more flexible test that places greater weight on the common sense of a person of ordinary skill:

> The same constricted analysis led the Court of Appeals to conclude, in error, that a patent claim cannot be proved obvious merely by showing that the combination of elements was "obvious to try." When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*See KSR*, 2007 WL 1237837, at *15 (internal citations omitted). The Court also cautioned that the specter of "hindsight bias" should not trump basic common sense, stating that "[r]igid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it." *Id.* Furthermore, the Court emphasized that an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 13.

But even before *KSR*, the Federal Circuit had sought to clarify that the "suggestion test is not a rigid categorical rule. The motivation need not be found in the references sought to be combined but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *See Dystar* 464 F.3d at 1361; *see also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286 (Fed. Cir. 2006). The "suggestion, teaching, or motivation to combine the relevant prior art teachings *does not have to be found explicitly in the*

*prior art . . . .*" *Alza*, 464 F.3d at 1290. Indeed, the suggestion test "not only permits, but *requires*, consideration of common knowledge and common sense." *Dystar*, 464 F.3d at 1367 (emphasis in original).

A second subsidiary question necessary to the obviousness inquiry is whether a person of ordinary skill in the art would have had a reasonable expectation that the combination of references would succeed for its intended purpose. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000). The standard is not "absolute predictability," but rather is whether a person of skill would have a "reasonable expectation" of success. *In re O'Farrell*, 853 F.2d 894 (Fed. Cir. 1988). The "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

In addressing obviousness, relevant secondary considerations must also be considered if they are present. Secondary considerations do not, however, control the analysis when there is an otherwise strong case of obviousness. *Id.* at 1372; *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476 (Fed. Cir. 1997). Moreover, for secondary considerations to be relevant there must be a nexus between the secondary consideration and the claimed invention. *See Ormco*, 463 F.3d at 1311-12.

Obviousness is determined from the point of view of a hypothetical person of ordinary skill in the art to which the patent pertains, who is presumed to have access to all prior art references in the field of the invention. *See In re Rouffet*, 149 F.3d 1350 (Fed. Cir. 1998). The person of ordinary skill in the art is also presumed to have ordinary creativity and common sense. *KSR*, 2007 WL 1237837, at *15.

To establish obviousness, Sicor has the burden of proving any disputed facts by clear and convincing evidence. *See Brown & Williamson*, 229 F.3d at 1124. The Court must then make the ultimate legal conclusion as to obviousness based on the evidence presented. *Id.*

### (a)     Level Of Ordinary Skill In The Art

Sicor has defined the person of ordinary skill in the art to which the '296 patent pertains as a cardiologist with a residency in internal medicine and two years of a cardiology fellowship, whose experience could also include nuclear cardiology imaging.  There is no real dispute between the parties concerning the definition of a hypothetical person of ordinary skill in the art in 1985.  Tr. 515:15-25.

### (b)     Scope And Content Of The Prior Art

The Sollevi prior art and the Fukunaga Abstract are prior art to the '296 patent under 35 U.S.C. § 102(b).  Either the Sollevi prior art or the Fukunaga Abstract, in combination with the knowledge of a person of ordinary skill, renders the asserted claims obvious.

### (1)     Sollevi I

Sollevi I (TX 1170) teaches the administration of a continuous intravenous infusion of adenosine at a mean dose of 140 µg/kg/min, following pretreatment with dipyridamole, to induce controlled hypotension  in nine anesthetized patients undergoing surgery for cerebral aneurysms. Tr. 123:10-124:5; Tr. 124:25-125:12; Tr. 125:20-22; TX 1170.  Sollevi I explains that dipyridamole was administered 10 to 30 minutes prior to the administration of adenosine "to inhibit adenosine cellular uptake" and to reduce the total required dose of adenosine.  Tr. 125:9-12; Tr. 130:23-25; TX 1170.  This statement simply describes the mechanism of action that was known to a person of ordinary skill at the relevant time: dipyridamole acts by increasing the adenosine concentration, and therefore reduces the amount of additional adenosine to be administered.  Tr. 355:16-356:8; Tr. 1374:8-16; TX 101 at 21; TX 228 at 809.

Following administration of adenosine, Sollevi I reported a large mean decrease of 43% in mean arterial blood pressure ("MABP") (Tr. 127:10-128:15; Tr. 129:17-19; Tr. 483:11-16) and a relatively large mean decrease of 61% in systemic vascular resistance ("SVR") (Tr. 128:11-129:7; Tr. 129:20-22).  Sollevi I also reported a large increase in cardiac output of 43%. Tr. 129:8-16.

Based on the disclosed changes in various hemodynamic parameters, Sollevi I would teach a person of ordinary skill in the art at the relevant time that the intravenous administration of 140 µg/kg/min of adenosine would selectively dilate the arteries of a human patient without inducing significant venous dilation.   Tr. 128:3-10; Tr. 130:10-22; Tr. 146:10-21.  As discussed *supra*, a decrease in SVR coupled with a decrease in MABP and an increase in cardiac output is a strong indication that dilation of arteries occurred.  Furthermore, an increase in cardiac output would also indicate that little or no venous dilation occurred.

Sollevi I concludes by referring to the intravenous administration of adenosine without a dipyridamole pretreatment (Tr. 136:23-137:8; Tr. 146:25-147:21) and states, "ADO in low molar concentrations rapidly induced a remarkably stable and easy reversible CH in man (see Fig 1), by a profound reduction in SVR concomitant with increased CO . . . It is concluded that the hemodynamic and metabolic properties of adenosine make it an suitable agent for CH in man." There is **no** reference to the need for a dipyridamole pretreatment in this conclusion.  Tr. 146:25-147:21; TX 1170.

### (2)    Sollevi II

Sollevi II (TX 37) discloses the same results from the same clinical study reported in Sollevi I (Tr. 148:16-22; Tr. 158:5-11), and further includes data from a tenth patient and information on the observed levels of certain adenosine metabolites (Tr. 148:16-22).

