## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ITEM DEVELOPMENT AB, <br> ASTELLAS US LLC, and <br> ASTELLAS PHARMA US, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SICOR INC. and <br> SICOR PHARMACEUTICALS, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) )    Civil Action No.:  05-0336-SLR |

## PLAINTIFFS' OPENING POST TRIAL BRIEF:
## U.S. PATENT NO. 5,731,296

Dated:  May 9, 2007

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

Paul M Lukoff #96
David E. Brand #201
PRICKETT JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6520
debrand@prickett.com

John Scheibeler
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 819-8200

*Attorneys for Plaintiff*
*Item Development AB*

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF THE CASE.............................................................................4

III.    HISTORY OF ADENOSINE RESEARCH AND THE DEVELOPMENT OF
        THE CLAIMED INVENTION.............................................................................4

        A.      Adenosine Was Thought Too Dangerous for Human Use .......................4

        B.      For Human Use, Research Focused on Anything But Adenosine ............5

                1.      Researchers Sought Adenosine Analogs ......................................5

                2.      The Field Turned to Dipyridamole ..............................................6

                3.      Some Researchers Investigated ATP ...........................................6

        C.      The First Human Medical Use of Adenosine Relied on Its Heart-
                Stopping Properties .................................................................................7

        D.      Dr. Sollevi Pioneered the Use of Adenosine Infusions in Humans .........8

                1.      Dr. Sollevi Pretreated Patients with Dipyridamole to Reduce
                        the Needed Dose of Adenosine .....................................................8

                2.      Dr. Sollevi Unexpectedly Discovered that Adenosine Could Be
                        Administered Without Dipyridamole Pretreatment and Without
                        a Large Increase in Dose ..............................................................9

        E.      Leaders in the Field Were Surprised by Dr. Sollevi's Results ...............10

IV.     THE ASSERTED CLAIMS ...............................................................................11

V.      SICOR'S BURDEN OF PROOF........................................................................12

VI.     FUKUNAGA 1982 DOES NOT ANTICIPATE THE ASSERTED CLAIMS
        OF THE '296 PATENT ......................................................................................13

VII.    THE CLAIMS OF THE '296 PATENT ARE NOT INVALID FOR
        OBVIOUSNESS ................................................................................................14

        A.      Sicor Must Prove Obviousness by Clear and Convincing Evidence
                Based on the Four Broad Factual Inquiries...........................................14

                1.      The Law of Obviousness and the Supreme Court's Decision in
                        KSR ..............................................................................................14

i

2.      Objective Evidence, Including Contemporaneous Statements of Skepticism by Experts in the Field and Commercial Success, Is Highly Probative of Nonobviousness .......................................................15

B.      Sicor Failed to Prove the Claimed Invention Would Have Been Obvious ...........................................................................................................17

1.      Scope and Content of the Prior Art:  Teaching Away ...............................17

        a.      The History of Adenosine Research Taught Away from the Invention ....................................................................................17

        b.      The Sollevi Abstracts Taught Away from the Invention ...............19

        c.      The Fukunaga Abstracts Taught Away from the Invention ....................................................................................19

        d.      Studies of Adenosine in Normal Volunteers Taught Away from the Invention ...................................................................20

2.      Level of Ordinary Skill in the Art ............................................................20

3.      Differences Between the Prior Art and the Claimed Invention ................21

4.      The Claimed Invention Would Not Have Been Obvious .........................21

        a.      One of Ordinary Skill Would Not Have Eliminated Sollevi's Dipyridamole Pretreatment ..............................................21

        b.      The ATP Infusion Reported in Fukunaga 1982 Would Not Have Led to the Use of Adenosine Infusion Without Dipyridamole Pretreatment ...............................................23

        c.      Dr. Binkley's Suggested Alternative Medical Uses for Adenosine Are Untimely and Incredible ......................................26

5.      Objective Evidence of Nonobviousness:  Skepticism, Commercial Success, Unexpected Results, and Copying.........................28

        a.      The Skepticism and Ultimate Praise Expressed in the Letters By Dr. Berne and Dr. Robicsek Is Highly Probative Objective Evidence of Nonobviousness .......................28

        b.      The Commercial Success of Adenoscan Is Also Objective Evidence of Nonobviousness .......................................32

       c.     The Unexpectedly Low Dose of Adenosine Required in the Absence of Dipyridamole is Further Evidence of Nonobviousness ............................................................................34

       d.     Sicor's Interest in Copying the Invention Also Demonstrates Its Nonobviousness ..................................................35

VIII.   SICOR'S WITNESSES WERE NOT CREDIBLE AND OFFERED OPINIONS BEYOND THE SCOPE OF THEIR EXPERT REPORTS ..........................35

    A.     Dr. Binkley...................................................................................................35

    B.     Dr. Leffler ...................................................................................................38

IX.    CONCLUSION....................................................................................................39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Al-Site Corp. v. VSI International, Inc.*,
    174 F.3d 1308 (Fed. Cir. 1999)...........................................................................13

*America Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
    725 F.2d 1350 (Fed. Cir. 1984)...........................................................................12

*In re Bell*,
    991 F.2d 781 (Fed. Cir. 1993).............................................................................14

*Burlington Industries, Inc. v. Quigg*,
    229 U.S.P.Q. 916 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987) ...............16

*Burlington Industries, Inc. v. Quigg,* 822 F.2d 1581 (Fed. Cir. 1987) ....................................16, 29

*Citizens Finance Group, Inc. v. Citizens Bank of Evans City*,
    383 F.3d 110 (3rd Cir. 2004) ..............................................................................29

*Coalition To Save Our Children v. State Board of Education*,
    90 F.3d 752 (3d Cir. 1996)..................................................................................37

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988)...........................................................................33

*In re Dillon*,
    919 F.2d 688 (Fed. Cir. 1990).............................................................................13

*In re Dow*,
    837 F.2d 469 (Fed. Cir. 1988).......................................................................16, 30

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc., No. IP 99-38-C H/K*,
    2001 WL 1397304 (S.D. Ind. 2001) ....................................................................34

*Environmental Designs, Ltd. v. Union Oil Co. of Cal.*,
    713 F.2d 693 (Fed. Cir. 1983).............................................................................16

*Ferguson Beauregard/Logic Controls v. Mega System, L.L.C.*,
    350 F.3d 1327 (Fed. Cir. 2003)...........................................................................38

*In re Fielder*,
    471 F.2d 640 (C.C.P.A. 1973) .............................................................................32

iv

*Forest Laboratories, Inc. v. Ivax Pharm., Inc.*,
   438 F. Supp. 2d 479 (D. Del. 2006)................................................................33, 35

*Gillette Co. v. S.C. Johnson & Son, Inc.*,
   919 F.2d 720 (Fed. Cir. 1990)..............................................................................22

*Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.*,
   321 U.S. 275 (1944).............................................................................................17

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966)...........................................................................................14, 15

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
   909 F.2d 1464 (Fed. Cir. 1990)............................................................................13

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*,
   802 F.2d 1367 (Fed. Cir. 1986)......................................................................16, 33

*Inline Connection Corp. et al. v. AOL Time Warner Inc. et al.*,
   No. 02-272-MPT (D. Del. Feb. 5, 2007) ........................................................37-38

*Interconnect Planning Corp. v. Feil*,
   774 F.2d 1132 (Fed. Cir. 1985)................................................................29, 31, 35

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
   106 F.3d 1563 (Fed. Cir. 1997).............................................................................17

*KSR International Co. v. Teleflex, Inc.*,
   No. 04-1350 (Apr. 30, 2007) .............................................................................3, 15

*Life Techs., Inc. v. Clontech Laboratories, Inc.*,
   224 F.3d 1320 (Fed. Cir. 2000).............................................................................20

*Lindemann Maschinenfabrik GmbH v. America Hoist & Derrick Co.*,
   730 F.2d 1452 (Fed. Cir. 1984)......................................................................16, 34

*Ortho-McNeil Pharm., Inc. v. Mylan Laboratories, Inc.*,
   348 F. Supp. 2d 713 (N.D. W. Va. 2004) ....................................................33, 34, 35

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
   No. 04-1371-JJF (D. Del. Sept. 20, 2006) ............................................................37

*Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*,
   75 F.3d 1568 (Fed. Cir. 1996)........................................................................16, 17

*Procter & Gamble Co. v. Paragon Trade Brands Inc.*,
989 F. Supp. 547 (D. Del. 1997)............................................................35

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000).........................................15, 16, 17, 33

*Schumer v. Laboratories Computer System, Inc.*,
308 F.3d 1304 (Fed. Cir. 2002)...............................................................12

*Standard Oil Co. v. America Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985)...............................................................20

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983)..............................................................28

*Structural Rubber Products Co. v. Park Rubber Co.*,
749 F.2d 707 (Fed. Cir. 1984)...............................................................13

*TP Laboratories, Inc. v. Prof'l Positioners, Inc.*,
724 F.2d 965 (Fed. Cir. 1984)...............................................................12

*Tec Air, Inc. v. Denso Manufacturing Michigan, Inc.*,
192 F.3d 1353 (Fed. Cir. 1999)........................................................17, 32

*Threadgill v. Armstrong World Industrial, Inc.*,
928 F.2d 1366 (3d Cir. 1991)................................................................32

*U.S. v. Adams*,
383 U.S. 39 (1966)..........................................................16, 28, 30

*Ultra-Tex Surfaces, Inc. v. Hill Brothers Chemical Co.*,
204 F.3d 1360 (Fed. Cir. 2000)..............................................................12

*Union Oil Co. of Cal. v. Atlantic Richfield Co.*,
208 F.3d 989 (Fed. Cir. 2000)...............................................................13

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
837 F.2d 1044 (Fed. Cir. 1988).........................................................14, 28

*United States v. Stelmokas*,
100 F.3d 302 (3d Cir. 1996)...............................................................32

*W.L. Gore & Associate, Inc. v. Garlock, Inc.*,
721 F.2d 1540 (Fed. Cir. 1983)..............................................................28

## FEDERAL STATUTES

35 U.S.C. § 103 ..................................................................................................14

35 U.S.C. § 282 .............................................................................................12, 38

Fed. R. Civ. P. 26(a)(2)(B) .................................................................................37

Fed. R. Civ. P. 37(c)(1) ......................................................................................37

Fed. R. Evid. 803(3) .......................................................................................29, 32

Fed. R. Evid. 901(b)(8) .......................................................................................32

## I.      INTRODUCTION

The patent in suit, U.S. Patent No. 5,731,296 (the '296 patent), concerns the discovery by

Dr. Alf Sollevi in the mid-1980s that "adenosine" could be safely administered to human patients

by continuous infusion to preferentially dilate arteries.  Such adenosine infusions are used

extensively today in the diagnosis of coronary artery disease in patients unable to perform a

standard exercise stress test.  Driven by a desire to enter this lucrative market, the Defendants

contend here that the claimed methods would have been obvious.  Their contentions, however,

ignore the long history of the dangerous side effects of adenosine that foreclosed or limited its

use in humans.  Aided by hindsight, it is improperly contended that the steps taken in the prior

art to avoid or ameliorate these dangerous effects were obviously unnecessary.  The contention is

belied by the evidence of what people actually working in this field at the relevant time did and

said before and after the invention was made known to them.

Despite its widespread use today, for nearly 50 years after it was first discovered and

tested, adenosine was considered too toxic and too short-acting to be of any use whatsoever as a

human pharmaceutical.  Early studies showed that adenosine could interrupt transmission of the

electrical signals in the heart, slowing the heart rate or even stopping the heart from beating.  The

rapid metabolism of adenosine into "uric acid" raised concerns about kidney damage.  By the

early 1980s, the only known medical use for adenosine was based not on its vasodilating

properties but on its negative effects on the beating heart.  Administering a tiny amount of

adenosine solution, in a single, short-acting bolus (*i.e.*, rapid injection) was shown to terminate a

particular form of heart arrhythmia.

In the face of this long negative history associated with adenosine, Dr. Alf Sollevi, a

young researcher in Sweden, undertook to administer adenosine to humans, not as a short-acting

bolus, but in a continuous intravenous infusion lasting close to an hour.  He did so in order to

achieve "controlled hypotension," *i.e.*, to drop blood pressure significantly, during brain surgery. He did not, however, administer adenosine alone. Concerned about adenosine's effect on the heart and its capacity to form the toxic uric acid metabolite, he pretreated his patients with "dipyridamole" to reduce the necessary dose of adenosine. Indeed, the prior art suggested that dipyridamole pretreatment could reduce the amount of adenosine needed by 10 to as much as 200-fold.

With dipyridamole pretreatment, Dr. Sollevi found that the needed blood pressure reductions could be achieved with an average adenosine dose of 140 mcg/kg/min. Infusing adenosine without dipyridamole pretreatment was unthinkable, as the much higher doses thought to be required (1,400 mcg/kg/min or more) would surely have led to serious side effects.

Dr. Sollevi proceeded against the conventional wisdom to conduct experiments to see if controlled hypotension could be achieved with adenosine alone. He discovered, surprisingly, that large doses of adenosine were not required in the absence of dipyridamole pretreatment. Instead, a dose increase of only about 50% was sufficient to cause the same amount of vasodilation without dipyridamole. The ability to infuse adenosine safely without dipyridamole pretreatment allowed adenosine to be used in a variety of medical techniques where the rapid termination of adenosine's effects was desirable. On the basis of his unexpected discovery, Dr. Sollevi filed the patent application that led to the '296 patent.

It is thus seen that the only known human medical uses for adenosine took precautions to protect the patient from the known negative side effects of adenosine. Either the dose was limited to a small, short-acting bolus or dipyridamole was employed to lower doses used for infusion. The Defendants now contend that safety concerns did not exist and that it would have

been obvious to use adenosine in humans without either of these safeguards. The contemporaneous evidence is to the contrary.

In addition to the prior art scientific publications that taught away from the invention, the Court has actual letters written to Dr. Sollevi by leaders in the field praising his invention and expressing surprise that he had not encountered safety problems. While the Court questioned at trial whether such unpublished correspondence is appropriately considered, courts, including the Supreme Court, have recognized that correspondence written at the time of the invention, long before any possible litigation-driven bias, is highly probative of nonobviousness, as discussed in detail in § VII.B.5.a., *infra*. Plaintiffs also offered testimony from Dr. Richard Klabunde and Dr. Sollevi, who were both active in the field at the relevant time and performing adenosine research.

The Defendants here have offered no such contemporaneous evidence. They rely instead on the opinions of Dr. Phillip Binkley, who had no experience with adenosine in the early 1980s. Working with the benefit of hindsight, Dr. Binkley asserted that the myriad safety concerns described in the prior art and in the writings of the experts of the day would not have dissuaded an ordinary physician. Tellingly, Dr. Binkley's opinions frequently strayed well beyond the bounds of his expert report, and were, in fact, contrary to his prior deposition testimony.

Since the trial in this matter, the Supreme Court has made its first pronouncement in decades on the law of obviousness. *KSR Int'l Co. v. Teleflex, Inc.,* No. 04-1350 (Apr. 30, 2007). The Court there reaffirmed the bedrock principle guiding resolution of this case — that an inventor proceeding contrary to conventional wisdom and achieving something unexpected is the hallmark of nonobviousness. *Id.* at 12.[1]

---

[1] The evidence and the legal authority compelling judgment in favor of Plaintiffs in this case, summarized herein, is compiled, organized, and annotated in Plaintiffs Proposed Findings

(continued…)

## II.    STATEMENT OF THE CASE

Patent owner Item Development AB (Item) and licensees Astellas US LLC and Astellas Pharma US, Inc. (collectively Astellas) brought this patent infringement suit under the Hatch-Waxman Act after Defendants Sicor Inc. and Sicor Pharmaceuticals, Inc. (collectively Sicor) prepared and filed an abbreviated new drug application (ANDA) seeking approval to market a generic version of Astellas's branded pharmaceutical Adenoscan®.[2]  (TX-4; TX-7.) Adenoscan is an adenosine solution for continuous infusion used to dilate coronary arteries during cardiac diagnostic procedures.  Sales of Adenoscan in 2005 exceeded $300 million. (TX-19; White 1235:4-10.)  Having conceded infringement just before trial, Sicor challenges the validity of claims 1, 3, 7, and 9 of the '296 patent.  (D.I. 129, ¶ 2.)  The case was tried to the Court beginning on February 12, 2007.

## III.    HISTORY OF ADENOSINE RESEARCH AND THE DEVELOPMENT OF THE CLAIMED INVENTION

### A.    Adenosine Was Thought Too Dangerous for Human Use

Adenosine was first administered to animals and humans in the 1920s and 30s.  (*See* TX-35; TX-187; Klabunde 516:4-22.)  These studies showed adenosine to be a potent vasodilator, but also a powerful inhibitor of the electrical signals that cause the heart to beat. (*See* TX-35 at 236; TX-187 at 258; Klabunde 516:4-22.)  As described in the contemporary literature of the 1980s, adenosine's ability to stop the heartbeat discouraged researchers for decades from any consideration of adenosine as a human pharmaceutical agent:

---

(…continued)
of Fact and Conclusions of Law filed concurrently herewith.  Reference herein to the more detailed discussions of the evidence and applicable law in that document is to "PFF ___" and "PCL ___," respectively.

[2] Adenoscan® (hereinafter Adenoscan) is a registered trademark of Astellas.

> Adenosine was first administered to human subjects in 1930 and
> 1933 to treat cardiac arrhythmias.  The development of serious side
> effects with large boluses of the drug (temporary cardiac arrest) led
> the authors to conclude that adenosine was not "a useful
> therapeutic preparation for the treatment of heart disease," a view
> which discouraged further research.

(TX-48 at 2229; Klabunde 520:23-522:2; *see also* TX-36 at 1254; Klabunde 517:2-17.)

### B.    For Human Use, Research Focused on Anything But Adenosine

#### 1.    Researchers Sought Adenosine Analogs

Having rejected adenosine itself as a potential human drug, many investigators tried to

develop adenosine analogs that would have the desirable effects of adenosine without its

undesirable adverse side effects.  (Binkley 326:18-328:1; Strauss 769:8-770:20.)[3]  As stated in a

typical publication from the early 1970s:

> The use of adenosine in cardiovascular therapy has been precluded
> both by the transitory nature of its vasodilator effects and by its
> toxic actions on the heart.  It would seem feasible however that
> certain *analogs* of adenosine may be found which have the
> coronary vasodilatory activity of adenosine, but which have greater
> duration of action *in vivo* and which lack the cardiac depressant
> action of the parent compound.

(TX-214 at 415 (emphasis added); Binkley 326:23-328:1; Strauss 770:16-20.)

One example of such efforts to find useful adenosine analogs involved efforts to use

"ethyl-adenosine" to dilate coronary arteries in connection with cardiac imaging techniques.

(*See*, *e.g.*, TX-1184; Binkley 328:2-329:5.)  Unlike adenosine, ethyl-adenosine did not slow the

heartbeat or cause hypotension in dog studies.  (*See* TX-176 at 419; TX-1184 at 406; Strauss

---

[3] Plaintiffs elicited a portion of the factual testimony of Sicor's expert Dr. Strauss to be
admitted in both this case and the related action, CV No. 05-337 SLR.  Defendants objected to
admission of Dr. Strauss's testimony here, urging that he was proffered solely as an expert in the
parallel action.  Dr. Strauss's testimony is appropriate here because he is not being offered to
provide expert opinions, but merely to recount his understanding of facts and circumstances in
the field of adenosine research in the late 1970s.  Plaintiffs identified Dr. Strauss as a fact
witness in this case in lists exchanged with Sicor months before trial, in November 2006.

772:3-772:17.)  Moreover, it had a longer lasting effect when administered as a bolus.  (*See* TX-1184 at 406; Strauss 771:6-772:2.)  Based on positive animal studies, it was viewed as a potential pharmaceutical agent for diagnosing coronary artery disease in humans.  (*See* TX-232 at 248; Strauss 767:19-768:9, 771:15-773:13, 774:19-776:4.)  But tests in actual human patients showed that the drug caused dangerous side effects, including inadequate blood flow in the heart (termed "ischemia") and chest pain.  (TX-259 at 472; Strauss 773:14-21.)  Thus, further work with ethyl-adenosine ceased.  (*See* Strauss 775:17-776:4.)

### 2.      The Field Turned to Dipyridamole

Following the failure of ethyl-adenosine, researchers continued to search for a vasodilator for use in human cardiac imaging.  Notably, they did not turn to adenosine.  Instead they chose dipyridamole.  (*See* TX-93; Binkley 329:6-330:6.)  Despite the fact that dipyridamole was believed to act, at least in part, by raising endogenous adenosine levels (TX-93 at 758; Binkley 330:8-25), nobody even suggested that adenosine itself should be used instead.  (Strauss 774:13-18.)

### 3.      Some Researchers Investigated ATP

A 1982 abstract by Dr. Fukunaga reported on the intravenous administration of a continuous infusion of adenosine triphosphate ("ATP") to cause hypotension in surgical patients.  (TX-42 (hereinafter "*Fukunaga 1982*"); Binkley 161:23-162:13.)  The abstract described ATP as a "physiological intracellular substance, which relaxes and dilates vascular smooth muscles, including coronary and cerebral arteries."  (TX-42; Klabunde 508:8-24.)

ATP is not adenosine.  It is a high energy molecule with a different chemical structure.  (Klabunde 505:17-506:18.)  ATP was known in the early 1980s to have different properties and to act through different receptors than adenosine.  (*See* TX-151; Klabunde 506:11-18;

6

510:8-513:24.)  Indeed, a study by Moir and Downs in the 1970s demonstrated that ATP was significantly more potent than adenosine as a coronary vasodilator.  (TX-199 at 1386; Klabunde 551:3-552:10.)

ATP was also known to break down into a variety of metabolites which rapidly interconverted with one another.  (*See* TX-126 at 612; Binkley 272:16-274:9; DTX-2008.) Adenosine was one of the metabolites of ATP, which was ultimately converted to uric acid. Because accumulation of uric acid had the potential to cause kidney damage in patients, Dr. Fukunaga recommended in a second abstract in 1984 that patients be pretreated with dipyridamole prior to ATP infusion, which greatly reduced the necessary dose of ATP to be administered by a factor of 12 or more.  (*See* TX-51; Klabunde 540:10-541:23.)

C.    **The First Human Medical Use of Adenosine Relied on Its Heart-Stopping Properties**

The first human medical use of adenosine was proposed in 1983 by Dr. Berne and his colleagues at the University of Virginia.  Dr. Berne was then one of the world's leading authorities on adenosine.  (Binkley 317:19-318:19.)  The proposed medical use — termination of an arrhythmia known as "PSVT" with a rapid, short-acting "bolus" injection of adenosine — employed the known heart-stopping properties of adenosine (termed "AV block") to obtain a positive effect in this unique patient population.  (TX-36; TX-45; Klabunde 522:3-523:23; Binkley 325:14-18.)  Those effects, however, were obviously undesirable for any other use. (Klabunde 523:24-524:25.)  Even for this application, there were concerns about serious side effects because "[o]verdosage might lead to prolonged asystole [cardiac arrest], hypotension or other tachyarrhythmias."  (TX-45 at 423.)

7

D.     **Dr. Sollevi Pioneered the Use of Adenosine Infusions in Humans**

1.     **Dr. Sollevi Pretreated Patients with Dipyridamole to Reduce the Needed Dose of Adenosine**

Dr. Sollevi pioneered the first administration of adenosine as an intravenous infusion in humans. Dr. Sollevi's interest and insight into adenosine had grown out of work he began as a medical student. (Sollevi 429:2-12.) He spent nearly six years studying adenosine's effects in animals before attempting to administer it to humans for controlled hypotension in patients undergoing neurosurgery for cerebral aneurysms. (Sollevi 434:12-435:4.) A cerebral aneurysm is a "bulb" or bubble on a blood vessel in the brain that could rupture, causing bleeding and death. (Sollevi 435:5-23.) In the 1980s, neurosurgeons sought to drastically reduce the patient's blood pressure (roughly 40%) during aneurysm surgery, causing "slack" in the "bubble" to avoid rupture. (Sollevi 435:24-436:24.)

Dr. Sollevi was concerned about adenosine's effects on the heartbeat, its potential to cause ischemia (especially in patients with heart disease), and its potential to cause toxic levels of the metabolite, uric acid, which could damage a patients' kidneys. (Sollevi 438:8-15.) So in addition to carefully monitoring the electrocardiograms and testing metabolite levels, he pretreated his patients with dipyridamole to inhibit the metabolism of adenosine and allow a much lower adenosine dose to be used. (Sollevi 438:17-439:6.) He excluded from his studies, patients with a history of heart disease because he feared adenosine would cause ischemia in such patients. (Sollevi 441:16-442:2.)

Dr. Sollevi published the results of his initial studies in abstracts in 1983 and 1984. (TX-1170 (hereinafter "*Sollevi I*"); TX-37 (hereinafter "*Sollevi II*").) These abstracts demonstrated that, in the presence of a dipyridamole pretreatment, an average dose of 140 mcg/kg/min of adenosine, infused intravenously, would reduce mean blood pressure by about 40

8

percent. (TX-1170; TX-37; Binkley 258:2-5, 258:10-13.) The abstracts did not mention the possibility of eliminating the dose-reducing dipyridamole pretreatment or provide any guidance about whether one could determine a safe and effective dose that would induce hypotension in the absence of that pretreatment.

> ### 2. Dr. Sollevi Unexpectedly Discovered that Adenosine Could Be Administered Without Dipyridamole Pretreatment and Without a Large Increase in Dose

A variety of studies in the prior art in the mid-1980s suggested that much higher amounts of adenosine would have to be infused in patients if the dipyridamole pretreatment were eliminated. Plaintiffs' expert, Dr. Klabunde, published an article in 1983 demonstrating that the short (<10 seconds) half-life of adenosine could be dramatically lengthened by "the usual therapeutic concentrations of dipyridamole." (TX-101 at 25; Klabunde 503:21-504:2.) A study by Kassell and colleagues in dogs showed that dipyridamole pretreatment had reduced the required dose of adenosine by nearly 200-fold. (TX-40 at 73; Klabunde 534:9-536:1.) Moreover, Dr. Fukunaga's 1984 abstract concerning administration of ATP in the presence of dipyridamole showed a large increase, from 12-fold to as much as 50-fold more, in the dose of ATP required without dipyridamole. (TX-51; Klabunde 1050:24-1051:8.) Notably, a later study by Biaggioni in April 1985 showed that administration of adenosine by intravenous infusion without dipyridamole pretreatment at doses up to 140 mcg/kg/min in 5 conscious normal volunteers did not cause hypotension, further supporting the perception that higher doses would be needed without dipyridamole. (TX-1187; Klabunde 555:3-556:14.)

Despite the many studies suggesting it would be futile, Dr. Sollevi proceeded in the winter of 1983 to 1984 to perform studies in human patients intravenously infusing adenosine without an initial dipyridamole pretreatment. (Sollevi 446:1-14, 447:13-449:18.) He explained

9

that his prior work with dipyridamole pretreatment had not answered his concerns about AV

block, accumulation of uric acid, or possible ischemia because those same effects could well be

observed at the higher doses required in the absence of dipyridamole pretreatment.  (Sollevi

447:13-448:8.)  Dr. Sollevi's perspective was that he had "no information" on the amount of

adenosine that would be required apart from his own animal studies suggesting that as much as

20-fold higher doses would be needed.  (Sollevi 448:2-449:8.)

       To his surprise, Dr. Sollevi found that only a small increase of approximately 50 percent

in the adenosine dose was required in the absence of dipyridamole.  (Sollevi 450:5-451:6.)  The

mean dose only increased from about 140 mcg/kg/min with dipyridamole to approximately 214

mcg/kg/min without the pretreatment.  (TX-1169 at 232; Sollevi 450:5-451:3.)  Moreover, the

increased dose did not significantly raise the level of uric acid accumulated during the

hypotension period.  (TX-1169 at 232, Table 4; Sollevi 451:7-21.)  Finally, elimination of the

dipyridamole pretreatment allowed the controlled hypotension to be rapidly terminated when no

longer needed during surgery.  (Sollevi 448:11-16.)

       **E.     Leaders in the Field Were Surprised by Dr. Sollevi's Results**

       Leaders in adenosine research were surprised by Dr. Sollevi's results with adenosine

infusion.  Dr. Sollevi recounted at trial how the dean of the field, Dr. Berne, could not believe

that adenosine could be administered safely by infusion, referring to Dr. Sollevi at their first

meeting as the "crazy Swede."  (Sollevi 452:25-454:3; Klabunde 1052:4-1053:4.)  In subsequent

correspondence between the two scientists, Dr. Berne reiterated his surprise, stating "[o]ne thing

I don't understand is how you avoid atrioventricular heart block [AV block] with doses of

adenosine that are required to greatly lower arterial pressure."  (TX-49.)  Dr. Sollevi's insight

had led him to do what the recognized leader in the field had considered impossible.

Still another adenosine researcher, Dr. Francis Robicsek, was also surprised by and skeptical about the safety of Dr. Sollevi's methods. Dr. Robicsek was head of a major thoracic surgery center and had done his own research on adenosine infusion in dogs in the early 1980s. (TX-255; Klabunde 1053:5-1055:1.)  Upon reading one of Dr. Sollevi's articles about infusing adenosine in patients, he wrote to the chief editor of the journal asking whether Dr. Sollevi had taken adequate steps to ensure that the kidneys would not be damaged by adenosine infusion due to the buildup of the toxic metabolite, uric acid. (TX-410; Sollevi 464:13-468:7.)  This was a concern that Dr. Sollevi himself had shared but overcome and that Dr. Fukunaga had addressed by recommending dipyridamole pretreatment. (TX-51; Klabunde 540:15-541:8; Sollevi 447:13-448:1, 449:14-18.)  The journal editor found that Dr. Robicsek's concerns warranted a reply from Dr. Sollevi and asked Dr. Sollevi to respond. (TX-293; Sollevi 465:8-466:24.)  The subsequent correspondence between the researchers revealed that Dr. Robicsek himself had considered administering adenosine infusions to humans, but had not proceeded in view of his concerns over uric acid. (TX-265; Sollevi 471:13-472:17.)  Dr. Robicsek further graciously congratulated Dr. Sollevi for succeeding where he had failed. (TX-265; Sollevi 471:13-472:17.)  The story of the '296 patent reflects Dr. Sollevi's courage and insight that led him to do what others had feared to do.

## IV.     THE ASSERTED CLAIMS

Dr. Sollevi filed a patent application relating to his work with adenosine infusion on September 24, 1985. (TX-308; Sollevi 431:5-25.)  That application ultimately led to the '296 patent-in-suit, which issued on March 24, 1998.  As discussed above, the asserted claims of the patent relate to Dr. Sollevi's conclusion that patients administered an adenosine infusion without pretreatment with dipyridamole exhibit clear selective arterial vasodilation without significant

venous dilation, allowing adenosine to be used for medical purposes, such as controlled

hypotension, and the other uses set forth in the original patent specification. (*See* TX-308;

Sollevi 433:23-434:11.)

The asserted claims are claims 1, 3, 7, and 9 of the '296 patent. For purposes of

illustration, claim 3 reads:

> 3. A method of selectively vasodilating the arteries of a human
> patient without inducing significant venous dilation and without
> pretreatment with dipyridamole, comprising continuously
> administering into the blood stream of said patient by intravenous
> administration about 0.05 milligrams to about 0.30 milligrams
> [about 50 micrograms to about 300 micrograms] of adenosine per
> kilogram body weight per minute.

(TX-275 at col. 22, ll. 20-26.)

## V.    SICOR'S BURDEN OF PROOF

As the party challenging the validity of the '296 patent, Sicor bears the burden of proof,

and it must carry that burden by clear and convincing evidence. 35 U.S.C. § 282; *Schumer v.*

*Lab. Computer Sys., Inc.,* 308 F.3d 1304, 1315 (Fed. Cir. 2002). The challenger's burden "is

constant and remains throughout the suit" and "does not shift at any time to the patent owner."

*TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984). Patents are

presumed valid, and each claim within a patent is independently presumed valid, even if other

claims within the patent are held invalid. 35 U.S.C. § 282.

If a patent challenger alleges invalidity based on prior art the PTO considered during

prosecution of the patent, that challenger has the "added burden of overcoming the deference that

is due to a qualified government agency presumed to have properly done its job." *Ultra-Tex*

*Surfaces, Inc. v. Hill Bros. Chem. Co.,* 204 F.3d 1360, 1367 (Fed. Cir. 2000) (quoting *Am. Hoist*

*& Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984). In other words, "the

challenger's 'burden is especially difficult when the prior art was before the PTO examiner

during prosecution of the application.'" *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323

(Fed. Cir. 1999) (quoting *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467

(Fed. Cir. 1990)).

Sicor's three primary references in this matter, *Fukunaga 1982*, *Sollevi I*, and *Sollevi II*,

were all before the patent office and are listed on the face of the '296 patent.  (TX-275.)

Consequently, Sicor bears the "especially difficult" burden of proving invalidity based on art that

was considered during patent prosecution.

## VI.    *FUKUNAGA 1982* DOES NOT ANTICIPATE THE ASSERTED CLAIMS OF THE '296 PATENT

Sicor has not come close to carrying its burden of proving anticipation of claims 1, 3, 7,

or 9 of the '296 patent by *Fukunaga 1982*.  A party seeking to invalidate a patent under § 102 for

anticipation must show that the allegedly invalidating prior art contains each and every element

of the claimed invention.  *Union Oil Co. of Cal. v. Atl. Richfield Co.*, 208 F.3d 989, 994-95 (Fed.

Cir. 2000);  *In re Dillon*, 919 F.2d 688, 715 (Fed. Cir. 1990).  If even one element is not shown

in the reference, then it does not anticipate.  *See Structural Rubber Prods. Co. v. Park Rubber*

*Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984).

Each of claims 1, 7, and 9 recites *"administering* into the blood stream of said patient

*adenosine"* at various concentrations. (TX-275 at col. 22 (emphasis added).)  Claim 3 contains a

similar recitation, further limiting the method of adenosine administration to "intravenous

administration."  (TX-275 at col. 22.)  Dr. Binkley repeatedly acknowledged that the *Fukunaga*

*1982* abstract described administration of *ATP*, not adenosine.  (Binkley 164:18-165:4;

169:18-21; 190:9-12; 243:14-22.)  These admissions should end the inquiry.  ATP is not

adenosine, and the claims require administering adenosine.  (Klabunde 505:7-506:6.)  Even Dr.

13

Binkley, despite offering his opinion at trial that the asserted claims were anticipated in view of *Fukunaga 1982*, admitted that at his deposition he had said he was not asserting anticipation. (Binkley 243:23-244:1.)  Other deficiencies in Sicor's anticipation argument are set forth at PFF § IV.

## VII.    THE CLAIMS OF THE '296 PATENT ARE NOT INVALID FOR OBVIOUSNESS

### A.    Sicor Must Prove Obviousness by Clear and Convincing Evidence Based on the Four Broad Factual Inquiries

To succeed in proving obviousness, Sicor must prove by clear and convincing evidence that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *See* 35 U.S.C. § 103.

#### 1.    The Law of Obviousness and the Supreme Court's Decision in *KSR*

Obviousness under 35 U.S.C. § 103 is a conclusion of law based on the factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), which include consideration of (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed subject matter as a whole, (3) the level of skill in the art, and (4) objective evidence of nonobviousness.  Additional factual findings include determining what the prior art teaches and whether it "teaches away" from the claimed invention.  *In re Bell*, 991 F.2d 781, 784 (Fed. Cir. 1993).  These findings must be made viewing the invention in the context of the state of the art that existed at the time it was made.  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988).

In its first obviousness case in many years, the Supreme Court has now clarified the standard for obviousness in the context of a simple mechanical "combination" invention. *KSR Int'l Co.*, slip op. at 12. The Court held that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id*. By contrast, the Court noted, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *Id.* Furthermore, prior art warnings about risks involved in the claimed invention and obtaining unexpected results also support a conclusion of nonobviousness. *Id.*

*KSR* confirmed that fact finders must avoid "the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *Id.* at 17 (citing *Graham*, 383 U.S. at 36). In this regard, the Court acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.* Moreover, while prior art combinations resulting in "predictable solutions" leading to "anticipated success" are indicators of obviousness, combinations that "work together in an unexpected and fruitful manner" are not obvious. *See id.* at 12.

> **2.    Objective Evidence, Including Contemporaneous Statements of Skepticism by Experts in the Field and Commercial Success, Is Highly Probative of Nonobviousness**

The assessment of obviousness also requires examination of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17-18. The Federal Circuit has emphasized the need for evaluating objective evidence of nonobviousness. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) (stating that "secondary considerations when present, must be considered in determining obviousness") This evaluation must be made during a court's consideration of

whether the claimed invention is obvious, not after such a determination is complete. *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir. 1984). "It is the secondary considerations that are often most probative and determinative of the ultimate conclusion of obviousness or nonobviousness." *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996). Such secondary considerations include the extent of the commercial success of the patented invention, unexpected results compared to the prior art, skepticism in the field, and any copying of the invention by others. *Id*. at 1574 (finding issues of material fact raised by evidence of copying and commercial success); *see*, *e.g.*, *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1382 (Fed. Cir. 1986) (crediting evidence of commercial success, unexpected results, and skepticism).

Evidence of initial skepticism, surprise, or incomprehension upon learning of the invention and thereafter praising its value is strong evidence of nonobviousness. *U.S. v. Adams*, 383 U.S. 39, 52 (1966); *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 697-98 (Fed. Cir. 1983); *Ruiz*, 234 F.3d at 668 ("Proceeding contrary to the accepted wisdom . . . is strong evidence of unobviousness.") (internal citations omitted). This is particularly true where "the skepticism is expressed at the time of the invention, in a nonadversarial setting." *Burlington Indus., Inc. v. Quigg*, 229 U.S.P.Q. 916, 919 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987). Such evidence of skepticism need not be derived from the technical literature but may include personal communications and comments by experts in the field. *See, e.g., Adams*, 383 U.S. 39 (crediting contemporaneous doubts expressed in correspondence by scientists and government experts who observed initial demonstrations of claimed battery); *Burlington Indus., Inc.*, 822 F.2d at 1584 (crediting inventor's testimony that mill operators dismissed him as "crazy" upon first learning of his invention); *In re Dow*, 837 F.2d 469, 472-73 (Fed. Cir. 1988)

16

(crediting evidence of skepticism expressed by expert chemist in a report sent to company management around time the invention was made).

Commercial success of an invention is also evidence that the invention would not have been obvious. *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.*, 321 U.S. 275, 279 (1944); *Pro-Mold*, 75 F.3d at 1573-74. Commercial success is usually shown by significant sales in a relevant market. *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). Additional evidence that is probative of commercial success includes growth in market share, increases in sales, and replacing earlier units sold by others. *Tec Air, Inc. v. Denso Mfg. Michigan, Inc.*, 192 F.3d 1353, 1360-1361 (Fed. Cir. 1999); *Ruiz*, 234 F.3d at 668.

**B.    Sicor Failed to Prove the Claimed Invention Would Have Been Obvious**

**1.    Scope and Content of the Prior Art:  Teaching Away**

**a.    The History of Adenosine Research Taught Away from the Invention**

The prior art here taught away from Dr. Sollevi's invention, which was directly contrary to the conventional wisdom of the day. The medical literature dating back to the 1920s showed that adenosine was long believed inappropriate for use as a vasodilator in human patients. (*See, e.g.,* TX-48 at 2229.) Reasons for this belief included adenosine's ability to slow or stop the beating of the heart by inhibiting electrical conduction in the AV node (AV block), as well as its short half-life, which, historically, was viewed as a liability rather than a benefit. (*See*, *e.g.*, TX-214 at 415.) This general understanding in the art was summed up in the publication by Maguire, which stated, "The use of adenosine in cardiovascular therapy has been precluded both by the transitory nature of its vasodilator effects and by its toxic actions on the heart." (*Id.*) An additional problem associated with adenosine was its ability to be metabolized into uric acid, a

17

compound capable of crystallizing in the kidneys, causing them to shutdown.  (*See* TX-51; TX-112; TX-255 at 19; TX-441 at 158; Sollevi 440:18-441:15, 461:10-464:12.)

These concerns about the safety and short acting nature of adenosine led to use in the prior art of anything but adenosine alone.  Instead, researchers tried to use adenosine analogs, (like ethyl-adenosine) or drugs that act indirectly, like dipyridamole, instead of adenosine.  *See* § III.B., *supra*.  For more than 50 years after its discovery, there was no attempt to use exogenously administered adenosine for any medical use in human patients.  (Strauss 767:8-18.)

In 1983, Dr. Berne described the first human medical use of adenosine as a treatment for the heart arrhythmia, PSVT, but this use emphasized adenosine's negative effects on cardiac conduction and involved individual rapid bolus doses, not longer-lasting infusions.  (*See* TX-36; Klabunde 522:3-524:20.)  More to the point, these studies effectively demonstrated in the clinic what those in the art had always feared, that exogenously administered adenosine would interrupt the beating of the heart.  For treatment of PSVT, this was a useful and brief effect, controlled through short bolus (*i.e.,* rapid injections) administration.  (Klabunde 523:24-524:8.)  For any other use, the effect would have been highly undesirable, and if it persisted as long as adenosine was administered, would render adenosine infusion impossible.  (*See* Klabunde 524:4-20.)  Consequently the use of adenosine for treatment of PSVT would have strongly discouraged, not encouraged, the use of adenosine infusions for vasodilation.  Indeed, this bias was so firmly entrenched in the field that cardiologists initially resisted using Astellas's Adenoscan brand adenosine as a pharmacologic stress agent for fear of inducing AV block even in the 1990s.  (Klose 1516:3-1517:1.)

18

  **b.**  **The Sollevi Abstracts Taught Away from the Invention**

It was against this backdrop that Dr. Sollevi published the *Sollevi I* and *Sollevi II*

abstracts, in 1983 and early 1984, respectively.  (TX-37; TX-1170; Sollevi 442:3-443:11.)  Sicor

urges that these abstracts demonstrated the safety of adenosine infusion in man and provided the

necessary reason for one of ordinary skill in the art to carry out the methods claimed in the '296

patent.  (*See* Binkley 136:23-137:8, 154:1-155:12.)  But every patient described in the abstracts

received dipyridamole pretreatment as a safety precaution for the stated purpose of minimizing

the required dose of adenosine.  (TX-1170; TX-37; Klabunde 527:12-20.)  The abstracts

themselves did not suggest or imply administering adenosine without dipyridamole

pretreatment.[4]  To the contrary, the prior art taught away from removing this precautionary step

by showing adenosine to be capable of serious adverse effects, particularly at higher doses.

(Klabunde 529:6-530:8, 537:20-538:6, 558:5-19.)  To be sure, it was technically possible to

attempt adenosine infusion without dipyridamole pretreatment, but the prior art would have

discouraged one of skill in the art from doing so.

  **c.**  **The Fukunaga Abstracts Taught Away from the Invention**

Sicor also cited the *Fukunaga 1982* abstract, suggesting that its disclosure of ATP

administration without dipyridamole pretreatment would have led a person of ordinary skill to

administer adenosine while eliminating the dipyridamole pretreatment described in *Sollevi I* and

*Sollevi II*.  (*See*, *e.g.*, Binkley 192:2-23.)  But that assertion is directly contrary to Fukunaga's

own recommendation, published as prior art just two years later in the *Fukunaga 1984* abstract,

---

  [4] Sicor's reliance on the conclusory statements in each abstract referring to the ability of
adenosine to induce hypotension is misplaced.  The context of these statements is clearly within
a methodology that used dipyridamole as a safety measure to reduce the required dose of
adenosine, thereby avoiding its known risks.  (Klabunde 529:6-530:8; 530:18-532:3.)

which urged the use of ATP rather than adenosine for controlled hypotension and further

recommended use of dipyridamole pretreatment to dramatically lower the dose and prevent side

effects, particularly uric acid build up, from high doses of ATP.  (TX-51; Klabunde 540:15-

541:8.)

### d.    Studies of Adenosine in Normal Volunteers Taught Away from the Invention

The Biaggioni abstract (TX-1187) relied upon by Sicor proposed no human medical use

for adenosine infusions without dipyridamole pretreatment, nor did it assess the effect of such

adenosine infusions in human patients.  (Klabunde 552:21-23, 556:10-14.)  The results that were

reported, indicating that a 140 mcg/kg/min dose of adenosine without dipyridamole pretreatment

did not reduce blood pressure in 5 normal volunteers, would have reinforced the view that much

higher adenosine doses would have been required to achieve controlled hypotension without

dipyridamole pretreatment.  (Klabunde 555:3-556:2.)

### 2.    Level of Ordinary Skill in the Art

Both sides agree that a person of ordinary skill in the art with which the '296 patent is

concerned would be a cardiologist with training in internal medicine and a cardiology fellowship.

(Klabunde 515:11-25.)  Consistent with the requirement that a person of ordinary skill be

considered "presumed to think along conventional lines," such a physician would have been

acutely aware of the adverse cardiac side effects that had been associated with adenosine for

decades and unlikely to discount them without significant reassurance.  *See Life Techs., Inc. v.*

*Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000) (citing *Standard Oil Co. v. Am.*

*Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985)).

### 3.    Differences Between the Prior Art and the Claimed Invention

Unlike the methods set forth in claims 1, 3, 7, and 9 of the '296 patent, the *Sollevi I* and *Sollevi II* abstracts describe administering an intravenous infusion of adenosine at a mean dose of approximately 140 mcg/kg/min in conjunction *with* dipyridamole pretreatment. (*See* TX-37; TX-1170.) The presence of a dipyridamole pretreatment is the essential difference between the prior art publications and the claimed methods. (Klabunde 527:2-20.) To prove its case, Sicor must prove by clear and convincing evidence, and without the use of hindsight, that it would have been obvious for one of ordinary skill to perform the claimed methods, which lack a dipyridamole pretreatment and are limited to dose ranges of 10 to 150 mcg/kg/min (claim 7); 50 to 300 mcg/kg/min (claim 3); and less than 350 mcg/kg/min (claims 1 and 9). This it has not done. In particular, Sicor has not proven that one of ordinary skill would then have had any legitimate reason to eliminate the dipyridamole treatment and administer an adenosine infusion in the claimed dose range to achieve controlled hypotension — the sole use disclosed for adenosine infusions in the prior art — or to believe that such a method could be successfully practiced. Sicor relies entirely on the opinions of Dr. Binkley, which are deeply contaminated with impermissible hindsight.

### 4.    The Claimed Invention Would Not Have Been Obvious

#### a.    One of Ordinary Skill Would Not Have Eliminated Sollevi's Dipyridamole Pretreatment

The prior art references relied on by Dr. Binkley suggested only one medical use for adenosine infusion: controlled hypotension. (Binkley 285:11-20; Klabunde 528:12-529:1; DTX-2002.) The prior art included a dipyridamole pretreatment for the specific purpose of lowering the needed adenosine dose in view of the known negative effects of adenosine. (*See* TX-1170; Klabunde 527:12-20.) To achieve controlled hypotension required administering

21

sufficient adenosine, in the presence of dipyridamole, to reduce blood pressure by approximately 40%.  (Binkley 284:5-285:20.)  The Sollevi Abstracts report that an adenosine dose of 140 mcg/kg/min was required on average under these conditions.

Acknowledging that one of ordinary skill would not have expected that controlled hypotension could be achieved at an adenosine dose of only 140 mcg/kg/min in the absence of dipyridamole, Dr. Binkley opined that one of ordinary skill would have eliminated the dipyridamole pretreatment and then gradually increased the adenosine dose to study whether vasodilation sufficient to induce controlled hypotension would occur.  (Binkley 342:17-343:6; 345:8-346:18.)  That assertion, which acknowledges the lack of any reasonable expectation of success, is nothing more than an invitation to experiment and falls well short of proving obviousness.  *See Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720 (Fed. Cir. 1990) (explaining a general disclosure that invites experimentation without a reasonable expectation of success does not render invention obvious).

Indeed, the record is clear that concerns about the side effects associated with larger doses of adenosine would have discouraged an ordinary cardiologist from eliminating the dipyridamole pretreatment in the first place.  (Klabunde 529:6-530:8.)  The prior art suggested that the dose of adenosine would need to be drastically increased, from 10 to as much as 200-fold higher, in the absence of dipyridamole.  (*See*, *e.g.*, Klabunde 535:13-536:8, 557:10-558:19.) Even with dipyridamole, *Sollevi I* and *II* indicated that 140 mcg/kg/min was required on average for controlled hypotension.  Those two facts would have made eliminating the dipyridamole pretreatment out of the question, for they suggested the need for a huge adenosine dose of 1,400 mcg/kg/min or more.  (Klabunde 537:20-538:6.)  Moreover, the expectation that much higher doses would be required in the absence of dipyridamole would not have reasonably suggested the

22

usefulness of doses within the claimed dose ranges.  Thus, rather than encouraging one of

ordinary skill to eliminate the dipyridamole pretreatment, the prior art would have strongly

discouraged it.

       **b.**       **The ATP Infusion Reported in *Fukunaga 1982* Would Not Have Led to the Use of Adenosine Infusion Without Dipyridamole Pretreatment**

Sicor suggests that one of ordinary skill would have concluded that the hypotension

reported in the *Fukunaga 1982* abstract following administration of ATP was, in fact, due solely

to conversion to adenosine and would have concluded, therefore, that adenosine itself could be

safely administered for surgical hypotension at the claimed dose range without a dipyridamole

pretreatment.  Such a conclusion would not have come from the abstract itself, which stated only

that "ATP is a physiological intracellular substance, which relaxes and dilates vascular smooth

muscles including coronary and cerebral arteries."  (TX-42; Klabunde 508:8-24.)  Moreover, by

the time the '296 patent was filed in 1985, it had been well established through the work of Dr.

Geoffrey Burnstock that ATP had its own receptors (designated P2) as compared to adenosine

(whose receptor had been designated P1).  (TX-151; Klabunde 513:20-24.)

Dr. Binkley opined that one of ordinary skill would have known that administering ATP

at the dose range described in *Fukunaga 1982* (200-600 mcg/kg/min) would correspond to an

"equivalent" dose of 97 to 290 mcg/kg/min, taking into account the relative molecular weights of

the different compounds.  (Binkley 167:5-168:7, 170:18-171:2.)    In other words, he opined that

on a weight basis, one microgram of adenosine would be equivalent to about two micrograms of

ATP.  (*See* Binkley 259:11-260:20.)  Dr. Binkley's opinion, however, was based on the

"simplifying assumption" (which was in fact merely speculation (Binkley 271:18-272:14)), that

100% of the administered ATP in *Fukunaga 1982* would have been rapidly converted to

adenosine and that it was the adenosine not the ATP that was causing the hypotensive effect. (Binkley 167:12-168:7.)

This conjecture cannot satisfy Sicor's burden of proof.  For example, Dr. Binkley's simplifying assumption does not take into account (1) that ATP is metabolized into various metabolites that would interconvert with one another (and even reform ATP), (2) that administration of exogenous ATP can cause cells to release their own endogenous ATP into the bloodstream, or (3) that adenosine would not simply "pool' in the body, but would further break down into other metabolites.  (Binkley 272:15-274:9; DTX-2008; *cf.* Klabunde 507:8-508:3.) Indeed, despite characterizing adenosine as the "end product" of ATP metabolism, Dr. Binkley admitted that adenosine itself would have been further degraded to uric acid.  (Binkley 168:8-25, 274:1-9.)  Consequently, it would have been impossible to predict or calculate the amount of adenosine formed in the bloodstream of a patient infused with ATP.  (Klabunde 507:8-508:3.)

Moreover, the human data contradicted Dr. Binkley's assumption that two micrograms of ATP would be equivalent to one microgram of adenosine.  The *Fukunaga 1984* abstract reported that, on average, 32 micrograms of ATP lowered blood pressure by about 40% in patients pretreated with dipyridamole.  (TX-51; Klabunde 550:4-14; Binkley 257:12-15; DTX-2002.) Under Dr. Binkley's assumption, a corresponding dose of 16 micrograms of adenosine should have had a similar effect.  (Binkley 258:25-260:1; Klabunde 549:4-550:14.)  In actual fact, Dr. Sollevi needed 140 micrograms of adenosine, nearly 10 times as much as Dr. Binkley's assumption predicted, to achieve a similar blood pressure reduction after dipyridamole pretreatment.  (Binkley 260:2-20; Klabunde 550:15-24.)

Thus, comparing the dose of adenosine required to induce hypotension following dipyridamole pretreatment with the corresponding dose of ATP would have shown that ATP was

a much more potent vasodilator in humans than adenosine, a result that would have utterly

contradicted the notion that the effects of ATP were simply due to its metabolism into adenosine.

(Klabunde 550:20-25, 1044:5-25.)  In this regard, one of ordinary skill would have understood

that if ATP were working indirectly through breakdown into adenosine, then ATP would be *less*

potent than adenosine, which it was not.  (*See* TX-152 at 198; Binkley 1459:20-1460:14; *see also*

Klabunde 1212:13-1213:8.)  Instead, the evidence clearly pointed to a direct action by ATP, even

if that action was mixed with action by other vasodilating metabolites, including adenosine.

(*See*, *e.g.*, Klabunde 1044:5-25.)

Most telling is what Dr. Fukunaga actually did in the early 1980s.  Sicor suggests that one

of *ordinary* skill in the art presented with the *Fukunaga 1982* abstract showing ATP-induced

hypotension without dipyridamole, and Dr. Sollevi's two abstracts, showing administration of

adenosine *with* dipyridamole pretreatment, would have proceeded to use an adenosine infusion

without dipyridamole.  Yet what Dr. Fukunaga, clearly an expert in the field, actually did was

quite the opposite.  Rather than testing or suggesting the use of adenosine without dipyridamole

pretreatment, he tested and recommended inducing hypotension with *ATP* and *adding* a

dipyridamole pretreatment to reduce the necessary dose.  (*Compare* TX-42 *with* TX-51.)

In a last ditch effort to support his assertion that 100% of the ATP administered to a

human patient would be converted to adenosine, Dr. Binkley relied on two dog studies that were

not disclosed in his expert report and offered previously undisclosed opinions and testimony

about them.  (*Compare* TX-88 and TX-236 *with* TX-26 and TX-43; Binkley 1412:1-1421:19.)

These studies suggested that intravenous ATP acted by conversion to adenosine in dogs.  But the

record shows very different levels of ATP metabolism and different effects in various animal

species and in animals versus humans.  (*See, e.g.,* TX-87 at 275; TX-126 at 613; Binkley
1465:5-1466:15; Klabunde 1215:2-1216:22.)

 While ATP was less potent than adenosine in dogs, and thought, therefore, to act
indirectly in that species, exactly the opposite result was seen in rabbits.  (*See* TX-87; Binkley
267:9-269:3.)  Most importantly, the available data in the prior art showed ATP to be a more
potent vasodilator than adenosine in humans, directly contradicting the notion that ATP was
working solely through metabolic formation of adenosine.  (Klabunde 1044:5-25,
1117:5-1118:21.)

   c. **Dr. Binkley's Suggested Alternative Medical Uses for
Adenosine Are Untimely and Incredible**

 In his testimony in Sicor's case-in-chief at trial, Dr. Binkley asserted that one of ordinary
skill in the art would have administered an adenosine infusion without dipyridamole pretreatment
at a dose of 140 mcg/kg/min to achieve some degree of selective arterial vasodilation even if it
were insufficient for controlled hypotension.  He could not, however, identify any medical
purpose in the prior art that would cause someone to perform such an infusion.  (Binkley 252:1-
255:21.)  This analysis was little more than a hindsight reconstruction guided by Dr. Binkley's
present day reading of the patent claims.  While he purported to be opining on the conclusions
that would have been drawn from the prior art by a person of ordinary skill in 1985, he admitted
that all of the relevant prior art references he had found related to causing controlled
hypotension, an application requiring a large decrease in blood pressure.  (Binkley 254:24-
255:21.)

 Testifying on rebuttal, two weeks later, Dr. Binkley offered a different opinion that one
of ordinary skill would have wanted to use an adenosine infusion without dipyridamole
pretreatment for the additional applications of treating heart disease or a condition termed "limb

ischemia." (Binkley 1366:13-1368:2.) This new opinion had not been disclosed in any of Dr.

Binkley's prior expert reports or deposition testimony and should be precluded on that basis

alone. (Binkley 1368:24-1370:11.) But even if substantively considered, the opinion is not

credible. Dr. Binkley did not cite any prior art suggesting these uses of adenosine. He admitted

that, even today, he had never actually used adenosine for such purposes, and he characterized

the use of adenosine for heart failure only as "something worth exploring." (Binkley 1489:6-

1490:11.)

 Moreover, an ordinarily skilled physician would have had numerous alternative drugs

with fewer side effects that would have been administered instead of adenosine. Adenosine

infusion carried serious potential liabilities: heart block was a possibility that could only be

detected by continuous electrocardiographic monitoring (Binkley 202:11-17); uric acid buildup

was a risk that could only be avoided, if at all, with repeated monitoring and concomitant

administration of other drugs (Klabunde 1198:23-1201:1); and even non-hypotensive doses of

adenosine had been associated with dose-limiting discomfort in conscious healthy subjects (*see*

TX-1187; Binkley 1489:16-1490:11.) Indeed, had adenosine truly been considered safely

interchangeable with various prior art vasodilators for general use, there is no reason why it

would not have been used for that purpose decades earlier. Moreover, while opining that an

ordinary physician would have administered adenosine to patients with heart failure, Dr. Binkley

did not even address the special cardiac sensitivities of these patients that had led Dr. Sollevi

specifically to exclude such patients from his studies. (Binkley 1489:6-1490:11.)

 In short, it strains credulity to suggest that an ordinary cardiologist would have eschewed

the battery of clinically proven conventional therapies in favor of an untested new drug with

known serious risks. Consequently, the only realistic use that one of ordinary skill in the art

would have considered for continuous adenosine infusion was in the context of inducing

controlled hypotension during surgery and then only with dipyridamole pretreatment.

> **5.    Objective Evidence of Nonobviousness:  Skepticism,
> Commercial Success, Unexpected Results, and Copying**

The record contains strong objective evidence of nonobviousness in the form of

skepticism followed by praise by experts in the field, commercial success, unexpected results,

and copying.  (*See, e.g.*, TX-49; TX-410; Klabunde 1051:16-1055:1.)  This evidence must be

taken into account because "[i]t may often establish that an invention appearing to have been

obvious in light of the prior art was not."  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044,

1053 (Fed. Cir. 1988).  Indeed, evidence of secondary considerations may often be the most

probative and cogent evidence in the record."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530,

1538 (Fed. Cir. 1983).

> **a.    The Skepticism and Ultimate Praise Expressed in the
> Letters By Dr. Berne and Dr. Robicsek Is Highly
> Probative Objective Evidence of Nonobviousness**

Proceeding against the conventional wisdom is strong evidence of nonobviousness.  *W.L.

Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1545 (Fed. Cir. 1983).  In particular, the

Supreme Court has acknowledged that expressions of disbelief by experts in the field at or about

the time of the invention is evidence of nonobviousness.  *Adams*, 383 U.S. at 52.  The record

here contains direct evidence of such skepticism by noted experts at a time long before the

instant lawsuit in the form of correspondence by Drs. Berne and Robicsek and testimony by Dr.

Sollevi.  (*See*, *e.g.*, TX-49, TX-410; Klabunde 1051:16-1055:1.)  This type of evidence, though

often not available, is preferred in patent cases, as it offers direct and compelling evidence of

how Dr. Sollevi's work contradicted the conventional wisdom.  "Recognizing the difficulty of

casting one's mind back to the state of technology at the time the invention was made, courts

have long recognized the usefulness of evidence of the contemporaneous attitude toward the asserted invention." *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985). Sicor has objected to these materials on relevance and hearsay grounds, but they are highly relevant and not hearsay.

For example, Dr. Sollevi's testimony that Dr. Berne referred to him as "crazy" at their first meeting when Dr. Sollevi described his experiments administering adenosine infusions to human patients (Sollevi 452:25-454:3) is precisely the sort of evidence that the Federal Circuit has credited as objective evidence of nonobviousness. *See Burlington,* 822 F.2d at 11584. In *Burlington,* the Federal Circuit credited testimony by the inventor, "that mill operators . . . initially dismissed him as 'crazy' when he first proposed his solution." *Burlington*, 822 F.2d at 1584. Likewise, here, Dr. Berne's reaction to the idea of administering an adenosine infusion is highly relevant to demonstrating the prevailing wisdom held by leaders in the field and showing how Dr. Sollevi's invention contradicted that view. Sicor's hearsay objection is misplaced as the statement is being offered to show the declarant's (Dr. Berne's) then existing state of mind. *See* Fed. R. Evid. 803(3); *Citizens Fin. Group, Inc. v. Citizens Bank of Evans City*, 383 F.3d 110, 133 (3rd Cir. 2004). Indeed, the statement is not being offered for the truth of the matter asserted (that Dr. Sollevi was crazy), but to show Dr. Berne's state of mind, which, because he was an expert in the field at the time, is relevant to the issue of obviousness.

Similarly compelling evidence of Dr. Berne's skepticism is the scientific correspondence he and Dr. Sollevi exchanged in late 1984 and early 1985. (Sollevi 454:8-460:20.) In this correspondence, Dr. Berne stated, unequivocally "I am really impressed with the studies you have done in humans . . . I think it is of considerable clinical importance. One thing I don't understand is how you avoid atrioventricular heart block with doses of adenosine that are

required to greatly lower arterial pressure.  We get AV block with doses of adenosine that do not

lower blood pressure."  (TX-49; Sollevi 459:1-460:20.)  Sicor objects to this correspondence on

relevance, authenticity, and hearsay grounds.

Correspondence and other private communications, such as the letters from Dr. Berne,

are highly relevant evidence for demonstrating the state of mind of an expert.  Sicor has

suggested that such materials are not relevant because they were not published in the scientific

literature and would not have been available to those of ordinary skill in the art.  But the

relevance of such letters is not based on their being available in the art, it is based on what they

show about the state of mind of the expert that wrote the letter.  The Supreme Court in *Adams*

acknowledged that to be the case by crediting the contemporaneous statement of an expert who

wrote a letter about the patentee's claimed battery, stating "Until the inventor can present more

convincing data . . . I see no reason to consider it further."  *Adams*, 383 U.S. at 44.[5]  The Court,

untroubled by the private nature of the communication or its lack of availability to those of

ordinary skill in the art, cited this communication as evidence that the patentee's invention was

contrary to the thinking of experts in the field at the time.  *Id*. at 44, 52.  The Federal Circuit has

relied on similar private communications, such as internal memoranda, to show

contemporaneous evidence of an expert's state of mind around the time the invention was made.

*See In re Dow Chem. Co.*, 837 F.2d 469, 472-73 (Fed. Cir. 1988).

---

[5] While not explicitly stated in the Court's opinion, examination of the patentee's brief and associated exhibits before the Court reveals that the statement comes from a 1942 letter written by the expert in question.  *See* Appendix 1 at 12, 78 (describing letters compiled in Exhibit 12 of *Adams* record to show skepticism by experts); Appendix 2 at iii-iv, 403 (Index of trial record and Exhibit 12 comprising correspondence and memos including text quoted by Supreme Court.)

The correspondence from Dr. Robicsek to the editor of a medical journal that published one of Dr. Sollevi's articles and his subsequent correspondence with Dr. Sollevi similarly reflect the skepticism that met Dr. Sollevi's invention.  Dr. Robicsek was the head of a major thoracic surgery clinic in the United States, and he was sufficiently concerned about the possibility that adenosine infusion would cause kidney failure that he wrote to the editor to seek additional information.  (Sollevi 464:13-466:18.)  Robicsek later followed up with a letter directly to Dr. Sollevi in which he explained that he had ceased his own studies of adenosine infusion because of concerns about kidney failure.  (Sollevi 471:13-472:18; TX-265.)  These letters show that even a leading thoracic surgeon was sufficiently worried about the problem of uric acid accumulation that he *ceased* his own research on adenosine infusion.  (TX-265 ("Unfortunately, we accepted this information at face value and ceased further work….")  Dr. Fukunaga also was concerned about uric acid accumulation, which led him to recommend dipyridamole pretreatment before administering ATP.  (*See* TX-51.)

Dr. Binkley, who was not working with adenosine in the mid-1980s, has offered his naked opinion, from the comfortable vantage point of today, that uric acid accumulation would not have been a concern, and, of course, with hindsight, we now know it is not a problem.  (*See* Binkley 224:6-225:2.)  But the objective evidence shows that those actually working in the field in the mid-1980s — Dr. Sollevi, Dr. Robicsek, and Dr. Fukunaga — were very much concerned about it.  It is this contemporaneous evidence that is most probative of the inquiry into obviousness at the time the invention was made.  *Interconnect*, 774 F.2d at 1143 ("A retrospective view of the invention is best gleaned from those who were there at the time.")  Sicor objects to both the Berne and the Robicsek letters (TX-49, TX-265, TX-293, TX-410, TX-411, TX-412, TX-413, TX-436, and TX- 439) on authenticity and hearsay grounds.

(Argument 410:23-413:25.)  Neither objection has merit.  The series of letters are authenticated

under the ancient document rule by Dr. Sollevi's testimony (Sollevi 454:4-460:20) that they were

from his files and were, in fact, letters that he sent or received more than 20 years ago. *See* Fed.

R. Evid. 901(b)(8);  *United States v. Stelmokas*, 100 F.3d 302, 311 (3d Cir. 1996).  Moreover,

"[o]nce a document qualifies as an ancient document, it is automatically excepted from the

hearsay rule under Fed. R. Evid. 803(16)."  *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d

1366, 1375-1376 (3d Cir. 1991).

### b.    The Commercial Success of Adenoscan Is Also Objective Evidence of Nonobviousness

Adenoscan's performance in the pharmacologic stress agent market has all the hallmarks

of an enormous commercial success (*see* Hay 1710:23-1712:16), strongly indicating

nonobviousness.  Where it is shown that significant economic benefit could be had by

modifications of the prior art, the inference is that persons of ordinary skill in the art, motivated

by their own economic self interest, would have done so earlier had the modifications been

obvious.  *In re Fielder*, 471 F.2d 640, 644 (C.C.P.A. 1973).

Adenoscan's sales have substantially and consistently grown since it was launched

(TX-19; Hay 1714:13-1716:19, 1733:11-1734:22; DTX-2014; DTX-2032); it has achieved

nearly $1.7 billion in sales over 10 years (TX-19; Hay 1716:14-18); and its share of the relevant

market has experienced substantial and sustained growth along with Adenoscan's sales.  (TX-21;

Hay 1729:7-19, 1730:24-1731:10, 1733:4-1734:22, 1738:12-1739:7; White 1243:20-1244:8;

DTX-2032.)  The combination of increasing sales and increasing market share is very powerful

evidence of commercial success. *Tec Air*, 192 F.3d at 1360-61.

Further evidence of commercial success is that Adenoscan displaced dipyridamole, the

earlier product in the market, and even continued to show substantial sales growth after

dipyridamole became available as a low price generic.  (TX-19; TX-21; Hay 1731:11-1733:3;

DTX-2029; DTX-2030; DTX-2031.)  S*ee Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir.

2000); *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F. Supp. 2d 479, 494-95 (D. Del. 2006)

(finding commercial success of Lexapro® based on large sales despite the availability of a

generic competitor at lower prices).

The nexus between the commercial success of Adenoscan and the merits of the claimed

invention is seen in multiple and varied ways.  *See Demaco Corp. v. F. Von Langsdorff*

*Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).  Sicor admits that its Adenosine Injection

USP infringes the asserted claims of the '296 patent, (D.I. 129 ¶ 2), and it copied its Adenosine

Injection USP from Adenoscan.  (Hernandez 2061:24 -2063:14.)  It can hardly argue that the

claims do not cover Adenoscan.  Indeed, Adenoscan's only active ingredient is adenosine.

(TX-75.)

Moreover, Defendants' witnesses established that Adenoscan's attributes of rapid onset

of action, safety, and ease of use when administered as a continuous intravenous infusion are

bona fide product advantages doctors recognize.  (*See, e.g.*, Strauss 784:6-786:6.)  While Sicor

attributes the success of Adenoscan to promotion and market forces, the courts have held

repeatedly that with medical inventions, the promotion of a product does not mean that the

product was purchased because of that promotion rather than because of its merit.  *Hybritech Inc.*

*v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1382 (Fed. Cir. 1986) ("[The] record shows that

advertising makes those in the industry - hospitals, doctors, and clinical laboratories - aware of

the diagnostic kits but does not make these potential users buy them; the products have to

work . . . ."); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713, 757 (N.D.

W. Va. 2004) ("The ultimate success of a prescription antibiotic hinges on its clinical

33

properties."). The record in this case confirms that the attributes of Adenoscan are far more determinative of demand for it than promotion. (Klose 1533:19-1534:3; Hay 1796:22-1798:1.)

In addition, Astellas's marketing was typical in the industry at the time (TX-19; TX-24; TX-1165; Hay 1742:3-24, 1745:3-1749:10; DTX-2040; DTX-2041) — a fact that courts have credited in finding commercial success is due to the invention itself. *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, No. IP 99-38-C H/K, 2001 WL 1397304, at *12 (S.D. Ind. 2001) ("… the evidence shows that Lilly's marketing and advertising budgets for AXID (nizatidine) have been relatively modest by industry standards."); *Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, *Inc.,* 348 F. Supp. 2d 713, 757 (N.D. W. Va. 2004) ("LEVAQUIN also maintained a relatively low ratio of total sales to promotional expenditures as compared to competing respiratory anti-infectives.").

Sicor's own actions in seeking market approval for a generic version of Adenoscan and provoking this lawsuit under the Hatch-Waxman Act also contradict its arguments that the product is not a commercial success, particularly when it is already selling generic dipyridamole — the major competing compound in the market. (TX-4; TX-7; Lea 2035:22-2036:2); *See Ortho-McNeil.*, 348 F. Supp. 2d at 759 ; *Eli Lilly & Co.*, 2001 WL 1397304, at *12 ("Strong evidence of commercial success is not surprising in a case under the Hatch-Waxman Act, of course. If the patented drug were not a commercial success, generic manufacturers would have little interest in offering their own versions of the drug.").

### c.    The Unexpectedly Low Dose of Adenosine Required in the Absence of Dipyridamole is Further Evidence of Nonobviousness

Evidence of unexpected results or advantages in the claimed invention is also evidence of nonobviousness. *Lindemann*, 730 F.2d at 1461. As discussed in detail above, the clear teaching of the prior art was that unacceptably high doses of adenosine would be required in the absence

of dipyridamole pretreatment.  (See  § III.D., *supra*.)  The discovery that such high doses were

not required is a critical aspect of the claimed invention, which surprised even Dr. Sollevi.

(Sollevi 449:19-451:6.)  Dr. Berne was also surprised, as he had expected to see AV block at

doses that did not cause hypotension.  (*See* TX-49.)

**d.     Sicor's Interest in Copying the Invention Also<br>Demonstrates Its Nonobviousness**

Although Sicor already markets dipyridamole as a pharmacologic stress agent, it filed an

ANDA and spurred this litigation for the purpose of introducing a generic copy of Adenoscan

that will be used according to the claimed methods of the '296 patent.  (*See* Lea

2035:22-2036:22.)  That interest in copying further demonstrates the nonobviousness of the

invention.  *See Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F. Supp. 2d 479, 496 (D. Del. 2006)

("In the Court's view, the copying of others is particularly telling in this case, because citalopram

is currently available as a generic drug.  Indeed, citalopram is sold generically by Defendants, yet

Defendants seek to copy and sell Lexapro[®]."); *see also Procter & Gamble Co. v. Paragon Trade*

*Brands Inc.*, 989 F. Supp. 547, 594 (D. Del. 1997); *Ortho-McNeil*, 348 F. Supp. 2d 759.

## VIII.   SICOR'S WITNESSES WERE NOT CREDIBLE AND OFFERED OPINIONS BEYOND THE SCOPE OF THEIR EXPERT REPORTS

### A.     Dr. Binkley

Dr. Binkley lacked any experience or perspective on adenosine research at the relevant

time.  Plaintiffs offered contemporaneous evidence and witnesses who were actually working in

the field of the invention at the time it was made because "[a] retrospective view of the invention

is best gleaned from those who were there at the time."  *See Interconnect*, 774 F.2d at 1143.  By

contrast, Dr. Binkley came to the litigation with no contemporaneous experience with adenosine

or ATP, no scientific publications in the field, and no research grants relating to adenosine.

(Binkley 238:21-241:6.)  Consequently, his view is plainly colored by his current experience, and while he opined on publications from the early 1980s, he had never seen those publications prior to this litigation.  (Binkley  241:7-243:7.)

Moreover, Dr. Binkley's trial testimony was often contradicted by his deposition testimony.  For example, Dr. Binkley opined at trial that *Fukunaga 1982* anticipated the asserted claims despite testifying at his deposition he was not asserting anticipation. (Binkley 243:10-244:1.)  He also opined about separating the effects of adenosine and dipyridamole in the *Sollevi I* and *Sollevi II* abstracts, despite having previously testified that the effects could not really be separated.  (Binkley 301:15-302:10.)

Most troubling of all, however, were Sicor's repeated attempts to elicit from Dr. Binkley testimony on new theories of invalidity and new exhibits not previously identified in his expert reports.  Sicor did so notwithstanding repeated warnings that it did so at its peril.  (*See*, e.g. Binkley 1370:6-10).  Indeed, Sicor went so far as to represent to the Court that a particular reference (TX-88) it was using with Dr. Binkley had been cited in a footnote in Dr. Binkley's report, only to be forced to admit later that no such citation existed.  (Binkley 1417:14-21.)  Even then, Sicor made no effort to correct its failure to abide by the discovery rules.  (Binkley 1417:23-25; 1421:16-1422:1.)

For example, a centerpiece of Dr. Binkley's obviousness testimony at trial was that one of ordinary skill in the art would have believed that dipyridamole was having little or no effect by the end of the period of hypotension in the *Sollevi I* and *Sollevi II* abstracts.  (Binkley 147:12-21; 154:1-17.)  This new theory was not disclosed during discovery  (Binkley 155:15-19) and was deeply flawed.  For example, Dr. Binkley relied in support of his new opinion on the fact that the adenosine levels in *Sollevi II* returned to normal within 3 to 9 minutes (Binkley 263:2-9.)

36

Dr. Binkley later contradicted himself, however, by admitting that if dipyridamole were not present, the adenosine levels would have returned to normal within just 40 seconds. (Binkley 265:18-23; *compare also* Binkley 1380:20-1381:7 (stating dipyridamole half life is 30-40 minutes) *with* Binkley 1472:16-1474:23 (stating dipyridamole half life is 40 to 80 minutes).)

By way of further example, Dr. Binkley asserted that the 1985 abstract by Biaggioni (TX-1187) showed selective arterial vasodilation, yet admitted this opinion did not appear in his reports. (*See, e.g.,* Binkley 173:23-174:13, 1444:21-25.) Dr. Binkley also relied for the first time in his rebuttal trial testimony on the alleged obviousness of other theoretical medical uses for adenosine as a selective arterial vasodilator other than inducing controlled hypotension. (Binkley 1366:19-1375:7.) Opinions on these other uses are not disclosed in his expert reports. (*See* TX-26; TX-43.)

An expert report must contain a complete statement of all opinions to be expressed. Fed. R. Civ. P. 26(a)(2)(B). A party that fails to meet the disclosure requirements of Rule 26 shall not be permitted to use the information it has failed to disclose as evidence at a trial, provided that such failure is not harmless. (Fed. R. Civ. P. 37(c)(1).) Sicor failed to meet the obligations of Rule 26 and this failure was most certainly not harmless. Sicor withheld information relating to a theory of invalidity, which ultimately resulted in an unfair surprise at trial. Thus, the testimony of Dr. Binkley that is beyond the scope of his expert report should be excluded from evidence. *See Coalition To Save Our Children v. State Bd. of Educ.,* 90 F.3d 752, 775 (3d Cir. 1996); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 04-1371-JJF, slip. op. at 13 (D. Del. Sept. 20, 2006) (addressing several motions in limine, Judge Farnan acknowledged that as "the court stated previously, opinions not disclosed by an expert in his report will not be permitted at trial"); *Inline Connection Corp. et al. v. AOL Time Warner Inc. et al*., No.

37

02-272-MPT, slip. op. at 16-17 (D. Del. Feb. 5, 2007) (granting motion to preclude an expert

from testifying on subject outside the scope of his deposition and expert report, citing the party's

failure to supplement the expert's report prior to trial).

     Dr. Binkley also offered previously undisclosed opinions and testimony at trial about

various exhibits. Both the testimony and the following exhibits should be excluded: (TX-88;

TX-126; TX-151; TX-199; TX-236; TX-5000[6]; Binkley 1412:2-1417:21, 1417:23-1422:1,

1422:3-1433:16; 1434:4-1438:2, 1505:6-1506:12.). These exhibits were not identified in

Dr. Binkley's expert reports and were not identified in Sicor's 35 U.S.C. § 282 notice. (*See*

TX-26; TX-43, Appendix 3.) Under 35 U.S.C. § 282 a party asserting invalidity must provide

notice in writing to the adverse party at least thirty days before the trial "the title date and page

numbers of any publication to be relied upon as anticipation of the patent in suit . . . ." Failure to

comply with these requirements is grounds for exclusion. *Ferguson Beauregard/Logic Controls

v. Mega Sys., L.L.C.*, 350 F.3d 1327, 1347 (Fed. Cir. 2003).

    **B.**     **Dr. Leffler**

     The testimony of Sicor's economic expert, Dr. Leffler was likewise not credible and not

reliable as set forth more fully in Plaintiffs' proposed findings of fact. (PFF IV.F.5..) For

example, Dr. Leffler's opinions were fraught with outright mistakes, such as relying on a

demonstrative exhibit (DTX-3131) that incorrectly reported the number of dipyridamole scans as

increasing from about 1 million to 3 million in 2004, when, even in 2004 there were only 1.34

million such scans performed. (*See* Leffler 1577:25-1578:17; 1653:19-1655:5.) Dr. Leffler also

misstated the sales growth of Adenoscan, asserting that it had "leveled off" between 1998 and

---

    [6] Note that TX-5000 was never disclosed at all during discovery and should be excluded
on that basis as well. (*See* Klabunde 1107:13-1114:7.)

2001, but later disavowing any "plateau in sales" and acknowledging that Astellas's annual report trumpeted "double digit growth in sales" over the period where Leffler had alleged a leveling off.  (*See* Leffler 1575:24-1576:24; 1592:14-24; 1595:1-25; 1664:23-1667:9.) Plaintiffs' expert further explained that Dr. Leffler's "leveling off" of sales was nothing more than an artifact of the way he had carried out the currency conversion between dollars and yen. (Hay 1725:12-1728:8.)  Finally, Dr. Leffler based his opinions in part on "IMS" data, that he acknowledged to be incomplete and inappropriate for many uses, including uses for which he had applied the data in his expert report.  (Leffler 1671:1-1673:12.)

## IX.    CONCLUSION

For the foregoing reasons, Sicor has failed to prove by clear and convincing evidence that the asserted claims of the '296 patent are invalid.  Plaintiffs respectfully request, therefore, that judgment in their favor be entered.

Dated:  May 9, 2007


   /s/ Mary B. Matterer                              /s/ David E. Brand
Richard K. Herrmann #405                    Paul M Lukoff #96
Mary B. Matterer #2696                       David E. Brand #201
MORRIS JAMES LLP                             PRICKETT JONES & ELLIOTT, P.A.
500 Delaware Avenue, Suite 1500             1310 King Street
Wilmington, DE 19801                         Wilmington, DE 19801
(302) 888-6800                               (302) 888-6520
mmatterer@morrisjames.com                    debrand@prickett.com

Charles E. Lipsey                            John Scheibeler
FINNEGAN, HENDERSON, FARABOW,                WHITE & CASE LLP
   GARRETT & DUNNER, LLP                     1155 Avenue of the Americas
Two Freedom Square                           New York, NY  10036
11955 Freedom Drive                          (212) 819-8200
Reston, VA 20190-5675
(571) 203-2700                               *Attorneys for Plaintiff*
                                             *Item Development AB*
Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*