# APPENDIX 1

Office-Supreme Court, U.S.
FILED

SEP 25 1965

JOHN F. DAVIS, CLERK

IN THE

# SUPREME COURT OF THE UNITED STATES

### OCTOBER TERM—1965

### No. 55

THE UNITED STATES OF AMERICA,

*Petitioner,*

*vs.*

BERT N. ADAMS, EMMA ADAMS, GEORGE HALLINGBY (individually and as Executor of the Estate of Olaf Hallingby, deceased), JANE MAESEL, IRIS PETRY, LEWIS M. SCHOTT, MARY ELLEN HALLINGBY SEIMERS, and HELEN LOUISE SUTCLIFFE (individually and as Executrix of the Estate of Ernest M. Sutcliffe, deceased),

*Respondents.*

## RESPONDENTS' BRIEF

JOHN A. REILLY,
*Attorney for Respondents,*
KENYON & KENYON,
165 Broadway,
New York, New York 10006

*Of Counsel:*
EDWARD J. HANDLER, III
WILLIAM J. UNGVARSKY
KENYON & KENYON

# INDEX

|  |  | PAGE |
|---|---|---|
| JURISDICTION | | 1 |
| STATUTES INVOLVED | | 2 |
| QUESTIONS PRESENTED | | 2 |
| STATEMENT OF THE CASE | | 3 |
| | A. The Conventional Voltaic Battery vs. The Adams Battery in Function | 4 |
| | B. The Conventional Voltaic Battery vs. The Adams Battery in Composition and Theory | 7 |
| | C. Adams and His Contacts With The Government | 10 |
| | D. Infringement | 13 |
| | E. The Course of This Litigation | 15 |
| SUMMARY OF ARGUMENT | | 17 |

ARGUMENT

| I. | THE STANDARD OF INVENTION AND THE ADAMS CONTRIBUTION | 20 |
|---|---|---|
| | A. The Government's Position | 20 |
| | B. Adams Position | 22 |
| |   (1) The Necessity for ''Invention'' | 22 |
| |   (2) The Historical Approach and Obviousness | 25 |
| II. | SUBSTANTIVE ISSUES | 31 |
| | A. Introduction | 31 |
| | B. The Adams Invention Is Recognized as a Scientific Advance by the Government, Its Suppliers and Battery Experts | 36 |

ii

PAGE

C. Adams Flew in the Face of the Battery Art and Thereby Produced a New Battery With Unique, Unexpected and Important Results ... 42

  (1) The Adams Battery Is New ......... 42

  (2) The Results of the Adams Battery Are Wholly Unexpected and Different From Any Other Battery ........... 47

D. The Adams Battery Has New Qualities and Functions That Fill Long Felt Wants ... 53

E. The Adams Invention Is Not Anticipated by The Prior Art but Rather Is Validated by It .................................. 57

F. The Unobviousness of the Adams System Is Further Proven by the Government's Admitted Surprise and Disbelief ........ 76

G. Unobviousness Is Established by the Lack of a Scientific Theory To Explain the Operation of the Adams Battery System .... 80

H. Conclusion as to Substantive Issues ..... 82

III. PROCEDURAL ISSUES ......................... 82

A. Lack of Jurisdiction ................... 82

  (1) The Government Did Not Apply for an Extension Until Nine Months After the Entry of the Judgment Sought To Be Reviewed ...................... 84

  (2) The Government Failed To Apply for the Writ Until After Its Extension Had Expired ...................... 86

B. The Government Has Reversed Its Position on a Question of Fact To Seek Reversal of the Decision the Government Induced the Lower Court To Make ...... 88

iii

## TABLE OF AUTHORITIES

PAGE

*Adams* v. *U. S.*, 330 F. 2d 622 .................... 1, 16

*Arkansas Anthracite Coal & Land Co.* v. *Stokes*,
2 F. 2d 511 (8 Cir. 1924), *cert. denied* 259 U. S. 584 ... 92

*Assets Realization* v. *Roth*, 226 N. Y. 370, 123 N. E.
743 (1919) .................................... 92


*B. G. Corp.* v. *Walter Kidde & Co., Inc.*, 79 F. 2d 20
(2 Cir. 1935) ................................. 82

*Baldwin-Southwark Corp.* v. *Tinius Olsen Testing
Mach. Co.*, 88 F. 2d 910 (3 Cir. 1937), *cert. denied*
302 U. S. 696 ................................ 47


*Coffin* v. *Ogden*, 18 Wall 120, 85 U. S. 120 .......... 21

*Concrete Appliances Co.* v. *Gomery*, 269 U. S. 177 .. 24

*Cuno Engineering Corp.* v. *Automatic Devices Corp.*,
314 U. S. 84 ...........17, 20, 22, 23, 24, 25, 26, 27, 30, 33


*Davis* v. *Wakelee*, 156 U. S. 680 .................... 93

*Dow Chemical Co.* v. *Halliburton Oil Well Cementing
Co.*, 324 U. S. 320 ............................. 68


*Federal Trade Commission* v. *Colgate-Palmolive Co.*,
380 U. S. 374 ................................. 86

*Federal Trade Commission* v. *Minneapolis-Honey-
well Co.*, 344 U. S. 206 .......................85, 86, 87


*Goodyear Co.* v. *Ray-O-Vac Co.*,
321 U. S. 275 ...............17, 20, 25, 27, 33, 53, 59, 75

*Graver* v. *Linde*, 339 U. S. 605 .................... 88

*Great A & P Tea Co.* v. *Supermarket Equip. Corp.*,
340 U. S. 147 ..17, 19, 22, 23, 24, 25, 27, 30, 33, 37, 41, 53, 74


*Hotchkiss* v. *Greenwood*, 11 Howard 248,
52 U. S. 248 ................................20, 25, 26


*Keystone Mfg. Co.* v. *Adams*, 151 U. S. 139 ......... 25


*Lincoln Engineering Co.* v. *Stewart-Warner Corp.*,
303 U. S. 545 ................................ 23

*Loom Co.* v. *Higgins*, 105 U. S. 580 ............... 25, 75

iv

PAGE

*Mantle Lamp Co.* v. *Aluminum Products Co.,*
301 U. S. 544 .................................  24
*Mumm* v. *Decker,* 301 U. S. 168 ...................  82

*Pacific Contact Labs., Inc.* v. *Solex Labs., Inc.,* 209
F. 2d 529 (9 Cir. 1953), *cert. denied* 348 U. S. 816..  21, 63
*Potts* v. *Creager,* 155 U. S. 597 ..................24, 25, 28

*Radio Corporation of America* v. *Radio Engineering*
*Laboratories, Inc.,* 293 U. S. 1 ..................  82
*Reckendorfer* v. *Faber,* 92 U. S. 347 ...............  23
*Reynolds* v. *Whitin Mach. Works,* 167 F. 2d 78 (4
Cir. 1948), *cert. denied* 334 U. S. 844 ...........  42, 58

*Sinclair & Carroll Co.* v. *Interchemical Corp.,*
325 U. S. 327 ..............................26, 71, 72
*Smith* v. *Snow,* 294 U. S. 1 ......................21, 58, 63
*Smith* v. *Whitman Saddle Co.,* 148 U. S. 674 ........  23

*Toledo Pressed Steel Co.* v. *Standard Parts, Inc.,*
307 U. S. 350 ...............................  23

## STATUTES INVOLVED

28 U. S. C. § 2101(c)  ..................2, 82-3, 84, 85, 86
35 U. S. C. § 101 ............................. 20, 62
35 U. S. C. § 103 ......................20, 25, 35, 72, 75

## PUBLICATIONS

*Supreme Court Practice* (3rd Ed.) Stern & Gress-
man ........................................  87

IN THE

# Supreme Court of the United States

### OCTOBER TERM, 1965

The United States of America,
*Petitioner,*

*v.*

Bert N. Adams, Emma Adams, George Hallingby (individually and as Executor of the Estate of Olaf Hallingby, deceased), Jane Maesel, Iris Petry, Lewis M. Schott, Mary Ellen Hallingby Seimers, and Helen Louise Sutcliffe (individually and as Executrix of the Estate of Ernest M. Sutcliffe, deceased),
*Respondents.*

No. 55

## RESPONDENTS' BRIEF

Respondents respectfully pray that the Government's Petition for a Writ of Certiorari herein be dismissed or that the decision of the lower Court be affirmed (R. 689; 330 F2d 622).

## Jurisdiction

On May 2, 1960, Adams[1] brought this suit in the Court of Claims on two counts, one for patent infringement and the other for breach of contract.

On April 17, 1964, the Court of Claims rendered a final judgment holding the Adams patent valid and infringed and declined to decide the breach of contract claim (330 F. 2d 622, 624).

---

[1] The eight respondents are hereinafter collectively referred to as Adams and the United States of America is referred to as the Government.

2

Neither side objected to this final judgment on the patent claim, petitioned for a rehearing on the subject, filed a petition for certiorari, or an application for an extension of time to file such a petition until the Government did so on January 14, 1965, nine months later.

On January 21, 1965, the Government's time to petition was extended until February 13, 1965. The Government did not serve its petition until February 16, 1965.

The Jurisdiction of this Court under 28 U. S. C. § 2101 (c) is in issue.

### Statutes Involved

In addition to the Statutes cited by the Government in its Brief (pp. 2-4), this case involves:

Title 28 of the United States Code which provides in pertinent part:

> "§ 2101.  Supreme Court; time for appeal or certiorari; docketing; stay
>
> °        •        •
>
> "(c) Any other appeal or any writ of certiorari intended to bring any judgment or decree in a civil action, suit or proceeding before the Supreme Court for review shall be taken or applied for within ninety days after the entry of such judgment or decree. A justice of the Supreme Court, for good cause shown, may extend the time for applying for a writ of certiorari for a period not exceeding sixty days."

### Questions Presented

1. Was the application for an extension of time to file a petition for certiorari applied for within the period allowed by law? 28 U. S. C. § 2101(c). This Brief, p. 84.

2. Was the petition for certiorari taken or applied for within the extended period of time granted to the Government? This Brief, p. 86.

3. Should not the petition be dismissed because the Government has reversed its position on a question of fact in order to seek a reversal of the lower Court's decision which the Government itself induced the lower Court to make? This Brief, p. 88.

3

4. Was not the ruling of the Court below, holding the Adams patent valid, in full conformity with the applicable decisions of this Court applying the constitutional and statutory standards of invention? This Brief, p. 3.

## Statement of the Case

The testimony before the Commissioner proved what the battery art knew and understood from the history of the prior art introduced into evidence by the Government and *Adams*. The Government, in its opening brief before this Court, refers to that testimony *once,* in a footnote. (Govt. Brief, p. 5). Because the history of the prior art serves to emphasize rather than to discredit the striking advance made by Adams, it is incumbent on Adams to set forth what was proven at the trial, since the Government does not do so.

### The Record at the Trial

This case concerns the first basic scientific advance in batteries in almost a century and a half.

Batteries[2] were invented in 1800 by Alessandro Volta (PX-42, R. 499, 281; R. 136-7). His batteries provided science and industry with the first practical source of electricity. When Volta discovered the battery, he also discovered and explained the scientific principles on which all subsequent batteries for almost a century and a half have been based (R. 217; PX-42, R. 499, 281).

In 1940 Adams invented the first device that produces electricity by an electrochemical process but does not respond to Volta's theory (R. 264, 695), or indeed any known theory (R. 262-4, 695; PX-40, R. 491-2, 264; PX-41, R. 495-6, 264). The components of the Adams battery were never assembled before[3] (R. 382-3, 704) for the excellent reason that the art "knew" they could not work in a battery (R. 264, 217). The Adams battery functions in an opposite manner to the conventional Voltaic battery (R. 217, 257, 206-7, 704).

---

[2] This case concerns primary batteries, i.e. the type that cannot be recharged. In primary batteries, all of the available electrical energy is stored in the battery when it is assembled.

[3] As the Government admitted in its petition (p. 11).

4

## A. The Conventional Voltaic Battery vs. The Adams Battery in Function

Batteries prior to 1940 had serious limitations which the science had sought to overcome, but which seemed insurmountable. Among such limitations were:

1. Conventional batteries delivered only *intermittent* power effectively (R. 217, 115, 118). They could not be used continuously because such use shortened their life to impractical limits (R. 217). At the trial, such batteries were referred to by both sides as "bell-ringers" because they were not capable of effective use except at spaced intervals (R. 145, 132, 370).

2. Conventional batteries delivered power that *declined* over each period of use (R. 217). They could not provide the *level* electrical power that an electric generator can provide (R. 145, 115; PX-38, this Brief, p. 51, R. 228). Thus, a conventional battery cannot effectively power for any prolonged period ordinary electric devices, such as motors, ignition systems, floodlights, beacons, radio sending and receiving sets or any high demand electrical equipment, all of which require *level* power to function effectively (R. 115, 199-200, 210, 292-3; PX-18, R. 454, 458, 87; R. 440).

3. Conventional batteries produce electricity by what is essentially a chemical process. When subjected to low temperatures that process slows down (R. 209, 119). When conventional batteries are subjected to extreme cold they produce less and less electricity, and if the temperature is low enough, the battery stops producing entirely (CX-2c, R. 445-6, 11; R. 209, 119). The *art had no tools* to overcome this low temperature problem (R. 261), thus conventional batteries are ineffective in very cold weather, in the arctic, in space and the stratosphere where temperatures fall to –60° below zero.

The Adams battery solved *all* of these problems. The Adams battery provides *continuous* power efficiently (R. 114-5, 118, 145, 217; PX-38, this Brief, p. 51). The Adams battery provides *level* power efficiently (R. 145-6, 111, 112-3, 115, 205-6; PX-38, this Brief, p. 51). The Adams battery provides efficient power at all temperatures down to –60° below zero (R. 68, 114, 145, 209, 258-260; TX-2, R. 390, 10; PX-19, R. 459, 88). Moreover, it will do all three simultaneously, without loss of efficiency (R. 112-115, 118-9, 144-6,

5

704). This is something *no other* battery can do (R. 209, 119) even today, twenty years later (R. 209).

The initial reaction of conventional Voltaic battery experts to these characteristics of the Adams battery was one of disbelief. When Adams first disclosed his battery to the Army's battery experts at Ft. Monmouth in 1942, they could not believe that the battery could produce power continuously. Rather they said that the battery was destroying itself by "running away" (R. 216-8). Only Adams had the vision to comprehend that this was the first battery to provide an effective source of continuous power (R. 68-9). Now the same experts agree with Adams (R. 157; TX-2, 390, 10; R. 212; PX-16, 448, 84; CX-2a, R. 439, 8). Adams batteries have been built that gave days of continuous power at voltages up to 1000 volts (CX-2a, 440, 8).

Nor could the Army battery experts believe that the Adams battery could produce level power. They knew that the batteries they were familiar with produced current which declined over each period of use (R. 216-7). Indeed the voltage and amperage curves of conventional batteries decline dramatically under continuous use (PX-38, this Brief p. 51). This is understandable, for as the chemical components in a battery are used up in the process, it is to be expected that it will produce less and less power.

The voltage and amperage curves of the Adams batteries are mathematically level (R. 226-7; TX-15, R. 419, 413; R. 145, 205, this Brief, p. 51). The experts could not believe this to be correct and said Adams did not know how to plot a curve, for his curves looked as if they were "drawn with a ruler" (R. 218; TX-15, R. 419, 413). But Adams was proven right again (R. 214, 111) for the published curves of the Adams type batteries the Government now procures all look as if they were drawn with level rulers (CX-2c, R. 446, 8; PX-16, 450, 84; R. 214; PX-37, 465, 202; R. 198). This characteristic of providing *level* power *continuously* makes it possible for the Adams battery to effectively power a whole host of scientific and commercial electronic equipment which has never been previously adequately powered by battery (R. 115-6, 199, 210-11, 292-3; PX-18, R. 458, 87; CX-2, R. 440, 8; R. 704). There is no known scientific explanation for this level delivery of power (R. 208, 695).

The Army battery experts also refused to believe or understand the low temperature capability of the Adams battery. This is also understandable, for in operation, the

6

Adams battery generates great quantities of heat and often boils, which rather than destroying it as occurs in all conventional batteries (R. 217, 260; PX-16, R. 450, 85), actually provides a source of self-generated heat which permits this battery to operate with unreduced efficiency in space, or in the arctic, at temperatures almost 100° below the freezing temperature of the water with which it is activated (R. 114, 68; PX-19, R. 459, 88; R. 260-1; CX-2c, R. 446, 8; R. 704). Only Adams understood this and recognized the utility of this generation of heat (R. 68, 77). The Government's experts told Adams that his battery was inoperative because it "overheated" (R. 77, 68, 216-7; PX-16, R. 450, 85; R. 213-4, 704), but they now agree that it is this same exothermic reaction which gives the Adams battery one of its most important advantages, extreme low temperature operation (PX-16, R. 449-50, 85; R. 213-4; R. 216; PX-37, R. 466, 202; R. 199-200; TX-2, R. 390, 10; PX-19, R. 459, 88). For this reason the Adams battery has now swept the fields of low temperature use and high altitude meteorological research (CX-2c, R. 445, 8; CX-2b, R. 442, 8; TX-2, R. 390, 10; CX-2a, R. 439, 8; R. 257-9; PX-37, R. 463, 202). It is used by the Government to assay weather conditions in the stratosphere and beyond, where there is practically no atmosphere and the temperature falls to -60° below zero (Ibid.; PX-19, R. 459, 88). Statements published by the Government say the Adams battery is "unsurpassed" under these conditions (R. 254-7; CX-2, R. 439, 8). It operates where conventional batteries freeze (R. 259; CX-2c, R. 445-6, 8).

Thus, the Adams battery functions in a manner completely different from any prior art battery (R. 209; 216-7) and produces results completely different and opposite from those that any other battery had ever before produced (R. 145-6; 119; 209). These new results were unexpected,[4] highly useful,[5] unbelievable,[6] and unbelieved at the time.[7]

The unusual functions and characteristics of the Adams battery fit it for tasks no other battery can adequately perform (R. 692, 704, 115, 199-200, 210, 292-3; PX-18, R. 454, 458, 87; CX-2, R. 439, 440, 445, 8; R. 259).

[4] (R. 694, 695; 206-9; TX-15, R. 416-7, 413; R. 199-200).

[5] (R. 692, 704, 210-11, 114-5, 115-6; CX-2, R. 439, 440, 442, 445, 8; PX-18, R. 454-8, 87-8; TX-2, R. 390, 10).

[6] (R. 206-9, 216-18, 704).

[7] (R. 68-9, 77; PX-16, R. 450, 85; R. 216-9, 206-9, 704).

7

The Adams battery has come to be recognized as an extremely important step by masters in the field of electrochemistry and to be a distinctive contribution to scientific knowledge and the useful arts (R. 692, 217, 206-9, 199-200, 114-9; TX-2, R. 390, 9-10; PX-40, R. 491-2, 264; R. 262-4; PX-19, R. 459, 88; CX-2, R. 439, 440, 445-6, 8; PX-18, R. 454-8, 87). It has made possible advances which would otherwise have not been feasible according to statements in Government publications made *ante litem motam*. In such publications, the Adams battery has been heralded by leading scientists in the field as "unsurpassed" (CX-2, R. 439, 8), "extremely important to the Military" (CX-2, R. 439, 8), "helped immensely in rounding out the sources of battery power" (CX-2, R. 440, 8; R. 704) and "brought about developments which would otherwise have been technically or economically impractical" (CX-2, R. 440, 8; R. 692). According to statements published by the Government, the Government has procured over a million of these batteries for meteorological use alone (CX-2c, R. 445, 8) and in so doing has saved itself over five million dollars (R. 256).

As a result of all the foregoing, the lower Court properly found:

> "23. The Adams invention was the first practical, water-activated, constant potential battery capable of operation at low temperatures. When Adams first disclosed his invention to others skilled in the art, he did not know its theory of operation and it was received with considerable skepticism. However, this development was subsequently recognized throughout the industry as an extremely important step in rounding out the sources of battery-furnished power, and filling important, long-standing needs of both civilian and military natures." (R. 704)

## B. The Conventional Voltaic Battery vs. The Adams Battery in Composition and Theory

Volta taught the world that batteries must consist of three elements, the two metallic electrodes and the liquid electrolyte with which the battery is filled (PX-42, R. 499-501, 281; R. 217), and that each of these *must* be a good conductor of electricity (*Ibid.*). Since 1800, all conventional Voltaic batteries have consisted of three such good con-

8

ductors. At the trial, the prior art showed that Volta had tried water as an electrolyte in his first battery experiments and rejected it (PX-42, R. 500-1, 281) because he found it to be a poor conductor (*Ibid.*). In fact, plain water is an insulator (R. 264, 120), and will not conduct electricity. The testimony showed that the art has known since 1800 that plain water could not be successfully used as an electrolyte in a battery and successive failures in the interim reenforced that knowledge (This Brief, pp. 45-6).

The art also knew that magnesium, which since 1880 had often been suggested for use in batteries because of its high electromotive force (R. 360-1) could not be successfully employed in conventional batteries because of its "corrodibility" or destruction by conventional electrolytes (This Brief, pp. 42-44, 64; R. 243, 295; DX-12, R. 565, 381; R. 363, 388; PX-39, R. 467, 8). The Government's prior art shows that it was recognized in 1928 that "magnesium could not be commercially utilized as a primary cell electrode" (DX-12, R. 565, 381). A 1937 patent, that ostensibly taught how to use magnesium in a battery, was inoperative (DX-14, R. 572, 381; R. 388). This situation prevailed through 1940 as the art cited by Adams showed (PX-39, R. 467, 251; R. 243) and as the Government's expert admitted (R. 362).

The art also knew that cuprous chloride, which in mixtures with other materials, had been suggested for use in batteries several times between 1880 and 1895 (DX-18, 19, 20, 21, R. 589, 591, 597, 601, 381), often produced disastrous results when employed in batteries (R. 388, 703) and was also destroyed by conventional acid or basic electrolytes (DX-18, R. 589, line 97—R. 590, line 8, R. 381). There is no evidence that any practical battery had ever been made employing it (This Brief, p. 44).

The invention claimed in the Adams patent is a battery comprising (a liquid container), a magnesium electrode and a cuprous chloride electrode (with or without carbon) (R. 395, 701-2). This combination is specifically novel (Find. No. 22, R. 704), and defines the battery as it is manufactured, distributed and sold. No prior art battery had this combination (R. 704). The Government so admitted in its Petition (p. 11). The Government batteries all respond to the claims of the Adams patent (R. 707-8), and no question of infringement was raised by the Government in its petition. The Adams patent teaches that the claimed combina-

9

tion is to be activated with water (R. 704; TX-10, R. 393, 394, lines 13-14, R. 11). The Government batteries are all activated in this manner (R. 156-7).

One may well ask how these substances all work in the Adams battery, if they never worked before, even singly. The answer is *no one knows* (R. 263-4, 695). But the record does disclose how Adams arrived at his invention.

Adams fundamentally disbelieved Voltaic theory and his original thinking in the field of electrochemistry coupled with two years of experimenting day and night led him to the discovery of his battery (R. 40-53, 106-7, 698). Conventional theory taught that water could not function as an electrolyte in a battery because it is an insulator (R. 217). Adams agreed water was an insulator (R. 40-1) but *believed* that only a non-active chemically neutral liquid like water could solve the problem of employing highly corrodible magnesium in a battery (R. 40, 49). Thus, for his purposes water was "a good electrolyte" (R. 41). However, conventional theory taught that magnesium was insoluble in water (R. 264) and therefor could not chemically react. Adams *believed* that magnesium was soluble in water and therefore that water and magnesium could react (R. 41). Conventional theory taught that cuprous chloride was also insoluble in water (R. 121, 264) but this did not deter Adams from experimenting with it in conjunction with magnesium (R. 41).

By dint of intensive experimentation and study (R. 40-53, 106-7) Bert N. Adams, with the help of his wife, discovered that when cuprous chloride was used in combination with magnesium and the battery activated by water the result was a new electrochemical system (R. 206-7, 216-7, 209, 253, 257, 264; PX-18, R. 454, 87; R. 119, 41, 698-9, 704). In 1940, after accidentally dropping cigarette ashes into the cuprous chloride which he was making into a cathode, Adams divined that it was the carbon in the ash that greatly improved the performance of the cathode and resultant battery (R. 43-5, 106, 698). Thus, as events proved, Adams invented the first practical, water-activated battery capable of producing *continuous* power at a *constant* level even *at extremely low temperatures* (R. 112-115, 118-9, 144-6, 209, 698, 704).

Adams combined components for his battery, each of which individually had been tried and discarded by the battery art over 50 years earlier (R. 264, 382, 692, 704). No one

10

before had ever put the combination together[8] (*Ibid.*), or
suggested that the combination should be put together or
could be an operative battery (R. 216-7; 209; PX-16, R. 410,
85; R. 704).

A man skilled in the art[9] has testified that it was ridicu-
lous for Adams to expect that the components he combined
in his battery would be operative or function as a battery
(R. 264-5, 206-9). Conventional Voltaic theory indicated
it must fail (R. 217, 695). No one knows how or why it
does operate (R. 263-4, 695). When Adams first made
his battery there was no scientific theory or explanation
that would predict its operation (R. 263-4). There was no
scientific theory that would explain its operation (R. 262-5,
217). Even today the theory upon which the Adams battery
operates is unknown (R. 263-4, 695, 704).

As a result of the foregoing, the Court below properly
found:

> "22. Each of the elements of the several claims
> of the Adams patent was individually old in the
> battery-making art at the time of the filing of the
> Adams application for the patent here in suit. While
> there is evidence of a definite need for a battery
> having the characteristics of the Adams battery,
> those skilled in the art failed to develop one for a
> period of over 50 years, during which time all of the
> necessary ingredients were available. There is no
> evidence that [fol. 969] anyone had ever before sug-
> gested the specific *combination* of elements which
> make up the Adams battery nor that anyone had
> ever before suggested that such a battery would have
> a substantially constant potential, could be operated
> under extreme temperatures, and could be operated
> with ordinary or distilled water." (R. 704).

## C. Adams and His Contacts With The Government

When Adams entered the scene in 1939, he was self-
taught in the field of electrochemistry (R. 40, 105). He

---

[8] The Government has admitted all along they were never put
together before. In its Petition, p. 11, the Government stated "It
is true that Adams put together elements not actually combined
before and obtained more favorable results, for some purposes, than
had prior combinations."

[9] This was Adams' expert, Dr. Mantell, who was described by
the Government as a "very renowned electrochemist." (R. 147)

11

experimented night and day for two years before he dis-
covered his battery (R. 40-53, 106-7). He had no research
laboratory and conducted his experiments with his wife's
help in his home (R. 44, 105-7, 81). The batteries that he
made for himself and for the Government were constructed
on his kitchen stove (PX-17, R. 453, 85; R. 105, 68, 69, 70,
71, 75, 76, 77, 78, 80, 81, 82). His triumph over these con-
ditions is a tribute to his inventive genius and the indomi-
table character of the human spirit.

Adams applied for the patent in suit shortly after Pearl
Harbor (R. 393). He had received copies of two publica-
tions of the National Inventor's Council of the U. S. Depart-
ment of Commerce requesting inventors to come forward
with inventions that might be helpful to the war effort and
promising compensation by the Government for disclosures
that were used (R. 8; TX-13, R. 408-12, 8) and he promptly
wrote to the National Inventor's Council on January 7,
1942 (R. 2, 59, 72-3; TX-15, R. 415, 413), the Navy on Janu-
ary 8, 1942 (R. 60) and the Army Signal Corps on January
10, 1942 (R. 60-61) and then went to Washington to offer
his battery in person (R. 61).

It is astonishing that Adams, a tyro, could recognize
and comprehend all the unusual electrochemical character-
istics and potential uses of his battery, but he did. All the
new characteristics of his battery were stated in the Adams
patent and all the new characteristics and potential uses
were divulged to the Government by Adams on January 7,
1942 in writing (TX-15, R. 415, 413).

In Washington, from January 21-24 of 1942, he had an
extensive four day conference at the Navy Department (R.
413, 61, 63). He was then directed to the Army's Experi-
mental Battery Center at Ft. Monmouth, New Jersey (R.
62-5) where he met many battery scientists, including Drs.
Adolph Fischbach and Hyman Mandel (R. 67, 428).

At a series of meetings held periodically at Ft. Mon-
mouth during 1942 and 1943, Adams described his battery
to these Government experts, including Drs. Fischbach and
Mandel (R. 63, 65, 66, 67, 68, 69, 70, 71, 75, 76, 77, 78, 80,
81, 82, 51, 53). He told them how it worked and what it
would do (R. 66, 75, 77). He informed them not only that
cuprous chloride worked as his patent taught (R. 66) but
also that silver chloride was operative (R. 66) which his
patent did not mention (R. 694).

12

At the request of the Army experts, who helped him get the necessary magnesium when he ran out, Adams made and delivered many batteries to them for test during 1942 and 1943 (R. 63, 65-70, 77-8, 80-1, 433, 432, 427, 421, 435). It is stipulated that a minimum of 14 batteries were delivered (R. 10). The Record shows at least 26 were delivered (R. 63-84). The experts complained that the batteries overheated (R. 68, 77) but admitted they showed level power delivery (R. 66, 67). Adams explained to them over and over that it was the so-called "overheating" that permitted his battery to operate at extremely low temperatures (R. 68-9, 77). They did not agree (R. 214, 68, 77; PX-16, R. 450, 85; R. 217, 704) but now they admit he was right (PX-16, R. 449-50, 85; R. 213-4, 216; PX-37, R. 466, 202; R. 199-200; TX-2, R. 390, 10).

Although he was promised the contrary by high authority including the Chief of the U. S. Signal Corps (R. 434, 74, 73) and although he saw Dr. Fischbach as late as 1948 (R. 84), neither Fischbach nor the other Government experts at Ft. Monmouth would ever reveal to him the results of their tests on his battery (R. 71, 74, 81, 82, 83).

The record shows that when the Adams battery was first disclosed and demonstrated to these Government experts at Ft. Monmouth they initially stated that they did not believe it would work (R. 68, 77, 216; TX-12, R. 401, 11; PX-16, R. 450, 85), but later they decided they were wrong (PX-16, R. 450, 85; TX-2, R. 390, 9-10).

The record of the internal Government correspondence shows that the Government secretly confirmed that Adams claims were correct and that his battery was operative. This was proven by the work of Dr. William Shorr, an employee at Ft. Monmouth (R. 218-9; TX-12, R. 404-6, 11) and by work at the Naval Research Laboratory by T. P. Dirkse[10] from 1943 to 1945 (R. 236-238). This work also confirmed that an operative magnesium-cuprous chloride battery with all the new characteristics Adams had stated, could be produced simply by following the instructions in the Adams patent, but any variation from the Adams patent was a failure (R. 218-227).

_____

[10] Dirkse's report went to Dr. White, who later turned up as the Government's expert in this case (Please see CX-4, unprinted).

13

Dr. Fischbach began to take an interest in the Adams battery in 1946 (PX-16, R. 450, 85) although he never admitted this to Adams in 1948 (R. 83-4).

In 1953, ten years after Adams disclosure of his battery to them, Drs. Fischbach and Mandel received a U. S. Patent covering this same magnesium, cuprous chloride battery (R. 157; TX-2, R. 390, 9-11). This patent pays tribute to the scientific achievements of this new battery system (TX-2, R. 390, 9-10). This patent is now *owned by the Government (Ibid.).* It has never been disclaimed, it is still viable.

The Adams patent was cited against the Fischbach patent application in the U. S. Patent Office, but, of course, the U. S. Patent Office did not know anything of the details of the past transactions between Fischbach and Adams. Fischbach received his patent by alleging that his electrode was more "porous" than Adams (TX-2, R. 391, 9-10). However, a Government expert at the trial testified that the electrode of Adams could be made as porous as desired (R. 333) by using carbon as Adams taught. This was confirmed by Adams expert, Dr. Mantell (R. 301).

Neither Dr. Fischbach nor Dr. Mandel testified at the trial, although they are both still employed at Ft. Monmouth (R. 305).

## D.  Infringement

The Government, in the "Statement" in its Brief, attempts to interject the question of infringement, a matter as to which it has not sought review (Pet. p. 2).

At Brief pages 4, 5 and 6, in footnotes and argument, the Government attempts to show that the Adams cuprous chloride is "fused", while the Army cuprous chloride is "pasted" (Govt. Brief, p. 4, 6), that the claims of Adams are limited to "fused" (Govt. Brief p. 5). That the Adams battery consists of a glass jar (Govt. Brief p. 4) while the Army battery is in a wax box and has "bibulous" separators between pasted pellets (Govt. Brief p. 6) and is the result of "extended experimentation" to improve the "impractical" Adams battery (Govt. Brief p. 6).

The Government does not tell the Court that both the Adams and Government battery electrodes are made by melting the cuprous chloride powder and pouring it to make the electrode (R. 120-3, 125, 325-6, 706-7). Adams

14

melts with heat (R. 122, 125) the Government with water (R. 121-2, 325-6). There is no difference between them (R. 138, 706-7). Both methods were old in 1880, according to the Government's own proofs (R. 270). The Government does not tell the Court that the Government battery is a pile type battery and the battery shown in the Adams drawing and example is a cup type battery and both types were disclosed by Volta in 1800 (R. 136-7; PX-42, R. 499-501, 281).

The Government does not tell the Court that there is not one word of testimony in the record concerning any extended experimentation by the Government, but that the documents produced by the Government show that it spent three years trying to design around the Adams patent and *failed* (R. 218-9; TX-12, R. 404-6, 11; R. 236-8; R. 218-227) and that a successful Adams battery was made by a Government researcher on *the first attempt*, following only the Adams patent (R. 218-9).

The Government also misquotes the lower Court's Finding No. 9 as to what the Commissioner found the Adams patent disclosed at p. 5 (lines 3 to 6) of its Brief, by altering the word "disclosed" to "claimed" in order to manufacture an argument that the Commissioner and Court of Claims made an error in interpreting the claims of Adams (Govt. Brief, Footnote p. 5). The Government says "The invention *claimed* was 'a battery comprised of a magnesium electropositive electrode (anode), a cuprous chloride electronegative electrode (cathode), and a water electrolyte' (R. 698)." (Govt. Brief, p. 5). But the Commissioner found at R. 698 that "The Adams patent *disclosed* a battery comprised of a magnesium electropositive electrode (anode), a cuprous chloride electronegative electrode (cathode), and a water electrolyte." [Emphasis ours in both cases]

It is submitted that this blatant alteration of the lower Court's finding is persuasive evidence that the Government's effort to show real error is bankrupt.

No issue of infringement was raised by the Government's Petition (Pet. p. 2) and none should be raised now. Adams will not answer allegations on a question as to which review has not been sought and granted unless this Court otherwise instructs, but states that the lower Court's findings on the subject of infringement (Nos. 25-38, R. 705-708) are unimpeachable, assuming the Government had the right to assail them, which it does not, even by innuendo.

15

## E. The Course of This Litigation

In 1955 Adams first examined a Government water-activated battery (R. 85-6) and thereafter requested compensation from the Government and was rejected (R. 3).

On May 2, 1960, this suit was brought against the United States in the Court of Claims to recover for (1) breach of contract, and (2) for infringement of the Adams patent No. 2,322,210, issued June 22, 1943 (R. 1, 689-90).

At the trial, the Government urged that it was within the skill of the art to construct the Adams battery, but the Government's own expert did not agree (R. 382).

The Government also urged that the Adams patent was anticipated by much ancient art. It relied particularly on nine patents, most of which were 50 or 60 years old at the time, which disclosed zinc and silver chloride as electrode components for batteries. The Government's own expert admitted these were all "bell-ringers" or conventional intermittent use batteries, and therefore a completely different type of battery than Adams (R. 370). The Government urged that the art taught that magnesium could be substituted for zinc in a battery, but the Government's own expert testified to the contrary (R. 362-3).

The Government failed to produce any prior art reference that disclosed a battery having a magnesium anode and a cuprous chloride electrode (R. 382-3, 704).

Adams urged at the trial that silver chloride and cuprous chloride were equivalents (R. 37, 33, 629-33). The Government admits it never took that position (R. 637, lines 17-19). Adams proposed to the Trial Commissioner requested Findings of Fact that silver chloride and cuprous chloride were equivalents (R. 629-33). The Government objected to all of them (R. 637-40). The Commissioner thereupon refused to find them equivalents (R. 694-6, 705-8). Neither side excepted. The Commissioner therefore found the Government's silver chloride, magnesium batteries did not infringe (R. 707-8).

The Commissioner recommended that the Adams patent be found valid and infringed only by the Government procurement of magnesium, cuprous chloride batteries (R. 695-6, 705-8). The Commissioner recommended that the breach of contract cause be dismissed (R. 640, 661).

The Court of Claims on April 17, 1964, rendered a final judgment that the patent was valid and infringed but deter-

16

mined that it did not have to decide the breach of contract cause (R. 689-90; 330 F. 2d 622, 624).

Neither the Government nor Adams took issue with the final judgment of the Court of Claims on the patent claim rendered April 17, 1964, until the Government did so nine months later.

On May 11, 1964, Adams moved the Court of Claims to alter its opinion and judgment, or for a rehearing *solely* to determine the issue of the breach of contract[11] (R. 711).

On October 16, 1964, the Court of Claims rendered a final judgment that there was no breach of contract[12] and made no change in the prior decision on the patent (R. 712-13).

The Government filed an application for an extension of time to file a petition for a writ of certiorari as to the final judgment of the Court of Claims on the *patent claim* on January 14, 1965. This was nine months after the judgment on that claim.

By order dated January 21, 1965, the Chief Justice extended the time for petitioning for certiorari to and including February 13, 1965 (R. 714).

The Government's petition for certiorari requesting this Court to review the final judgment of the Court of Claims on the patent claim was delivered to the Clerk of the Supreme Court on February 12, 1965. No attempt was made to serve Adams until February 16, 1965, three days after the Government's time had expired (This Brief, p. 87). Certiorari was granted on March 29, 1965 (R. 715), 380 U. S. 949.

In its petition the Government asserted that the "Question Presented" involved the fact that silver chloride and cuprous chloride were equivalents, Adams had substituted one for the other, his invention was thereby invalid, and urged that the lower Court be reversed on that basis (Petition, p. 2 and p. 6). The Government continues to maintain that position in its Brief (pp. 7, 17, 21).

On May 10, 1965, Adams filed a motion to Dismiss the Writ on the ground that the Government was seeking to reverse the decision below by reversing its position on the question of the equivalence of cuprous chloride and silver

---

[11] Which included a charge of an unlawful taking under the Fifth Amendment.

[12] The Court of Claims did not mention the issue of an unlawful taking.

17

chloride which it had maintained before the Commissioner. This Court entered an Order on June 1, 1965 postponing further consideration of this Motion until the hearing on the merits (381 U. S. 931).

## Summary of Argument

It is the position of Adams that the standard of invention pertinent to this case is set forth in this Court's decisions in *Great A & P Tea Co.* v. *Supermarket Equip. Corp.*, 340 U. S. 147, *Goodyear Co.* v. *Ray-O-Vac Co.*, 321 U. S. 275 and *Cuno Engineering Corp.* v. *Automatic Devices Corp.*, 314 U. S. 84.

All batteries, prior to Adams, had certain recognized deficiencies which the art had long sought to overcome. Among these were:

(1) Conventional batteries could effectively deliver only intermittent, as opposed to continuous, power.

(2) Conventional batteries delivered power that declined over each period of use. They could not provide the level electrical power that a generator can provide, for example.

(3) Conventional batteries were adversely affected by low temperatures in that they delivered less and less power as the temperatures declined and at extremely low temperatures failed entirely.

The Adams battery solved all of these problems. It delivers continuous power, like a generator. It delivers level power, like a generator. And it will deliver such power at all temperatures from 150° above zero to –60° below zero. No other battery, even today, can do this.

Both Adams and the Government proved that the components of the Adams battery were old, as failures, in the art more than 50 years prior to the Adams invention. The art had long wished to employ the components successfully employed by Adams. Magnesium, used by Adams as his anode, had often been recommended for use in batteries. However, the proofs at the trial showed that no one prior to Adams knew how to use magnesium in a battery because of its extreme corrodibility or reactivity. The Government put in a number of patents and treatises on this subject which, taken chronologically, showed that each earlier one

18

had failed to solve the problem. The last one, issued just two years prior to Adams' work, so indicated and was itself a failure as the testimony at the trial showed. The record is clear that the employment of magnesium defeated the ingenuity of the battery art prior to Adams. The cuprous chloride material used by Adams for his cathode was also early recommended in the art in conjunction with other substances but never employed successfully as far as the record shows.

The Adams battery consists simply of an anode of magnesium and a cathode of cuprous chloride (with or without carbon) and the battery is activated by water. Conventional Voltaic theory taught that this combination could not work because both substances are insoluble in water, and water is a non-conductor of electricity. Thus, no chemical reaction and no electrochemical reaction can occur in the Adams battery. But these reactions do occur, although no one knows how or why.

The Adams battery, after being activated, operates in a completely unbattery-like fashion. First, it will not deliver power on demand, but only after an appreciable period of time. Second, once started, it cannot be turned off short of destroying it. Third, in operation and when attached to a load, it heats and often boils.

All of these characteristics were considered to be destructive and when Adams disclosed his battery to conventional battery experts, including the Government's experts at Fort Monmouth, they stated that the battery was inoperative.

However, ten years after the event, these same experts have taken out patents on the same battery system as Adams, in which the virtues, novelty and utility of the battery are extolled. These patents are now owned by the Government.

The Government takes the position that the Adams battery is not new, however, this position is contrary to the position the Government took in its Petition. Moreover, the Government could find no reference that showed the successful use of magnesium in a battery, nor could it find a reference that showed the successful use of cuprous chloride (either alone or with carbon) in a battery. Of course, no reference showed the combination.

The Government urged art consisting of zinc-silver chloride batteries. The Government maintains that zinc and

19

magnesium are equivalents in batteries, but the record is
dispositive that they are not. The Government maintains
that silver chloride and cuprous chloride are equivalents.
However, before the lower court, only Adams took the posi-
tion that they were. The Government opposed all of Adams
proposed Findings to the Commissioner that they were
equivalents. The Commissioner decided that issue in the
Government's favor and thereupon held that the Govern-
ment's silver chloride-magnesium batteries did not infringe.
It is submitted that the Government cannot reverse itself on
a question of fact in order to attack a decision that the
Government itself induced the Commissioner to make.

The Government admits the Adams battery is useful but
takes the position that it was obvious to make the invention.
However, the proofs are clear that the Adams battery was
completely unobvious. Not only was its advent on the
scene greeted with surprise and disbelief by the Govern-
ment's own experts, but all of the elements needed for its
construction were available in the art for fifty years before
Adams put them together as a result of his intensive experi-
ments. Furthermore, the Government cannot explain the
fact that there is no theory that will explain the operation
of the Adams battery even today, twenty years after the
event, and no theory that would have predicted its operation
or indicated its construction in 1940 when Adams made his
invention.

It is considered that the aforesaid facts, found by the
lower court, meet the criteria of this Court's cases as set
forth in the opening paragraph of this summary. First,
the Adams invention is a contribution, and an important
one, to useful knowledge and the science of electrochem-
istry. The uses of the Adams battery are manifold. It
supplies power in a manner which no prior art battery was
able to do and thereby fills a long-standing need in the
battery art. In addition, it has come to fill a host of exotic
new uses. It is unsurpassed for high altitude use and it is
unsurpassed for underwater use. The elements of the
Adams battery take on a new function from being brought
into concert and produce a battery whose operating charac-
teristics are opposite, in most respects, to all prior art
batteries. The Adams invention has advanced science and
it has been recognized by masters in the field of electro-
chemistry as a major advance. Thus the criteria set forth
in both the majority and concurring opinions of *A & P* are

20

fulfilled. The historical test as set forth in *Goodyear* v. *Ray-O-Vac*, 35 U. S. Code 103, and *Hotchkiss* v. *Greenwood* is also met in that all of elements necessary to construct the Adams battery were old in the art fifty years before Adams put them together. Conventional theory taught that they could not work. When they were put together the surprise and astonishment of the experts which greeted the result supplies objective proof of the unobviousness of the invention. So, too, does the fact that there is no scientific theory that will explain the operation of the battery.

For all of the above reasons, it is submitted that the Adams invention also meets the test of *Cuno*, for it clearly shows the flash of creative genius, not merely the skill of the calling.

# ARGUMENT

## I. The Standard of Invention and The Adams Contribution

### A. The Government's Position

In its Brief, the Government urges that the "straight forward application of the three statutory tests is dispositive of the present litigation" (p. 12) referring to 35 U. S. C. § 101 requiring that an invention must be (1) new and (2) useful and 35 U. S. C. § 103 requiring that an invention must be (3) unobvious.

Referring to the allegation that Adams is not new, that is factually answered in this Brief, pp. 57-76. Moreover, it was admitted by both sides that all of the elements of the Adams combination were individually old but the combination was specifically new, and the lower Court so found (R. 704, 692). The Government's position that "the Adams battery is not 'new' " (Brief, p. 12) is in direct contradiction to the admission in its Petition that "It is true that Adams put together elements not actually combined before and obtained more favorable results, for some purposes, than had prior combinations." (Pet., p. 11).

To show that Adams is not "new," the Government relies primarily on a single patent reference identified as the Skrivanoff 1888 patent (DX-19, R. 591, 381) which *the testimony showed was a battery that exploded violently upon assembly* (R. 388). The Government has cited in its

Brief (p. 34) *Pacific Contact Laboratories, Inc.* v. *Solex Laboratories,* 209 F. 2d 529, 532 (9 Cir. 1953), *cert. denied* 348 U. S. 816 which it is submitted disposes of the Skrivanoff reference in these words:

> "And a prior unsuccessful experiment does not constitute invention and cannot therefore be an anticipation."

See also *Coffin* v. *Ogden,* 18 Wall 120, 124; *Smith* v. *Snow,* 294 U. S. 1, 17.

The basic difficulty with the Government's position that the Adams battery is not *new,* is that there has never been a battery before that had its operating characteristics. (This Brief, pp. 4-7). If the Adams constitutents had been previously assembled in a battery, that battery would have had the characteristics of the Adams battery. As the Government originally admitted, Adams is new.

The Government still admits that the Adams invention is useful (Govt. Brief, p. 12). But it wishes this Court to review the finding of the lower Court that the Adams invention was unobvious. The Government's Brief says:

> "We submit that, lacking a meaningful comprehensive test of patentability, it is important for the Court to establish that these statutory tests are to be rigorously and independently applied where validity is in question." (Brief, p. 12)

and

> "The important consideration, we believe, is that each patent application be scrutinized with care and that the standard, as written, be rigorously applied." (Brief, p. 13)

In other words, this Court is asked to insure that the Court of Claims has done a careful and rigorous job.

It is respectfully submitted that this is not the question that this Court was requested to review in the Government's Petition for Certiorari. The entire thrust of the Government's Petition for Certiorari was that there was a constitutional test which existed independently of the three statutory tests and although the statutory tests might have been met, still a patent might not be valid for failure to meet the constitutional test as enunciated by the case law of this Court. It was suggested that the constitutional

22

test related to such decisions as those of this Court in *Cuno
Engineering Corp.* v. *Automatic Devices Corp.*, 314 U. S.
84 and *Great A & P Tea Co.* v. *Supermarket Equip. Corp.*,
340 U. S. 147. This position apparently has been withdrawn
by the Government by its attack in its brief on the decision
in *Cuno* (Govt. Brief, pp. 13, 14, 20). As to *A & P*, that
decision is scarcely quoted in the Government's brief. This
may be due to the fact that the Government's brief cites
a total of 36 cases of which 30 involve mechanical combina-
tions, and it is submitted that 29 of those 30 cases are dis-
tinguished by the decision of this Court in *Great A & P
Tea Co.* v. *Supermarket Equip. Corp.*, 340 U. S. 147, 152,
itself a mechanical combination case, wherein it is stated:

> "Elements may, of course, especially in chemistry
> or electronics, take on some new quality or function
> from being brought into concert, but this is not a
> usual result of uniting elements old in mechanics."

Since *A & P* appears to remain highly relevant to the
questions presented in the Adams case we will discuss it.

## B.  Adams Position

### (1) *The Necessity for "Invention"*

In *Great A & P Tea Co.* v. *Supermarket Equip. Corp.*,
340 U. S. 147, 150-51, the Court posed the question of the
standard of invention in a case involving a combination
comprised of elements designated to be old, as follows:

> "What indicia of invention should the courts seek
> in a case where nothing tangible is new, and inven-
> tion, if it exists at all, is only in bringing old elements
> together?"

> "While this Court has sustained combination pat-
> ents,[4] it never has ventured to give a precise and
> comprehensive definition of the test to be applied
> in such cases. The voluminous literature which the
> subject has excited discloses no such test.[5] It is
> agreed that the key to patentability of a mechanical
> device that brings old factors into cooperation *is
> presence or lack of invention."* (340 U. S. 147, 150-1)
> [Emphasis ours and footnotes omitted]

The Court has been consistent in requiring the presence
of invention to sustain patents and under the umbrella of

23

that concept a number of indicia to determine such presence
have been formulated.

In *A & P*, the Court stated some of the indicia as fol-
lows:

> "The negative rule accrued from many litiga-
> tions was condensed about as precisely as the sub-
> ject permits in *Lincoln Engineering Co. v. Stewart-
> Warner Corp.*, 303 U. S. 545, 549: 'The mere
> aggregation of a number of old parts or elements
> which, in the aggregation, perform or produce *no
> new or different function or operation* than that
> theretofore performed or produced by them, is not
> patentable invention.' To the same end is *Toledo
> Pressed Steel Co. v. Standard Parts, Inc.*, 307 U. S.
> 350, and *Cuno Engineering Corp. v. Automatic De-
> vices Corp.*, 314 U. S. 84. *The conjunction or concert
> of known elements must contribute something; only
> when the whole in some way exceeds the sum of its
> parts* is the accumulation of old devices patentable.
> Elements may, of course, especially in chemistry or
> electronics, take on some new quality or function
> from being brought into concert, but this is not a
> usual result of uniting elements old in mechanics."
> (340 U. S. 147, 151-2) [Emphasis ours]

The Court added: *"The function of a patent is to add
to the sum of useful knowledge."* (340 U. S. 147, 152) [Em-
phasis ours]

In the above case, Mr. Justice Douglas wrote a concur-
ring opinion with which Mr. Justice Black agreed, and
stated certain objective criteria as follows:

> "The invention to justify a patent, had to serve the
> ends of science—*to push back the frontiers of chem-
> istry*, physics, and the like; *to make a distinctive con-
> tribution to scientific knowledge."* (340 U. S. 147,
> 154) [Emphasis ours]

Mr. Justice Douglas then added that this was the reason
why the opinions of this Court have commonly taken "in-
ventive genius" as the test and cited in a footnote a number
of cases in support. The footnote read:

> " "Inventive genius"—Mr. Justice Hunt in *Recken-
> dorfer v. Faber*, 92 U. S. 347, 357; "Genius or inven-
> tion"—Mr. Chief Justice Fuller in *Smith v. Whit-
> man Saddle Co.*, 148 U. S. 674, 681; "Intuitive

24

genius''—Mr. Justice Brown in *Potts* v. *Creager,* 155
U. S. 597, 607; "Inventive genius"—Mr. Justice
Stone in *Concrete Appliances Co.* v. *Gomery,* 269
U. S. 177, 185; "Inventive genius"—Mr. Justice Roberts in *Mantle Lamp Co.* v. *Aluminum Products Co.,*
301 U. S. 544, 546; *Cuno Corp.* v. *Automatic Devices
Corp.,* 314 U. S. 84, 91, "the flash of creative genius,
not merely the skill of the calling.' ' ''

Then, Mr. Justice Douglas stated at 340 U. S. 147, 155
that:

"Patents serve a higher end—*the advancement of
science*" and invention—
"*has to be of such quality and distinction that
masters of the scientific field in which it falls will
recognize it as an advance.*" [Emphasis ours]

It is submitted that the majority opinion and the concurring opinion do, indeed, closely concur in requiring that
a patent make an addition to the sum of useful knowledge
(majority) or a distinctive contribution to scientific knowledge (concurring).

In its petition the Government forcefully pointed out
the fact that this Court had many times required the
presence of "inventive genius" or the like as a criterion
for invention and cited many of the cases referred to by
Mr. Justice Douglas in the aforesaid footnote (Pet. p. 12).
It urged, as a reason for granting certiorari, that lower
courts were failing to apply that criterion (Pet. p. 12).

The Government in its Brief, no longer finds the
presence of creative genius necessary (Govt. Brief, pp. 13,
20) it appears so blinded by the "flash" that "creative
genius" is also lost. The Government, although citing
*A & P,* never mentions the necessity for a contribution to
useful or scientific knowledge. It never directly refers in
its argument to the constitutional standard of invention,
as it did so often in its Petition (Pet. pp. 12, 13).

It is submitted the reason for this change of viewpoint
is that when one applies the facts of record in Adams to the
decision of this Court in *A & P,*[13] as expressed in both the
majority and the concurring opinions, it becomes clear that

---

[13] Or to *Cuno*; for the evidence of the presence of a "flash of
creative genius, not merely the skill of the calling" in the Adams
invention is compelling, as will be seen.

25

the Adams invention possesses just precisely those qualifi-
cations of a major contribution or scientific advance, in-
cluding the qualification of recognition by masters of the
scientific field in which it falls, as this Court has long re-
quired.

### (2) *The Historical Approach and Obviousness*

In addition to the tests of invention set forth in *A & P*
and *Cuno* this Court has also often applied a test which has
been characterized as the "historical approach." This test
is set forth in a long line of cases, stretching from *Loom
Co.* v. *Higgins,* 105 U. S. 580, 591 to *Goodyear Co.* v. *Ray-O-
Vac Co.,* 321 U. S. 275, 279 and includes *Keystone Mfg. Co.*
v. *Adams,* 151 U. S. 139, 144-5 and *Potts* v. *Creager,* 155
U. S. 597, 608.

The historical test implies an examination of the history
of the prior art, as seen by those skilled in it, to determine
what the art knew and understood at the time the inventor
appeared on the scene. Tied in with that test are the deci-
sions of this Court since *Hotchkiss* v. *Greenwood,* 11 How-
ard 248, 52 U. S. 248, establishing that if no more ingenuity
and skill is necessary to construct the device than was pos-
sessed by an ordinary mechanic acquainted with the art,
the patent was void.

This test has now become a part of the statutory law
of patents (35 U. S. C. § 103) which reads:

> "§ 103.  Conditions for patentability; non-obvious
>             subject matter
>     "A patent may not be obtained though the in-
> vention is not identically disclosed or described as
> set forth in section 102 of this title, if the differences
> between the subject matter sought to be patented
> and the prior art are such that the subject matter
> as a whole would have been obvious at the time the
> invention was made to a person having ordinary
> skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner
> in which the invention was made."

Although the Government takes the position that the
Adams invention was obvious and fails to meet the test
of 35 U. S. C. § 103, it does not cite or discuss *Goodyear*
v. *Ray-O-Vac* in its Brief although the lower Court decision
it seeks to reverse, relied on it in part (R. 692).  In dis-

26

cussing *Hotchkiss* v. *Greenwood* and the impact of 35 U. S. C. § 103, the Government in its Brief deprecates this Court's decision in *Cuno* (Govt. Brief, pp. 13, 20)[14] although it has always been at least dubious that the term "flash of creative genius" meant or was intended to mean a state of mind. As the Government had indicated originally in its Petition (Pet. p. 12) the term was synonymous with "inventive genius" as used in a long line of this Court's decisions, and they all meant that the invention had to show that factor by its qualities, not that the inventor had to be one, as the Government now suggests (Govt. Brief, pp. 20, 13-14).

The Government's position on *Cuno* is particularly confusing in view of its position on *Sinclair & Carroll Co.* v. *Interchemical Corp.*, 325 U. S. 327.

The Government says *Cuno* is overruled because it required a "flash of genius" (Govt. Brief, pp. 20, 13-14) and quotes the Reviser's Note to Section 103 so to show (Govt. Brief, p. 34). However, the Government says this is not material to its case because it now relies on *Sinclair*, which "did not apply the 'flash of genius' terminology or standard" (Govt. Brief, p. 20). But in discussing *Sinclair* in relation to the Adams invention, the Government says "there, as here, the patent in suit was not the product of *long and difficult experimentation*" (Govt. Brief, p. 22) [Emphasis ours].

The Reviser's Note, quoted by the Government at its Brief p. 34, shows that "the second sentence [of Section 103] states that patentability as to this requirement is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it *resulted from long toil and experimentation* or from a flash of genius." [Emphasis ours]

It would appear that *Sinclair* is thereby specifically overruled on the exact point relied on by the Government and for the same reason that *Cuno* is overruled, at least according to the Government's reasoning.

The Government has reversed its position on the law in the short space of seven months between its Petition and its Brief. The law and rationale thereof which it cited to this Court as a reason for granting certiorari, the Govern-

---

[14] In the Appendix to its Brief, the Government vacillates on its position on *Cuno*. See pp. 35-6 thereof.

27

ment no longer urges. The law it now cites to this Court is of dubious validity.

It is Adams' position that the *A & P, Cuno* and *Ray-O-Vac* cases delineate the standard of invention as treated by this Court in its late decisions on the subject, and 35 U. S. C. § 103 does not change that standard.

It is submitted that there is a very good reason why the Government vacillates on the law and it is the same reason the Government cites the testimony in this case to this Court but *once*. That reason is simply that the effect of the testimony and trial record in the Adams case, when applied to the test of this Court's criteria of invention as enunciated in *A & P, Cuno* and *Ray-O-Vac*, is to demonstrate invention of the highest order under any and all of those criteria. It is further submitted that this Court will have little difficulty in determining that Adams is an inventor if it will apply the law the Government set forth in its Petition and criticizes in its Brief to the trial record in this case. Should this Court apply the different and lesser standard set forth in the Government's Brief, the result will be the same *a fortiori*.

To briefly show this, let us relate the record broadly to the aforestated criteria of this Court in the matter of invention. Taking these criteria in the reverse order to which they are discussed above:

First, tested by the historical standard, the record shows that all of the elements employed by Adams were individually old in the art (as failures) more than 50 years before Adams made his invention (Find. 22, R. 704, 692; this Brief, pp. 7-10). During the interim, when inventive greats such as Edison, Le Clanche, Davy, De La Rue and hundreds of others had labored in the same area, no one put the Adams invention together, or suggested that it could be. When it was invented by Adams, and disclosed to eminent battery scientists, the art failed to recognize in its operating characteristics, which were different from those of any prior art battery, that the combination was the first new type of electrochemical system since Volta and that it produced unique results. The record shows that when the Adams battery was displayed and explained to the Government's own experts they judged it to be an inoperative battery because of its wholly different operating characteristics. Some of these same experts now agree

28

that the very characteristics which led them to believe that the Adams battery was inoperative actually provide it with its most useful and wholly new functions. Indeed these same experts have found the battery to be so valuable that they now claim it as their own and have received patents for it which are now owned by the Government. Thus, the very invention criticized by the Government in the present case as being old and obvious and falling below the standard of invention is claimed by the Government itself by at least two presently viable U. S. patents (This Brief, pp. 10-13, 7-10). As was well said in *Potts v. Creager*, 155 U. S. 597, 609 cited in the Government's Brief at page 33:

> "The result appears to have been a new and valuable one—so much so that, within a short time thereafter, defendants themselves obtained a patent upon a machine of their own to accomplish it."

The record further shows that today no one knows how or why the Adams battery operates. There is no scientific theory to explain its operation, and there was none to predict its operation in 1939 (This Brief, pp. 9-10, 80). Not only is the historical test thereby passed by the Adams battery, but obviousness is objectively negated.

Turning now to the other aspect of the standard of invention, the matter of a scientific contribution of magnitude, the record shows that after the initial incredulity of the experts was overcome, the Adams battery was later hailed by scientists as an important achievement which has made technical advances possible which would otherwise not have occurred and that it is unsurpassed as a tool in scientific investigation of such matters as meteorological and under-water phenomena and has a host of other important uses.

Further, the Adams battery has been hailed as an achievement in publications of the Government and its suppliers. The record shows that masters of the scientific field of electrochemistry now recognize the Adams battery to be an advance in that science. Selected statements follow:

> "Magnesium—cuprous chloride batteries have attained considerable importance, particularly as 'meteorological' or 'one-shot' batteries, . . ."
> *Fischbach*, 1950 (TX-2, R. 390, 9-10)

29

"The exact nature of the complex chemical current-producing reactions of this type of cell [magnesium-cuprous chloride-water] is not known in any substantial detail and much of the development has necessarily depended upon the employment of purely empirical methods."

*Chubb,* 1952 (PX-40, R. 491-2, 264; R. 262-4)

"DESCRIPTION—The magnesium-cuprous chloride battery is a new type of water activated battery designed to operate under certain types of extreme conditions in which normal dry batteries will not function efficiently."

*Ray-O-Vac,* 1955 (PX-19, R. 459, 88)

"The water activated battery systems are among the relatively new power sources which have become extremely important to the Military during the past decade."

*Morse,* 1956 (CX-2a, R. 439, 8)

"The definite trend to water activated batteries for high altitude and sea water applications indicates they are unsurpassed as one-shot power packs for low temperature use and for underwater operation."

*Morse (Ibid.* R. 439)

"The development of widespread use of water activated battery systems, and especially the cuprous chloride/magnesium system has helped immensely in rounding out the sources of battery furnished power."

*Morse, (Ibid.* R. 440)

"There can be no doubt that the addition of water activated batteries to the family of power sources has brought about developments which would otherwise have been technically or economically impractical."

*Morse (Ibid.* R. 440)

"The new devices designed to aid the scientists who work in the field of meteorology often times use water activated batteries to fill their power requirements. The BA 259 unit, of which nearly a million have been built, is the standard example of the successful application of a cuprous chloride battery."

*Broglio,* 1958 (CX-2c, R. 445-6, 8)

30

These statements amply support the lower Court's Finding that the "new and unexpected" results of the Adams invention constituted an "important advance in the art", "recognized throughout the industry as an extremely important step", "rounding out the sources of battery-furnished power, and filling important, long-standing needs." (R. 704, 692).

Thus the lower Court's findings are carefully consistent with the criteria of invention set forth in both the majority and concurring opinions of this Court in *Great A & P Tea Co. v. Supermarket Equip. Corp.*, 340 U. S. 147.

By its operation the Adams battery challenges the basic electrochemical theory of the great Volta which heretofore had stood since 1800. The Adams battery provides the first operative electrochemical data which cannot be explained by conventional scientific theory (R. 262-4, 695, 206-9, 217; PX-40, R. 491-2, 264; PX-41, R. 495-6, 264). Thereby the Adams invention evidences *creative genius*. *Cuno Engineering Corp.* v. *Automatic Devices Corp.*, 314 U. S. 84.

For these reasons it is submitted that the Adams invention meets every test this Court has enunciated. It is a work of inventive and creative genius. It is recognized by masters in the field of electrochemistry to be an advance and to represent a distinctive contribution to scientific knowledge. It has greatly added to the sum of useful knowledge and it meets every element of the historical test, and thereby the non-obviousness of the Adams contribution is objectively demonstrated.

The facts of record that show that Adams is an inventor were found by the lower Court and these findings correctly applied to the standard of invention as set forth in this Court's decisions. For that reason the decision of the lower Court herein should be affirmed.

## II.  Substantive Issues

### A.  Introduction

In this cause, the Commissioner, after a five-day trial decided the patent infringement cause in Adams' favor, with one exception.[15]  During the trial, at which the Commissioner had the opportunity to hear and see the witnesses, to observe their conduct and demeanor on the stand, evaluate their frankness, credibility and impartiality, or the lack of it, Adams produced as witnesses, in addition to the renowned electrochemist Dr. Mantell, Mr. and Mrs. Adams, both of whom testified as to the facts of the making of the invention and the disclosure thereof to employees of the Government during World War II and the subsequent appropriation of the Adams invention by these same Government employees.

In response thereto, and despite the implications of the Adams testimony concerning the Government's employees, the Government produced not one fact witness. The Government's first expert was Howard Knapp, whose direct testimony is no longer relied on (R. 302-4).

The Government's second expert was Dr. Joseph C. White, a long time employee of the Government at the Naval Research Laboratory (R. 344) and a witness whose testimony was favorable to Adams at every crucial point (R. 362-3, 382-3, 384).

This brief will delineate the facts of Record upon which the Court below found the Adams patent valid in accordance with the decisions of this Court defining the standard of invention.

The Adams patent is an electrochemical patent defining a battery system capable of producing electric current (R. 120).  It is not concerned with structure nor with the specific physical shape, size or arrangement of the battery components, nor with methods of making them.

---

[15] The Commissioner refused to find that silver chloride was the equivalent of cuprous chloride and to that extent limited the patent and its claims to the precise language thereof, permitting the patent no broader scope despite the pioneering nature of the invention. This ruling was not excepted to by either Adams or the Government, although the Government now urges the Commissioner should be reversed for not finding the opposite.  (This Brief, p. 88).

32

The invention resides in the electrochemical system involved and the effects produced thereby. The battery comprises a cathode made of cuprous chloride to which a small amount of carbon may be added, the anode is magnesium. This exact combination of chemical elements was never assembled before (R. 704, 692, 382-3, 264; Govt. Pet., p. 11). The battery is activated by water, a substance which will not conduct electricity (R. 264). Although the theory of selection contradicted known principles of electrochemistry and the act of selection was both fortuitous and novel, it is the unique results of the battery thereby provided which represents a major contribution to the progress of science and the useful arts.

Adams and the Government combined to prove that the physical structure, shape and size of the components, and methods of making same, of the battery shown in the Adams embodiment and of the batteries procured by the Government were old long before Adams (R. 125, 134, 136-7, 138-9, 127-9). Adams and the Government combined to prove that all of the elements used by Adams in his battery were individually old in the art by 1888 at the latest. These elements were rejected failures at that time and remained so until Adams.

In the intervening fifty years between 1888 and the work of Adams in 1939, the many great scientists who experimented in the field of batteries had failed to put the Adams combination together, although all of the necessary materials and techniques were available throughout that period, and the need for batteries that would function at low temperatures and were capable of providing a continuous source of level power was great (R. 704, 692).

After a half century of failure by the art, it fell to Adams to put the novel system together, and to recognize in the resulting battery's unusual and seemingly inoperative characteristics the qualities of a great new scientific advance in the battery art.

One had to fly in the face of conventional battery theory to put this new electrochemical system together. Conventional battery theorists thought in terms of highly conductive electrolytes, intermittent use batteries, declining power delivery over each period of use and minimal "local action" when the battery was disconnected. Adams, unhampered by stereotyped scientific theory, was naive enough to attempt combinations of elements that contradicted the con-

33

ventional Voltaic battery theory. But having done so, and having obtained what may be more accurately described as a heat engine than a battery, Adams was genius enough to recognize that he had produced an operative battery despite its unbattery-like characteristics. He alone was able to comprehend what he had accomplished and the utility of his discovery. He was also patriot enough to reveal his battery system fully and fairly to the Government within the month after Pearl Harbor and to receive for his pains first, adverse criticism and bitter discouragement by the Government's battery experts and second, the appropriation of his invention by these same Government battery experts years later in patents the Government now claims as its own (R. 450; TX-2, R. 390, 9-10; TX-6, R. 392, 10).

The Court below has held the Adams patent valid and infringed (Find. Nos. 24 and 38, R. 704, 707-8). The Court below noted that the Government was unable to find a reference of any kind disclosing or suggesting the specific combination of elements used in the Adams battery (Find. Nos. 22 and 23, R. 704), and that none of the Government's references even suggested that a battery having the capabilities of the Adams battery could be produced by any means (Find. No. 22, R. 704). Finding that each of the elements of the several claims of the Adams patent was individually old in the battery making art at the time of the filing of the patent in suit (Find. No. 24, R. 704), the Court found:

> ". . . the Adams invention was not, as a whole, obvious, at the time the invention was made, to a person having ordinary skill in the battery art." (R. 704)

Thus, the Court properly found the patent valid and the record supports it at every point. The findings of fact show that the standards of invention enunciated by this Court in *Cuno*,[16] *Ray-O-Vac*[17] and *A & P*[18] (both majority and concurring opinions) are far exceeded by the proofs of record relating to this invention.

---

[16] *Cuno Engineering Corp.* v. *Automatic Devices Corp.*, 314 U. S. 84, 91.

[17] *Goodyear Co.* v. *Ray-O-Vac Co.*, 321 U. S. 275, 279.

[18] *Great A & P Tea Co.* v. *Supermarket Equip. Corp.*, 340 U. S. 147, 152, 154, 155.

34

That record shows the following:

(1) Adams flew in the face of the art and the teachings of conventional battery theory in

> (a) combining the ingredients that he did to make his battery, and

> (b) recognizing that the new result, which appeared to be a completely inoperative battery, was in fact a battery of a type that had never been seen before (This Brief, pp. 4-10).

(2) Articles published by the Government and the Government's suppliers establish that the Adams battery system is recognized by battery experts as a major scientific advance. Adams created the first battery that provided a continuous source of level power at low temperatures, the first truly new type of battery since Volta's original invention of the first battery in 1800 (This Brief, p. 36).

(3) In creating his battery system, Adams fulfilled age old dreams in the battery art and contradicted existing battery theory in

> (a) solving the problem of employing magnesium, which had always been recognized on a theoretical basis as having beneficial electromotive characteristics, but which, due to its high corrodibility and chemical reactivity had defied use in a practical battery (This Brief, p. 42) and

> (b) solving the problem of effectively employing the dangerous and discarded cuprous chloride (This Brief, p. 43) and making therefrom a practical operative battery that was capable of being activated by water (This Brief, p. 45).

(4) Due to its unusual operating characteristics, the Adams battery has filled long felt wants. It provides an effective source of power for all battery motivated mechanisms that require level or constant current delivery, such as radio receivers or transmitters, emergency sources of power and light, warning and signal lights, rescue apparatus and devices intended for low temperature or arctic use and operation at sea. These are all old devices and the

need for properly powering them has existed as long as
they have (This Brief, p. 53).

(5) In addition to fulfilling long felt wants, the Adams
battery system, when discovered, produced unexpected and
important results entirely different from those which are
obtained by any other battery, and which no one believed
could be achieved by any means:

(a) The Adams battery when activated can be
made to heat and boil. It was recognized by Adams,
and initially by Adams alone, that the battery can
thus be used for extremely low temperature opera-
tion (This Brief, pp. 48, 4).

(b) The battery produces level voltage and am-
perage. Curves of operation of a single cell of the
Adams battery system show unique and almost
mathematically perfect level curves. There is no other
battery that has these characteristics. There is no
battery theory that will explain these characteristics
(This Brief, pp. 50, 4).

(c) The Adams battery has the unexpected
characteristic of maintaining an almost constant
efficiency regardless of the electrical load imposed
upon it. Within limits and with small percentage
differences in efficiencies, these batteries are as effi-
cient under sixteen times normal load as they are
under normal load (This Brief, p. 55).

(d) In addition, the battery's efficiency is unaf-
fected by operation under a combination of the con-
ditions of high load and extremely low temperature
operation, a feature found in no other battery.
(This Brief, p. 56)

(e) The battery is light in weight, cheap and
highly efficient for its size and weight. It has the
advantage of being operable with any type of water,
thus making it utilizable for rescue devices, safety
devices and a wide range of military and naval uses.
(This Brief, p. 57)

(6) The prior art cited by both sides shows that before
Adams, the battery art did not know how to successfully
employ any of the components used by Adams. The prior
art validates the Adams patent. (This Brief, p. 57)

36

(7) The surprise and disbelief displayed by the Government's own experts and attested to by Adams' expert, when the characteristics and properties of the Adams battery system were first announced and shown to them, is proof beyond peradventure of its unobviousness. If the experts were astonished and refused to believe the evidence of their own eyes with the battery operating before them, how can the invention have been obvious? Particularly since they later agreed they were wrong and now claim the discovery as their own (R. 450, This Brief, p. 76).

(8) As the record establishes, there is no scientific theory today that will explain the operation of the Adams battery and none that would predict its operativeness in 1940; this being so, how can the invention have been obvious? (This Brief, p. 80.)

## B. The Adams Invention Is Recognized as a Scientific Advance by the Government, Its Suppliers and Battery Experts

Adams worked in an art littered with the proliferation of a century of experiment by myriad scientists; nevertheless he managed to produce, out of that confusion, a radically new and astonishing invention using only what had long ago been discarded. Thereby Adams executed an invention of such beautiful simplicity that it can only be regarded as a stroke of genius.

The Adams invention performs a function never before performed, and one of such novelty as to mark an extremely important step in the progress of the art.

The Court below so found. It said:

"The Adams invention was the *first* practical, water-activated, constant potential battery capable of operation at low temperatures. When Adams first disclosed his invention to others skilled in the art, he did not know its theory of operation and it was received with considerable skepticism. However, this development was subsequently recognized throughout the industry as an *extremely important step in rounding out the sources of battery-furnished power, and filling important, long-standing needs* of both civilian and military natures." (Find. No. 23, R. 704) [Emphasis ours]

37

This finding is amply supported by the Record for Adams created the first practical battery that provided a continuous source of level power (R. 704, This Brief, pp. 4-5, 50). It was the first such battery ideally suited for low temperatures and high drain uses (This Brief, pp. 48, 56). Its pioneering nature is shown by the skepticism and disbelief of the Government experts to whom Adams disclosed it (Find. No. 23, R. 704; see also pp. 76 to 80 of this Brief), and by the fact that, now as then, the electrochemical theory upon which the Adams battery operates is unknown (R. 695; see also pp. 80 to 82 of this Brief).

As will be shown from the published statements of the Government, its suppliers, and battery experts, the Adams patent meets the criteria of invention set forth in *Great A & P Tea Co. v. Supermarket Equip. Corp.*, 340 U. S. 147, for it:

(1) performs a new and different function than any prior art battery (as required at 340 U. S. 147, 151)

(2) has added to the sum of useful knowledge (as required at 340 U. S. 147, 152)

(3) has pushed back the frontiers of electrochemistry and constitutes a distinctive contribution to scientific knowledge (as required at 340 U. S. 147, 154)

(4) has been recognized by masters of the scientific field of electrochemistry as a distinctive advance (as required at 340 U. S. 147, 155)

Dr. Mantell testified that the Adams battery was the first to deliver a continuous source of power at constant voltage and amperage (R. 114-5, 118 and 216-7).

He stated at R. 217 that:

> "It is interesting to note that all of our battery philosophy up to this time indicated that the battery should be designed not to rise in temperature, but be designed primarily for intermittent service. That is what a battery was good for, and that when you used it in continuous service, the battery would polarize and lose voltage, and it was considered that a battery system consisted of electrodes, with electrolyte, and the electrolyte should be a conductor."

> "He [Adams] comes along and says: 'I don't do that,' and naturally he is received with skepticism, particularly, by a man who was one of the outstand-

38

ing battery experts[19] in the world, and who has prob-
ably tested and examined more battery systems than
anybody else." (R. 217)

The impact on the art and on the Government of the
Adams battery system is best demonstrated in the published
statements of the Government, its experts and employees
and its suppliers.

Dr. Fischbach, of the U. S. Army Signal Corps Labora-
tory at Ft. Monmouth, N. J., one of the men to whom Adams
disclosed and demonstrated his batteries in 1942 and 1943,
and who tested it and publicly announced he did not at
first believe it could operate, said in his patent applied for
in 1950 and issued in 1953, that:

> "This invention relates to primary cells, of the
> deferred action type, using the electrochemical
> system magnesium-water-cuprous chloride.
> "Magnesium-cuprous chloride batteries have at-
> tained considerable importance, particularly as
> 'meteorological' or 'one-shot' batteries, due to their
> high capacity per unit of weight and volume, their
> excellent operating characteristics even at low tem-
> peratures (linear potential and capacity), their ease
> of activation with water as electrolyte and their low
> cost of manufacture." (TX-2, R. 390, 9-10)

The Fischbach patent[20] is owned by the Government
(R. 390). Only the Government now owns a patent on the
Adams battery for Adams' patent expired in 1960 (R. 393).

---

[19] The outstanding battery expert referred to by Dr. Mantell
was the late Dr. Vinal of the National Bureau of Standards.

[20] Its claims cover the same electrochemical system as Adams.
For example, claim *10* of Fischbach reads:

> "10. A deferred action type primary battery using the
> system magnesium-cuprous chloride comprising juxtaposed
> electrically connected cells, said cells each comprising as
> internal elements a magnesium electrode, a spacer of bibu-
> lous ionically conductive material, and a cuprous chloride
> electrode, said cuprous electrode comprising a thin grid
> supporting a porous spongy mass of cuprous chloride."
> (Not reprinted.  See original Trial Exhibit 2).

This is the same battery as Adams and is claimed in the same
manner as Adams claimed his battery, which the Government now
says is not an invention.  See Adams Claim 1 (R. 395).

39

Dr. Chubb, of the Eagle-Picher Company, a supplier of the Government, used the same terminology as Fischbach concerning the magnesium-cuprous chloride battery. Chubb's patent issued in 1954 (TX-6, R. 392, 10), and *is also now owned by the Government*. It is submitted that the tribute paid to the Adams battery system, first by the praise contained in these two patents, and second by the facts concerning their origin and ownership, is beyond cavil.

In 1950, the same Dr. Fischbach wrote an article published in the August, 1950 edition of *Electrical Engineering*, in which he stated:

> "Standard-type primary and secondary batteries are unsatisfactory for certain types of Army and Air Corps equipment and, consequently, special purpose batteries suitable for these particular applications had to be developed. This article describes three systems which have been found to be the most effective at the present time.

> \* \* \*

> "Of the three afore-mentioned systems, the magnesium, water, cuprous-chloride system seems to offer the best solution for some of the specialized applications, . . ."
> (R. 448, 449)

E. M. Morse of the Eagle-Picher Company, another supplier of the Government, stated in 1956 in the Proceedings of the Tenth Annual Battery Research and Development Conference held at the Signal Corps Engineering Laboratories at Ft. Monmouth, New Jersey, sponsored by the U. S. Army and published by the Government:

> "The water activated battery systems are among the relatively new power sources which have become extremely important to the Military during the past decade . . . The definite trend to water activated batteries for high altitude and sea water applications indicates they are unsurpassed as one-shot power packs for low temperature use and for underwater operation.

> "The development of widespread use of water activated battery systems, and especially the cuprous chloride/magnesium system has helped immensely in rounding out the sources of battery furnished

40

power . . . There can be no doubt that the addition of water activated batteries to the family of power sources has brought about developments which would otherwise have been technically or economically impractical. It appears that present developments will tend to increase the ever-broadening field for the use of water activated batteries." (CX-2a, R. 439, 440, 8)

E. Broglio, also of the Eagle-Picher Company, stated in 1958 in the Proceedings of the Twelfth Annual Battery Research and Development Conference at Ft. Monmouth published by the Government, that:

"The new devices designed to aid the scientists who work in the field of meteorology often times use water activated batteries to fill their power requirements. The BA 259 unit, of which nearly a million have been built, is the standard example of the successful application of a cuprous chloride battery. (Figure 1) This battery has been supplying much of the power to gather weather information from radiosonde balloons. * * * The most significant point about these batteries is that they operate under environmental conditions which would normally freeze the electrolyte and cause them to be inoperative." (CX-2c, R. 445-6, 8).

In an Engineering Bulletin published about 1955 by the Ray-O-Vac Co., a Government supplier, entitled "Characteristics of the Magnesium Cuprous Chloride Battery" it is stated:

"DESCRIPTION—The magnesium-cuprous chloride battery is a new type of water activated battery designed to operate under certain types of extreme conditions in which normal dry batteries will not function efficiently . . ."
"TEMPERATURE RANGE—Satisfactory operation at temperatures ranging from $+140°F$ to $-60°F$ or at altitudes of 100,000 ft. is an important characteristic . . ."
"LIGHT WEIGHT—The light weight of magnesium-cuprous chloride units compared to conventional dry batteries of comparable capacity make them extremely desirable for applications where weight is an important factor . . ." (PX-19, R. 459, 88)

41

The Burgess Battery Co., a supplier of the Government discussed its A. M. Power Units (water activated batteries including cuprous chloride-magnesium batteries) in a publication as follows:

"BURGESS A. M. POWER UNITS OFFER A NEW TYPE OF HIGHLY PORTABLE POWER SUPPLY"

"CONSTANT VOLTAGE—Constancy of voltage is an important factor in electronic equipment. In this respect A. M. POWER UNITS have a definite advantage because they deliver practically constant voltage throughout their service . . ."
"Moreover the voltage is not greatly affected by the current drain. Increasing the current 16-fold only lowers the *peak voltage* from 1.60 to 1.52 per cell."

\*         \*         \*

"HIGH CURRENT AND POWER OUTPUT—A. M. POWER UNITS deliver power equal to that of batteries many times larger . . . For obtaining high power from a small source, A. M. POWER UNITS are unexcelled."
"CONSTANT OUTPUT—Whatever the load, the energy output of A. M. POWER UNITS is practically constant . . ."
"LIGHT WEIGHT—In most cases, replacing generators or ordinary batteries with A. M. POWER UNITS will mean a considerable reduction in weight . . ."

\*         \*         \*

"WIDE TEMPERATURE RANGE—While A. M. POWER UNITS must be activated at temperatures above the freezing point of water, they can be successfully discharged at ambient temperatures as low as –60°F. The heat produced within the battery keeps it from freezing. Temperatures as high as 150°F. are not detrimental" (PX-18, R. 454-456, 86).

The foregoing published accolades by the Government, its suppliers and battery experts show that the Adams battery system performs a new and different function than any previous battery, is a significant contribution to useful knowledge and the science of electrochemistry, and is recognized so to be by these experts. It is submitted the Adams patent meets the criteria of invention as set forth in *Great A & P Tea Co. v. Supermarket Equip. Corp.*, 340 U. S. 147.

42

## C. Adams Flew in the Face of the Battery Art and Thereby Produced a New Battery With Unique, Unexpected and Important Results

### (1) *The Adams Battery Is New*

The Court below has found that:

> "22. Each of the elements of the several claims of the Adams patent was individually old in the battery-making art at the time of the filing of the Adams application for the patent here in suit. While there is evidence of a definite need for a battery having the characteristics of the Adams battery, those skilled in the art failed to develop one for a period of over 50 years, during which time all of the necessary ingredients were available. There is no evidence that anyone had ever before suggested the specific *combination* of elements which make up the Adams battery nor that anyone had ever before suggested that such a battery would have a substantially constant potential, could be operated under extreme temperatures, and could be operated with ordinary or distilled water." (R. 704).

The Record supports the above finding.

The "boneyard of failures"[21] which composes the Government's collection of ancient prior art shows that the art had long wanted a battery in which magnesium could be employed as an electrode.

From the time magnesium was discovered in 1854 (R. 120, 382; DX-19, R. 591, 381), the art made many attempts to use it in a primary battery because of the position of magnesium on the electrochemical chart (R. 360-1). But magnesium is highly corrodible[22] (R. 243, 295; DX-12, R. 565, 381; R. 363, 388; PX-39, R. 467-8, 251), and although many recommendations were made that magnesium be used as an electrode in primary batteries, (*Ibid.*, R. 360-1, 295) it was always on a theoretical basis that did not solve the corrosion problem (R. 243, 295). There are very few practical batteries today that employ magnesium as a component. The

---

[21] *Reynolds* v. *Whitin Mach. Works,* 167 F.2d 78, 84 (4 Cir. 1948), *cert. denied,* 334 U. S. 844.

[22] Which means it is destroyed chemically by the other constituents of conventional Voltaic cells before it can deliver its available electrical potential (DX-12, R. 565, lines 48-53, 381).

43

Government has supplied us with a chronological catalog of failures extending over the years.

The Government has cited British Patent No. 4341 to Skrivanoff (DX-19, R. 591, 381), issued in 1881. Dr. White said this represented an early attempt to build a bell-ringing primary battery (R. 370) which automatically distinguishes it from the Adams system. Skrivanoff employed magnesium (DX-19, R. 591, 381; R. 371). Dr. Mantell, who duplicated the Skrivanoff disclosure, suffered two fires and an explosion before he became discouraged and concluded that the battery was inoperative (R. 388). The Court below agreed that:

> "17. The Skrivanoff foreign patent discloses a battery having an electrode of magnesium, an electrode comprising cuprous chloride *mixed together with* some *seven* other substances, and a strong electrolyte. The evidence establishes that the disclosure of this very old patent is inoperative." (R. 703). [Latter emphasis ours]

The Government also cited U. S. Patent No. 1,696,873, issued to Wood in 1928 (DX-12, R. 565, 381), which mentions magnesium for the time-honored reason that magnesium is near the top of the electrochemical series (*Ibid.*, R. 360-1). In his patent, Wood stated that if magnesium were used "one or more strong oxidizing agents" would *have to be added* to the electrolyte *to mitigate corrosion*[23] of the magnesium (DX-12, R. 565, lines 54-65, 381). This "reference" thus teaches that if magnesium is to be used as an electrode, a special oxidizing agent must be added to an already complex electrolyte. The Wood patent also states ". . . it has been generally accepted that magnesium could not be commercially utilized as a primary cell electrode" (*Id.* at lines 12-15), and also that: "magnesium will corrode so rapidly in ammonium chloride solution that the cell becomes valueless in a few hours, even on open circuit. *The same disadvantage applies to all the commercially used primary cell electrolytes.*" (*Id.* at lines 48-53) [Emphasis ours] Thus the art *was pointed away from magnesium* because of the special corrosion problems.

---

[23] The problem Adams solved by *adding* nothing, but ignoring 140 years of research on conductive electrolytes, and experimenting with plain water. See also DX-19, R. 591, 311; R. 594, 383, 243.

44

Then in 1937 came Jumau, U. S. Patent No. 2,078,143 (DX-14, R. 572, 381) which mentions magnesium (*Ibid.*, R. 361-2). The Government expert who testified concerning it, admitted that the Jumau patent teaches that acid or basic electrolytes will attack magnesium (R. 363). This patent was tried by Dr. Mantell who reported that the battery was inoperative (R. 388). One may properly ask—what does an inoperative disclosure teach the art? The significance of Jumau is that it teaches that 2 years prior to Adams, no one, after a half century of effort, had learned how to use magnesium in a battery.

Even today, the Adams battery system is one of the few successful systems using magnesium as a component. In 1946 in referring to prior art batteries, employees of one of the Government's contractors stated in a published statement that:

> "No work had been done on use of other negatives such as magnesium to increase the voltage of such a system and render it more widely useful." (PX-39, R. 468, 251)

Not only did the Government fail to refute this on the record, but the Government's own expert agreed with the statement (R. 362).

The other electrode substance employed by Adams was cuprous chloride, which had been suggested for use in batteries four times between 1880 and 1895 (R. 382; DX-18, R. 589, 381; DX-19, R. 593, 381; DX-20, R. 597, 381; DX-21, R. 608, 381) and not since. Cuprous chloride is poisonous (R. 121) and sometimes produced disastrous results when employed in batteries (R. 388; DX-19, R. 591, 381). It, too, is insoluble (R. 121, 123, 266, 263, 264) and destroyed by conventional acid electrolytes (DX-18, R. 589, line 97—R. 590, line 8, R. 381). There is no evidence that any practical battery had ever been made employing it.

Moreover, chance played its part in the employment of cuprous chloride. The discovery of the role of carbon as a catalyst in the cuprous chloride electrode was due to Adams accidentally dropping cigarette ashes in the mix (R. 43-4, 106, 698). By inspiration, he deduced that it was the carbon in the ash that was effective, and then determined by trial and error that all kinds of carbon were effective (R. 45, 106-7) in the cuprous chloride electrode.

45

Thus, the making of the Adams battery was not a mere act of "selection". When Adams discovered his ingredients he disregarded conventional battery theory, chose to combine materials that no one else in the battery art could get to work even one at a time, and finally was handed a catalytic combination by Lady Luck.

However, Adams was not experimenting blindly for he had his own theory. To use highly corrodible magnesium, he reasoned that one could activate only with a chemically unreactive liquid (R. 49, 40) that would not destroy the magnesium chemically before it could produce electricity in the electrochemical couple. Water is chemically neutral (R. 49, 40). However, water could not work according to traditional theory because magnesium is insoluble in water (R. 264) and so could not react, and even if it did produce electricity, the water could not conduct it (R. 277-8, 217, 264). But Adams believed magnesium was soluble in water (R. 41) and so could react, thus affecting the second electrode, and he perservered with many experiments (R. 40-1, 105-7) until success crowned his efforts and he discovered the electrochemical couple of magnesium and cuprous chloride.[24] (R. 41, 66). He succeeded because he followed his own theory and concepts and disregarded conventional theory.

Moreover, the Adams battery is the only battery that has ever solved the problem of utilizing the desirable properties of water as a substitute for electrolytes to activate a primary battery. (R. 209, 691, 704).

In his initial experiments reported in 1800, Volta attempted to employ water and found that it would not function as an efficient electrolyte, and therefore directed the attention of the art into the field of conducting electrolytes (PX-42, R. 500-1, 281; R. 217). Plain water, of course, is an insulator (R. 277-8, 217, 264) and will not conduct electricity *(Ibid.)*. In 1880, Niaudet reported a water battery (DX-1, R. 507-8, 380) but stated that it was of "little interest" until De La Rue used a solution of seasalt or sal-ammoniac in the battery *(Id.* at 508) to impart conductivity. Thus, he reaffirmed Volta's theory and reasserted the need for conductive electrolytes.

---

[24] He also discovered that silver chloride would work (R. 41) and told the Government about it in 1942 (R. 66).

46

Since that time the art is replete with examples of unsuccessful efforts to obtain a battery that could be activated with plain water. These attempts usually took the expedient of placing a soluble dry metallic salt between the electrodes or in recesses in the battery case or container to impart conductivity to the added water. One example of this, out of the many available, is provided in Defendant's Exhibit 5 which is U. S. Patent No. 405,196, issued to Barrett in 1889 (DX-5, R. 531, 380). In this battery, a zinc sulfate material was used in dry form and as Barrett states in the patent:

> "I prefer to charge the battery with the sulphate in a dry form, and for this purpose I impregnate the porous diaphragm between the zinc and silver elements with the salt by boiling or saturating the diaphragm with a saturated solution of the salt, after which the liquid is evaporated, leaving the salt in a dry or inactive state. The porous diaphragm may then be in contact with both elements without producing action, while the addition of water will at any time put the battery into an active condition." (DX-5, R. 532, l. 97—R. 533, l. 8, 380)

The Barrett reference indicates that from at least 1889 the art had sought the end achieved by Adams, without ever dreaming that ordinary water, without salts or other chemicals, could function alone.

That the need and desire continued to exist is shown in Defendant's Exhibit 11 "Primary Cells" by Codd, published in 1929, wherein it is stated:

> "*Inert Cells.*
> Before terminating this chapter, mention must be made of an important branch of dry cells, that is, the inert cell, which is virtually a dry cell put up without the moist paste in place, and with one of the vent holes enlarged to form an opening large enough to carry a small cork (Fig. 40). Although the paste is omitted as such, the excitant salts are left in place within the cell, and in some cases the desiccated components of the jelly. Under these conditions the cell will store in good condition for very long periods, and when it is required to put the cell in action it is only necessary to add water through the vent (having removed the cork) till the cell is full, using for the purpose a small glass syringe similar to that used to fill a fountain pen."
> (DX-11, R. 559, 380)

47

Codd shows the art was desirous of having a battery that could be activated by plain water as late as 1929, but did not know how to accomplish it.

Adams solved a problem that had puzzled the experts since earliest times. Adams' solution to the puzzle is admittedly simplicity itself; a battery comprising an anode of magnesium, a cathode of cuprous chloride, the battery adapted to be activated by plain water. But a solution of such simplicity, in the face of the repeated attempts and failures of those skilled in the art to solve the problem, is strong evidence of inventive genius.

In *Baldwin-Southwark Corp.* v. *Tinius Olsen Testing Mach. Co.,* 88 F. 2d 910, 914 (3rd Cir. 1937), *cert. denied* 302 U. S. 696 the Court of Appeals stated:

"... Indeed the simplicity of a device, instead of minimizing its inventive character may be an evidence of invention. In that regard this court, in *Arouson v.* Toy Devices, Inc., 1 F. (2d), 91, 92 said: 'Mere simplification of a substantial character, disposing of parts which have long been in use, may amount to invention. *"To obtain simplicity is the highest trait of genius."* [Citing cases]'" (Emphasis ours)

That Adams solved the old problem of employing magnesium and cuprous chloride in a practical battery capable of activation by water is evidence of invention. That his solution was one of such astonishing simplicity in a crowded art is *evidence of genius.*

### (2) *The Results of the Adams Battery Are Wholly Unexpected and Different From Any Other Battery*

Having deliberately combined the ingredients to make his wholly novel battery, Adams flew in the face of the art in recognizing its peculiar operating characteristics as being beneficial rather than self-destructive. Most prior art batteries were generally capable only of intermittent use (R. 217, 115, 118) and could not supply continuous, level current at temperature extremes. Such batteries, if used continuously, had an extremely short life (R. 217), and their voltage and amperage declined (sometimes linearly, but never without some slope) during each instance of use (R. 217; PX-38, R. 228, This Brief, p. 51).