48

Important evidence of an efficient battery of the prior art type was that during periods of inactivity "local action" was minimized or did not occur (R. 131; DX-1, R. 510, 380). This meant that the chemical activity ceased (R. 131-2). An advantage of prior art batteries was that they provided an instantaneously available source of power when connected to a load. That is why Dr. Mantell and Dr. White called them "bell ringers"—when the button was pushed the current was immediately available (R. 132, 145, 370). More important the battery went off when the button was released (R. 145, 132).

When Adams put his cell together, looking at it and him in the year 1940, from the point of view of traditional battery theory, it is clear that he defied convention in everything he did.

FIRST: When the Adams battery is constructed, the water added, and the terminals connected to a load to complete the circuit, what occurs? In terms of traditional theory, a battery should deliver its power instantly (R. 217, 145). In the Adams battery *nothing* happens for as long as thirty minutes.[25]  (TX-10, R. 395, col. 2, lines 2-6, R. 11; TX-12, R. 406, 11). It is possible that in the half century before Adams, the Adams combination was tried. One may speculate how many times it was *thrown away* because power was not delivered during the period of time the patience and acuity of the experimenter allowed. Scientists thinking in terms of a better conventional battery would discard the combination. Not delivering power promptly, it was not a battery (R. 145, 217).

SECOND: Adams continues to work—the battery is now generating power and he observes that the water solution is beginning to heat up and, after a short period of time, if the battery is connected to a high load, *the water begins to boil* (R. 260-1). In terms of traditional theory, an overheated battery is building internal resistance, losing its efficiency and destroying itself (R. 216-7; PX-16, R. 450,

---

[25] *The same thing happens in the batteries the Government procures.*  (R. 156-7). The instructions on TX-7 (R. 10), an Army battery states that battery is ready for use *29 minutes* after adding water. (R. 156-7). *This is the exact amount of time (less 1 minute) the Adams' patent* states a water-activated battery will take to activate without special measures (TX-10, R. 395, col. 2, lines 2-6, R. 11).

49

85). Every prior art battery when it began to overheat was losing its ability to deliver current as it destroyed itself internally (R. 216-7). In the Adams battery the heating in no way lowers the operating efficiency of the battery one iota and, in fact, is now known to be a side reaction (R. 260; CX-2c, R. 444, 8; CX-2b, R. 441, 8), which was immediately understood by Adams in 1940, and by Adams alone, to provide the heat source which would make this battery the first one that would ever operate efficiently at temperatures almost 100°F. below the freezing point of the water with which it was activated (R. 68-9, 260). Traditional battery experts believed this exothermic reaction made the battery useless (PX-16, R. 448, 85; R. 216-7). This is the first battery whose performance is unaffected by cold. This characteristic, which is possessed by no other battery even today, renders the Adams battery uniquely able to survive and efficiently deliver power in the arctic and high in the stratosphere where temperatures go down to 60 degrees below zero (R. 114; CX-2, R. 446, 8; PX-19, R. 459, 88). And this is where the Government uses it, in its meteorological balloons that radio weather information down to earth from the stratosphere and in its arctic and cold weather equipment (CX-2c, R. 445, 8; CX-2b, R. 442, 8; TX-2, R. 390, 10; CX-2a, R. 439, 8; R. 257-9; PX-37, R. 463, 202). The Adams battery has made effective the modern science of meteorology. If you have flown in commercial or military aircraft in the last ten years, your course, altitude and safety were determined by information radioed down to earth by the power of Adams batteries.

THIRD: Adams perseveres, and the battery generates current and reaches a peak for both voltage and amperage which it maintains, however *it does so whether the external circuit is connected or not.* Disconnecting the load does not turn off the Adams battery as it does in conventional batteries. When the load is disconnected, the battery goes right on boiling, generating current and ultimately uses itself up (R. 114-5, 118). Thus, the battery lacks the great advantage of conventional batteries because it cannot be turned off and a scientist looking for a better conventional battery would conclude that this battery was unsuitable (TX-12, R. 406, 11; R. 216-7, 114-5; PX-16, R. 448, 85). Here Adams recognized the advantage in the disadvantage. Although the battery was self-destructive in terms of non-con-

50

tinuous use, it provided continuous power without loss of efficiency which no battery had ever done before (R. 115-6, 145-6). Traditional battery experts believed this self-destructive operation made the battery useless (PX-16, R. 450, 85; TX-12, R. 402, 11; R. 216-7). Adams recognized it to be the first battery that effectively and efficiently delivered *continuous* electrical power (TX-15, R. 416, 413).

FOURTH: Adams now connects the terminals of his boiling battery to an ammeter and a voltmeter to measure the current flow under load and records it.[26] The readings show that all during its useful life this battery generates absolutely, mathematically level power (*Ibid.*, R. 44). Every prior art battery shows a decline in current delivery under continuous use (R. 217; PX-38, See this Brief, p. 51, R. 473, 251). Graphs of their power delivery look like this:



or like this



An Adams battery delivers power[27] like this:



---

[26] Mrs. Adams generally did this. Her very human story of her husband's experiments, triumphs and defeats should not pass unnoticed (R. 105-107).

[27] See TX-15, R. 419, 413; PX-37, R. 465, 202; PX-38, see this Brief, next page.



CERTAIN LINES ACCENTUATED TO FACILITATE REPRODUCTION



51

This is the first battery that does not get tired as it grows old. Is this surprising? No other battery can do it (R. 217, 115, 145). Furthermore there is no known battery theory that will explain this constant level delivery of power (R. 208, 695).

This single characteristic makes the Adams battery more useful for powering conventional and unconventional electrical and electronic equipment than any other known battery (R. 210-11; PX-18, R. 458, 87; R. 115-6, 199, 292-3, 704; CX-2, R. 440, 8).

In 1943, a man named Shorr, who was a scientist at the Army Signal Corps Labs. in Ft. Monmouth, was given a copy of the Adams patent (R. 219-20). He built a battery following only the directions in that patent and plotted a graph of its power delivery (R. 219-21). At about the same time he tested two commercial Kollsman batteries of the type then being procured by the Government for high-altitude research (R. 226-7). At the trial the results were cross-plotted on the same graph as Shorr had plotted the results of the Adams battery. This is Plaintiffs' Exhibit 38 (see opposite page, where it is reproduced.)

The graph speaks for itself. The experimental Adams battery delivers 20 times as much power as the commercial battery, and delivers level power, while the decline in power of the commercial batteries presents a sad contrast.

This is *the real prior art* and the contribution of Adams stands out starkly in contrast to it. Is it any wonder the Government now uses Adams batteries for high altitude research? (CX-2c, R. 445, 8; CX-2b, R. 442, 8; TX-2, R. 390, 10; CX-2a, R. 439, 8; R. 257-9; PX-37, R. 463, 202). Is it any wonder Adams batteries have been heralded as unsurpassed for low-temperature, high-altitude applications? (R. 254-7; CX-2a, R. 439, 8).

It is submitted to be clear on this Record that Adams flew in the face of the art and in the face of common sense in combining the ingredients that should never have worked; and then in recognizing that the peculiar, unusual and wholly unbattery-like results produced were the indicia of the first new battery since Alessandro Volta. As the Court below so rightly said:

"The evidence presented during the trial shows that although the necessary materials and techniques

52

were available to the battery experts for over 50 years, no one put them together, or recognized that the *combination* would work, or yield new and unexpected results." (R. 692)

"The battery disclosed in the Adams patent is made up of *particular* components which *unexpectedly* produced a battery having *unique* characteristics." (R. 694) (latter emphasis ours)

"Adams selected *specific* components from the group of known battery components and found that the *combination* of these specific components resulted in a workable battery having *unique* and *unexpected* characteristics. The unexpectedness of the Adams invention is evidenced by the fact that, even today, the theory upon which the Adams battery operates is unknown." (R. 695). (latter emphasis ours)

In summary, the Court correctly found:

"22. Each of the elements of the several claims of the Adams patent was individually old in the battery-making art at the time of the filing of the Adams application for the patent here in suit. While there is evidence of a definite need for a battery having the characteristics of the Adams battery, those skilled in the art failed to develop one for a period of over 50 years, during which time all of the necessary ingredients were available. There is no evidence that anyone had ever before suggested the specific *combination* of elements which make up the Adams battery nor that anyone had ever before suggested that such a battery would have a substantially constant potential, could be operated under extreme temperatures, and could be operated with ordinary or distilled water." (R. 704)

"23. The Adams invention was the first practical, water-activated, constant potential battery capable of operation at low temperatures. When Adams first disclosed his invention to others skilled in the art, he did not know its theory of operation and it was received with considerable skepticism. However, this development was subsequently recognized throughout the industry as an extremely important step in rounding out the sources of battery-furnished power, and filling important, long-standing needs of both civilian and military natures." (R. 704)

53

It is submitted these significant findings are fully sub-
stantiated by the evidence.

## D. The Adams Battery Has New Qualities and Func-
tions That Fill Long Felt Wants

One of the recognized indicia of invention is that the
device in question because of its new and unexpected re-
sults or because of its new quality or function satisfies long
felt needs in the art, and yet consists wholly of components
or substances long known to the art. *Goodyear Co.* v. *Ray-
O-Vac Co.*, 321 U. S. 275, 279; *Great A & P Tea Co.* v.
*Supermarket Equip. Corp.*, 340 U. S. 147, 151-2.

Due to its unusual operating characteristics, the Adams
battery provides an effective source of power for all elec-
trical or electronic systems which require level or constant
current delivery, thereby fulfilling a want in the battery art
that had been in existence for a century or more (R. 115-6,
199, 210-211; PX-18, R. 458, 87; CX-2, R. 440, 8; R. 704).

Almost every conventional electrical device requires a
supply of level voltage and amperage to function effec-
tively. The lights in one's home function at 110 volts and a
minimum amperage, so do all conventional appliances, such
as your refrigerator, washing machine, etc. If the voltage
or amperage drops, the lights dim or go out, the refriger-
ator labors or automatic controls switch it off, the washing
machine will not wash. Up to 1940 only an electric gen-
erator had been a satisfactory supplier of level voltage and
amperage (R. 145, 115, 228; PX-38; This Brief, p. 51).

The Adams battery is the first battery that generates
power *like an electric generator* (PX-18, R. 454, 87). It
produces continuous power, it produces level voltage and
amperage and is completely unaffected by cold down to
60° below zero Centigrade (This Brief, p. 4).

Many of the needs which the Adams battery now fills
had existed for decades prior to Adams. Published state-
ments, by a Government supplier, show the Adams battery
has come to fill a lengthy list of long standing electrical
needs. The Burgess Battery Company has stated (PX-18,
R. 458, 87) that water-activated batteries are used in:

54

"Airborne electronic equipment
Meteorological equipment
Signal lights
Emergency flares
Lights for pilot balloon observations
Marker lights for floating buoys
Light units for movie work
Motors
Radiosonde units for weather observation
Emergency radio equipment
Air-sea rescue equipment
Ignition systems
Emergency lights for hospitals
Direction-finding equipment."

All of the foregoing uses are old. The need for a satisfactory source of battery power for signal lights, emergency flares and marker lights has existed for as long as men have been signalling to each other. The need for lighting floating navigational buoys, lighting and powering sea-rescue equipment and lighting life jackets has existed since earliest times. The need for powering motors and radio equipment is decades old for D-C motors and wireless telegraphy existed before the end of the nineteenth century. Conventional batteries could not fill the aforesaid needs satisfactorily. This was because the requirement in each case was for continuous power, or for level power, or for power that did not halt or decline under very cold conditions, or for very high power under any conditions, and only the Adams battery can fill such requirements, no prior battery could (R. 115-6, 199, 210-11, 292-3; PX-18, R. 458, 87; CX-2, R. 440, 8; R. 704).

Due to the level voltage produced by the Adams battery, its exceptional utility is for powering electronic equipment. The Government's contractor, Burgess Battery Company, has aptly and publicly stated this advantage as follows:

> "Constancy of voltage is an important factor in electronic equipment. In this respect AM Power Units have a definite advantage because they deliver practically constant voltage throughout their service. . . . Moreover, the voltage is not greatly affected by the current drain." (PX-18, R. 454, 87)

This was confirmed by Dr. Mantell in his testimony concerning the importance of level voltage and amperage delivery to prevent fading of radio electronic equipment (R. 114-5, 210-11). It is interesting to note that Adams in his

55

initial disclosures to the Government in early 1942 pointed out to them this precise characteristic of his battery system and its particular utility for powering radio transmitters and receivers (TX-15, R. 415-18, 423-4, 87).

Related to the foregoing is the acknowledged fact that in the Adams battery an exothermic reaction takes place (R. 114, 68). Adams immediately recognized that this made his battery useful for extremely low temperature operations. He reported that fact in his patent filed December 18, 1941 (TX-10, R. 395, lines 10-12, 11):

> "The battery is characterized by a linear potential and will operate successfully under all temperature conditions."

It is this characteristic which permits its low temperature utility and has permitted it to sweep the fields of high altitude meteorological use and arctic use (CX-2c, R. 445, 8; CX-2b, R. 442, 8; TX-2, R. 390, 10; CX-2a, R. 439, 8; R. 257-9; PX-37, R. 463, 202; PX-19, R. 459, 88) (See this Brief, p. 6), but these are very old needs. As Dr. Mantell testified, the need for meteorological information for the guidance of aircraft was great as far back as World War I (R. 259). Balloons and radios for collecting and disseminating weather information were available at that time (R. 259-60) but the battery that could survive high altitude use was lacking. The need for the battery that accomplished the effective powering of this equipment is as old as the history of navigation, whether aerial or naval. It is now admitted that the Adams battery system is unsurpassed for powering such meteorological equipment (R. 259; CX-2a, R. 439, 8; PX-19, R. 459, 88).

But the Adams battery has other extraordinary characteristics apart from producing level power continuously at any temperature. Another characteristic of the Adams battery is that it will produce its total efficiency regardless of the size of the electrical load (amperage drain) imposed on it (PX-18, R. 454, 88; R. 112-13). This was noted by Adams in his earliest disclosures to the Government (TX-15, R. 414-20, 413; R. 207). As seems to be the universal pattern in this case, published statements of the Government and its suppliers now confirm Adams' statement and hail this characteristic as a great contribution.

56

As the Burgess Battery Company has stated publicly:

> "Moreover, the voltage is not greatly affected by
> the current drain. *Increasing the current 16 fold only
> lowers the peak voltage from 1.60 to 1.52 per cell.*"
> (PX-18, R. 454, 87) (Emphasis partially ours).

Dr. Mantell affirmed this by stating that the efficiency
of the Adams battery would remain constant "at medium
loads, high loads, and low loads" (R. 112-3).

In the Adams battery system there is no substantial
drop in efficiency through the imposition of an abnormal
load on the battery, for example, an Adams battery pro-
ducing 110 volts will light with equal brightness either one
110 volt light bulb or 15 such lights in series.  In other
words, it will deliver widely variable amperage on demand,
without a material decline in voltage.  Larger Adams bat-
teries will do the same in infinite multiples.  This truly
remarkable characteristic has made it possible for this bat-
tery to become a light-weight power source for emer-
gency transmitters, D-C motors, light units, and other units
which require a great amount of power to function and
which would normally require a great weight and volume
of batteries for operation.  (PX-19, R. 459, 88; PX-18, R.
454, 87; R. 253-4).

An additional unexpected effect is the curious result of
imposing a combination of the two foregoing conditions
on the Adams battery.  When subjected to both *extreme
low temperature* and *extreme high load,* the Adams battery
maintains its relative efficiency (R. 118-9, 145-6).  It will
deliver *continuous, level* power at *extreme low tempera-
tures* under *extreme high load* without substantial loss of
efficiency (R. 112-15, 118-19, 144-6, 704; PX-18, R. 454-6,
88; PX-19, R. 459-60, 88).  Dr. Mantell testified that no
other battery has this characteristic (R. 119, 209).  It is
this unique characteristic which makes the Adams battery
a source of power for more prosaic and exotic uses than
any other battery.  For the Adams battery can deliver its
unique level *high power* under arctic conditions or as high
in the atmosphere as 100,000 feet *without substantial loss
of efficiency* (PX-18, R. 454-6, 88; PX-19, R. 459-60, 88; R.
113-4, 118-9, 144-6).

What other uses do the unusual characteristics of the
Adams battery permit?  Because the battery can operate

57

on water, the immersion of the battery in water can be used to trigger the battery and thus the battery can be used for emergency signalling and rescue equipment, even where the person involved may be helpless (R. 115-6, 384, 292). And according to statements published by its contractors, this is where the Government uses it, to power lights on life jackets and rafts for airmen and sailors, and to power automatic radio senders that float in the sea and reveal the location of those lost (R. 115-6, 384; PX-18, R. 454, 458, 87).

Because the battery can operate on water, it can be made to operate under water, even in the frigid arctic (CX-2, R. 439-440, 8). And this is where the Government uses it, in its submarines (R. 210, 292-3) and in sonobuoys that signal the location of unfriendly submarines and craft (CX-2a, R. 437-9, 8; R. 384). It has been justly heralded as "unsurpassed" for underwater use (CX-2a, R. 439, 8; R. 254-7).

The foregoing advantages were all pointed out to the Government's experts in the earliest correspondence with the Government in 1942 (TX-15, R. 415-418, 423). They refused to believe that it could operate. Now the Government's position is that it was obvious all along (Gov't. Brief, p. 19).

By virtue of the above, we submit it is proven that the result of the Adams battery system was a new and unexpected quality or function that was unbelievable to battery experts, but not to Adams. He appreciated and understood it immediately and recognized that it filled explicit long felt wants. Truly, the whole of the Adams battery is greater than the sum of its parts, and the result thereof is a significant contribution to useful and scientific knowledge. Adams is thereby an inventor of the first order as the Court below has properly indicated in its decision (R. 704).

## E. The Adams Invention Is Not Anticipated by The Prior Art but Rather Is Validated by It

At the trial the Government cited 24 prior disclosures, some of which dated back to 1880 and most of which were prior to 1900. By citing art in which various elements of the Adams system had been individually used, the Government apparently believed it could induce the Court to find the *combination* to be old.

58

Such citation of numerous and voluminous references has often been taken to be in itself strong evidence of invention.

As was said in *Reynolds* vs. *Whitin Mach. Works*, 167 F.2d 78 at pages 83 and 84 (4th Cir. 1948), *cert. denied*, 334 U. S. 844:

> "Defendant has cited 21 patents as basis for its contention that complainants' invention is lacking in novelty; and this in itself is evidence of the weakness of the contention. Such a citation of so many prior patents almost always means either that none of them is in point and that the patentee has brought together for the purpose of his invention devices to be found in prior patents of different character, or that there have been prior attempts to solve the problem with which he was confronted which have not met with success . . . Patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

The Court below came to this conclusion and cited the above case as support therefor. It stated:

> "The defendant has cited some 24 prior disclosures against the Adams patent. These citations, some of which date back as far as 1880, show that each of the elements of the Adams battery was well known in the battery-making art at least 50 years before the Adams application for letters patent. Adams, after all these many disclosures, put together the specific *combination* of elements that resulted in a lightweight cell which could be exposed to extreme temperature conditions and which, upon activation by water, produced a constant electric potential. The volume of the prior art points to the novelty of the Adams invention. It has been frequently held that voluminous prior art indicates that none of the prior art is in point or indicates that prior attempts to solve the problem have not met with success."
> (R. 691)

It will be established that the voluminous ancient art cited by the Government provides the strongest evidence of invention, (*Smith* v. *Snow*, 294 U. S. 1, 17) since it shows the long existence and availability in the art of all the ma-

59

terials and elements used by Adams to construct his bat-
teries, and the inability of the art to discover how to use
them even singly.  Despite the great long-standing need
for batteries capable of delivering level power, or capable
of delivering continuous power, or capable of functioning
at low temperatures, no one prior to Adams put these ele-
ments together, or suggested that they should be, or ever
imagined or suggested that any combination of elements
could produce a battery having such completely new and
different characteristics from all prior art batteries (R.
704).

The Court below held that this was the fact here.  It
stated:

> "The evidence presented during the trial shows that
> although the necessary materials and techniques
> were available to the battery experts for over 50
> years, no one put them together, or recognized that
> the *combination* would work, or yield new and unex-
> pected results.  Further, the evidence shows that the
> invention constituted an important advance in the
> art and has had many successful uses.  The courts
> have recognized that obviousness is negated where
> the patent teaches a solution which has long eluded
> the researchers in the art, even though all the ele-
> ments required to provide the solution have been
> readily available."  (Citing and quoting from *Good-
> year Co. v. Ray-O-Vac Co.*, 321 U. S. 275) (R. 692).

The art cited by the Government, the art cited by
Adams, and the testimony of Record provide this Court
with the historical background necessary to evaluate and
validate the invention.  It was on the basis of just such an
historical review of the art and the attempts and failures
therein delineated that the Court below decided that Adams
was an inventor.

An analysis of the art shows there is no patent or article
cited by the Government which teaches the combination of
elements used in the Adams battery to produce his new
electrochemical system. (R. 704)

The breakdown of the Government's art is as follows:

(1) Nine of its anticipatory references (DX-2 through
DX-10)[28] disclose batteries with zinc and silver chloride

---

[28] DX-2, R. 515, 380; DX-3, R. 519, 380; DX-4, R. 525, 380;
DX-5, R. 531, 380; DX-6, R. 534, 380; DX-7, R. 539, 380; DX-8,
R. 543, 380; DX-9, R. 546, 380; DX-10, R. 549, 380.

60

as components.  None of these disclose the use of magnesium, cuprous chloride, or activation by plain water.  All of these were characterized by Dr. White, the Government's expert at one point or other in his testimony, as history, or *another* attempt to improve the silver chloride battery.

He referred to DX-1 (R. 505, 380) an 1870 publication, as a history book (R. 346), to the Hayes patent of 1880 (DX-2, R. 515, 380) as an attempt "to improve the so-called chloride of silver batteries which apparently had been well known for some time" (R. 347).  White pointed out that DX-3 (R. 519, 380), another old text book, indicated the silver chloride battery of an earlier reference (DX-1, R. 505, 380) had to be modified to be practical (R. 349).  The modification consisted in adding a conductive electrolyte (R. 349).  To the same effect were his comments on DX-4 (R. 525, 380), an old text by Carhart (R. 350-1).

Both DX-5 (R. 531, 380), the Barrett patent, and DX-6 (R. 534, 380), the Hard patent, were characterized as "another method of applying silver chloride" or "an improvement in an existing battery" (R. 352-3).  To the same effect were his comments on DX-7 (R. 539, 380) and 8 (R. 543, 380) (R. 354-5) and finally in relationship to DX-9 (R. 546, 380), the old Fink patent, Dr. White summed up as follows, "This is another attempt to improve the so-called chloride of silver batteries" (R. 355).  The import of all of this testimony was that there were not any good silver chloride batteries, and the last one was patented in 1894.  There is no evidence such batteries have been used since that date.  The Mullen and Howard reference cited to the Court by Adams was published in 1946 and discussed these silver chloride batteries, as follows:

> "The usefulness of silver chloride as a depolarizer has not previously been exploited further than use as reference electrodes and one type of voltaic cell.  This cell was of the pasted silver chloride-zinc type made similar to the Leclanche dry cell.  Probably the main reason for lack of exploitation was due to low voltage of 1.0 volt per cell and low ampere discharge rates.  No work had been done on use of other negatives such as magnesium to increase the voltage of such a system and render it more widely useful . . ." (PX-39, R. 467, 468, 251)

(2) Four of the Government's anticipatory references (DX-12, 13, 14 and 17, R. 565, 381; 568, 381; 572, 381; 587,

61

381) disclosed batteries with magnesium as a component. *None of these references disclose the use of silver or cuprous chloride alone as an electrode* and all of them disclose that it is difficult to use magnesium in a battery. Each one successively in point of time shows that the previous one failed to solve the problem of employing magnesium in a battery. There is no evidence that any of these batteries operate or are presently in use.

(3) Three of the Government's anticipatory references (DX-18, 20 and 21, R. 589, 381; 597, 381; 601, 381) disclose the use of cuprous chloride in conjunction with mixtures of other materials, including acids and bases which would destroy its chemical identity (R. 383-4). None of these references disclose the use of cuprous chloride alone (or mixed with carbon) or its use in conjunction with magnesium. The dates of these references are 1895, 1891 and 1888. There is no evidence that any of these batteries operate or are presently used.

(4) Two of the Government's anticipatory references disclose the use of neither magnesium, cuprous chloride nor silver chloride (DX-22 and 23, R. 615, 381; 618, 381).

Therefore a total of 18 of the Government's anticipatory references disclose either none of the components of the Adams system or one single component of the system. None of these 18 references disclose the combination.

To remedy the devastation to its own case caused by its shotgun approach to the art, the Government now rests on four references, as follows:

1. The 1880 patent to Skrivanoff (DX-19, R. 591, 380) referred to in the Government's brief at pp. 8, 15-18.

2. The 1880 textbook of Niaudet (DX-1, R. 505, 380) referred to obscurely as "an 1880 treatise" in the Government's brief at p. 7.

3. The 1883 patent to Hayes (DX-2, R. 515, 380) referred to in the Government's brief at p. 7.

4. The 1929 textbook of Codd (DX-11, R. 553, 380) referred to in the Government's brief at pp. 17, 21 as a "1929 treatise".

In its brief the Government argues these references at face value. It never informs this Court of what the

62

testimony showed concerning them, or what other references put into the record by both Adams and the Government taught concerning them, their operativeness, and what they taught the art, if anything. From the Government's Brief one would think there had never been a trial. The Government asks this Court not to take over the fact finding function of the Commissioner or the Court of Claims, but rather to take over the function of an *ex parte* patent examiner.

On the above references it alleges first that the Adams combination is not *new,* citing 35 U. S. C. § 101. But the Government had admitted all along, up until now, that the Adams combination was specifically new. In its Petition (p. 11) it stated:

> "It is true that Adams put together elements not actually combined before and obtained more favorable results, for some purposes, than had prior combinations."

The Government urges that the Skrivanoff reference shows the Adams combination is not *new.* But Skrivanoff, if it works, is a "bell-ringing" battery (R. 370, 591). It will not give continuous, level power at any temperature and it shuts off when you release the bell. Thus, its operating characteristics are entirely different from Adams (R. 145, 132, 370).

If Skrivanoff's battery had Adams' combination, it would have Adams' characteristics. However, the Government says in its brief, "The Adams claim was, in essence, the combination of magnesium and cuprous chloride as the principal functional elements of the electrodes, and in this respect Skrivanoff *fully anticipated* Adams." (Govt. Brief, p. 16) [Emphasis ours]. Thus the Government's position is that Skrivanoff teaches (1) a magnesium electrode and (2) a cuprous chloride electrode. Let us analyze these in reverse order.

First, it is not true that the Skrivanoff patent teaches cuprous chloride as one electrode. The electrode in Skrivanoff is a *carbon* or *copper* electrode faced with a paste of phosphoric acid, amorphous phosphorous, metallic copper in spangles, and cuprous chloride, mixed together with sulfuric acid and applied *hot* to the carbon and covered

63

with blotting paper impregnated with concentrated zinc chloride and sulfuric acid (R. 593).

Dr. White, the Government's expert refused to state that the Skrivanoff electrode mix still contained cuprous chloride after being mixed with phosphorous and sulfuric acid, as follows:

> "Q. Have you any information as to what the residual product, after the combination is made, would contain, and would it still contain cuprous chloride?
> "A. I have the disclosure of the patentee, and that is all the information I have." (R. 383-4)

*There is no evidence in the case that the Skrivanoff electrode, when completed, contains cuprous chloride.*

Further, the so called "cuprous chloride" electrode of Skrivanoff caught fire when put together. Adams' expert tried to make the Skrivanoff electrode (The Government's expert did not (R. 383)) and stated:

> "Q. Doctor, did you test or put together the combination described in the Skrivanoff patent concerning the mixture shown on page 2?
> "A. I tried to put the mixture shown on page 2 of the protochloride of copper, phosphorous, amorphous, phosphoric acid, and metallic copper, in spangles. It says that sulphuric acid has to be added to give the paste a sufficient consistency. I had two fires, and blew the side out of a vent." (R. 388)

One may properly ask, how much would one learn about cuprous chloride as an electrode material from the above experience? The answer is given by the Government's own cited case:

> "And a prior unsuccessful experiment does not constitute invention and cannot therefore be an anticipation." *Pacific Contact Labs., Inc. v. Solex Labs.,* 209 F. 2d 529, 532 (9 Cir. 1953), *cert. denied,* 348 U. S. 816. See also: *Smith v. Snow,* 294 U. S. 1, 17.

Lastly, the Government argues that Adams teaches mixing carbon and cuprous chloride (Gov't. Brief, p. 15) and therefore is like Skrivanoff's mixture of seven substances. But Adams' Claim 1 does not include carbon. The answer to Skrivanoff is, of course, that Adams is not like Skrivan-

64

off in any respect because, with or without carbon, Adams (1) doesn't explode, and (2) works.

Second, it is not true that Skrivanoff teaches the art how to use magnesium in a primary battery. Dr. Mantell's testimony on what happened to him when he made the electrode containing seven materials plus cuprous chloride, is recounted above. Now let us find out what happened to him when he also took magnesium and tried to put the entire battery together. He testified:

> "When I took the mix which was made and tried to make a battery, and then added the electrolyte on the other side, concentrated chromic acid, and then added potassium permanganate, I did not know what I had because it blew up." (R. 388)

The true relevance of Skrivanoff is that it is another ancient failure. It is part of the historical background showing the confusion in the art prior to Adams.

Other and later art put in by the Government showed that the art, prior to Adams, never learned how to use magnesium in a primary battery. The Government cited the 1928 patent to Wood (DX-12, R. 565, 380) which taught, as of that date, that "it has been generally accepted that magnesium could not be commercially utilized as a primary cell electrode" (R. 565) for the reason that it corrodes too rapidly in electrolytes (R. 565). Next the Government cited the 1929 Codd textbook (DX-11, R. 553, 380) which it asserts teaches the substitution of magnesium for zinc in a conventional cell using sulfuric acid as an electrolyte (Govt. Brief, p. 21.) This is not true. What Codd is showing is a test method of measuring electromotive force. In a test cell it is only necessary that the magnesium survive for a matter of seconds in order to permit a measurement of the electromotive force to be made. There is no teaching in Codd, as of 1929, that magnesium could be substituted for zinc in a practical battery. This is proven by the later Jumau patent of 1937 (DX-14, R. 572, 380) which taught that magnesium cannot be used with an acid mix. Jumau states "it is, therefore, not necessary to use an acid or basic electrolyte which would *attack the magnesium* in open circuit." (R. 572, col. 2, lines 12-14 [Emphasis ours]). Dr. White admitted that an acid or basic electrolyte would attack the magnesium (R. 363). This was confirmed by the

65

testimony of Dr. Mantell who stated that magnesium was a
highly corrodible material and as of 1940 could not be used
in a conventional cell (R. 243). Further, Jumau itself (DX-
14, R. 572, 380) which pretended to teach the art how to
employ magnesium in a battery, as of 1937, proved to be
inoperative (R. 388). Adams put in the Mullen and Howard
article (PX-39, R. 468, 251) of 1946 which taught that no
work had been done up to World War II to solve the prob-
lem of using magnesium as an electrode in a primary cell
(R. 243). It was in relationship to this reference that the
Government's own expert, Dr. White, testified that *it was
not within the skill of the art to substitute magnesium for
zinc in 1939* (R. 362)

What does the aforesaid analysis of the Government's
art on the use of magnesium prove? The Government has
cited so many references by years from 1888 up to date that
each one establishes that no previous reference ever taught
the art how to use magnesium in a battery until Adams did
so, and finally the Government's expert admitted this to be
true.

What the Government's art shows is that in 50 years of
experimentation, the art moved away from the direction of
Adams, it never learned how to use magnesium. It was only
Adams who solved the basic problem by going back to first
principles and producing the first battery which did not
respond to Volta's theory whereupon the problem of using
magnesium was solved, the problem of using cuprous
chloride successfully was solved and water suddenly be-
came useful. All the jack straws fell into line at once. The
line of patents cited by the Government stretching over a
period of 50 years is the best evidence in the case that
Adams is a pioneer inventor.

The Government asks where is the invention in making
the Adams battery over Skrivanoff (Govt. Brief, p. 16).
The answer is, in ignoring it.

As a result of all of the above, the lower Court properly
found:

> "17. The Skrivanoff foreign patent discloses a bat-
> tery having an electrode of magnesium, an electrode
> comprising cuprous chloride *mixed together with*
> some seven other substances, and a strong elec-
> trolyte. The evidence establishes that the disclosure
> of this very old patent is inoperative." (Find. No.
> 17, R. 703)

66

The next two references relied on by the Government are the 1880 Niaudet text (DX-1, R. 505, 380) and the 1883 Hayes patent (DX-2, R. 515, 380). Neither of these references shows the use of either magnesium or cuprous chloride.

Both references teach zinc and silver chloride as electrode materials. The record establishes that the zinc-silver chloride battery is an entirely different battery than the magnesium cuprous chloride Adams battery (R. 131-2). The zinc-silver chloride battery is a conventional intermittent use battery, or "bell-ringer", not a continuous action Adams battery (R. 131-2).

The Government argues it is obvious to create the Adams invention by making substitutions of "equivalent"[29] materials in Hayes. There is a difficulty with this, the Government's sole expert on the subject testified specifically that it was *not*.

On page 362 of the Record, the Government's counsel questioned Dr. White, its expert, as follows:

"Q. I would like to ask you this question: I would like to ask *whether* in your opinion *it would be within the skill of an expert* in your field *to substitute magnesium for the* element *zinc* in the electrode C, shown *in the Hayes patent?*

"A. It certainly would be.

"Q. In your opinion, would it have been within the skill of one skilled in the art by around 1937 or 1938?

"A. In view of all the references *except this particular one.*

"Q. When you say 'this particular one' you mean what?

"A. *That is the Mullen-Howard article, but I do not know the date.*" (Emphasis ours)

The Government's expert knew well from having heard the previous testimony of Dr. Mantell on the subject, (R. 243) that the Mullen and Howard article (PX-39, R. 467, 251) said that:

"The usefulness of silver chloride as a depolarizer has not previously been exploited further than use

[29] The non-existence of equivalency of the relevant materials is fully set forth in this Brief, p. 59.

67

as reference electrodes and one type of voltaic cell. This cell was of the pasted silver chloride-zinc type made similar to the Leclanche dry cell. Probably the main reason for lack of exploitation was due to low voltage of 1.0 volt per cell and low ampere discharge rates. *No work had been done on use of other negatives such as magnesium* to increase the voltage of such a system and render it more widely useful . . ." (PX-39, R. 467, 468, 250-1) (Emphasis ours)

It is clear from the above that in view of this reference (the date of which was *after* 1938, i.e., 1946), Dr. White *could not truly conclude that it was within the skill of the art* to substitute magnesium for zinc in batteries in 1937 or 1938. After this direct testimony of Dr. White, the Government never again referred to the Mullen-Howard article in any further testimony. It is submitted that it is a travesty to request this Court to find the Adams invention anticipated in view of such a Record. The Government argues the Hayes patent in its Brief, but doesn't tell this Court what *its own witness said about it*. The Government's position is destroyed by its own proofs.

The last reference relied on by the Government in its Brief (pp. 17, 21) is the Codd textbook of 1929 (DX-11, 553, 380).

The Codd reference is a lengthy text written in 1929 (R. 553). The relevant pages of Codd are brought together in the printed record purely as a result of the omission of the intervening pages (and their numbers) by printer's convention. In cataloging different batteries and discussing them, it refers to magnesium on its page 22 (R. 554) and in discussing another battery entirely on its page 44 mentions silver chloride (R. 558), and no where suggests that any one had ever put them together, or that anyone ought to put them together.

The 1929 Codd reference is probably the most devastating answer to the Government's case imaginable. For although the Government doesn't mention it, Codd, at page 78 (R. 559) in his book, far removed from his comment on *magnesium* at page 22, and far removed from his remarks on a *silver chloride* battery at page 44, discussed another type of battery and there showed that the art was still highly desirous of creating a *water* activated battery in 1929, but didn't know how to do it except by secreting an

68

electrolytic material in the battery prior to adding water. At R. 559 Codd states:

> "*Inert Cells.*
>
> Before terminating this chapter, mention must be made of an important branch of dry cells, that is, the inert cell, which is virtually a dry cell put up without the moist paste in place, and with one of the vent holes enlarged to form an opening large enough to carry a small cork (Fig. 40). Although the paste is omitted as such, the excitant salts are left in place within the cell, and in some cases the desiccated components of the jelly. Under these conditions the cell will store in good condition for very long periods, and when it is required to put the cell in action it is only necessary to add water through the vent (having removed the cork) till the cell is full, using for the purpose a small glass syringe similar to that used to fill a fountain pen."

Thus, in one text, circa 1929, only 10 years before Adams, a well known electrochemist mentions magnesium and silver chloride and never suggests that anyone put these substances together, or that they should be put together, or that if they were anything extraordinary would happen, or that they could be activated with plain water. It is submitted that *the vacancy of the art immediately prior to Adams'* entrance on the scene is thereby established by Codd.

However the Government urges the Codd reference in a slightly different manner. In its Petition on this subject it said that the Adams contribution resided merely in the substitution of known equivalents in a prior art battery, citing *Dow Chemical Co. v. Halliburton Oil Well Cementing Co.,* 324 U. S. 320, 330. It further argued, on the same authority, that even though better results may be produced by such a means, *Dow* and other decisions of this Court establish that this does not constitute invention (Pet. p. 8). To reach this conclusion, it suggests that Codd teaches the equivalency of cuprous chloride for silver chloride and zinc for magnesium (Govt. Brief, p. 21).

As to the first, the Government is in no position to urge that cuprous chloride and silver chloride are equivalents before this Court. Before the trier of the facts, the Government opposed all of Adams' requested findings of fact

that the substances were equivalents (R. 629-33, 637-40) whereupon the trier of the facts refused to find that the substances were equivalents (R. 644-5). Neither side excepted and the Court of Claims affirmed (R. 689). It is submitted that since the Government induced the Commissioner to decide this question of equivalents as he did, that should have ended the matter. Adams has moved to dismiss the Petition herein because of the Government's reversal of position on this fact question (This Brief, pp. 88-93).

Should this Court determine that the Government has reversed its position, it is submitted that the Petition should be dismissed. Should this Court determine that the Government is free to urge equivalency, and that cuprous chloride and silver chloride are equivalents, this Court must then address itself to the issue of the Government's infringing use of magnesium-silver chloride batteries, for there is *no art that anticipates either magnesium-cuprous chloride batteries or magnesium-silver chloride batteries.* Both types of water-activated batteries are *sui generis* both as to novelty of composition and as to novelty of operating characteristics. (R. 146, 209)

As to the allegation that magnesium and zinc are equivalents, the record in this case disposes of that question. See this Brief, pp. 42-44, 64-65. The Government's own expert, on direct, stated that it was not within the skill of the art to substitute magnesium for zinc in 1939 into the Adams battery combination (R. 362). The Government's own exhibits show that as of ten years before the Adams invention, despite multiple efforts by the art, no one knew how to employ magnesium in a practical battery (DX-12, R. 565, 380), and "it has been generally accepted that magnesium could not be commercially utilized as a primary cell electrode" (R. 565, lines 12-15). Further that magnesium will corrode so rapidly in all commercially used primary cell electrolytes that the cell becomes valueless in a few hours (R. 565, lines 48-54). Even as late as 1937, according to the Government's cited art, no one knew how to make a successful battery with magnesium (R. 388; *Jumau,* DX-14, 572, 380), for Jumau was also a failure (R. 388). This situation continued to prevail up to the beginning of World War II (R. 243; PX-39, R. 467, 251). The proofs further show that magnesium and zinc are not chemical equivalents. In Defendant's Exhibit 16 (R. 582,

70

585, 380), it is shown that magnesium is an *alkaline earth metal*. The Government's expert so testified (R. 364) and excluded zinc from the category (R. 364). Zinc is shown to be one of the low melting metals by DX-16 (R. 585). The only thing zinc and magnesium have in common is they are both metals.

Adams' expert testified that the zinc-silver chloride system is an entirely different type of battery than the magnesium-cuprous chloride system of Adams (R. 131-2). When zinc is substituted into the Adams battery the result is a conventional intermittent use battery, another "bell-ringer," not a continuous action Adams type battery (R. 131-2). Adams himself testified that he tried zinc in his battery and it failed (R. 41). The fact testimony of both sides concurs that zinc and magnesium are not equivalents in the Adams battery system.

Moreover the fact testimony of both sides concurs that when both acts of substitution are reversed—i.e. zinc is substituted for magnesium and silver chloride for cuprous chloride, the resultant battery is entirely different in operation than the magnesium-cuprous chloride battery. A zinc-silver chloride battery is a bell-ringer, it gives intermittent power, declining current and fails in cold weather. A magnesium-cuprous chloride battery gives continuous power at a constant level at any temperature (This Brief, pp. 4-10).

Dr. Mantell, Adams' expert, testified:

> "Q. Doctor, is this zinc-silver chloride system the same electrochemical system as the magnesium-cuprous chloride-water system?
> "A. No, it is not. This is a bell-ringing type of battery." (R. 132)

If the substances were equivalents as the Government says they would produce the same type of battery. The reason they do not is because the substances are not equivalents.

These observations not only dispose of Codd, they also apply to and dispose of the other two references relied on by the Government, Niaudet (DX-1, R. 505, 380) and Hayes (DX-2, R. 515, 380), this Brief pp. 64-65, for both of those are also zinc-silver chloride batteries.

Later in its Brief, the Government urges Codd in another and more subtle manner. Indeed the manner is so

71

subtle that the Government identifies the reference only by indirection.

It says:

> "If the Adams battery contained any innovation at all, it was in the 'new' combination of magnesium and cuprous chloride electrodes." (Govt. Brief, p. 20)

and later,

> "Indeed, all the elements of the Adams electrodes appear on charts reproduced in the 1929 Treatise cited in the statement (R. 556, 562)." (Govt. Brief, p. 21)

Will this Court believe it, that despite the above statement, *nowhere* in the "1929 treatise" (i.e. Codd) is there any mention of *cuprous chloride*. It is just not there.

It may be that the Government believes this Court will note at record page 562 the listing "copper (cuprous)" and hopes that this Court will not realize that "copper (cuprous)" merely means monovalent copper. Or perhaps the Government hopes that this Court will interpret "copper (cuprous)" to be the same as cuprous chloride, *which it is not.*

The Government adds to the above argument by saying in its Brief pages 21 and 22 that the Codd reference (DX-11) is really a series of charts or lists and that picking magnesium and cuprous chloride from such lists, is not invention, despite "the fact that wholly unexpectedly, the battery showed certain valuable operating advantages over other batteries" and states that these facts are analogous to *Sinclair & Carroll Co.* v. *Interchemical Corporation*, 325 U. S. 327, 331, where a patentee selected his solvents from "a catalog of a chemical manufacturer" and therefore Adams is invalid. (Govt. Brief, pp. 21-22).

*First*, we have pointed out Codd *does not disclose* cuprous chloride.

*Second*, as the Government's brief notes, in *Sinclair* "the patent in suit was not the product of long and difficult

72

experimentation"[30] but contrary to the Government's position in its Brief, in Adams, it *was* (R. 40-53, 106-7).

*Third,* in *Sinclair,* the patentee admitted that he knew the *properties* of the material he wanted, and he went to a list that *he had* that showed the properties of various materials, and selected the material from it (325 U. S. 327, 332, 333) and this Court in *Sinclair* cited the *record of testimony* to prove it. Here the Government never cites the record of testimony, or anything else, to show that Adams selected any substances from a list. For the import of *all* the testimony and *all* of the Government's exhibits was that

> 1. No one knew how to make magnesium work in a battery
>
> 2. Everyone knew cuprous chloride was dangerous, and it hadn't been used since 1895
>
> 3. Everyone knew water could not activate a battery.

*Fourth;* Where is the list?

In the *Sinclair* case, as aforesaid, the patentee knew the characteristics of the substance he desired. He took a list and found the substances having those characteristics set forth in the list. Where is the list for Adams?

If there was such a list, would it not show?

MAGNESIUM:  Not useable in batteries because it is destroyed by the electrolyte before it can produce electricity.

CUPROUS CHLORIDE:  Not shown in the list.

WATER:  Not useable in batteries because it will not conduct electricity.

As aforesaid, the several pages cited by the Government from the lengthy textbook by Codd are widely separated in the original text and brought together in the

---

[30] In any event, the Reviser's Note, 35 U. S. C. 103 shows that in this respect *Sinclair* is no longer law. In referring to the last sentence of § 103 that Note states: ". . . it is immaterial whether it [the invention] resulted from long test and experimentation . . .".

73

printed record by elision and the omission of the original page numbers. At one page, magnesium is mentioned on a list (R. 556) and so is potassium and sodium, and if anyone puts any of those in an electrolyte, or in water, as any high school student of chemistry knows, he is either going to get a fire or an explosion (sodium and potassium) or nothing (magnesium).

At another place, many pages removed from the foregoing in the original text, Codd mentions "cuprous copper" or monovalent copper and shows it can be deposited electrochemically (R. 562). This may be a disclosure of cuprous *chloride* to the Government, but Adams can't find cuprous chloride any place on R. 562. Then at another place pages away in the book, silver chloride is mentioned (R. 563). This might have some relevance if the Government had ever called them equivalents at the trial, but it admits it didn't (R. 637).

At another place, equally removed from the others, Codd shows how the electromotive series is computed (R. 554). He refers to the Voltaic cell and shows that zinc is attacked by sulfuric acid, but shows a potential. Then he substitutes magnesium for zinc and gets a higher potential (R. 554).

Therefore, suggests the Government, magnesium is a substitute for zinc. But the Government forgets it also showed the court in another reference, the Wood patent, issued within a year of Codd (DX-12, R. 565) that:

> "it has been generally accepted that magnesium could not be commercially utilized as a primary cell electrode." (R. 565, lines 12-15) because the corrosion of the magnesium in even weak electrolytes like ammonium chloride is so rapid ". . . the cell becomes valueless in a few hours, even on open circuit. *The same disadvantage applies to all the commercially used primary cell electrolytes.*" (R. 565, lines 48-54) [Emphasis ours]

The Codd textbook teaches how to measure the potential of magnesium, a matter that takes a few seconds before the sulfuric acid destroys it. The Wood patent teaches you can't make a battery out of it. The inoperative Jumau patent of 1937 reenforces this conclusion (R. 388).

The answer to the Government's position is given by its own *reductio ad absurdum*. It should be known that

74

the electrochemical series (which is the "list" shown in
Codd at R. 556) is merely a partial compilation of the
periodic table which is reproduced in the Hopkins refer-
ence (DX-16, R. 585, 380). The periodic table has been in
existence since 1859, the electromotive series came shortly
after.

There, in the Periodic Table, are listed all the known
elements as of 1946, 92 in number (R. 585). Even today
there are only 112 known elements, and as the Government
says in its Brief, of a like chart "the art knew of a finite
interchangeable list of substances" (Govt. Brief, p. 18) and
suggests all one has to do is to select the ones one wants
and make use of their known, established and immutable
properties. One might pick out 4, 5 or 6 elements from the
chart, combine them and cure cancer, or choose others and
conquer mortality. The Government has established that
chemical invention is no longer possible. Everything is on
that list someplace and all you have to do is select what
you want. This one chart, brought up to date, anticipates
every chemical compound that will ever be discovered.

The Government apparently does not agree with this
Court's statement in *A & P* that:

> "Elements may, of course, especially in chemistry
> or electronics, take on some new quality or function
> from being brought into concert, but this is not a
> usual result of uniting elements old in mechanics."
> (340 U. S. 147, 151-2)

*Sinclair* stands for the proposition that one cannot pick
the novel substance off a list, but *Sinclair* doesn't suggest
that an inventor is anticipated by someone else's combining
chemical encyclopedias *ad infinitum* by hindsight and find-
ing that almost every chemical substance used in an inven-
tion is listed someplace. Particularly where the art not
only did not teach that the substances might be put together,
but affirmatively taught that they could not be used.

What is the true significance of Codd in this Case? It
is known from other exhibits and the testimony of both
sides that all the elements used by Adams were individually
old before 1888. Finally in 1928, the Codd reference showed
that somebody put *almost* all of them together, i.e., *in a book,
but not in a battery.* This is the best the Government can
do and it is submitted that there could be no more con-

75

clusive showing of the poverty of the art than this last and most heavily relied on reference.

The Government nevertheless insists that the Adams invention does not meet the condition for patentability set forth in 35 U. S. C. § 103[31] (Govt. Brief, p. 19) in that it was "obvious".

The Government's expert, however, a man with long experience in the battery field, could not explain why it had taken so long for the combination to be made, were it obvious. He was asked:

> "Q. Doctor, how is it that it took a man skilled in the art, I think you said, until 1938, to put the combination together, where all the components had been known in the art since 1888 for the last one? How do you explain the time lapse of 50 years or a half century?
>
> "A. I think this can't very well be answered. Maybe there was no need for it. Somebody has to have the need and the opportunity. I don't know.
>
> "Q. You don't know?
>
> "A. That is right."  (R. 382)

It is established in this Brief, pp. 4-10, 53-57, that the need for the Adams battery existed many, many years before it was filled, and the opportunity to put together the simple components that filled it, existed for more than 50 years. What was lacking was not "need" or "opportunity" but *"genius"* and that Adams supplied.

This Court has long recognized that when the solution to a pressing problem has long escaped the art although all the elements required to fashion the solution have been readily available, invention is present and "obviousness" is negated.  *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.,* 321 U. S. 275, 279, is a leading case in point. So is *Loom Co. v. Higgins,* 105 U. S. 580, 591. This law has not changed in eighty years.

---

[31] "§ 103. Conditions for patentability; non-obvious subject matter.

A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

76

The decision of the Court below is in careful accord with this Court's decisions and with the Statute in that it found that the invention *as a whole* was not obvious (R. 704). It is submitted that the Court below is right. This is borne out by the fact that even after Adams disclosed the elements used in his battery, the experts in the Signal Corps Laboratories could neither believe it nor were they satisfied. They had Dr. Shorr conduct hundreds of experiments using countless combinations of different elements only to learn that it was the Adams combination, and *only* that combination, which would produce his new battery system (R. 218-227; TX-12, R. 404-6, 11). The experiments conducted by Dr. Shorr, the battery scientist employed by the Government at Fort Monmouth (R. 11) are like the prior art cited by the Government in that one of the Adams elements are selected and combined with some other elements to make a battery. The testimony on Shorr's laboratory notes discloses that none of these experimental combinations were any good and Shorr concluded that it was only the Adams battery system that he found feasible (R. 219).

What then does the prior art teach? It teaches one to experiment like Shorr and fill a notebook full of failures.

That the Adams combination is specifically new is proven by the fact that no prior art battery operates like the battery that Adams built. That it is unobvious is proven by the fact that conventional battery experts could not believe it worked when they saw it operating.

The Government has failed to answer this proposition and thereby has failed to establish lack of invention for the Adams patent.

### F. The Unobviousness of the Adams System Is Further Proven by the Government's Admitted Surprise and Disbelief

In August 1950, well before the filing of this suit, Dr. Adolph Fischbach, an employee of the Battery Division of the U. S. Signal Corps at Fort Monmouth and the man with whom Adams conferred on numerous occasions in 1942 and 1943 concerning the Adams battery (R. 71, 76, 84), published an article entitled "Special Purpose Batteries" in the August 1950 issue of *Electrical Engineering*. He said on pages 701-702 thereof that:

77

> "Work on the development of the magnesium,
> water, cuprous-chloride system was first started in
> the early part of 1946. Early tests had indicated its
> possibilities as a relatively inexpensive high-capacity
> battery. *Although the system was first thought to*
> *be impractical for battery applications due to its*
> *initial self-discharge and evolution of heat,* the Sig-
> nal Corps, by continued effort in its Engineering
> Laboratories, developed a practical operating cell."
> (Emphasis ours) (PX-16, R. 450, 85)

This is an admission against interest that when Adams
brought his battery to the attention of the "experts" at
Fort Monmouth in 1942 they did not believe the battery was
operative because it functioned continuously rather than
intermittently and had an exothermic reaction. As we now
know, these two unexpected results of the Adams system
provide the battery with two of its most important advan-
tages, continuous power with level or linear potential and
capacity and excellent low temperature operation charac-
teristics (This Brief, pp. 4-6). Fischbach confirmed this
in the same article wherein he also said:

> "Standard-type primary and secondary batteries are
> unsatisfactory for certain types of Army and Air
> Corps equipment and, consequently, special purpose
> batteries suitable for these particular applications
> had to be developed. This article describes three
> systems which have been found to be the most effec-
> tive at the present time." (PX-16, R. 448, 85)

and later:

> "Of the three afore-mentioned systems, the mag-
> nesium, water, cuprous-chloride system seems to offer
> the best solution for some of the specialized applica-
> tions, particularly those where the battery has to be
> stored for long periods of time; where the battery has
> to be easily activated at the time it is required for
> operation, where the power can, or will, be used
> within a comparatively short time after activation;
> and where the capacity required per unit of weight
> and volume is exceptionally high. The battery must,
> of necessity, be activated at more or less normal
> temperatures (above the freezing point of water).
> Since heat is generated during the course of the dis-
> charge, this system can be utilized in powering equip-

78

ments going into cold temperatures, if the proper
heat balances are maintained.'' (*Id.* at R. 449)

Dr. Fischbach further confirmed this in 1953 when he
issued his U. S. patent No. 2,636,060 (TX-2, R. 390, 9-10)
which covered the same battery as Adams patented in 1943,
now in suit.

The Fischbach patent[32] states:

> ''This invention relates to primary cells, of the
> deferred action type, using the electro-chemical sys-
> tem magnesium-water-cuprous chloride.
> ''Magnesium-cuprous chloride batteries have at-
> tained considerable importance, particularly as 'me-
> teorological' or 'one-shot' batteries, due to their high
> capacity per unit of weight and volume, their excel-
> lent operating characteristics even at low tempera-
> tures (linear potential and capacity), their ease of
> activation with water as electrolyte and their low cost
> of manufacture.'' (*Id.* at R. 390)

Thus, in his article, and in his patent, Fischbach con-
firms that first, he did not believe the Adams battery would
work when Adams demonstrated it to him because it could
not be stopped and because it boiled, and second, that Fisch-
bach now considers it an invention and extols it in his patent
and points out the same advantages of level power (linear
potential and capacity) and excellent low temperature per-
formance that Adams told him about ten years before (R.
71, 76, 84; TX-15, R. 421-7, 413).

The disbelief and lack of understanding on the part of
the experts is further evidenced by the comments of Dr.
Vinal of the National Bureau of Standards (TX-12, R. 401-3,
11), whom Dr. Mantell identified as ''one of the outstanding
battery experts in the world'' (R. 217). On December 16,
1942, he is reported to have commented adversely on Adams'
claims of operation at –40°F., to have criticized Adams and
the graphs (curves) submitted by him because ''they have
been drawn with a ruler'' (TX-12, R. 402, 11). Vinal
stated that the Adams cell might be of the type which ''runs
away as a result of local action when over-taxed'' (R. 216-9)
and that ''there is no point in saying that it is 'based on a
new type of electrochemical action''' (TX-12, R. 402, 11).

---

[32] This patent is assigned to the Government.

79

These comments show that Vinal doubted Adams' claims of (1) low temperature capability (2) level delivery of power, and (3) believed that the fact that Adams battery would deliver continuous power under load merely meant that the battery "runs away . . . when over-taxed" (R. 216-9).

Even this great battery expert, with all of his years of experience, could not believe that the Adams battery worked as described, or that the Adams cell was based on a new type of electrochemical action as the testimony now shows is true (R. 206-7, 216-7, 209, 253, 257, 264; PX-18, R. 454, 87; R. 119, 41, 698-9, 704).

Dr. Mantell commented on Vinal's views and at R. 217 made a remarkably succinct statement which summarizes the heart of the Adams case. In discussing the Vinal remark that the Adams cell which may be of the type which "runs away" Mantell said:

> "It is interesting to note that all of our battery philosophy up to this time indicated that the battery should be designed not to rise in temperature, but be designed primarily for intermittent service. That is what a battery was good for, and that when you used it in continuous service, the battery would polarize and lose voltage, and it was considered that a battery system consisted of electrodes, with electrolyte, and the electrolyte should be a conductor.
>
> "He [Adams] comes along and says: 'I don't do that,' and naturally he is received with skepticism, particularly by a man who was one of the outstanding battery experts in the world, and who has probably tested and examined more battery systems than anybody else." (R. 217)

The disbelief of the Government's experts was underlined by the reactions of Dr. Mantell to the substance of the initial Adams disclosure to the Government. At R. 206-9 Dr. Mantell was handed a copy of TX-15, pp. 1-5, the first Adams disclosure letter of January 7, 1942 addressed to the Government, and was asked to comment on each of the claimed characteristics of the Neutro Cell listed on page 2 of that letter. As to each one he stated that the claimed characteristic was true and that if he had been told in 1940 of a battery having this characteristic he would have been highly skeptical.

80

In summary he was asked the following:

> "Q. Doctor, if somebody had come to you in 1940 with page 2, the whole page, would you have believed what was on there?
> "A. I would have had considerable difficulty in making myself believe it, and I would not in general have believed it." (R. 209)

Thus we have a picture confirmed by all sources, the Government's employees, Adams' expert, the Government's contractors, independent experts and observers, to the effect that none of them could believe that this simple combination of materials could result in a new battery system and moreover that the effects and results of such a system were so astonishing that they caused further surprise and disbelief to the point where according to Dr. Fischbach the system had initially been considered impractical (This Brief, pp. 76-80).

A greater tribute to the pioneering quality of Adams' work is hard to envision. To say that this invention was obvious is to fly in the face of proof corroborated beyond any reasonable doubt.

The lower Court has expressly found that:

> "When Adams first disclosed his invention to others skilled in the art, he did not know its theory of operation and it was received with considerable skepticism. However, this development was subsequently recognized throughout the industry as an extremely important step in rounding out the sources of battery-furnished power, and filling important, long-standing needs of both civilian and military natures." (Find. No. 23, R. 704)

Once again, the Finding is fully reflective of the Record and of the applicable law.

## G. Unobviousness Is Established by the Lack of a Scientific Theory to Explain the Operation of the Adams Battery System

Inventors in the employ of the Government's battery contractors, specifically the eminent Dr. Chubb of Eagle-Picher, have stated publicly in patents applied for in 1952 (PX-41, R. 494-6, 264) and 1954 (PX-40, R. 490-1, 264) that:

81

"The exact nature of the complex chemical cur-
rent-producing reactions of this type of cell [magne-
sium-cuprous chloride] is not known in any substan-
tial detail and much of the development has
necessarily depended upon the employment of purely
empirical methods." (PX-40, R. 491, 264).

He also stated:

"In practice, however, the reactions do not cor-
respond to any simple theory . . ." (PX-41, R.
496, 264).

Dr. Mantell commented on the above and on his own
knowledge concerning the Adams battery system and in
relation to Dr. Chubb's remarks stated:

"He goes on in effect and says:

'We don't have an adequate theory and we do
not have any positive evidence which would say:
"All right, all you have got to do is to put them
together and you will know what will happen." ' "
(R. 263)

Directly thereafter Dr. Mantell testified as follows:
"Q. Doctor, do I understand that you have said there
is no theory today that will explain the operation of
the characteristics of this battery?
"A. That is correct.
            *       *       *
"Q. Doctor, was there any theory available in the
art prior to 1940 from which one could have predicted
the operation of this battery?
"A. I would say in 1940 it was ridiculous to take
an insoluble magnesium material and insoluble
cuprous chloride and combine the two with an insula-
tor like water." (R. 264)

The corroborating evidence of Dr. Chubb and Dr. Man-
tell establishes that in 1940 there were no guideposts pro-
vided by scientific theory to lead one to put the Adams
system together (R. 261-65). It is interesting that today,
twenty years later, scientists still cannot explain the scien-
tific theory behind the Adams system nor can they predict
the effect of additions of different substances to the system.
Even today development depends on empirical experi-

82

mentation. Adams without the benefit of any scientific theory did make the selection; this selection was certainly not obvious to those skilled in the art and in and of itself involves invention. *B. G. Corp.* v. *Walter Kidde & Co., Inc.,* 79 F.2d, 20, 22 (2d Cir. 1935).

In response to this evidence the lower court found that:

> "When Adams first disclosed his invention to others skilled in the art, he did not know its theory of operation and it was received with considerable skepticism." (Find. No. 23, R. 704)

> "The unexpectedness of the Adams invention is evidenced by the fact that, even today, the theory upon which the Adams battery operates is unknown." (R. 695)

These statements are unimpeachable and provide the strongest support for the ultimate finding that the invention was not obvious.

It is submitted that Adams is an inventor of the first order. The Government has failed to carry its burden to show otherwise. *Radio Corporation of America* v. *Radio Engineering Laboratories, Inc.,* 293 U. S. 1, 8; *Mumm* v. *Decker,* 301 U. S. 168, 171. Rather the Record shows that Adams has affirmatively proven that his invention is the first basic advance in the battery art since Volta, and his patent is valid.

### H. Conclusion as to Substantive Issues

The lower Court's decision herein should be affirmed.

## III.  Procedural Issues

### A.  Lack of Jurisdiction

A question in this case is one of jurisdiction—whether the petition for certiorari was applied for within the period allowed by law. We submit that it was not.

Title 28 of the United States Code provides in pertinent part:

83

"§ 2101. Supreme Court; time for appeal or certi-
orari; docketing; stay

* * *

"(c) Any other appeal or any writ of certiorari
intended to bring any judgment or decree in a civil
action, suit or proceeding before the Supreme Court
for review shall be taken or applied for within ninety
days after the entry of such judgment or decree. A
justice of the Supreme Court, for good cause shown,
may extend the time for applying for a writ of cer-
tiorari for a period not exceeding sixty days."

The Government failed to comply with the jurisdictional
requirement in two respects.

First, it did not apply for an extension of time to apply
for a writ until nine months after the entry of the judgment
sought to be reviewed.

Second, after receiving an extension of time within which
to apply, and assuming *arguendo* that the application for
extension was timely, the Government failed to apply for
a writ until after the extension had expired.

The chronology of relevant events is as follows:

On May 2, 1960, this suit was brought against the United
States in the Court of Claims to recover upon two separate
claims, (1) breach of contract, and (2) infringement of the
Adams patent (R. 1).

After a full trial, on January 28, 1963, the Commissioner
recommended that the Adams patent be found valid and
infringed by the Government's procurement of magnesium,
cuprous chloride, water-activated batteries. The Commis-
sioner recommended that the breach of contract cause be
dismissed (R. 659-661).

The Court of Claims on April 17, 1964, rendered final
judgment on the patent claim, holding it valid and infringed
but determined that it did not have to decide the breach
of contract claim (R. 689-690).

On May 11, 1964, Adams moved the Court of Claims to
alter its opinion and judgment, or for a rehearing *solely* to
determine the issue of breach of contract.

Adams' motion read:

"Plaintiffs respectfully move this Court, pursu-
ant to Rule 68, to determine the issue of the breach

84

of the alleged implied contract[33] and to provide for
a determination of the amount of recovery under said
contract claim by the trial commissioner, pursuant
to Rule 47 (c) (2), and to alter or amend its opinion
and judgment dated April 17, 1964, accordingly. A
rehearing is prayed should the Court deem that the
same would be helpful.'' (R. 711)

Neither party filed a petition for a rehearing relating
in any way to the Court of Claims' final judgment on the
patent claim.

On October 16, 1964, the Court of Claims rendered judg-
ment that there was no breach of contract and made no
change in its prior decision on the patent claim (R. 712).

On January 14, 1965, the Government filed an applica-
tion with the Supreme Court for an extension of time within
which to seek review of the final judgment of the Court of
Claims on the *patent claim*. This was some *nine months*
after the final judgment of the Court of Claims on the *pat-
ent claim* and thereby some six months late. (28 U. S. C.
§ 2101(c))

By order dated January 21, 1965, the Chief Justice ex-
tended the Government's time to seek a writ until February
13, 1965 (R. 714). The Chief Justice was not advised in
the Government's Application, which was specifically for
an extension of time to review the judgment of the Court
of Claims on the *patent claim* that the "timely petition for
rehearing" and subsequent decision of the Court of Claims
relied on therein to toll the expiration of the time for filing
were limited to the breach of contract claim.

(1) *The Government Did Not Apply for an Extension
Until Nine Months After the Entry of the Judg-
ment Sought To Be Reviewed*

When the Government filed its application on January
14, 1965, for an extension of time to seek review of the judg-
ment of the Court of Claims on the patent claim, nine

---

[33] The Footnote read:

    " 'Contract' as used herein is intended to include plain-
    tiffs' allegations of express and implied contract and an
    unlawful taking under Article 5 of the Constitution."
    (R. 711)

85

months had already elapsed since that judgment was rendered by that Court.

It is submitted that the Government's application for an extension was thereby applied for too late to comply with the provisions of 28 U. S. C. § 2101(c) because its application and subsequent Petition related solely to the judgment on the *patent claim.*

It is established that any application for an extension must be presented within the ninety day period set forth in the first sentence of 28 U. S. C. § 2101(c). This construction of the Statute is not specifically defined therein. It is dependent on Supreme Court Rule No. 34(2).

Thus the question presented by Adams' motion herein is this:

—does the ninety day period in which the Government could apply for an extension to review the *patent claim* run from the decision of the Court of Claims on the *patent claim* entered in April of 1964,

—or does it run from the decision of the Court of Claims on the *contract claim* entered in October of 1964.

If the first, then the Government was too late. If the second, then the Government was on time in applying for its extension.

We admit that the Government had the right to apply for an extension to review the judgment of the Court of Claims on the *contract* claim when it did, but we submit it had no right to apply for an extension and file a subsequent petition limited to the *patent* claim when it did.

In *Federal Trade Commission* v. *Minneapolis-Honeywell Co.,* 344 U.S. 206, this Court held that a substantive change in a judgment not affecting the portion sought to be reviewed does not extend the time for seeking review of the unchanged portion.

*A fortiori,* a petition for rehearing not seeking to affect the portion of the judgment sought to be reviewed should not extend the time for seeking review of the unchanged portion. Here, Adams' motion and petition for rehearing sought only the determination of the undecided contract claim, and sought no substantive change, or any change whatsoever, in the patent portion sought to be reviewed by certiorari; thereby Adams' motion and petition should not extend the time for seeking review of the unchanged and unchallenged patent portion.

We submit that the Government's application filed in January of 1965 for an extension to review the judgment of April of 1964 of the Court of Claims on the patent claim was too late because that was the final judgment on the claim to be reviewed. The events which occurred in that Court after that judgment was rendered were of no import to the matters to be dealt with on review here.

The same situation existed in *Minneapolis-Honeywell* wherein this Court said:

> "Those statutes are not to be applied so as to permit a tolling of their time limitations because some event occurred in the lower court after judgment was rendered which is of no import to the matters to be dealt with on review." (344 U. S. 206, 213)

There is no reason why the Government could not and should not have applied for its extension within ninety days after the first judgment, rather than allowing nine months to pass. The situation here is not as it was in *Federal Trade Commission v. Colgate-Palmolive Co.*, 380 U. S. 374, where this Court held that the time limit of 28 U. S. C. § 2101(c) was met by filing for certiorari within 90 days after the Circuit Court's second opinion.

There, this Court observed as to the first opinion of the Court of Appeals that, *"We find it inconceivable that the Commission could have successfully sought certiorari from this judgment."* (380 U. S. 374, 383). In Adams, the same petition which the Government actually filed ten months later could have been filed as readily directly after the first judgment of the Court of Claims was handed down. This Court gave notice, by its decision in *Minneapolis-Honeywell*, that prompt filing of petitions was required. That rule should be maintained.

It is submitted that the Government's application for an extension was filed too late to comply with 28 U. S. C. § 2101(c) as construed by Supreme Court Rule 34(2).

### (2) *The Government Failed To Apply for the Writ Until After Its Extension Had Expired*

After receiving the aforesaid extension of time from the Chief Justice (Order dated January 21, 1965, R. 714) granting the Government until February 13, 1965 to apply for a

87

writ, the Government failed to apply until after its extended period had expired.

The Government delivered its Petition to the Clerk of this court on February 12, 1965 accompanied by a Certificate of Service that was in error in that no service, or attempt at service, had yet been made.[34]

Service was not made until February 16, 1965, when copies of the Petition were first mailed addressed to counsel for Adams. This was three days after the expiration of the extended time period.

The mere act of filing copies of a petition with the Clerk of the Supreme Court is not applying for the writ within the meaning of the statute. The present rules of this Court make it clear (Rule 21(1) and (33)) that the act of applying for a writ of certiorari shall consist of service and subsequent filing of proof of service with copies of the petition.[35] Only when this has been accomplished has the act of applying for the writ been completed.

As was well said in *Federal Trade Commission* v. *Minneapolis-Honeywell Co.*, at 344 U. S. 206, 213:

> ". . . litigation must at some definite point be brought to an end. It is a principle reflected in the statutes which limit our appellate jurisdiction to those cases where review is sought *within a prescribed period*." (emphasis ours)

It is idle to argue that the Rules of this Court as to service and filing of a petition for certiorari may be waived.

The statute, as clarified by the established Rules of this Court, constitutes the jurisdiction of this Court. It is submitted that it is no more proper for this Court to now waive the provisions of Rule 21(1) and 33 as to service of a petition and proof of service than it would be to now waive the provisions of Rule 34(2) requiring that an extension of

---

[34] This is admitted. See exchange of letters between counsel reprinted in Respondent's Brief in Opposition to the Government's Petition, etc. dated March 3, 1965, Appendix thereof, pp. 20-23.

[35] "The petition is now required to be served on opposing counsel *before* it is filed (Rule 21(1)) and not within ten days thereafter, as was permitted under the former rules. Service shall be by one of the methods described in Rule 33. . . ." *Supreme Court Practice* (3rd Ed.) Stern & Gressman, p. 258.

88

time to petition must be sought within the original ninety
day period.

If this Court may permit a party to file or serve a peti-
tion long after an extension had expired, it may likewise
grant an extension long after the ninety day period has
expired. That it should not do either suggests that the
meaning of the statute has been construed by this Court's
Rules in both cases. An opposite holding in either case
would vitiate the statute and the salutary rule that litigation
must at some definite point be brought to an end.

It is submitted that the petition herein should be dis-
missed for lack of jurisdiction and failure to comply with
the statute.

### B. The Government Has Reversed Its Position on a Question of Fact to Seek Reversal of the Decision the Government Induced the Lower Court To Make

Adams' Motion to Dismiss the Petition is pending be-
fore this Court. The Motion and accompanying brief were
filed by Adams on May 10, 1965. The Government's Memo-
randum in Opposition was filed shortly thereafter. This
Court has reserved decision until final hearing (Order dated
June 1, 1965, 381 U. S. 931).

The issue presented is simple.

Certiorari has been granted on the basis of the Govern-
ment's allegation in its petition that the equivalence of
silver chloride and cuprous chloride was admitted below
and that such equivalency taken together with the prior art
anticipates the Adams patent (Pet. pp. 2, 6) and therefore
the lower Court should be reversed. That position is reiter-
ated in the Government's brief (pp. 7, 17, 21). However,
the Government in the proceedings before the Commis-
sioner below opposed all eight Findings of Fact proposed
by Adams that silver chloride and cuprous chloride were
equivalents (R. 629-33; 637-40). Thereupon the Commis-
sioner refused to find that the substances were equivalents
(R. 644-5). Adams acquiesced, and the Government did not
except. The Court of Claims affirmed and accepted the
Commissioner's opinion and findings of fact (R. 689).

A question of equivalence is one of fact, and a finding of
equivalence is a determination of fact. *Graver v. Linde,* 339
U. S. 605, 609. A question of fact is not one as to which one
may argue inconsistently as the Government suggests in

89

its Reply Memorandum of May 1965 (p. 3). The Government attempts to suggest that Adams took the position that silver chloride and cuprous chloride were equivalents only when Adams was urging the Commissioner to find infringement by reason of the Government's procurement of silver chloride batteries, and that Adams did not take the position that silver chloride and cuprous chloride were equivalents when he was urging the Commissioner to find the Adams patent valid over the prior art silver chloride patents that the Government put into the record. This is not true.

Adams presented the issue of the equivalency of silver chloride and cuprous chloride to the court in complete candor. Adams requested the court to find them to be equivalents, and either to find that the patent was invalid if the Court found that the Government's silver chloride art anticipated the patent, or to find that the patent was valid and infringed by the Government's silver chloride batteries if the Court found the Government's art not anticipatory. Adams stated in his opening to the court at R. 37-8:

"I would like to refer briefly to the doctrine of chemical equivalents. The doctrine of chemical equivalents cuts two ways, Your Honor, as the Supreme Court has pointed out in Graver v. Linde. Every patent is entitled to be subjected to the doctrine of equivalents because the doctrine of equivalents is not only used to protect claims but it is used to anticipate a patent. If you find a patentee discloses compound X but compound Y is old in the art, and Y and X are equivalents, then the patent on compound X may be invalidated because of the doctrine of equivalents. So the [fol. 29] doctrine of equivalents is a two-edged sword.

"We say that the Adams patent mentions only cuprous chloride specifically. Defendant has cited volumes of silver chloride references. Why? Because he is depending on the doctrine of equivalents, and he is saying that silver chloride works like cuprous chloride in this system, and if silver chloride is old, this system fails because they are equivalents and that if silver chloride water-activated batteries were invented before Adams, Defendant should win.

"But having taken that position, that silver chloride anticipates, the oldest maxim in the patent book is that that which anticipates if earlier, infringes if later.

90

"Defendant cannot say: 'We have cited silver chloride against these batteries but you cannot use that to show it infringes.'

"He must eat the cake or leave it.

"We feel that the doctrine of equivalents should be applied here uniformly across the board.

* * *

"We also say that silver chloride is an equivalent, and, as Your Honor knows, silver chloride was used in batteries as well as magnesium, cuprous chloride and water before Adams used them. The doctrine of mechanical equivalents, and the doctrine of chemical equivalents should be applied uniformly to the patent, either with respect to anticipation or to determine the scope of the claims as to which there may be infringement, and let the chips fall where they may."

With this statement made upon the Record in open Court on the first day of trial, all the Government had to do, to be able to maintain its present position was to state that it also agreed that cuprous chloride and silver chloride were equivalents.

The Government never did this; it admits that it never took the position that silver chloride and cuprous chloride were equivalents (R. 637). It opposed all eight requested Findings of Fact of Adams that the substances were equivalents (R. 636-40).

It is submitted that the Government's decision to oppose Adams requested findings that the substances were equivalents was no inadvertence[36] for it is estimated that the Government's procurement of silver chloride batteries is 10 times in value that of its procurement of cuprous chloride batteries. The Adams patent mentions only cuprous chloride batteries and does not mention silver chloride. By opposing Adams' position that the two were equivalents, the Government persuaded the Commissioner to find that the Adams patent could not cover the Government's procurement of silver chloride batteries (Find. 28, R. 705-6,

---

[36] Indeed it is the clearest admission that the Government itself did not believe that its silver chloride art anticipated the Adams invention. In this respect it agreed with the subsequent evaluation of that art by both the Commissioner and the Court of Claims. (Finds. 15-21, R. 703-4)

91

Find. 38, R. 707-8).  Thereby the Government saved itself approximately 90% of Adams' potential recovery.

Having achieved that victory by opposing all proposed Findings that cuprous chloride and silver chloride were equivalents, the Government now wishes to reverse itself on that question of fact to attack the decision of the lower Court that the Adams patent is valid.  By the process of taking one position on the facts before the lower Court and an opposite position before the Supreme Court, the Government hopes to achieve a total victory in two bites.

Such intellectual acrobatics bring to mind the English aphorism—

> "Upon Thursday it was treason to cry God save King James of England, and upon Friday, high treason not to cry so."
> *The Wonderfull Yeare*, Thomas Dekker (1603)

At the trial Adams put in the record, through the testimony of Adams himself and through the testimony of his expert, all of the evidence available on the subject of the equivalency of silver chloride and cuprous chloride.  Some of this evidence was favorable to the proposition (R. 41-2, 119-20, 186, 197-200, 248-50, 251-2, 256).  Some was unfavorable (R. 123, 142-44, 41, 229, 263).

The Commissioner, in a detailed opinion, taking note of the fact that it was Adams' position that cuprous chloride and silver chloride were equivalents, refused to find that they were equivalents (R. 694-5).  He reasoned that "The battery disclosed in the Adams patent is made up of particular components which unexpectedly produced a battery having unique characteristics" and that "the unexpectedness of the Adams invention is evidenced by the fact that, even today, the theory upon which the Adams battery operates is unknown." (R. 694-5)  The Commissioner stated that "It cannot be said that one reasonably skilled in the battery art would have known of the interchangeability of cuprous chloride and silver chloride in the Adams battery" (R. 694).  He therefore refused to find the two substances to be equivalents (R. 694-5), and held the Adams patent not infringed by the silver chloride batteries procured by the Government (Find. 28, R. 705, Find. 38, R. 707-8).

Thus, having won on the major issue of liability, and excised 90% of Adams potential recovery, the Government

92

now urges this Court that silver chloride and cuprous
chloride are really equivalents in order to attack the other
part of the lower Court's decision that the Adams patent is
valid.

The Government says that it is arguing inconsistently
because a patent may have one scope for anticipation and
another for infringement, and that it has a right to be incon-
sistent. The Government may have a right to *argue* incon-
sistently, but the Government has no right to take inconsis-
tent positions on a question of fact, particularly when one
position is taken before the trier of the facts and a different
position is taken before this Court in order to seek reversal
of the decision of the trier of the facts that the Government
itself induced him to make. And this is what it has done.
The Government has said to the trier of the facts—do not
find that silver chloride and cuprous chloride are equiva-
lents—we oppose Adams in this regard. The Government
now says to this Court—reverse the Commissioner and the
Court of Claims because these substances are in fact equiva-
lents. They ask this Supreme Court to find as a fact what
they opposed before the Commissioner.

A leading case on the subject of reversing positions be-
tween lower and upper Courts is *Arkansas Anthracite Coal
& Land Co. v. Stokes*, 2 F. 2d 511, 515 (8 Cir. 1924) *cert.
denied* 259 U. S. 584 wherein it is well stated:

> "But it is also well-nigh universal and fundamental,
> as a rule of appellate procedure, that a litigant may
> not mend his hold on the way up to an appellate court
> by seeking to reverse a case, because the theory on
> which it was tried below, and in which appellants
> then acquiesced, is, in fact, erroneous. In short, to
> state the rule simply and baldly, the theory on which
> a case is tried nisi is the theory on which it must, on
> appeal, be weighed for error."

Further, as was well stated by Justice Cardozo in *Assets
Realization v. Roth*, 226 N. Y. 370, 374, 123 N. E. 743, 744
(1919):

> "The defendant helped to induce that ruling when
> the result was to his advantage. We will not change
> it at his instance now when the result is to his detri-
> ment."

93

Of course, the definitive decision is that of this Court in *Davis* v. *Wakelee,* 156 U. S. 680, 689 which is cited and discussed at page 10 of Adams Motion to Dismiss of May 10, 1965.

For the above reasons and in view of the full arguments and citations contained in Adams' Motion dated May 10, 1965, it is respectfully submitted that the Government's Petition should now be dismissed.

Respectfully,

JOHN A. REILLY,
*Attorney for Respondents,*
KENYON & KENYON,
165 Broadway,
New York, New York 10006

*Of Counsel:*
EDWARD J. HANDLER, III
WILLIAM J. UNGVARSKY
KENYON & KENYON

Dated: September 25, 1965

94

### CERTIFICATE OF SERVICE

Five copies of the foregoing Respondent's Brief were served upon the Solicitor General, Department of Justice, Washington, D.C., 20530, by depositing the same in a U. S. Post Office at New York, New York, with first-class postage pre-paid, addressed as above, and

Two copies of the said Brief were served upon Paul F. Arseneau, Esq., Department of Justice, Washington, D.C. 20530, by depositing the same in a U. S. Post Office at New York, New York, with first-class postage pre-paid, addressed as stated,

This............day of September, 1965.

............................
JOHN A. REILLY
*Attorney for Respondents*