## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ITEM DEVELOPMENT AB, ASTELLAS US LLC, | ) | |
| and ASTELLAS PHARMA US, INC., | ) | |
| | ) | Civil Action No. 05-336-SLR |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SICOR INC. and | ) | |
| SICOR PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW CONCERNING U.S. PATENT NO. 5,731,296

Dated: May 9, 2007

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C. 20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

Paul M Lukoff #96
David E. Brand #201
PRICKETT JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6520
debrand@prickett.com

John Scheibeler
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

*Attorneys for Plaintiff*
*Item Development AB*

## TABLE OF CONTENTS

PLAINTIFFS' PROPOSED FINDINGS OF FACT ........................................................................1

I.    THE PARTIES ...........................................................................................................................1

      A.    Plaintiffs ...........................................................................................................................1

      B.    Defendants ........................................................................................................................1

II.   THE NATURE OF THE CASE .................................................................................................2

III.  FACTUAL BACKGROUND ....................................................................................................4

      A.    Historically, Adenosine Was Not Considered Appropriate for Human
            Administration .................................................................................................................4

            1.    Adenosine Was Rejected as a Human Pharmaceutical Agent
                  Seventy Years Ago Because of Its Effects On Electrical
                  Conduction in the Heart ......................................................................................5

            2.    In the 1960s, Dr. Robert Berne Developed the "Adenosine
                  Hypothesis," Predicting a Role for Adenosine as an
                  Endogenous Regulator of Blood Flow in the Heart, Not As an
                  Exogenously Administered Pharmaceutical Agent. ....................................7

            3.    In the Early 1980s, Dr. Berne and His Colleagues Discovered
                  that Adenosine's Effects on Cardiac Conduction Could be
                  Used to Treat A Limited Population of Patients with Abnormal
                  Heart Rhythms ......................................................................................................8

            4.    Drug Development Efforts in the 1970s Sought Analogs to
                  Harness the Vasodilating Ability of Adenosine While Avoiding
                  Its Adverse Effects on the Heart ....................................................................10

            5.    The Prior Art Suggested Infusion of Dipyridamole, Not
                  Adenosine, as a Pharmacologic Stress Agent for Myocardial
                  Perfusion Imaging ..............................................................................................12

            6.    Adenosine Triphosphate (ATP) Was a Separate Molecule
                  Whose Characteristics Were the Subject of Separate
                  Laboratory and Clinical Studies .....................................................................14

                  a.    ATP Was Known to Have Unique Properties and Its
                        Own Receptors and Had Been Shown to Be a More
                        Potent Vasodilator Than Adenosine .................................................14

        b.     Prior Art Studies Identified ATP as a Powerful
             Vasodilator in Its Own Right ..........................................................15

        c.     ATP Was Known to be Metabolized into Various
             Compounds, Including Adenosine, But Its Greater
             Potency as a Vasodilator Showed that it Also Worked
             Through Its Own Receptor............................................................16

        d.     The Effects of ATP and the Extent of Its Metabolism
             Into Adenosine Were Highly Species Dependent........................18

   B.     Dr. Alf Sollevi Countered Conventional Wisdom and Pioneered the
        Use of Adenosine Infusion in Humans ................................................19

      1.     Dr. Sollevi's First Studies Used Low Dose Administration of
         Adenosine in Conjunction with Dipyridamole Pretreatment to
         Induce Surgical Hypotension ....................................................20

      2.     Dr. Fukunaga Later Recommended Using Dipyridamole
         Pretreatment to Avoid Problems Associated with
         Administering ATP Infusions ...................................................22

      3.     Animal and *In Vitro* Models Regarding Adenosine and Human
         Studies of ATP Infusion Suggested That Dipyridamole
         Pretreatment Greatly Reduced the Effective Dose of Adenosine ..............24

      4.     Dr. Sollevi Unexpectedly Discovered that Adenosine Could
         Selectively Vasodilate Arteries and Safely Induce Surgical
         Hypotension  Without Dipyridamole Pretreatment ...................26

      5.     Dr. Sollevi Envisioned and Tested Additional Uses for
         Adenosine as a Selective Arterial Vasodilator and Filed a
         Patent Application that Issued as the '296 Patent......................28

      6.     The Leaders in the Field Were Surprised that Adenosine
         Infusion Could Be Safely Administered at Therapeutically
         Significant Doses ......................................................................28

         a.     Dr. Berne Was Surprised That Dr. Sollevi Had Been
             Able to Reduce Blood Pressure by Adenosine-Mediated
             Vasodilation Without Inducing AV Block ...................................29

         b.     Dr. Francis Robicsek Also Questioned the Safety of
             Adenosine Infusion in a Letter to a Medical Journal....................30

IV.   NOVELTY OF THE ASSERTED CLAIMS ..................................................32

   A.     The Asserted Claims ..............................................................................32

B.      *Fukunaga 1982* Does Not Describe or Disclose the Administration of Adenosine at Any Dose ..............................................................33

C.      The Reportedly "Maintained" Cardiac Output in *Fukunaga 1982* Does Not Demonstrate Consistent Selective Arterial Vasodilation................................35

V.     FACTS CONCERNING NONOBVIOUSNESS OF THE ASSERTED CLAIMS ................................................................................................36

     A.      Scope and Content of the Prior Art.......................................................36

     B.      Level of Ordinary Skill in the Art.........................................................39

     C.      Differences Between the Claimed Invention and the Prior Art .............39

VI.    THE PRIOR ART TAUGHT AWAY FROM ADMINISTERING AN ADENOSINE INFUSION ALONE AS A SELECTIVE ARTERIAL VASODILATOR ...........................................................................................40

     A.      One of Ordinary Skill Would Have Been Discouraged from Administering Adenosine Without Dipyridamole Pretreatment Because of Concerns About Side Effects with Larger Doses of Adenosine. ...............................................................................................40

     B.      One of Ordinary Skill in the Art Would Have Concluded that the Effect of Dipyridamole Pretreatment Lasted Throughout the Period of Hypotension in Dr. Sollevi's Studies....................................................43

     C.      The *Fukunaga 1982* and *Fukunaga 1984* Abstracts Taught Away From Administering Adenosine Without Dipyridamole Pretreatment.................45

VII.   IT WAS UNEXPECTED THAT DIPYRIDAMOLE PRETREATMENT COULD BE ELIMINATED WITHOUT A LARGE INCREASE IN THE DOSE OF ADENOSINE INFUSED ................................................................47

VIII.  ADENOSCAN IS A HIGHLY SUCCESSFUL COMMERCIAL PRODUCT ...............48

     A.      Adenoscan is a Highly Successful Commercial Product .......................48

          1.      Adenoscan Went From Newcomer To Market Leader, Becoming a Very Successful Product for Astellas Even in the Face of Competition from Generic Dipyridamole .....................................48

          2.      Sales of Adenoscan Were Driven by the Attributes of the Claimed Invention, Not Marketing and Promotion ...................................50

          3.      Sicor's Arguments Regarding Commercial Success .................................51

          4.      Adenoscan's Promotion Was Typical In The Industry.............................52

5.     Sicor's Economic Expert Was Unreliable And His Theories
       Not Supported By The Record..................................................................53

PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW ............................................57

I.      CONTROLLING AUTHORITY ..............................................................................57

II.     THE '296 PATENT IS PRESUMED VALID AND SICOR, AS THE
        PATENT CHALLENGER, BEARS THE BURDEN OF PROVING THE
        CONTRARY BY CLEAR AND CONVINCING EVIDENCE......................................57

III.    THE ASSERTED CLAIMS OF THE '296 PATENT ARE NOT INVALID
        FOR ANTICIPATION.............................................................................................58

        A.     A Prior Art Reference Does Not Anticipate Unless It Discloses Each
               Limitation of the Claimed Invention........................................................58

        B.     Sicor Failed to Prove Fukunaga 1982 Discloses Each Limitation of the
               Asserted Claims Either Expressly or Inherently......................................59

               1.     Sicor Failed to Prove Fukunaga 1982 Discloses Administration
                      of Adenosine .................................................................................59

               2.     Sicor Failed to Prove that Fukunaga 1982 Disclosed Selective
                      Arterial Vasodilation or Dosages within the Ranges set Forth in
                      Claims 3 or 7 ................................................................................60

IV.     THE CLAIMS OF THE '296 PATENT ARE NOT INVALID FOR
        OBVIOUSNESS .....................................................................................................61

        A.     Sicor Must Prove Obviousness by Clear and Convincing Evidence
               Based on the Four Broad Factual Findings...............................................61

               1.     The Law of Obviousness and the Supreme Court's Decision in
                      *KSR* .............................................................................................62

               2.     Objective Evidence, Including Contemporaneous Statements of
                      Skepticism by Experts In the Field and Commercial Success, Is
                      Highly Probative of Nonobviousness ...........................................63

        B.     Sicor Failed to Prove the Claimed Invention Would Have Been
               Obvious in View of the Methods Described in the *Sollevi I* and
               *Sollevi II* Abstracts and the Background Prior Art ................................65

               1.     Level of Ordinary Skill in the Art................................................65

               2.     Differences Between the Prior Art and the Claimed Invention ................65

iv

        3.       Objective Evidence of Nonobviousness:  Skepticism, Commercial Success, Unexpected Results, and Copying..........................67

   C.     The Skepticism and Ultimate Praise Expressed In the Letters By Dr. Berne and Dr. Robicsek Is Highly Probative Objective Evidence of Nonobviousness ...................................................................................................67

   D.     The Unexpectedly Low Dose of Adenosine Required in the Absence of Dipyridamole is Further Evidence of Nonobviousness.....................................70

   E.     Sicor's Interest in Copying the Invention Also Demonstrates its Nonobviousness ........................................................................................................70

   F.     The Commercial Success Of Adenoscan Is Objective Evidence Of Nonobviousness ........................................................................................................70

        1.       There is a Nexus Between the Sales of Adenoscan and the Claims of the Patent .....................................................................................72

        2.       Sicor Failed To Prove that Sales of Adenoscan® are Not Driven by the Attributes of the Claimed Method .....................................................73

        3.       Market Circumstances Cannot Sever Proper Nexus.................................73

        4.       Clinical Attributes Determine Success of Pharmacologic Stress Agents, Not Promotion .............................................................................74

        5.       Dr. Leffler's Opinion Is Contrary To The Evidence.................................76

V.     DR. BINKLEY WAS NOT CREDIBLE AND OFFERED OPINIONS BEYOND THE SCOPE OF HIS EXPERT REPORTS ....................................................77

This matter was tried before the Court on February 12, 2007 through February 28, 2006. Being duly advised, the Court now issues its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). To the extent that any of the findings of fact set forth below is a conclusion of law, it is hereby adopted as a conclusion of law. To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

### I. THE PARTIES

#### A. Plaintiffs

1. Plaintiffs Astellas US LLC and Astellas Pharma US, Inc. (collectively "Astellas") are corporations engaged in the business of research, development, and sale of pharmaceutical products throughout the world. (D.I. 1 ¶ 4.)

2. Both Astellas US LLC and Astellas Pharma US, Inc. are organized and existing under the laws of the State of Delaware, with their principal places of business at Three Parkway North, Deerfield, Illinois 60015-2548. (D.I. 127, Ex. 1 ¶ 1.)

3. Astellas was formed from a merger between two pharmaceutical companies, Fujisawa Pharmaceutical Co., Ltd. and Yamanouchi Pharmaceutical Co., Ltd. (White 1227:15-17.)

4. Plaintiff Item Development AB ("Item") is a Swedish corporation having an office and principal place of business at Svanholmsvagen 2A, Stocksund, 18207, Sweden. (D.I. 127, Ex. 1 ¶ 2.)

#### B. Defendants

5. Defendants Sicor Pharmaceuticals Inc. and Sicor Inc. (collectively "Sicor") are in the business of making and selling generic drugs, which they distribute in Delaware and throughout the United States. (D.I. 127, Ex. 1 ¶¶ 3, 4, 14.)

6.      Both Sicor Pharmaceuticals Inc. and Sicor Inc. are corporations organized and existing under the laws of the State of Delaware having principal places of business at 19 Hughes, Irvine, California 92618.  (D.I. 127, Ex. 1 ¶¶ 3-4.)

7.      Defendant Sicor Pharmaceuticals Inc. is a wholly owned subsidiary of Sicor Inc. (D.I. 127, Ex. 1 ¶ 5.)

## II.    THE NATURE OF THE CASE

8.      Plaintiffs Item and Astellas brought this suit against (i) Sicor and (ii) Teva Pharmaceuticals USA (a Delaware corporation) and Teva Pharmaceutical Industries, Ltd. (an Israeli corporation) (collectively "Teva") for infringement of Item's United States Patent No. 5,731,296 ("the '296 patent").  (*E.g.*, D.I. 1 ¶¶ 29-30.)

9.      The '296 patent issued in 1998 and was assigned to and is owned by Item. (D.I. 127, Ex. 1 ¶ 9; TX-275.)  The sole inventor of the invention claimed in the '296 patent is Dr. Alf Sollevi (TX-275.)  The '296 patent claims, *inter alia*, methods of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole by continuously infusing the chemical compound known as adenosine. (TX-275, claims 1, 3, 7, and 9.)

10.     Astellas is the exclusive licensee of certain rights under the '296 patent.  (D.I. 127, Ex. 1 ¶ 10.)  Pursuant to those rights, Astellas markets a product known as Adenoscan®.[1] (D.I. 1 ¶ 18.)

11.     Adenoscan was approved by the United States Food and Drug Administration (the "FDA") in 1995.  Adenoscan, an adenosine solution, is labeled for use as an adjunct to thallium-201 myocardial perfusion scintigraphy and as such it is administered to patients

---

[1]      Adenoscan® (hereinafter "Adenoscan") is a registered trademark of Astellas.

2

undergoing cardiac stress tests who are unable to exercise adequately on a treadmill. (D.I. 1 ¶ 18; D.I. 127, Ex. 1 ¶ 12; TX-75.) Thus, Adenoscan is known as a "pharmacologic stress agent." Adenoscan is the most widely prescribed pharmacologic stress agent on the market today. (*See* TX-21; Hay 1731:23-1733:3; DTX-2030.)

12.    On December 6, 2004, Sicor filed an Abbreviated New Drug Application ("ANDA") under the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585 (popularly known as the Hatch-Waxman Act), seeking approval to market generic copies of Astellas's Adenoscan upon expiration of the '296 patent. (TX-4.) On April 16, 2005, Sicor amended its ANDA to seek permission to sell its generic product before expiration of the '296 patent and to include a certification (i) that its proposed product would not infringe the '296 patent and/or (ii) that the '296 patent was invalid or unenforceable. (TX-7.) Item and Astellas then filed suit against Sicor and Teva alleging infringement of the '296 patent under 35 U.S.C. § 271(e)(2)(A).[2] (D.I. 1 ¶¶ 29, 30.)

13. This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. §271(b), (c), and (e)(2). The Court has subject matter jurisdiction over this case under the Hatch Waxman Act and 28 U.S.C. §§ 1331, 1338(a), 2201, 2202.

14. Plaintiffs seek an order (i) prohibiting FDA approval of the Defendants' generic adenosine product labeled for use in myocardial perfusion scintigraphy (also called myocardial perfusion imaging or "MPI") prior to the expiration of the '296 patent, in accordance with 35 U.S.C. § 271(e)(4)(A); and (ii) enjoining the Defendants from the commercial manufacture, use,

---

[2]    Astellas is also exclusive licensee of rights under U.S. Patent No. 5,077,877 (the '877 patent), which is owned by King Pharmaceuticals Research and Development, Inc. ("King"). King and Astellas also filed suit against Sicor in the parallel action copending in this Court. *See* CV No. 05-0337-SLR.

offer to sell, sale, or importation of their adenosine product labeled for use in myocardial

perfusion imaging, in accordance with 35 U.S.C. § 271(e)(4)(B). (*E.g.*, D.I. 1, Prayer for Relief).

15. The parties filed a Stipulation of Dismissal of Complaint as to Teva, in which Teva

agreed to be bound by the decision of the Court herein and the Court entered an order approving

this Stipulation on August 9, 2005.  (D.I. 10 ¶ 1.)

16. Sicor admitted "that making, using, offering to sell, importing, or selling Sicor's

Adenosine Injection USP labeled for use in myocardial perfusion imaging in the United States

would infringe asserted claims 1, 3, 7, and 9 of United States Patent No. 5,731,296."[3]  (D.I. 129,

¶ 2.)

## III.    FACTUAL BACKGROUND

### A.    Historically, Adenosine Was  Not Considered Appropriate for Human Administration

17. Adenosine is a naturally occurring molecule that was isolated from the human body

and recognized to have powerful pharmacologic effects more than 70 years ago.  (*See* TX-35;

Klabunde 516:4-22.)

18. Despite its early discovery, adenosine infusions were not administered to humans for

any medical purpose until Dr. Sollevi, the inventor of the '296 patent, conducted his initial

experiments with adenosine in the early 1980s.  (Sollevi 437:21-438:7.)

19. The scientific literature demonstrates that this long gap between the discovery of

adenosine and its use according to the claimed methods of the invention was not by chance, but

---

[3] For the purposes of this litigation, Plaintiffs Astellas and Item are asserting only claims 1, 3, 7, and 9 of the '296 patent.  (*See* D.I. 129, Ex. 2, ¶ 1.)

because of the recognized potential for exogenously administered adenosine to cause harmful

effects in humans.  (*See, e.g.,* TX-35; TX-187; TX-48 at 2229; Klabunde 521:5-23.)

> **1.    Adenosine Was Rejected as a Human Pharmaceutical Agent Seventy Years Ago Because of Its Effects On Electrical Conduction in the Heart**

20. The first animal experiments with adenosine were reported by Drury and Szent-

Gyorgyi in 1929, in an article described as "one of the foundation articles, recognizing and

describing the actions of adenosine. . . ."  (Binkley 101:13-17; *see also* TX-35; TX-36 at 1254;

Klabunde 516:4-7, 517:6-17.)

21. Although demonstrating that adenosine was a vasodilator, the studies also revealed

adenosine's ability to slow or stop electrical conduction in the heart, resulting in "AV block."

"AV block" is the interruption of conduction in the AV node of the heart, which was known to

coordinate the beating of the upper chambers of the heart (the atria) and the lower chambers (the

ventricles).  (TX-35 at 236; TX-36 at 1254; Binkley 244:13-245:17; Klabunde 517:6-17;

519:8-520:18.)

22. There are three degrees of AV block.  In "first degree" AV block, there is some delay

in the conduction going through the AV node, but all the impulses will travel through.

(Klabunde 519:8-520:18.)  "Second degree" AV block is more severe and not all of the impulses

will go from the atria into the ventricles; therefore, the atrial rate may be higher than the

ventricular rate.  (*Id.*)  Third degree AV block, also known as "complete AV block," is the most

severe because the action potentials or electrical currents going through the AV node are

completely blocked, preventing any activity from the atria from getting into the ventricles.  (*Id.*)

23. Studies published a few years after the work of Drury and Szent-Gyorgyi showed that

adenosine could also decrease heart rate or even arrest the heart beat in humans.  (TX-48 at 2229;

Klabunde 516:11-22, 521:5-18.)

24. For example, in 1934, Jezer published an article entitled "The Effect of Adenosine on Cardiac Irregularities in Man" and describing his study involving the bolus administration of between 25 to 45 mg of adenosine to eight human patients. (TX-187.) Similar to Drury and Szent-Gyorgyi's animal experiments, Jezer observed adenosine causing serious effects on the heart, including AV block. (TX-187.) In fact, Jezer observed cessations of heart beat (ventricular standstill) for up to nine seconds following the administration of adenosine. (TX-187 at 256, 258; Strauss 766:7-15.)

25. Not mere historical oddities, these and other early studies of adenosine's effects shaped the understanding of those of ordinary skill in the art for decades. As recounted by Biaggioni in 1986:

> Adenosine was first administered to human subjects in 1930 and 1933 to treat cardiac arrhythmias. The development of serious side effects with large boluses of the drug (temporary cardiac arrest) led the authors to conclude that adenosine was not "a useful therapeutic preparation for the treatment of heart disease", a view which discouraged further research.

(TX-48 at 2229 (internal citations omitted); Klabunde 520:23-522:2; *see also* TX-36 at 1254 (referring to animal and human studies in the 1920s and 1930s that demonstrated adenosine's ability to slow heart rate and cause AV block); Klabunde 517:2-17.)

26. Similarly, a commentary published in a reliable medical journal in 1990 stated, "[d]espite these interesting characteristics, adenosine *never achieved clinical usefulness*; rather it found a staid, but secure, role over the years as a short acting vasodilating agent in experimental animal studies, especially those involving the coronary circulation." (Binkley 313:24-315:25.)[4]

---

[4]     TX-47, the source for this quotation, was not itself offered into evidence but the pertinent section was read into evidence pursuant to Fed.R.Evid. 803 (18), the reference having been established as reliable. (See Binkley 313:24-315:13; *see also* Binkley 311:8-312:19.)

     2.    **In the 1960s, Dr. Robert Berne Developed the "Adenosine Hypothesis," Predicting a Role for Adenosine as an Endogenous Regulator of Blood Flow in the Heart, Not As an Exogenously Administered Pharmaceutical Agent.**

27. By the 1960s, studies of adenosine were directed at answering basic scientific questions about the endogenous compound's effects in the body, not developing new therapeutic or diagnostic uses for the drug.  (*See* Klabunde 1076:20-1078:19; Strauss 766:19-767:13.)

28. Dr. Robert Berne, a physician-scientist at the University of Virginia, was recognized as the dean of the adenosine field.  (Binkley 317:19-318: 15.)  Dr. Berne was an "outstanding physiologist and scientist" and a "well-recognized expert in cardiovascular physiology."  (*Id.*)

29. Dr. Berne was trained as an M.D. and was the Chairman of Physiology at the University of Virginia in Charlottesville, which was recognized as the leading center for adenosine research during the sixties, seventies, and the early to mid-eighties.  (Klabunde 499:23-500:9.)

30. In 1963, Dr. Berne published a "classic" paper in which he proposed that adenosine might be the physiological molecule responsible for coronary vasodilation in response to low oxygen levels (hypoxia) in cardiac tissue.  (*See* TX-113 at 317; Klabunde 1071:25-1072:3.)  Dr. Berne's proposition set forth in this paper became known as the "Adenosine Hypothesis."  (TX-113; Binkley 247:8-12.)

31. The Adenosine Hypothesis proposed that when the heart needed to increase its oxygen supply, such as during stress, *endogenous* adenosine would be formed by the breakdown of ATP, resulting in coronary artery vasodilation and an increase in circulation of blood within the coronary tissue.  (TX-113 at 321; Klabunde 499:5-19.)

32. The entire focus of the Adenosine Hypothesis was the role of *endogenous* adenosine in the *heart*, not in the systemic circulatory system.  (*See* Klabunde 1076:20-1078:19.)  Indeed,

nothing in the scientific literature cited by Sicor would have suggested any connection between the Adenosine Hypothesis and potential medical uses of adenosine. (*Id*.) Thus, the Adenosine Hypothesis in the early 1980s was little more than a framework for ongoing studies of the role of endogenous adenosine in the body, following which there was "lots and lots of research," described in up to 20,000 publications, explaining the physiological effects of adenosine. (*See* Strauss 766:19-767:13.)

33. Illustrating this point, Dr. Berne wrote another review article on advances in adenosine physiology and the Adenosine Hypothesis in 1980, seventeen years after his initial publication. (*See* TX-228.) Like the earlier article, the later publication did not mention, much less recommend, that *exogenously* administered adenosine might have utility in human patients as a selective arterial vasodilator. (*Id.*)

**3.     In the Early 1980s, Dr. Berne and His Colleagues Discovered that Adenosine's Effects on Cardiac Conduction Could be Used to Treat A Limited Population of Patients with Abnormal Heart Rhythms**

34. Prior to Dr. Sollevi's work, the only medical use for adenosine reported in the prior art was a use that took advantage of the heart-stopping action of the compound. That clinical application was studied by Dr. Berne and his colleagues at the University of Virginia in the early 1980s, when they investigated using adenosine as a potential short-acting therapeutic in patients suffering from cardiac arrhythmia. (*See* TX-36; TX-45.)

35. Specifically, in a pair of publications published in 1983 and August 1985, Dr. Berne, together with lead author Dr. John DiMarco and their colleagues from the University of Virginia, reported that adenosine could be administered by a short, rapid bolus injection to terminate an arrhythmia termed "paroxysmal supraventricular tachycardia" ("PSVT"), in which the heart beats very rapidly. (TX-36; TX-45; Klabunde 522:3-523:23; Binkley 325:14-18.)

8

36. This treatment was based on adenosine's ability to slow conduction and beating of the heart, an effect that would be highly undesirable in a drug whose purpose was to induce selective arterial vasodilation in patients.  (Klabunde 523:24-524:25.)

37. Also leading away from the potential intravenous infusion of adenosine as a vasodilator, the University of Virginia authors noted that the electrical effects of adenosine were dose dependent and warned that "[t]he need to individualize dosage for each patient is an important factor that must be considered before adenosine is widely used clinically."  (TX-45 at 423.)  The reason for this warning was that "[o]verdosage might lead to prolonged asystole [cardiac arrest], hypotension or other tachyarrhythmias."  (*Id.*)

38. In addition, Dr. DiMarco noted that, although the effects of adenosine on the beating heart were short in duration, "their duration seems to be proportional to the dose in each patient and these side effects could be serious in certain patients."  (TX-45 at 423; Binkley 325:11-326:8.)  Thus, one of ordinary skill in the art would have recognized that, regardless of the method of administration, a given dosage of adenosine would have the ability to dramatically slow or impede the beating of the heart and that dose would vary widely and unpredictably from patient to patient.  (*See, e.g.,* TX-45 at 423.)  This would have led one away from the potential intravenous infusion of adenosine as a vasodilator.  (Klabunde 524:4-20.)

39. While the investigators using adenosine for treatment of PSVT succeeded in avoiding serious adverse events by titrating the dose of adenosine administered to their patients so that only the lowest necessary dose was administered, such individualized dosing was in the context of a rapid bolus administration in which the desired effect, instantaneous resetting of the heart beat, took advantage of the normally undesirable capacity of adenosine to alter electrical conduction in the heart.  (TX-36 at 1256-57, 1261; TX-45 at 423; Klabunde 524:4-20.)

9

40. Continuous intravenous infusion to cause selective vasodilation would have raised a different problem in that one could not have predicted whether the desired vasodilatory effect could be obtained at a dose below a dose that affected the heart. Moreover, in the case of vasodilation, stopping the infusion to eliminate side effects would also eliminate the desired vasodilation. (*See* Klabunde 557:10-558:19.)

41. Indeed, even the University of Virginia investigators acknowledged, in the context of PSVT treatment, that chronic prophylaxis would be impossible because of adenosine's brief duration of action and that, while a longer-acting adenosine analog might work, use of such an analog would have to take into account adenosine's many other effects in the body. (TX-45 at 423; Binkley 326:9-22.)

42. Consequently, the use of adenosine for treatment of PSVT would have strongly discouraged, not encouraged, the use of adenosine for vasodilation. Indeed, this bias was so entrenched in the field that even in the mid-1990s cardiologists initially resisted using Astellas's Adenoscan product as a pharmacologic stress agent for fear of inducing AV block. (Klose 1516:7-1517:1.)

> ### 4.    Drug Development Efforts in the 1970s Sought Analogs to Harness the Vasodilating Ability of Adenosine While Avoiding Its Adverse Effects on the Heart

43. The discussion of longer acting analogs in the context of PSVT treatment and the lack of any mention by Dr. Berne and his colleagues of using adenosine as a vasodilator reflected the general view in the art that adenosine itself was not a viable drug candidate for most applications because of its short half-life and adverse cardiac effects. (*See, e.g.,* TX-214 at 415; Binkley 326:18-328:1; Strauss 769:8-770:20.)

44. Consequently, throughout the 1970s and early 1980s, many investigators had instead tried to develop adenosine analogs that would have the desirable effects of adenosine without its

undesirable adverse side effects.  (Binkley 326:18-328:1; Strauss 769:8-770:20.)  As stated in a

typical publication from the early 1970s:

> The use of adenosine in cardiovascular therapy has been precluded
> both by the transitory nature of its vasodilator effects and by its
> toxic actions on the heart.  It would seem feasible however that
> certain *analogs* of adenosine may be found which have the
> coronary vasodilatory activity of adenosine, but which have greater
> duration of action *in vivo* and which lack the cardiac depressant
> action of the parent compound.

(TX-214 at 415 (emphasis added); Binkley 326:23-328:1; Strauss 770:16-20.)

45. Many researchers were involved in the search for useful adenosine analogs.  This

unsuccessful search for viable analogs is exemplified by efforts to use an intravenous infusion of

the analog ethyl-adenosine to dilate coronary arteries in conjunction with cardiac stress imaging.

(*See* TX-176; TX-1184; TX-259.)

46. In the mid-1970s, Abbott Laboratories carried out and published animal studies on

the adenosine analog ethyl adenosine 5-carboxylate hydrochloride ("ethyl-adenosine")

demonstrating, in dogs, that the compound was a potent and selective coronary vasodilator with a

prolonged duration of action as compared to natural adenosine.  (TX-176 at 419; Strauss

771:6-772:17.)  The studies also demonstrated that ethyl-adenosine, unlike adenosine, did not

decrease systemic blood pressure or slow heart rate (i.e., cause bradycardia) in dogs.  (TX-176 at

419; Strauss 771:6-772:17.)

47. Consequently, in the late 1970s, Sicor's expert, Dr. Strauss, and a colleague selected

ethyl-adenosine for a series of pilot animal studies they were performing on the use of a

pharmacologic agent instead of exercise to stress the heart in connection with myocardial

perfusion imaging.  (Strauss 767:19-768:9, 769:3-7; Binkley 328:7-329:5.)  Although they too

worked with dogs, their goal was to transfer the technique to humans.  (Strauss 767:19-768:9.)

48. Yet when researchers tested ethyl-adenosine in human patients with coronary artery disease, they found that the compound, in fact, caused ischemia and angina (chest-pain), which led them to abandon further studies on the compound.  (Strauss 773:14-21, 775:17-776:4; TX-259 at 470, 472-73.)  The article reporting this study described the failure, stating "[o]ur study demonstrates lack of clinical effectiveness as well as detrimental effects produced by an adenosine analogue thought, on the basis of animal investigations, to be potentially antianginal in its effect in man."  (TX-259 at 472.)

49. The experience with ethyl-adenosine illustrates that even an analog that was designed to eliminate the negative effects of adenosine and which showed promise in animal studies turned out to be harmful, causing ischemia and angina in humans.

> **5.     The Prior Art Suggested Infusion of Dipyridamole, Not Adenosine, as a Pharmacologic Stress Agent for Myocardial Perfusion Imaging**

50. Other researchers continued efforts on myocardial perfusion imaging studies, but turned to dipyridamole rather than adenosine.  (Binkley 328:22-329:17.)  Despite the fact that dipyridamole was believed to act, at least in part, by raising endogenous adenosine levels (TX-93 at 758; Binkley 330:8-25), nobody even suggested that adenosine itself should be used instead. While Sicor contends that dipyridamole was chosen because pharmaceutical grade adenosine was not commercially available at the time, the evidence does not bear this out.  (*Compare* Binkley 1377:18-1378:20 *with* 331:1-332:14.)

51. The evidence clearly shows that scientists, such as those at the University of Virginia and elsewhere, who were sufficiently interested in adenosine were able to obtain and prepare adenosine for human administration.  (Binkley 331:1-332:14.)

52. Indeed, the record shows that it was a lack of interest and lack of recognition by those in the art that adenosine would be a safe or effective alternative to dipyridamole in human

patients rather than a lack of availability of pharmaceutical-grade adenosine that prompted researchers to choose dipyridamole. (*See* Binkley 331:21-332:14; Klabunde 525:16-526:14.)

53. Also demonstrating that lack of commercial availability was no impediment to researchers in the field, a 1979 article authored by Sicor's expert, Dr. Strauss, recommended the use of dipyridamole or ethyl-adenosine, but not adenosine itself, as pharmacologic stress agents in humans even though neither was then commercially available. (*See* Strauss 774:19-776:4, 777:24-778:4; TX-232 at 247-48.) Indeed, a 1986 review article authored by Dr. Strauss did not even mention adenosine as part of the "State of the Art" of myocardial imaging, even though an adenosine infusion had been used in dogs for this purpose in 1981. (TX-373; Strauss 776:13-777:1,778:18-779:8.)

54. Also telling, Dr. Strauss himself did not begin using adenosine for myocardial imaging until 1991, and even then he used a "stepwise" protocol starting at doses far below the then recommended amount of 140 mcg/kg/min. (TX-314; Strauss 779:21-780:19.) At trial, Dr. Strauss testified that the decision to use the stepwise protocol had "nothing to do with the AV block." (Strauss 780:7-781:5.) But he was impeached by his flatly contradictory prior deposition testimony. He previously testified that he used the stepwise protocol "because adenosine had been used to treat arrhythmias where the onset of [AV] block is intentional that this could be a significant problem with infusion." (Strauss 780:20-781:5, 782:17-783:18.) He was concerned that adenosine at 140 mcg/kg/min would induce heart block. (Strauss 782:27-783:18.)

13

6.      **Adenosine Triphosphate (ATP) Was a Separate Molecule Whose Characteristics Were the Subject of Separate Laboratory and Clinical Studies**

a.      **ATP Was Known to Have Unique Properties and Its Own Receptors and Had Been Shown to Be a More Potent Vasodilator Than Adenosine**

55. Sicor relies in part on prior art concerning administration of an intravenous infusion of ATP rather than adenosine in support of its validity challenge to the asserted claims. (*See, e.g.*, Binkley 192:2-23; TX-42; TX-51.)

56. ATP (adenosine triphosphate) is a high energy molecule with a chemical structure that includes three "phosphate groups" (collections of phosphorous and oxygen atoms) not found in adenosine itself. (Klabunde 505:17-506:10.)

57. As is not uncommon with chemical molecules, the presence of these additional atoms of phosphorus and oxygen gives ATP important biological properties that adenosine lacks. (Klabunde 506:11-18.) For example, ATP is the primary energy source in all cells, and is particularly prevalent in the muscular tissue of the heart. (Klabunde 506:7-10; TX-113 at 317.) In contrast, adenosine does not serve as an energy source and is only generated transiently in the heart. (Klabunde 506:11-13;.)

58. By the mid-1980s, it was well known that ATP and adenosine worked through different receptors in the body, (the adenosine receptor was referred to as the P1 receptor, and the ATP receptor was referred to as the P2 receptor), and that those different receptors would lead to different biochemical actions within a cell. (Klabunde 510:8-513:24; TX-151.)

59. Despite knowledge of these receptors, it was still largely unknown what the effects of natural ATP and adenosine were in various tissues in the body, much less whether the two compounds would have the same or different effects when administered intravenously, or what the differences in their effects might be. (TX-151 at 110; Binkley 1455:15-24.)

14

b.    **Prior Art Studies Identified ATP as a Powerful Vasodilator in Its Own Right**

60. The prior art described studies by various researchers on the vasodilating effects of ATP, as well as related purine molecules, including adenosine diphosphate ("ADP") and adenosine.  (*See, e.g.,* TX-126 at 610; TX-199.)  While the specific role played by the various compounds was poorly understood, these studies demonstrated differences in the ability of each to act as an independent vasodilator.  (Binkley 273:1-274:24; Klabunde 507:8-508:3, 1116:5-1117:4.)  For example, Moir and Downs demonstrated in the early 1970s that ATP and ADP "were significantly more potent than AMP [adenosine monophosphate] or adenosine as coronary vasodilators."  (TX-199 at 1386; Klabunde 551:3-552:10, 1117:5-1118:1.)

61. Further studies on the vasodilating effects of ATP included a 1982 abstract, published by Fukunaga and colleagues, in which ATP was administered by intravenous administration to induce hypotension in surgical patients.  (TX-42 ("*Fukunaga 1982*"); Klabunde 506:23-507:7.)

62. The abstract discussed only ATP, not adenosine, noting that ATP-induced hypotension had "long been employed during clinical anesthesia in Japan," but that "the detailed pharmacological and circulatory effects" of such treatment had not been well documented.  (TX-42.)  The abstract further described ATP as a "physiological intracellular substance, which relaxes and dilates vascular smooth muscles, including coronary and cerebral arteries" and concluded that "ATP should potentially be considered for use among the vasoactive hypotensive drugs."  (TX-42.)  In other words, *Fukunaga 1982* concluded that ATP itself was a vasodilator.  (Klabunde 508:8-24.)

63. The abstract was notably silent as to adenosine, did not suggest that the effects of ATP were mediated by adenosine, and did not mention adenosine as a potential alternative to ATP as an experimental hypotensive agent.  (TX-42; Klabunde 508:4-7.)  Indeed, consistent with

15

the earlier study by Moir and Downs, which showed ATP to be fifty times more potent than

adenosine, adenosine would have been expected to be less potent than ATP itself in inducing

hypotension in humans, suggesting higher doses of adenosine would need to be used.  (Klabunde

1117:5-1118:4.)

> c.    **ATP Was Known to be Metabolized into Various Compounds, Including Adenosine, But Its Greater Potency as a Vasodilator Showed that it Also Worked Through Its Own Receptor**

64. In addition to recognizing ATP as a direct acting vasodilator, prior art investigators

knew that it could be broken down by enzymes in the bloodstream into more than six different

metabolites, including adenosine.  (TX-126 at 612; Binkley 272:15-274:9; DTX-2008.)  But it

would have been impossible to predict the specific amount of these various metabolites or

separate their individual effects because they rapidly interconverted with each other and several,

including ADP, AMP, and adenosine, caused vasodilation in their own right.  (Klabunde 507:8-

508:3, 1116:5-1117:4, 1220:19-1221:10; Binkley 273:1-274:9.)

65. Furthermore, it was known that the "metabolic" pathways acting on ATP also

operated in reverse, so that while ATP was being rapidly broken down into ADP, AMP, and

adenosine, inosine, and other metabolites, a portion of those metabolites were being reformed

into AMP, ADP, and even ATP itself.  (Binkley 272:15-25; DTX-2008.)

66. Further complicating the picture, administration of exogenous ATP could cause

release of intracellular stores of endogenous ATP, with the result that ATP administration would,

in effect, "beget" more ATP.  (Binkley 1445:5-1446:10; TX-126 at 615; TX-228 at 807.)

67. Finally, as ATP was broken down, the phosphate groups were removed at various

steps along the metabolic pathway.  These phosphate groups released during ATP metabolism

themselves had some modest vasodilatory activity.  (Binkley 274:10-275:6.)

16

68. Consequently, the vasodilation observed upon administration of an intravenous ATP infusion in humans was the result of the combined activity of exogenous ATP, endogenous ATP, and all the various metabolites, including the released phosphate groups. (Klabunde 507:8-508:3, 1116:5-1117:4, 1220:19-1221:10; Binkley 273:1-275:6.)

69. Although the prior art recognized the possibility that certain effects of ATP might be indirect, resulting from metabolism of ATP to form adenosine rather than direct binding of ATP to its receptor, there was no reliable evidence that the vasodilatory effects of ATP following intravenous administration to humans were solely the result of conversion to adenosine. (TX-152 at 198; Klabunde 1044:5-25, 1116:5-1117:4; Binkley 1466:16-1467:23.) The primary hallmark of such an indirect effect, were it to be true, would be where ATP was observed to be less potent than adenosine. (TX-152 at 198; Binkley 1459:20-1460:14, 1470:9-1471:6.)

70. Logically, if ATP was working solely by being metabolized into adenosine, it would make no sense for ATP itself to be more potent than the purported direct acting molecule. However, Moir and Downs had shown ATP to be a more potent vasodilator than its metabolites AMP and adenosine. (TX-199 at 1386; Klabunde 551:20-552:3.) Moreover, as discussed in detail below, subsequent studies by Dr. Fukunaga and Dr. Sollevi, involving administration of ATP or adenosine in the presence of dipyridamole, also showed ATP to be the more potent vasodilator in humans, indicating a direct vasodilating effect of ATP rather than an indirect effect. (*Compare* TX-51 *with* TX-1170; TX-199 at 1386; TX-152 at 198; Klabunde 1044:5-25, 1116:5-1117:4, 1118:8-21; Binkley 259:3-260:8, 1459:20-1460:14.) Such a direct effect would further indicate that ATP's vasodilatory action was not solely due to the ATP's metabolism to adenosine.

### d. The Effects of ATP and the Extent of Its Metabolism Into Adenosine Were Highly Species Dependent

71. Metabolism of ATP differed in prior art studies of different species. Consequently, prior art investigators knew that effects of ATP and its degree of metabolism would be different in different species. (*See, e.g.,* Klabunde 1216:18-25; TX-126 at 613.)

72. For example, Sicor cited a study in dogs in which ATP apparently acted by being completely metabolized to adenosine. (TX-88; Binkley 396:4-397:17.) A different study by Fukunaga in rabbits, however, showed ATP to be the more potent vasodilator, demonstrating that, in rabbits, ATP was having a direct effect. (Binkley 267:9-269:6, 1465:5-1466:15; TX-87 at 275.) Indeed, Fukunaga commented in that rabbit study that "[a]lthough much information about the extracellular, especially cardiovascular, effects of the adenine nucleotides has been accumulated, clinical uses will require more information in different species and under a variety of conditions." (TX-87 at 277.)

73. Sicor's expert, Dr. Binkley, attempted to also rely on two dog studies that were not disclosed in his expert report and offered previously undisclosed opinions and testimony about them. (TX-88; TX-236; Binkley 1412:1-1421:19.) Yet the record shows very different levels of ATP metabolism and different effects of ATP in various animal species and in animals versus humans. (*See, e.g.,* Binkley 1465:5-1466:15; TX-87 at 277; Klabunde 1215:2-1216:18; TX-126 at 613.) Most importantly, the available human data in the prior art showed ATP to be a more potent vasodilator than adenosine, contradicting the notion that ATP was working solely through metabolic formation of adenosine. (*See*, *e.g.*, Klabunde 1044:5-25, 1116:5-1118:21.)

74. Other investigators also reported that the rate of ATP breakdown in humans was low in comparison to other species. (TX-126 at 613; Klabunde 1215:2-1216:3.)

B.    **Dr. Alf Sollevi Countered Conventional Wisdom and Pioneered the Use of Adenosine Infusion in Humans**

75. It was against this backdrop -- the historical belief that adenosine itself was not a useful molecule, that ATP was, in any event, more potent, and that the only viable medical use for adenosine was as a rapid bolus for treatment of patients suffering from the arrhythmia PSVT -- that Dr. Alf Sollevi pioneered the administration of adenosine as an intravenous infusion in humans.  (Sollevi 437:21-438:7.)

76. He performed his studies at the Karolinska Institute, one of Sweden's premier research hospitals.  (Sollevi 427:18-22.)

77. Dr. Sollevi became interested in adenosine while still a medical student, when he performed basic science studies on adenosine's ability to regulate circulatory and nerve function in fat tissue.  (Sollevi 429:2-12.)  That interest grew into a life-long endeavor leading to numerous clinical studies in humans and close to a hundred peer-reviewed articles concerning adenosine.  (Sollevi 429:13-18.)

78. Remarkably, Dr. Sollevi's work on adenosine in the early 1980s was directly contrary to the conventional wisdom that adenosine was not useful and was potentially dangerous in humans, outside of the narrow application of a rapid bolus injection for individuals suffering from PSVT.  Dr. Sollevi, however, persevered despite the contrary teaching of the scientific literature.  (*See, e.g.,* TX-48 at 2229; TX-36 at 1254; TX-214 at 415; Klabunde 516:13-522:2, 523:24-524:20, 1052:4-1055:1; Binkley 326:18-328:1; Strauss 769:8-770:20.)

79. Dr. Sollevi was uniquely suited to make his own judgments about the safety and utility of adenosine, as he had spent nearly six years studying adenosine's effects in animals before attempting to administer it to humans.  (Sollevi 434:12-18.)

19

80. One application Dr. Sollevi envisioned as a result of his work was to use an intravenous infusion of adenosine as a vasodilator for controlled hypotension in patients undergoing neurosurgery for a cerebral aneurysm. (Sollevi 434:19-435:4.) A cerebral aneurysm is a serious condition involving a "bulb" or bubble on a blood vessel in the brain that could rupture and cause bleeding and death. (Sollevi 435:5-15.)

81. While surgery is required to repair the aneurysm, there is a high risk that manipulation of the weakened vessel during surgery could itself rupture the aneurysm and kill the patient. (Sollevi 435:9-19.) Consequently, neurosurgeons sought to drastically reduce the patient's blood pressure during surgery by inducing controlled hypotension to cause "slack" in the aneurysm. (Sollevi 435:20-436:24.)

82. The greater the drop in blood pressure during the controlled hypotension the less likely it would be that the aneurysm would rupture. However, allowing the blood pressure to fall too low could also kill the patient. (Sollevi 435:24-436:24.) Thus, to accommodate these competing concerns, surgical hypotension was typically induced to cause a fall of approximately 40 percent in the mean arterial blood pressure. (Sollevi 436:14-436:24.)

1.      **Dr. Sollevi's First Studies Used Low Dose Administration of Adenosine in Conjunction with Dipyridamole Pretreatment to Induce Surgical Hypotension**

83. When planning his controlled hypotension studies in humans, Dr. Sollevi was concerned about the effects of adenosine on cardiac conduction, as well as its ability to cause ischemia. (Sollevi 438:8-15.) He was also concerned about the potential buildup of adenosine metabolites as a result of infusing adenosine, particularly uric acid, which could lead to kidney damage. (Sollevi 437:9-438:16, 438:8-15.)

84. To reduce the danger of side effects, Dr. Sollevi planned to monitor the patients' heart beat by electrocardiogram (ECG) and to administer the lowest possible dose of adenosine,

20

carefully titrating the dose so patients received only the amount of adenosine required to achieve the desired blood pressure reduction. (Sollevi 438:17-439:8.)

85. Dr. Sollevi also decided to pretreat the patients with dipyridamole, a drug known to block the uptake of adenosine into cells, thus increasing the amount of endogenous adenosine in the circulatory system. Dr. Sollevi chose dipyridamole as a pretreatment, knowing that such pretreatment would inhibit the metabolism of adenosine (which occurred inside cells) and allow a much lower dose of adenosine to be used while also reducing the overall concentration gradient of adenosine in the body between the central circulation, where it was administered, and the more peripheral sites where it would cause vasodilation and reduce blood pressure. (Sollevi 438:17-439:23.) This reduction in the overall concentration gradient would occur because dipyridamole, by inhibiting the breakdown of adenosine, caused higher concentrations of adenosine to reach to periphery. (Binkley 250:5-251:19.)

86. When he began his studies, Dr. Sollevi did not know how much pretreatment with dipyridamole would reduce the necessary dose of adenosine in patients. (Sollevi 437:21-25, 439:24-440:17.) However, his animal studies had suggested that the dipyridamole might result in as much as a 20-fold reduction in the necessary dose of adenosine. (Sollevi 440:7-17.)

87. Even with such a reduced dose, Dr. Sollevi also took the precaution of sampling the patients' blood before, during, and after hypotension, to analyze the buildup of possibly harmful metabolites using methods established in his own laboratory. (Sollevi 440:18-441:15.)

88. To reduce concerns about causing ischemia in patients treated with adenosine, Dr. Sollevi excluded those with a history of heart disease from the study. (Sollevi 441:17-442:2.)

89. Results of Sollevi's initial studies were published in abstracts in 1983 and 1984. (TX-1170; TX-37; Sollevi 442:3-443:11.)

21

90. These abstracts demonstrated that, in the presence of a dipyridamole pretreatment, an average dose of 140 mcg/kg/min of adenosine, infused intravenously, would reduce mean blood pressure by about 40 percent.  (TX-1170; TX-37; Binkley 258:2-5, 258:10-13.)

91. While no serious side effects were reported in these abstracts, they involved less than a dozen patients.  (TX-1170; TX-37.)

92. Importantly, these abstracts did not mention the possibility of eliminating the dose-reducing dipyridamole pretreatment or provide any guidance about whether one could determine a safe and effective dose that would induce hypotension in the absence of that pretreatment.  (TX-1170; TX-37.)  To the contrary, a subsequent study by Biaggioni in April 1985 showed that administration of adenosine by intravenous infusion without dipyridamole pretreatment at doses up to 140 mcg/kg/min in five normal healthy volunteers did not cause hypotension.  (TX-1187; Klabunde 555:3-556:14.)

> **2.     Dr. Fukunaga Later Recommended Using Dipyridamole Pretreatment to Avoid Problems Associated with Administering ATP Infusions**

93. Two years after his 1982 abstract concerning administration of an ATP infusion to induce controlled hypotension in surgical patients, and after the publication of Dr. Sollevi's studies on the use of adenosine with a dipyridamole pretreatment, Dr. Fukunaga published an abstract expressing concerns about the effects of administering high doses of ATP in surgical patients.  (TX-51.)

94. In his second abstract, Dr. Fukunaga noted that adenosine could be responsible for many of the hemodynamic effects of ATP infusion, but that further metabolism of the adenosine formed by ATP breakdown  could also lead to undesirably high levels of uric acid.  (TX-51.)  Consequently, Dr. Fukunaga recommended pretreating patients with dipyridamole to reduce the necessary dose of ATP required during controlled hypotension.  (TX-51.)

95. Specifically, the second Fukunaga abstract stated "[w]hen hypotension is needed for long periods, the large doses of ATP required may cause undesirably high levels of uric acid and phosphate.  It was found that this problem can be greatly avoided if dipyridamole (Dp) is used simultaneously." (TX-51; Binkley 270:15-271:1; Klabunde 540:15-541:8.)

96. Dr. Fukunaga's study demonstrated that dipyridamole could reduce the required dose of ATP infusion by about twelve-fold on average or as much as fifty-fold, leading him to recommend the ATP-dipyridamole combination to enhance the hypotensive effect of ATP alone and allow use of a lower dose.  (TX-51; Binkley 178:19-25, 270:15-271:1; Klabunde 541:17-542:6.)

97. Thus, despite his earlier abstract, Dr. Fukunaga later became concerned about the safety of administering ATP without affirmatively reducing the necessary dose by pretreating with dipyridamole.  (*See* TX-51; Klabunde 540:15-541:8.)

98. The timing of his later publication strongly suggests that Dr. Fukunaga was motivated by Dr. Sollevi's published abstracts to *add* dipyridamole pretreatment to his earlier protocol for administering ATP, not to attempt administration of adenosine without dipyridamole.  (TX-51; Klabunde 1045:2-1046:13.)

99. Dr. Fukunaga also determined that the mean dose of ATP required to reduce mean arterial blood pressure in human patients by 40% after dipyridamole pretreatment was only about 32 mcg/kg/min as compared to Dr. Sollevi's mean dose of 140 mcg/kg/min of adenosine to achieve a similar degree of hypotension under similar conditions.  (*Compare* TX-51 *with* TX-1170; Klabunde 1044:5-18.)  As mentioned above, this requirement for substantially *less* ATP than adenosine to achieve the same hypotensive effect was consistent with the observations

of Moir and Downs that ATP was a more potent vasodilator than adenosine.  (TX-199; Klabunde

550:4-14, 1044:19-25.)

100.    Dr. Fukunaga's results thus provided additional evidence that ATP acted, at least

in part, as a direct vasodilator in humans, despite also being broken down into adenosine and

other byproducts.  (TX-51; Klabunde 1044:5-25, 1116:5-1117:4, 1220:19-1221:10.)

> **3.    Animal and *In Vitro* Models Regarding Adenosine and Human
> Studies of ATP Infusion Suggested That Dipyridamole
> Pretreatment Greatly Reduced the Effective Dose of Adenosine**

101.    A variety of studies in the early 1980s had demonstrated dipyridamole's powerful

ability to inhibit the metabolic breakdown of adenosine.  (*See, e.g.*, TX-101; TX-40; TX-51.)

This potent effect of dipyridamole suggested that much higher amounts of adenosine would have

had to be infused into patients to achieve the same degree of controlled hypotension that

Dr. Sollevi had observed at a dose of 140 mcg/kg/min following dipyridamole pretreatment.

(TX-101; *see* Klabunde 535:13-536:8, 1041:25-1042:22, 1050:7-1051:8.)

102.    Indeed, Dr. Sollevi had concluded, based on his own studies that as much as

twenty times more adenosine would be required in the absence of dipyridamole than in its

presence.  (Sollevi 440:7-17.)

103.    Plaintiffs' expert, Dr. Klabunde, performed studies in the early 1980s

demonstrating and quantifying the rapid breakdown of adenosine in human blood.  (TX-101;

Klabunde 501:16-503:20.)  This rapid breakdown was expressed in terms of the half-life of

adenosine, *i.e.*, the time it took for half of an administered dose of adenosine to disappear, which

Dr. Klabunde measured to be less than 10 seconds.  (TX-101; Klabunde 501:16-503:20.)

104.    Dr. Klabunde found that, by inhibiting adenosine metabolism, dipyridamole

dramatically increased adenosine's half-life in human blood, leading him to conclude in 1983

that "the usual therapeutic concentrations of dipyridamole are sufficient to inhibit adenosine metabolism by more than 90% in whole blood." (TX-101 at 25; Klabunde 503:21-504:2.)

105.    Studies in live animals also pointed to dipyridamole as dramatically reducing the necessary dose of adenosine infusion required for controlled hypotension. (*See, e.g.*, TX-40.)

106.    For example, a 1983 publication by Kassell and colleagues involving induction of controlled hypotension in dogs reported that dipyridamole pretreatment had reduced the necessary dose of adenosine by nearly 200-fold. (TX-40 at 73; Klabunde 532:7-534:25.) While the authors "speculated" that the dipyridamole pretreatment might be unnecessary in humans because dogs were "notoriously difficult" animals in which to induce hypotension, they offered no data to support their speculation. (TX-40 at 73; Klabunde 1046:14-1048:25.) Indeed, far from being difficult, the dogs in the Kassell study showed dramatic hypotension at a dose of only 50 mcg/kg/min in the presence of dipyridamole, compared to a dose of 10,000 mcg/kg/min without dipyridamole. (TX-40 at 73; Klabunde 1048:6-25.)

107.    Dr. Fukunaga's 1984 study of ATP-induced hypotension following dipyridamole pretreatment also evidenced a powerful dipyridamole effect in humans. (TX-51; Klabunde 541:17-542:3; DTX-2002.) Specifically, Dr. Fukunaga demonstrated that dipyridamole reduced the required human dose of ATP by approximately 12-fold on average to as much as 50-fold. (TX-51; Klabunde 541:17-542:3, 1050:24-1051:8.)

108.    Taken together with the *in vitro* and animal studies, these human studies with ATP would have further suggested that to achieve hypotension with adenosine in the absence of dipyridamole in the way Dr. Sollevi had at a dose of 140 mcg/kg/min in the presence of dipyridamole would require at least a 10-fold or greater increase in the dose of adenosine administered. (TX-51; TX-1170; Klabunde 543:12-544:7.) But administering such a large dose

of adenosine (e.g., in excess of 1,400 mcg/kg/min) would have been out of the question given the likelihood of causing bradycardia, cardiac arrest, or AV block, as well as potential kidney toxicity due to accumulation of the adenosine metabolite uric acid.  (TX-36; TX-51; TX-410; Klabunde 537:5-538:6, 1054:2-1055:1) .

109.    Indeed, eliminating dipyridamole pretreatment would have been exactly the opposite of the advice in the *Fukunaga 1984* abstract.  (TX-51.)

### 4.    Dr. Sollevi Unexpectedly Discovered that Adenosine Could Selectively Vasodilate Arteries and Safely Induce Surgical Hypotension  Without Dipyridamole Pretreatment

110.    Despite the studies suggesting the need for much higher doses of adenosine in the absence of dipyridamole and very real concerns that administration of adenosine alone at a dose sufficient to induce controlled hypotension would cause serious cardiac side effects, Dr. Sollevi proceeded in the winter of 1983 to 1984 to perform studies in human patients intravenously infusing adenosine without an initial dipyridamole pretreatment.  (TX-112; TX-1169; Sollevi 446:1-14, 447:13-449:18.)

111.    Dr. Sollevi explained that his prior work with adenosine infusion in conjunction with dipyridamole pretreatment had not answered his concerns about AV block, accumulation of uric acid, or possible ischemia because those same effects could well be observed at the higher doses he believed would be required in the absence of the dipyridamole pretreatment.  (TX-112; Sollevi 448:2-8.)  Dr. Sollevi's perspective was that he had "no information" on the amount of adenosine that would be required apart from his own animal studies suggesting that as much as 20-fold higher doses would be needed.  (TX-112; Sollevi 448:2-449:8.)

112.    Dr. Sollevi's ultimate goal, however, was to administer adenosine alone, in hopes that it would be a fast-acting compound that would be easy to titrate and reverse when

26

hypotension was no longer needed, so he proceeded in the face of uncertainty. (Sollevi 448:9-18.)

113.    To his surprise, Dr. Sollevi found that only a small increase of approximately 50 percent (1.5-fold) in the adenosine dose was required in the absence of dipyridamole in humans. (TX-169; Sollevi 450:5-451:6.) Indeed, the mean dose increased from only about 140 mcg/kg/min with dipyridamole to only about 214 mcg/kg/min without the pretreatment. (TX-1169 at 232; Sollevi 450:5-451:3.) Importantly, the increased dose did not induce heart block or significantly raise the level of uric acid accumulated during the hypotension period. (TX-1169 at 233; Sollevi 451:7-21.) Finally, elimination of the dipyridamole pretreatment allowed the controlled hypotension to be rapidly terminated when no longer needed during surgery. (Sollevi 448:11-16.)

114.    By the time he became aware of these new results, Dr. Sollevi had already submitted for peer review a complete scientific article concerning his work on adenosine infusion after dipyridamole pretreatment. (TX-112; Sollevi 446:1-14.) Unable to completely rewrite the paper at the late stage of the review process, Dr. Sollevi nevertheless sought permission to include data from the new studies in the manuscript under review. The journal acquiesced, allowing the results to be summarized as a footnote. (Sollevi 446:1-14; TX-112 at 403.)

115.    Dr. Sollevi subsequently submitted a complete article on his studies of the use of adenoscan without dipyridamole pretreatment in the fall of 1986. (TX-1169; Sollevi 446:22-447:12.)

5. **Dr. Sollevi Envisioned and Tested Additional Uses for Adenosine as a Selective Arterial Vasodilator and Filed a Patent Application that Issued as the '296 Patent**

116.    Dr. Sollevi filed a patent application relating to his work with adenosine infusion on September 24, 1985.  (TX-308; Sollevi 431:5-25.)  That patent application matured into the '296 patent-in-suit on March 24, 1998.  (TX-275.)

117.    As discussed above, the asserted claims of the patent (claims 1, 3, 7, and 9) relate to Dr. Sollevi's conclusion that patients administered an adenosine infusion without pretreatment with dipyridamole exhibit clear selective arterial vasodilation without significant venous dilation, allowing the adenosine infusion to be used for medical purposes, such as controlled hypotension and the other uses set forth in the original patent specification.  (TX-308; Sollevi 433:23-434:11.)

118.    Dr. Sollevi based his conclusion on the observation that patients administered an adenosine infusion exhibited a clear cut reduction in vascular resistance with essentially unaffected heart filling pressures and, *without exception*, an increase in cardiac output.  (TX-308; Sollevi 433:23-434:11.)  Such measurements of coronary filling were established measurements for determining whether a vasodilator was acting selectively on the arterial system.  (*See* Klabunde 544:18-545:16.)

6. **The Leaders in the Field Were Surprised that Adenosine Infusion Could Be Safely Administered at Therapeutically Significant Doses**

119.    Dr. Sollevi himself was surprised to learn that adenosine could be used to induce selective arterial vasodilation resulting in controlled hypotension without dipyridamole pretreatment at low doses that did not cause significant side effects.  (Sollevi 451:4-6.)

120.    He was not alone in that surprise.  The record reflects that leaders in the field were equally surprised at Dr. Sollevi's results.  (TX-49; Klabunde 1052:4-1053:4.)  Indeed, they

28

told him exactly that in person and in scientific correspondence he received in the mid-1980s. (*See*, e.g., Sollevi 453:13-454:3, 454:4-15, 459:3-23, 471:15-472:17; TX-49; TX-265.)

> ### a. Dr. Berne Was Surprised That Dr. Sollevi Had Been Able to Reduce Blood Pressure by Adenosine-Mediated Vasodilation Without Inducing AV Block

121. As discussed above, Dr. Robert Berne was the preeminent leader in the field of adenosine research by the mid-1980s. (Binkley 317:19-318:19; Klabunde 1052:16-24.) Having established the Adenosine Hypothesis in the 1960s, he and his colleagues at the University of Virginia were at the cutting edge of adenosine research with their clinical studies on the use of adenosine for treatment of PSVT. (Klabunde 499:5-9; 1052:4-1053:4.)

122. Dr. Sollevi remembers well his first meeting with Dr. Berne at a scientific conference on adenosine in Wiesbaden in late 1984. (Sollevi 452:25-453:19.) Upon learning that Dr. Sollevi was from Sweden, Dr. Berne asked whether he was aware of the "crazy Swede" who was infusing adenosine into human patients. (Sollevi 453:19-454:3.)

123. This description of the administration of adenosine infusion as "crazy" directly reflects the view of those in the field, even the very best in the field, that adenosine was a potentially dangerous drug whose only potential use in humans was for treating PSVT in rapid bolus doses. (Klabunde 1052:4-1053:4; Sollevi 453:19-454:3.)

124. Dr. Sollevi's recollection of Dr. Berne's skepticism and concern and his surprise upon learning that adenosine could be infused safely and successfully to achieve controlled hypotension is corroborated in correspondence between the two scientists following their first meeting. (Sollevi 454:4-455:23.)

125. Dr. Berne wrote to Dr. Sollevi in December 1984, describing his interest in Dr. Sollevi's work in humans and requesting copies of recent publications. (TX-436; Sollevi 455:24-456:22.) Dr. Sollevi responded in a January 1985 letter, referring to the meeting in

Wiesbaden and providing detailed comments on scientific questions raised by Dr. Berne, including a copy of his 1984 article describing adenosine administration with and without dipyridamole pretreatment.  (TX-439; TX-112; Sollevi 457:3-458:25.)  Dr. Berne wrote again on February 8, 1985, acknowledging Dr. Sollevi's letter and again expressing his admiration and surprise over Sollevi's results in humans, stating:

> I am really impressed with the studies you have done in humans and I hope that you will continue to pursue this because I think it is of considerable clinical importance.  One thing I don't understand is how you avoid atrioventricular heart block with doses of adenosine that are required to greatly lower arterial pressure.  We get AV block with doses of adenosine that do not lower blood pressure (see enclosed reprint).

(TX-49.)

126.    Thus, Dr. Berne, the undisputed expert in the field of adenosine research, expressed again in February 1985 what he had first expressed at their meeting in Wiesbaden, namely admiration for Dr. Sollevi's pioneering work and surprise that Dr. Sollevi had succeeded in lowering blood pressure with adenosine without inducing AV block.  (TX-49; Klabunde 1051:14-1053:4.)

### b.    Dr. Francis Robicsek Also Questioned the Safety of Adenosine Infusion in a Letter to a Medical Journal

127.    As discussed above, in addition to cardiac side effects, Dr. Sollevi and others in the field were concerned over the potential for adenosine infusion to cause a buildup of toxic metabolites, specifically uric acid, that could cause kidney failure.  (Sollevi 433:7-22; TX-308; TX-441 at 158; TX-255.)  These concerns are reflected not only in the literature but also in correspondence spurred by one of Dr. Sollevi's publications in 1985, involving the use of an adenosine infusion at a dose of 100 mcg/kg/min in patients undergoing surgery.  (*See* TX-441.)

128.    In that publication, Dr. Sollevi commented on the lack of observed uric acid accumulation stating that "[t]hese findings are clinically important, since accumulation of uric acid may cause renal tubular crystallization, leading to kidney dysfunction."  (TX-441 at 158.)

129.    Dr. Francis Robicsek of the Heineman Medical Research Center in Charlotte, North Carolina, had expressed similar concerns about kidney toxicity due to uric acid accumulation associated with adenosine administration in an article he co-authored and published in 1982.  (Sollevi 463:6-464:12; TX-255.)  That earlier article described administration of an adenosine infusion to dogs in a surgical setting, but warned that "toxicity related to kidney dysfunction may limit the use of adenosine alone and may require xanthine oxidase inhibition to prevent uric acid crystallization in the renal tubules."  (TX-255 at 19.)

130.    After reading Dr. Sollevi's 1985 article, Dr. Robicsek wrote a letter to the editor of the medical journal in which it was published questioning whether Dr. Sollevi had considered the potential toxic effects of uric acid on the kidney and whether he had taken special precautions to prevent it.  (TX-410; Sollevi 464:13-468:7.)  Dr. Robicsek went on to note that he had never applied the adenosine infusion method he had tested in dogs to human patients because of concerns that uric acid accumulation would cause kidney failure.  (TX-410.)  The editor of the medical journal forwarded Dr. Robicsek's letter to Dr. Sollevi and requested a response, stating that Dr. Robicsek was the chief of a leading thoracic surgical clinic in the United States, and that the letter raised a discreet "but still, in my view, justified question on possible effects of adenosine on kidney function."  (TX-293; Sollevi 465:8-466:24.)

131.    Dr. Sollevi responded to Dr. Robicsek in a detailed scientific letter, prompting Dr. Robicsek to write back to Dr. Sollevi directly.  (*See* TX-411; TX-412; TX-413; Sollevi 468:20-472:17.)  In that response, Dr. Robicsek reiterated that he had never performed an

adenosine infusion in humans because of concerns of uric acid accumulation and congratulated Dr. Sollevi on his "beautifully conducted work."  (TX-265: Sollevi 472:2-17.)

132.    This exchange directly illustrates how even experts in the field, *i.e.,* the chief editor of a major medical journal and Dr. Robicsek, the chief of a leading thoracic surgical clinic, were skeptical about the safety of adenosine infusion.  (Klabunde 1053:5-1055:1.)

133.    That skepticism was fueled by concerns that adenosine metabolism would form uric acid, resulting in kidney failure.  (Klabunde 1054:7-1055:1.)  Even Dr. Fukunaga, upon whose work Sicor heavily relies, stated in his 1984 abstract that concomitant use of dipyridamole was desirable in order to reduce the buildup of uric acid.  (TX-51; Klabunde 540:15-541:8.)

134.    Sicor's expert, Dr. Binkley, who did not himself confront the adenosine metabolism issue in the mid-1980s, offered his own opinion that uric acid accumulation would not have discouraged those in the field at the time from using an adenosine infusion, and that, absent extremely high levels, uric acid elevation would need to take place "over a period of years" for it to be a concern.  (Binkley 224:6-227:9.)  Those who actually confronted the issue at the relevant time, however, clearly were concerned that adenosine infusion would result in uric acid accumulation and kidney failure, as evidenced by the literature and correspondence created long before the litigation at hand.  (See Section 6.b., *supra*.)

IV.    **NOVELTY OF THE ASSERTED CLAIMS**

A.    **The Asserted Claims**

135.    The asserted claims are claims 1, 3, 7, and 9 of the '296 patent.  (D.I. 127 ¶ 1.)

136.    For purposes of illustration, claim 3 reads:

> 3. A method of selectively vasodilating the arteries of a human
> patient without inducing significant venous dilation and without
> pretreatment with dipyridamole, comprising continuously
> administering into the blood stream of said patient by intravenous
> administration about 0.05 milligrams to about 0.30 milligrams
> [about 50 micrograms to about 300 micrograms] of adenosine per
> kilogram body weight per minute.

(TX-275 at col. 22, ll. 20-26.)

137.    The invention covered by the asserted claims reflects the discovery by Dr. Alf
Sollevi of the first legitimate medical uses of continuous infusion of adenosine without
dipyridamole pretreatment in human patients and the dosing parameters for safe practice of those
methods.  (*See* TX-275, col. 22, claims 1, 3, 7, and 9.)  The invention of the asserted claims
concerns selectively vasodilating the arteries of a human patient without inducing significant
venous dilation and without pretreatment with dipyridamole by administering an adenosine
infusion at various dose ranges.  (TX-275 at col. 22, claims 1, 3, 7, and 9.)

138.    In this litigation, Sicor asserts that three primary references invalidate the asserted
claims, namely *Fukunaga 1982*, *Sollevi I*, and *Sollevi II* (Binkley 188:23-191:18; TX-42;
TX-1170; TX-37.), despite the fact that all of these references were before the Patent Office and
are listed on the face of the '296 patent.  (TX-275.)

**B.    *Fukunaga 1982* Does Not Describe or Disclose the Administration of
Adenosine at Any Dose**

139.    The *Fukunaga 1982* abstract relied on by Sicor does not describe or disclose the
administration of adenosine to human patients.  (TX-42.)  As described above, adenosine is not
mentioned in the abstract, which concerns administering a different molecule, ATP.  (TX-42;
Klabunde 508:4-7.)

140.    In addition, the abstract does not describe any dose of adenosine to be administered.  (TX-42; Klabunde 508:4-7.)  Defendants' expert, Dr. Binkley, attempted to calculate an equivalent dose of adenosine based on the "simplifying assumption" that 100 percent of the administered ATP would have been converted into adenosine in the blood of patients in the study.  (Binkley 167:12-168:7, 258:18-259:2.)  However, at his deposition, Dr. Binkley had admitted that this was merely  "speculation."  (Binkley 271:18-272:14.)

141.    Dr. Binkley's assumption led him to opine that the dose range of ATP administered in *Fukunaga 1982* (200-600 mcg/kg/min) corresponded to an "equivalent" adenosine dose range of 97 to 290 mcg/kg/min, taking into account the relative molecular weights of the two compounds.  (Binkley 167:2-168:7.)  In other words, he opined that, on a weight basis, one microgram of adenosine would be equivalent to about two micrograms of ATP. (*See* Binkley 259:11-260:20.)

142.    Moreover, the human data contradicted Dr. Binkley's assumption.  The *Fukunaga 1984* abstract reported that, on average, 32 micrograms of ATP lowered blood pressure by about 40% in patients treated with dipyridamole.  (TX-51; Klabunde 550:4-14; Binkley 257:12-15; DTX-2002.)  If Dr. Binkley's assumption was correct, a corresponding dose of 16 micrograms of adenosine should have had a similar effect.  (Binkley 258:25-260:1; Klabunde 549:4-550:14.) However, Dr. Sollevi needed 140 micrograms of adenosine, nearly 10 times as much as Dr. Binkley's assumption predicted, to achieve a similar blood pressure reduction after dipyridamole pretreatment.  (Binkley 260:2-20; Klabunde 550:15-24.)

143.    Further, Dr. Binkley did not offer direct evidence on the point or attempt to show how the dose range set forth in, for example, claim 3 (50 to 300 mcg/kg/min) would have been

disclosed if the metabolism of ATP occurred at less than 100 percent efficiency. (Binkley 167:12-168:7, 170:18-172:2.)

144.    Dr. Binkley further admitted at trial that ATP administration would result in formation of more metabolic byproducts than just adenosine, that the various metabolites would interconvert with one another, and that adenosine would not simply "pool" in the body, but would itself be converted into other metabolites. (Binkley 272:15-274:16.) Indeed, despite describing adenosine as the "end product" of ATP metabolism, Dr. Binkley admitted that adenosine is itself further degraded to uric acid. (Binkley 168:8-25, 274:1-9.) Consequently, it would have been impossible to predict or calculate the amount of adenosine formed in the bloodstream of a patient to whom ATP was administered. (Klabunde 507:8-508:3.)

145.    Critically, even if Dr. Binkley's "simplifying assumption" were accepted for the sake of argument, and all of the administered ATP were to be converted in the body to an equimolar amount of adenosine, it would not change the fact that the drug "administered" to the patient in *Fukunaga 1982* was not adenosine, but ATP. (Binkley 243:14-22.) It is beyond dispute that ATP was the drug in the syringe that was "administered" into the patient, not adenosine. (Binkley 243:14-22, 190:9-12, 169:18-21, 164:18-165:4.) Consequently, there is simply no teaching in the *Fukunaga 1982* abstract of adenosine administration at any dose. (TX-42; *see also* Klabunde 507:13-508:3.)

C.    **The Reportedly "Maintained" Cardiac Output in *Fukunaga 1982* Does Not Demonstrate Consistent Selective Arterial Vasodilation**

146.    Dr. Sollevi described the hallmarks of selective arterial vasodilation as involving a clear cut reduction in vascular resistance combined with essentially unaffected filling pressures to the heart and, without exception, an increase in cardiac output (the rate of blood flow pumping through the heart). (Sollevi 433:23-434:11.) Indeed, he observed such a decrease in vascular

resistance, maintained filling pressure, and an increase in cardiac output in patients administered adenosine infusions.  (TX-37; TX-1170; TX-1169 at 232; Sollevi 433:23-434:11.)

147.    By contrast, the *Fukunaga 1982* abstract does not report the same consistent increase in cardiac output together with maintained filling pressure.  The abstract does not even report measurement of filling pressures, such as right atrial pressure.  (Klabunde 544:8-546:2; TX-42.)

148.    Acknowledging that a decrease in cardiac output would be inconsistent with selective arterial vasodilation, Dr. Binkley relied on the abstract's statement that cardiac output was "well maintained" to opine that ATP infusion had resulted in selective arterial vasodilation.  (Binkley 165:13-166:7; TX-42.)  The data presented in Table 2 of the abstract, however, showed that in two out of the five patients for which data is allegedly presented, cardiac output actually decreased.  (Klabunde 546:3-18; TX-42.)

149.    Moreover, while the table purports to show data from five patients, the text of the abstract reports that cardiac output was only measured in four.  (Klabunde 546:9-547:21; Binkley 309:17-310:2; TX-42.)  Consequently, the *Fukunaga 1982* abstract does not support a finding of selective arterial vasodilation in patients administered an intravenous infusion of ATP, much less a consistent response in all patients.  (Klabunde 548:9-20.)

## V.    FACTS CONCERNING NONOBVIOUSNESS OF THE ASSERTED CLAIMS

### A.    Scope and Content of the Prior Art

150.    Taken as a whole, the prior art shows a concern about the safety of administering adenosine infusions, particularly at higher doses, that would have led away from the claimed methods of inducing selective vasodilation by adenosine infusion without dipyridamole pretreatment.  (*See, e.g.,* Klabunde 529:6-530:8; TX-37; TX-1170; TX-51.)

151.    Sicor relies, as primary references, on Dr. Sollevi's two abstracts (TX-37 ("*Sollevi I*"); TX-1170 ("*Sollevi II*")) on the use of adenosine infusion with a dipyridamole pretreatment to induce controlled hypotension during surgery.  (Binkley 188:15-191:18.)

152.    In addition, Sicor cites as primary references *Fukunaga 1982* (TX-42) concerning use of ATP without dipyridamole pretreatment to induce surgical hypotension, as well as the later 1984 Fukunaga abstract (TX-51 ("*Fukunaga 1984*")) recommending dipyridamole pretreatment as a way of reducing buildup of uric acid when ATP was infused.  (Binkley 192:2-193:2.)

153.    However, *Fukunaga 1984* plainly points away from the use of either adenosine or ATP without dipyridamole pretreatment.  (TX-51; Klabunde 540:15-541:16.)

154.    *Fukunaga 1984* is also important because, when compared with Dr. Sollevi's studies, it showed that much lower doses of ATP than adenosine were required to induce hypotension in the presence of dipyridamole.  These studies thus confirmed that ATP was a more potent vasodilator than adenosine in humans.  (TX-51; Klabunde 1044:5-25; Binkley 258:19-260:8.)  Because the hallmark of indirect action by ATP would be lower potency than adenosine, the demonstration that in human patients pretreated with dipyridamole ATP was the *more* potent vasodilator is clear evidence that ATP was acting, at least in part, through direct action on its own receptors.  (*See* Klabunde 549:12-550:24, 1116:5-1118-21.)

155.    Sicor also relies on the abstract by Dr. Biaggioni concerning administration of adenosine to normal volunteers (*see* Binkley 192:2-193:2).  But the adenosine infusion there was for no medical purpose and failed to induce hypotension.  (Binkley 256:13-17; Klabunde 552:17-23, 554:14-555:5.)  Sicor also relies on prior art references that it asserts establish that adenosine was well known as a vasodilator of arteries but these are publications  by Dr. Berne

describing the role of *endogenous* adenosine -- the so-called "Adenosine Hypothesis." (*See* Binkley 192:2-193:2.) Sicor also relies on the 1929 publication by Drury. (*See* Binkley 192:2-193:2.) But this is the publication that identified adenosine's dangerous effects on the heart. (TX-1187; *see* Klabunde 516:4-22.)

156.     Ultimately, however, Sicor's picture of the prior art is incomplete because it does not acknowledge adenosine's long history of untoward effects on electrical conduction in the heart and its ability to cause bradycardia, AV block, temporary cardiac arrest, or uric acid accumulation. (TX-35; TX-36; TX-255; TX-441; Klabunde 516:4-22, 540:15-541:16.) These effects and the concerns they raised are reflected in the publications from the 1920s and 1930s by Drury and by Jezer as well as in modern publications that summarized the historical development of adenosine research and were discussed previously. (TX-35; TX-36; TX-45; TX-48; TX-187; *see also* Klabunde 516:13-517:1.)

157.     In addition to these general concerns about adenosine's effect on the heart, the prior art contained publications from the University of Virginia group (co-authored by Dr. Berne and identifying DiMarco as the lead author) that showed adenosine's ability to treat PSVT by interrupting electrical conduction when administered by rapid bolus and warning of dose-dependent cardiac side effects and the need to consider individual sensitivities to adenosine. (TX-36; TX-45.)

158.     The prior art also contained publications concerning unsuccessful efforts to develop adenosine analogs, such as ethyl-adenosine, that would retain adenosine's vasodilating features without inducing ischemia and other cardiac effects; the failure of ethyl-adenosine in human trials; and the subsequent decision to proceed with dipyridamole, but not adenosine itself, as a pharmacologic stress agent for myocardial perfusion imaging in human patients. (*See, e.g.,*

TX-214 at 415; TX-176; TX-1184; TX-259; TX-93; Binkley 326:18-328:1; Strauss 769:8-770:20, 771:51-773:21.)

159.    In addition, the prior art contained references demonstrating dipyridamole's potent effects on adenosine metabolism that would have led to the conclusion that much higher doses of adenosine would be required to induce hypotension in patients if dipyridamole pretreatment were removed.  (*See, e.g.,* Klabunde 529:6-530:8.)  These included Dr. Klabunde's *in vitro* studies, Kassell's study on adenosine infusion to induce hypotension in dogs with and without dipyridamole pretreatment, and *Fukunaga 1984*.  (*See*, *e.g.*, TX-1036; TX-101; TX-40; TX-51; Klabunde 540:15-542:6.)

### B.    Level of Ordinary Skill in the Art

160.    The parties agree that a person of ordinary skill in the art would be a cardiologist whose training would have included medical school, a residency in internal medicine, and fellowship in cardiology.  (Klabunde 515:11-25; Binkley 95:25-96:7.)

### C.    Differences Between the Claimed Invention and the Prior Art

161.    Sicor has identified Dr. Sollevi's two abstracts (*Sollevi I* and *Sollevi II*) concerning the administration of adenosine infusion following dipyridamole pretreatment to induce controlled hypotension in patients undergoing aneurysm surgery as the closest prior art for purposes of obviousness.  (*See, e.g.,* Binkley 154:23-155:14; TX-1170; TX-37.)  The mean dose of adenosine administered in these trials in the presence of dipyridamole was 140 mcg/kg/min.  (TX-1170; TX-37; Binkley 258:2-5, 256:22-257:1; Klabunde 537:5-8.)

162.    None of the prior art relied on by Sicor refers to a medical use for adenosine other than inducing controlled hypotension during surgery.  (Binkley 256:7-17.)

163.    Consequently, the difference between the closest prior art and the claimed invention concerns whether or not to use dipyridamole to reduce the required dose of adenosine during controlled surgical hypotension.  (Klabunde 527:12-20.)

164.    The relevant factual inquiry is whether the prior art, common sense, or any other factor would have taught, suggested, or motivated a person of ordinary skill to eliminate the dipyridamole pretreatment, and whether one of ordinary skill reasonably expected such a modified method to be successful (*i.e.*, to be safe and effective) if the pretreatment were eliminated.

## VI.    THE PRIOR ART TAUGHT AWAY FROM ADMINISTERING AN ADENOSINE INFUSION ALONE AS A SELECTIVE ARTERIAL VASODILATOR

### A.    One of Ordinary Skill Would Have Been Discouraged from Administering Adenosine Without Dipyridamole Pretreatment Because of Concerns About Side Effects with Larger Doses of Adenosine.

165.    The abstracts themselves, *Sollevi I* and *Sollevi II,* did not suggest or imply administering adenosine without dipyridamole pretreatment.[5]  To the contrary, the prior art taught away from removing this precautionary step by showing adenosine to be capable of serious adverse effects, particularly at higher doses.  One need only look to the reason dipyridamole was included in Dr. Sollevi's studies in the first place to recognize that the prior art concerns about adenosine safety would have discouraged one of ordinary skill from using adenosine as a selective arterial vasodilator without the dipyridamole pretreatment.  (Klabunde 529:23-530:8; Sollevi 440:7-441:5.)

---

[5]    Sicor's reliance on the conclusory statements in each abstract referring to the ability of adenosine to induce hypotension is misplaced.  The context of these statements is clearly within a methodology that used dipyridamole as a safety measure to reduce the required dose of adenosine, thereby avoiding adenosine's known risks.

166.    The *Sollevi I* abstract states explicitly, and Dr. Sollevi confirmed, that the purpose of the dipyridamole pretreatment was to reduce the required dose of adenosine.  (TX-1170; Sollevi 438:17-439:8.)

167.    Dr. Fukunaga made the same point in his 1984 abstract in the context of ATP infusion, indicating that dipyridamole pretreatment should be used to reduce the dose of ATP administered.  (TX-51.)

168.    One of ordinary skill in the art would have been aware of the evidence of literally decades of concern about adenosine's effects on the heart.  (*See, e.g.,* TX-35; TX-187; TX-36; TX-45; TX-48.)  Based on that evidence, one of ordinary skill in art would have understood that the reason to minimize the dose of adenosine was to minimize the possibility of AV block and other toxic effects on the heart and to minimize the chance of accumulating uric acid and harming the kidneys.  (*See* Klabunde 537:5-538:6, 1052:4-1055:1.)

169.    Indeed, aside from Dr. Sollevi's abstracts, the only other potential medical use of adenosine was in the treatment of PSVT by rapid bolus administration, a use that explicitly invoked adenosine's effects on conduction in the heart.  (*See, e.g.,* TX-36 ("At a mean dose of $179\underline{+}$ 88 mcg/kg ($\underline{+}$ SD), adenosine suppressed sinus node automaticity and depressed atrioventricular (AV) nodal conduction.").)

170.    While Dr. Sollevi did not report AV block in the 10 patients treated with adenosine after dipyridamole pretreatment, one of ordinary skill would have expected that a much higher dose (ten to one hundred-fold greater) would have been required in the absence of dipyridamole.  (Klabunde 1134:3-18, 529:10-530:8.)  Such higher doses would have presented real concerns that patients would exhibit the bradycardia, complete AV block, or  "temporary

cardiac arrest" reported in the prior art and discouraged elimination of dipyridamole.  (Klabunde 537:9-538:6; TX-48 at 229; TX-45 at 417; TX-36 at 1254.)

171.    Dr. Binkley suggests that there would have been a motivation to "simplify" Dr. Sollevi's procedure by reducing the number of needed drugs through elimination of the dipyridamole pretreatment.  (Binkley 183:18-184:5.)  However, that motivation was always present, and in spite of it Dr. Sollevi and Dr. Fukunaga both recommended, and indeed used, dipyridamole pretreatment in surgical patients.  (TX-37; TX-1170; TX-51.)

172.    Dr. Klabunde also confirmed that one of ordinary skill in the art presented with both the *Fukunaga 1982* abstract and the 1984 abstract would see the later abstract as an evolution in Dr. Fukunaga's thinking, particularly because of the explicit safety rationale for adding dipyridamole.  (Klabunde 1045:7-1046:13.)

173.    Dr. Binkley offered a new opinion on rebuttal that one of ordinary skill would have been motivated to use an adenosine infusion without dipyridamole pretreatment for the additional applications of treating heart disease or a condition termed "limb ischemia."  (Binkley 1366:13-1368:2.)  This new opinion had not been disclosed in any of Dr. Binkley's prior expert reports or deposition testimony and should be precluded on that basis alone.  (Binkley 1368:24-1370:11.)

174.    But even if substantively considered, the opinion is not credible.  Dr. Binkley did not cite any authority for these suggested uses.  He admitted that, even today, he had never actually used adenosine for such purposes, and characterized the use of adenosine for heart failure only as "something worth exploring."  (Binkley 1489:6-1490:11.)  Moreover, an ordinarily skilled physician would have had numerous alternative drugs with fewer side effects that could have been administered instead of adenosine.  Indeed, had adenosine truly been

considered interchangeable with various prior art vasodilators, there is no reason why it would

not have been used for that purpose decade earlier.  Most importantly, Dr. Binkley did not

address the risks that would have been perceived in administering adenosine to patients suffering

from heart failure.  Even Dr. Sollevi's studies had specifically excluded patients with any history

of cardiac disease because of concerns relating to this more vulnerable population.  (TX-1170;

Sollevi 441:16-22.)

> **B.** **One of Ordinary Skill in the Art Would Have Concluded that the Effect of Dipyridamole Pretreatment Lasted Throughout the Period of Hypotension in Dr. Sollevi's Studies**

175.    Based on the work of Dr. Klabunde and Dr. Sollevi's own abstracts and

publications, one of ordinary skill in the art would have expected that dipyridamole would have a

large inhibitory effect on adenosine metabolism throughout the period of surgical hypotension

described by Dr. Sollevi.  (Klabunde 530:18-532:3.)

176.    In spite of this, Dr. Binkley asserted at trial that one of ordinary skill would have

concluded there was "very little, if any, dipyridamole effect" remaining at the end of the surgical

hypotensive period because Dr. Binkley contended there was a rapid return of adenosine levels

to baseline and the rapid reversal of the blood pressure effect when the infusion was stopped.

(Binkley 154:1-17, 147:12-21.)  This, however, was a new theory that was not previously

disclosed in Dr. Binkley's expert reports.  (Objection at 155:15-19; TX-26; TX-43.)  Moreover,

it is completely unsupported by the record.

177.    Indeed, according to the *Sollevi II* abstract (TX-37), in the presence of

dipyridamole, adenosine levels did not return to control levels until 3 to 9 minutes after the

adenosine infusion was discontinued at the end of the surgical hypotensive period.  (TX-37;

Klabunde 529:9-531:10.)  This is a clear indication of the continuing effects of dipyridamole

because, based on adenosine's known short half-life (<10 seconds), one of ordinary skill would

have expected adenosine blood levels to return to normal in only 30 to 40 seconds in the absence

of dipyridamole. (Klabunde 531:1-532:3.) Dr. Binkley admitted as much on cross-examination,

contradicting his earlier testimony. (Binkley 265:13-23.)

178.    The slow return to normal of the adenosine levels (3 to 9 minutes versus 30 to 40

seconds) was thus a clear indication that dipyridamole had a strong and continuing effect on

adenosine metabolism throughout the period of hypotension. (*Id.*) When confronted with this

reasoning, Dr. Binkley offered rebuttal testimony on a different theory as to why the

dipyridamole effect had disappeared by the end of the period of hypotension. This theory had

not been previously disclosed in Dr. Binkley's expert reports. (*See* Binkley 1379:9-1397:21,

261:12-262:14; TX-26; TX-43.)

179.    Most of Dr. Binkley's second and previously undisclosed theory concerned the

so-called "functional half-life" of adenosine, which Dr. Binkley testified was between 30 and 40

minutes and corresponded to the half-life of the "physiological effect of the drug." (Binkley

1380:20-1381:22.) This new theory was contradicted, however, by Dr. Binkley's deposition

testimony that "[t]he half-life of dipyridamole is 40 to 80 minutes and, therefore, you could have

greatly prolonged effects of both the dipyridamole and the adenosine."[6] (Binkley 1474:8-23.)

180.    Furthermore, regardless of Dr. Binkley's view on the half-life of dipyridamole,

the literature available prior to the filing date of the '296 patent would still have led one of

ordinary skill in the art to conclude that dipyridamole was having a powerful inhibiting effect on

adenosine metabolism, even at the end of the hypotensive period. (Klabunde 531:1-532:3.) For

---

[6]      On redirect, Dr. Binkley asserted that his deposition testimony was not referring
to the "functional" half-life of dipyridamole, but that assertion is itself inconsistent with the
entire thrust of his deposition testimony, which was that the 40 to 80 minute half-life of
dipyridamole could lead to "greatly prolonged effects of both the dipyridamole and the
adenosine." (Binkley 1507:8-12, 1474:8-23).

example, Dr. Sollevi published an article in 1984 concerning the effect of dipyridamole treatment in humans showing that even 75 minutes after administration of dipyridamole, the blood levels of adenosine were elevated and the amount of dipyridamole in the blood was 0.8 micromolar.  (TX-1173 at 167; Binkley 1480:4-22.)  At that concentration, dipyridamole would have inhibited adenosine metabolism by at least 60 to 90 percent.  (Klabunde 1039:15-1040:14.)

181.    Moreover, based on the report in the *Sollevi I* abstract that the concentration of dipyridamole prior to adenosine infusion was 1 to 2 micromolar, one of ordinary skill could have expected substantial inhibition by dipyridamole even after the passing of two dipyridamole half-lives.  (TX-37; TX-101 at 24; Klabunde 1037:20-1040:19.)  Indeed, Dr. Klabunde concluded in his 1983 article that "therapeutic concentrations of dipyridamole are sufficient to inhibit adenosine metabolism by more than 90 percent in whole blood."  (TX-101 at 25; Klabunde 1041:25-1042:14.)

182.    Consequently, persons of ordinary skill would have expected that dipyridamole was continuing to greatly reduce the necessary dose of adenosine throughout the hypotensive period of adenosine treatment in Dr. Sollevi's studies.  (Klabunde 1042:15-22.)  There is certainly no clear and convincing evidence that such persons would have immediately recognized from these published texts that dipyridamole was having *no effect* at the end of the adenosine infusion.

### C.    The *Fukunaga 1982* and *Fukunaga 1984* Abstracts Taught Away From Administering Adenosine Without Dipyridamole Pretreatment

183.    Sicor suggests that one of ordinary skill would have concluded that the hypotension reported in the *Fukunaga 1982* abstract following administration of ATP was, in fact, due solely to conversion to adenosine and would, therefore, have concluded that adenosine itself could be safely administered without a dipyridamole pretreatment.  (Binkley 166:12-22.)

45

184.    However, such a conclusion would not have come from the abstract itself, which stated only that "ATP is a physiological intracellular substance, which relaxes and dilates vascular smooth muscles including coronary and cerebral arteries."  (TX-42; Klabunde 508:8-24.)

185.    Moreover, by the time the '296 patent was filed in 1985, it had been well established through the work of Dr. Burnstock that ATP had its own receptors (known as "P2 receptors") as compared to adenosine (whose receptor had come to be called the "P1 receptor"). (TX-151; Klabunde 510:8-19, 513:10-25.)  Not only were adenosine and ATP known to bind to different receptors, these receptors were known to be expressed in different tissues.  (TX-151; Klabunde 1171:15-1172:3.)

186.    Although the ability of dipyridamole to reduce the dose of ATP required to achieve hypotension in surgical patients would have suggested to a person of ordinary skill that adenosine played some role in ATP's vasodilator effects, comparing the dose of adenosine required to induce hypotension following dipyridamole pretreatment in humans with the dose of ATP required to induce similar human hypotension under similar conditions would have shown that ATP was a much more potent vasodilator than adenosine.  This result would have contradicted the notion that the effects of ATP were simply due to its metabolism into adenosine. (TX-51; TX-1170; Klabunde 1044:5-25.)

187.    Indeed, one of ordinary skill would have understood that an important hallmark showing that ATP was *not* working directly on its own receptors, but indirectly through breakdown into adenosine, would have been if ATP were *less* potent than adenosine, which it was not.  (*See* TX-152 at 198; Binkley 1459:20-1460:14.)  Instead, the evidence of the greater potency of ATP clearly pointed to a direct action by ATP in reducing blood pressure, even if that

action was mixed with action by other vasodilating metabolites, including adenosine.  (TX-42; Klabunde 507:8-508:3, 1116:5-1118:2, 1220:19-1221:10; Binkley 273:1-274:9.)

188.     Most telling, however, is what Dr. Fukunaga actually did in the early 1980s. Sicor suggests that one of *ordinary* skill in the art presented with the *Fukunaga 1982* abstract showing ATP-induced hypotension without dipyridamole and Dr. Sollevi's two abstracts showing administration of adenosine *with* dipyridamole pretreatment would have proceeded to test or use an adenosine infusion without dipyridamole.  (Binkley 183:5-184:5.)

189.     However, what Dr. Fukunaga, clearly an expert in the field, actually did was quite the opposite.  (TX-51.)  Rather than testing or suggesting the use of adenosine without dipyridamole pretreatment, he instead continued to test and recommend inducing hypotension with ATP while adding in a dipyridamole pretreatment to reduce the necessary dose.  (TX-51; Klabunde 540:15-541:16.)

## VII.   IT WAS UNEXPECTED THAT DIPYRIDAMOLE PRETREATMENT COULD BE ELIMINATED WITHOUT A LARGE INCREASE IN THE DOSE OF ADENOSINE INFUSED

190.     Based on the evidence in the prior art, one of ordinary skill would not have expected that adenosine could be infused alone without dipyridamole pretreatment, to cause a desirable hypotension through selective arterial vasodilation at a dose only 50% greater than the dose required in the presence of dipyridamole.  (Klabunde 1049:19-1051:8.)

191.     To the contrary, the prior art pointed to a powerful potentiating effect of dipyridamole, without which much higher doses of adenosine infusion would have been required.  (Klabunde 1050:11-1051:8.)

192.     In addition to Dr. Klabunde's studies on dipyridamole's ability to inhibit adenosine metabolism, the prior art study by Kassell in dogs had required very large doses of adenosine without as opposed to with dipyridamole.  (TX-40; Klabunde 532:7-533:23.)

193.    Dipyridamole pretreatment reduced the necessary adenosine dose by nearly 200 times.  (Klabunde 1050:11-1051:8.)

194.    Moreover, the human studies by Dr. Fukunaga with ATP infusion would also have led one to expect that 10-fold, 12-fold, or even higher amounts of adenosine would be required in the absence of dipyridamole pretreatment.  (Klabunde 1050:11-1051:8; Binkley 259:3-261:7.)

195.    Even Dr. Sollevi, whose knowledge of adenosine would have greatly exceeded that of a person of ordinary skill, testified that he was surprised to find that only a 50% increase in the dose of adenosine was required to obtain hypotension in surgical patients without dipyridamole pretreatment.  (TX-1169; Sollevi 449:19-451:6.)  Indeed, his own animal studies had suggested that as much as 20-fold more adenosine would have been required.  (Sollevi 448:19-449:8.)

## VIII.   ADENOSCAN IS A HIGHLY SUCCESSFUL COMMERCIAL PRODUCT

### A.    Adenoscan is a Highly Successful Commercial Product

#### 1.    Adenoscan Went From Newcomer To Market Leader, Becoming a Very Successful Product for Astellas Even in the Face of Competition from Generic Dipyridamole

196.    Astellas's Adenoscan product is an adenosine solution for use as a pharmacologic stress agent in connection with MPI.  (TX-75; White 1231:4-7.)

197.    Adenoscan was launched in 1995.  (White 1232:11-15.)  When it was launched, Adenoscan faced the challenge of entering a market dominated by dipyridamole, the market leader at that time.  (TX-21; White 1232:13-24; Hay 1732:9-25.)

198.    At the time of the Adenoscan launch, Astellas itself was new to the pharmaceutical stress market, never having sold a product in that market before.  (White 1232:13-24.)

199.    However, despite its newcomer status, Adenoscan's sales, both unit sales and sales revenue, experienced substantial and sustained growth after its launch.  (TX-19; TX-21; Hay 1733:11-1734:22, 1714:13-1716:9; DTX-2032; DTX-2014.)

200.    Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005.  (TX-19; Hay 1714:13-1716:9; DTX-2014.)  Adenoscan sales continued these substantial increases despite facing competition from generic dipyridamole beginning in late 1996.  (TX-19; White 1244:9-1247:15; Hay 1738:12-1740:1.)  Adenoscan went on to amass almost $1.7 billion in sales revenue in less than ten years.  (TX-19; Hay 1716:14-18.)

201.    In concert with its substantially increasing sales, Adenoscan gained significant market share over time, both in terms of sales revenue and scans performed.  (TX-21; White 1243:20-1244:8; Hay 1729:7-19, 1730:24-1731:10, 1733:4-1734:22, 1738:12-1739:7; DTX-2032.)  Adenoscan's increases in market share came at the expense of its main competitor, dipyridamole, until Adenoscan displaced dipyridamole as the market leader.  DTX-2029; DTX-2030; DTX-2031; Hay 1731:11-1733:3; TX-21.)  In December of 1995 Adenoscan held 16.5% of the market share of scans and dipyridamole held 76%.  (TX-21; Hay 1731:11-22; DTX-2029.)  By June of 2005 Adenoscan's market share had grown to 61.4% of scans and dipyridamole's market share had fallen to 32%.  (TX-21; Hay 1731:23-1733:3; Leffler 1674:8-21; DTX-2030; DTX-2031.)

202.    Adenoscan's increases in share of sales revenue, its portion of the dollars spent on pharmacologic stressors in the market, were even more dramatic.  Adenoscan revenues grew from 10% of the pharmacologic stress market at the end of 1995 to over 90% by the end of 2004. (TX-21; Hay 1738:12-21.)  Adenoscan has gained market share not just from doctors switching from dipyridamole but also by taking an increasingly larger share of the growing market. (DTX-2032; Hay 1733:4-1734:11, 1739:20-1740:1; Klose 1528:18-1529:22.)

### 2.    Sales of Adenoscan Were Driven by the Attributes of the Claimed Invention, Not Marketing and Promotion

203.    Sales of Adenoscan were driven by the characteristics of the invention claimed in the '296 patent.  (Hay 1712:17-1713:20, 1738:22-1740:1, 1754:10-1757:19,[7] 1796:22-1798:1.) Sicor's proposed adenosine product is a generic version of Adenoscan, which is identical to the branded drug in every way, including the labeled indications.  (TX-4 at SIC004148-4159; TX-75; Hernandez 2058:21-2064:1; Lea 2038:6-11.)  Having conceded that its own product is covered by the '296 patent claims (*see* D.I. 129, ¶ 2), Sicor has conceded that those claims also cover Adenoscan.  Thus, success of Adenoscan is success of the claimed invention.

204.    Adenoscan's sales grew because clinicians recognized significant advantages flowing from the use of Adenoscan.  (Hay 1796:22-1798:1; *see also* Hay 1754:10-1757:15.) Moreover, Sicor's expert, Dr. Strauss, testified that he uses Adenoscan in his own practice because he perceives its attributes of increased safety and ease of use as major advantages over dipyridamole.  (Strauss 784:6-786:6.)  Others mentioned rapid onset of action and ease of use as attributes of Adenoscan.  (Strauss 786:3-6; *see* White 1353:19-1354:16.)

---

[7]    Although Sicor objected to a portion of this testimony (Hay 1754:10-1757:19) as outside of the scope of his expert report, these topics were actually addressed in Dr. Hay's report at paragraph 125, as noted at the trial (Argument at 1754:21-1755:8.)

205.    Plaintiffs' economic expert, Dr. Hay, testified that Adenoscan's sales performance demonstrates that doctors must recognize advantages in Adenoscan to choose it over generic dipyridamole— a seven to ten times cheaper product.  (Hay 1738:22-1740:1, 1754:10-1757:19.)  Indeed, Adenoscan's market share is nearly twice that of dipyridamole because physicians prefer Adenoscan to dipyridamole.  (*See* White 1353:19-1354:16.)

### 3.    Sicor's Arguments Regarding Commercial Success

206.    Sicor argues that the combined factors of Astellas' marketing campaign, the presence of only one other significant competitor (dipyridamole) in the market, that competitor's lack of promotion due to availability of a generic product, and the growth in demand for pharmacological stress testing are responsible for the outstanding sales performance of Adenoscan, rather than the merits of Adenoscan itself.  (Leffler 1579:13-1582:13.)  These arguments, however, are inconsistent with the strong evidence that doctors recognized significant therapeutic advantages in Adenoscan and used it because of those advantages.  (Hay 1796:22-1798:1, 1754:10-1757:15; White 1353:19-1354:16.)  They are also inconsistent with the fact that Sicor has been selling dipyridamole for years (Lea 2035:15-2036:3), but is now going to considerable trouble to obtain market approval for generic adenosine as well.

207.    Sicor overstates the impact of promotion and fails to acknowledge that pharmacologic stress agents are sold to expert consumers, cardiologists and nuclear medicine specialists, who are not swayed by pure promotion because their patients' health depends on their medical diagnosis and treatment decisions.  (White 1231:22-1232:7; Hay 1712:6-1713:25, 1754:14-1757:15, 1797:2-1798:1.)  The record reflects that once clinicians learned about the benefits of Adenoscan and gained experience with the drug, the sales of Adenoscan boomed.  (Klose 1516:7-1517:25, 1528:18-1529:14.)  In addition, adenosine and dipyridamole are used in clinics and hospitals multiple times each day, and their effects in patients are fully observed and

51

taken into account by the physicians who make purchasing decisions.  (Hay 1712:17-1713:25.)
Adenoscan is seven to ten times more expensive than dipyridamole, and it must demonstrate
specific beneficial attributes for these expert consumers to continue to purchase it.  (White
1245:17-25; Hay 1797:2-1798:1.)

### 4.    Adenoscan's Promotion Was Typical In The Industry

208.    Astellas promoted Adenoscan using a marketing program that was very typical in
the pharmaceutical industry at that time.  At most, Astellas spent what was an average amount of
money by industry standards on the promotion of Adenoscan.  (TX-19; TX-24; TX-1165; Hay
1712:6-16, 1749:2-20, 1742:16-24, 1745:3-1748:6; White 1263:16-1264:23; DTX-2040;
DTX-2041.)  As a percentage of gross sales, these promotion costs were less than 6% of gross
sales revenue for most of the years between 1996-2005, and dropped to about 3% by 2005.
(TX-19; DTX-2041; Hay 1747:17-1748:6.)  The combination of average promotional
expenditures and anything but average sales made Adenoscan a very profitable product for
Astellas.  (TX-19; DTX-2040; Hay 1754:2-9, 1749:2-20.)

209.    Astellas's promotion efforts were focused on education and had a high
"informational" quotient directed to the attributes of Adenoscan.  (White 1229:23-1231:3; Klose
1533:13-18.)

210.    As many pharmaceutical companies did at the time, Astellas also had an
educational program that was focused on the pharmacologic stress market in general as opposed
to a particular product.  (TX-92; TX-224; TX-365; White 1252:17-1260:10; Hay
1751:13-1752:19.)  These educational efforts did not cause the recipient to purchase Adenoscan
specifically, although it was expected that "rising water would raise all boats."  (White
1257:2-16.)

211.    Astellas provided free trials of Adenoscan so that doctors could learn about Adenoscan and get experience with it.  (White 1274:21-1275:23; Klose 1518:1-1528:17.) Astellas also supported research and clinical trials involving pharmacologic stress agents to advance the knowledge in the field.  (White 1251:1-1252:16.)  Sicor's expert Dr. Binkley testified that he does not prescribe a company's products because he received grant funding from them for research.  (Binkley 239:3-17.)

212.    Astellas participated, along with the American Heart Association and many other companies, in the Her Heart campaign, an effort to increase the awareness of women's cardiovascular health issues.  (TX-365; TX-359; TX-222; White 1261:2-1262:13; Klose 1531:8-1532:8.)

213.    As a company, Astellas was focused on safety as well as on education.  Since a pump is necessary for the safe and effective administration of Adenoscan, Astellas instituted a pump program to make pumps available at no charge to those using Adenoscan.  (White 1264:24-1266:17.)  This too was not unusual in the industry because it enabled the safe and proper use of the product.  (Hay 1752:21-1754:1.)

### 5.    Sicor's Economic Expert Was Unreliable And His Theories Not Supported By The Record

214.    Sicor relies heavily on its economic expert, Dr. Keith Leffler.  Dr. Leffler offered the opinion that Adenoscan's "sales pattern is extremely well explained by the circumstances that existed in the marketplace."  (Leffler 1632:12-14.)  However, in arriving at this opinion Dr. Leffler never consulted any physicians about the reasons why they choose Adenoscan over other pharmaceutical stress agents.  (Leffler 1683:6-21.)  Dr. Leffler did not have an opinion nor provide any view as to whether or not Adenoscan does or does not have any superior qualities as a product -- indeed, he deferred to the technical experts on whether there was a meaningful

therapeutic advantage for adenosine over dipyridamole for myocardial perfusion imaging. (Leffler 1631:5-11, 1683:6-1684:12, 1680:21-1681:3.)  Despite not having considered or even tried to find out what doctors actually believe, and ignoring the substantial evidence that doctors purchase Adenoscan based on its merits, Dr. Leffler purports to be able to tell that physicians are purchasing Adenoscan based on promotion and market circumstances.  (Leffler 1631:5-11, 1683:6-1684:12, 1680:21-1681:3, 1631:12-1632:22.)  His opinions on this issue are not credible.

215.    Dr. Leffler's opinions were also based on mistakes and inaccuracies.  Dr. Leffler relied on a demonstrative (DTX-3131) during his testimony that incorrectly reported the number of dipyridamole scans as increasing from about 1 million in 1996 to over 3 million in 2004 and used that demonstrative to support his opinion concerning increases in sales of dipyridamole. (*See* Leffler 1577:25-1578:17, 1697:13-1698:23; *compare* DTX-3131 *with* 3134.)  In fact, even in 2004, there were only 1.34 million dipyridamole scans, not 3 million.  (TX-21; Leffler 1653:19-1654-23; DTX-3134.)

216.    Dr. Leffler also misstated the sales growth of Adenoscan by asserting that sales growth "leveled off" between 1998 and 2001.  (Leffler 1572:19-1573:4, 1575:23-1577:4, 1595:1-25; DTX-3130.)  In reality, sales continued to grow substantially and steadily in the years 1998 to 2001, and there was no "leveling off" of sales.  (Leffler 1662:11-1666:9; Hay 1725:8-1728:8; DTX-2043.)  Indeed, the annual report for Astellas's Japanese parent reported "double digit growth in sales" for Adenoscan over the same period that Dr. Leffler had characterized as a "leveling off."  (TX-331; *see* Leffler 1664:23-1667:9.)  Rather than using data reported in dollars by Astellas's U.S. - based finance department, Dr. Leffler chose to use the annual sales of Adenoscan as reported in yen in Astellas's Annual Reports.  (TX-330; TX-331; Leffler 1657:10-1659:10, 1665:18-1670:23.)  Dr. Leffler's claim that sales "leveled off" or

"slowed" is an artifact of his choice to convert the Adenoscan sales in the Annual Reports using the exchange rate from one day of the corresponding year, despite the clear disclaimer in Astellas's Annual Reports. (TX-330; TX-331; DTX-2043; DTX-2047; Hay 1725:8-1728:8.) When the annual Adenoscan sales in yen reported in Astellas's Annual Reports are converted to dollars using the IMF annual average exchange rate, a rate Dr. Leffler previously described as the "official" exchange rate, they match the sales figures in TX-19 within 0.37%. (DTX-2042; DTX-2047; DTX-2034; DTX-2036; Hay 1719:5-1723:20.)

217.    On cross-examination, Dr. Leffler himself disavowed the existence of any "plateau" in sales and changed his testimony to assert merely that there was "a slowing in the growth." (Leffler 1662:22-1663:9.) Dr. Leffler also admitted that "depending on how one uses the exchange rate, you will get more or less slowing of growth." (Leffler 1663:13-15.) Dr. Leffler, of course, used the form of exchange that maximized the appearance of slowing. (Leffler 1662:11-1664:22.)

218.    Additionally, Dr. Leffler used unit data from IMS, that he acknowledged to be incomplete and inappropriate for many uses, including his calculation of the market shares of Adenoscan and dipyridamole. (Leffler 1671:1-1673:12.) IMS data understates Adenoscan's actual market share because IMS data does not capture all of the sales of pharmacologic stress agents and reports only the number of vials sold. (TX-142; Hay 1735:16-1737:17.) As a result, IMS cannot provide reliable information about the sales amounts of any pharmacologic stress product and cannot provide any information about the number of times a product is selected for a procedure. (TX-142; Hay 1735:19-1737:17; Leffler 1590:14-1593:4, 1672:5-23, 1678:8-19.)

219.    This is not the first time that Dr. Leffler has relied upon dubious evidence to support his opinions or used evidence in an inappropriate fashion. Courts have criticized Dr.

Leffler for his use of erroneous data and opinions contradicted by the evidence several times before.  (Leffler 1644:17-1653:18.)  For example, in *F.T.C. v. Freeman Hospital*, 911 F. Supp. 1213, 1219 (W.D. Mo. 1995), the court declined to adopt Dr. Leffler's analysis of the relevant geographic market, determining it to be flawed because it was based on incomplete data.  In *Howerton v. Grace Hospital*, 1995 WL 787529 (W.D.N.C. 1995), the court rejected Dr. Leffler's opinion concerning market power and monopolization because it was refuted by Plaintiffs' own evidence and not supported by the record.  *See also In re Methionine Antitrust Litigation*, 2003 WL 22048232 (N.D.Cal.) (decertifying a class because Dr. Leffler did not perform the proposed analysis that the Court relied upon when granting the Plaintiffs' motion for class certification).

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

### I.     CONTROLLING AUTHORITY

1.   Any appeal in this action, which arises under the patent laws of the United States, must be to the U.S. Court of Appeals for the Federal Circuit, 28 U.S.C. § 1295(a)(1), whose precedent, therefore, governs matters of substantive patent law in this Court.

2.   The Federal Circuit has adopted decisions of the Court of Customs and Patent Appeals ("C.C.P.A.") as its own precedent, making those decisions binding on this Court with respect to substantive patent law.  *Phillips Petroleum Co. v. United States Steel Corp.*, 604 F. Supp. 555, 562 (D. Del. 1985) (citing *South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed Cir. 1982) (en banc)).

### II.    THE '296 PATENT IS PRESUMED VALID AND SICOR, AS THE PATENT CHALLENGER, BEARS THE BURDEN OF PROVING THE CONTRARY BY CLEAR AND CONVINCING EVIDENCE

3.   Patents are presumed valid.  Each claim within a patent is independently presumed valid, even if other claims within a patent are held invalid.  35 U.S.C. § 282.

4.   As the party challenging the validity of the '296 patent, Sicor bears the burden of proof, and it must carry that burden by clear and convincing evidence.  35 U.S.C. § 282; *Schumer v. Lab. Computer Sys., Inc.,* 308 F.3d 1304, 1315 (Fed. Cir. 2002).

5.   The challenger's burden "is constant and remains throughout the suit" and "does not shift at any time to the patent owner."  *TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984).

6.   If a patent challenger alleges invalidity based on prior art the United States Patent and Trademark Office ("PTO") considered during prosecution of the patent, that challenger has the "added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job."  *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.,* 204

F.3d 1360, 1367 (Fed. Cir. 2000) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984). In other words, "the challenger's 'burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application.'" *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (quoting *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990)). Hence, Sicor bears the "especially difficult" burden of proving invalidity because Sicor's three primary references in this matter, *Fukunaga 1982*, *Sollevi I*, and *Sollevi II*, were all before the PTO and are listed on the face of the '296 patent. (TX-275.)

7. Additionally, Sicor cannot rely on expert testimony that was not previously disclosed to meet its burden. A party seeking to introduce expert testimony at trial must provide an opposing party with "a written report prepared and signed by the witness. The report shall contain *a complete statement of all opinions* to be expressed and *the basis and reasons therefor* . . . ." Fed. R. Civ. P 26(a)(2)(B) (emphasis added).

## III. THE ASSERTED CLAIMS OF THE '296 PATENT ARE NOT INVALID FOR ANTICIPATION

### A. A Prior Art Reference Does Not Anticipate Unless It Discloses Each Limitation of the Claimed Invention

8. A party seeking to invalidate a patent under § 102 for anticipation must show that the allegedly invalidating prior art contains each and every element of the claimed invention. *Union Oil Co. of Cal. v. Atlantic Richfield Co*., 208 F.3d 989, 994-95 (Fed. Cir. 2000); *In re Dillon*, 919 F.2d 688, 715 (Fed. Cir. 1990). If even one element is not shown in the reference, then it does not anticipate. *See Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984).

9. Sicor has alleged that certain references "inherently" anticipate the asserted claims. While "[i]t is true that mere recitation of a newly discovered function or property, inherently

possessed by things in the prior art, does not distinguish a claim drawn to those things from the prior art," inherency "may not be established by probabilities or possibilities, *In re Oerlich*, 666 F2d. 578, 581 (C.C.P.A. 1981). Moreover, the mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.*

10. Moreover, it is important to remember that, as with express anticipation, anticipation by inherency still requires that "each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).

### B.    Sicor Failed to Prove Fukunaga 1982 Discloses Each Limitation of the Asserted Claims Either Expressly or Inherently

#### 1.    Sicor Failed to Prove Fukunaga 1982 Discloses Administration of Adenosine

11. Each of claims 1, 7, and 9 recites an element "*administering* into the blood stream of said patient *adenosine*" at various concentrations. (TX-275 at col. 22, emphasis added.) Claim 3 recites a similar element, further limiting the method of *adenosine administration* to "intravenous administration." (TX-275 at col. 22.) The element of "*adenosine administration*" is missing from *Fukunaga 1982*. As Sicor's expert, Dr. Binkley, repeatedly acknowledged, the Fukunaga 1982 abstract describes the administration of ATP, not adenosine. (Binkley 164:18-165:4; 169:18-21; 190:7-12; 243:14-22.) Indeed, after offering his opinion at trial that the asserted claims were anticipated in view of *Fukunaga 1982*, Dr. Binkley admitted that at his deposition he had said he was not asserting anticipation because *Fukunaga 1982* involved the administration of ATP, not adenosine. (*See* Binkley 243:23-244:1.) The administration of ATP is neither the express nor inherent administration of adenosine -- it is the administration of a

different compound, to wit, ATP.[8]  Consequently, the evidence demonstrates that Sicor cannot

satisfy its burden of proving that *Funkanaga 1982* discloses "each and every element" of the

claims.

> ## 2.    Sicor Failed to Prove that Fukunaga 1982 Disclosed Selective Arterial Vasodilation or Dosages within the Ranges set Forth in Claims 3 or 7

12. Sicor's anticipation argument also fails because Sicor did not meet its burden of

proving by clear and convincing evidence that *Fukunaga 1982* discloses the element of selective

arterial vasodilation.  *Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.3d 989, 994-95 (Fed.

Cir. 2000); *In re Dillon*, 919 F.2d 688, 715 (Fed. Cir. 1990.)  Sicor offers no direct proof that this

limitation was met by the prior art, relying instead on indirect inferences based on incomplete

data and assumptions.  Such inferences and assumptions cannot substitute for clear and

convincing evidence.  Inherency "may not be established by probabilities or possibilities," and

"[t]he mere fact that a certain thing *may* result from a given set of circumstances is not

sufficient."

13. The *Fukunaga 1982* abstract does not show increased cardiac output without

exception.  *See* § IV. C.  Thus, Sicor has not shown, by clear and convincing evidence, that the

*Fukunaga 1982* abstract disclosed the element of selective arterial vasodilation.

14. Sicor's anticipation argument also fails because Sicor did not meet its burden of

proving by clear and convincing evidence that *Fukunaga 1982* discloses the element of

administration of adenosine at the dose ranges set forth in claims 3 or 7.  *Union Oil Co. of Cal. v.*

---

[8]    To the extent Sicor now seeks a specific construction of "administering adenosine," it should have raised the issue during the claim construction disclosure and briefing stage.  Having failed to do so at the appropriate time, Sicor has now waived the opportunity.  *See Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004); *Adv'd Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*, Civ. Nos. 98-80-SLR, 98-314-SLR, 98-316-SLR, 2007 WL 949782 at *9 (D. Del. 2007).

*Atlantic Richfield Co.*, 208 F.3d 989, 994-95 (Fed. Cir. 2000); *In re Dillon*, 919 F.2d 688, 715

(Fed. Cir. 1990.)  Claims 3 and 7, require administration of adenosine into the bloodstream at a

rate 50 to 300 mcg/kg/min and 10 to 150 mcg/kg/min, respectively.  (TX-275 at col. 22.)  Dr.

Binkley's simplifying assumption that 100% of the administered ATP was converted to

adenosine is unwarranted in light of the evidence of the complex metabolism of ATP (*see* § IV.

B.), and the fact that ATP is more potent in reducing blood pressure in humans than adenosine

(*see* § III. A 6. a.)  Evidence of complete conversion of ATP to adenosine in dogs is not

controlling in view of the evidence of significant species variation in ATP metabolism.  (*See* §

III. A. 6. d.)  Nor is the fact that ATP's effects on electrical conduction in the heart may be

attributed to adenosine controlling.  These electrical effects occur in a different organ based on

different receptors, and likely exposure to different adenosine concentrations than the peripheral

receptors for drops in systemic blood pressure.  (*See* § III. A. 6. c.)

     15. In view of these failures, Sicor's evidence at trial did not rise to the level of clear and

convincing proof of anticipation of claims 1, 3, 7, or 9 by *Fukunaga 1982*.

## IV.   THE CLAIMS OF THE '296 PATENT ARE NOT INVALID FOR OBVIOUSNESS

###    A.   Sicor Must Prove Obviousness by Clear and Convincing Evidence Based on the Four Broad Factual Findings

     16. To succeed in proving obviousness, Sicor must prove by clear and convincing

evidence that "the differences between the subject matter sought to be patented and the prior art

are such that the subject matter as a whole would have been obvious at the time the invention

was made to a person having ordinary skill in the art to which said subject matter pertains."  *See*

35 U.S.C. § 103.

     17. Obviousness is a conclusion of law based on four broad factual inquiries:  (1) the

scope and content of the prior art, (2) the differences between the prior art and the claimed

subject matter as a whole, (3) the level of skill in the art, and (4) objective evidence of

nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

18. Additional factual inquiries include determining what the prior art teaches and

whether it "teaches away" from the claimed invention. *In re Bell*, 991 F.2d 781, 784 (Fed. Cir.

1993).

19. These inquiries must be conducted viewing the invention in the context of the state of

the art that existed at the time the invention was made. *ACS Hosp. Sys. Inc. v. Montefiore Hosp.*,

732 F.2d 1572, 1577 (Fed. Cir. 1984); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044,

1050-51 (Fed. Cir. 1988).

20. Moreover, it is improper to use hindsight to reconstruct the claimed invention from

the prior art. *ACS Hosp. Sys. Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984);

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988).

### 1. The Law of Obviousness and the Supreme Court's Decision in *KSR*

21. The Supreme Court recently addressed the standard for obviousness in the context of

a simple mechanical "combination" invention, noting  that "[t]he combination of familiar

elements according to known methods is likely to be obvious when it does no more than yield

predictable results." *KSR Int'l Co. v. Teleflex, Inc.*, No. 04-1350 slip. op. at 12 (Apr. 30, 2007.)

22. By contrast, the Court noted, "when the prior art teaches away from combining

certain known elements, discovery of a successful means of combining them is more likely to be

nonobvious." *Id.*  Furthermore, prior art warnings about risks involved in the claimed invention

and obtaining unexpected results also support a conclusion of nonobviousness. *Id.*

23. The Court acknowledged that "it can be important to identify a reason that would

have prompted a person of ordinary skill in the relevant field to combine the elements in the way

the claimed new invention does." *Id.*  at 15.

24. Throughout their inquiry, fact finders must avoid "the distortion caused by hindsight bias and must be cautions of arguments reliant upon *ex post* reasoning." *Id.* at 17 (citing *Graham*). They should also realize that while prior art combinations resulting in "predictable solutions" leading to "anticipated success" are clear indicators of obviousness, where those combinations "work together in an unexpected and fruitful manner" they are not obvious. *See id.* at 12.

2. **Objective Evidence, Including Contemporaneous Statements of Skepticism by Experts In the Field and Commercial Success, Is Highly Probative of Nonobviousness**

25. The assessment of obviousness also requires examination of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17-18. The Federal Circuit has emphasized the need for evaluating objective evidence of nonobviousness. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) (stating that "secondary considerations, when present, must be considered in determining obviousness"). "It is the secondary considerations that are often the most probative and determinative of the ultimate conclusion of obviousness or nonobviousness." *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996). Moreover, courts must make this evaluation while considering whether the claimed invention is obvious, not once a determination is complete. *Lindemann Maschenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir. 1984).

26. Such secondary considerations include the extent of the commercial success of the patented invention, unexpected results compared to the prior art, skepticism in the field, and any copying of the invention by others and when present, must be considered in determining obviousness. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000).

27. Evidence of initial skepticism, surprise, or incomprehension upon learning of the invention and thereafter praising its value is strong evidence of nonobviousness. *U.S. v. Adams*,

383 U.S. 39, 52 (1966); *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 697-98 (Fed.

Cir. 1983); *Ruiz*, 234 F.3d at 668 ("Proceeding contrary to the accepted wisdom . . . is strong

evidence of unobviousness.") (internal citations omitted).  This is particularly true where "the

skepticism is expressed at the time of the invention, in a nonadversarial setting." *Burlington

Indus., Inc. v. Quigg*, 229 U.S.P.Q. 916, 919 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir.

1987).

28. Evidence of skepticism need not derive solely from the technical literature but also

may include personal communications and comments by experts in the field.  *See, e.g., U.S. v.

Adams*, 383 U.S. 39 (crediting contemporaneous doubts expressed in correspondence by

scientists and government expert who observed initial demonstration of claimed battery);

*Burlington Industries,* F.2d 1581, 1584 (Fed. Cir. 1987) (crediting inventor's testimony that mill

operators dismissed him as "crazy" upon first learning of his invention); *In re Dow*, 837 F.2d

469, 472-73 (Fed. Cir. 1988) (crediting evidence of skepticism expressed by expert chemist in a

report sent to company management around time the invention was made).

29. Commercial success of an invention is also evidence that the invention would not

have been obvious. *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.*, 321 U.S. 275, 279 (1944);

*Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics,* 75 F.3d 1568, 1573-74 (Fed. Cir. 1996).

Commercial success is usually shown by significant sales in a relevant market.  *J.T. Eaton &

Co., Inc. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).  Additional

evidence probative of commercial success includes growth in market share, increases in sales,

and replacing earlier units sold by others.  *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d

1353, 1360-61 (Fed Cir. 1999); *Ruiz*, 234 F.3d at 668.

**B.    Sicor Failed to Prove the Claimed Invention Would Have Been Obvious in View of the Methods Described in the *Sollevi I* and *Sollevi II* Abstracts and the Background Prior Art**

30. Sicor has not carried its burden in proving that the claimed invention would have been obvious. Sicor's obviousness case rests primarily on the *Sollevi I* and *Sollevi II* abstracts concerning the use of adenosine after dipyridamole pretreatment to cause controlled hypotension in patients undergoing aneurysm surgery (both of which were considered by the PTO during prosecution), supplemented by various background prior art. (Binkley 185:3-191:18.) Viewed in the context of the four factual determinations under *Graham*, Sicor has not proven that these references would have rendered the methods of claims 1, 3, 7, or 9 obvious as of the September 24, 1985 filing date of the '296 patent.

**1.    Level of Ordinary Skill in the Art**

31. Both sides agree that a person of ordinary skill in the art with which the '296 patent is concerned would be a cardiologist with training in internal medicine and a cardiology fellowship.

32. Consistent with the requirement that a person of ordinary skill be considered "presumed to think along conventional lines," such a physician would have been actually aware of the adverse cardiac side effects that had been associated with adenosine for decades and unlikely to discount them without significant reassurance. *See Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 448, 454 (Fed. Cir. 1985).

**2.    Differences Between the Prior Art and the Claimed Invention**

33. Unlike the methods set forth in claims 1, 3, 7, and 9 of the '296 patent, the *Sollevi I* and *Sollevi II* abstracts describe administering an intravenous infusion of adenosine at a mean dose of approximately 140 mcg/kg/min in conjunction *with* dipyridamole pretreatment. The presence of a dipyridamole pretreatment is the essential difference between the prior art publications and the claimed methods. (*See* § V. C and VI. A.)

34. To prove its case, Sicor must prove by clear and convincing evidence, and without the use of hindsight, that it would have been obvious for one of ordinary skill to perform the claimed methods, which lack a dipyridamole pretreatment and are limited to dose ranges of 10 to 150 mcg/kg/min (claim 7); 50 to 300 mcg/kg/min (claim 3); and less than 350 mcg/kg/min (claims 1 and 9). This it has not done.

35. In particular, Sicor has not proven that one of ordinary skill would have had a reason to eliminate the dipyridamole treatment and administer an adenosine infusion in the claimed dose range to achieve controlled hypotension. That assertion, which acknowledges the lack of any reasonable expectation of success, is nothing more than an invitation to experiment and falls well short of proving obviousness. *See Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720 (Fed. Cir. 1990) (explaining a general disclosure that invites experimentation without a reasonable expectation of success does not render the invention obvious).

36. Not only has Sicor shown no reason to remove the dipyridamole from the claimed process, the evidence clearly shows that, at the time of the invention, dipyridamole was thought to be necessary for the safe and effective use of adenosine. (*See* § VI. A.) Indeed, quite apart from suggesting the claimed invention, the prior art here taught away from Dr. Sollevi's invention, which he developed only by proceeding directly contrary to the conventional wisdom of the day. (*See* § III. B.) As set forth above, the medical literature dating back to the 1920s showed that adenosine was long believed inappropriate for use as a vasodilator in human patients. (*See generally* § III.) Reasons for this belief included: adenosine's inhibition of the AV node, which could slow or stop the beating of the heart, its short half-life, which was viewed as a liability rather than a benefit, and its metabolism into uric acid, which could crystallize in the kidneys and cause them to fail.

37. Consequently, one of ordinary skill would not have had any reason to administer an adenosine infusion for any purpose other than controlled hypotension and would not have had any reason to administer it for that purpose in the absence of dipyridamole or within the claimed dose range.

### 3.    Objective Evidence of Nonobviousness:  Skepticism, Commercial Success, Unexpected Results, and Copying

38. The record contains strong objective evidence of nonobviousness in the form of skepticism followed by praise by experts in the field commercial success, unexpected results, and copying.  (*See* § IV. F.)

39. This evidence must be taken into account because "[i]t may often establish that an invention appearing to have been obvious in light of the prior art was not."  *Uniroyal,* 837 F.2d at 1053.

40. Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

### C.    The Skepticism and Ultimate Praise Expressed In the Letters By Dr. Berne and Dr. Robicsek Is Highly Probative Objective Evidence of Nonobviousness

41. Proceeding against the conventional wisdom is strong evidence of nonobviousness. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1545 (Fed. Cir. 1983).

42. In particular, the Supreme Court has acknowledged that expressions of disbelief by experts in the field at or about the time of the invention is evidence of nonobviousness.  *U.S. v. Adams*, 383 U.S. at 52.  The record here contains direct evidence of such skepticism by noted experts at a time long before the instant lawsuit in the form of correspondence by Drs. Berne and Robicsek and testimony by Dr. Sollevi.

43. This type of evidence, though not often available, is preferred in patent cases, and it offers direct and compelling evidence of how Dr. Sollevi's work contradicted the conventional wisdom. "Recognizing the difficulty of casting one's mind back to the state of technology at the time the invention was made, courts have long recognized the usefulness of evidence of the contemporaneous attitude toward the asserted invention." *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985). Sicor has objected to these materials on relevance and hearsay grounds, but they are highly relevant and not hearsay.

44. For example, Dr. Sollevi's testimony that Dr. Berne referred to him as "crazy" at their first meeting when Dr. Sollevi described his experiments administering adenosine infusions to human patients (Sollevi 452:2-454:3) is precisely the sort of evidence that the Federal Circuit has credited as objective evidence of nonobviousness. *See* Burlington, 822 F.2d 1584. In *Burlington Industries*, the Federal Circuit credited testimony by the inventor, "that mill operators . . . initially dismissed him as 'crazy' when he first proposed his solution." *Burlington*, 822 F.2d at 1584. Likewise, here, Dr. Berne's reaction to the idea of administering an adenosine infusion is highly relevant to demonstrating the prevailing wisdom held by leaders in the field and showing how Dr. Sollevi's invention contradicted that view.

45. Sicor's hearsay objection is misplaced as the statement is being offered to show the declarant's (Dr. Berne's) then existing state of mind. *See* Fed. R. Evid. 803(3); *Citizens Financial Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F. 3d 110, 133 (3rd Cir. 2004). Indeed, the statement is not being offered for the truth of the matter asserted (that Dr. Sollevi was crazy), but to show Dr. Berne's state of mind, which, because he was an expert in the field at the time, is relevant to the issue of obviousness.

46. Similarly compelling evidence of the skepticism of some of the leading researchers of the day is the scientific correspondence they exchanged with Dr. Sollevi .  (TX-49; TX-265; TX-293; TX-410; TX-411; TX-412; TX-413; TX-436, and TX-439.)  Sicor objects to this correspondence on relevance, authenticity, and hearsay grounds.  Correspondence and other private communications, such as the letters from Dr. Berne, are also highly relevant evidence for demonstrating the state of mind of an expert.  Sicor has suggested that such materials are not relevant because they were not published in the scientific literature and would not have been available to those of ordinary skill in the art.  But the relevance of such letters is not based on their being available in the art, it is based on what they show about the state of mind of the expert that wrote the letter.  The Supreme Court in *Adams* acknowledged that to be the case by crediting the contemporaneous statement of an expert who wrote a letter about the patentee's claimed battery, stating "Until the inventor can present more convincing data . . . I see no reason to consider it further."  *Adams*, 383 U.S. at 44.[9]  The Court, untroubled by the private nature of the communication or its lack of availability to those of ordinary skill in the art, cited this communication as evidence that the patentee's invention was contrary to the thinking of experts in the field at the time.  *Id*. at 44, 52.

47. The Federal Circuit has relied on similar private communications to show contemporaneous evidence of an expert's state of mind around the time the invention was made.  *See In re Dow Chemical Co.*, 837 F.2d 469, 472-473 (Fed. Cir. 1988).

---

[9]    While not explicitly stated in the Court's opinion, examination of the patentee's brief and associated exhibits before the Court reveals that the statement comes from a 1942 letter written by the expert in question.  *See* Appendix 1 to Plaintiffs' Opening Post Trial Brief at 12, 78 (describing letters compiled in Exhibit 12 of *Adams* record to show skepticism by experts); Appendix 2 to Plaintiffs' Opening Post Trial Brief at iii-iv, 403 (Index of trial record and Exhibit 12 comprising correspondence and memos including text quoted by Supreme Court).

### D.    The Unexpectedly Low Dose of Adenosine Required in the Absence of Dipyridamole is Further Evidence of Nonobviousness

Evidence of unexpected results or advantages in the claimed invention is also evidence of nonobviousness. *Lindemann*, 730 F2d at 1461-62. As discussed in detail above, the clear teaching of the prior art was that unacceptably high doses of adenosine would be required in the absence of dipyridamole pretreatment. (*See* § VI. A.) The discovery that such high doses were not required is a critical aspect of the claimed invention, which surprised even Dr. Sollevi. (Sollevi 449:19-451:6.) Dr. Berne was also surprised, as he had expected to see AV block at doses that did not cause hypotension. (*See* § IV. C.)

### E.    Sicor's Interest in Copying the Invention Also Demonstrates its Nonobviousness

Although Sicor already markets dipyridamole as a pharmacologic stress agent, it filed an ANDA and spurred this litigation for the purpose of introducing a generic copy of Adenoscan that will be used according to the claimed methods of the '296 patent. That interest in copying further demonstrates the nonobviousness of the invention. *See Forest Labs.,* 438 F. Supp. 2d at 496 (D. Del. 2006) ("In the Court's view, the copying of others is particularly telling in this case, because citalopram is currently available as a generic drug. Indeed, citalopram is sold generically by Defendants, yet Defendants seek to copy and sell Lexapro®."); *see also Procter & Gamble Co. v. Paragon Trade Brands Inc.*, 989 F.Supp. 547, 594 (D. Del. 1997); *Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, 348 F.Supp.2d 713, 759 (N.D.W.Va. 2004).

### F.    The Commercial Success Of Adenoscan Is Objective Evidence Of Nonobviousness

48. Where it is shown that significant economic benefit could be had by modifications of the prior art, the inference is that persons of ordinary skill in the art, motivated by their own

economic self interest, would have done so earlier had the modifications been obvious. *In re Fielder*, 471 F.2d 640, 644 (C.C.P.A. 1973).

49. A strong indicator of commercial success is substantial and sustained increases in sales since launch. *Tec Air*, 192 F.3d at 1360-61. Since its launch in 1995, Adenoscan sales have shown such substantial and sustained increases. (*See* § IV. F.)

50. The combination of increasing sales and increasing market share is very powerful evidence of commercial success. *Tec Air,* 192 F.3d at 1360-61 (Fed. Cir. 1999). Both Adenoscan's sales and market share have increased since launch. (*Id.*)

51. Further evidence of commercial success is provided when a newcomer to a market displaces the market leader. *See Ruiz*, 234 F.3d at 668. Adenoscan displaced dipyridamole, the earlier product in the market, and went from newcomer to market leader. (*Id.*)

52. Another measure of commercial success is substantial sales increases even when faced with competition from significantly cheaper generic drugs. *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F. Supp. 2d 479, 496 (D. Del. 2006) (finding commercial success of Lexapro[®] based on large sales despite the availability of a generic competitor at lower prices). Adenoscan sales continued to increase even when faced with competition from significantly cheaper generic dipyridamole. (*Id.*)

53. It is not necessary for a product to "quickly dominate" the market in order for that product to be a commercial success. *See Medtronic, Inc. v. DAIG Corporation*, 789 F.2d 903, 907 (Fed. Cir. 1986) (rejecting economic expert's definition of commercial success as "aggressive growth in market share" because such a definition could lead to the conclusion that a product innovation was *per se* not a commercial success despite having a profound influence on the market and industry); *Takeda Chem Indus. Ltd. v. Mylan Labs.*, 417 F. Supp. 2d 341, 386

(S.D.N.Y. 2006) ("There is no requirement that the invention be the only successful product in its market niche or the most successful").

54. Moreover, looking to other markets for benchmarks is unhelpful in assessing commercial success of the patented product. *See Eli Lilly and Co. v. Teva Pharm., USA, Inc.*, No. IP 02-0512-C-B/S, 2004 WL 1724632, at *22 (S.D. Ind. 2004) (rejecting Defendant's expert's sales comparison to Lipitor® as unhelpful since it lowers cholesterol and has nothing to do with PMS).

55. Also, the practical advantages of a process with increased speed and savings in labor are advantages courts have relied on in finding commercial success. *See Nat'l Dairy Prods. Corp. v. Swiss Colony, Inc.*, 364 F. Supp. 134, 141 (D.C. Wis. 1972). Adenoscan's attributes of rapid onset of action, safety, and ease of use are *bona fide* product advantages doctors recognize. *Id*.

### 1.    There is a Nexus Between the Sales of Adenoscan and the Claims of the Patent

56. There is a nexus between the commercial success of Adenoscan and the merits of the claimed invention. A prima facie case of nexus is made out when the patentee shows both that there is commercial success and that the product that is commercially successful is the invention disclosed and claimed in the patent. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988).

57. If the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the party challenging the validity of the patent. *Demaco Corp.*, 851 F.2d at 1392 (Fed. Cir. 1988).

58. Sicor admits that its proposed product infringes the asserted claims of the '296 patent and that it copied its Adenosine Injection USP from Adenoscan. (Hernandez 2061:24-2063:14.)

As such, Sicor has conceded that the claims of the '296 patent cover Adenoscan's use in myocardial perfusion imaging.  (*See* generally § IV. F.)  Thus, commercial success due to the merits of Adenoscan is commercial success of the claimed invention.

59. Further support for nexus can be found in the significant evidence that the commercial success of Adenoscan is due to the merits of the Adenoscan product.  *See R.R. Dynamics, Inc. v. A. Stucki Co.*, 579 F. Supp. 353, 366-67 (E.D. Pa. 1983) (testimony as to the advantage of the spaced structure with the biasing spring easily supports inference that the claimed invention itself was responsible for the commercial success).

### 2.    Sicor Failed To Prove that Sales of Adenoscan® are Not Driven by the Attributes of the Claimed Method

60. The party challenging the validity of the patent bears the burden of proving that commercial success is *not* due to the patented invention but is due instead to extraneous factors other than the patented invention.  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1394 (Fed. Cir. 1988).

61. Sicor has failed to rebut the prima facie case of nexus with clear and convincing evidence that the commercial success of Adenoscan was due to extraneous factors other than the patented invention.  It argues instead that Adenoscan's outstanding sales performance resulted from the combined factors of 1) Astellas's marketing campaign, 2) the circumstances of only one other FDA approved competitor in the market (Persantine®), 3) this competitor ceasing to promote, and 4) the growth in demand for pharmacological stress testing in the pharmaceutical stress market.  (Leffler 1579:13-1582:13.)

### 3.    Market Circumstances Cannot Sever Proper Nexus

62. Sicor's argument that the circumstances of the marketplace explain the commercial success of the product is an argument that has been made unsuccessfully by challengers of a

product's commercial success.  *See, e.g., Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d

1367, 1382 (Fed. Cir. 1986)*; Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, 348 F. Supp. 2d 713,

757 (N.D. W. Va. 2004).  Indeed, Sicor's specific argument that increasing levels of obesity are

responsible for product sales (Leffler 1627:7-11) has been rejected by courts.  *Takeda Chem.*

*Indus. Ltd. v. Mylan Labs.*, 417 F. Supp. 2d 341, 386 (S.D.N.Y. 2006) (rejecting defendants'

argument that much of the commercial success of Actos® is due to a rise in obesity with an

accompanying increase in the incidence of diabetes).

　　　63. Moreover, courts have found that a product can be commercially successful even in

the absence of viable competitors in its market.  *Insight Tech. Inc. v. Surefire, LLC*, 447 F. Supp.

2d 120, 134 (D.N.H. 2006) (rejecting argument that patented products were only successful

because there were no viable competing products after competitor voluntarily withdrew from the

market).

### 4. Clinical Attributes Determine Success of Pharmacologic Stress Agents, Not Promotion

　　　64. Sicor attributes the success of Adenoscan to the combination of Astellas's promotion

of Adenoscan and the cessation of promotion of Persantine® by Dupont.  (Leffler 1579:13-

1582:13.)  However, courts have held repeatedly that with medical inventions, the promotion of

a product does not mean that the product was purchased because of that promotion rather than

because of its merit.  *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1382 (Fed.

Cir. 1986) ("[The] record shows that advertising makes those in the industry-hospitals, doctors,

and clinical laboratories-aware of the diagnostic kits but does not make these potential users buy

them; the products have to work . . . ."); *Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, 348 F. Supp.

2d 713, 757 (N.D. W. Va. 2004) ("The ultimate success of a prescription antibiotic hinges on its

clinical properties.").

65. Moreover, the record in this case confirms that the attributes of Adenoscan are far more determinative of demand for the product than promotion. Sophisticated doctors, such as the cardiologists who purchase or prescribe Adenoscan, do not prescribe a product because they receive grants from the product's company. Nor do these physicians prescribe a drug based only on marketing. Rather, they chose the product that will work the best and be the safest for their patients. (*See* generally § IV. F. 4.)

66. Courts have relied on relatively low ratios of promotion expenses to sales and modest budgets for promotion in rejecting commercial success challenges based on excessive marketing. *See Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, No. IP 99-38-C H/K, 2001 WL 1397304, at *12 (S.D. Ind. 2001) ("... the evidence shows that Lilly's marketing and advertising budgets for AXID (nizatidine) have been relatively modest by industry standards."); *Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, 348 F. Supp. 2d 713, 757 (N.D. W. Va. 2004) ("LEVAQUIN also maintained a relatively low ratio of total sales to promotional expenditures as compared to competing respiratory anti-infectives."). Astellas did not devote any more resources to marketing and promotion than was typical in the industry at that time. (*See* generally § IV. F.)

67. Sicor's own actions in seeking market approval for a generic version of Adenoscan and provoking this lawsuit under the Hatch-Waxman Act also contradict its arguments that the product is not a commercial success, particularly when it is already selling the only competing compound in the market (Lea 2035:22-2036:2). *See Ortho-McNeil Pharm., Inc. v. Mylan Labs.*, 348 F. Supp. 2d 713, 759 (N.D. W. Va. 2004); *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F. Supp. 2d 479, 496 (D. Del. 2006) ("In the Court's view, the copying of others is particularly telling in this case, because citalopram is currently available as a generic drug. Indeed, citalopram is sold generically by Defendants, yet Defendants seek to copy and sell Lexapro[®].");

75

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, No. IP 99-38-C H/K, 2001 WL 1397304, at *12 (S.D. Ind. 2001) ("Strong evidence of commercial success is not surprising in a case under the Hatch-Waxman Act, of course. If the patented drug were not a commercial success, generic manufacturers would have little interest in offering their own versions of the drug.").

68. Also telling, Sicor's vice president of business development, Mr. Craig Lea, testified that Sicor would not develop products that it did not think were going to be commercially successful. (Lea 2036:15-23.)

## 5. Dr. Leffler's Opinion Is Contrary To The Evidence

69. The weakness of Sicor's arguments is apparent from their lack of evidentiary support. Sicor's expert, Dr. Leffler never consulted any physicians about the reasons why they are buying adenosine versus dipyridamole or conducted any surveys to determine why physicians choose Adenoscan over other pharmaceutical stress agents, and he did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product. (Leffler 1680:12-1681:3; 1683:6-11.) These are all factors that courts consider in weighing an economic expert's opinion about a products' lack of commercial success. *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F. Supp. 2d 479, 495 (D. Del. 2006) (court unpersuaded by Defendant's expert's testimony that success of Lexapro[®] was the direct result of Plaintiffs' aggressive marketing campaign when expert had not consulted with any physicians or conducted any surveys demonstrating why doctors chose Lexapro[®], had no opinion about the efficacy of Lexapro,[®] and could not state what percentage of its sales were the result of its qualities as a drug).

70. Sicor can not prove that there is no nexus between the commercial success of Adenoscan and the merits of the product because the evidence shows that Adenoscan was a commercial success based on merit. The combined factors of effective marketing and fortuitous

market circumstances fail to explain Adenoscan's remarkable economic performance, and they can not sever the strong and readily apparent nexus between Adenoscan's merits and its sales success. This is powerful and persuasive evidence of nonobviousness.

## V.    DR. BINKLEY WAS NOT CREDIBLE AND OFFERED OPINIONS BEYOND THE SCOPE OF HIS EXPERT REPORTS

71. An expert report must contain a complete statement of all opinions to be expressed. Fed. R. Civ. P. 26(a)(2)(B). A party that fails to meet the disclosure requirements of Rule 26 shall not be permitted to use the information it has failed to disclose as evidence at a trial, provided that such failure is not harmless. (Fed. R. Civ. P. 37(c)(1).) Sicor failed to meet the obligations of Rule 26 and this failure was most certainly not harmless. Sicor withheld information relating to a theory of invalidity, which ultimately resulted in an unfair surprise at trial. Thus, the testimony of Dr. Binkley that is beyond the scope of his expert report should be excluded from evidence. *See Coalition To Save Our Children v. State Bd. of Educ.,* 90 F.3d 752, 775 (3d Cir. 1996); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 04-1371-JJF, Slip Op. at 13 (D. Del. Sept. 20, 2006) (addressing several motions in limine, Judge Farnan acknowledged that as "the court stated previously, opinions not disclosed by an expert in his report will not be permitted at trial"); *Inline Connection Corp. v. AOL Time Warner Inc.,* No. 02-272-MPT, Slip Op at 16-17 (D. Del. Feb. 5, 2007) (granting motion to preclude an expert from testifying on subject outside the scope of his deposition and expert report, citing the party's failure to supplement the expert's report prior to trial).

72. Repeated reliance on theories and references that an expert has not previously discussed in a report or deposition suggests that the opinions that were disclosed are unmeritorious. Sicor repeatedly resorted to such improper tactics in an effort to fill the gaps in its case.

73. Dr. Binkley repeatedly testified outside of the scope of his expert report and was contradicted by his deposition testimony.  For example, Dr. Binkley opined at trial that *Fukunaga 1982* reference anticipated the asserted claims despite testifying at his deposition he was not asserting anticipation. (Binkley 243:10-244:1.)  He also opined about separating the effects of adenosine and dipyridamole in the *Sollevi I* and *Sollevi II* abstracts, despite having previously testified that the effects could not really be separated. (Binkley 301:15-302:10.)

74. A centerpiece of Dr. Binkley's obviousness opinion was that one of ordinary skill in the art would have believed that dipyridamole was having little or no effect by the end of the period of hypotension in the *Sollevi I* and *Sollevi II* abstracts.  (Binkley 147:12-21; 154:1-17.)  This new theory was not disclosed during discovery  (Binkley 155:15-19) and was deeply flawed.  For example, Dr. Binkley relied in support of his new opinion on the fact that the adenosine levels in *Sollevi II* returned to normal within 3 to 9 minutes (Binkley 263:2-9.)  Dr. Binkley later contradicted himself, however, by admitting that if dipyridamole were not present, the adenosine levels would have returned to normal within just 40 seconds.  (Binkley 265:18-23; *compare also* Binkley 1380:20-1381:7 (stating dipyridamole half life is 30-40 minutes) *with* Binkley 1472:16-1474:23 (stating dipyridamole half life is 40 to 80 minutes).)

75. By way of further example, Dr. Binkley asserted that the 1985 abstract by Biaggioni (TX-1187) showed selective arterial vasodilation, yet admitted this opinion did not appear in his reports.  (*See, e.g.,* Binkley 173:23-174:13, 1444:21-25.)  Dr. Binkley also relied for the first time in his rebuttal trial testimony on the alleged obviousness of other theoretical medical uses for adenosine as a selective arterial vasodilator other than inducing controlled hypotension. (Binkley 1366:19-1375:7.)  Opinions on these other uses are not disclosed in his expert reports.

76.    Dr. Binkley also offered previously undisclosed opinions and testimony at trial about various exhibits.  Both the testimony and the following exhibits should be excluded: TX-88, TX-126; TX-151, TX-199, TX-236, TX-5000;[10] Binkley 1412:2-1417:21, 1417:23-1422:1, 1422:3-1433:16, 1434:4-1438:2, 1505:6-1506:12.)  These exhibits were not identified in Dr. Binkley's expert reports and were not identified in Sicor's 35 U.S.C. § 282 notice.  Under 35 U.S.C. § 282, a party asserting invalidity must provide notice in writing to the adverse party at least thirty days before the trial "the title date and page numbers of any publication to be relied upon as anticipation of the patent in suit . . . ."  Failure to comply with these requirements is grounds for exclusion.  *Ferguson Beauregard/Logic Controls v. Mega Sys. L.L.C.*, 350 F.3d 1327, 1347 (Fed. Cir. 2003).

77.    In this case, Sicor repeatedly presented new theories of invalidity and relied on exhibits not previously identified, which denied Plaintiffs a fair opportunity to address these issues at trial.  Sicor did so notwithstanding repeated warnings that it did so at its peril.  (*See*, *e.g.* Court 1370:6-10).  Indeed, Sicor went so far as to represent to the Court that a particular reference (TX-88) it was using with Dr. Binkley had been cited in a footnote in Dr. Binkley's report, only to be forced to admit later that no such citation existed.  (Binkley 1417:14-21.)  Even then, Sicor made no effort to correct its failure to abide by the discovery rules.  (Binkley 1417:23-25; 1421:16-1422:1.)  Consequently, Sicor should be precluded from relying on these exhibits and the testimony elicited regarding them.

78. In addition, Dr. Binkley lacked any experience or perspective on adenosine research at the relevant time.  Plaintiffs offered contemporaneous evidence and witnesses who were actually working in the field of the invention at the time it was made because "[a] retrospective

---

[10]  Note that TX-5000 was never disclosed at all during discovery and should be excluded on that basis as well.  (*See* Klabunde 1107:13-1114:7.)

view of the invention is best gleaned from those who were there at the time." *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985).  By contrast, Dr. Binkley came to the litigation with no  contemporaneous experience with adenosine or ATP, no scientific publications in the field, and no research grants relating to adenosine.  (Binkley 238:21-241:3.) Consequently, his view is plainly colored by his current experience, and while he opined on publications from the early 1980s, he had never seen those publications prior to this litigation. (Binkley  241:7-243:7.)

Dated:  May 9, 2007


  /s/ Mary B. Matterer                              /s/ David E. Brand
Richard K. Herrmann #405                  Paul M Lukoff #96
Mary B. Matterer #2696                      David E. Brand #201
MORRIS JAMES LLP                            PRICKETT JONES & ELLIOTT, P.A.
500 Delaware Avenue, Suite 1500        1310 King Street
Wilmington, DE 19801                       Wilmington, DE 19801
(302) 888-6800                                 (302) 888-6520
mmatterer@morrisjames.com               debrand@prickett.com

Charles E. Lipsey                             John Scheibeler
FINNEGAN, HENDERSON, FARABOW,       WHITE & CASE LLP
  GARRETT & DUNNER, LLP                  1155 Avenue of the Americas
Two Freedom Square                          New York, NY  10036
11955 Freedom Drive                          (212) 819-8200
Reston, VA 20190-5675
(571) 203-2700                                 *Attorneys for Plaintiff*
                                                   *Item Development AB*
Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*