150.    The dose of adenosine to be intravenously administered safely and effectively for a given medical use could be determined by a simple dose titration.  (Binkley, Tr. 204:24-205:13, 208:20-209:6; TX 36 at 1261.)

151.    Dose titration of adenosine would have been a matter of routine experimentation to a person of ordinary skill in the art in the relevant time period.  (Binkley, Tr. 204:24-205:13; Klabunde, Tr. 1132:21-1133:1; TX 36 at 1261.)  The short half life of adenosine would enable a person of ordinary skill to titrate the dose of adenosine to be administered to a patient individually with routine medical monitoring.  (Binkley, Tr. 204:24-205:13, 208:20-209:6, 211:12-24, 216:17-23, 217:4-16, 219:2-220:2; TX 36 at 1261; TX 45 at 418-20; TX 46 at 1604-05; TX 48 at 2229.)

152.    As early as 1983, other published research expressly suggested the administration of adenosine without dipyridamole:

> [W]e speculate that adenosine alone, without the potentiating effects of dipyridamole, may be sufficient to produce hypotension in higher primates and man without involving excessive volumes of fluid.

(TX 40 at 73 *see also* Klabunde, Tr. 1197:13-1198:5.)

### 4.    No Secondary Factors Support Non-Obviousness

153.    Plaintiffs have alleged a number of secondary considerations of non-obviousness, including unexpected results, skepticism of experts, and commercial success of its Adenoscan® product. (*See* Plaintiffs' Opening Statement, Tr. 54:24-55:16, 67:24-68:18, 69:4-70:1.)  As discussed *infra* in paragraphs 154-224, none of this evidence shows that the '296 patent was not obvious.

#### a.    "Side Effects" Upon Which Plaintiffs Rely

154.    Plaintiffs rely upon three "side effects" associated with adenosine as evidence in support of their secondary considerations: (1) AV block, (2) uric acid build-up, and (3) excessive

fluid load.  (*See* Plaintiffs' Opening Statement, Tr. 54:24-55:16, 67:24-68:18, 69:4-70:1.)  Each

of these side effects – to the extent they are linked to adenosine  – are typically relatively mild

and short in duration.  (Binkley, Tr. 198:9-14, 227:4-9; Klabunde, Tr. 1207:5-1208:3.)

155.    None of these side effects would have discouraged a person of ordinary skill in

the art in 1985 from administering an intravenous infusion of adenosine at the claimed rate in the

absence of dipyridamole.  (Binkley. Tr. 200:5-201:4.)  Since dipyridamole lengthens the duration

of the side effects associated with adenosine, these side effects would have motivated a person of

ordinary skill to omit the dipyridamole pretreatment when administering adenosine.  (Binkley.

Tr. 200:5-201:4, 203:10-17, 204:13-23, 205:14-24, 209:7-14.)

(i)    **AV Block**

156.    In addition to its effects as a vasodilator, the administration of adenosine may

result in the interruption of atrio-ventricular conduction in the heart ("AV block").  (Binkley, Tr.

199:12-23.)  This property of adenosine was known in the art and led to the use of adenosine as a

bolus injection for the treatment of arrhythmia.  (Binkley, Tr. 199:12-200:4; Zaret, Tr. 1963:10-

1964:11.)  Plaintiffs sell a commercial product (Adenocard[®]) for this very use.  (Binkley, Tr.

75:4-6; Klose, Tr. 1515:7-13.)

157.    AV block is a disruption in the electrical circuit from the top chamber of to the

bottom chamber of the heart, and it generally progresses in stages. (Binkley, Tr. 197:14-23.)  For

example, Stage I of AV block is the most common form and, when it occurs, appears as an

asymptomatic  "blip" on a electrocardiograph ("ECG") monitor that usually cannot be felt by a

patient.  (Binkley, Tr. 198:9-14.)

158.    If AV block were observed during adenosine administration by a person of

ordinary skill in the art in 1985, it would typically resolve shortly after the administration of

adenosine is stopped, due to the short half life of adenosine.  (Binkley, Tr. 200:5-18.)  In other words, the doctor would simply need to turn the adenosine infusion off to stop the AV block "very quickly." (Klabunde, Tr. 1133:20-1134:2.)

159.    Persons of ordinary skill at the relevant time would not have been discouraged from administering intravenous adenosine without dipyridamole pretreatment because they would have known that the dose of adenosine to be administered to a patient should be gradually titrated to the desired level (which would be considered routine experimentation).  (Binkley, Tr. 200:5-18, 204:24-205:13, 208:20-209:6, 211:12-24, 216:17-23, 217:4-16, 219:2-220:2.)

160.    A person of ordinary skill in 1985 could also monitor a patient with an ECG to determine whether AV block had occurred and would know that adenosine administration should be stopped if any signs of AV block (*e.g.*, a decrease in heart rate) were observed.  (Klabunde, Tr. 1133:2-19.)

161.    In addition, a person of ordinary skill would have known to administer an adenosine agonist (*e.g.*, theophylline and aminophylline) to counteract the effects of adenosine if AV block were to occur.  (TX 228 at 808.)

162.    AV block was not associated with the use of adenosine by the continuous intravenous infusion method used by Dr. Sollevi in Sollevi I and II and others in the prior art.  (Binkley, Tr. 201:21-203:3.)

163.    AV block had only been observed in connection with administration of adenosine as a bolus injection. (Binkley, Tr. 201:10-20; TX 36; TX 45.)  For example, no AV block was reported in the Biaggioni Abstract.  (TX 1187.)

164.    A person of ordinary skill in the art at the relevant time would understand that the risk of AV block would be reduced – if not eliminated – by steady administration of adenosine as

a continuous intravenous infusion, instead of administration of the total adenosine dose as a single bolus injection.  (Binkley, Tr. 199:18-200:4.)

### (ii)  Uric Acid Build-Up

165.    Uric acid is a metabolite of adenosine.  (Binkley, Tr. 224:1-5.)  Adenosine is broken down by adenosine deaminase to inosine and xanthine, and then ultimately to uric acid, which is secreted from the body through the urine.  (Binkley, Tr. 224:1-5.)

166.    Uric acid levels in the body are constantly fluctuating.  (Binkley, Tr. 224:1-5, 226:11-15.)

167.    Transient increases and fluctuations in uric acid levels, by themselves, are not harmful.  (Binkley, Tr. 227:4-9.)

168.    Changes in uric acid levels are only cause for concern (if at all) when substantially and persistently increased over time.  (Binkley, Tr. 227:4-9.)

169.    A person of ordinary skill would also have known that another agent (allopurinol) could be administered to reduce an unwanted build-up of uric acid in the blood (Binkley, Tr. 358:11-22; Klabunde, Tr. 1200:2-7, 16-20.)

170.    There is no discussion in the published literature regarding the effects of high levels of uric acid following adenosine administration. (Binkley, Tr. 224:6-226:7.)  For example, no uric acid build-up was reported in the Biaggioni Abstract.  (TX 1187.)

### (iii)  Excessive Fluid Load

171.    "Excessive fluid load," which is generally defined as a build-up of fluid in the body, is not caused by adenosine or any of its metabolites. (Klabunde, Tr. 1209:7-15.)

172.    Any excessive fluid load that might occur following adenosine administration could be resolved simply by increasing the concentration of adenosine in solution. (Klabunde, Tr. 1207:5-1208:3.)

173.    There is no discussion in the published literature in support of the claim that a person of ordinary skill would have been discouraged from intravenously administering adenosine without dipyridamole due to concerns about excessive fluid load.  (Zaret, Tr. 1978:23-1979:16.)  For example, no excessive fluid load was reported in the Biaggioni Abstract.  (TX 1187.)

### b.  There is No Evidence of Skepticism of Experts

174.    There is no evidence of skepticism of experts that demonstrates the non-obviousness of the asserted '296 patent claims; Plaintiffs rely entirely upon personal, non-public correspondence between the inventor and others in the field, who may or may not be experts. (Klabunde, Tr. 1201:2-16; Binkley, Tr. 363:14-364:4, 364:19-365:7; Zaret, Tr. 1974:12-14, 18-19.)

175.    The correspondence does not provide conclusive evidence that experts were skeptical that adenosine could be administered without causing AV block or uric acid build-up. (Klabunde, Tr. 1197:7-1200:7.)  For example, the correspondence does not make clear (1) the study subjects (*e.g.*, humans or animals), (2) the dose of adenosine used, (3) the manner in which adenosine was administered (*e.g.*, bolus or intravenous infusion), and (4) the purposes of the study (*e.g.*, vasodilation or platelet aggregation).  (Klabunde, Tr. 1198:6-23.)

176.    The correspondence was not publicly available, not subject to public scrutiny or comment, and would not have discouraged persons of skill in the art. (Klabunde, Tr. 1201:2-16.)

### c.  Adenosine Does Not Exhibit Any Unexpected Results as Compared with Dipyridamole

177.    As discussed *infra* in paragraphs 178-183, Plaintiffs have not demonstrated any unexpected results for the methods in the asserted claims.

178.    The lack of occurrence of AV block was not unexpected.  (Binkley, Tr. 200:5-18.) There is no public reference in which the continuous intravenous administration of adenosine in humans resulted in the occurrence of serious AV block; for example, no AV block was reported in the Biaggioni Abstract.  (TX 1187.)

179.    All of the references presented by Plaintiffs at trial that were published in 1985 or earlier concerned either bolus administration of adenosine or administration of adenosine to animals.  (TX 36; TX 40; TX 45; TX 48.)  A person of ordinary skill would have understood that there were limitations in the predictive values of animal studies, especially when inducing hypotension.  (TX 40 at 73.)

180.    Neither Sollevi I nor Sollevi II – the only prior art publications in which adenosine was administered to humans as a continuous intravenous infusion – discloses any evidence of AV block resulting from intravenous administration of adenosine and dipyridamole together. (Binkley, Tr. 202:18-203:3, 206:3-207:5; TX 1170; TX 37.)  The administration of adenosine and dipyridamole together would actually result in a greater increase in the concentration of circulating adenosine than if adenosine were administered alone.  (Binkley, Tr. 200:5-201:4, 203:10-17, 204:13-23, 205:14-24, 209:7-14.)

181.    A person of ordinary skill in the art in 1985 would have been more – not less – concerned about the possible side effects of adenosine if dipyridamole pretreatment were also administered.  (Binkley, Tr. 200:5-201:4, 205:14-24, 209:7-14; Klabunde, Tr. 1096:11-25.) Since the effects of dipyridamole (including side effects) last longer than the effects of adenosine alone, if a side effect like AV block occurred during adenosine administration following dipyridamole pretreatment, a physician would not simply be able to stop the adenosine infusion

to resolve the AV block, given that the dipyridamole would still be blocking adenosine breakdown. (Binkley, Tr. 200:19-201:4, 205:14-24.)

182.    Plaintiffs did not point to any specific study data or results to support the claim that the lack of uric acid build-up was unexpected. (Binkley, Tr. 224:6-226:7.) Plaintiffs rely upon a single, unsupported background statement in the introduction of an abstract to support their position that a person of ordinary skill would have expected uric acid build-up to occur following adenosine administration. (TX 51 at A39.)

183.    The only publication in the prior art that disclosed the adenosine metabolites formed following the continuous intravenous infusion of adenosine is Sollevi II. (TX 37.) In that publication, even though adenosine metabolites were monitored, there is no mention of the occurrence uric acid build-up, or that uric acid build-up was anticipated to be a problem. (TX 37.)

### d.  The Commercial Success of Adenoscan is Not Due to Any Alleged Superiority of the Claimed Invention

184.    The sales levels achieved by Adenoscan® do not provide evidence of any superiority of this drug. (Leffler; Tr. 1631:12-1632:22.) Rather, the sales levels achieved by Adenoscan® are explained by the confluence and interaction of four economic factors:

> (1)  There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;
>
> (2)  Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;
>
> (3)  Extensive marketing and promotion of Adenoscan® by Fujisawa; and
>
> (4)  Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

(Leffler, Tr. 1579:3-1582:13; DTX 3133.)

(i)    **There was Only One Other FDA-Approved Competitor in the Pharmacological Stress-Testing Market at the Time of Adenoscan® Entry**

185.    Adenoscan® entered the market and began generating sales in August 1995. (Leffler, Tr. 1572:6-8.)  It was originally marketed by Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa"), now Astellas. (White, Tr. 1228:8-17.)

186.    In August 1995, when Adenoscan® entered the market, there was just one competing product, Persantine®, marketed by DuPont.  (Leffler, Tr. 1577:10-16, 1580:4-7; White, Tr. 1307:14-16; DTX 3133.)  Persantine® is the brand name for the drug dipyridamole. (Leffler, Tr. 1577:13-16.)

187.    The fact that there was only direct competitor to Adenoscan® made the pharmacological stressor market unique as compared to most pharmaceutical markets, which generally have many competitors engaged in promotional activity.  (Leffler, Tr. 1580:4-6.)

188.    In most pharmaceutical markets, the real difficulty is capturing the attention of the prescribers, who typically face numerous therapeutic alternatives and must filter through a lot of promotional "noise" in the marketplace.  (Leffler, Tr. 1602:11-21.)

189.    Unlike most pharmaceutical markets, the pharmacological stressor market was uncluttered.  (Leffler, Tr. 1602:22.)  It was "ripe for the picking" for a new player to enter and launch a competitive challenge against the available product.  (Leffler, Tr. 1602:22-25.)

190.    As a result, Adenoscan® was able to succeed in capturing the ears and the minds of doctors relatively quickly.  (Leffler, Tr. 1602:22-1603:2.)  There was just one other serious competitor –  Persantine® – with which Adenoscan® vied briefly for the attention of prescribers. (Leffler, Tr. 1602:2-4, 1603:12-14.)

191.    For this reason, the pharmacological stressor market was an "ideal" market for a new entrant such as Fujisawa, seeking to achieve sales.  (Leffler, Tr. 1602:11-1603:4.)

**(ii)  Adenoscan® Became the Only Promoted Product in the
Pharmacological Stress Testing Market Shortly After Its Entry**

192.    The second economic factor explaining the sales levels of Adenoscan® is that it became the only promoted product in the pharmacological stress testing market shortly after its entry.  (Leffler, Tr. 1580:14-21; DTX 3133.)

193.    In anticipation of the 1997 expiration of the patent on Persantine®, DuPont launched an authorized generic product in November 1996 in an advance attempt to capture generic dipyridamole sales.  (Leffler, Tr. 1603:17-21.)

194.    DuPont ceased its promotion of Persantine® approximately 16 months after the entry of Adenoscan®.  (Leffler, Tr. 1580:16-1581:7, 1603:14-16; White, Tr. 1307:17-1308:5.)

195.    DuPont ceased its promotion of Persantine® when generic dipyridamole was launched because promotion was no longer in DuPont's economic interest. (Leffler, Tr. 1603:21-1604:2.)  First, the effects of such promotion would be most likely to benefit the competing generic dipyridamole products.  (Leffler, Tr. 1604:2-4.)   Second, the accompanying reduction in the price of the branded dipyridamole product in the face of generic competition made the promotion is no longer worth the expenditure.  (Leffler, Tr. 1604:4-6.)

196.    As a result, by late 1996, Adenoscan® found itself in the fortunate situation of being the only product advertising itself to the prescribers of pharmacological stress tests. (Leffler, Tr. 1604:7-11.)  This advantage has continued to the present day.  (Leffler, Tr. 1604:12-22; White, Tr. 1308:1-11.)

**(iii)  Extensive Marketing and Promotion of Adenoscan® by Fujisawa**

197.    The third economic factor explaining the sales levels of Adenoscan® is Fujisawa's extensive and effective marketing and promotion of the product.  (Leffler, Tr. 1581:11-15; DTX 3133.)

## (1)  A Concentrated Market

198.    Typically, the pharmaceutical industry is very promotion-driven because companies compete to capture the attention of very busy prescribers, who act as agents for patients.  (Leffler, Tr. 1605:2-9.)  Many articles in the economic literature have demonstrated the significance and importance of marketing and promotion to the success of a pharmaceutical product.  (Leffler, Tr. 1605:9-12, 1606:15-25.)

199.    One characteristic of the pharmacological stressor market in particular is that it is very concentrated, *i.e.*, in that the majority of procedures using pharmacologic stress agents are performed in a relatively low number of institutions.  (Leffler, Tr. 1608:10-1609:3; TX 1226 at AST0065741.)  This market characteristic was recognized in Fujisawa's "Launch Plan for Adenoscan."  (White, Tr. 1294:4-21; TX 1226 at AST0065741.)

200.    Since Adenoscan® is not prescribed by hundreds of thousands of office-based physicians – as is the case with consumer-oriented products – Fujisawa could focus its promotion in a direct way on the relatively small number of clinics and hospitals comprising the market for its product.  (Leffler, Tr. 1607:1-25.)

201.    Fujisawa, a smaller company that did not have the resources for a vast marketing apparatus, recognized this market characteristic as advantageous.  (Leffler, Tr. 1607:1-25, 1608:5-9; White, Tr. 1292:22-1294:21; TX 1226 at AST0065741.)  The search for opportunities to manufacture products in specialty markets, *i.e.*, niche areas such as cardiology, was at the heart of Fujisawa's, and now Astellas's, business strategy.  (White, Tr. 1227:5-1228:3; Leffler, Tr. 1607:1-25.)

202.    Fujisawa engaged in traditional and non-traditional promotion in its efforts to capture this narrow pharmacological stressor market.  (Leffler, Tr. 1620:12-20; White, Tr. 1263:1-10, 1283:7-14.)  Fujisawa's traditional marketing activities included, *e.g.*, detailing, or

informational visits to doctors by pharmaceutical sales representatives; advertising; and

sampling.  (Leffler, Tr. 1605:13-1606:14, 1610:19-20; White, Tr. 1263:1-10.)

### (2)  Substantial Detailing Efforts

203.   The level of market concentration dictates how many human resources a company

would need to get a marketing message out to the target audience; the higher the concentration of

a market, the fewer the number of sales representatives that would be needed.  (White, Tr.

1294:4-21.)

204.   The concentration of the pharmacological stress test market notwithstanding,

Fujisawa devoted a substantial sales force for the purpose of detailing prescribers regarding the

Adenoscan® product.  (Leffler, Tr. 1609:20-22.)  The sales force employed by Fujisawa (86 sales

representatives) was more than twice the size of the sales force DuPont had dedicated to the

detailing of Persantine® to the same set of institutions and service providers (42 sales

representatives).  (Leffler, Tr. 1609:4-1610:3; White, Tr. 1294:22-25, 1303:22-1305:17; TX

1226 at AST0065741; TX 1242 at AST0185350.)

### (3)  Support of the ASNC

205.   Fujisawa also engaged in non-traditional marketing activities that were not in the

bailiwick of detailing, advertising, and sampling in its efforts to capture the pharmacological

stressor market.  (Leffler, Tr. 1610:15-20.; White, Tr. 1283:7-14, 1290:12-23.)

206.   The first of the promotional activities that was not within the traditional set of

promotional activities was Fujisawa's sponsorship of the American Society of Nuclear

Cardiology ("ASNC"), a medical society that advised doctors about which pharmacological

stress agents to prescribe.  (Leffler, Tr. 1611:5-8, 1611:13-15, 1613:5-1614:13; TX 1045 at

AST0083228; TX 1078 at AST0066744; TX 1128 at AST0043954; DTX 3148.)

207.    The ASNC was perceived to be a "major strategic partner" and engaged in several marketing programs sponsored by Fujisawa that were designed to increase awareness of and demand for pharmacological stress testing.  (Leffler, Tr. 1611:10-15; TX 1045 at AST0083228.) The goals of Fujisawa's partnership with the ASNC (and other medical societies) were to support market penetration of Adenoscan as well as achieve total market growth.  (Leffler, Tr. 1612:9-1613:4; White; Tr. 1252:17-25, 1339:4-15; TX 1078 at AST0066744.)

208.    One specific way in which Fujisawa supported the ASNC was by covering subscription costs to medical fellows, *i.e.*, young cardiologists in training.  (Leffler, Tr. 1614:14-1615:7; TX 1128 at AST0043954; DTX 3148.)  The covering of subscription costs was termed a "great strategic idea" that enabled Fujisawa and the ASNC to develop ground-floor relationships with the very individuals who would be prescribing pharmacological stress agents in the future. (Leffler, Tr. 1614:24-1615:7, 1630; TX 1128 at AST0043954; DTX 3148.)

### (4)  Physician Advocacy Program

209.    Another way Fujisawa engaged in non-traditional marketing and promotion was to develop a physician advocacy program in which the company forged relationships with influential doctors who would advocate for the use of Adenoscan® as a preferred pharmacological stressor.  (Leffler, Tr. 1615:9-17.)

210.    Physician advocates could be individuals at medical institutions who were called upon by Fujisawa to advocate for the institution's adoption of Fujisawa's product, or thought leaders who publish frequently, garner respect, and speak at symposia sponsored by Fujisawa. (White, Tr. 1268:18-1270:5.)

211.    Physician advocates were paid in the form of fees and other benefits for their work.  (Leffler, Tr. 1617:12-23; TX 1151 at AST0178186.)

**(5)   Financial Incentives: Trial Support and Pumps**

212.    Another example of Fujisawa's non-traditional marketing and promotional activities is its provision of financial incentives to physicians or institutions to try Adenoscan®. (Leffler, Tr. 1617:24-1618:18.)  Through its trial support program , Fujisawa would subsidize the cost of Adenoscan at clinics or hospitals that had not adopted Adenoscan.  (Leffler, Tr. 1618:3-8; White, Tr. 1275:9-15; TX 1045 at AST0083229-230.)

213.    Fujisawa also implemented a program in which it distributed, free-of-charge, the specialized volumetric pumps required for Adenoscan® administration to institutions that did not have them and might otherwise have been disincented to use Adenoscan® as a pharmacological stressor.  (Leffler, Tr. 1618:19-1619:3; Klose, Tr. 1539:14-1540:12, 1540:18-1541:2.)  The cost of a volumetric infusion pump was approximately $2,000, a significant up-front expense and hurdle to account conversion.  (Leffler, Tr. 1618:19-1619:8; White, Tr. 1289:11-14.)  No customer request for a pump was rejected, and Fujisawa's sales representatives perceived that the pump program was "vital to the success of Adenoscan."  (Klose, Tr. 1540:4-12; Leffler, Tr. 1619:9-1620:3; TX 1077 at AST0043166-167; DTX 3151.)

**(6)   Educational Initiatives: The Chest Pain Initiative and the Her Heart Initiative**

214.    Fujisawa also engaged in non-traditional marketing and promotion by sponsoring and implementing educational initiatives that not only had the objective of educating prescribing doctors and the public, but were also designed to increase the market for pharmacological stress testing, the sales of Adenoscan®, the revenues of Fujisawa, and the ultimate return on investment to the shareholders of Fujisawa.  (White, Tr. 1290:12-1291:6, 1311:11-18.)

215.    One of these initiatives was the "Chest Pain Initiative."  (Leffler, Tr. 1620:4-18.) The Chest Pain Initiative was designed to introduce nuclear imaging into emergency room

diagnostics for the purpose of identifying whether or not a patient complaining of chest pain is experiencing a heart attack. (Klose, Tr. 1529:23-1530:12.) Although the initiative was not successful, it represented an attempt by Fujisawa to expand the market for Adenoscan® at a time (2000-early 2001) when the product was beginning to reach market penetration and experience resultant slowed sales growth, as discussed *infra* in paragraph 230. (Klose, Tr. 1530:9-1531:6.)

216.    Another of Fujisawa's educational initiatives was the "Her Heart Initiative," which was designed not only to educate doctors and the public about the cardiovascular risks faced by women, but also to increase the use of stress testing for the diagnosis of cardiovascular problems in women, and therefore boost sales of Adenoscan®. (Leffler, Tr. 1620:19-1621:7, 1623:4-13; DTX 3143.) The Her Heart Initiative did in fact result in an increase in the sales of Adenoscan®. (Klose, Tr. 1532:9-16.)

217.    A Regional Manager of Fujisawa's Hospital Sales Force in mid-2002 observed that "[d]octors really saw [the Her Heart Initiative] as a business expansion opportunity that can increase their number of scans." (Leffler, Tr. 1621:8-1623:13; DTX 3143.)

218.    The Her Heart Initiative represented another effort by Fujisawa to expand the use of Adenoscan® in order to achieve sales growth from the product. (White, Tr. 1290:12-23.)

### (7)  Combining Adenosine with Exercise

219.    Another way in which Fujisawa engaged in non-traditional marketing and promotion was by supporting the publication, distribution, and presentation of educational materials that described the application of Adenoscan® in ways that would increase its use. (Leffler, Tr. 1624:17-1625:1.) An example of such a publication, entitled "The Use of Myocardial Perfusion Imaging," was created by Rush Medical Center and funded by an unrestricted educational grant from Fujisawa. (White, Tr. 1258:1-15.) The document is a text for a Continuing Medical Education program contains a description of the potential advantages

of combining limited exercise with adenosine.  (Leffler, Tr. 1623:14-1624:7; TX 224 at AST0094043.)

220.    "The Use of Myocardial Perfusion Imaging" indicates that adenosine can be used for stress testing in ways that it was not typically used, *i.e.*, in conjunction with exercise as opposed to as a complete substitute for exercise, and represents another effort on the part of Fujisawa to expand the market of potential users of Adenoscan®.  (Leffler, Tr. 1624:12-1625:1; TX 224 at AST0094043.)

### (8)  Fujisawa's Marketing and Promotion Was Extensive

221.    As described *supra* in paragraphs 184-219, Fujisawa's marketing and promotion was extensive and effective at expanding the market for pharmacological stress testing at a time when, absent a promoting competitor, Fujisawa could capture the bulk of the expanded market. (Leffler, Tr. 1581:11-15, 1620:8-10, 1625:2-25, 1629:11-22.)

222.    The fact that Fujisawa's sales force was over two times the detail force used by DuPont to promote its competing product Persantine® indicates that Fujisawa's promotion of Adenoscan® was extensive.  (Leffler, Tr. 1625:2-11.)

223.    Fujisawa's promotional expenditure data also demonstrates that Fujisawa's promotion of Adenoscan® was extensive.  (Leffler, Tr. 1625:12-13.)  For the years 1998 through 2000, Fujisawa's promotional expenditures were over $28 million, or approximately seven percent of sales.  (Leffler, Tr. 1625:12-15.)  This ratio of promotion-to-sales is in the upper range for hospital-based products, and is particularly high in the pharmacological stress testing market where, as discussed *supra* in paragraphs 196 and 199, the market is concentrated in fewer institutions and there is no other promoted competing product.  (Leffler, Tr. 1625:12-25.)

224.    There was nothing improper about Fujisawa's promotion of Adenoscan®. (Leffler, Tr. 1626:1-4.)  It was a well-managed promotional campaign that succeeded in raising

49

awareness and adoption of the use of pharmacological stress testing – using Adenoscan® in particular – irrespective of any claimed superiority of the drug.  (Leffler, Tr. 1626:5-11, 1629:11-22, 1631:12-1632:22.)

225.    Plaintiffs do not promote the features of the claimed invention in connection with the generation of sales of Adenoscan.  (*See, e.g.*, TX 75.)

### (iv)  Growth in Demand for Pharmacological Stress Testing Unrelated to the Asserted Inventions

226.    The fourth economic factor explaining the sales levels of Adenoscan® is the growth in demand for pharmacological stress testing unrelated to the asserted inventions. (Leffler, Tr. 1581:19-20; DTX 3133.)

227.    Between 1996 and 2004, the pharmacological stress test market experienced an over 300-percent growth in the use of pharmacological stressors for myocardial perfusion imaging.  (Leffler, Tr. 1627:15-1628:17; TX 21; DTX 3134.)

228.    Trends in the sales of Adenoscan reflected this general market growth.  (Leffler, Tr. 1628:18-25; DTX 3130.)



**Adenoscan® Sales (1998-2005)**

Source: TX 139, 268, 325-333.

DTX 3130
C.A. 05-337-SLR

DTX 3130
C.A. 05-336-SLR

229.   After its entry into the marketplace in August 1995, Adenoscan® experienced relatively moderate sales from August 1995 through about mid-1999.  (Leffler, Tr. 1575:23-1576:8, 1630:12-1631:4; DTX 3130.)

230.   Adenoscan®'s growth then leveled out during the period from about mid-1999 through about mid-2001.  (Leffler, Tr. 1576:15-18.)  This flattened growth is typical of the life cycle of products in pharmaceutical markets.  (Leffler, Tr. 1576:8-10; DTX 3130.)

231.   Beginning in about 2001 to 2002, the sales of Adenoscan® accelerated at a relatively substantial rate through mid-2005.  (Leffler, Tr. 1576:23-1577:4, 1628:18-1629:10; DTX 3130.)  Such a phenomenon is unusual in pharmaceutical markets; it is rare to see a product

in its sixth year on the market suddenly show substantially increasing sales. (Leffler, Tr. 1629:1-10; DTX 3130.)

232. In the meantime, in the late 1990s and early 2000s, demographic phenomena such as the increased aging of the American population and the rise in American obesity stimulated a growing concern about cardiovascular disease and sparked changes in diagnostic and treatment guidelines with respect to cardiovascular disease. (Leffler, Tr. 1581:21-1582:4, 1626:12-1627:14; White, Tr. 1309:22-1310:18.) As the American population aged and became less fit, the result was an increased inability to perform exercise-based stress tests for the diagnosis of possible cardiovascular problems. (Leffler, Tr. 1626:15-1627:11.)

233. These demographic phenomena and guideline changes resulted in a growth in demand for pharmacological stress agents at a time that was very fortuitous for Fujisawa, because there was a general, substantial growth in demand for the product the company was marketing in a market in which Adenoscan® was the only promoted product. (Leffler, Tr. 1582:5-8, 1627:12-14; White, Tr. 1311:3-9.)

234. These demographic phenomena, combined with Fujisawa's role in generating growth through its educational initiatives and other forms of promotion, are reflected in the increasing sales growth experienced by Adenoscan® in recent years. (Leffler, Tr. 1629:11-22; DTX 3130.)

235. It is notable that this general growth in the demand for pharmacological stressors also benefited Adenoscan®'s competing, non-promoting pharmacological stressor competitors, namely, dipyridamole. (Leffler, Tr. 1628:23-1629:1.)



Source: TX 21.

DTX 3132
C.A. 05-336-SLR

DTX 3132
C.A. 05-337-SLR

236.     Looking at the number of pharmacological stress tests performed using dipyridamole, from 1995 through 2005, it is clear that the use of dipyridamole was relatively constant with slight growth through about mid-2000, when an acceleration in the use of dipyridamole is observed.  (Leffler, Tr. 1599:12-1600:5; TX 21; DTX 3132.)  Then usage of dipyridamole experiences a rapid acceleration for about five quarters and then a general continued growth in use.  (Leffler, Tr. 1600:1-5; TX 21; DTX 3132.)

237.     The pattern in the usage of dipyridamole demonstrates that it clearly retained significant usage throughout the period during which Adenoscan has been on the market, such that the pharmacological stressor market does not display a dynamic in which a competitor enters

the market and takes significant usage away from another product. (Leffler, Tr. 1600:6-16, 1632:4-7; DTX 3132.)

238.    While the general growth in the demand for pharmacological stressors benefited Adenoscan®'s competing, non-promoting pharmacological stressor competitors, Adenoscan® differentially benefited from the growth in the marketplace because it was the only product being promoted. (Leffler, Tr. 1629:23-1630:11.)

**(v)    The Four Economic Factors Explain the Sales Levels Achieved by Adenoscan®, Irrespective of Any Claimed Superiority of the Product**

239.    There is no nexus between the claimed superiority of Adenoscan® and the sales achieved by the product. (Leffler, Tr. 1631:5-11.)

240.    The sales of Adenoscan® are explained by the facts recited *supra* in paragraphs 184-238. (Leffler, Tr. 1631:12-21.)

241.    If Adenoscan® truly had significant advantages over the existing competitors in the pharmacological stressor market, it would have been expected to capture most of those competitors' sales and quickly dominate the marketplace, particularly in a situation where it was the only product being promoted. (Leffler, Tr. 1631:22-1632:12, *see* Lipitor example at 1632:8-11.) However, dipyridamole continued to generate significant growth in usage and sales alongside Adenoscan®. (Leffler, Tr. 1632:5-7.)

242.    Therefore, the sales pattern exhibited by Adenoscan® is well-explained by the circumstances that existed in the marketplace and Fujisawa's recognition of and ability to capitalize on those circumstances – irrespective of any claimed superiority of the product. (Leffler, Tr. 1631:12-1632:22.)

### E.  The Claimed Inventions of the '296 Patent Were Anticipated By the Prior Art

243.    A person of ordinary skill in the art at the relevant time would conclude that Fukunaga inherently discloses each and every element of the asserted claims of the '296 patent. (Binkley, Tr. 186:6-191:3; DTX 3045.)

244.    Specifically, Fukunaga discloses selective arterial dilation without significant venous dilation following intravenous administration of ATP - which rapidly degrades to adenosine, as discussed *supra* at paragraphs 71-83 - within the claimed dosage ranges and without pretreatment with dipyridamole.  (Binkley, Tr. 186:6-191:3; DTX 3045.)

245.    Moreover, the Fukunaga Abstract observes responses indicative of selective arterial dilation without significant venous dilation, including a decrease in MABP and SVR, coupled with a "well maintained" cardiac output. (Binkley, Tr. 164:13-25, 165:16-21, 163:9-18, 165:22-166:7; TX 42 at A65; DTX 3044.)

246.    The Fukunaga Abstract concludes that "ATP should potentially be considered for use among the vasoactive hypotensive drugs" which would have also indicated to a person of ordinary skill in the art in 1985 that adenosine should be considered for use as a vasodilator. (TX 42 at A65; DTX 3044.)

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Claims 1, 3, 7, and 9 of the '296 Patent Are Invalid As Obvious

#### 1.  Legal Standard

1.      A claimed invention is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains."  35 U.S.C. § 103(a); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306 (Fed. Cir. 2006).

2.      Obviousness is a legal conclusion, based on underlying factual findings.  *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006).

3.      The factual inquiries underlying the legal determination of obviousness including the following four factors: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claimed invention and the prior art; and (4) the relevant secondary considerations.  *See Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).

4.      Any obviousness inquiry must address the subsidiary question of whether the art provides a suggestion or motivation to combine the references.  The Supreme Court recently rejected the rigid application of the "teaching-suggestion-motivation" ("TSM") test that had previously been employed by the Federal Circuit:

> The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents . . . . In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends.

*KSR Int'l Co. v. Teleflex Inc.*, No. 04-1350, 2007 WL 1237837, at *14 (U.S. Apr. 30, 2007).

5.      In lieu of the strict TSM test, the Court adopted a more flexible test that places

greater weight on the common sense of a person of ordinary skill:

> The same constricted analysis led the Court of Appeals to conclude, in error, that
> a patent claim cannot be proved obvious merely by showing that the combination
> of elements was "obvious to try."  When there is a design need or market pressure
> to solve a problem and there are a finite number of identified, predictable
> solutions, a person of ordinary skill has good reason to pursue the known options
> within his or her technical grasp.  If this leads to the anticipated success, it is
> likely the product not of innovation but of ordinary skill and common sense.  In
> that instance the fact that a combination was obvious to try might show that it was
> obvious under § 103.

*KSR*, 2007 WL 1237837, at *15 (internal citations omitted).

6.      The Court cautioned that the specter of "hindsight bias" should not trump simple

common sense, stating that "[r]igid preventative rules that deny factfinders recourse to common

sense, however, are neither necessary under our case law nor consistent with it."  *See KSR*, 2007

WL 1237837, at *16.

7.      The Court also emphasized that an obviousness analysis "need not seek out

precise teachings directed to the specific subject matter of the challenged claim, for a court can

take account of the inferences and creative steps that a person of ordinary skill in the art would

employ."  *KSR*, 2007 WL 1237837, at *13.

8.      Even before *KSR*, the Federal Circuit had had sought to clarify that the

"suggestion test is not a rigid categorical rule.  The motivation need not be found in the

references sought to be combined but may be found in any number of sources, including

common knowledge, the prior art as a whole, or the nature of the problem itself."  *See Dystar*,

464 F.3d at 1361; *see also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (Fed. Cir. 2006)

("We do not have a rigid test that requires an actual teaching to combine before concluding that

one of ordinary skill in the art would know to combine the references.").

9.      The "suggestion, teaching or motivation to combine the relevant prior art

teachings *does not have to be found explicitly in the prior art . . . .*"  *Alza*, 464 F.3d at 1290

(emphasis in original).  The motivation or suggestion can be found implicitly in the prior art as a

whole and/or in the knowledge of a person of skill in the art.  *Id.* at 1290, 1294.

10.      The suggestion test "not only permits, but *requires*, consideration of common

knowledge and common sense."  *Dystar*, 464 F.3d at 1367 (emphasis in original).

11.      A presumption of obviousness exists where the ranges disclosed in a prior art

reference overlap or encompass the claimed range.  *See Ormco*, 463 F.3d at 1311; *In re Peterson*,

315 F.3d 1325, 1330 (Fed. Cir. 2003); *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368

(Fed. Cir. 2007) ("[D]iscovery of an optimum value of a variable in a known process is usually

obvious.") (citation omitted); *Medichem*, 437 F.3d at 1167 ("[S]electing a narrow range from

within a somewhat broader range disclosed in a prior art reference is no less obvious than

identifying a range that simply overlaps a disclosed range.") (citation omitted).

12.      A second subsidiary question necessary to the obviousness inquiry is whether a

person of ordinary skill in the art would have had a reasonable expectation that the combination

of references would succeed for its intended purpose.  *See Brown & Williamson Tobacco Corp.*

*v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000).  The standard is not "absolute

predictability," but rather is whether a person of skill would have a "reasonable expectation" of

success.  *In re O'Farrell*, 853 F.2d 894, 903-904 (Fed. Cir. 1988); *see also Pfizer*, 480 F.3d at

1364 ("[O]nly a reasonable expectation of success, not a guarantee, is needed.").

13.      The "case law is clear that obviousness cannot be avoided simply by a showing of

some degree of unpredictability in the art so long as there was a reasonable probability of

success."  *Pfizer*, 480 F.3d at 1364.

14.    In addressing obviousness, relevant secondary considerations must also be considered if they are present.  Secondary considerations do not, however, control the analysis when there is an otherwise strong case of obviousness.  *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997)**.**  Moreover, for secondary considerations to be relevant there must be a nexus between the secondary consideration and the claimed invention.  *See Ormco*, 463 F.3d at 1311-12.

15.    Obviousness is determined from the point of view of a hypothetical person of ordinary skill in the art to which the patent pertains, who is presumed to have access to all prior art references in the field of the invention.  *See In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).  The person of ordinary skill in the art is also presumed to have ordinary creativity and common sense.  *KSR*, 2007 WL 1237837, at *15.

16.    Assertions that an expert did not think of the idea in the patent at the time are irrelevant.  The "'fundamental issue' is whether a *hypothetical* person of ordinary skill in the art, when confronted with the problem . . . would have been motivated" to make the connection.  *Sibia Neurosciences, Inc., v. Cadmus Pharm. Corp.*,  225 F.3d 1349, 1358 (Fed. Cir. 2000) (emphasis added).

17.    To establish obviousness, Sicor has the burden of proving any disputed facts by clear and convincing evidence.  *See Brown & Williamson*, 229 F.3d at 1124.  The Court must then make the ultimate legal conclusion as to obviousness based on the evidence presented.  *Id.*

## 2.    <u>The Scope and Content of the Prior Art</u>

18.    Prior art may be drawn from the relevant fields or from other fields so long as the reference in another field is related to the problem that the inventor was trying to solve.  *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004) ("Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem

addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved."). In determining what is relevant prior art, it is improper to assume that "a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." *KSR*, 2007 WL 1237837, at *15.

19.     Each of the references relied upon by Dr. Binkley was "reasonably pertinent to the particular problem" that the named inventors of the '296 patent addressed. *See Bigio*, 381 F.3d at 1325.

### 3.   <u>Differences Between The Claimed Invention Of The '296 Patent And The Prior Art</u>

20.     While the prior art and asserted claims are extremely similar (if not identical), the differences between them must be considered as part of a proper obviousness analysis. *See Dystar*, 464 F.3d at 1360.

#### a.   <u>Sollevi Prior Art</u>

21.     Sollevi I and Sollevi II ("the Sollevi prior art") reports identical results from the same clinical study concerning administration of 140 µg/kg/min of intravenous adenosine to humans to cause selective arterial vasodilation, and both abstracts differ from the asserted claims in only one way:  the use of a dipyridamole pretreatment.

22.     The Sollevi prior art uses a dipyridamole pretreatment before the administration of adenosine, while each of the asserted claims recite the administration of adenosine without dipyridamole.

23.     A person of ordinary skill would understand based upon the methods and conclusions set forth in the Sollevi prior art, as well as the background knowledge in the art, that

the prior art suggested the administration of intravenous adenosine without the use of any dipyridamole whatsoever.

### b. **Fukunaga Abstract**

24.    The Fukunaga Abstract discloses the intravenous administration of a selective arterial vasodilator to humans.  The sole difference between Fukunaga and the asserted claims is that the vasodilator used in Fukunaga is ATP, whereas the asserted claims recite adenosine.

25.    ATP was known as the parent molecule to adenosine, and a person of ordinary skill would understand based upon various prior art publications that exogenous ATP is converted rapidly and completely to adenosine following administration.

26.    Such a person would also understand that the selective arterial vasodilation that is observed following the administration of ATP is due to its breakdown to adenosine – not due to the direct action of ATP itself.

### 4. **The Sollevi Prior Art, In Combination with the Knowledge of a Person of Ordinary Skill in the Art, Renders the Asserted Claims Obvious**

27.    The disclosures the Sollevi prior art, in combination with the knowledge of a person of ordinary skill in the art, would render each of the asserted claims of the '296 patent obvious.

28.    The Sollevi prior art discloses or suggests each of the following: (1) a method of selective vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates.

### a. **Element No. 1**

29.    The Sollevi prior art discloses a method of selectively vasodilating the arteries with little or no venous dilation.

30.     A person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Sollevi prior art demonstrated selective arterial vasodilation with little or no venous dilation.

31.     The Sollevi prior art disclosed a decrease in MABP and SVR, along with an increase in cardiac output, which would indicate to a person of ordinary skill that arteries had been dilated with little or no venous dilation.

32.     The Sollevi prior art thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

### b.   Element No. 2

33.     The Sollevi prior art discloses that anesthetized human patients were the subjects of the study.  The Sollevi abstracts thus disclose the claimed limitation "of a human patient," as set forth in asserted claims 1, 3, 7, and 9.

### c.   Element No. 3

34.     The Sollevi prior art discloses the use of a dipyridamole pretreatment before the administration of adenosine.  However, based on the disclosures of the Sollevi prior art and knowledge in the art at the time, it would have been obvious to a person of ordinary skill in the art to omit this dipyridamole pretreatment.

35.     Common sense would have motivated a person of ordinary skill in 1985 to omit the dipyridamole pretreatment and administer adenosine alone.  *See KSR*, 2007 WL 1237837, at *15.

36.     The mechanism of action of dipyridamole was well-known at that time.  Persons of ordinary skill in the art in 1985 knew that dipyridamole acted by increasing the endogenous concentration of adenosine.

37.    Omission of the dipyridamole pretreatment would be understood by a person of ordinary skill to solve the problem of the longer duration of side effects with dipyridamole.

38.    A person of ordinary skill in the art would have drawn the "natural" conclusion to administer adenosine as the direct-acting agent to product the same effect.  *See KSR*, 2007 WL 1237837, at *13 ("[A] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.").

39.    A person of ordinary skill would also have been motivated to omit the dipyridamole pretreatment as unnecessary to achieve the desired selective arterial vasodilation at amounts less than the maximal dilatation that caused the controlled hypotension in the Sollevi prior art, because the Sollevi prior art taught that the continuous intravenous infusion of adenosine could maintain selective arterial vasodilation even as the effect of the dipyridamole pretreatment might be waning.

40.    The Sollevi prior art would therefore suggest to a person of ordinary skill in the art to administer adenosine "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

### d.    **Element No. 4**

41.    The Sollevi prior art discloses the administration of adenosine as a continuous intravenous infusion.

42.    The Sollevi prior art thus discloses the claimed manner of administration, as set forth in asserted claims 1, 3, 7, and 9.

### e.    **Element No. 5**

43.    The Sollevi prior art discloses the administration of adenosine at a rate of 140 • g/kg/min, which falls within each of the claimed rates of administration: 0.35 mg/mg/min or

less (claims 1 and 9); about 0.05 to about 0.3 mg/kg/min (claim 3); or about 0.01 to 0.15 mg/kg/min (claim 7).

44.    A presumption of obviousness exists where the ranges disclosed in a prior art reference overlap or encompass the claimed range.  *See Ormco*, 463 F.3d at 1311; *Peterson*, 315 F.3d at 1330; *see also Pfizer*, 480 F.3d at 1368 ("[T]he discovery of an optimum value of a variable in a known process is usually obvious.").

45.    In view of the teachings of the Sollevi prior art, coupled with the knowledge of a person of ordinary skill in the art in 1985, the asserted claims of the '296 patent are obvious.

5. **The Fukunaga Abstract, In Combination with the Knowledge of a Person of Ordinary Skill in the Art, Renders the Asserted Claims Obvious**

46.    The disclosures in the Fukunaga Abstract, coupled with the knowledge of a person of ordinary skill in the art in 1985, would render each of the asserted claims of the '296 patent obvious.

47.    The Fukunaga Abstract discloses or suggests each of the following: (1) a method of selective vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates.

a. **Element No. 1**

48.    The Fukunaga Abstract discloses a method of selectively vasodilating the arteries with little or no venous dilation.

49.    In the Fukunaga Abstract, MABP (pressure) and SVR (resistance) decrease, and cardiac output (blood flow) is "well-maintained," and person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Fukunaga Abstract demonstrated selective arterial vasodilation with little or no venous dilation.

64

50.    The Fukunaga Abstract thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

### b.  Element No. 2

51.    The Fukunaga Abstract discloses that anesthetized human patients were the subjects of the study.

52.    The Fukunaga Abstract thus discloses the claimed limitation "of a human patient," as set forth in asserted claims 1, 3, 7, and 9.

### c.  Element No. 3

53.    The Fukunaga Abstract discloses that dipyridamole was not used as a pretreatment before the administration of ATP.

54.    The Fukunaga Abstract thus discloses the claimed limitation "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

### d.  Element No. 4

55.    The Fukunaga Abstract discloses the continuous administration of ATP.

56.    ATP is rapidly converted to adenosine when ATP is endogenously administered, which would have been well-known to a person of ordinary skill in the art at the relevant time.

57.    Based on other references and knowledge in the art at that time, a person of ordinary skill in the art, as well as Dr. Sollevi himself, would also have understood that the conversion of ATP to adenosine is nearly complete.

58.    Fukunaga 1984, as well as other references and knowledge in the art, also taught a person of ordinary skill that adenosine – not ATP – is responsible for the vasodilation that is observed following the administration of ATP, and this mechanism of action would have been understood by a person of ordinary skill.

59.     The Fukunaga Abstract also concludes that "ATP should potentially be considered for use among the vasoactive hypotensive drugs" which would have also indicated to a person of ordinary skill that adenosine should be considered for use as a vasodilator, given that such a person would have known that the effects of ATP were due to the actions of adenosine.

### e.   Element No. 5

60.     The Fukunaga Abstract discloses the administration of ATP at a rate that is equivalent to the claimed rates of adenosine administration: 0.35 mg/mg/min or less (claims 1 and 9); about 0.05 to about 0.3 mg/kg/min (claim 3); or about 0.01 to 0.15 mg/kg/min (claim 7).

61.     To calculate the amount of adenosine that would have resulted from a given dose of ATP, a person of ordinary in the art in 1985 would have used a standard calculation and the known molecular weights of those molecules.

62.     Based on this equation, a person of ordinary skill would have determined that a dose of  0.2 to 0.6 mg/kg/min of ATP is equivalent to doses of between 0.097 and 0.290 mg/kg/min of adenosine.

63.     This adenosine dose is equivalent to a dose of 97 to 290 µg/kg/min, which includes or overlaps each of the ranges recited in the asserted claims of the '296 patent.

### 6.   No Secondary Factors Support Non-Obviousness

64.     When, as here, the prior art sets forth a prima facie case of obviousness, the patentee bears the burden of presenting evidence, if any, that the claimed invention would not have been obvious to one skilled in the art.  *See, e.g.*, *Newell Cos., Inc. v. Kenney Mfg. Inc.*, 864 F.2d 757, 768-69 (Fed. Cir. 1988); *see also Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir. 2000) (affirming finding of invalidity due to patentee's failure to rebut *prima facie* case with secondary considerations).  Such evidence might include the so-called "secondary considerations" of non-obviousness, including the failure of others to make the

claimed invention, skepticism by others that the claimed invention could work, and commercial success attributable to the merits of the claimed invention.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

65.    For secondary considerations to be relevant, there must be a nexus between the secondary consideration and the claimed invention.  *See Ormco*, 463 F.3d at 1311-12 ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").

66.    Even if relevant, secondary considerations do not control the obviousness determination.  *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks*, 122 F.3d at 1483; *see also Newell*, 864 F.2d at 769.  Indeed, it is well-established that such evidence will not save a patent when the prior art provides "strong evidence of obviousness."  *Brown & Williamson*, 229 F.3d at 1131; *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed Cir. 1989); *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 317 (Fed. Cir. 1985).

67.    Whether evidence of secondary considerations of nonobviousness suffices to rebut the *prima facie* case of obviousness is a question of law.  *Tec Air, Inc. v. Denso Mfg. Michigan Inc.,* 192 F.3d 1353, 1360 (Fed. Cir. 1999).

68.    To show commercial success as a secondary consideration of nonobviousness, Plaintiffs must demonstrate that there is "[a] nexus between commercial success and the claimed features."  *Brown & Williamson*, 229 F.2d at 1130.  If Plaintiffs show that "the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness [Sicor]," *id.*,  to show that the commercial success was "due to other factors extraneous to the patented invention . . ."  *See J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

69.    Plaintiffs have failed to demonstrate a nexus between the '296 patent claimed invention and the alleged commercial success of the Adenoscan® product. *See Ormco*, 463 F.3d at 1311-12 ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").

70.    Adenoscan® was marketed not on the basis of its ability to selectively dilate arteries rather than veins without pretreatment with dipyridamole (*i.e.*, the claimed '296 patent invention), but on the basis of its short half life and the concomitant rapid cessation of side effects. In short, the nexus is with characteristics of adenosine that were long known in the prior art, and not the claimed inventions.

71.    Adenoscan® sales levels do not suggest any non-obviousness. The commercial sales of Adenoscan® are explained by the confluence and interaction of four economic factors: (1) the existence of just one other FDA-approved competitor in the pharmacological stress testing market at the time of Adenoscan® market entry; (2) the absence of marketing and promotion by the manufacturers of drugs that are competitive alternatives to Adenoscan®; (3) extensive marketing and promotional campaigns; and (4) growth in demand for myocardial perfusion imaging employing pharmacological stress agents occurring for demographic and marketing reasons unrelated to the asserted invention.

72.    Even if commercial sales were found not to be a product of promotion and market forces, commercial success is not sufficient to overcome the strong case of obviousness here. *See Newell*, 864 F.2d at 769 ("[A]lthough the record shows a highly successful product, the record also establishes such a strong case of obviousness . . . that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion.")

**B. Claims 1, 3, 7, and 9 of the '296 Patent Are Invalid As Inherently Anticipated**

**1. Legal Standard**

73.    A patent claim is invalid as anticipated under 35 U.S.C. § 102 when every limitation of the claim was contained, either expressly or inherently, in a single prior art reference. *See* 35 U.S.C. § 102; *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

74.    To anticipate, a prior art reference "must also be enabling, such that one of ordinary skill in the art could practice the invention without undue experimentation." *Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005).

75.    An inherent characteristic is one that is the "natural result flowing from" the disclosure or teaching of the prior art. *See Schering Corp. v. Geneva Pharm., Inc.,* 339 F.3d 1373, 1379 (Fed. Cir. 2003); *Eli Lilly & Co. v. Barr Labs, Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001).

76.    A "reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time." *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006). That is, "[i]nherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure." *Id.* at 1368 (citation omitted).

**2. The Asserted Claims are Inherently Anticipated by the Fukunaga Abstract**

77.    A person of ordinary skill in the art at the relevant time would conclude that the Fukunaga Abstract inherently discloses each and every element of the asserted claims of the '296 patent.

78.    The Fukunaga Abstract discloses each of the following: (1) a method of selective vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without

pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates.

### a. **Element No. 1**

79. The Fukunaga Abstract discloses a method of selectively vasodilating the arteries with little or no venous dilation.

80. A person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Fukunaga Abstract demonstrated selective arterial vasodilation with little or no venous dilation.

81. The Fukunaga Abstract thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

### b. **Element No. 2**

82. The Fukunaga Abstract discloses that anesthetized human patients were the subjects of the study.

83. The Fukunaga Abstract thus discloses the claimed limitation "of a human patient," as set forth in asserted claims 1, 3, 7, and 9.

### c. **Element No. 3**

84. The Fukunaga Abstract discloses that dipyridamole was not used as a pretreatment before the administration of ATP.

85. The Fukunaga Abstract thus discloses the claimed limitation "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

### d. **Element No. 4**

86. The Fukunaga Abstract discloses the continuous administration of ATP.

87.     The *in vivo* conversion of exogenous ATP to adenosine is the "natural result flowing from" ATP administration.  *See Schering*, 339 F.3d at 1379; *Eli Lilly*, 251 F.3d at 970.

88.     A person of ordinary skill in the art at the relevant time would have understood that ATP rapidly degrades in the body to adenosine, and such a person would have also understood that adenosine is responsible for the arterial vasodilation effects associated with ATP.

89.     The Fukunaga Abstract thus inherently discloses the claimed limitation "by continuously administering adenosine," as set forth in asserted claims 1, 3, 7, and 9.

### e.  <u>Element No. 5</u>

90.     The Fukunaga Abstract discloses the administration of ATP at a rate that is equivalent to the claimed rates of adenosine administration.

91.     Using the equation discussed *supra*, person of ordinary skill would have determined that a dose of  0.2 to 0.6 mg/kg/min of ATP is equivalent to doses of between 0.097 and 0.290 mg/kg/min of adenosine.

92.     This adenosine dose is equivalent to a dose of 97 to 290 µg/kg/min, which includes or overlaps the ranges recited in the asserted claims of the '296 patent.

93.     But even if a person of ordinary skill had not recognized that the administration of 0.2 to 0.6 mg/kg/min would have been equivalent to the claimed dose of adenosine, the Fukunaga Abstract would still inherently anticipated the asserted claims.  *See Abbott*, 471 F.3d at 1368 ( "[I]nherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure.").

## III.  <u>CONCLUSION</u>

94.    Defendants request that the Court adopt the foregoing findings of fact and

conclusions of law and enter judgment that the '296 patent is invalid as obvious or inherently

anticipated or both.

Respectfully submitted,


/s/ *Karen E. Keller*

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

*Attorneys for Defendants Sicor Inc. and*
*Sicor Pharmaceuticals, Inc.*


Dated:  May 9, 2007

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on May 16, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Paul M. Lukoff, Esquire
David E. Brand, Esquire
Prickett Jones & Elliot, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

Richard K. Herrmann, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306

I further certify that on May 16, 2007, I caused copies of the foregoing document to be served by e-mail on the above-listed counsel and on the following in the manner indicated:

### BY E-MAIL

Charles E. Lipsey, Esquire
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675

Susan H. Griffen, Esquire
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, DC 20001-4413

John Scheibeler, Esquire
WHITE & CASE, LLP
1155 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendants*