**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ITEM DEVELOPMENT AB, ASTELLAS US )<br>LLC, and ASTELLAS PHARMA US, INC. )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>SICOR INC. and SICOR )<br>PHARMACEUTICALS, INC. )<br>)<br>Defendants. )<br>)<br>)<br>————————————————————— ) | Civil Action No. 05-336 SLR |

**DEFENDANTS SICOR'S RESPONSIVE POST-TRIAL BRIEF**

John W. Shaw (No. 3362)
Josy W. Ingersoll (No. 1088)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

*Attorneys for Defendants Sicor Inc. and*
*Sicor Pharmaceuticals, Inc.*

Dated: June 19, 2007

## TABLE OF CONTENTS

I.     Introduction ..................................................................................................... 1

II.    The Asserted Claims Of The '296 Patent Are Invalid As Obvious ......................... 4

    A.    The Sollevi Abstracts Render the Asserted Claims of the '296 Patent
        Obvious ........................................................................................................ 5

        1.    The Sollevi Abstracts Demonstrated That 140 µg/kg/min Adenosine
             Could Be Administered Safely To Humans By Continuous
             Intravenous Administration .............................................................. 5

    B.    The Fukunaga 1982 Abstract Renders the Asserted Claims of the '296
        Patent Obvious ............................................................................................ 7

    C.    The Dose Required to Produce a Desired Effect Could Have Been
        Determined Through Routine Experimentation ........................................ 11

    D.    The Prior Art Uses of Adenosine and Other Vasodilators Did Not Teach
        Away from the Claimed Invention............................................................ 12

        1.    The Use of Other Vasodilators During the Relevant Time Period
             Would Have Encouraged Persons of Ordinary Skill to Look to
             Adenosine ......................................................................................... 13

        2.    Research Concerning Adenosine for Various Medical Uses Exploded
             Following a 1980 Publication by Dr. Berne.................................... 14

III.   Secondary Considerations Do Not Support The Non-Obviousness Of The Asserted
    Claims .............................................................................................................. 16

    A.    Plaintiffs Have Not Demonstrated Unexpected Results ........................... 16

        1.    The Occurrence of Selective Arterial Vasodilation at the Claimed
             Dosages Was Not Unexpected......................................................... 17

        2.    The Lack of AV Block Was Not Unexpected ................................. 18

        3.    The Lack of Uric Acid Build-Up Was Not Unexpected ................. 19

    B.    Plaintiffs Have Failed to Provide Evidence of Skepticism ....................... 19

        1.    The Correspondence Is Not Probative Of Non Obviousness....................... 20

        2.    The Correspondence Relied Upon by Plaintiffs is Not Admissible .............. 21

    C.    Copying Is Irrelevant in the ANDA Context .............................................. 22

|   | D. | Plaintiffs Have Failed to Show that the Alleged Commercial Success of Adenoscan® Has Any Nexus to the Asserted Claims | 23 |
|---|---|---|---|
|   |   | 1. | The Sales Levels of Adenoscan® Are Explained By the Interplay of Economic Factors, Not The Product's Clinical Attributes | 23 |
|   |   | 2. | Dr. Hay's Analysis Is Unsound and His Testimony Is Unreliable | 28 |
| IV. | | The Asserted Claims Of The '296 Patent Are Inherently Anticipated | 29 |
| V. | | Expert Testimony Issues | 30 |
|   | A. | Dr. Binkley is Highly Qualified to Serve as An Expert in This Case | 30 |
|   |   | 1. | Dr. Binkley's Opinions Were Well Within the Scope of His Expert Report | 31 |
|   |   | 2. | Dr. Binkley Was Forced to Rebut Issues Raised by Plaintiffs for the First Time at Trial | 32 |
|   | B. | Dr. Leffler is Highly Qualified to Testify As An Expert in This Case | 34 |
|   | C. | The Expert Testimony Offered By Plaintiffs is Not Credible | 36 |
|   |   | 1. | Dr. Klabunde is a Physiologist Who Has Never Administered Any Vasodilator, Including Adenosine, To a Patient | 36 |
|   |   | 2. | Plaintiffs' Last-Minute Decision Not To Call Dr. Zaret Unfairly Deprived Sicor of Favorable Admission | 37 |
| VI. | | Remaining Evidentiary Issues | 38 |
|   | A. | Sicor's Designation of Dr. Zaret's Deposition Testimony is Admissible | 38 |
|   | B. | Dr. Strauss's Testimony Cannot Be Properly Considered | 39 |
| VII. | | Conclusion | 40 |

# TABLE OF AUTHORITIES

CASES

*ABB Air Preheater Inc. v. Regenerative Envtl. Equip.,*
    167 F.R.D. 668 (D.N.J. 1996) ................................................................. 34

*Abbott Labs. v. Baxter Pharmaceutical Prods., Inc.,*
    471 F.3d 1363 (Fed. Cir. 2006) .............................................................. 29

*Amazon.com, Inc. v. Barnesandnoble.com, Inc. et al.,*
    239 F.3d 1343 (Fed. Cir. 2001) .........................................................30, 40

*Aventis Pharma Deutschland GmbH v. Lupin Ltd.,*
    2006 WL 1008962 (E.D. Va. July 17, 2006) ........................................ 22

*Cable Elec. Prods. v. Genmark, Inc.,*
    770 F.2d 1015 (Fed. Cir. 1985) .............................................................. 22

*Crowley v. Chait,*
    322 F. Supp. 2d 530 (D.N.J. 2004) ........................................................ 33

*Eli Lilly & Co. v. Barr Labs, Inc.,*
    251 F.3d 955 (Fed. Cir. 2001) ............................................................... 29

*eSpeed, Inc. et al. v. Brokertec USA, LLC,*
    404 F. Supp. 2d 575 (D. Del. 2005) ...................................................... 31

*Forest Labs., Inc. v Ivax Pharm., Inc.,*
    237 F.R.D. 106 (D. Del. 2006) .............................................................. 32

*Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.,*
    693 F. Supp. 114 (D. Del. 1988) ....................................................... 26-27

*In re Fla. Microsoft Antitrust Litig.,*
    2002 WL 31423620 (Fla. Cir. Ct. 2002) ............................................... 34

*In re Fulton,*
    391 F.3d 1195 (Fed. Cir. 2004) .............................................................. 13

*In re GPAC Inc.,*
    57 F.3d 1573 (Fed. Cir. 1995) ............................................................... 22

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997) .............................................................. 24

*KSR Int'l Co. v. Teleflex Inc.,*
    127 S. Ct. 1727 (2007) ..........................................................1, 4, 7, 13

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
    485 F.3d 1157 (Fed. Cir. 2007) ......................................................... 4, 16

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
   337 F.3d 1362 (Fed Cir. 2003) ................................................................. 26

*Merck & Co., Inc. v. Teva Pharms USA, Inc.*,
   405 F.3d 1338 (Fed Cir. 2005) ................................................................. 27

*Ormco Corp. v. Align Tech.*,
   463 F.3d 1299 (Fed. Cir. 2006) ................................................................. 6

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ........................................................... 16-17

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
   461 F. Supp. 2d 271 (D.N.J. 2006) ................................................. 23, 34, 36

*Renishaw PLC v. Marposs Societa' Per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998) ........................................................... 16-17

*Revlon, Inc. v. Carson Prods. Co.*,
   602 F. Supp. 1071 (S.D.N.Y. 1985) ............................................................ 26

*Richardson-Vicks, Inc. v. Upjohn Co.*,
   122 F.3d 1476 (Fed. Cir. 1997) ................................................................. 16

*Schering Corp. v. Geneva Pharm., Inc.*,
   339 F.3d 1373 (Fed. Cir. 2003) ................................................................. 29

*Sentex Sys., Inc. v. Elite Access Sys., Inc.*,
   194 F.3d 1331 (Fed. Cir. 1999) (unpublished opinion) .................................. 23

*Speller v. U.S.*,
   14 Cl. Ct. 170 (1988) ............................................................................ 24

*Tracinda Corp. v. Daimlerchrysler AG*,
   362 F. Supp. 2d 487 (D. Del. 2005) ...................................................... 38-39

*U.S. v. Adams*,
   383 U.S. 39 (1966) ............................................................................... 20

*Vandenberg v. Dairy Equip. Co.*,
   740 F.2d 1560 (Fed. Cir. 1984) .......................................................... 27-28

*Wash. Legal Found. v. Legal Found. of Wash.*,
   271 F.3d 835 (9th Cir. 2001) ................................................................. 34

## STATUTES

35 U.S.C. § 282 ......................................................................................... 33

## OTHER AUTHORITIES

Rule 26(a)(3), Fed. R. Civ. P. ......................................................................... 34

## I.    __INTRODUCTION__

The case for the obviousness of the asserted '296 patent claims is not a figment of hindsight, as Plaintiffs would have this Court believe.  Here, the sole named inventor, Dr. Alf Sollevi, rendered the '296 patent obvious by publishing his work over one year before the patent's priority date.  Dr. Sollevi's two abstracts ("the Sollevi abstracts") disclosed a method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation, comprising continuously administering adenosine at a rate of 140 µg/kg/min, using a pretreatment with dipyridamole. [1]  There is no serious dispute that these abstracts disclosed every element of the asserted claims save one: the elimination of the dipyridamole pretreatment.

At trial, Sicor demonstrated clearly and convincingly that everyday insights would have motivated a person of ordinary skill at the relevant time to take the single, obvious step of eliminating the dipyridamole pretreatment.  The skilled artisan would have been moved to do so where her goal was to achieve selective arterial vasodilation at a level less than the maximal vasodilation required to induce controlled hypotension for the surgical patients in Dr. Sollevi's study.  *See KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1742 (2007) ("A person of ordinary skill is a person of ordinary creativity, not an automaton.").  The skilled artisan would have known that dipyridamole acted indirectly by increasing the concentration of endogenous adenosine in the body and thus the dipyridamole pretreatment served only to reduce the amount of exogenously administered adenosine.  As dipyridamole was just the middleman used to increase the adenosine concentration, it could be eliminated where the desired level of selective arterial vasodilatation required was less.

The Sollevi abstracts are not the only invalidating prior art here.  A 1982 abstract by Dr. Fukunaga ("Fukunaga 1982") disclosed a method of selectively vasodilating the arteries of a human

---

[1]    "The Sollevi abstracts" refers to the following two abstracts authored by Dr. Alf Sollevi, which were published over one year before the priority date of the '296 patent:  A. Sollevi et al., Cardiovascular effects of adenosine during controlled hypotension in cerebral artery aneurysm surgery, Anesthesiology (Circulation II) 59(3): A9 (Sept. 1983) (TX 1170, "Sollevi I"); A. Sollevi et al., Cardiovascular effects of adenosine in man, Acta Physiol. Scan. 120(2): 11A (Feb. 1984) (TX 37, "Sollevi II").

patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering adenosine triphosphate ("ATP") at a rate equivalent to the range of adenosine claimed in the '296 patent. The ATP administered by Dr. Fukunaga would have been rapidly and virtually completely converted to adenosine, a fact that persons of skill would have readily understood based a number of relevant prior art publications, among them a Sollevi publication. Dr. Fukunaga's 1984 abstract ("Fukunaga 1984"), in which the amount of ATP required to induce controlled hypotension was reduced by a dipyridamole pretreatment, confirmed that the selective arterial vasodilatation observed in Fukunaga 1982 was caused by the adenosine liberated by the rapid metabolism of the infused ATP, and not by the direct action of the ATP itself.

Plaintiffs' response to Sicor's strong *prima facie* case of invalidity is threefold. First, Plaintiffs dispute that skilled artisans would have reasonably expected that selective arterial vasodilatation would result from the intravenous administration of adenosine alone in the claimed ranges. In support, Plaintiffs' expert opined that skilled artisans would have determined that amounts of adenosine far higher than the claimed range would be required. But Plaintiffs' expert's calculations both ignored the teaching of the Fukunaga 1982 and 1984 abstracts and incorrectly assumed that the skilled artisan's only goal was the maximal selective arterial vasodilatation induced by Dr. Sollevi and Dr. Fukunaga for surgical patients.

Second, Plaintiffs contend that the only medical use of adenosine disclosed in the prior art was controlled hypotension, and thus that skilled artisans would not consider adenosine for other uses, *e.g.*, those uses calling for less selective arterial vasodilatation and less adenosine, which would suggest the elimination of dipyridamole pretreatment. Dr. Binkley, however, testified that such uses would have been of interest to a person of skill at the time, and Plaintiffs have not shown otherwise. More important, Plaintiffs' argument is inapposite because even if the asserted claims did require that the selective arterial vasodilatation be employed for a specific medical use – which they do not – there is no legal requirement that the prior art have expressly disclosed such use for these claims to be obvious. As the Supreme Court made clear in *KSR*, a finding of obviousness does not require precise teachings directed to the specific

subject matter of the claim.  127 S. Ct. at 1741.  In this case, the '296 patent claims only selective

vasodilation without qualification as to the level or medical purpose.  And it is not disputed that selective

arterial vasodilatation can occur at levels below the extreme level achieved in controlled hypotension – a

basic scientific principle that was confirmed by both Plaintiffs' expert (Tr. 1059:19-22) and Sicor's

expert, Dr. Binkley (Tr. 1367:7-1368:2).

Finally, Plaintiffs also raise a number of so-called "secondary considerations" in an attempt to

rebut Sicor's *prima facie* obviousness case, including unexpected results, skepticism of experts, and

commercial success.  But the purported "unexpected results" – no AV block and no increase in uric acid

levels – were not unexpected based on Dr. Sollevi's own prior art.  The Sollevi abstracts do not report any

concern regarding AV block or uric acid.  Moreover, Dr. Sollevi testified that he had the means to

monitor for AV block and uric acid build-up, and he did not observe any sign of either of them.  (Tr.

479:5-23; Tr. 482:11-16.)  Whatever concerns may have existed in the older prior art, Dr. Sollevi's own

work obviated them before the critical date.

In similar fashion, the purported skepticism of experts that adenosine could be safely

administered to patients is just smoke and mirrors.  Plaintiffs cannot point to a single publication –

peer-reviewed or otherwise – that demonstrates this purported skepticism.  There are none.  The private

correspondence on which Plaintiffs rely is not the discourse of experts written to withstand public

scrutiny, but merely letters congratulating Dr. Sollevi for achieving a result which the authors do not

doubt was feasible or was in fact accomplished.

Plaintiffs have also failed to demonstrate a nexus between the asserted claims of the '296 patent

and the alleged commercial success of the Adenoscan® product.  Adenoscan® was marketed on the basis

of its short half life and the concomitant short duration of side effects, not on the basis of its ability to

selectively vasodilate arteries rather than veins.  Moreover, the sales levels for Adenoscan® do not suggest

any non-obviousness and are instead explained by the confluence and interaction of four economic

factors.

3

For these reasons, and as explained in more detail below, as well as in Sicor's May 9, 2007 Opening Post-Trial Brief, Sicor asks this Court to find that the asserted '296 patent claims are invalid and enter judgment in Sicor's favor.

## II.    THE ASSERTED CLAIMS OF THE '296 PATENT ARE INVALID AS OBVIOUS

Plaintiffs attack Sicor's case for obviousness by challenging the lack of motivation to modify the prior art.  In the face of the evidence and the recent Supreme Court and Federal Circuit decisions concerning obviousness, Plaintiffs' challenge must fail.  *See generally KSR*, 127 S. Ct. 1727; *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007).

In their brief, Plaintiffs repeatedly claim that Sicor has not provided evidence of motivation to modify the prior art.  But the rigid "teaching-suggestion-motivation" test upon which Plaintiffs rely is not the legal standard for an obviousness analysis.  The Supreme Court could not have been more clear: a "expansive and flexible" approach should be used in assessing obviousness:

> As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill can employ.

*See KSR*, 127 S. Ct at 1739-41.  While recognizing the need to guard against hindsight bias, the Supreme Court cautioned against adopting a wooden approach that takes common sense out of the obviousness analysis:

> The Court of Appeals, finally, drew the wrong conclusion from the risk of courts and patent examiners falling prey to hindsight bias.  A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning.  ***Rigid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it.***

*See KSR*, 127 S. Ct. at 1742-43 (emphasis added; citations omitted).  The Supreme Court was cautioning against just the sort of trap that Plaintiffs' arguments have set for the Court here.  By contrast, the correct analysis employs a broader conception of the suggestion test, taking into account the common knowledge in the field of art and allowing for the skilled artisan's use of her common sense and ordinary innovation.  *Id.* at 1742.  Here, the application of common knowledge and common sense renders these claims obvious.

A.    **The Sollevi Abstracts Render the Asserted Claims of the '296 Patent Obvious**

Plaintiffs repeatedly describe Dr. Sollevi as a "pioneer" in the adenosine field.  (D.I 151 at 8.)

Even if that description were correct and Dr. Sollevi's continuous intravenous administration of adenosine

were "pioneering," the problem for Plaintiffs is that Dr. Sollevi placed his "pioneering" work in the public

domain in two abstracts (TX 37 and TX 1170) published more than a year before the priority date of the

'296 patent (September 24, 1985).  The Sollevi abstracts describe a human clinical study which disclosed

nearly each and every element of the asserted claims: a method of selectively dilating the arteries of a

human patient without inducing significant venous dilation, comprising administering adenosine

intravenously at a rate of 140 µg/kg/min.  (D.I. 150 at 17-19.)  There is no dispute that these elements are

disclosed in the Sollevi abstracts.  (Tr. 1941:18-1942:6.)  As a consequence of Dr. Sollevi's disclosures,

persons of ordinary skill, employing their knowledge of the prior art, their common sense, and their

ordinary creativity, would have understood that the dipyridamole pretreatment in the Sollevi abstracts

could be eliminated and that the continuous intravenous administration of adenosine to humans in the

claimed range could be done safely and would be reasonably likely to cause selective arterial

vasodilation.

1.    **The Sollevi Abstracts Demonstrated That 140 µg/kg/min Of Adenosine Could Be Administered Safely To Humans By Continuous Intravenous Administration**

Plaintiffs claim that Dr. Sollevi administered a dipyridamole pretreatment before adenosine due

to his "concern[] about adenosine's effect on the heart and its capacity to form the toxic uric acid

metabolite" and that Dr. Sollevi considered the infusion of adenosine without dipyridamole "unthinkable,

as the much higher doses thought to be required . . . would surely have lead to serious side effects."  (D.I.

151 at 2.)  Plaintiffs' argument and the Sollevi testimony upon which Plaintiffs rely should be discounted

as a litigation-inspired gloss lacking credibility.

The contemporaneous documents, the Sollevi abstracts, are silent on Dr. Sollevi's reasons for the

use of dipyridamole except to say that dipyridamole was an "adenosine uptake inhibitor" (TX 37) and

"reduced the required ADO dose" (TX 1170).  Furthermore, Dr. Sollevi made no mention of such serious

concerns when he disclosed his own experiments using adenosine without dipyridamole pretreatment. (TX 112 at 403 fn.††).  Nor were any of the purported serious side effects observed in Fukunaga 1982 (TX 42), a study that Dr. Sollevi cited in his contemporaneous publications.

In view of Dr. Sollevi's silence in the contemporaneous record, his litigation-inspired after-the-fact testimony should carry no weight.  Dr. Sollevi has acknowledged his financial interest in the outcome of this case.  (Tr. 473:19-474:8.)  And even if he were entirely free of bias – and he is not – Dr. Sollevi's testimony as an purported inventor is not relevant to the obviousness analysis because, according to Plaintiffs, Dr. Sollevi was an innovator and thus not a person of ordinary skill in the art in 1985.  Moreover, the reasons that Dr. Sollevi now asserts for using the dipyridamole pretreatment were not expressed contemporaneously by him in the public domain and thus could not even have influenced the thinking of persons of ordinary skill at the time.  The standard for obviousness is the understanding of a person of ordinary skill – not the understanding of the inventor – based on what is in the public domain. *Ormco Corp. v. Align Tech.*, 463 F.3d 1299, 1306 (Fed. Cir. 2006).

Other circumstantial evidence discounts Plaintiffs' and Dr. Sollevi's assertions that adenosine was perceived as too dangerous to be used without dipyridamole.  The Sollevi abstracts conclude by recommending the use of intravenous adenosine for controlled hypotension – with no reference to the need for dipyridamole.  (D.I. 150 at 18-19.)  If Dr. Sollevi believed that it was dangerous to administer adenosine without dipyridamole, as Plaintiffs claim, a person of ordinary skill would have expected the Sollevi abstracts to stress the importance of the dipyridamole pretreatment – but the Sollevi abstracts never do so.  By contrast, the last sentences of the Sollevi abstracts state that the "hemodynamic and metabolic properties of **adenosine** make it a suitable agent for CH in man." (*Id.* (emphasis added).) There is no mention that dipyridamole must always be used.  Because adenosine and dipyridamole have very different metabolic properties, in particular half life,[2] this statement focusing on the advantageous

---

[2]    For example, the metabolism of adenosine in human blood is 10 to 30 seconds, whereas the half life of dipyridamole is approximately 30 to 40 minutes.  (D.I. 150 at 11.)

metabolic properties of adenosine would not indicate to skilled artisans that it was ***unthinkable*** to administer adenosine without a dipyridamole pretreatment.

Further, the specter of danger from the use of adenosine is belied by Dr. Sollevi's decision to conduct the first ever human trial on the intravenous administration of adenosine (with or without dipyridamole) on surgical patients suffering from cerebral aneurysms (*i.e.*, "a 'bulb' or bubble on a blood vessel in the brain that could rupture, causing bleeding and death"). (D.I. 151 at 8.) As a physician desiring to do no harm to his patients, Dr. Sollevi's decision to forego the accepted protocol within the medical community to first conduct clinical trials in healthy volunteers strongly suggests that his contemporaneous concerns regarding the danger of adenosine were far less than he and Plaintiffs now assert.

### B.    The Fukunaga 1982 Abstract Renders The Asserted Claims Of The '296 Patent Obvious

Plaintiffs argue that persons of ordinary skill would not have understood that the controlled hypotension reported in the Fukunaga Abstracts following the intravenous administration of adenosine triphosphate ("ATP") was the result of the action of adenosine. Plaintiffs' argument fails because it incorrectly presumes that persons of ordinary skill would view the prior art robotically instead of using their expertise and common sense (s*ee KSR*, 127 S. Ct. at 1742), and would ignore the teachings of more relevant and recent prior art in favor of the less relevant and older prior art cited by Plaintiffs.

Plaintiffs rely primarily on the testimony of Dr. Klabunde, who on the ATP-adenosine conversion issue, focused almost exclusively on references from the 1970s (TX 151; TX 199). These references do not contradict Sicor's evidence, and at any rate were outdated by the '296 patent priority date. Dr. Klabunde and Plaintiffs turn a blind eye to the evidence existing at the relevant time that the vasodilative effects of ATP were due to its rapid and complete conversion to adenosine. (D.I. 150 at 11-13.) For example, a contemporaneous publication co-authored by Dr. Sollevi expressly stated that ATP that is intravenously administered is degraded "entirely to adenosine" during the transpulmonary passage. (TX 236 at 547.)

Plaintiffs assert that a study by Moir and Downs published in the early 1970s ("Moir and Downs," TX 199) would have led skilled artisans to believe that ATP was a more potent vasodilator than adenosine and thus that ATP, not adenosine, was the direct-acting agent for the selective arterial vasodilatation in Fukunaga 1982. Plaintiffs' analysis is wrong. Even Dr. Klabunde admitted that by the relevant time, the Moir and Downs study was old news, and a person of ordinary skill would have looked to more recent publications to understand the relationship between ATP and adenosine in vasodilation. (Tr. 1118:8-12.) The later publications would lead the skilled artisan to understand that adenosine, not ATP, was the direct-acting agent in Fukunaga 1982.

Moreover, the data in Moir and Downs do not even support Plaintiffs' position that skilled artisans would have viewed ATP as more potent than adenosine. As Dr. Binkley testified, "there really is not a great difference" in coronary blood flow when comparing data from the dogs who had received ATP and the dogs who had received adenosine (Tr. 1422:18-1425:25), nor were p-values calculated to allow a proper statistical analysis of the data comparison (Tr. 1450:7-24).[3]

Importantly, Dr. Binkley noted a key difference in the manner of ATP administration in TX 199 and the manner of ATP administration in the Fukunaga abstract that undermines Plaintiffs' characterization of the results. (Tr. 1426:19-1427:15.) In TX 199, ATP was administered directly into the artery to be dilated and did not cross the transpulmonary passage. In Fukunaga 1982, ATP was administered intravenously, and thus necessarily flowed through the transpulmonary passage. A person of ordinary skill would have understood that intravenously administered ATP would be degraded entirely to adenosine during the transpulmonary passage (*see*, *e.g.*, TX 236), and also would have understood that the ATP administered in TX 199 (which reflected intra-arterial administration) bypassed the transpulmonary passage. (Tr. 1426:19-1427:15.) Therefore, a person of ordinary skill would have known the data in TX 199 did not represent the effects that would be expected if ATP was intravenously, because the conversion of adenosine to ATP in the transpulmonary passage could not occur.

---

[3]    Dr. Binkley did not believe that the difference in the amount of adenosine and ATP that was administered to the dogs in TX 199 was relevant.

Based on a correct and complete understanding of the prior art, the asserted claims would have been obvious to a person of ordinary skill in the art in view of Fukunaga 1982 (TX 42). Fukunaga 1982 disclosed the intravenous administration of 200 to 600 ug/kg/min of ATP, which a person of ordinary skill would have understood to be equivalent to about 97 to 290 µg/kg/min of adenosine.[4] (D.I. 150 at 19.) Fukunaga 1982 also disclosed that the administration of ATP in this dosage range lead to controlled hypotension, coupled with "well-maintained" cardiac output, which indicates that selective arterial vasodilation occurred. (Tr. 163:9-166:7.)

Dr. Sollevi himself expressly addressed Fukunaga 1982 in a 1984 publication that discussed the same results set forth in the Sollevi abstracts. (TX 112.) In that discussion, Dr. Sollevi described what was known to persons of ordinary skill at that time – that degradation of ATP to adenosine was rapid, complete, and resulted in "considerable phosphate formation" in the bloodstream. (*Id*. at 403.) Relying on a 1982 reference in support of the statement that "high levels of phosphate could cause arrhythmia," Dr. Sollevi stated that "we consider it more appropriate to use adenosine in preference to ATP to induce controlled hypotension." (*Id*.) The substitution of adenosine for ATP was therefore not inventive – it was based on the disclosure in Fukunaga 1982 coupled with the knowledge of a person of ordinary skill in the art at the relevant time.

A person of ordinary skill would have understood, based on a number of relevant publications, that ATP breaks down to adenosine almost immediately following intravenous administration. (*See*, *e.g.*, TX 236 at 547; TX 51 at A39; TX 228 at 807-08; TX 5000 at 1196.) A 1984 publication co-authored by Dr. Sollevi himself disclosed that "the arterial plasma adenosine concentration during ATP infusions was similar to that found during an equimolar infusion of adenosine." (TX 88 at 174-75.) This publication

---

[4]  Plaintiffs challenge the simplifying assumptions that Dr. Binkley made in calculating this conversion. (D.I. 151 at 23-24.) But plaintiffs never actually contest that this conversion is precisely the sort of calculation that a person of ordinary skill would have replied upon to estimate the amount of adenosine to administer to achieve the same result. (Tr. 167:20-168:18.) The person of ordinary skill has been defined as a physician, not a pharmacokineticist.

contradicts Plaintiffs' argument that skilled artisans would not have understood that the ATP administered in Fukunaga 1982 was being rapidly converted to adenosine.

Most important, the results in Fukunaga (TX 51, "Fukunaga 1984") convincingly demonstrated that in Fukunaga 1982 *adenosine was the direct-acting agent* of the selective arterial vasodilation, *not ATP*. The pretreatment with dipyridamole in Fukunaga 1984 reduced the amount of ATP that was required to induce controlled hypotension. Because dipyridamole blocks the uptake of adenosine, but not ATP, the result in Fukunaga 1984 meant that the vasodilatation was caused by adenosine that accumulated after its rapid conversion from the ATP. (Tr. 178:14-18; Tr. 179:13-181:22.) Thus Fukunaga 1984 would confirm to a person of ordinary skill that adenosine – not ATP – was responsible for the vasodilation. Rather than discourage a skilled artisan from using adenosine without dipyridamole, as Plaintiffs claim, Fukunaga 1984 would simply teach that dipyridamole could be a "potentially useful added agent," and is not a requirement for safe and effective selective arterial vasodilation. (D.I. 150 at 28-29.)

Plaintiffs are also wrong in contending that skilled artisans would not understand the direct-acting effect of adenosine in Fukunaga 1982 based on a publication by Dr. Burnstock concerning the different cellular receptors for adenosine and ATP (TX 151). The opposite is true. Dr. Burnstock's research showed that the receptors for adenosine (P1) are predominant in sites where arterial vasodilatation can occur, *e.g.*, "in most cardiovascular beds" (like arteries), whereas the receptors for ATP (P2) are predominant in sites that play no role in arterial vasodilatation, *e.g.*, the gastrointestinal tract and the urinogenital system. (TX 151 at 110; D.I. 150 at 13; Tr. 1172:6-18.) Dr. Klabunde confirmed that a subsequent 1985 publication (also by Burnstock) would teach a person of ordinary skill that P1 receptors were associated with vasodilation. (Tr. 1174:25-1177:2; TX 152 at 195.) Given that adenosine receptors are present predominantly in arteries and ATP receptors are not, a person of ordinary would understand that the arterial vasodilation that was observed following that administration of ATP was due to its conversion to adenosine. (Tr. 1437:11-1438:2.) And the rapid conversion of ATP to adenosine would

have suggested to the skilled artisan that little (if any) ATP would remain to bind to any ATP receptors that were present in the arterial vasculature.  (Tr. 1107:3-12; TX 5000 at 1196; TX 51 at A39.)

C.    **The Dose Required to Produce a Desired Effect Could Have Been Determined Through Routine Experimentation**

In response to Sicor's evidence that the Sollevi abstracts and Fukunaga 1982 disclose that a dose of 140 µg/kg/min of intravenous adenosine is safe, Plaintiffs contend that a person of ordinary skill would not have been able to determine the dose of adenosine needed to cause vasodilation.  (D.I. 151 at 9-10.) This argument fails, too.

First, Plaintiffs rely primarily on *in vitro* studies or studies in non-human species.  Not one of the studies cited by Plaintiffs concern a dose titration of adenosine in humans, even though such studies had been published during the same time period.  (TX 36; TX 45.)  Based on these studies in humans, a person of ordinary skill would have understood that the dose of adenosine administered could be readily titrated until the desired level of vasodilation were achieved.  Dr. Klabunde confirmed that such a dose titration would have been routine experimentation for a person of ordinary skill in the art at that time. (Tr. 1132:21-1133:1; *see also* TX 36 at 1261.)

Second, selective arterial vasodilation is not an all or nothing phenomenon.  Different degrees of vasodilation may occur depending upon the dose of vasodilator that is administered.  Importantly, the asserted claims of the '296 patent do not claim a specific degree of vasodilation, and are directed to a method of selective arterial vasodilation generally.  Yet Plaintiffs' argument assumes that the only goal of a person of ordinary skill in the art is the maximal selective arterial vasodilatation required to induce controlled hypotension in surgical patients.  Dr. Binkley explained that skilled artisans would also be interested in medical uses of adenosine calling for less than maximal selective arterial vasodilatation. (Tr. 1370:15-1372:10; Tr. 1372:25-1374:3.)   Plaintiffs cannot defeat the case for obviousness by conjuring new claim limitations, such as an implied requirement for a certain level of vasodilation, particularly where their litigation position has been that no claim construction is needed.  The limitation

that Plaintiffs would have this Court now read into the asserted claims is a far cry from their plain and ordinary meaning.

And in fact, as Dr. Klabunde confirmed, a person of ordinary skill could have used the amount of adenosine administered in the Sollevi abstracts as a guide and easily conducted a dose titration to determine the required dose. (D.I. 150 at 23.) A person of ordinary skill would have had a reasonable expectation that such a titration would be successful, given that publications at the relevant time concerning administration of adenosine in ***humans*** stated that "rapid uptake and metabolism of adenosine allow easy dose titration." (TX 45 at 423.)

Plaintiffs also cite an abstract by Biaggioni ("Biaggioni," TX 1187) in support of their argument that a person of ordinary skill would not believe that a dose of 140 µg/kg/min would be sufficient to cause "hypotension." (D.I. 151 at 9.) But again, Plaintiffs have ignored the plain language of the asserted claims. None of the asserted claims set forth a specific medical use for adenosine, let alone hypotension. Instead, the claims recite ***only*** a method of causing selective arterial vasodilation. As confirmed by Dr. Klabunde at trial, controlled hypotension for surgery is the result of near-maximal vasodilation. (Tr. at 1059:15-1060:4.) A person ordinary skill at the relevant time would have known that lower levels of vasodilation would have been necessary for other medical uses, like cardiac diagnostics. By contrast, the Biaggioni study cited by Plaintiffs demonstrated that 140 µg/kg/min adenosine could be safely administered to humans without dipyridamole pretreatment and without causing AV block or excessive build up of uric acid. And the pattern of side effects (*e.g.*, flushing) observed in Biaggioni also confirmed that adenosine doses in the claimed range had a systemic effect.

### D.     The Prior Art Uses of Adenosine and Other Vasodilators Did Not Teach Away from the Claimed Invention

Plaintiffs contend that certain problems historically associated with adenosine would have taught away from its intravenous administration at the critical time. (D.I. 151 at 5-7.) For example, Plaintiffs cite a publication from the early 1970s which notes that adenosine's use in cardiovascular therapy has

been hampered due to its short-term action and its effects on the heart.[5] (TX 214) But skilled artisans would not view the prior art wearing Plaintiffs' blinders. The Sollevi abstracts, which were published much closer to the date that the '296 patent was filed, disclosed the safe and effective use of intravenous adenosine in humans with dipyridamole, whereas Fukunaga 1982 and Biaggioni demonstrated the same without dipyridamole pretreatment.

### 1. The Use of Other Vasodilators During the Relevant Time Period Would Have Encouraged Persons of Ordinary Skill to Look to Adenosine

Plaintiffs also claim that the use of other known vasodilators, specifically dipyridamole and ATP, would have taught away from adenosine administration. (D.I. 151 at 6-7.) Plaintiffs' argument is wrong both legally and factually. Importantly, the disclosure in the prior art of a variety of alternatives, without specific dissuasion from a particular choice, does not constitute teaching away from any one of the alternatives. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). And rather than teach away from the use of adenosine, the use of dipyridamole and ATP, in view of the knowledge of their mechanism of action through adenosine, would have motivated a person of ordinary skill to "cut out the middleman" and administer adenosine for the same purpose.

Far from teaching away, the use of dipyridamole as a vasodilator would have taught a person of ordinary skill in the art that adenosine could be used for the very same purpose. Dipyridamole had long been known in the art as a vasodilator, and its mechanism of action had been understood since at least the late 1970s. (D.I. 150 at 10-11.) As Dr. Klabunde confirmed, persons of ordinary skill would have understood not only dipyridamole's mechanism of action but also that the use of dipyridamole had several drawbacks, including a slower onset and a longer duration. (D.I. 150 at 11.) Based on these drawbacks, a person of ordinary skill would have been motivated to administer adenosine alone to effect vasodilation. *See KSR*, 127 S. Ct. at 1742 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options with his or her technical grasp.").

---

[5]     This publication was not cited in Dr. Klabunde's expert report (TX 119) and was first introduced at trial.

Similarly, prior art publications about the use of ATP for vasodilation would have encouraged a person of ordinary skill to use adenosine for the very same purpose. As discussed *supra*, such a person would have understood that ATP that is intravenously administered rapidly and completely degrades to adenosine, and this adenosine – not its ATP parent – causes selective arterial vasodilation. And as Dr. Sollevi's own writings make clear (TX 112 at 403), a person of ordinary skill would have understood that the administration of ATP would result in an increase in phosphate, which would be formed during ATP's conversion to adenosine, and thus would be motivated to administer adenosine directly. As with dipyridamole, a person of ordinary skill would have been motivated by common sense to remove the middleman and administer adenosine directly to effect vasodilation.

But at the relevant time, pharmaceutical-grade adenosine was not readily available for intravenous administration. (Tr. 331:21-332:2.) Therefore, a person of ordinary skill would have used dipyridamole and ATP as indirect-acting surrogates for what such a person would have understood to be the direct action of adenosine.

### 2.    Research Concerning Adenosine for Various Medical Uses Exploded Following a 1980 Publication by Dr. Berne

In December 1980, long before the priority date of the '296 patent and well after the outdated prior art cited by Plaintiffs, Dr. Robert Berne published an article in *Circulation Research* entitled "The Role of Adenosine in the Regulation of Coronary Blood Flow" (TX 228). Dr. Berne described adenosine as one of the "***principle contenders*** that can serve as a mediator of coronary blood flow (CBF) regulation." (*Id.* at 807 (emphasis added).) Soon thereafter, the field of adenosine research exploded, as scientists and physicians searched for new uses for this "principle contender" in the field of vasodilation. As Dr. Binkley testified, selective arterial vasodilators were considered for many different uses during the relevant time period, including treatment of hypertension, treatment of congestive heart failure, treatment of limb ischemia, diagnosis of coronary artery disease, and (last but not least) controlled hypotension. (D.I. 150 at 21.)

Plaintiffs' assertion that Dr. Berne disclosed the "first human medical use" of adenosine in December 1983 as a treatment for paroxysmal supraventricular tachycardia ("PSVT") is simply wrong. (D.I. 151 at 18.)  By September 1983, the Sollevi abstracts had disclosed the intravenous administration of adenosine to surgical patients (TX 1170), and shown that a dose of 140 µg/kg/min of intravenous adenosine was safe.  Plaintiffs are wrong that Dr. Berne's December 1983 publication would have discouraged a person of ordinary skill from using intravenous adenosine administration.[6]  By that time, Dr. Sollevi had already done so, Dr. Fukunaga had used its equivalent (TX 42), and Biaggioni's work with adenosine (TX 1187) was not far behind.

Moreover, the Sollevi abstracts would have encouraged interest in the intravenous infusion of adenosine.  For example, Dr. Klabunde testified that the goal of one of his own publications (dated 1982) about the effects of adenosine *in vitro* was to stimulate others to find practical medical applications for adenosine.  (Tr. 1078:21-1080:2.)  If *in vitro* experiments could stimulate this level of interest, then the *in vivo* clinical testing in humans at the relevant time, as published in the Sollevi abstracts, would place even more focus on this area of research.

Even before the Sollevi abstracts were published, the use of adenosine to induce controlled hypotension in humans was also an area of interest.  Other contemporaneous scientists suggested that adenosine could be administered to humans without dipyridamole to induce controlled hypotension:

> [W]e speculate that adenosine alone, without the potentiating effects of dipyridamole, may be sufficient to produce hypotension in higher primates and man without involving excessive volumes of fluid.

*See* TX 40 at 73; *see also* Tr. 1197:13-1198:5.

---

[6]    Similarly, Plaintiffs also cite a number of additional publications in which adenosine is administered as a bolus injection for treatment of PSVT.  (D.I. 151 at 5.)  But rather than discourage persons of ordinary skill, these publications would, if anything, motivate a person of ordinary skill in the art to seek additional medical uses for adenosine, including diagnostic uses.  (TX 36 at 1261.)  And  notably, plaintiff Astellas markets an injectable form of adenosine, sold under the brand name Adenocard®, for this treatment of PSVT.

III.    **SECONDARY CONSIDERATIONS DO NOT SUPPORT THE NON-OBVIOUSNESS OF THE ASSERTED CLAIMS**

Plaintiffs devote a substantial portion of their attack on Sicor's *prima facie* obviousness case to secondary indicia of non-obviousness ("secondary considerations").  But where, as here, the case for obviousness is strong, even substantial evidence of secondary indicia will fail.  *See, e.g.*, *Richardson-Vicks, Inc. v. Upjohn Co.,* 122 F.3d 1476, 1484 (Fed. Cir. 1997) ("The unexpected results and commercial success of the claimed invention, although supported by substantial evidence, do not overcome the clear and convincing evidence that the subject matter sought to be patented is obvious."); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007) (holding that even if patentee showed unexpectedly superior results, "this secondary consideration does not overcome the strong showing of obviousness in this case").  Even if the secondary considerations evidence here were as compelling as Plaintiffs claim – and it is not – nevertheless it falls short of the not obvious mark.  *See Leapfrog*, 485 F.3d at 1162 (affirming that a patent was invalid where the "district court explicitly stated in its opinion that Leapfrog had provided substantial evidence of commercial success, praise, and long-felt need, but that, given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that claim 25 would have been obvious").

A.    **Plaintiffs Have Not Demonstrated Unexpected Results**

Plaintiffs' argument for unexpected results makes no sense because it ignores the language of the asserted claims.  As discussed *supra*, the claims of the '296 patent are directed to a method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation, and without pretreatment with dipyridamole, through the continuous intravenous administration of adenosine at certain rates.  (D.I. 150 at 6.)  There is no requirement in the claims that a specific degree of vasodilation be achieved, nor a "functional" requirement that AV block or increases in uric acid levels do not occur. *See Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1252 (Fed. Cir. 1998) (declining to "plac[e] a functional limitation" in a claim, on the basis that "this limitation appear[ed] nowhere in the claims; rather it c[a]me[] from a concept of operability").

1.    **The Occurrence of Selective Arterial Vasodilation at the Claimed Dosages Was Not Unexpected**

Plaintiffs assert that "the clear teaching of the prior art was that unacceptably high doses of adenosine would be required in the absence of dipyridamole pretreatment." (D.I. 151 at 34-35.) Plaintiffs' contention is wrong for at least two reasons. First, Fukunaga 1982, viewed in the light of Fukunaga 1984, confirmed that the intravenous administration of adenosine in the claimed range, without dipyridamole pretreatment, caused maximal selective arterial vasodilation sufficient to induce controlled hypotension in surgical patients. For this reason alone, the occurrence of selective arterial vasodilatation would not be unexpected.

Second, Plaintiffs' contention is improperly limited to the consideration of controlled hypotension for surgery, whereas the claims are not. The only "purpose" actually claimed in asserted claims of the '296 patent is "selectively vasodilating the arteries of a human patient without inducing significant venous dilation." (TX 275 at col. 22, ll. 20-21.) Contrary to Plaintiffs' suggestions, the asserted claims do **not** claim "a safe and effective dose [of adenosine] that would induce hypotension in the absence of [dipyridamole] pretreatment." (*See*, *e.g.*, D.I. 151 at 9.) Plaintiffs' attempt to interject additional "functional" elements into the asserted claims is legally improper and must fail. *See Renishaw*, 158 F.3d at 1248-49 ("'We know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement.'" (quoting *McCarty v. Lehigh Val. R.R.*, 160 U.S. 110, 116 (1895))).

To evaluate whether a given result is unexpected, the court should consider what result was expected. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007). The evidence is that a person of ordinary skill in the art at the relevant time would have expected the intravenous administration of adenosine to cause at least some selective arterial vasodilation at the claimed dose range and in the absence of dipyridamole pretreatment. (Tr. 355:16-356:8; TX 37; TX 42; TX 1170.)

Plaintiffs' "unexpected results" argument is also specious to the extent that it relies on the Sollevi testimony. (D.I. 151 at 8-10, 34-35.) Dr. Sollevi's statements at trial must be considered against the

17

backdrop of several important facts: he is not a person of ordinary skill in the art (the proper standard for an invalidity analysis) (Tr. 475:10-24), and he has a strong financial interest in the outcome of this litigation (Tr. 473:19-474:8, 475:2-9). Further, Dr. Sollevi's contemporaneous publications concerning the intravenous administration of adenosine without dipyridamole do not raise as concerns the prospect of increases in uric acid levels and AV block as associated concerns. Presumably, if Dr. Sollevi were so concerned about these issues, he would have addressed them in his publications at the time. (*See*, *e.g.*, TX 112.)

Finally, Plaintiffs' argument suffers from a serious credibility issue. Dr. Sollevi would have this Court believe that he decided to conduct an experiment eliminating the dipyridamole pretreatment for 20 surgical patients and expecting to use amounts of adenosine that he deemed at the time to be "unthinkable" and likely to cause AV block and serious risk of uric acid build-up, yet at the same time relegated his report of the results of this "unthinkable" experiment to a footnote in TX 112 that failed to mention any of the surprise at the results that he now asserts. There is no reason to believe that Dr. Sollevi or the Karolinska Institute Hospital would have permitted such risk taking with patients. Dr. Sollevi's expression of surprise at the "unexpected result" rings hollow and should be discounted in its entirety.

### 2.  The Lack of AV Block Was Not Unexpected

Plaintiffs also assert that the lack of AV block observed following the claimed administration of adenosine was unexpected. (D.I. 151 at 7.) But Plaintiffs' contention is not supported by the record, and makes no logical sense. The Sollevi abstracts do not report AV block and thus directly contradict Plaintiffs' argument that a person of ordinary skill in the art would have expected the intravenous adenosine administration of adenosine in the claimed range to cause AV block. Dr. Sollevi "carefully monitor[ed] the electrocardiograms" when he administered adenosine with dipyridamole, and he did not observe any evidence of AV block. (D.I. 151 at 8; Tr. 479:5-23.) Therefore, a person of ordinary skill would understand that the Sollevi abstracts proved that continuous intravenous infusion of adenosine at a

rate of 140 ug/kg/min was not likely to cause AV block, particularly if the same dose of adenosine was administered in the absence of dipyridamole.

The person of ordinary skill would also understand that AV block is a transient effect that would be much more easily resolved in the **<u>absence</u>** of dipyridamole pretreatment, given that dipyridamole causes an additional increase in the adenosine concentration that lasts for a relatively longer period of time. (D.I. 150 at 31-32.) If dipyridamole and adenosine are administered together, their combined effects cannot be terminated by the flick of a switch – but the effects of adenosine alone can be.

### 3.     <u>The Lack of Uric Acid Build-Up Was Not Unexpected</u>

Plaintiffs further suggest that the lack of uric acid build-up observed following the intravenous administration of adenosine was an unexpected result. (*See*, *e.g.*, D.I. 151 at 16, 18.) But again, a person of ordinary skill would actually understand that the side effects that might be associated with adenosine, including a transient increase in uric acid levels, would be much less likely to occur if dipyridamole were not administered with adenosine. (D.I. 150 at 32-33.)   And, as discussed above, the Sollevi abstracts also would have relieved any concerns that a person of ordinary skill in the would have had regarding the risk of uric acid build-up from intravenous adenosine administration. Dr. Sollevi "carefully . . . test[ed] the metabolite levels" when he administered adenosine with dipyridamole, but he did not observe any evidence of prohibitive increases in uric acid levels.[7] (D.I. 151 at 8; Tr. 482:11-16.) Importantly, a person or ordinary skill at the relevant time would have understood that the net increase in adenosine concentration would have been greater – and that any side effects were more likely to occur – if dipyridamole were also intravenously administered along with adenosine, as compared to the increase when the same dose of adenosine was administered alone.

### B.     <u>Plaintiffs Have Failed to Provide Evidence of Skepticism</u>

The keystone of Plaintiffs' evidence of skepticism in the field is personal, non-public correspondence between the inventor, Dr. Sollevi, and others in the field who may or may not be experts.

---

[7]     And contrary to Plaintiffs' assertions (D.I. 151 at 7), adenosine is much more likely to be recycled into AMP than degraded to inosine (the precursor to uric acid). (TX 228 at 808.)

Even if admissible, which Sicor does not concede, the correspondence here is not probative and should be given no weight.

### 1.     The Correspondence Is Not Probative Of Non-Obviousness

As "evidence" of skepticism in the field, Plaintiffs rely entirely on personal correspondence between Dr. Sollevi and Dr. Berne (Tr. 1201:7-10, 13-16; Tr. 1974:12-14, 18-19), and other correspondence between and among Dr. Sollevi, a journal editor, and Dr. Francis Robicsek[8] (Tr. 1201:11-16; Tr. 363:14-364:4).  The correspondence relied upon by Plaintiffs is far too unspecific to be probative, let alone to be persuasive evidence that experts were skeptical that adenosine could be administered without causing AV block or uric acid build-up.  The correspondence does not describe (1) the study subjects (*e.g.*, humans or animals), (2) the dose of adenosine used, (3) the manner in which adenosine was administered (*e.g.*, bolus or intravenous infusion), (4) the purposes of the study (*e.g.*, vasodilation or platelet aggregation), and (5) whether a dipyridamole pretreatment was administered. Each of these factors represents a piece of information that must be known to determine whether the correspondence is even relevant to skepticism of experts, or whether the expert may have may have, in fact, been expressing skepticism about a completely different discovery.  (D.I. 150 at 34.)

Plaintiffs cite *U.S. v. Adams*, 383 U.S. 39 (1966), in support of the argument that the correspondence proved skepticism of experts.  (D.I. 151 at 28-30.)  *Adams* does not help Plaintiffs because important distinctions exist between the two cases.  Unlike this case, private correspondence was not the only evidence available to the Court in *Adams*.  Instead, as the *Adams* briefs cited by Plaintiffs make clear (D.I. 151, Appendix at 76-78), an issued patent and a published article served as primary evidence of skepticism of experts.  Thus, in *Adams*, the totality of the evidence, not just private correspondence, supported a finding of skepticism of experts.

Furthermore, in *Adams*, the Court emphasized that the proffered evidence showed ***continued*** skepticism that the inventor had accomplished what he claimed to have accomplished, even after the

---

[8]     Plaintiffs have provided no evidence that Dr. Robicsek ever conducted a clinical study administering adenosine to a human, making his purported "expertise" in the field dubious at best.

inventor disclosed his discovery.  *See Adams*, 383 U.S. at 44.  The letters here evidence no such disbelief.  Rather, the correspondence congratulates Dr. Sollevi for accomplishing exactly what he said he had accomplished (the specific nature of the accomplishment cannot be discerned from the correspondence).  Certainly, congratulations from one colleague to another does not mean that scientific work is patentable.

Second, as discussed *supra*, the inventor's alleged subjective disbelief that adenosine could be administered intravenously in the relevant ranges without encountering certain adverse events runs counter to evidence in the prior art at the time.  (D.I. 150 at 30-33.)  Similarly, Dr. Sollevi's secondhand testimony that others in the field considered him "a crazy Swede" is hardly the sort of evidence of skepticism that supports a finding of non-obviousness.  For these reasons, Plaintiffs' ill-considered attempt to use a few ambiguous private letters as evidence of widespread skepticism in the field must be rejected.

### 2.     The Correspondence Relied Upon by Plaintiffs is Not Admissible

The correspondence here was private and thus not publicly available to persons of ordinary skill in the art, not subject to public scrutiny or comment, and therefore could not have influenced (much less discouraged) persons of ordinary skill in the art at the relevant time.  (Tr. 1201:7-10, 13-16; Tr. 363:14-364:4.)

As Plaintiffs note, the Court questioned at trial whether this correspondence should be considered.  (D.I. 151 at 3.)  In response to Plaintiffs' argument that the letters should be admitted because of the ancient documents exception to the hearsay rule, the Court observed:

> [T]he keystone to the hearsay rule is reliability, and I can't imagine that letters, not publications that appear at someplace in a public context, but personal letters, not signed, not authenticated, can possibly be deemed reliable, and making them old doesn't make [me] more comfortable that they are reliable sources of evidence.

(Tr. 415:9-15.)  In addition, the Court pointed out that

> [S]omeone is more apt to be skeptical in a private fashion, which is not necessarily tested by any scientific thought than they are in published materials. . . . what I write in an e-mail to my Law Clerk I would never want published as my view on a matter.  It is not my view on a matter until it is published, and I think that's why prior art is defined the way it is.

(Tr. 417:5-11.)  Sicor shares the Court's view that "when scientists don't express the same skepticism in public, [the Court is] concerned that a letter just like e-mails was written without scientific thought and was a transitory thought and not a reliable scientific thought."  (Tr. 421:9-13.)  Tellingly, the editor of the journal that published the study at the heart of correspondence between Dr. Sollevi and Dr. Robicsek concluded that this correspondence did not merit publication.  (TX 412.)  This corroborates Sicor's view that this correspondence does not raise genuine scientific issues.  As such, it could not be probative of the non-obviousness of the asserted claims.

### C.    Copying Is Irrelevant in the ANDA Context

Plaintiffs assert that the filing of Sicor's ANDA is evidence of copying of the invention.  (D.I. 151 at 35.)  However, the Federal Circuit has stated "'more than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue.'"  *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (*quoting Cable Elec. Prods. v. Genmark, Inc.*, 770 F.2d 1015 (Fed. Cir. 1985)).  Indeed, copying may occur for reasons that are unrelated to any purported nonobviousness of the invention.  *See Cable Elec. Prods.*, 770 F.2d at 1028, *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999).

The Eastern District of Virginia has explained why copying is particularly weak evidence of non-obviousness in the ANDA litigation context.  *See Aventis Pharma Deutschland GmbH v. Lupin Ltd.*, 2006 WL 1008962, at *45 (E.D. Va. July 17, 2006).  Like the defendant in *Aventis*, Sicor has filed an ANDA seeking to market a generic version of Plaintiffs' branded pharmaceutical product.  As the court noted in *Aventis*, "the ANDA process allows a generic drug company to challenge a drug patent by alleging the patent is invalid."  *Id.*  The *Aventis* court therefore found that, even though there was no question that the defendant attempted to copy the branded pharmaceutical product, "given that there is a statute in place that encourages generic drug companies to challenge patents, [Plaintiffs'] copying argument is weak."  *Id.*  This case originates out of that same statute.  Plaintiffs' copying argument is equally weak here and should be disregarded.

**D.      Plaintiffs Have Failed to Show that the Alleged Commercial Success of Adenoscan®
Has Any Nexus to the Asserted Claims**

As Defendants demonstrated in their opening post-trial brief, Plaintiffs have failed to demonstrate

the requisite nexus between the claimed invention of the '296 patent and the alleged commercial success

of the Adenoscan® product.  (D.I. 150 at 36-38.)  None of Plaintiffs' experts testified at trial that a nexus

existed.  Dr. Klabunde never addressed the issue.  Nor did Plaintiffs' economic expert, Dr. Hay.  Indeed,

in his expert report, Dr. Hay devoted just one conclusory sentence to the issue, stating in the penultimate

paragraph of his expert report that the sales of Adenoscan® are connected to the attributes of the product,

and otherwise ignored the issue in favor of describing the sales performance of Adenoscan®.  (Tr.

1790:11-1792:15, 1793:7-14.)  But the sales levels achieved by Adenoscan® are the product of various

economic factors and without more do not demonstrate any superiority of this drug that would suggest

that the '296 patent was not obvious.  *Pfizer Inc. v. Teva Pharms. USA, Inc.,* 461 F. Supp. 2d 271, 274

(D.N.J. 2006) (commercial success alone does not demonstrate non-obviousness and must be the result of

the product's features rather than other factors such as advertising); *see also Sentex Sys., Inc. v. Elite

Access Sys., Inc.*, 194 F.3d 1331, at *7 (Fed. Cir. 1999) (unpublished opinion) (a patentee may not use

sales figures alone to establish commercial success, but must establish a nexus between the sales and the

claimed invention).

**1.      The Sales Levels of Adenoscan® Are Explained By the Interplay of
Economic Factors, Not The Product's Clinical Attributes**

The sales levels achieved by Adenoscan® are explained by economic and demographic factors,

not by any asserted innovation in the '296 patent.  Adenoscan® was marketed not on the basis of its ability

to selectively dilate arteries rather than veins without pretreatment with dipyridamole (*i.e.*, the claimed

'296 patent invention), but on the basis of its short half life and the concomitant rapid cessation of side

effects.  (*See* D.I. 149 FOF at ¶¶ 224-25; *see* D.I. 149 COL at ¶ 70.)  In fact, as shown by Dr. Binkley, the

"advantages" of Adenoscan® touted in Fujisawa's marketing were expected characteristics of adenosine

known in the prior art.  (Tr. 107:11-21.)  To be probative of non-obviousness, the commercial success

must have some nexus with the asserted innovation, not merely with features that were known in the prior art.  *See J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

In assessing commercial success, a court should

> "not be blinded to other factors which may contribute to the commercial success of an invention, such as extensive advertising campaigns, price discounts for the patented item, or promotional schemes which enhance the commercialization of the invention without in any way evidencing a long-felt need for the device."

*Speller v. U.S.*, 14 Cl. Ct. 170, 174 n.5 (1988) (quoting *Pacifica Technica Corp. v. U.S.*, 2 Cl. Ct. 170, 173 (1983)).  As described at length in Defendants' opening brief and proposed findings of fact, the sales levels achieved by Adenoscan® were driven by the interplay of four economic factors:

(1)    There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;

(2)    Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;

(3)    Extensive marketing and promotion of Adenoscan® by Fujisawa; and

(4)    Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

(Tr. 1579:3-1582:13; DTX 3133; *see also* D.I. 150 at 36-38 and D.I. 149 FOF at ¶¶ 184-242.)

### (a)    Adenoscan® Entered the Pharmacological Stressor Market at a Fortuitous Time

Plaintiffs describe the sales gained by Adenoscan® as a triumph over adversity because Fujisawa was a new player in the pharmacological stress market selling a new product that would soon face competition from the soon-to be-generic, and therefore lower-priced, dipyridamole.  (D.I. 151 at 32-33.)  This picture is false.

First, Fujisawa had been working for years to secure FDA approval and launch Adenoscan®.  (*See*, *e.g.*, TX 1226 at AST0065726-727.)  In that time, the company developed countless strategic relationships with physician advocates and sponsored the activities of the American Society of Nuclear Cardiology ("ASNC"). (Tr. 1611:10-15; Tr. 1612:9-1613:4; Tr. 1252:17-25, 1339:4-15; TX 1078 at AST0066744.)  Fujisawa was hardly the "new kid on the block."

24

Second, Fujisawa launched Adenoscan® at a propitious time in the pharmacological stressor market.  (D.I. 149 FOF at ¶¶ 185-196.)  Persantine®, the one other directly competing product, was nearing the end of its patent protection.  (D.I. 150 at 36.)  When Persantine® went generic in late 1996, its manufacturer, DuPont, ceased to promote the product.  (D.I. 150 at 37.)  Thus, not long after its launch, Adenoscan® had the good fortune to become the only product being advertised to the prescribers of pharmacological stress tests.  (*Id*.)  Furthermore, the audience for the Adenoscan® marketing message was relatively price insensitive.  Prescribing physicians do not themselves pay for the product and expect that their patients will be covered by federal or private health insurance.  (Tr. 1694:18-1695:9.)  Adenoscan® has continued to benefit as the only product advertised in the pharmacological stress market up to the present day.  (D.I. 150 at 37.)

**(b)  Fujisawa's Extensive Marketing and Promotion Drove The Adenoscan® Market Share Growth**

Plaintiffs would have this Court believe that Fujisawa's promotion of Adenoscan® was "typical" in the industry.  (D.I. 151 at 34.)  The evidence shows otherwise.  On cross-examination, Dr. Hay admitted that the 6% industry-standard average promotion-to-sales ratio that he relied on for his testimony that Fujisawa's spending was "typical" was essentially a concocted number and inappropriately applied to the pharmacological stress market.  (Tr. 1760:19-24, 1761:3-9, 1763:15-18, 1764:1-1765:6.)  Dr. Hay's 6% was not based on reliable data.  Instead, without any basis in fact, Dr. Hay  "calculated" this 6% ratio as the "midpoint" between two other numbers that are based on reliable data: the 12% industry average for drugs sold primarily in retail pharmacies and the 3.1% industry average for drugs sold primarily in hospitals.  (Tr. 1761:12-1762:6.)  Dr. Hay admitted that the appropriate average promotion-to-sales ratio for Adenoscan® is 3.1% because pharmacological stress products are sold primarily in hospitals and clinics, and not in retail pharmacies.  (Tr. 1760:19-24; Tr. 1761:3-9; Tr. 1763:15-18; Tr. 1764:1-1765:6.)  Dr. Hay also admitted that if a line were drawn at the 3% mark on the misleading demonstrative used to illustrate his testimony, it would be clear that Fujisawa's marketing and promotional spending would exceed the average in every single year from 1995 through 2005.  (Tr. 1766:18-1777:12; DTX 2041.)  In

25

fact, Fujisawa's spending in at least the years 1996, 1999 and 2001 was roughly **twice** as high as the average promotional spending for hospital-dominated products in those years. (*Id.*) This is especially remarkable given that the pharmacological stress market is very concentrated, requiring fewer resources to reach the marketing audience. (D.I. 149 at ¶¶ 198-201.) It is also remarkable in a market in which, as Plaintiffs contend, the consumers are "expert," and allegedly "not swayed" by product promotion. (D.I. 151 at 33.) The evidence suggests that the Adenoscan® promotion was substantial and effective.

As described in detail in Defendants' Proposed Findings of Fact, Fujisawa's spending was devoted to extensive traditional and non-traditional marketing activities, including substantial detailing efforts; support of the American Society of Nuclear Cardiology ("ASNC"); support of physician advocates; provision of financial incentives such as trial product and pumps to prospective customers; sole sponsorship of industry "educational initiatives"; and promotion of Adenoscan® for new uses and user populations. (D.I. 149 at ¶¶ 197-225.) Such an extensive marketing and promotion program "obscure[s] any nexus that might have existed between the merits of the product and its commercial success." *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1370 (Fed Cir. 2003) (affirming district court's discount of Plaintiffs' asserted evidence of commercial success); *see also Revlon, Inc. v. Carson Prods. Co.*, 602 F. Supp. 1071, 1096-97 (S.D.N.Y. 1985) (finding that the success of Defendant's product was due to advertising campaign, product packaging, and choice of target audience for the marketing message—not to any claimed advantage of the patented invention). In fact, "where the success of an invention is due to advertising, good business sense, the prior art, etc., rather than the advantages inherent in the discovery, it is **irrelevant** to a determination of obviousness." *Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.*, 693 F. Supp. 114, 131 (D. Del. 1988) (emphasis added). Notably, the Adenoscan® package insert does not promote the features of the claimed invention, *i.e.*, selective vasodilation of the arteries without inducing significant venous dilation.

    **(c)**     **Adenoscan®'s Increasing Sales Were Also Due to the General Growth of the Pharmacological Stress Market**

Despite Plaintiffs' representations concerning relative market shares, Adenoscan® did not grow market share at the expense of dipyridamole, the incumbent product in the pharmacological stress market. (Tr. 1600:6-16, 1632:4-7; DTX 3132; DTX 3134; *see also* D.I. 149 at ¶ 237.) And, as discussed *supra*, although the market was ripe for a new entrant when Fujisawa launched Adenoscan®, it took over six years for the sales of Adenoscan® to overtake dipyridamole, even with the differential in the prices of the products. (D.I. 149 at ¶¶ 229-230.) Such a delay in the market's willingness to embrace Adenoscan® is not probative of commercial success. *Friction Div. Prods.*, 693 F. Supp. at 131 ("More probative of nonobviousness [than sales, which may be attributable to advertising increases] would be evidence of commercial success *immediately following* the patenting of the invention.") (emphasis added). The fact is that dipyridamole retained significant usage upon the launch of Adenoscan® and has experienced continuous growth since that time. (Tr. 1599:12-1600:16; TX 21; DTX 3132; DTX 3134.)

The higher overall level of growth achieved by Adenoscan® can be attributed to the company's extensive investment in marketing and promotion to expand the user population for the product. (D.I. 149 at ¶¶ 214-218.) It is also attributable to a general growth in demand for pharmacological stress testing unrelated to the asserted invention, and due instead to demographic phenomena such as the increased aging of the American population and the rise in American obesity. (D.I. 150 at 37-38.) As Plaintiffs' witness Mr. White pointed out, "rising water raises all the boats" – *i.e.*, dipyridamole as well as Adenoscan®. (Tr. 1257:11-12.) But Adenoscan®'s success based on fortuitous market circumstances cannot be attributed to the claimed invention and thus is not probative of nonobviousness. *See Merck & Co., Inc. v. Teva Pharms USA, Inc.*, 405 F.3d 1338, 1339 (Fed Cir. 2005) (Lourie, J., dissenting from order denying rehearing *en banc*) (stating that once commercial success is established, "the only other question is whether the success is attributable to the claimed invention ('nexus'), rather than to other factors such as market power, advertising, **demand for all products of a given type**, a rising economy that 'lifts all boats,' etc.") (emphasis added); *see also Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560,

1567 (Fed. Cir. 1984) (concluding that any commercial success of the patented device could have been due to an increased use of herringbone milking systems, and not the claimed invention).

For the above reasons, to the extent that Adenoscan® succeeded in achieving sales in the pharmacological stressor market, these sales do not demonstrate a nexus between the claimed invention and the alleged Adenoscan® commercial success, and are not probative of non obviousness.

### 2.    Dr. Hay's Analysis Is Unsound and His Testimony Is Unreliable

The testimony of Plaintiffs' expert, Dr. Hay, was unreliable and his analysis of the economic issues in this case was inaccurate in several important respects.  First, as discussed *supra*, Dr. Hay relied on a concocted industry average that is inappropriate for the niche market of pharmacological stress agents.

Second, Dr. Hay conducted his analysis based not on the actual facts in this case, but on facts he either made up or was told by Plaintiffs' counsel to assume.  For example, in response to questions about Fujisawa's 86-member sales force, which Dr. Hay had earlier disagreed was twice the size of the sales force of its competitor, DuPont, Dr. Hay admitted when pressed that he "[didn't] know exactly what [DuPont was] doing."  (Tr. 1774:24-1776:19.)  Despite this lack of knowledge, Dr. Hay testified on direct to an opinion on the relative detailing efforts of Fujisawa and DuPont.  His testimony should be disregarded.

By way of further example, Dr. Hay insisted on using dollar-based market share as a preferred measure of the relative success of Adenoscan® and dipyridamole.  Yet Astellas' own Senior Vice President of Marketing, Richard White, testified that the preferred measure used internally by Astellas to gauge the success of its products is market share of procedures performed.  (Tr. 1286:23-1287:9; Tr. 1777:11-1778:3.)  Dr. Hay also inappropriately chose to use gross sales to calculate market shares and promotion-to-sales ratios, even though he admitted on cross examination that gross sales is an "inflated number" and that Mr. White testified that net sales "represents the money that the company actually takes in for the sales of its product" because it factors out "certain returns and allowances."  (Tr. 1236:21-1237:3; Tr. 1788:2-15.)

Finally, at several points throughout his testimony, Dr. Hay was intent on criticizing Dr. Leffler's testimony even though he had either incorrectly heard the testimony or failed to listen to it altogether. (Tr. 1767:13-1768:14.) In one instance, Dr. Hay was even forced to admit that his criticism on direct examination of Dr. Leffler's calculation of a promotion-to-sales ratio was based on a calculation that Dr. Leffler had revised since his opening report and had not presented to the Court at trial. (Tr. 1773:25-1774:23.) Dr. Hay's apparent personal bias against Dr. Leffler and his disregard of the facts make him an unreliable source for this Court to rely on.

For all of the above reasons, this Court should disregard the conclusions that Plaintiffs ask this Court to draw in reliance on Dr. Hay's unsound analysis and unreliable testimony.

## IV.     THE ASSERTED CLAIMS OF THE '296 PATENT ARE INHERENTLY ANTICIPATED

In arguing that the Fukunaga abstract does not anticipate the asserted claims of the '296 patent, Plaintiffs simply ignore the law of inherent anticipation. (D.I. 151 at 13-14.) While Fukunaga 1982 admittedly does not expressly disclose the administration of adenosine, a person of ordinary skill in the art at the relevant time would understand that "the natural result flowing from" the administration of ATP would be the rapid and virtually complete conversion of ATP to adenosine. *See Schering Corp. v. Geneva Pharm., Inc.,* 339 F.3d 1373, 1379 (Fed. Cir. 2003) (finding claims directed to antihistamine metabolite inherently anticipated on the basis that "a limitation or the entire invention is inherent and in the public domain if it is the 'natural result flowing from' the explicit disclosure of the prior art."); *Eli Lilly & Co. v. Barr Labs, Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001). (D.I. 150 at 39-40.) Moreover, a "reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time." *Abbott Labs. v. Baxter Pharmaceutical Prods., Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006). Here, the immediate and complete conversion of ATP to adenosine was, in fact, appreciated at the time, and repeatedly acknowledged by Dr. Sollevi. (D.I. 150 at 11-12.)

As discussed *supra*, the Fukunaga abstract disclosed the administration of ATP (without dipyridamole) to patients to cause controlled hypotension, one of the medical applications of selective arterial vasodilation. The dose of ATP administered was equivalent to a dose of adenosine that

29

falls within each of the claimed ranges, based on a common sense calculation that a person of ordinary skill in the art would have made as a guideline for determining the amount of adenosine to administer for the same or similar purpose. Therefore, each and every element of the asserted claims was disclosed in Fukunaga 1982.

## V.    EXPERT TESTIMONY ISSUES

### A.    Dr. Binkley is Highly Qualified to Serve as An Expert in This Case

In a thinly-veiled attempt to distract the Court from the substantive issues, plaintiffs complain that Dr. Binkley was not credible because he "came to the litigation with no contemporaneous experience with adenosine or ATP, no scientific publications in the field, and no research grants relating to adenosine." (D.I. 151 at 35.) By contrast, the record shows that Dr. Binkley was a highly qualified and credible expert witness in this case.

Plaintiffs' challenge to Dr. Binkley on the ground that he lacked contemporaneous experience with adenosine must fail as a matter of law. "Whatever [an expert] did or did not *personally* realize at the time [of the alleged invention] based on his actual knowledge is *irrelevant*. The relevant inquiry is what a hypothetical ordinarily skilled artisan would have gleaned from the cited references at the time that the patent application leading to the [ ] patent was filed." *Amazon.com, Inc. v. Barnesandnoble.com, Inc. et al.*, 239 F.3d 1343, 1364 (Fed. Cir. 2001) (citation omitted) (second emphasis added). In addition, unlike Dr. Klabunde, the only technical expert proffered by Plaintiffs at trial, Dr. Binkley is a cardiologist who was in practice at the relevant time, so he squarely qualified as a person of ordinary skill in the art at the time of the alleged invention. In this case, the parties agree that a person of ordinary skill in the art to which the '296 patent pertains is a cardiologist with a residency in internal medicine and two years of a cardiology fellowship, whose experience could also include nuclear cardiology imaging. (Tr. 95:25-96:7; Tr. 515:15-25.) Dr. Binkley is a cardiologist, and he completed both a residency in internal medicine and a fellowship in cardiology in the mid 1980s. (Tr. 73:23-74:4, 75:22-76:4.) Dr. Klabunde lacks these qualifications.

Furthermore, as this Court recently observed, "'[t]he "person of ordinary skill in the art" is a theoretical construct used in determining obviousness under § 103, and is not descriptive of some particular individual.'" *eSpeed, Inc. et al. v. Brokertec USA, LLC*, 404 F. Supp. 2d 575, 579 (D. Del. 2005) (quoting *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997)). For this reason, an argument that an expert is unqualified to render an opinion is "falacious [sic]" where "'the record reflects his substantial credentials . . . , and the decision to permit him to testify was well within the discretion of the trial judge.'" *Id.* at 579-80 (quoting *Endress*, 122 F.3d at 1042)). Having been a practicing cardiologist at the time, Dr. Binkley is a far more credible witness on what skilled artisans would have understood than Dr. Klabunde, who is not a cardiologist, not a even a physician, was not teaching physicians at the relevant time, and only later came to teach at a school of osteopathy.

Dr. Binkley's credentials are reflected in the trial record, and speak for themselves. (Tr. 72:16-73:25; Tr. 75:2-76:24, Tr. 76:25-77:8; Tr. 77:9-17.) And unlike Dr. Klabunde, Dr. Binkley has administered or supervised the administration of adenosine for the purpose of pharmacologic stress testing. (Tr. 74:23-75:3.)

### 1.     Dr. Binkley's Opinions Were Well Within the Scope of His Expert Report

Plaintiffs argue that Dr. Binkley offered new theories of invalidity that were not previously disclosed in his expert reports, but the facts prove otherwise. First, contrary to Plaintiffs' assertion, Dr. Binkley did opine in his expert report that a person of ordinary skill would be motivated to administer adenosine without pretreatment by dipyridamole, in part because of the properties resulting from difference in the half lives of dipyridamole and adenosine. (TX 26 at ¶¶ 64-67.) In his report, Dr. Binkley expressly discussed the fact that the half-life of dipyridamole is longer than that of adenosine and describes the resultant difference in the residual effects of each compound after administration is stopped:

> Therefore, even after dipyridamole administration is stopped, the breakdown of adenosine would be inhibited for an additional period of time, resulting in a prolonged increase in the adenosine concentration and a persistence of undesirable side effects. In contrast, any side effect caused by the administration of adenosine alone would resolve shortly

after adenosine administration was stopped, given that adenosine
deaminase would be freely available to metabolize the additional
adenosine and thereby lower the adenosine concentration.

(TX 26 at ¶ 65.)  In addition, Dr. Binkley opined in his expert report that the hemodynamic effects

observed in the Sollevi abstracts would indicate to a person of ordinary skill that the administration of

adenosine alone would produce selective arterial vasodilation.  (TX 26 at ¶¶ 47-48; TX 1170; TX 37.)  At

trial, Dr. Binkley explained, in a manner consistent with the opinions in his expert report, that a person of

ordinary skill would attribute the hemodynamic effects observed in the Sollevi abstracts to the effects of

the adenosine (and not to dipyridamole) because the amount of dipyridamole administered in the one-time

pretreatment would have been nearly undetectable by the end of the adenosine infusion.

(Tr. 136:10-147:21.)

Plaintiffs also argue that Dr. Binkley did not previously disclose his opinion that the

hemodynamic parameters observed in the Biaggioni Abstract showed selective arterial vasodilation.  (D.I.

151 at 37; TX 1187.)  But as set forth in his expert reports, Dr. Binkley's opinion was that the Biaggioni

Abstract would teach a person of ordinary skill in the art at the relevant time that adenosine could be

safely administered intravenously to humans at the claimed dose of 140 µg/kg/min without dipyridamole

pretreatment and without the occurrence of serious side effects.  (TX 26 at ¶¶ 82-84; Tr. 175:5-176:5.)

That Biaggioni also showed the adenosine was having an effect is well within the scope of this opinion.

*See Forest Labs., Inc. v Ivax Pharm., Inc.*, 237 F.R.D. 106, 113 (D. Del. 2006) (viewing expert's

amplifying testimony concerning a study mentioned in his expert report to be a "permissible elaboration

on the opinions set out in the expert report").

## 2.    Dr. Binkley Was Forced to Rebut Issues Raised by Plaintiffs for the First Time at Trial

Consistent with Plaintiffs' aim of sidestepping Sicor's *prima facie* obviousness case, Plaintiffs

seek to exclude compelling portions of Dr. Binkley's testimony.  The Court should not agree to do so.

First, Plaintiffs insist that six exhibits[9] – five of which were first introduced into evidence by plaintiffs – and Dr. Binkley's rebuttal testimony concerning those exhibits should be excluded because Sicor did not satisfy its obligation under 35 U.S.C. § 282 to disclose Dr. Binkley's intent to rely upon those exhibits for his rebuttal testimony. (D.I. 151 at 38.) But under 35 U.S.C. § 282, Sicor (as the party asserting invalidity) was required only to give notice in writing to Plaintiffs of any publication to be relied upon as an anticipatory reference or as showing the state of the art at the relevant time. *See* 35 U.S.C. § 282 (2007). Contrary to Plaintiffs' implication, § 282 does not include any mention of a defendant's obligation to provide notice of publications it intends to discuss in order to rebut the other party's interpretation.

Furthermore, five of these exhibits (TX 88, TX 126, TX 151, TX 199, TX 236) were on the Plaintiffs' exhibit list, which was submitted to the Court as part of the pretrial order (D.I. 127, Ex. 6), and were introduced by the Plaintiffs through their expert, Dr. Klabunde. Pursuant to the Pretrial Order submitted to the Court by parties, "[e]ach party may use an exhibit that is listed on the other side's exhibit list, to the same effect as though it were listed on its own exhibit list." (D.I. 127, ¶ 22.) Clearly, not only were Plaintiffs on notice about the existence of these exhibits – since Plaintiffs added them to the exhibit list themselves – but Plaintiffs were also on notice that Sicor's expert witness could testify about these exhibits in his rebuttal testimony. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (explaining that the Third Circuit "does not automatically exclude anything an expert could have included in his . . . original report" and "[a]ll that is required is for the information to repel other expert testimony").

The sixth exhibit (TX 5000) was also properly discussed by Dr. Binkley. This publication was used by Sicor to impeach Dr. Klabunde's testimony. (Tr. 1225:9-19.) The use of this exhibit with Dr.

---

[9]     These exhibits are TX 88, TX 126, TX 151, TX 199, TX 236, and TX 5000. Sicor respectfully notes for the Court that the first five of these exhibits were introduced into evidence by Plaintiffs, and were therefore appropriately discussed by Dr. Binkley in his rebuttal testimony. (*See* Tr. 509:21; Tr. 560:10; Tr. 1225:6; Tr. 1225:9-19.) The sixth exhibit was appropriately introduced by Defendants to impeach Plaintiffs' expert Dr. Klabunde. (Tr. 319:25-320:3.)

Klabunde was proper, because pure impeachment evidence need not be disclosed before trial. (Rule 26(a)(3), Fed. R. Civ. P.; *see also* Tr. 319:25-320:3.) And in turn, it was also appropriate for Dr. Binkley to return comment on TX 5000 in order to rebut the testimony offered by Dr. Klabunde. *Crowley*, 322 F. Supp. 2d at 551.

In addition, Plaintiffs contend that Dr. Binkley's assertion that a person of ordinary skill in the art in September 1985 would be motivated to find additional medical uses for adenosine as a selective arterial vasodilator was not disclosed in his expert reports. (D.I. 151 at 37.) But Plaintiffs first raised the issue of other medical uses at trial, through Dr. Klabunde's testimony that that the only known use for intravenous adenosine in September 1985 in the prior art was controlled hypotension. (Tr. 528:12-529:5.) Dr. Binkley had no previous opportunity to offer testimony on this issue, and his rebuttal testimony was limited to the issue raised by Plaintiffs. His testimony was permissible rebuttal and consistent with and within the overall scope of the opinions in his expert reports. *See ABB Air Preheater Inc. v. Regenerative Envtl. Equip.,* 167 F.R.D. 668, 671 (D.N.J. 1996) (observing that the Third Circuit has a "distinct aversion to the exclusion of testimony").

### B.     Dr. Leffler is Highly Qualified to Testify As An Expert in This Case

Like their attack on Dr. Binkley, Plaintiffs' attack on the credibility of Dr. Leffler's testimony also falls far short of the mark. As evidenced from the trial record, Dr. Leffler has extensive expertise in the economics of the pharmaceutical industry. (Tr. 1564:4-1566:10, 1568:7-23; *see also* Tr. 1562:2-11, 17-24.) In addition to serving as a consultant to the Department of Justice, Dr. Leffler has been qualified as an expert witness in federal and state courts as well as before state agencies and federal regulatory agencies such as the Federal Trade Commission. (Tr. 1563:7-12, 1564:2-3.) Dr. Leffler's qualifications have been specifically acknowledged, and his economic analyses adopted, by several federal and state courts. *See, e.g.*, *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 859 (9th Cir. 2001) (*en banc*); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271, 274-75 (D.N.J. 2006); *In re Fla. Microsoft Antitrust Litig.*, 2002 WL 31423620, at *6-7 (Fla. Cir. Ct. 2002).

In a feeble attempt to discredit Dr. Leffler's compelling testimony in this case, Plaintiffs complain about a typographical error on one of the demonstrative exhibits that Dr. Leffler discussed during his testimony. (D.I. 151 at 38.) Yet, Dr. Leffler clearly explained to the Court that the data the exhibit (DTX 3131) was meant to display was also before the Court in DTX 3132 and DTX 3134, which did not contain the typographical error. (Tr. 1697:13-1698:23.)

Plaintiffs also complain that Dr. Leffler used IMS data to calculate a promotion-to-sales ratio and considered IMS data in other sections of his economic analysis. (D.I. 151 at 39.) However, Dr. Leffler openly acknowledged that because there is a certain level of underreporting in IMS sales figures, IMS data is not the most appropriate source of data for the calculation of a promotion-to-sales ratio. Dr. Leffler did not present such a calculation to the Court. (Tr. 1673:9-12.) Furthermore, Dr. Leffler sufficiently and convincingly explained to the Court why IMS data is appropriate for the purpose of comparing the relative sales performance and market shares of the pharmaceutical products of concern in this suit. (Tr. 1586:4-23, 1587:9-1589:7.) Other data sources, such as Astellas' internal sales figures and measures of scans performed in the market, are not sufficient for this purpose. (Tr. 1589:8-19.)

Plaintiffs also complain that Dr. Leffler "disavowed" his conclusion that there was a slowing of the revenue growth rate from the late 1990s through mid-2000. (D.I. 151 at 38-39.) This is not true. First, Dr. Leffler pointed out that the gross sales figures on which Plaintiffs rely are not real numbers, but rather "accounting numbers" that do not include price concessions, returns, and other allowances and therefore do not truly reflect the amount of money the company has generated from a product. (Tr. 1700:24-1701:6.) Second, Dr. Leffler explained that when looking at the net sales data, one sees a so-called "second wind" in or about mid-2000, which reflects "a therapeutic category explosion," resulting in an increasing, rather than declining, growth rate from that point forward. (Tr. 1701:7-1702:17.) Dr. Leffler further points out that the Adenoscan[®] growth following mid-2000 was in part due to its ability to benefit from the category explosion to a greater extent than its competitor since it was the only product being promoted in the market. (Tr. 1702:22-1703:3.)

35

A final example of the lengths to which Plaintiffs will go to attempt, in vain, to discredit Dr.

Leffler is their complaint, articulated only in their Proposed Conclusions of Law, that "Dr. Leffler never

consulted any physicians" about what product qualities or benefits drive their purchasing decisions.  (D.I.

152 at ¶ 214.)  However, as an economist, it would have been "inappropriate" for Dr. Leffler to engage in

such research and offer the Court medical opinions.  *Pfizer*, 461 F. Supp. 2d at 275.  Furthermore, even if

there were therapeutic advantages of Adenoscan® over dipyridamole that could be shown by such an

analysis, "this would not obviate [Dr. Leffler's] ultimate conclusion that factors such as marketing and

promotion, not these therapeutic benefits, were ultimately responsible for [the product's] commercial

success" if the evidence were to bear out this conclusion.  *Id.*  Sicor submits that the evidence does,

indeed, bear out this conclusion, and that no efforts on the part of Plaintiffs to discredit Dr. Leffler can

change that fact.

### C.     The Expert Testimony Offered By Plaintiffs is Not Credible

The only scientific expert witness offered by Plaintiffs at trial is neither a practicing physician nor

even a person of ordinary skill in the art.  Plaintiffs had a far more qualified witness, Dr. Zaret, a

cardiologist whom they touted to the Court in their opening statement and had present in court while Dr.

Binkley testified, but at the last minute opted not to call at trial.

### 1.     Dr. Klabunde is a Physiologist Who Has Never Administered Any Vasodilator, Including Adenosine, To a Patient

Dr. Klabunde, the only technical expert offered by Plaintiffs at trial, is a physiologist who has

never administered any vasodilator (including adenosine) to a human or animal.  He has never even

observed the administration of adenosine.  (Tr. 1057:4-19.)  Dr. Klabunde's training and experience

provide little basis for him to understand the perspective of a person of ordinary skill in the art at the

relevant time.  (Tr. 1056:12-1058:12.)  While this fact does not automatically disqualify Dr. Klabunde as

serving as an expert in this case, it diminished the credibility of Dr. Klabunde's testimony, in which he

repeatedly opined upon what he – a physiologist – would know or understand at the relevant time period,

instead of properly explaining the understanding of a person of ordinary skill. (*See*, *e.g.*, Tr. 1062:20-1064:9; Tr. 1086: 23-1087:9; Tr. 1110:6-21.)

>     **2.     Plaintiffs' Last-Minute Decision Not To Call Dr. Zaret Unfairly Deprived Sicor of Favorable Admission**

Furthermore, at the last minute, Plaintiffs cancelled the trial testimony of their other technical expert. (Tr. 1141:15-16.) Dr. Zaret, like Dr. Binkley, is a practicing physician.

It is not surprising that Plaintiffs opted not to call Dr. Zaret to testify. At deposition, Dr. Zaret made admissions favorable to Sicor's case. First, Dr. Zaret confirmed that there were no reports in the prior art of AV block occurring in human patients when adenosine was given by continuous intravenous infusion. (Tr. 1943:11-17.) He also confirmed that that no prior art report showed the occurrence of AV block in any other context involving adenosine other than with bolus administration. (Tr. 1974:6-11.)

Second, Dr. Zaret conceded that a person or ordinary skill in the art at the relevant time would know that the routine practice of dose titration could be used to minimize the possibility of side effects during the continuous intravenous administration of adenosine, and would know that stopping administration of adenosine would quickly stop the observed signs of the side effects. (Tr. 1946:17-22.)

Third, Dr. Zaret agreed that persons of ordinary skill in the art would understand that the selective vasodilation of the arteries could be useful in "many contexts" other than in treatment for heart disease. (Tr. 1959:13-18, 1960:6-1961:10.)

Finally, Dr. Zaret testified that the correspondence between Dr. Sollevi and Dr. Berne, on which Plaintiffs heavily rely in support of their arguments concerning skepticism in the field, were private communications and therefore would not have served to discourage persons of ordinary skill in the art at the relevant time because they would not have been available to them to review. (Tr. 1974:12-24.)

Plaintiffs' assertion that this decision not to call Dr. Zaret at trial was due to the "inexorable passage of [Plaintiffs'] allotted time" is not convincing. (Tr. 1141:13-16.) In fact, Plaintiffs had at least five and a half hours of time remaining at the close of trial. It is apparent that, Plaintiffs made the

strategic decision not to call Dr. Zaret at trial because his testimony would have further strengthened Sicor's case for obviousness.

## VI.    REMAINING EVIDENTIARY ISSUES

### A.    Sicor's Designation of Dr. Zaret's Deposition Testimony is Admissible

Sicor should be permitted to rely on the deposition testimony of Plaintiffs' expert, Dr. Barry L. Zaret, which Sicor designated on February 27, 2007, to which Plaintiffs made counter-designations on the same date. Although these designations were made after the deadline for designation of deposition testimony, Sicor had not previously designated Dr. Zaret's testimony because Sicor had expected to cross-examine Dr. Zaret at trial. Both Plaintiffs and Sicor had identified Dr. Zaret in their initial trial witness disclosures, made on November 20, 2006. In addition, both Plaintiffs and Sicor identified Dr. Zaret as a witness to be called live at trial in their final witness disclosures in connection with the proposed pretrial order submitted to the Court on January 26, 2007. (*See* D.I. 127 at 148, 152.) In their opening statement to the Court on February 12, 2007, Plaintiffs identified topics as to which Dr. Zaret would testify. (Tr. 45:20-46:22.) Yet, on Thursday, February 22, 2007, Plaintiffs informed the Court that they would not be calling Dr. Zaret in connection with their case-in-chief. (Tr. 1141:15-16.) By that time, Dr. Zaret had left Wilmington and was beyond the Court's subpoena power. Sicor subsequently designated portions of Dr. Zaret's deposition testimony, and Plaintiffs identified counter-designations, while maintaining their objection to the designation of any testimony from Dr. Zaret. Under the circumstances, Sicor's designation of Dr. Zaret's *expert* testimony at deposition was appropriate.

The circumstances here are similar to those addressed by Judge Farnan in *Tracinda Corp. v. Daimlerchrysler AG*, 362 F. Supp. 2d 487 (D. Del. 2005). Like Plaintiffs here, plaintiff in *Tracinda* identified a particular expert in their list of trial witnesses submitted with the pre-trial order. *Id.* at 511. Also like Plaintiffs here, that plaintiff later chose not to call that expert witness at trial – a decision plaintiff did not reveal until well after the deadline for depositions designations. *Id.* In this case, Plaintiffs did not inform Sicor of their decision until not to call Dr. Zaret until virtually the end of trial,

and well after Sicor had planned its trial strategy, which included cross-examination of Dr. Zaret in the areas on which Plaintiffs had designated him as an expert.

Plaintiffs have identified counter-designations to the designated deposition testimony. Plaintiffs' designations of Dr. Zaret's testimony should not be permitted, however, except to the extent appropriate to complete the record and avoid mischaracterization. Sicor has objected to Plaintiffs' counter-designations that go beyond the scope of Sicor's designations. Under these circumstances, there is no basis to exclude Sicor's designations of Dr. Zaret's deposition testimony. *Cf. Tracinda*, 362 F. Supp. 2d at 511-512 (allowing defendant's use of deposition testimony of plaintiff's expert, and allowing plaintiff's reliance on undesignated portions to complete the record and avoid mischaracterization).

## B.        Dr. Strauss's Testimony Cannot Be Properly Considered

The testimony of Dr. H. William Strauss, an expert called by Sicor in connection with Civil Action No. 05-337, presents a very different question. Plaintiffs attempt to use Dr. Strauss's testimony in this case – a case in which he was never identified as an expert witness by any party – under the guise of calling the testimony "fact" testimony. (Tr. 764:14-21). Yet, Plaintiffs did not actually question Dr. Strauss on pure matters of fact regarding any events of which he has personal knowledge. Instead, Plaintiffs wanted Dr. Strauss, whom they admit is an expert in the field of myocardial perfusion imaging ("MPI"), to testify using his expertise to discuss a variety of publications. This is expert testimony, not fact testimony, and the testimony should be excluded because Dr. Strauss was never identified as an expert in this case. *See* Fed. R. Civ. P. 26(a)(3)(A); D.I. 127 at Exhibit 8C.

A brief review of some of the exhibits that Plaintiffs tried to introduce through Dr. Strauss highlights Plaintiffs' attempt to introduce evidence based on Dr. Strauss's expertise, not his factual experiences. For example, Plaintiffs questioned Dr. Strauss about information contained in TX 35, an article published in 1929. (Tr. 765:12-766:2.) Plaintiffs do not assert, nor can they assert, that Dr. Strauss has any personal knowledge of the research that is reported in this 1929 article. Accordingly, any testimony by Dr. Strauss about the article or the teachings of the article is necessary *expert* testimony, and should be excluded. Plaintiffs then questioned Dr. Strauss about information contained in a variety of

other published studies with which Dr. Strauss had no personal involvement. (*See, e.g.*, Tr. 766:7-767:13; Tr. 770:16-20.) None of this testimony as admissible fact testimony as Dr. Strauss had no personal knowledge of any the "facts," but rather, can only testify about the information because of his expertise in the field.

With respect to the testimony elicited by Plaintiffs concerning Dr. Strauss's own publications and work, that too should be excluded, both because Dr. Strauss was not designated as an expert in this case and because it is irrelevant. To the extent that Plaintiffs seek to rely on Dr. Strauss's work in an attempt to establish the state of the art at a particular time, that is again an appropriate subject for expert testimony. Plaintiffs could and should have had their own experts interpret and testify as to Dr. Strauss's work in context. To the extent Plaintiffs seek to use Dr. Strauss's testimony to argue what skilled artisans would have understood based on what Dr. Strauss personally did or did not do at a particular time, the testimony is irrelevant. Dr. Strauss is not, and was not at the relevant time, a person of skill in the art with respect to the '296 patent. Dr. Strauss specializes in nuclear medicine, and he has not done a fellowship in cardiology. "The relevant inquiry is what a hypothetical ordinarily skilled artisan would have gleaned from the cited references at the time that the patent application leading to the [ ] patent was filed" not the actions of a single, specific individual. *Amazon.com, Inc. v. Barnesandnoble.com, Inc. et al.*, 239 F.3d 1343, 1364 (Fed. Cir. 2001) (emphasis added).

For all of these reasons, the testimony of Dr. Strauss appearing in the record at transcript page 764 line 14 through page 786 line 6 should be excluded in this action.

## VII.    CONCLUSION

For the foregoing reasons, Sicor respectfully requests that each and every one of the asserted claims of the '296 patent be declared invalid.

Dated:   June 19, 2007

Respectfully submitted,

/s/ *Karen E. Keller*
John W. Shaw (No. 3362)
Josy W. Ingersoll (No. 1088)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

*Attorneys for Defendants Sicor Inc. and*
*Sicor Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on June 19, 2007, I

caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the

Court using CM/ECF, which will send notification that such filing is available for viewing and downloading

to the following counsel of record:

| | |
|---|---|
| Paul M. Lukoff, Esquire | Richard K. Herrmann, Esquire |
| David E. Brand, Esquire | Morris James Hitchens & Williams |
| Prickett Jones & Elliot, P.A. | 222 Delaware Avenue, 10th Floor |
| 1310 King Street | P.O. Box 2306 |
| P.O. Box 1328 | Wilmington, DE 19899-2306 |
| Wilmington, DE 19899 | |

I further certify that on June 19, 2007, I caused copies of the foregoing document to be

served by hand delivery on the above-listed counsel and on the following in the manner indicated:

**BY E-MAIL ON JUNE 19, 2007 AND**
**FEDERAL EXPRESS ON JUNE 20, 2007**

| | |
|---|---|
| | Susan H. Griffen, Esquire |
| Charles E. Lipsey, Esquire | FINNEGAN, HENDERSON, FARABOW, |
| FINNEGAN, HENDERSON, FARABOW, | GARRETT & DUNNER, LLP |
| GARRETT & DUNNER, LLP | 901 New York Avenue, N.W. |
| Two Freedom Square | Washington, DC 20001-4413 |
| 11955 Freedom Drive | |
| Reston, VA 20190-5675 | |

John Scheibeler, Esquire
WHITE & CASE, LLP
1155 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Karen E. Keller
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Defendants*