## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ITEM DEVELOPMENT AB, | ) | |
| ASTELLAS US LLC, and | ) | |
| ASTELLAS PHARMA US, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  05-0336-SLR |
| | ) | |
| SICOR INC. and | ) | |
| SICOR PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' POST TRIAL BRIEF:
## U.S. PATENT NO. 5,731,296

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

Paul M Lukoff #96
David E. Brand #201
PRICKETT JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6520
debrand@prickett.com

John Scheibeler
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 819-8200

*Attorneys for Plaintiff*
*Item Development AB*

# TABLE OF CONTENTS

*Page*

I.  INTRODUCTION ...........................................................................................1

II.  SICOR FAILED TO PROVE OBVIOUSNESS IN VIEW OF THE SOLLEVI
    PRIOR ART...............................................................................................2

    A.  "Common Sense" Informed by the Prior Art Would Have Led One of
        Ordinary Skill to Retain the Dipyridamole Pretreatment, Not Omit It...................4

        1.  Sicor Offers No Explanation of Why Dr. Sollevi and
            Dr. Fukunaga Used and Recommended Dipyridamole
            Pretreatment If Mere "Common Sense" Would Have Led One
            to Omit It.......................................................................................5

        2.  Sicor's Purported "Suggestions" to Omit Pretreatment with
            Dipyridamole Would Not Have Overcome the Clear Teaching
            Away In the Art .............................................................................8

        3.  Sicor's Assertion that One of Ordinary Skill Would Have
            Believed that Dipyridamole's Effect Was Waning Is Untimely
            and Contradicted by the Record.................................................13

    B.  One of Ordinary Skill in the Art Would Not Have Expected Adenosine
        to Be Useful For Any Application Other than Controlled Hypotension ...............16

        1.  The Prior Art Cited by Sicor Related to Controlled
            Hypotension .................................................................................16

        2.  Dr. Binkley's Testimony Concerning Proposed Alternative
            Uses for Adenosine Infusion Was Not Disclosed in His Expert
            Report............................................................................................18

        3.  Sicor's Proposed Alternative Medical Uses for Adenosine Are
            Technically and Legally Deficient ..............................................21

            a.  Heart Failure ...................................................................21

            b.  Hypertension ...................................................................22

            c.  Limb Ischemia .................................................................22

        4.  Sicor Has Not Demonstrated Any Reasonable Expectation of
            Success In Using Adenosine For Other Medical Applications.................23

III.  SICOR FAILED TO PROVE OBVIOUSNESS IN VIEW OF THE
     FUKUNAGA PRIOR ART .........................................................................25

A.    Sicor Ignores Direct Evidence of ATP's Direct Vasodilating Activity in Human Patients in Favor of Assumptions by Dr. Binkley ...............................25

B.    Sicor's Assertion of What One of Ordinary Skill *Would Have* Done is Flatly Contradicted by What Dr. Fukunaga *Actually Did*......................................27

IV.    SICOR DISMISSES THE CONTEMPORANEOUS EVIDENCE OF NONOBVIOUSNESS .....................................................................................................28

1.    Contemporaneous Writings Show Serious Concerns About the Side Effects Sicor Dismisses as Unimportant.............................................28

a.    Dr. Berne's Publication of the Adenosine Hypothesis Did Not Lead to Consideration of Adenosine as a Pharmaceutical Vasodilating Agent.................................................29

b.    Dr. Sollevi's Testimony and the 1980s-Vintage Correspondence of Drs. Berne and Robicsek Is Compelling  Evidence of the State of Mind of Experts in the Field and Is Not Inadmissible Hearsay ................................30

2.    It Was Unexpected that Such a Low Dose of Adenosine Could Be Used In the Absence of Dipyridamole ...................................35

3.    Sicor's Critique of the Commercial Success of Adenoscan® Rings Hollow In the Face of Its Efforts to Copy the Drug ......................36

V.    SICOR FAILED TO PROVE ANTICIPATION IN VIEW OF FUKUNAGA.................39

VI.    CONCLUSION..............................................................................................................41

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Page(s)*

*Al-Site Corp. v. VSI Int'l, Inc.*,
   174 F.3d 1308 (Fed. Cir. 1999)...........................................................................................12

*Alza Corp. v. Mylan Labs., Inc.*,
   464 F.3d 1286 (Fed. Cir. 2006).....................................................................................26, 27

*In re Bell*,
   991 F.2d 781 (Fed. Cir. 1993)...............................................................................................8

*In re Bowen*,
   492 F.2d 859 (C.C.P.A. 1974) ............................................................................................23

*Burlington Indus., Inc. v. Quigg*,
   822 F.2d 1581 (Fed. Cir. 1987)...........................................................................................30

*Capon v. Eshar*,
   418 F.3d 1349 (Fed. Cir. 2005)...........................................................................................23

*Citizen's Fin. Group, Inc. v. Citizens Bank of Evans City*,
   383 F.3d 110 (3d Cir. 2004).................................................................................................30

*Coal. to Save Our Children v. State Bd. of Educ.*,
   90 F.3d 752 (3d Cir. 1996)...................................................................................................19

*In re Cook*,
   439 F.2d 730 (C.C.P.A. 1971) ............................................................................................23

*Diamond Rubber Co. v. Consol. Rubber Tire Co.*,
   220 U.S. 428 (1911)........................................................................................................5, 36

*In re Doumani*,
   281 F.2d 215 (C.C.P.A. 1960) .......................................................................................17, 18

*In re Dow Chem. Co.*,
   837 F.2d 469 (Fed. Cir. 1988).............................................................................................30

*Dystar Textilfarben GMBH & Co. Deutschland KG v. C.H. Patrick Co.*,
   464 F.3d 1356 (Fed. Cir. 2006).......................................................................................8, 28

*F.T.C. v. Freeman Hospital*,
   911 F. Supp. 1213 (W.D. Mo. 1995) ...................................................................................36

*George v. Celotex Corp.*,
    914 F.2d 26 (2d Cir. 1990).................................................................32

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)........................................................................28

*Hobbs v. Beach*,
    180 U.S. 383 (1901).....................................................................29

*Howerton v. Grace Hospital*,
    No. 4:90CV187, 1995 WL 787529 (W.D.N.C. July 5, 1995) .................................36

*Interconnect Planning Corp. v. Feil*,
    774 F.2d 1132 (Fed. Cir. 1985)............................................................7

*KSR Int'l. Co. v. Teleflex, Inc.*,
    127 S.Ct. 1727 (2007)...............................................8, 23, 24, 25, 34

*Kraft Gen. Foods, Inc. v. BC-USA, Inc.*,
    840 F.Supp. 344 (E.D. Pa. 1993) .........................................................30

*In re Kratz*,
    592 F.2d 1169 (C.C.P.A. 1979) ...........................................................23

*In re Lemin*,
    364 F.2d 864 (C.C.P.A. 1966) ............................................................34

*Loom Co. v. Higgins*,
    105 U.S. 580 (1881)........................................................................5

*In re Methionine Antitrust Litig.*,
    No. 00-1311, 2003 WL 22048232 (N.D. Cal. Aug. 26, 2003) ................................36

*In re Oelrich*,
    579 F.2d 86 (C.C.P.A. 1978) ........................................................12, 34

*Ormco Corp. v. Align Tech, Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006)......................................................38, 39

*Potts v. Creager*,
    155 US 597 (1895)..........................................................................5

*In re Rinehart*,
    531 F.2d 1048 (C.C.P.A. 1976) ...........................................................23

*Schering Corp. v. Geneva Pharm., Inc.*,
  339 F.3d 1373 (Fed. Cir. 2003)...............................................................40

*In re Shetty*,
  556 F.2d 81 (C.C.P.A. 1977) .................................................................23

*Threadgill v. Armstrong World Indus., Inc.*,
  928 F.2d 1366 (3d Cir. 1991)..................................................................32

*United States v. Adams*,
  383 U.S. 39 (1966)...........................................................................30, 34

*United States v. Kairys*,
  782 F.2d 1374 (7th Cir. 1986) ...............................................................32

*United States v. Stelmokas*,
  100 F.3d 302 (3d Cir. 1996)..............................................................31, 32

*Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*,
  814 F.2d 628 (Fed. Cir. 1987)................................................................39

*In re Wesslau*,
  353 F.2d 238 (C.C.P.A. 1965) .........................................................10, 28

*Zenith Labs. Inc. v. Bristol-Myers Squibb Co.*,
  19 F.3d 1418 (Fed. Cir. 1994)................................................................27

## FEDERAL STATUTES

35 U.S.C. § 282.......................................................................................17

Fed. R. Civ. P. 26(a)(2)(B) ................................................................18, 20

Fed. R. Civ. P. 37(c)(1)......................................................................18, 20

Fed. R. Evid. 803(3)...............................................................................30

Fed. R. Evid. 803(16).........................................................................31, 32

Fed. R. Evid. 901(b)(4) ...........................................................................32

Fed. R. Evid. 901(b)(8).......................................................................31, 32

## I.    INTRODUCTION

Sicor's current theory of the case utterly contradicts the actual contemporaneous evidence in the prior art.  Sicor suggests that one of ordinary skill would have believed it to be *safer* to administer an adenosine infusion to patients *without* dipyridamole pretreatment even though Dr. Sollevi had specifically included dipyridamole to reduce the chance of side effects with adenosine infusion and Dr. Fukunaga, another leader in the field, had recommended using dipyridamole for safety reasons in patients administered an infusion of ATP.  Data in the scientific literature suggested that dangerously high doses of adenosine would be required in the absence of dipyridamole.  Thus, Dr. Sollevi's ultimate success in performing controlled hypotension with an adenosine infusion at low doses without dipyridamole pretreatment was completely unexpected.  Dr. Sollevi's fundamental method lies at the heart of the commercial use of adenosine today, a use that Sicor seeks to copy and that it admitted just before trial infringed U.S. Patent No. 5,731,296 (the '296 patent).

Facing these difficult facts and an uphill battle at trial, Sicor repeatedly sought to change its theory of the case by relying on new information that was beyond the scope of its expert reports.  It offered a wholly new theory that the dipyridamole pretreatment would have "worn off" by the end of the period of hypotension in Dr. Sollevi's studies so that one of ordinary skill would conclude that the pretreatment was not important.  Besides never having been disclosed in Sicor's expert reports, this theory was factually flawed, as the prior art itself showed a continued strong effect of dipyridamole even after the hypotension period.

Sensing the difficulty in showing that one of ordinary skill would have believed it safe to administer an adenosine infusion without dipyridamole pretreatment for the purposes described in the prior art, Sicor offered another wholly new theory that an ordinary cardiologist would have viewed a lower dose adenosine infusion as a suitable substitute for standard vasodilators in

treatment of maladies such as congestive heart failure, limb ischemia, or hypertension. This attempt to change horses in midstream forced Sicor to elicit further expert testimony that was nowhere in its expert reports. Predictably, that testimony was, at best, simplistic and failed to account for the very properties of adenosine that had long prevented its use in the art. Even Sicor's expert, Dr. Binkley, whose primary field is heart failure, admitted that he has never used adenosine to treat patients with heart failure, despite opining that such treatment would have been an obvious choice in 1985.

Fundamentally, Sicor's case is grounded on *ex post* reasoning supported almost entirely by the naked opinion of its expert, Dr. Binkley, who was not working in the field at the relevant time and whose testimony conflicts with what the evidence shows about those who were. Such shaky underpinnings hardly constitute clear and convincing evidence of obviousness and cannot support Sicor's conclusion of invalidity.

## II.    SICOR FAILED TO PROVE OBVIOUSNESS IN VIEW OF THE SOLLEVI PRIOR ART

In its expert reports and at trial, Sicor asserted that two prior art abstracts published by Dr. Sollevi more than one year before the effective filing date of the '296 patent (TX-1170 and TX-37, *Sollevi I* and *Sollevi II*, respectively) would have rendered his claimed invention obvious to one of ordinary skill in the art. (DB[1] 2). Both abstracts described the use of adenosine together with a dipyridamole pretreatment to induce controlled hypotension (reduction of blood pressure by about 40%) in a small group of patients during surgery. Sicor has alleged that it would have been obvious to eliminate the dipyridamole pretreatment and simply increase the

---

[1] As used herein, "DB" refers to Defendants' Post Trial Brief (D.I. 150) and "PB" refers to Plaintiffs' Post Trial Brief (D.I. 151), both filed on May 9, 2007.

adenosine dose to achieve the same physiological effect. This obviousness allegation was resoundingly refuted by the trial evidence.

The stated purpose of the dipyridamole pretreatment in *Sollevi I* and *II* was to reduce the necessary dose of adenosine administered to the patients. (TX-1170; Sollevi 438:17-439:8.) Dr. Sollevi further explained that dipyridamole pretreatment would allow a more stable concentration of adenosine and "stabilize" or reduce the concentration gradient between the heart (where adenosine could cause heart block) and the peripheral circulation (where it lowered blood pressure). (Sollevi 438:17-439:8.)

Dr. Sollevi had to administer an average dose of 140 mcg/kg/min of adenosine in patients treated with dipyridamole. (TX-1170; Sollevi 442:19-23.) Neither Dr. Sollevi nor anyone else knew how much adenosine would have to be administered in the absence of dipyridamole to obtain a similar reduction in blood pressure, but the expectation was that much more would have been required. (*See* Klabunde 1050:11-1051:8; Sollevi 439:24-440:17, 448:19-449:8.) Prior art studies involving induction of hypotension with ATP rather than adenosine had shown that approximately 12 times more ATP was required in the absence of dipyridamole (Klabunde 1050:24-1051:8), but studies of adenosine-induced hypotension in dogs suggested that an even larger dose could be necessary—on the order of 100 to 200 times more in the absence of dipyridamole (*compare* TX-40 at 70-71 *with id.* at 73 (reporting mean dose of 3 mg/kg/hr with dipyridamole compared to 600 mg/kg/hr without); Klabunde 533:24-536:1, 1050:15-23). Even if the necessary increase had only been 10-fold (*i.e.*, 1,400 mcg/kg/min rather than 140 mcg/kg/min), administering such a high dose of adenosine by continuous infusion would not have been obvious, it would have been unthinkable. (Klabunde 537:18-538:6.)

A.    **"Common Sense" Informed by the Prior Art Would Have Led One of Ordinary Skill to Retain the Dipyridamole Pretreatment, Not Omit It**

Sicor contends that "ordinary creative insights" and "common sense" would have led one of ordinary skill in the art to administer adenosine without a dipyridamole pretreatment.  (DB 3, 22.)  Yet, safety concerns caused more than 50 years to elapse between the first test of adenosine administration to humans and the first test of continuous adenosine infusion in conjunction with dipyridamole pretreatment by Dr. Sollevi.  (*See* Klabunde 516:4-517:17, 520:24-522:2; Strauss 766:7-767:18.)  Dr. Sollevi had specifically used dipyridamole pretreatment to reduce the dose of adenosine and prevent side effects (TX-1170; Sollevi 438:17-439:8), and an article by Dr. Fukunaga also recommended using dipyridamole as a way to reduce side effects in connection with ATP administration (TX-51; Klabunde 540:15-541:8).  To suggest that both researchers were not just wrong but dangerously stupid, and that one of *ordinary* skill would have believed administration of adenosine *without* dipyridamole to be safer, strains credulity and is the purest form of hindsight.

The Supreme Court has recognized for decades that after-the-fact assertions that a patented invention was the result of mere common sense should be viewed skeptically, particularly where those assertions are supported by little more than bare expert opinion:

> Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, 'in the light of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer . . . .'  Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention.  But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not.

*Diamond Rubber Co. v. Consol. Rubber Tire Co.,* 220 U.S. 428, 434-35 (1911) (citation

omitted).  *See also Potts v. Creager*, 155 US 597, 608 (1895) ("The apparent simplicity of a new

device often leads an inexperienced person to think that it would have occurred to any one

familiar with the subject; but the decisive answer is that with dozens and perhaps hundreds of

others laboring in the same field, it had never occurred to any one before."); *Loom Co. v.

Higgins*, 105 U.S. 580, 591 (1881) ("Now that it has succeeded, it may seem very plain to any

one that he could have done it as well.  This is often the case with inventions of the greatest

merit.").

Sicor's unlikely conjecture, based on unsupported *ex post* expert opinions, cannot satisfy

its burden of proving invalidity by clear and convincing evidence.  This is particularly so where,

as here, most of those opinions were not properly disclosed during expert discovery and were

contradicted by direct contemporaneous evidence presented at trial.

> **1.    Sicor Offers No Explanation of Why Dr. Sollevi and
> Dr. Fukunaga Used and Recommended Dipyridamole
> Pretreatment If Mere "Common Sense" Would Have Led One
> to Omit It**

Acceptance of Sicor's assertion that "common sense" would lead to recognition that

adenosine infusion would be safer *without* dipyridamole (DB 22, 31) would require the Court to

conclude that Dr. Sollevi, one of the world's leading experts on adenosine and dipyridamole,

knew less than one of ordinary skill and was foolish to include dipyridamole in the first place.

Dr. Sollevi had, however, spent five to six years studying the pharmacology and physiology of

adenosine and adenosine analogs in various species prior to embarking on his human studies.

(Sollevi 434:12-17.)  He had studied and was fully aware of the effects of dipyridamole.  (Sollevi

477:15-478:1.)  But he concluded that it would be safer to administer adenosine infusions to his

surgical patients after dipyridamole pretreatment, particularly as a way of reducing the likelihood

of AV block. (Sollevi 438:17-439:6.) Indeed, Dr. Sollevi noted that in the prior human studies in which larger doses of adenosine were administered as a bolus, only AV block was observed, not a hypotensive vasodilator effect. (TX-36 at 1259; *see* Sollevi 460:3-20, 487:6-14.) Reducing the dose of adenosine through dipyridamole pretreatment also reduced the potential for kidney toxicity due to uric acid accumulation. (*See* Sollevi 440:18-441:5.)

Dr. Sollevi further explained that dipyridamole stabilized the concentration gradient between the heart and the peripheral circulation. (Sollevi 438:17-439:6.) This is important because intravenously administered adenosine will reach the heart before it is transported to the more distant portions of the circulatory system. (*See* Binkley 250:5-251:19.) Thus, there is a steep "gradient" in adenosine concentration with the highest concentrations near the heart and lower concentrations in the more peripheral parts of the arterial circulation. *See id.* However, it is these more distant sites in the circulation that regulate blood pressure through selective arterial vasodilation. (Binkley 248:4-249:3.) Thus, whatever the necessary concentration of adenosine is to cause selective vasodilation in the periphery, a higher amount will be experienced by the heart before the drug passes along to the periphery.[2] Dr. Sollevi used dipyridamole to flatten the adenosine concentration gradient between the heart and the periphery by slowing down the metabolic breakdown of adenosine. (Sollevi 438:17-439:6.) As a practical consequence, less adenosine would need to be present at the heart to get the same amount to the periphery. Thus, Dr. Sollevi had good reason to administer dipyridamole as a way of improving patient safety, and there is no evidence that one of ordinary skill in the art would have reached the opposite conclusion.

---

[2] Dr. Biaggioni commented on this phenomenon, which results from the short half-life of adenosine, in a 1986 article that is not prior art to the '296 patent but was acknowledged as authoritative by Dr. Klabunde. (TX-48 at 2235; Klabunde 520:24-521:4.)

Indeed, Sicor's "common sense" argument also requires the Court to conclude that Dr. Fukunaga was foolish to recommend using dipyridamole pretreatment in connection with infusion of ATP. After publishing his initial study on the administration of a continuous infusion of ATP to patients to induce controlled hypotension in the *Fukunaga 1982* abstract (TX-42), Dr. Fukunaga published a second study two years later in which his patients were pretreated with dipyridamole before infusion of the ATP. (TX-51; *Fukunaga 1984*.) Dr. Fukunaga explicitly suggested that dipyridamole be administered as a way of avoiding the problem of buildup of metabolites like uric acid. (*Id.*; Klabunde 540:15-541:8.) Thus, Dr. Fukunaga recognized the value of dipyridamole in reducing the chances of side effects in connection with ATP administration. While Sicor contends that "common sense" would have led one of ordinary skill to *eliminate* the dipyridamole pretreatment described in the *Sollevi I* and *Sollevi II* abstracts and to conclude that administration of adenosine would be safer without it, Sicor offers no explanation of why Dr. Fukunaga reached a directly contrary conclusion with respect to administration of ATP.

To support its common-sense argument, Sicor notes that it is always preferable to administer one drug rather than two. (DB 22.) Both Dr. Sollevi and Dr. Fukunaga plainly would have had the same preference. Yet, each of them co-administered dipyridamole because they felt it had important safety benefits. There is, therefore, a logical disconnect between the *ex post* opinions of Sicor's expert and the testimony and writings of those who were actually present at the relevant time. Of the two, the Federal Circuit has held the latter to be more reliable. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed. Cir. 1985) ("A retrospective view of the invention is best gleaned from those who were there at the time.").

While the Supreme Court in *KSR* instructed courts not to overlook common sense in analyzing obviousness, this Court should be highly skeptical when a defendant resorts to purported "common sense" that *contradicts* the clear teaching of the prior art.  *See KSR Int'l. Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1742 (2007).  The "common sense" suggested by Sicor is nothing more than the same thinly disguised hindsight accused infringers have relied on since the 1800s to minimize the perceived importance of a patented invention.

> **2.    Sicor's Purported "Suggestions" to Omit Pretreatment with Dipyridamole Would Not Have Overcome the Clear Teaching Away In the Art**

Sicor argues that dipyridamole would prolong any side effects that would occur because dipyridamole has a longer half-life than adenosine.  (DB 31.)  But as discussed above, Dr. Sollevi believed such side effects would be less likely to occur due to the lower dose and smoother adenosine concentration gradient attained with dipyridamole pretreatment.  (Sollevi 438:17-439:6, 440:18-441:5.)  Moreover, the use of dipyridamole by both Dr. Sollevi and Dr. Fukunaga to reduce the dose of adenosine (or ATP) administered, thereby reducing the chance of side effects, clearly would have taught away from administering adenosine by infusion without dipyridamole pretreatment.

Although Sicor discusses concerns about side effects primarily in its consideration of objective or "secondary" indicia of nonobviousness, the question of whether a reference teaches away rather than toward a claimed invention is part of the factual inquiry required to determine the scope and content of the prior art on which Sicor bears the burden of proof by clear and convincing evidence.  *Dystar Textilfarben GMBH & Co. Deutschland KG v. C.H. Patrick Co.,* 464 F.3d 1356, 1360 (Fed. Cir. 2006); *see also In re Bell*, 991 F.2d 781, 784 (Fed. Cir. 1993) ("What a reference teaches and whether it teaches toward or away from the claimed invention are questions of fact.").  Here, Sicor's conjecture that one of ordinary skill would have believed

administration of adenosine infusion would be safer in the absence of dipyridamole pretreatment must be weighed against the clear fact that (1) the art had refused for safety reasons to use adenosine in humans for 50 years after discovery of its vasodilating properties (*see, e.g.,* Klabunde 521:5-23; Strauss 766:7-767:18), (2) the only known human medical use of adenosine alone was to interfere intentionally with electrical conduction in the heart (to treat PSVT) (*see, e.g.,* TX-36; TX-45; Klabunde 523:18-524:10), (3) both the *Sollevi I* and *II* abstracts and the *Fukunaga 1984* abstract taught that dipyridamole pretreatment *should* be used to minimize the dose of adenosine or ATP, and (4) *Fukunaga 1984* explicitly made the point that use of dipyridamole would have "greatly avoided" the problem of accumulation of toxic metabolites (TX-51).

In an effort to respond to these clear teachings, Sicor relied on a previously undisclosed 1984 article by Berne (TX-5000, *Berne 1984*), noting that dipyridamole potentiated AV block induced by hypoxia or ischemia.  (*See* DB 11.)[3]  Sicor's reliance on *Berne 1984* is both untimely and misplaced.

While Sicor asserts that one of ordinary skill would have learned from *Berne 1984* that dipyridamole pretreatment should be omitted, that assertion conveniently ignores the fact that the article is entirely about adenosine's potent ability to interrupt the electrical conduction in the heart and that the *only* clinical use for adenosine discussed in the article is in the treatment of PSVT.  (TX-5000 at 1196.)  While the *Berne 1984* article noted that dipyridamole potentiated the natural physiological effect of AV block, which occurred after induction of hypoxia or ischemia in laboratory animals, it concluded that such potentiation occurred because endogenous

---

[3]  Despite admitting at trial that TX-5000 had not been previously disclosed and representing to the Court that it was not being offered into evidence, Sicor repeatedly relies on that very exhibit, citing it no less than five times in its brief.  (*Compare* Binkley 1505:6-20 *with* DB 10, 11, 12, 30.)

adenosine was causing the AV block.  (*Id.* at 1195-96.)  This can hardly be read as supporting the use of exogenous adenosine as a clinical vasodilator.  Even if the article had shown that dipyridamole potentiated AV block caused by high doses of exogenous adenosine, such a teaching would not be inconsistent with the clear benefit of using dipyridamole to reduce the necessary dose of adenosine  and avoid the need for administering AV block-inducing doses in the first place.

Far from teaching the clinical benefits of administering adenosine infusions without dipyridamole pretreatment, the *Berne 1984* article merely reinforced the teaching that adenosine causes AV block even when the dose was "small and did not reduce systemic blood pressure." (TX-5000 at 1196.)  It is elementary patent law that a defendant may not "pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."  *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965).  Accordingly, Sicor's reliance on a single out-of-context idea in the *Berne 1984* article is misplaced and ineffective in countering the teaching away in the art.

Moreover, *Berne 1984* (TX-5000) and witness testimony about it should be excluded because Sicor never disclosed the document during discovery and it was never commented on by any expert prior to trial.  *See* Plaintiffs' Opening Brief (PB) § VIII.A.  Sicor does not even argue that the document was disclosed, but instead makes the completely baseless assertion that the article was referred to in correspondence between Dr. Berne and Dr. Sollevi.  (*See* DB 12; *see also* fn. 2, *supra*.)  This assertion tests the boundaries of good faith, as it is not supported by any witness or other evidence and is flatly contradicted by the testimony of Dr. Sollevi, who identified *DiMarco 1983* (TX-36) as the publication referred to in the correspondence.  (Sollevi

460:18-20.)  Indeed, Sicor plainly chose not to ask Dr. Sollevi about the article when it had the opportunity to do so at trial.

Sicor further relies on a speculative statement in an article by Kassell (TX-40) that dipyridamole pretreatment might not be necessary in humans to avoid excessive fluid administration.  (DB 22.)  The problem of adenosine infusion in human patients was not simply the volume of fluid carrier needed to contain the adenosine, which was the problem addressed in the portion of *Kassell* cited by Sicor.  The problem was concern that the amount of the adenosine active ingredient could cause heart block or build up of undesirable metabolites in human patients.  The *Kassell* statement is, therefore, utterly irrelevant to the question of whether a person of ordinary skill would have perceived the dipyridamole pretreatment in *Sollevi I* and *Sollevi II* to be an unnecessary human safety precaution.

More significantly, the experiments reported by *Kassell* were in dogs, not humans.  By the time of the invention of the '296 patent, there was no need to speculate about the relationship between the amount of adenosine with dipyridamole pretreatment needed to achieve a 40% reduction in blood pressure in dogs (*Kassell*) versus humans.  The *Sollevi I* and *Sollevi II* abstracts provided a basis for such comparison.  The issue was whether elimination of the dipyridamole in *Sollevi I* and *Sollevi II* would require infusion of a dangerously high level of adenosine.  The portion of *Kassell* relevant to this issue was his report of a dramatic increase in the amount of adenosine required in the absence of dipyridamole—two orders of magnitude more.  (TX-40 at 73; Klabunde 533:15-536:1.)  The possibility of needing up to 200 times more adenosine than was used in *Sollevi I* and *Sollevi II* with dipyridamole pretreatment would have made elimination of that pretreatment in humans unthinkable.  (Klabunde 535:13-536:8.)

Moreover, the subsequent actions of Dr. Sollevi and Dr. Fukunaga in treating actual human patients, where both recommended dipyridamole pretreatment, are more compelling than the speculative statements of *Kassell* based on his dog work.  As the Federal Circuit has stated:

> In determining how the Oelrich disclosure was interpreted by those skilled in the art, we are more impressed by what those so skilled Did than by what they Said.  Even though the words of the Oelrich patent implied that sub-critical operation was feasible, it was never, in fact, considered when a concrete problem requiring such operation was actually presented to two persons of ordinary skill in the art, both intimately familiar with the Oelrich patent.

*In re Oelrich*, 579 F.2d 86, 91 (C.C.P.A. 1978).

Even the patent examiner agreed that *Kassell* was no impediment to the patentability of the claims issued in the '296 patent.  The article and the statement relied on by Sicor was explicitly discussed *in the patent specification itself* (*see* TX-275 at col. 5, ll. 18-44), yet the examiner allowed the claims over it.  Indeed, in addition to *Kassell* the patent examiner had before him all three of the primary references relied on by Sicor (all three are listed on the face of the patent).  (*See* TX-275.)  Such circumstances, in which a challenger offers little more than a "do over" of the patent examination process, result in an "especially difficult" burden for the party asserting invalidity.  *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999).

Sicor's additional alleged "suggestions" in the prior art to remove the dipyridamole pretreatment suffer from similar weaknesses.  For example, Sicor asserts that the *Sollevi I* and *II* abstracts "conclude[] by referring to the intravenous administration of adenosine without any reference to a dipyridamole pretreatment."  (DB 27.)  In reality, neither abstract "refers" to or suggests administering adenosine without dipyridamole pretreatment.  To the contrary, both merely refer to the properties of adenosine that had been demonstrated in the clinical tests on patients who were pretreated with dipyridamole.  (*See* TX-37; TX-1170.)  For the reasons

discussed above, one of ordinary skill in the art would have had good reason to believe that such pretreatment was an important part of the overall protocol.

Likewise, Sicor mischaracterizes in its brief the dose of adenosine disclosed in the *Sollevi I* and *II* abstracts, suggesting that both disclosed "administration of adenosine at a rate of 140 μg/kg/min, which falls within each of the claimed rates of administration."  (DB 27.)  Of course, the "claimed rates of administration" are rates of administration *without* dipyridamole pretreatment, whereas the only doses disclosed in the abstracts were *with* dipyridamole pretreatment.  Sicor's citation to case law about "dose optimization" is thus irrelevant in view of the fact that the prior art dose information was not even in the context of the claimed method. Indeed, as discussed above, one of ordinary skill in the art would have expected that much higher doses of adenosine would be required if the dipyridamole pretreatment were to be eliminated. *See* Section II., *supra,* third paragraph.

> **3.      Sicor's Assertion that One of Ordinary Skill Would Have Believed that Dipyridamole's Effect Was Waning Is Untimely and Contradicted by the Record**

Based on the work of Dr. Klabunde and Dr. Sollevi's own abstracts and publications, one of ordinary skill in the art would have expected that dipyridamole would have a large inhibitory effect on adenosine metabolism even at the end of the surgical hypotension period described by Dr. Sollevi.  (Klabunde 530:18-532:3.)  Sicor contends in its brief (DB 26), however, and Dr. Binkley asserted for the first time at trial, that one of ordinary skill would have concluded there was "very little, if any, dipyridamole effect" remaining at the end of the surgical hypotensive period because of the rate of return of adenosine levels to baseline and the rate of reversal of the blood pressure effect when the infusion was stopped (Binkley 154:1-17, 147:12-21).  This theory, like many others offered by Dr. Binkley at trial, was not disclosed in his expert

reports.  (Objection at 155:15-19, 261:12-262:14; TX-26; TX-43.)  Moreover, it is completely unsupported by the record.

To the contrary, according to the *Sollevi II* abstract (TX-37), in the presence of dipyridamole, adenosine levels did not return to control levels until 3 to 9 minutes after the adenosine infusion was discontinued at the end of the surgical hypotensive period.  (TX-37; Klabunde 530:9-532:3.)  This is a clear indication of the continuing effects of dipyridamole. Based on adenosine's known short half-life (<10 seconds), one of ordinary skill would have expected adenosine blood levels to return to normal in only 30 to 40 seconds in the absence of dipyridamole.  (Klabunde 531:1-532:3.)  Dr. Binkley admitted as much on cross-examination, contradicting his earlier testimony.  (Binkley 265:13-23.)  The slow return to normal of the adenosine levels (3 to 9 minutes versus 30 to 40 seconds) thus demonstrated that dipyridamole had a strong and continuing effect on adenosine metabolism throughout the period of hypotension.  (Klabunde 531:11-532:3.)

The facts on cross-examination having undermined his initial opinion that the effects of dipyridamole had worn off, Dr. Binkley offered rebuttal testimony on yet another new theory. This theory had also not been previously disclosed in Dr. Binkley's expert reports.  (*See* Binkley 1385:10-1386:6, 1392:17-23, 1397:13-14.)  Most of this second theory concerned the so-called "functional half-life" of dipyridamole, which Dr. Binkley testified was between 30 and 40 minutes and corresponded to the half-life of the "physiological effect of the drug."  (Binkley 1380:20-1381:22.)  This new theory was contradicted, however, by Dr. Binkley's deposition

testimony that "[t]he half-life of dipyridamole is 40 to 80 minutes and, therefore, you could have greatly prolonged effects of both the dipyridamole and the adenosine."[4]  (Binkley 1474:8-23.)

Furthermore, regardless of Dr. Binkley's view on the half-life of dipyridamole, the literature available prior to the filing date of the '296 patent would still have led one of ordinary skill in the art to conclude that dipyridamole was having a powerful inhibiting effect on adenosine metabolism, even at the end of the hypotensive period.  (Klabunde 531:1-532:3.)  For example, Dr. Sollevi published an article in 1984 concerning the effect of dipyridamole treatment in humans showing that even 75 minutes after administration of dipyridamole, the blood levels of adenosine were elevated and the amount of dipyridamole in the blood was 0.8 micromolar.  (TX-1173 at 167; Binkley 1480:4-22.)  At that concentration, the level of inhibition of adenosine breakdown would have been slightly less than 90 percent.  (Klabunde 1039:15-1040:14.)

Consequently, persons of ordinary skill would have expected that dipyridamole was continuing to greatly reduce the necessary dose of adenosine throughout even the longest hypotensive period of adenosine treatment in Dr. Sollevi's studies.  (*See* TX-1170 (reporting mean adenosine infusion time of 33 minutes, range 12 to 71 minutes); Klabunde 1042:15-22.) There is certainly no clear and convincing evidence that such persons would have recognized that dipyridamole was having *no effect* at the end of the adenosine infusion.

---

[4]  On redirect, Dr. Binkley asserted that his deposition testimony was not referring to the "functional" half-life of dipyridamole, but that assertion is itself inconsistent with the entire thrust of his deposition testimony, which was that the 40 to 80 minute half-life of dipyridamole could lead to "greatly prolonged effects of both the dipyridamole and the adenosine."  (Binkley 1507:8-12, 1474:8-23.)

**B.     One of Ordinary Skill in the Art Would Not Have Expected Adenosine to Be Useful For Any Application Other than Controlled Hypotension**

Sicor's other assertions of obviousness in view of the *Sollevi I* and *II* abstracts are also both untimely and unmeritorious.  Sensing the frailty of its argument for removal of dipyridamole from the processes of *Sollevi I* and *Sollevi II*, Sicor contends that one of ordinary skill in the art would have expected adenosine to be useful at lower doses for medical purposes other than inducing controlled hypotension.  (DB 3.)  But the only prior art it identified and relied upon at trial concerned surgical hypotension, not other medical uses.  (Binkley 285:11-20; Klabunde 528:12-529:1; DTX-2002).  These new contentions were not disclosed in Sicor's expert reports, are devoid of the evidentiary support needed to prove them had they been properly disclosed, and are simply scientifically and legally wrong.

**1.     The Prior Art Cited by Sicor Related to Controlled Hypotension**

As detailed in Plaintiffs' Opening Brief, for 50 years prior to the early 1980s, adenosine had been known as a compound that was too toxic and too short acting to have *any* useful human medical purpose.  (Plaintiffs' Opening Brief (PB) at §§ III.A-B.)  Early studies had revealed that adenosine exerted powerful inhibitory effects on the electrical signals that cause the heart to beat (AV block).  (TX-48 at 2229; Klabunde 520:23-522:2; *see also* TX-36 at 1254; Klabunde 517:2-17.)  Patients administered a bolus dose of adenosine experienced periods of slow heartbeat or temporary cardiac arrest, neither of which would be acceptable in a general-use vasodilator.  (TX-48 at 2229; TX-36 at 1254; Klabunde 520:23-522:2.)  In addition, rather than recognizing potential benefits of the short half-life of adenosine, prior art researchers saw it as a liability, believing adenosine's vasodilatory effects would be too transitory to be useful. (TX-214 at 415; Binkley 326:23-328:1; Strauss 769:23-770:20.)

Not surprisingly in view of the state of the scientific literature, the *only* medical use of adenosine infusion in the prior art relied upon in Dr. Binkley's expert reports concerned selective vasodilation for inducing controlled hypotension during surgery.  (Binkley 285:11-20, 1484:7-1485:7; DTX-2002.)  Sicor's invalidity theory was that it would have been obvious to use adenosine for controlled hypotension without the dipyridamole pretreatment.

As the trial evidence unfolded, it became clear that Sicor could not effectively rebut the evidence discussed above that one of ordinary skill in the art would have predicted that a dangerously high dose of adenosine would have been needed to induce surgical hypotension without dipyridamole pretreatment.  So Sicor instead resorted on rebuttal to a wholly new theory that one of ordinary skill might use lesser amounts of adenosine to achieve lesser degrees of selective arterial vasodilation for other medical uses.

Specifically, it was alleged that it would have been obvious to use adenosine without dipyridamole pretreatment in humans for myocardial imaging and to treat heart failure, hypertension, and limb ischemia.  (*See* DB 20-21.)[5]  Sicor, however, did not offer into evidence any statutory prior art describing these other medical uses.  Nor could it have, because no such prior art or invalidity theory had been disclosed in its expert reports or notice under 35 U.S.C. § 282.  Nor did Sicor offer any substantive comparison between the pharmacologic profiles of adenosine and vasodilators previously used for these other purposes of the sort needed to prove its new obviousness allegation.  *In re Doumani*, 281 F.2d 215, 217 (C.C.P.A. 1960) ("The

---

[5]  Sicor cites to testimony by Dr. Klabunde (1079:21-1080:2) for the proposition that lesser degrees of arterial vasodilation "would be important for other medical uses," but the cited testimony is completely inapposite (DB 20).  In the testimony relied on by Sicor, Dr. Klabunde merely agreed, in response to a question about one of his own publications concerning the half-life of adenosine in dogs (TX-1036), that a general goal in understanding physiologic mechanisms might be to "stimulate other people to use what you found by using practical medical applications."  (*See* Klabunde 1079:3-1080:2.)

question whether such a substitution is obvious must be determined on the basis of the circumstances of each case, especially the extent to which similarity and equivalence between the substances involved are recognized in the prior art.")  For example, Sicor did not offer testimony comparing the expected patient profile, mode of administration, side effect profile, potency, half-life, or other clinical characteristics of the known vasodilators to adenosine to show how "common sense" would have led to substitution of adenosine in these other medical applications and an expectation that such substitution would be safe and effective.

> **2.     Dr. Binkley's Testimony Concerning Proposed Alternative Uses for Adenosine Infusion Was Not Disclosed in His Expert Report**

While technologically and legally unmeritorious for reasons discussed in §§ II.B.3. and 4., *infra*, Dr. Binkley's opinions on purported alternative medical uses for adenosine should be excluded because they were not included in either of his expert reports.  *See* Fed. R. Civ. P. 26(a)(2)(B), 37(c)(1).  Dr. Binkley's opening expert report included a detailed discussion of the *Sollevi I* and *II* references and his opinion that the references would have rendered the claimed invention obvious, but the report was utterly silent as to alternative medical needs that one of ordinary skill would have reasonably expected adenosine to fill.  Sicor points to paragraphs 64-66 of the report as supporting Dr. Binkley's opinions (DB 20, fn.10), but these paragraphs are clearly written only in the context of adenosine's use for controlled hypotension in the *Sollevi I* and *II* abstracts and do not mention uses like treatment of "congestive heart failure," "hypertension," or "limb ischemia."

Indeed, far from suggesting these other uses of adenosine, the report contends that one of ordinary skill would test various doses in an effort to find one that would result in *the same physiological effects* reported in the *Sollevi I* and *II* abstracts, *i.e.*, controlled hypotension,

without dipyridamole pretreatment and without serious side effects.  As stated in paragraph 67 of

Dr. Binkley's expert report, not cited by Sicor:

> Therefore, in my opinion, a person of ordinary skill in the art who
> wished to use adenosine to achieve the *same physiological effects*
> reported in Sollevi I and Sollevi II would first administer a dose of
> 140 µg/kg/min of adenosine as a matter of routine
> experimentation.  If this dose was not sufficient to produce the
> desired effects, the person of ordinary skill would increase the dose
> until the desired effects were achieved.

(TX-26 at 22, ¶ 67, emphasis added.)

In this regard, Dr. Binkley did not even offer testimony about treatment of hypertension,

heart failure, or limb ischemia with adenosine in his testimony in Sicor's case-in-chief, but only

on rebuttal during the last week of trial.  While Sicor apparently contends that such rebuttal

testimony need not comply with the expert disclosure rules (*see* Tr. 1369:12-17), that contention

is contrary to Third Circuit law.  *See Coal. to Save Our Children v. State Bd. of Educ.,* 90 F.3d

752, 775-76 (3d Cir. 1996) (upholding district court's exclusion of expert testimony where party

failed to supplement expert reports and instead offered surprise rebuttal testimony at trial).

Dr. Binkley also changed his testimony concerning the *Biaggioni 1985* abstract during

rebuttal.  Having agreed on cross-examination during the first week of trial that the *Biaggioni*

*1985* abstract did not show any medical use of adenosine he offered contrary testimony during

rebuttal.  During the first week of trial Dr. Binkley testified as follows:

> Q. [Mr. Lipsey] Okay.  And have I correctly identified the medical
> uses described in those five publications in DTX-2002.  Namely,
> controlled hypotension for the first four and no medical use in
> Biaggioni?
>
> A.  Yes.

(Binkley 256:13-17.)  Yet two weeks later, on leading questioning from his own counsel, Dr.

Binkley stated:

> Q. [Ms. Hassett] And do you agree with the view that the Biaggioni abstract is unrelated to any medical use that would be of significance to a person of ordinary skill in September 1985?
>
> A. Well, no, I don't really agree with that.

(Binkley 1375:14-18; *but see* 1484:17-1485:7.)

Dr. Binkley went on to expand further on his view of how the *Biaggioni 1985* abstract would relate to the use of adenosine in the treatment of heart failure, a view that was not mentioned in his expert report. (*See* TX-26 at 26-27.) Dr. Binkley also repeatedly asserted at trial that the *Biaggioni 1985* abstract demonstrated selective arterial vasodilation (*see* Binkley 174:5-13, 1375:20-1377:4), despite having failed to include such an opinion in his expert reports. Indeed, Dr. Binkley even admitted that he had "not stated explicitly" in his report that *Biaggioni 1985* showed selective arterial vasodilation. (*See* Binkley 307:2-14, 1444:5-25.) Dr. Binkley's discussion of *Biaggioni 1985* in his expert report was limited to what it would teach in combination with the *Fukunaga 1982* abstract (TX-42). (*See* TX-26 at 26-27.)

Allowing Dr. Binkley to offer these new and undisclosed theories for the first time during the last week of trial would be unfair and highly prejudicial to the Plaintiffs. The Federal Rules require disclosure of expert opinions and provide that the consequence for failing to disclose such opinions is that they will be excluded at trial. Fed. R. Civ. P. 26(a)(2)(B), 37(c)(1). By failing to disclose Dr. Binkley's opinions, Sicor avoided the scrutiny and deposition cross-examination contemplated by the Federal Rules. Given adequate disclosure of the opinions, Plaintiffs could have asked their own experts to search the literature and respond to Dr. Binkley's bare assertion that such alternative uses for adenosine would have been obvious to an ordinary physician in September 1985. By eliciting the undisclosed opinions for the first time at trial, and after Plaintiffs' expert had testified, Sicor enjoyed the benefit of surprise without the potential for rebuttal.

20

### 3.    Sicor's Proposed Alternative Medical Uses for Adenosine Are Technically and Legally Deficient

Sicor's apparent premise that all selective arterial vasodilators would be interchangeable for all medical purposes is clearly not true.  Simply by way of one example apparent from the trial record, dipyridamole did not produce profound hypotension in Dr. Sollevi's studies, whereas adenosine did.  (Klabunde 1166:4-9.)

Without a detailed comparison between the properties of adenosine and the properties of other known vasodilators used in these other medical uses, Dr. Binkley's opinions that adenosine infusion could be used in lieu of those other vasodilators to treat heart disease, hypertension, or limb ischemia (*see* Binkley 1367:20-1368:2) are simply not credible and should be accorded no weight.  (*See* Binkley 1489:24-1490:22.)

### a.    Heart Failure

Dr. Binkley blithely opined that adenosine infusion would have been administered as a treatment for patients suffering from heart failure because other vasodilators had been so used (Binkley 1371:22-24), but he did not address concerns that would have existed about administering to patients with heart disease a compound like adenosine known to be capable of inducing slowing of the heartbeat (bradycardia), temporary cardiac arrest, and extreme hypotension.  The field was so concerned about these effects that nobody used adenosine to treat heart disease for decades after its vasodilating properties were discovered.  (*See, e.g.,* TX-214 at 415.)  Even in the 1990s, physicians were reluctant to administer adenosine infusions to patients with coronary artery disease because of concern over AV block.  (Klose 1516:3-1517:1.) Indeed, Dr. Sollevi was sufficiently concerned about the effects of adenosine in heart patients that he excluded such patients from his studies.  (TX-1170 ("Nine patients (35-58 years) without cardiopulmonary disease . . . ."); Sollevi 441:16-442:2.)

21

Tellingly, despite identifying himself as a heart failure specialist who performs research on vasodilators (Binkley 74:1-4, 12-22), Dr. Binkley admitted that, even today, he has never used adenosine to treat heart failure as he proposed would have been obvious to one of ordinary skill in the art in 1985.  (*See* Binkley 1490:5-11.)  Such a disconnect between what an expert *says* would have been obvious and what he and everyone else actually *did* in the field is a strong indicator that the recently-formulated expert opinions are impermissibly based on hindsight.

### b.     Hypertension

Dr. Binkely's vague reference to using adenosine in patients with hypertension is equally flawed.  As shown in the *Biaggioni 1985* abstract, administration of adenosine did not reduce mean arterial blood pressure in normal volunteers at a doses of 140 mcg/kg/min, and higher doses were not tolerable.  (TX-1187; Klabunde 554:14-555:17.)  Dr. Binkley did not address how one of ordinary skill in the art would have expected to find a tolerable and efficacious dose for reducing blood pressure based on the information in *Biaggioni 1985*.  (*See* Klabunde 555:18-556:14.)

### c.     Limb Ischemia

Similarly, with respect to treatment of limb ischemia, Dr. Binkley stated only that "[t]here were some *efforts* to do that at times with ischemic limbs with other vasodilators." (Binkley 1372:11-24, emphasis added.)  This testimony does not indicate whether the "efforts" to use traditional vasodilators to treat limb ischemia actually *worked* and does not even establish a reasonable expectation of success with existing vasodilators, much less adenosine.  The mere possibility that adenosine could cause heart block in human patients manifest from widespread reports of this effect in the literature would logically have counseled against its use for garden-variety vasodilator applications where other proven, safer drugs were available that did not carry this liability.

22

4.    **Sicor Has Not Demonstrated Any Reasonable Expectation of Success In Using Adenosine For Other Medical Applications**

It has long been the law that in unpredictable arts, proof of obviousness requires proof of a reasonable expectation of success. *See, e.g., In re Rinehart*, 531 F.2d 1048, 1053-54 (C.C.P.A. 1976). The *KSR* decision did not change this aspect of the law of obviousness. While the Supreme Court found error in the Federal Circuit's conclusion that the patent claim in *KSR* could not be proved obvious merely by showing that the combination of elements was "obvious to try," that finding was in the context of a mechanical invention where there was "a design need or market pressure to solve a problem" and "a finite number of identified, *predictable* solutions," not an *unpredictable* pharmaceutical invention. *See KSR*, 127 S.Ct. at 1742, emphasis added. Numerous aspects of the patent law are applied differently in predictable mechanical technologies than they are in unpredictable technologies, like human medicine. *See, e.g., In re Bowen,* 492 F.2d 859, 862 (C.C.P.A. 1974); *In re Cook,* 439 F.2d 730, 734 (C.C.P.A. 1971); *Capon v. Eshar*, 418 F.3d 1349, 1358-59 (Fed. Cir. 2005). The requirement for a reasonable expectation of success is such a patent law principle that it is less easily satisfied where predictability is lacking, as it is here. *See, e.g., In re Shetty*, 556 F.2d 81, 86 (C.C.P.A. 1977); *In re Kratz*, 592 F.2d 1169, 1175 (C.C.P.A. 1979).

Moreover, Sicor's reliance on the Supreme Court's reference to "common sense" in *KSR* as part of the broad obviousness inquiry is inappropriate here. (*See* DB 22.) The *KSR* Court noted only that in some fields, like the mechanical brake pedal there at issue, there might be "little discussion of obvious techniques or combinations" because market demand rather than scientific literature drives design considerations." *KSR*, 127 S.Ct. at 1741. The human medical use of vasodilators, however, is surely not such a field. Indeed, Sicor's expert, Dr. Strauss, identified 20,000 publications looking into the physiological effects of adenosine after

Dr. Berne's 1963 publication on the "adenosine hypothesis." (Strauss 767:8-13.) This is not a field where the body of prior technical knowledge had not been reduced to writing and in which the dictates of unpublished "common sense" drive development decisions.

Dr. Binkley offered opinions that "there was great interest" in vasodilating agents and that "adenosine would have appealed" to physicians treating congestive heart failure because of its short half-life, but he did not offer any basis by which a physician would reasonably expect that adenosine could be used successfully for that purpose. (*See* Binkley 1370:15-1371:24.) As discussed above, far from reasonably expecting success in patients with a history of coronary artery disease, the field eschewed use of adenosine as a vasodilator in humans for 50 years, and Dr. Sollevi, concerned about the effects of adenosine infusion in heart patients, excluded such patients from his study. (*See* TX-1170; Sollevi 441:16-442:2.) In the face of such contrary evidence, it is not enough for Dr. Binkley simply to assert that the use of adenosine would have "appealed" to those in the field or that those in the field would have been "interested" in knowing whether adenosine could be used as a vasodilator in congestive heart failure.

Further demonstrating the disconnect between Dr. Binkley's general opinions about "interest" and an actual opinion about what would have been obvious, Dr. Binkley opined that one of ordinary skill might "consider" using adenosine for myocardial perfusion imaging in September 1985 based on knowledge that dipyridamole worked by influencing levels of endogenous adenosine. (*See* Binkley 1374:4-1375:7.) Yet, when pressed on cross examination as to whether he meant that that use would have been obvious, Dr. Binkley said no. (Binkley 1491:5-12.)

While the Supreme Court in *KSR* directed that courts must not focus unduly on the problem the inventor was trying to solve where other needs or problems in the field might have

suggested the claimed invention (*see KSR*, 127 S.Ct. at 1742), Sicor has failed to offer reliable evidence that one of ordinary skill in the art would have expected adenosine infusion to be successfully useable for any medical use other than controlled hypotension and then only with a dipyridamole pretreatment.

III.    **SICOR FAILED TO PROVE OBVIOUSNESS IN VIEW OF THE FUKUNAGA PRIOR ART**

A.    **Sicor Ignores Direct Evidence of ATP's Direct Vasodilating Activity in Human Patients in Favor of Assumptions by Dr. Binkley**

Sicor also asserts that the *Fukunaga 1982* abstract would have rendered the claimed invention obvious because one of ordinary skill would know that adenosine, not ATP, was causing selective arterial vasodilation. (DB 29-30.) As an initial matter, the *Fukunaga 1982* abstract says nothing about selective arterial vasodilation and the cardiac output data is too convoluted for one of ordinary skill to have drawn a meaningful conclusion that the vasodilation was primarily arterial. (TX-42; Klabunde 545:6-546:2, 548:9-20.) More importantly, direct evidence from human patients shows that ATP was having its own effect, wholly apart from any effect due to adenosine.

As discussed in Plaintiffs' Opening Brief (PB 24-25), the *Fukunaga 1984* abstract reported using a dose of 32 mcg/kg/min of ATP (alleged by Dr. Binkley to correspond to about 16 mcg/kg/min of adenosine) after pretreatment with dipyridamole to reduce blood pressure by about 40%. (Klabunde 549:4-550:24, 1044:5-25.) Dr. Sollevi needed approximately 140 mcg/kg/min to get the same effect with adenosine after pretreatment with dipyridamole. (Klabunde 549:4-550:24, 1044:5-25.) This requirement for significantly more adenosine than ATP to obtain the same effect was utterly inconsistent with the idea that ATP in humans was reducing blood pressure merely by acting as a precursor whose effects were being mediated primarily through adenosine. Prior art publications had shown that when ATP worked by being

25

broken down into adenosine (as it did in the treatment of PSVT) ATP was less potent than

adenosine, not more potent.  (TX-36 at 1262; TX-152 at 198; Binkley 1459:20-1460:14;

Klabunde 1211:20-1213:8.)  That ATP was more potent than adenosine as a vasodilator in

humans indicated a direct ATP-mediated vasodilator action.  (Klabunde 551:20-552:3,

1044:5-25, 1117:5-1118:21.)

  This direct evidence is more compelling than Dr. Binkley's bare opinions, which he

admitted were based on the "simplifying assumption" that 100 percent of ATP would have been

broken down into adenosine.  (Binkley 167:20-168:12.)  Indeed, if Dr. Binkley's assumption

held true, one would have predicted that only 16 mcg/kg/min of adenosine would have been

required for Dr. Sollevi to obtain a hypotensive drop in blood pressure in the presence of a

dipyridamole pretreatment.  (Klabunde 549:21-550:14.)  In fact, nearly ten times more adenosine

(140 mcg/kg/min) was required to achieve the same 40% reduction in blood pressure.  (Klabunde

550:15-24.)

  As the party bearing the burden of proof, it was incumbent upon Sicor to offer sufficient

scientific evidence in human patients to support its assertions.  But Sicor lacks direct evidence

that ATP was working to lower blood pressure simply via conversion to adenosine in human

patients.  Indeed, as noted above, the only direct evidence shows just the opposite.

  A party relying on indirect evidence to prove a metabolic effect in the body faces the risk

of a failure of proof.  For example, the Federal Circuit has affirmed district court findings of

noninfringement where patentees attempted to prove infringement due to metabolic breakdown

based on unsubstantiated models and indirect proof.  *See Alza Corp. v. Mylan Labs., Inc.*, 464

F.3d 1286, 1295 (Fed. Cir. 2006) ("To prove infringement, Alza bore the burden of proving,

*inter alia,* that Mylan's accused generic formulation exhibited an *in vivo* release profile falling

within the claimed ranges at the relevant times."); *see also Zenith Labs. Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1424 (Fed. Cir. 1994) ("Zenith is correct that there was a failure of proof as to whether any crystals, assumed to form in the stomach from ingested cefadroxil DC, literally infringe the '657 claim."). Sicor's burden of proving invalidity by clear and convincing evidence here is even higher than the mere preponderance burden born by the patent owners in *Alza* and *Zenith*. Consequently, Sicor has failed to prove by clear and convincing evidence that the vasodilation in *Fukunaga* was simply the result of breakdown of ATP to adenosine in the blood or that one of ordinary skill would have perceived it to be such.

The publications Sicor now relies on to bolster its position cannot overcome its lack of direct evidence in human patients. While Dr. Binkley offered various statements from *animal* studies concerning the breakdown of ATP to adenosine, he admitted that there were significant interspecies differences in the action of adenosine and ATP and other limitations on animal studies. (Binkley 1460:15-1462:2, 1464:22-1467:23.) Moreover, as discussed in Plaintiffs' Opening Brief (PB § VIII.A.), many of the ATP metabolism references about which Dr. Binkley testified at trial were not disclosed in his expert report.

**B.      Sicor's Assertion of What One of Ordinary Skill *Would Have* Done is Flatly Contradicted by What Dr. Fukunaga *Actually Did***

Sicor's absolute reliance on hindsight to recast the actual thinking in the prior art is nowhere more clear than in its assertion that the *Fukunaga 1982* abstract concerning administration of ATP without dipyridamole would have made the administration of adenosine without dipyridamole obvious. Sicor's assertion of what one of ordinary skill *would have done* is plainly tainted by hindsight because it can be tested against what one of extraordinary skill, Dr. Fukunaga, *actually did*. After the publication of his own abstract on the administration of ATP and after the publication of Dr. Sollevi's abstracts on the administration of adenosine with

dipyridamole pretreatment, Dr. Fukunaga did *not*, as Sicor suggests one of ordinary skill in the art would have done, administer adenosine without dipyridamole pretreatment.  Instead, he *added* dipyridamole pretreatment to his own protocol using ATP, for the explicit purpose of reducing the necessary dose and avoiding side effects.  (TX-51; Klabunde 1045:2-1046:13.)  Moreover, he explicitly recommended the use of ATP rather than adenosine.  (TX-51.)  As noted above, proof of obviousness cannot be supported by picking and choosing only so much of the prior art as supports the allegation.  Obviousness must be judged based on the state of the prior art as a whole.  *Wesslau*, 353 F.2d at 241.

## IV.    SICOR DISMISSES THE CONTEMPORANEOUS EVIDENCE OF NONOBVIOUSNESS

### 1.    Contemporaneous Writings Show Serious Concerns About the Side Effects Sicor Dismisses as Unimportant

Sicor asserts that concerns about side effects constitute a "single common theme" with respect to Plaintiffs' objective or "secondary" evidence of nonobviousness.  (DB 30.)  Of course, as discussed above, the question of whether the teachings in the prior art would have encouraged or discouraged one of ordinary skill in the art is a subsidiary part of the required assessment of the scope and content of the prior art under *Graham v. John Deere Co.*, 383 U.S. 1 (1966).  *See Dystar,* 464 F.3d at 1360.  However, the evidence of concern in the prior art about side effects is also relevant to the evidence of skepticism by experts and unexpected results, both constituting secondary indicia of nonobviousness.

Sicor asserts that side effects associated with adenosine administration were "typically relatively mild and short in duration" and thus would not have discouraged one of ordinary skill in the art.  (DB 31.)  But this view does not explain why so many years passed between the first administration of adenosine to humans in the 1930s and Dr. Sollevi's work in the 1980s.  Sicor's suggestion that the gap was "due to the lack of an approved pharmaceutical-grade product

suitable for human injection" (DB 10) merely begs the question:  why had no one sought and

obtained such approval to market adenosine?  The record here reflects that adenosine for human

use was readily available to Jeezer in the 1930s (TX-187), DiMarco in 1983 (TX-36), Sollevi in

1983 (TX-1170), and Biaggioni in 1985 (TX-1187).  (*See* Binkley 1491:17-1494:7.)  Availability

was not the impediment.  Concern over safety was.

> **a.** **Dr. Berne's Publication of the Adenosine Hypothesis**
> **Did Not Lead to Consideration of Adenosine as a**
> **Pharmaceutical Vasodilating Agent**

Sicor further contends that renewed interest in adenosine was spurred by a "seminal

publication in 1980 in Circulation Research (TX-228)," referring to a review article by Berne

concerning the "adenosine hypothesis" (DB 10), which identified adenosine as a mediator of

vasodilation in the coronary arteries.  Notably, Sicor cites no testimony to support its contention.

In fact, the record does not support Sicor's assertion that the 1980 article "placed adenosine

squarely at the forefront" of research on vasodilators.  Both Dr. Klabunde and Dr. Binkley

agreed that the real seminal paper on the adenosine hypothesis was published by Dr. Berne

*seventeen years earlier*, in 1963.  (*See* Binkley 247:4-12; Klabunde 1071:25-1072:25.)  That no

one between 1963 and the early 1980s tested or suggested the use of adenosine infusion as a

selective arterial vasodilator is compelling evidence that the recognition of adenosine as a

naturally-occurring "endogenous" vasodilator simply did not lead to the further recognition that

it might be useful as an "exogenously" administered pharmaceutical.  As observed by the

Supreme Court more than a century ago in *Hobbs v. Beach*, 180 U.S. 383, 392 (1901):

> It appears from the testimony that several of these addressing
> machines, of which that of Dennis and York is a type, and which
> are now claimed to have inspired the Beach patent, had been upon
> the market for many years, and yet it never seems to have occurred
> to any one engaged in the manufacture of paper boxes that they
> could be made available for the purpose of attaching strips to the
> corners of such boxes.  This very fact is evidence that the man who

discovered the possibility of their adaptation to this new use was
gifted with the prescience of an inventor.

Indeed, the researchers who wrote in 1971 that the use of adenosine "ha[d] been

precluded both by the transitory nature of its vasodilator effects and by its toxic actions on the

heart" (TX-214 at 415) would already have been well aware of the adenosine hypothesis.

Nothing in Dr. Berne's later 1980 review would have changed this prior art view of adenosine,

which was still firmly entrenched when Dr. Sollevi carried out his studies.

> **b.    Dr. Sollevi's Testimony and the 1980s-Vintage
> Correspondence of Drs. Berne and Robicsek Is
> Compelling  Evidence of the State of Mind of Experts in
> the Field and Is Not Inadmissible Hearsay**

Evidence that experts in the field were skeptical or disbelieving of the claimed invention

is acknowledged as compelling objective evidence of nonobviousness.  *See United States v.*

*Adams*, 383 U.S. 39, 52 (1966); *In re Dow Chem. Co.,* 837 F.2d 469, 473 (Fed. Cir. 1988);

*Burlington Indus., Inc. v. Quigg,* 822 F.2d 1581, 1584 (Fed. Cir. 1987).  Of course, skepticism

and disbelief are states of mind that are generally inferred from the available evidence rather than

proven directly.  Such evidence of a declarant's then-existing state of mind is specifically

excepted from the hearsay rule under Fed. R. Evid. 803(3).  *See Kraft Gen. Foods, Inc. v. BC-*

*USA, Inc.,* 840 F.Supp. 344, 348 (E.D. Pa. 1993) (allowing witness to testify about customer

statements of product confusion where such confusion was relevant to deciding trademark

action); *see also Citizen's Fin. Group, Inc. v. Citizens Bank of Evans City,* 383 F.3d 110, 133 (3d

Cir. 2004).

Dr. Sollevi recounted, for example, how Dr. Berne had initially thought it "crazy" to

administer adenosine by infusion (Sollevi 453:13-454:3) and how he later wrote to Dr. Sollevi

reiterating his surprise that Sollevi had not observed AV block in his patients, because Berne

observed AV block with adenosine at levels that did not cause hypotension.  (TX-49; Sollevi

459:3-22.)  Dr. Robicsek discussed in correspondence with Dr. Sollevi and the editor of a

medical journal how he was concerned about uric acid buildup and how he had *ceased* his own

work with adenosine infusion and never applied it in humans because of those concerns.

(TX-265; TX-410; Sollevi 467:5-468:7, 471:15-472:17.)  Just as testimony from a

business-person about out-of-court statements by customers confused by a similar product is

admissible to demonstrate the state of mind of the customer, testimony and written statements

reporting concern, surprise, and disbelief by experts in the field are admissible to show the

skeptical state of mind of those experts.

Moreover, as discussed in Plaintiffs' Opening Brief (PB 32), the letters themselves are

admissible on the separate basis of being authenticated "ancient documents," *i.e.*, documents in

existence for more than 20 years at the time they are offered into evidence.  *See* Fed. R. Evid.

803(16), 901(b)(8).  Dr. Sollevi testified that the letters from Drs. Berne and Robicsek were part

of a chain of ongoing correspondence he had received on or about the dates indicated on the

documents and that he had maintained the letters in his custody since that time.  (*See, e.g.,*

Sollevi 454:8-15, 455:5-23, 459:3-12, 467:5-17, 471:15-472:1.)  The standard for admissibility

of documents as "ancient" under Fed. R. Evid. 901(b)(8) is low, merely requiring that the

document "is in such condition as to create no suspicion concerning its authenticity, was in a

place where, if authentic, it likely would be, and has been in existence 20 years or more at the

time it is offered."  *United States v. Stelmokas*, 100 F.3d 302, 312 (3d Cir. 1996).  In light of Dr.

Sollevi's foundational testimony, there can be little question that the letters are authentic.

Indeed, Sicor did not even cross-examine Dr. Sollevi at trial about his custody of the letters.[6]

---

[6]  Examples in this Circuit and others show admission of the contents of ancient
documents over authenticity and hearsay objections under circumstances considerably more
convoluted than here.  *See, e.g., Stelmokas,* 100 F.3d at 312 (affirming district court's admission
(continued…)

Rule 901(b)(8) works hand-in-hand with Rule 803(16) such that documents authenticated and

qualifying under Rule 901(b)(8) as ancient documents are "automatically" excepted from the

hearsay rule. *Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1375-76 (3d Cir.

1991); *see also Stelmokas*, 100 F.3d at 312; *Celotex*, 914 F.2d at 30. Consequently, in view of

the clear evidence of authentication, Sicor's hearsay objection to the Berne and Robicsek letters

must also be overruled.

Beyond its evidentiary objections, Sicor criticizes the correspondence from Drs. Berne

and Robicsek as "too vague" to be interpreted, suggesting that it lacks detail with respect to dose,

method of administration, and other factors. (DB 34). Sicor is wrong as a matter of fact. For

example, Dr. Berne's statement in his February 1985 letter (TX-49) that "we get AV block with

doses of adenosine that do not lower blood pressure (see enclosed reprint)" is clearly reflected in

the 1983 DiMarco et al. article (TX-36), which Dr. Sollevi identified as the reprint referred to in

the letter. (*See* Sollevi 460:3-20; TX-36 at 1259 ("Adenosine also did not produce hypotension

when administered to patients during [PSVT].").) Similarly the parameters of Dr. Robicsek's

studies in dogs were set forth in a published article by Masters et al. in 1982. (*See* TX-255 at 16,

19; Sollevi 463:15-23.) More importantly, however, both Drs. Berne and Robicsek were clearly

aware of and were referring to their concern and surprise with respect to *Dr. Sollevi's* studies.

Dr. Robicsek's October 1985 letter to the editor of the Scandinavian Journal of Thoracic and

---

(…continued)

over hearsay and authenticity objection of documents from Lithuanian government archives establishing Stelmokas's role in war crimes during World War II); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) (affirming district court's admission of 1940s era unpublished scientific report on asbestos safety despite defendant's objection that it needed to test the reliability of the report's assertions); *United States v. Kairys*, 782 F.2d 1374, 1379-80 (7th Cir. 1986) (upholding admission of World War II era SS identification card as ancient document despite questions as to chain of custody). Note that Rule 901(b)(4) provides yet another basis for authenticity because the documents are part of a chain of correspondence. Advisory Committee Note at Example 4.

Cardiovascular Surgery (TX-410) even included a citation to one of Dr. Sollevi's publications. (*See* TX-410, citing TX-441; Sollevi 461:10-462:9.)  That publication concerned Dr. Sollevi's use of a continuous infusion of adenosine without dipyridamole pretreatment at a dose of 100 mcg/kg/min to reduce platelet loss in patients undergoing surgery.  (TX-441 at 156; Sollevi 461:10-462:9.)  Thus, contrary to Sicor's assertions, the parameters of the studies referred to in the correspondence are not in question.

Sicor also belittles the concerns in the prior art about AV block and uric acid buildup, essentially suggesting that such concerns should be dismissed absent proof of actual injuries caused by adenosine infusion in the prior art.  (*See*, *e.g*., DB 32 ("AV block had only been observed in connection with administration of much greater amounts of adenosine as a bolus injection."); DB 33 ("Plaintiffs cannot point to any discussion in the published literature of the effects of high levels of uric acid following adenosine administration.").)

Sicor's statements simply ignore unequivocal statements in the prior art reflecting these concerns.  (*See, e.g.,* TX-214 at 415.)  In addition to the correspondence discussed above, Dr. Robicsek, wrote in his published study of adenosine's effects in dogs that "toxicity related to kidney dysfunction may limit the use of adenosine alone and may require xanthine oxidase inhibition to prevent uric acid crystallization in the renal tubules.  Our present experiments are addressing this possible problem."  (TX-255 at 19.)  Of course, Dr. Robicsek's later correspondence reveals that he never succeeded in addressing the "possible problem" of uric acid buildup but abandoned the project *because* of this perceived problem.  (TX-410; TX-265; Sollevi 467:20-468:7, 472:10-14.)  Moreover, while Dr. Binkley opines that one of ordinary skill would have simply administered xanthine oxidase inhibitors with adenosine to alleviate any concern about uric acid (Binkley ), plainly Dr. Robicsek did not believe such co-treatment would

eliminate the problem, as demonstrated by his decision not to proceed with studies in humans. (TX-410; TX-265; Sollevi 467:20-468:7, 472:10-14.)  Dr. Fukunaga also cited uric acid buildup as a risk of administration of ATP.[7]  (TX-51.)

In addition, Sicor's focus on whether there were actual injuries due to adenosine misses the point.  A method need not *actually be* harmful or dangerous in order to be nonobvious.  Such a standard would be nonsensical, essentially assuring that a drug or medical procedure that defied expectations in terms of safety would be denied patentability by virtue of its success. Indeed, the Supreme Court in *KSR* acknowledged that mere perceptions of danger may constitute sufficient teaching away to support a finding of nonobviousness.  *See KSR,* 127 S.Ct. at 1740. The Court noted, discussing the case of *Adams*, that "[w]hen Adams designed his battery, the prior art warned that risks were involved in using the types of electrodes he employed. The fact that the elements worked together in an unexpected and fruitful manner supported the conclusion that Adams's design was not obvious to those skilled in the art."  *Id.* Adams was not required to show *actual* failures or injuries resulting from his choice of electrodes.  What mattered were the *perceptions* of those in the field that such dangers existed.  As the C.C.P.A. noted more than forty years ago, the issue is not whether "those skilled in the art could discover what appellant discovered by doing what he did.  This is unquestionably so, but the issue under the law is whether it would be obvious to do what he did."  *In re Lemin*, 364 F.2d 864, 867 (C.C.P.A. 1966); *accord, In re Oelrich*, 579 F.2d 86, 92 (C.C.P.A. 1978).

---

[7]  There is no inconsistency between Plaintiffs' pointing out that ATP differs from adenosine and has its own effects while citing the common concern over uric acid with both compounds.  (DB 35.)  The problem arises with both compounds because both are ultimately degraded in the body to form uric acid.  (Klabunde 541:9-16.)

### 2.     It Was Unexpected that Such a Low Dose of Adenosine Could Be Used In the Absence of Dipyridamole

As discussed in detail in Plaintiffs' Opening Brief and Findings of Fact, it was unexpected that adenosine could be administered effectively at the low doses in claims 1, 3, 7, and 9.  (PB 9-10, 34.)  In particular, claim 7 is limited to administration of adenosine by continuous infusion at a dose between 10 mcg/kg/min and 150 mcg/kg/min.  (TX-275 at col. 22, ll. 41-47 (reciting dose range of 0.01 to 0.15 milligrams of adenosine per kilogram body weight per minute).)  Nothing in the prior art cited by Sicor suggested any medical use of adenosine infusion without dipyridamole pretreatment at such a low dose range.  To the contrary, prior art studies suggested that much higher doses would have been required in the absence of dipyridamole.  (*See, e.g.,* Klabunde 529:6-530:8, 535:13-536:8, 537:5-538:6, 1050:11-1051:8.)

Apparently referring to previously undisclosed opinions regarding possible uses of adenosine other than controlled hypotension, Dr. Binkley opined that a person of ordinary skill would have believed he or she could obtain "at least some degree of selective arterial vasodilatation" at a dose of 140 mcg/kg/min or higher without dipyridamole pretreatment. (Binkley 154:23-155:8.)  Aside from being improper for reasons noted in § II.B.2., *supra*, that opinion was based on Dr. Binkley's theory that one of ordinary skill would have concluded that dipyridamole was no longer having an effect at the end of the adenosine infusion period in Dr. Sollevi's studies.  (*See* Binkley 154:9-155:8.)  As discussed above, however, that theory was also not disclosed in Dr. Binkley's expert report and is inconsistent with the statement in the *Sollevi II* abstract that adenosine levels returned to baseline within 3 to 9 minutes, as opposed to the 40 seconds that would have been expected if there really were little dipyridamole effect.  (*See* Binkley 261:12-265:23.)

### 3.    Sicor's Critique of the Commercial Success of Adenoscan® Rings Hollow In the Face of Its Efforts to Copy the Drug

Predictably, Sicor fights vigorously in this litigation for the right to make generic adenosine for infusion according to the claimed invention but criticizes Adenoscan, the product embodying that use, contending that its "sales levels are the product of economic factors and do not demonstrate any superiority of this drug that would suggest that the '296 patent was not obvious." (DB 36.)  Defendants have made such arguments for a hundred years or more, and courts have always been duly skeptical.  As explained by the Supreme Court in a case involving a patented tire design, "[the defendant] gives the tribute of its praise to the prior art; it gives the Grant tire the tribute of its imitation, as others have done." *Diamond Rubber*, 220 U.S. at 441. Indeed, Sicor never explains why it is intent on selling a generic form of Adenoscan[8] if Adenoscan's commercial value is solely due to the marketing efforts of Astellas, which would not be expected to continue after generic entry.

As discussed in Plaintiffs' Opening Brief (PB 38-39), Sicor's economic theories are grounded on the testimony of its economic expert, Dr. Leffler, an "expert" who has been specifically criticized in written opinions for having offered unsupported or unreliable opinions. *See, e.g., F.T.C. v. Freeman Hospital*, 911 F. Supp. 1213, 1219 (W.D. Mo. 1995) (finding that Dr. Leffler's use of "erroneous data casts doubt on the reliability of his calculations."); *Howerton v. Grace Hospital*, No. 4:90CV187, 1995 WL 787529 at *15 (W.D.N.C. July 5, 1995) (criticizing Dr. Leffler's opinion for using "selective factual allegations often not supported by the record . . . ."); *In re Methionine Antitrust Litig.*, No. 00-1311, 2003 WL 22048232 at *4 (N.D. Cal. Aug. 26, 2003) (finding that Dr. Leffler did "none of the proposed analysis upon

---

[8]  Adenoscan® (Adenoscan) is the registered trademark for adenosine for use in MPI marketed by Astellas.

which the Court relied in granting [plaintiff's] motion for class certification" and that Dr.

Leffler's regression analysis failed to account for factors that had served as "the whole premise

behind his original methodology"). Dr. Leffler's opinions here suffered from similar errors and

inaccuracies.

In actual fact, the record shows that sales of Adenoscan were driven by the characteristics

of the invention, not promotion. (Hay 1712:17-1713:20, 1738:22-1740:1, 1754:10-1757:19,

1796:22-1798:1.) Adenoscan's sales grew because clinicians recognized significant advantages

flowing from the use of Adenoscan. (Hay 1796:22-1798:1; *see also* Hay 1754:10-1757:15;

Klose 1516:17-1517:25.) Sicor's arguments are inconsistent with the strong evidence that

doctors recognized significant therapeutic advantages in Adenoscan and used it because of those

advantages. (Hay 1796:22-1798:1, 1754:10-1757:15; Strauss 784:6-786:6; White

1353:19-1354:16.) Sicor overstates the impact of promotion and fails to acknowledge that

pharmacologic stress agents are sold to expert consumers, cardiologists and nuclear medicine

specialists, who are not swayed by pure promotion because their patients' health depends on

their medical diagnosis and treatment decisions. (White 1231:22-1232:7; Hay 1712:6-1713:25,

1754:14-1757:15, 1797:2-1798:1; Klose 1532:17-1533:6.)

Although Sicor contends that the pharmacologic stress market was an ideal market for a

new entrant (DB 36-37), in fact, shortly after its launch, Adenoscan had to compete with a

significantly cheaper generic dipyridamole in an extremely cost conscious health care

environment. (Hay 1738:22-1740:1.) Astellas's Vice President of Marketing and Sales for the

Critical Care Unit identified this as the biggest sales challenge facing Adenoscan. (White

1246:1-11.) This challenge made the pharmacologic stressor market far from an "ideal" market

for Adenoscan. Furthermore, while Sicor suggests that Fujisawa devoted an unusual amount of

resources to the marketing of Adenoscan (DB 37), the actual promotion was typical in the industry at the time.  (TX-19; TX-24 at 54; TX-1165; Hay 1742:3-1749:10, 1757:20-25; DTX-2041.)

Sicor also suggests that the increase in Adenoscan sales can be attributed to a general growth in demand for pharmacologic stress testing.  (DB 37.)  But the trend in Adenoscan's sales growth exceeds the general market growth.  Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005.  (TX-19; Hay 1714:13-1716:9; DTX-2014.)  More importantly, its market share grew too.  In December of 1995 Adenoscan held just 16.5% of the market share of scans and dipyridamole held 76%.  (TX-21; Hay 1731:11-22; DTX-2029.)  By June of 2005 Adenoscan's market share had grown to 61.4% of scans and dipyridamole's market share had fallen to 32%.  (TX-21; Hay 1731:23-1733:3; Leffler 1674:8-21; DTX-2030; DTX-2031.)  Indeed, despite being seven to ten times cheaper than Adenoscan, dipyridamole's sales growth significantly lagged that of both Adenoscan and the pharmaceutical stressors market.  (Hay 1733:4-1734:11; DTX-2032.)

To counter this evidence of remarkable commercial success, Sicor alleges that Plaintiffs have failed to demonstrate the required nexus between the claimed invention and the alleged commercial success of their product.  (DB 31, citing *Ormco Corp. v. Align Tech, Inc*., 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).)  In *Ormco*, the Federal Circuit found the requisite nexus lacking between the claimed invention and the plaintiff's commercial product, which was a set of numerically ordered dental appliances ("invisible braces").  *Id*. at 1313.  According to the court in *Ormco*, commercial success was due to unclaimed or non-novel features of the tooth repositioning devices at issue, such as the aesthetic appeal and improved comfort of transparent devices, neither of which were claimed, but which were attributes found in third party prior art

devices. *Id*. at 1306, 1312. Because the attributes deemed essential for commercial success were divisible from the invention as claimed and found in the prior art, the court in *Ormco* held that there was no nexus between the claimed invention and the commercial success of the product. *Id*. at 1311-12.

In contrast, the attributes leading to commercial success here are not divisible from the invention and were not known in the prior art. Adenoscan is preferred to the competitor product because it constitutes an administration of a continuous adenosine infusion to human patients, specifically for pharmacologic myocardial perfusion imaging. (TX-75; TX-138 at 300; Wackers 892:2-13, 893:1-894:3.) Adenosine is safer than the competitor product, which is why experts like Dr. Strauss use it in their practices. (Strauss 786:3-6; Wackers 892:2-13.) The safety and efficacy of the invention is one and the same with what is claimed, not some feature divisible from what is claimed, as in *Ormco*.

Notwithstanding the contentions of Sicor and Dr. Leffler, the overwhelming bulk of the evidence supports the view that Adenoscan was an overwhelming commercial success whose sales were driven by significant product advantages that made it more attractive to physicians.

## V.    SICOR FAILED TO PROVE ANTICIPATION IN VIEW OF FUKUNAGA

Sicor invites legal error by ignoring the patent claims in its inherent anticipation analysis. Proof of anticipation requires that "each and every element as set forth in the claim is found, either expressly or inherently described in a single prior art reference." *Verdegaal Bros., Inc.* v. *Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). Sicor's brief admits that the "Fukunaga Abstract [*Fukunaga 1982*] discloses the continuous administration of ATP." (DB 40.) Based on that admission alone, there should be no question that the *Fukunaga 1982* abstract does not anticipate because each of the asserted claims 1, 3, 7, and 9 recites a method that requires "administering . . . adenosine." (TX-275 at col. 22; Klabunde 505:7-16, 514:8-25.)

While Sicor asserts that *Fukunaga 1982* discloses "the administration of ATP at a rate that is equivalent to the claimed rates of adenosine administration" (DB 40), this assertion misses the point that the claimed method *requires* administering adenosine, not ATP or any other alleged "equivalent."  Moreover, as discussed above, Sicor's contention that ATP breaks down into a calculable "equivalent" amount of adenosine is based on an unwarranted "simplifying assumption" by Dr. Binkley and ignores the clear evidence that ATP had its own powerful vasodilating effect in humans separate and apart from any activity associated with breakdown into adenosine.

Sicor further misapprehends the Federal Circuit's inherency analysis in *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1379-80 (Fed. Cir. 2003), and fails to acknowledge the controlling portion of that decision.  In *Schering,* the Federal Circuit invalidated *compound* claims to a metabolite (DCL) that was necessarily formed from an antihistamine drug whose administration for treatment of allergic reactions was known in the prior art.  *Id.* at 1380, 1382. Thus, because the formation of the claimed *compound*, DCL, was determined to be a natural result flowing from the prior art administration of the antihistamine, the claim to the DCL compound itself was held to be anticipated.  *Id.* at 1380.

Importantly,  and not mentioned by Sicor, the *Schering* court explicitly distinguished compound claims from method claims, such as the asserted claims of the '296 patent at issue here.  The court stated that "this case does not preclude patent protection for metabolites of known drugs" and noted that claims to a method of administering the DCL metabolite would not be anticipated by prior art administration of the precursor antihistamine.  *Id.* at 1381.  The court also specifically noted its approval of the district court's decision finding no anticipation of method and composition claims.  *Id.*

Thus, even leaving aside the factual issues concerning the extent and effect of ATP metabolism upon administration to human patients, Sicor's assertion that claims limited to methods of administering adenosine are anticipated by the prior art administration of ATP in *Fukunaga 1982* must fail.

## VI.    CONCLUSION

For the foregoing reasons, Sicor has failed to prove by clear and convincing evidence that the asserted claims of the '296 patent are invalid.  Plaintiffs respectfully request, therefore, that judgment in their favor be entered.

Dated:  June 19, 2007


___/s/ Mary B. Matterer_____          ___/s/ David E. Brand_____
Richard K. Herrmann #405                         Paul M Lukoff #96
Mary B. Matterer #2696                           David E. Brand #201
MORRIS JAMES LLP                                 PRICKETT JONES & ELLIOTT, P.A.
500 Delaware Avenue, Suite 1500                  1310 King Street
Wilmington, DE 19801                             Wilmington, DE 19801
(302) 888-6800                                   (302) 888-6520
mmatterer@morrisjames.com                        debrand@prickett.com

Charles E. Lipsey                                John Scheibeler
FINNEGAN, HENDERSON, FARABOW,                    WHITE & CASE LLP
  GARRETT & DUNNER, LLP                          1155 Avenue of the Americas
Two Freedom Square                               New York, NY  10036
11955 Freedom Drive                              (212) 819-8200
Reston, VA 20190-5675
(571) 203-2700                                   *Attorneys for Plaintiff*
                                                 *Item Development AB*
Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*