Sollevi II teaches the administration of a continuous intravenous infusion of adenosine at a molar dose that is equivalent to 140 µg/kg/min, following pretreatment with dipyridamole, to induce controlled hypotension in ten anesthetized patients undergoing surgery for cerebral aneurysms.  Tr. 148:16-149:14.  As explained in Sollevi II, the "adenosine uptake inhibitor" dipyridamole was administered prior to the administration of adenosine.  Tr. 148:16-22; Tr. 149:9-16; Tr. 159:2-4.  This statement simply describes the mechanism of action that was known to a person of ordinary skill at the relevant time: dipyridamole acts to increase the adenosine

concentration by inhibiting adenosine uptake.  Tr. 355:16-356:8; Tr. 1374:8-16; TX 101 at 21; TX 228 at 809.

The results reported in Sollevi II were the same results reported in Sollevi I.  *Compare* TX 1170, TX 37.  For example, Sollevi II reported a mean reduction in MABP following adenosine administration of 43% and a mean decrease in SVR of 61%.  Tr. 149:17-150:3.  Sollevi II also reported that cardiac output was increased by 40%.  *Id.*

Based on these results, Sollevi II would teach a person of ordinary skill in the art at the relevant time that the intravenous administration of 140 µg/kg/min of adenosine would selectively dilate the arteries of a human patient without inducing significant venous dilation.  Tr. 150:8-151:24.  As discussed *supra*, a decrease in SVR coupled with a decrease in MABP and an increase in cardiac output is a strong indication that dilation of arteries occurred.  Furthermore, an increase in cardiac output would also indicate that little or no venous dilation occurred.

Sollevi II concludes by referring to the administration of adenosine **without** the use of a dipyridamole pretreatment:  "These results indicate that adenosine may be used to achieve controlled hypotension in man since it acts as a rather pure arteriolar vasodilator with rapid onset, sustained action and rapid elimination."  Tr. 154:9-22; TX 37.  There is no reference to the need for a dipyridamole pretreatment in this conclusion.

### (3)    **Fukunaga Abstract**

The Fukunaga Abstract (TX 42) discloses the administration of adenosine triphosphate ("ATP") to twenty-seven patients at a dose of 200 to 600 µg/kg/min, without pretreatment with dipyridamole.  Tr. 162:6-13; Tr. 163:19-166:7.  As discussed *supra*, exogenous ATP rapidly and completely breaks down to adenosine shortly after the ATP is administered.  A person of ordinary skill in the art would have known to use a simple molar conversion to calculate that 200 to 600 µg/kg/min of ATP was equivalent to about 97 to 290 µg/kg/min of adenosine.  Tr. 167:6-169:17.

The Fukunaga Abstract teaches that MABP and SVR decreased significantly, while cardiac output was "well maintained" or increased.  Tr. 169:22-170:4.  The decrease in SVR

which would lead a person of ordinary skill to conclude that selective arterial dilation had occurred, and the lack of decrease in cardiac output would further indicate to such a person that little or no venous dilation had occurred. Tr. 163:9-18; Tr. 170:5-14. Moreover, this selective arterial vasodilation could be expected based upon the known vasodilatory effect of adenosine. The Fukunaga Abstract also does not report the occurrence of any serious side effects following administration of ATP.

### (c)   A Person Of Ordinary Skill Would Have Been Motivated To Find Additional Medical Uses For Adenosine Without Dipyridamole

Based on the teachings in the Sollevi prior art and the Fukunaga Abstract, a person of ordinary skill in the art in 1985 would understand that the controlled hypotension observed in this prior art was a result of the arterial vasodilation caused by the adenosine. Such a person would have realized that nearly maximal arterial dilation had occurred because controlled hypotension had been achieved.[10] Tr. 124:6-24; Tr. 137:20-138:9.

Further, such a person would have also understood that arterial dilation occurs over a range – it is not an "all or nothing" phenomena.[11] Tr. 137:20-138:9. The person of ordinary skill would therefore have been motivated to find medical uses for an intravenous adenosine infusion other than controlled hypotension. As Dr. Klabunde confirmed, while controlled hypotension is conclusive evidence that arterial vasodilation was achieved (Tr. 1059:19-22), lesser degrees of arterial dilation would not necessarily cause controlled hypotension (Tr. 1059:23-1060:4), but would be important for other medical uses (Tr. 1079:21-1080:2). In fact, Dr. Klabunde agreed that the "goal" of one of his own publications about the effects of adenosine *in vitro* was to stimulate others to find practical medical applications for adenosine. Tr. 1079:21-1080:2.

---

[10]   Plaintiffs objected to Dr. Binkley's trial testimony on this issue, but such testimony is plainly within the scope of Dr. Binkley's expert report, at least ¶¶ 64-66 (TX 26).

At the relevant time period, persons of ordinary skill were actively researching additional uses for selective arterial vasodilators, including in the treatment of hypertension (Tr. 1372:25-1374:3), in the treatment of congestive heart failure (Tr. 1370:15-1372:10), in the diagnostic procedure of myocardial perfusion imaging (Tr. 1374:4-1375:7), and in the treatment of limb ischemia (Tr. 1372:11-24). As part of this research, persons or ordinary skill in the art often studied the properties of arterial vasodilators in order to determine whether a specific vasodilator would be suitable for a particular use. For example, the following prior art reference concerned a study of the hemodynamic properties of adenosine in man:

> I.O. Biaggioni *et al.*, *Humoral and Hemodynamic Effects of Adenosine Infusion In Man*, Clinical Res., 33(2): 280A (April 1985) ("Biaggioni Abstract").

Specifically, the Biaggioni Abstract (TX 1187) concerns a clinical study of the relationship between the cardiovascular effects of adenosine and inhibition of sympathetic nervous system activity. TX 1187 at 280A.

But the Biaggioni Abstract is significant apart from exemplifying the interest in the art on properties of selective arterial vasodilators for purposes other than inducing hypotension. The Biaggioni Abstract discloses the administration of continuous intravenous infusions of adenosine without dipyridamole pretreatment to five conscious volunteers at a rate of 10 µg/kg/min to 140 µg/kg/min, with no serious side effects reported. Tr. 172:12-173:1; Tr. 174:19-22; Tr. 175:5-176:4. Therefore, the Biaggioni Abstract would teach a person of ordinary skill in the art at the relevant time that adenosine could be administered intravenously to humans at the claimed dose of 140 µg/kg/min without dipyridamole pretreatment and without the occurrence of serious side effects. *Id.* This teaching would further motivate such a person to seek additional uses for adenosine alone as a selective vasodilator. Tr. 174:5-13; Tr. 1079:21-1080:2.

---

[11] There is no requirement in the asserted claims that a specific amount of selective arterial vasodilation be achieved.

Common sense alone would motivate the person of ordinary skill to omit the dipyridamole pretreatment. *See KSR*, 2007 WL 1237837, at *15 ("[A] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions."). A person of ordinary skill would have understood that the administration of dipyridamole with adenosine would prolong any side effects that might occur, given that dipyridamole has a longer half life than adenosine. Tr. 1096:11-25; TX 1173 at 167; TX 1177 at 1080. As Dr. Klabunde agreed, a person of ordinary skill in 1985 would understand that the dipyridamole pretreatment could potentiate any harmful side effects of subsequently-administered adenosine. Tr. 1096:11-25. This knowledge would suggest to a person of ordinary skill that she could administer adenosine alone to minimize the chance of concentration-dependant side effects. Tr. 200:5-201:4; Tr. 203:10-17; Tr. 204:13-23; Tr. 205:14-24; Tr. 209:7-14. In addition, a person of ordinary skill in the art at the relevant time would believe that it is better, in general, to administer one drug rather than two, at least in order to reduce the possible risk of unfavorable or dangerous drug interactions. Tr. 183:19-184:5.

In addition, and as early as 1983, other published research expressly suggested the administration of adenosine without dipyridamole pretreatment:

> [W]e speculate that adenosine alone, without the potentiating effects of dipyridamole, may be sufficient to produce hypotension in higher primates and man without involving excessive volumes of fluid.

*See* TX 40 at 73; *see also* Tr. 1197:13-1198:5. Given this disclosure, the administration of adenosine without dipyridamole would be reasonable and make obvious sense to a person of ordinary skill in 1985, without the need for much further discussion. Indeed, the Supreme Court has noted that in some instances and in some fields, there is little discussion of obvious techniques or combinations. *See KSR*, 2007 WL 1237837, at *14 ("In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends.").

- 22 -

Using the amounts in the prior art as a guide, the dose of adenosine to be intravenously administered safely and effectively for a given medical use could be determined by a simple dose titration. Dr. Klabunde confirmed that such a dose titration would have been routine experimentation for a person of ordinary skill in the art at that time (Tr. 1132:21-1133:1); *see also* TX 36 at 1261. *Pfizer*, 480 F.3d at 1364 ("[O]nly a reasonable expectation of success, not a guarantee, is needed.").

### (d) Differences Between The Claimed Invention Of The '296 Patent And The Prior Art

While the prior art and asserted claims are extremely similar (if not identical), the differences between them must be considered as part of a proper obviousness analysis. *See Dystar*, 464 F.3d at 1360.

### (1) Sollevi Prior Art

The Sollevi prior art (TX 1170 & TX 37) reports identical results from the same clinical study concerning administration of 140 µg/kg/min of intravenous adenosine to humans to cause selective arterial vasodilation (Tr. 148:16-22; Tr. 158:5-11), and both abstracts differ from the asserted claims in only one way: the use of a dipyridamole pretreatment. The Sollevi prior art uses a dipyridamole pretreatment before the administration of adenosine, while each of the asserted claims recite the administration of adenosine without dipyridamole.

But as discussed *infra*, a person of ordinary skill would understand based upon the methods and conclusions set forth in the Sollevi prior art, as well as the background knowledge in the art, that the prior art suggested the administration of intravenous adenosine without the use of any dipyridamole whatsoever.

### (2) Fukunaga Abstract

The Fukunaga Abstract discloses the intravenous administration of a selective arterial vasodilator to humans. The sole difference between Fukunaga and the asserted claims is that the vasodilator used in Fukunaga is ATP, whereas the asserted claims recite adenosine.

But as discussed *supra*, ATP was known as the parent molecule to adenosine (Tr. 106:14-18; Tr. 107:22-108:24; DTX 3016-A-H), and a person of ordinary skill would understand based upon various prior art publications that exogenous ATP is converted rapidly and completely to adenosine following administration (*see*, *e.g.*, Tr. 107:22-109:20; Tr. 167:20-169:17; TX 36 at 1262; TX 228 at 807-08; TX 236 at 547). Such a person would also understand that the selective arterial vasodilation that is observed following the administration of ATP is due to its breakdown to adenosine – not due to the direct action of ATP itself. TX 51 at A39; TX 88 at 174-75; TX 236 at 547.

2.     **The Sollevi Prior Art, In Combination With The Knowledge Of A Person Of Ordinary Skill In The Art, Renders The Asserted Claims Obvious**

The disclosures of the Sollevi prior art, in combination with the knowledge of a person of ordinary skill, would render each of the asserted claims of the '296 patent obvious. The Sollevi abstracts disclose or suggest each of the following: (1) a method of selectively vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates (Tr. 186:6-191:3; DTX 3030; DTX 3037; DTX 3045).

(a)     **Element No. 1**

As discussed *supra*, the Sollevi prior art discloses a method of selectively vasodilating the arteries with little or no venous dilation. A person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Sollevi abstracts demonstrated selective arterial vasodilation with little or no venous dilation. The Sollevi prior art disclosed a decrease in MABP and SVR, along with an increase in cardiac output, which would indicate to a person of ordinary skill that arteries had been dilated with little or no venous dilation. The Sollevi prior art thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

**(b)**     <u>Element No. 2</u>

As discussed *supra*, the Sollevi prior art discloses that anesthetized human patients were the subjects of the study.  The Sollevi prior art thus discloses the claimed limitation "of a human patient," as set forth in asserted claims 1, 3, 7, and 9.

**(c)**     <u>Element No. 3</u>

As discussed *supra*, the Sollevi prior art discloses the use of a dipyridamole pretreatment before the administration of adenosine.  However, based on the disclosures of the Sollevi prior art and knowledge in the art at the time, it would have been obvious to a person of ordinary skill in the art to omit this dipyridamole pretreatment.

Common sense would have motivated a person of ordinary skill in 1985 to omit the dipyridamole pretreatment and administer adenosine alone.  *See KSR*, 2007 WL 1237837, at *15.  The mechanism of action of dipyridamole was well-known at that time:  dipyridamole acted by increasing the endogenous concentration of adenosine.  Tr. 355:16-356:8; Tr. 1374:10-16. Moreover, omission of the dipyridamole pretreatment would be understood by a person of ordinary skill to solve the problem of the longer duration of side effects with dipyridamole.  Tr. 200:5-201:4; Tr. 203:10-17; Tr. 204:13-23; Tr. 205:14-24; Tr. 209:7-14.  A person of ordinary skill in the art would have drawn the "natural" conclusion to administer adenosine as the direct-acting agent to product the same effect.  *See KSR*, 2007 WL 1237837, at *3 ("A court must ask whether the improvement is more than the predictable use of prior=art elements according to their established functions.").

A person of ordinary skill would also have been motivated to omit the dipyridamole pretreatment as unnecessary to achieve a desired level of selective arterial vasodilation, in view of the teaching in the Sollevi prior art that the continuous intravenous infusion of adenosine could still maintain maximal selective arterial vasodilation (*i.e.*, controlled hypotension) even as the effect of the dipyridamole pretreatment might be waning.  In the Sollevi prior art, dipyridamole

was given as a single injection 10 to 30 minutes before adenosine administration.  Tr. 141:22-142:4; Tr. 151:25-152:5.  Subsequently, adenosine was administered as a continuous intravenous infusion in at least one patient for up to 75 minutes.  Tr. 142:11-16; Tr. 148:16-22. The MABP immediately before adenosine was administered was approximately 82 mmHg, which dropped rapidly to 46 mmHg when the adenosine infusion of 140 µg/kg/min began. Tr. 142:18-23; Tr. 149:22-150:3.  By the end of adenosine administration, at least two (and up to three) dipyridamole half lives may have elapsed,[12] and only one fourth to one eighth of the original dipyridamole concentration would have remained.  Consequentially, a person of ordinary skill would have understood that the effective amount of dipyridamole, and thus its blockage of adenosine uptake, likely did not remain steady for the duration of the controlled hypotension. Tr. 143:25-146:7.  The person of skill would have understood that, at least for those patients in which the intervals between the treatments with dipyridamole and the cessation of the adenosine intravenous infusion were more prolonged, that the dipyridamole and its blocking effect in the patient was waning.  Tr. 147:17-21; Tr. 154:1-17; Tr. 160:8-21.

But even though the level of dipyridamole would have been waning by end of the experiment, the decrease in MABP was sustained at the same level throughout the continuous adenosine administration – regardless of the varying level of dipyridamole present. Tr. 142:24-143:4; Tr. 143:25-146:8; DTX 3064.  Therefore, a person of ordinary skill in the art would understand the administration of adenosine alone would also cause some degree of selective arterial vasodilation, as evidenced by the controlled hypotension being maintained for each patient in the Sollevi prior art, despite the different amounts of time elapsing between the dipyridamole and adenosine treatments, and the different durations of adenosine administration. Tr. 139:17-141:7; 160:1-21.  Furthermore, Dr. Klabunde confirmed that such a person would

---

[12]     As discussed *supra*, the half life of dipyridamole is about 30 to 40 minutes.

understand that dipyridamole alone did not cause the "profound" hypotension reported in the Sollevi prior art.  Tr. 1166:4-9.

In addition, as discussed *supra*, the Sollevi prior art concludes by referring to the intravenous administration of adenosine without any reference to a dipyridamole pretreatment. Tr. 136:23-137:8; Tr. 146:25-147:21; Tr. 154:9-22.

The Sollevi prior art would therefore suggest to a person of ordinary skill in the art to administer adenosine "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

### (d)    Element No. 4

As discussed *supra*, the Sollevi prior art discloses the administration of adenosine as a continuous intravenous infusion.   The Sollevi prior art thus discloses the claimed manner of administration, as set forth in asserted claims 1, 3, 7, and 9.

### (e)    Element No. 5

As discussed *supra*, the Sollevi prior art discloses the administration of adenosine at a rate of 140 ug/kg/min, which falls within each of the claimed rates of administration: 0.35 mg/mg/min or less (claims 1 and 9); about 0.05 to about 0.3 mg/kg/min (claim 3); or about 0.01 to 0.15 mg/kg/min (claim 7).   A presumption of obviousness exists where the ranges disclosed in a prior art reference overlap or encompass the claimed range.  *See Ormco*, 463 F.3d at 1311; *In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003); *see also Pfizer*, 480 F.3d at 1368 ("[T]he discovery of an optimum value of a variable in a known process is usually obvious.").

In view of the teachings of the Sollevi prior art, coupled with the knowledge of a person of ordinary skill in the art in 1985, the asserted claims of the '296 patent are obvious.

### 3.    The Fukunaga Abstract, In Combination With The Knowledge Of A Person Of Ordinary Skill, Renders The Asserted Claims Obvious

The disclosures in the Fukunaga Abstract (TX 42), coupled with the knowledge of a person of ordinary skill in the art in 1985, would render each of the asserted claims of the '296

patent obvious.  The Fukunaga Abstract discloses or suggests each of the following: (1) a method of selectively vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates.  Tr. 186:6-191:3; DTX 3044; DTX 3045.

(a)    Element No. 1

As discussed *supra*, the Fukunaga Abstract discloses a method of selectively vasodilating the arteries with little or no venous dilation.  In the Fukunaga Abstract, MABP (pressure) and SVR (resistance) decrease, and cardiac output (blood flow) is "well-maintained," and person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Fukunaga Abstract demonstrated selective arterial vasodilation with little or no venous dilation.  The Fukunaga Abstract thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

(b)    Element No. 2

As discussed *supra*, the Fukunaga Abstract discloses that anesthetized human patients were the subjects of the study.  The Fukunaga Abstract thus discloses the claimed limitation "of a human patient," as set forth in asserted claims 1, 3, 7, and 9.

(c)    Element No. 3

As discussed *supra*, the Fukunaga Abstract discloses that dipyridamole was not used as a pretreatment before the administration of ATP.  The Fukunaga Abstract thus discloses the claimed limitation "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

A subsequent publication by Fukunaga concerned the administration of ATP following a pretreatment with dipyridamole (TX 51, "Fukunaga 1984"), which Plaintiffs claim would have discouraged a person of ordinary skill at the relevant time from administering adenosine alone. Plaintiffs are wrong.  Rather than discourage such a person, Fukunaga 1984 would simply teach

the person of ordinary skill that dipyridamole could be a "potentially useful added agent," and is

not a requirement for safe and effective selective arterial vasodilation. Tr. 182:20-183:4. The

study described in the Fukunaga Abstract demonstrated that intravenous administration of ATP

alone would cause selective arterial vasodilation within the claimed dosage ranges

(Tr. 182:11-19), and the results published later in Fukunaga 1984 would not undermine the

significance of the previous study to the person of skill in the art. Instead, these results would

simply add to the developing body of knowledge. Tr. 182:20-183:4; Tr. 184:24-185:2.

The fact that administration of dipyridamole with ATP reduced the amount of ATP that

was required to induce controlled hypotension, as reported in TX 51, would confirm to a person

of ordinary skill that adenosine – not ATP – was responsible for the vasodilation. As confirmed

by Dr. Klabunde, a person of ordinary skill would understand that dipyridamole does not block

ATP uptake in the blood, but dipyridamole does block adenosine. Tr. 1167:16-20. Therefore, the

ATP concentration would not be increased by dipyridamole, but the adenosine concentration

would be. Tr. 1167:21-1168:1. Common sense would tell a person of ordinary skill in the art

that the reduction in the amount of ATP needed to induce controlled hypotension when a

dipyridamole pretreatment was used would only be possible if adenosine was the active agent and

played a substantial role in vasodilation following the administration of ATP. Tr. 179:13-24;

181:17-22.

(d)    Element No. 4

The Fukunaga Abstract discloses the continuous administration of ATP. As discussed

*supra*, ATP is rapidly converted to adenosine when ATP is endogenously administered, which

would have been well-known to a person of ordinary skill in the art at the relevant time. As also

discussed *supra*, and based on other references available at that time, a person of ordinary skill in

the art, as well as Dr. Sollevi himself, would also have understood that the conversion of ATP to

adenosine is nearly complete. TX 88 at 174-75. These references also taught a person of

ordinary skill that adenosine – not ATP – is responsible for the vasodilation that is observed

following the administration of ATP (Tr. 166:12-167:1; TX 51 at A39; TX 88 at 174-75; TX 236 at 547, TX 5000), and this mechanism of action would have been understood by a person of ordinary skill.[13]

(e)    <b>Element No. 5</b>

The Fukunaga Abstract discloses the administration of ATP at a rate that is equivalent to the claimed rates of adenosine administration: 0.35 mg/mg/min or less (claims 1 and 9); about 0.05 to about 0.3 mg/kg/min (claim 3); or about 0.01 to 0.15 mg/kg/min (claim 7). To calculate the amount of adenosine that would have resulted from a given dose of ATP, a person of ordinary in the art in 1985 would have used a standard calculation and the known molecular weights of those molecules. Tr. 167:5-168:18. Based on this equation, a person of ordinary skill would have determined that a dose of 0.2 to 0.6 mg/kg/min of ATP is equivalent to doses of between 0.097 and 0.290 mg/kg/min of adenosine. *Id.* This adenosine dose is equivalent to a dose of 97 to 290 µg/kg/min, which includes or overlaps each of the ranges recited in the asserted claims of the '296 patent. Tr. 186:6-191:3; TX 5008.

4.    <b>No Secondary Factors Support Non-Obviousness</b>

To rebut Defendants' *prima facie* case of obviousness, Plaintiffs have raised a number of so-called secondary considerations of non-obviousness, including unexpected results, skepticism of experts, and commercial success of its Adenoscan® product.

Plaintiffs' asserted secondary considerations have a single common theme: certain side effects associated with bolus injections of adenosine would have discouraged a person of ordinary skill in the art in 1985 from administering a continuous intravenous infusion of adenosine to humans at the claimed rate in the absence of dipyridamole. However, the scant evidence in the record is hardly sufficient to overcome Defendants' *prima facie* case of obviousness.

---

[13]    The Fukunaga Abstract also concludes that "ATP should potentially be considered for use among the vasoactive hypotensive drugs" which would have also indicated to a person of ordinary skill that adenosine should be considered for use as a vasodilator.

### (a)     "Side Effects" Upon Which Plaintiffs Rely

Plaintiffs rely upon three so-called "side effects" associated with adenosine as evidence in support of their secondary considerations: (1) AV block, (2) uric acid build-up, and (3) excessive fluid load.  Tr. 54:24-55:16.  However, in spite of Plaintiffs' insistence to the contrary, these side effects – if they are linked to adenosine at all – are typically relatively mild and short in duration.   Most importantly, none of these side effects would have discouraged a person of ordinary skill in the art in 1985 from administering continuous intravenous infusion of adenosine at the claimed rate in the absence of dipyridamole.  Tr. 200:5-201:4.  In fact, given that dipyridamole actually lengthens the duration of the side effects associated with adenosine, these side effects would have actually motivated a person of ordinary skill to do just the opposite – omit the dipyridamole pretreatment when administering adenosine.  Tr. 200:5-201:4; Tr. 203:10-17; Tr. 204:13-23; Tr. 205:14-24; Tr. 209:7-14.

### (1)     AV Block

Plaintiffs repeatedly cite atrioventricular block ("AV block") as a side effect of adenosine administration that would give rise to a concern by persons of ordinary skill in the art in 1985 that adenosine could not safely be administered in the absence of dipyridamole.  Plaintiffs' argument does not make sense, and the record does not support it.  The person of ordinary skill would understand that AV block is transient effect that would be much more easily resolved in the **absence** of dipyridamole pretreatment.  Tr. 200:5-201:4.

AV block is an disruption in the electrical circuit from the top chamber of to the bottom chamber of the heart (Tr. 197:14-23),[14] and it generally progresses in stages.  For example, Stage I of AV block is the most common form and usually an asymptomatic "blip" on a electrocardiograph ("ECG") monitor.  Tr. 198:9-14.  If AV block were observed during adenosine

---

[14]     This property of adenosine was known in the art and led to the use of adenosine as a bolus injection for the treatment of arrhythmia.  Plaintiffs also sell a commercial product (Adenocard®) for this very use.

administration by a person of ordinary skill in the art in 1985, it would typically resolve shortly after the administration of adenosine is stopped, due to the short half life of adenosine.  Tr. 200:5-18.  In other words, and as Dr. Klabunde agreed, the doctor would simply need to turn the adenosine infusion off in order to stop the AV block "very quickly."  Tr. 1133:20-1134:2.

Therefore, persons of ordinary skill would not have been discouraged from administering intravenous adenosine without dipyridamole pretreatment.  Tr. 200:5-18.  Instead, a person of ordinary skill would have known that the dose of adenosine to be administered to a patient should be gradually titrated to the desired level (which would be considered routine experimentation).  A person of ordinary skill in 1985 could also monitor a patient with an ECG (a standard experimental practice at the time) to determine whether AV block had occurred (Tr. 1133:2-19) and would know and that adenosine administration should be stopped if any signs of AV block (*e.g.*, a decrease in heart rate) were observed.  In addition, a person of ordinary skill would have known to administer an adenosine agonist (*e.g.*, theophylline or aminophylline) to counteract the effects of adenosine if AV block were to occur.  TX 228 at 80.

AV block was not associated with the use of adenosine by the continuous intravenous infusion method used by Dr. Sollevi in the Sollevi abstracts, as well as other publications in the prior art.  Tr. 201:21-203:3.  Instead, AV block had only been observed in connection with administration of much greater amounts of adenosine as a bolus injection.  Tr. 201:10-20; TX 36; TX 45.  A person of ordinary skill in the art would understand that the risk of AV block would be reduced – if not eliminated – by steady administration of adenosine as a continuous intravenous infusion, instead of administration of the total adenosine dose as a single bolus injection.  Tr. 199:18-200:4.

### (2)  Uric Acid Build-Up

Uric acid build-up is also cited by Plaintiffs as a side effect of adenosine administration that would give rise to concern by person of ordinary skill in the art in 1985 that adenosine could not be safely be administered in the absence of dipyridamole.

But Plaintiffs' argument is not supported by the facts. Uric acid is a metabolite of adenosine, and uric acid levels in the body are constantly fluctuating. Tr. 224:1-5; Tr. 226:11-15. Importantly, transient increases and fluctuations in uric acid levels, by themselves, are not harmful. Tr. 227:4-9. In fact, changes in uric acid levels are only cause for concern (if at all) when substantially and persistently increased over time. *Id.* A person of ordinary skill would also have known that another agent (allopurinol) could be administered to reduce an unwanted build-up of uric acid in the blood. Tr. 358:11-22; Tr. 1200:2-7, 16-20.

Not surprisingly, Plaintiffs cannot point to any discussion in the published literature of the effects of high levels of uric acid following adenosine administration. Tr. 224:6-226:7.

### (3)     Excessive Fluid Load

Plaintiffs did not cite any evidence in support of their claim that a person of ordinary skill would have been discouraged from intravenously administering without dipyridamole due to concerns about "excessive fluid load," which is generally defined as a build-up of fluid in the body.

Plaintiffs' lack of support is hardly surprising, given that none can be found in the published literature. Tr. 1978:23-1979:16. Plaintiffs' testifying expert admitted that excessive fluid load is not caused by adenosine or any of its metabolites. Tr. 1209:7-15. In addition, Plaintiffs' testifying expert admitted that any excessive fluid load that might occur following adenosine administration could be resolved simply by increasing the concentration of adenosine in solution. Tr. 1207:5-1208:3.

### (b)     Skepticism of Experts

Plaintiffs have not provided any publication or other publicly available information in support of its reliance on skepticism of experts as a secondary consideration of non-obviousness. Instead, the plaintiffs rely entirely upon personal, non-public correspondence between the inventor and others in the field, who may or may not be experts. This personal correspondence is plainly hearsay, and it is not sufficient evidence of skepticism of experts that could rebut

defendants' *prima facie* case of obviousness.  The authors' personal (and speculative) disbelief that adenosine could be administered intravenously in the relevant ranges without encountering certain adverse events runs counter to evidence in the prior art at the time.  This correspondence is simply a diversion, and it should not be given any weight by the Court.

Moreover, even if these so-called "experts" were skeptical, the correspondence is much too vague and incomplete to provide conclusive evidence that experts were skeptical that adenosine could be administered without causing AV block or uric acid build-up.[15]  For example, the correspondence does not make clear (1) the study subjects (*e.g.*, humans or animals),[16] (2) the dose of adenosine used, (3) the manner in which adenosine was administered (*e.g.*, bolus or intravenous infusion), and (4) the purposes of the study (*e.g.*, vasodilation or platelet aggregation).  Tr. 1198:6-23.  Plaintiffs cannot be permitted to mold this vague correspondence to disclose what Plaintiffs wish it did.

### (c)    Unexpected Results

Similarly, Plaintiffs have not provided sufficient proof that the methods in the asserted claims would have produced unexpected results.

The lack of occurrence of AV block was not unexpected.  In fact, plaintiffs could not point to a single public reference in which intravenous administration of adenosine in humans resulted in the occurrence of AV block.  Instead, all of the references presented by plaintiffs at trial concerned either bolus administration of adenosine (*e.g.*, TX 36; TX 45), or administration of adenosine to animals (*e.g.*, TX 40).  A person of ordinary skill would have understood that there were limitations in the predictive values of animal studies, especially when inducing hypotension. TX 40 at 73.

Significantly, neither Sollevi I nor Sollevi II – the only prior art publications in which adenosine was administered to humans as a continuous intravenous infusion – discloses any

---

[15]    Excessive fluid load is not mentioned at all in this correspondence.

evidence of AV block resulting from intravenous administration of adenosine and dipyridamole together.  Tr. 202:18-203:3; Tr. 206:3-207:5; TX 1170; TX 37.  And as discussed *supra*, the administration of adenosine and dipyridamole together would result in a greater increase in the concentration of circulating adenosine than if adenosine were administered alone.  *See*, *e.g.*, Tr. 200:5-201:4; Tr. 203:10-17; Tr. 204:13-23; Tr. 205:14-24; Tr. 209:7-14.

Therefore, a person of ordinary skill in the art in 1985 would have been **more** concerned about the possible side effects of adenosine if dipyridamole pretreatment were also administered – not less concerned, as plaintiffs claim.  If any result was unexpected, it was that the administration of adenosine together with dipyridamole did not cause AV block.  As previously discussed, the effects of dipyridamole (including side effects) last longer than the effects of adenosine alone.  So if a side effect like AV block occurred during adenosine administration following dipyridamole pretreatment, a physician would not simply be able to stop the adenosine infusion to resolve the AV block, given that the dipyridamole would still be blocking adenosine breakdown.  Tr. 200:19-4; Tr. 205:14-24.

Plaintiffs were similarly unable to point to any specific study data or results that supported their claim that the lack of uric acid build-up was unexpected.  Tr. 224:6-226:7.  Instead, plaintiffs relied upon a single, unsupported background statement in the introduction of an abstract to support their position that a person of ordinary skill would have expected uric acid build-up to occur following adenosine administration.  TX 51 at A39.[17]

The only publication in the prior art that disclosed the adenosine metabolites formed following the continuous intravenous infusion of adenosine was Sollevi II (TX 37).  But in that

---

[16]    Dr. Klabunde agreed that different species respond to adenosine in different ways.  Tr. 1196:20-23.

[17]    Notably, the statement upon which plaintiffs rely concerns uric acid build-up following the administration of ATP, not adenosine.  But at the same time, plaintiffs continually posit that adenosine and ATP are completely different molecules with readily distinguishable effects to rebut defendants' obvious position.  Plaintiffs cannot have it both ways.

publication, even though adenosine metabolites were monitored, there was no mention of the occurrence uric acid build-up, or that uric acid build-up was even anticipated to be a problem.

### (d)    Commercial Success

Finally, Plaintiffs have failed to demonstrate the required nexus between the '296 patent claimed invention and the alleged commercial success of their Adenoscan® product. *See Ormco*, 463 F.3d at 1311-12 ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").

The Adenoscan® sales levels are the product of economic factors and do not demonstrate any superiority of this drug that would suggest that the '296 patent was not obvious. Tr. 1631:12-1632:22. Rather, the sales levels achieved by Adenoscan® are explained by the interplay of four economic factors:

(a)    There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;

(b)    Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;

(c)    Extensive marketing and promotion of Adenoscan® by Fujisawa; and

(d)    Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

Tr. 1579:3-1582:13; DTX 3133.

When Adenoscan® entered the market in August 1995, its only real competition was dipyridamole, marketed by DuPont as Persantine®. Tr. 1577:10-16, 1580:4-7; Tr. 1577:13-16; Tr. 1307:14-16; DTX 3133. The small number of products made the pharmacological stressor market unique as compared to most pharmaceutical markets, which generally have many competitors engaged in promotional activity. Tr. 1580:4-6. Thus, the pharmacological stressor market was an ideal market for a new entrant such as Fujisawa, seeking to achieve sales. Tr. 1602:11-1603:4.

The market situation rapidly improved for Fujisawa and Adenoscan®. Shortly after its entry Adenoscan® became the *only promoted product* in the pharmacological stress testing market. Tr. 1580:14-21; DTX 3133. In anticipation of the 1997 expiration of the patent on Persantine®, DuPont launched an authorized generic product in November 1996 in an advance attempt to capture generic dipyridamole sales. Tr. 1603:17-21. DuPont ceased its promotion of Persantine® when generic dipyridamole entered the market because it was no longer in its economic interest promote the branded product. Tr. 1603:21-1604:2; Tr. 1580:16-1581:7, Tr. 1603:14-16; Tr. 1307:17-1308:5. Adenoscan® found itself in the fortunate situation of being the only product advertising itself to the prescribers of pharmacological stress tests. Tr. 1604:7-11. This advantage has continued to the present day. Tr. 1604:12-22; Tr. 1308:1-11.

Fujisawa engaged in traditional and non-traditional promotion in its efforts to capture the pharmacological stressor market. Tr. 1620:12-20; Tr. 1263:1-10, Tr. 1283:7-14. Fujisawa's traditional marketing activities included, *e.g.*, detailing, or the visiting of doctors by pharmaceutical sales representatives; advertising; and sampling. Tr. 1605:13-1606:14, Tr. 1610:19-20; Tr. 1263:1-10. Despite the concentration of the pharmacological stress test market, Fujisawa devoted a substantial sales force for the purpose of detailing prescribers regarding the Adenoscan® product. Tr. 1609:20-22. The sales force employed by Fujisawa (86 sales representatives) was <u>twice</u> the size of the sales force DuPont had dedicated to the detailing of Persantine® to the same set of institutions and service providers (42 sales representatives). Tr. 1609:4-1610:3; Tr. 1294:22-25; Tr. 1303:22-1305:17; TX 1226 at AST0065741; TX 1242 at AST0185350.

Apart from Fujisawa's marketing efforts, the sales of Adenoscan® benefited from the growth in demand for pharmacological stress testing unrelated to the asserted inventions. Tr. 1581:19-20; DTX 3133. In the late 1990s and early 2000s, demographic changes, among them the increased aging of the American population and the rise in American obesity, stimulated a growing concern about cardiovascular disease and sparked changes in diagnostic and treatment

guidelines with respect to cardiovascular disease.  Tr. 1581:21-1582:4.  Combined with increased

efforts to expand the target population for stress tests (*e.g.*, by seeking to include more women

and minorities and to use the test more than before), these social and demographic factors fueled

a growth in demand for pharmacological stress agents that has been very fortuitous for sales of

Adenoscan®.  Tr. 1582:5-8.  In short, commercial sales levels of Plaintiffs' Adenoscan®

product have been due to sales, promotion and other economic factors.

Finally, even if the commercial sales of Plaintiffs' product were not a product of

promotion and market forces, commercial success is not sufficient to overcome the strong

case of obviousness here.  *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757  (Fed.

Cir. 1989) ("[A]lthough the record shows a highly successful product, the record also

establishes such a strong case of obviousness . . . that the objective evidence of

nonobviousness does not persuade us to reach a contrary conclusion.")

### B.     The Asserted Claims Are Invalid As Anticipated

#### 1.     The Law Of Anticipation

A patent claim is invalid as anticipated under 35 U.S.C. § 102 when every limitation of

the claim was contained, either expressly or inherently, in a single prior art reference.  *See* 35

U.S.C. § 102; *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed.

Cir. 2001).  To anticipate, the reference must also enable one of skill in the art to make and use

the claimed invention.  *See Bristol-Myers Squibb*, 246 F.3d at 1374.

An inherent characteristic is one that is the "natural result flowing from" the disclosure or

teaching of the prior art.  *See Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1379 (Fed.

Cir. 2003); *Eli Lilly & Co. v. Barr Labs, Inc.*, 251 F.3d 955 (Fed. Cir. 2001).  Moreover, a

"reference may anticipate even when the relevant properties of the thing disclosed were not

appreciated at the time."  *Abbott Labs. v. Baxter Pharmaceutical Prods., Inc.*, 471 F.3d 1363

(Fed. Cir. 2006). That is, "[i]nherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure." *Id.* at 1368.

2.    **The Asserted Claims Are Inherently Anticipated By The Fukunaga Abstract**

A person of ordinary skill in the art at the relevant time would conclude that the Fukunaga Abstract inherently discloses each and every element of the asserted claims of the '296 patent: The Fukunaga Abstract inherently discloses each of the following: (1) a method of selective vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage amounts. Tr. 186:6-191:3; DTX 3044.

(a)    **Element No. 1**

As discussed *supra*, the Fukunaga Abstract discloses a method of selectively vasodilating the arteries with little or no venous dilation. A person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Fukunaga Abstract demonstrated selective arterial vasodilation with little or no venous dilation. The Fukunaga Abstract thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

(b)    **Element No. 2**

As discussed *supra*, the Fukunaga Abstract discloses that anesthetized human patients were the subjects of the study. The Fukunaga Abstract thus discloses the claimed limitation "of a human patient," as set forth in asserted claims 1, 3, 7, and 9.

(c)    **Element No. 3**

As discussed *supra*, the Fukunaga Abstract discloses that dipyridamole was not used as a pretreatment before the administration of ATP. The Fukunaga Abstract thus discloses the

claimed limitation "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

### (d)     Element No. 4

The Fukunaga Abstract discloses the continuous administration of ATP.  As discussed *supra*, the *in vivo* conversion of exogenous ATP to adenosine is the "natural result flowing from" ATP administration.  *See Schering*, 339 F.3d at 1379; *Eli Lilly*, 251 F.3d at 970.  A person of ordinary skill in the art at the relevant time would have understood that ATP rapidly degrades in the body to adenosine, and such a person would have also understood that adenosine is responsible for the arterial vasodilation effects associated with ATP.   The Fukunaga Abstract thus inherently discloses the claimed limitation "by continuously administering adenosine," as set forth in asserted claims 1, 3, 7, and 9.

### (e)     Element No. 5

The Fukunaga Abstract discloses the administration of ATP at a rate that is equivalent to the claimed rates of adenosine administration.  Using the equation discussed *supra*, person of ordinary skill would have determined that a dose of  0.2 to 0.6 mg/kg/min of ATP is equivalent to doses of between 0.097 and 0.290 mg/kg/min of adenosine.  This adenosine dose is equivalent to a dose of 97 to 290 µg/kg/min, which includes or overlaps the ranges recited in the asserted claims of the '296 patent.

But even if a person of ordinary skill had not recognized that the administration of 0.2 to 0.6 mg/kg/min would have been equivalent to the claimed dose of adenosine, the Fukunaga Abstract would still inherently anticipated the asserted claims.  *See Abbott*, 471 F.3d at 1367-68 ("Inherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure.").

## IV.    <u>CONCLUSION</u>

The asserted claims of the '296 patent recite nothing more than the well-known use of adenosine to selectively dilate arteries.  The inventor's own prior art publications and other knowledge in the prior art either disclose or suggest each of the claimed elements, including the manner and rate of adenosine administration.  The only claimed element that is not expressly disclosed in these publications is the administration of adenosine without dipyridamole.  A person of ordinary skill, understanding the mechanism of action of dipyridamole, would be motivated to make the obvious change of simply omitting the dipyridamole pretreatment and use adenosine alone to induce selective arterial vasodilation short of controlled hypotension.

In the alternative, the Fukunaga Abstract, a prior art reference concerning the administration of ATP, would confirm to a person of ordinary skill in the art that adenosine could be administered without a dipyridamole pretreatment.  The Fukunaga Abstract would render the '296 patent invalid as inherently anticipated and obvious, given that a person of ordinary skill would understand that ATP is readily and completely degraded to adenosine, and that the effects of ATP are also due to the actions of adenosine.

The Plaintiffs have failed to overcome Sicor's *prima facie* case of obviousness. Therefore, for the foregoing reasons, the asserted claims of the '296 patent should be declared invalid as both inherently anticipated and obvious in view of the prior art.

Respectfully submitted,

/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

*Attorneys for Defendants Sicor Inc. and
Sicor Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on May 9, 2007, I

caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the

Court using CM/ECF, which will send notification that such filing is available for viewing and downloading

to the following counsel of record:

| | |
|---|---|
| Paul M. Lukoff, Esquire | Richard K. Herrmann, Esquire |
| David E. Brand, Esquire | Morris James Hitchens & Williams |
| Prickett Jones & Elliot, P.A. | 222 Delaware Avenue, 10th Floor |
| 1310 King Street | P.O. Box 2306 |
| P.O. Box 1328 | Wilmington, DE 19899-2306 |
| Wilmington, DE 19899 | |

I further certify that on May 9, 2007, I caused copies of the foregoing document to be served

by hand delivery on the above-listed counsel and on the following in the manner indicated:

**BY E-MAIL ON MAY 9, 2007 AND FEDERAL
EXPRESS ON MAY 10, 2007**

Charles E. Lipsey, Esquire
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675

Susan H. Griffen, Esquire
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, DC 20001-4413

John Scheibeler, Esquire
WHITE & CASE, LLP
1155 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ Karen E. Keller
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendants*