## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ITEM DEVELOPMENT AB, ASTELLAS US )
LLC, and ASTELLAS PHARMA US, INC. )
)
Plaintiffs, )
)
v. )          Civil Action No. 05-336 SLR
)
SICOR INC. and SICOR )
PHARMACEUTICALS, INC. )
)
Defendants. )
)
——————————————————————)

## PLAINTIFFS' PROPOSED COUNTERFINDINGS OF FACT AND
## COUNTERCONCLUSIONS OF LAW

Richard K. Herrmann #405
Mary B. Matterer #2696
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

Charles E. Lipsey
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*

Paul M Lukoff #96
David E. Brand #201
PRICKETT JONES & ELLIOTT, P.A.
1310 King Street
Wilmington, DE 19801
(302) 888-6520
debrand@prickett.com

John Scheibeler
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 819-8200

*Attorneys for Plaintiff*
*Item Development AB*

# TABLE OF CONTENTS

I.    PLAINTIFF'S COUNTERFINDINGS TO DEFENDANTS' PROPOSED
      FINDINGS OF FACT.................................................................................1

      A.    Counterfindings Regarding the '296 Patent.............................................2

      B.    Counterfindings Regarding the Background ............................................3

            1.    Counterfindings Regarding the State of the Art .........................3

            2.    Counterfindings Regarding the Level of Ordinary Skill in
                  the Art ...........................................................................................3

            3.    Counterfindings Regarding Vasodilators Generally....................3

            4.    Counterfindings Regarding Hemodynamic Parameters..............5

            5.    Counterfindings Regarding Adenosine........................................6

            6.    Counterfindings Regarding ATP ...............................................10

            7.    Counterfindings Regarding Dipyridamole.................................20

      C.    Counterfindings Regarding Obviousness in View of the Prior Art ......24

            1.    Counterfindings Regarding the Scope and Content of the
                  Prior Art .....................................................................................24

            2.    Counterfindings Regarding Motiviation to Administer
                  Adenosine for Any Medical Use Other Than Inducing
                  Controlled Hypotension .............................................................40

            3.    Counterfindings Regarding Motivation to Administer
                  Adenosine Without Dipyridamole Pretreatment.......................44

            4.    Counterfindings Regarding Secondary Factors .........................48

      D.    Counterfindings Regarding Anticipation................................................78

II.   PLAINTIFFS' COUNTERCONCLUSIONS TO DEFENDANTS'
      PROPOSED CONCLUSIONS OF LAW ..........................................................81

      A.    Counterconclusions Regarding Obviousness.........................................81

            1.    Counterconclusions Regarding Legal Standard.........................81

            2.    Counterconclusions Regarding Differences Between the
                  Claimed Invention Of the '296 Patent and the Prior Art ..........92

            3.    Counterconclusions Regarding the Sollevi Prior Art In
                  Combination with the Knowledge of a Person of Ordinary
                  Skill in the Art............................................................................94

            4.    Counterconclusions Regarding *Fukunaga 1982* In
                  Combination with the Knowledge of a Person of Ordinary
                  Skill in the Art............................................................................98

            5.    Counterconclusions Regarding Secondary Factors ..................102

     B.      Counterconclusions Regarding Anticipation ........................................................106

            1.      Counterconclusions Regarding Legal Standard......................................106

            2.      Counterconclusions Regarding *Fukunaga 1982* ....................................108

III.     CONCLUSION..............................................................................................................111

## I.    PLAINTIFF'S COUNTERFINDINGS TO DEFENDANTS' PROPOSED FINDINGS OF FACT

As an aid to the Court, Plaintiffs have prepared responses and counterfindings with an emphasis on issues believed to be most pertinent to this case.  Each response and counterfinding is in bold text immediately following the finding to which it pertains.  While each response and counterfinding indicates specific reasons for Plaintiffs' disagreement with Sicor's proposed finding, such responses and counterfindings do not necessarily encompass all of the bases for Plaintiffs' disagreement.  Moreover, the absence of a response or counterfinding to any specific proposed finding or part thereof does not constitute an admission that Plaintiffs agree with or concede that the proposed finding or any part thereof is correct as stated.

Additionally, Plaintffs provide the following glossary of abbreviations used herein to refer to the various post-trial filings:

- "PB" refers to Plaintiffs' Opening Post Trial Brief, as filed on May 9, 2007, (D.I. 151);

- "DB" refers to Defendants Sicor's Post-Trial Brief, as filed on May 9, 2007, (D.I. 150);

- "POB" refers to Plaintiffs' Opposition to Defendants' Post Trial Brief, as filed on June 19, 2007;

- "PFF" refers to Plaintiffs' Proposed Findings of Fact, as filed on May 9, 2007, (D.I. 152);

- "DFF" refers to Defendants' Proposed Findings of Fact, as filed on May 16, 2007, (D.I. 153);

- "PCF" refers to Plaintiffs' Counterfindings of Fact corresponding to the DFF of the same number, as filed on June 19, 2007;

- "PCL" refers to Plaintiffs' Proposed Conclusions of Law, as filed on May 9, 2007, (D.I. 152);

- "DCL" refers to Defendants' Proposed Conclusions of Law, as filed on May 16, 2007, (D.I. 153); and

- "PCC" refers to Plaintiffs' Counterconclusions of Law corresponding to the DCL of the same number, as filed on June 19, 2007.

### A.    Counterfindings Regarding the '296 Patent

DFF18.    The '296 patent has a priority date of September 24, 1985, and therefore the relevant time for prior art is on or before September 24, 1985.  (Binkley, Tr. 192:2-193:2; TX 275; DTX 3063.)

**PCF18.    The '296 patent has an effective filing date pursuant to 35  U.S.C. § 120 for the subject matter of the asserted claims of September 24, 1985.  (TX-275.)  While generally the relevant time for assessing the state of the art with respect to the '296 patent would be on or before September 24, 1985, publications describing Dr. Sollevi's own work cannot be relied upon to defeat patentability unless published before September 24, 1984. (*See* 35 U.S.C. §§ 102(a), (b).)**

DFF24.    Claim 7 of the '296 patent reads as follows:

> A method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering into the blood stream of said patient by intravenous administration about 0.01 milligrams to about 0.15 milligrams of adenosine per kilogram body weight per minute.

(TX 275, col. 22, ll. 41-47; DTX 3048.)

**PCF24.    Claim 7 of the '296 patent reads as follows:**

> **A method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering into the blood stream of said patient adenosine at a rate of administration of 0.01 to 0.15 milligrams of adenosine per kilogram body weight per minute.**

DFF26.    The specification of the '296 patent uses the term "preload" as equivalent to dilating veins and the term "afterload" as equivalent to dilating arteries.  (TX 275, col. 2, ll. 39-42.)

**RESPONSE:  Plaintiffs object to this finding as immaterial to any issue in dispute at trial.  Whether couched in terms of selective arterial vasodilation without inducing significant venous dilation or inducing a reduced afterload without reducing the preload, all claims require selective arterial vasodilation by adenosine, the hallmarks of which were a very clear-cut reduction in vascular resistance combined with essentially unaffected**

2

filling pressures of the heart, and without exception, an increase in cardiac output (the rate of blood flow pumping through the heart).  (Sollevi 433:23-434:11.)

### B.    Counterfindings Regarding the Background

#### 1.    Counterfindings Regarding the State of the Art

DFF27.    The field of art relevant to the '296 patent can be described broadly as the field of vasodilators and the related hemodynamic parameters, with a focus on the medical uses of vasodilators.  (Binkley, Tr. 95:9-24.)

**RESPONSE:  Plaintiffs object to the proposed finding as irrelevant because the only theory of invalidity disclosed in Sicor's expert reports was invalidity in view of prior art concerning inducing controlled hypotension in surgical patients, not other uses of vasodilation.**

#### 2.    Counterfindings Regarding the Level of Ordinary Skill in the Art

DFF28.    The person of ordinary skill in the art to which the '296 patent pertains is a cardiologist with a residency in internal medicine and two years of a cardiology fellowship, whose experience could also include nuclear cardiology imaging.  (Binkley, Tr. 95:25-96:7.)

**PCF28.    (*See* PFF160.)  A person of ordinary skill in the art would be a cardiologist whose training would have included medical school, a residency in internal medicine, and fellowship in cardiology.  (Klabunde 515:11-25; Binkley 95:25-96:7.)**

#### 3.    Counterfindings Regarding Vasodilators Generally

DFF38.    Vasodilators that act primarily to dilate arteries include adenosine, dipyridamole, and hydralazine.  (Binkley, Tr. 85:10-15; DTX 3004-I.)

**RESPONSE:  The portion of the transcript cited by Sicor (Binkley at 85:10-15) does not support this statement.  Thus, the following counterfinding, which is supported by the cited testimony, is proposed:**

**PCF38.    Nitro compounds are classic examples of venodilators that dilate primarily the veins.  (Binkley 85:10-15.)**

DFF41.    Vasodilators have been used in medicine since the early 1950s, when they were used in medication to treat hypertension (*i.e.*, high blood pressure) by "relaxing" the blood

vessels. (Binkley, Tr. 86:17-21.) For example, a vasodilator like hydralazine would be used to relax the arteries, and therefore reduce the patient's blood pressure. (Binkley, Tr. 86:17-87:12.)

**RESPONSE: Plaintiffs object to this finding as irrelevant because Defendants' expert reports did not disclose any theory of invalidity based on use of hydralazine in the 1950s to lower blood pressure. The only prior art medical use relied on in Sicor's expert reports concerned induction of controlled hypotension in surgical patients.**

**PCF41.     Not all vasodilators work interchangeably to lower the blood pressure. For instance, dipyridamole did not produce hypotension in Dr. Sollevi's studies, whereas adenosine did. (Klabunde 1166:4-20.) Moreover, adenosine did not lower mean arterial blood pressure in the *Biaggioni 1985* study of normal conscious volunteers. (*See* TX-1187; Klabunde 554:14-555:2.)**

DFF42.     Later, in the 1970s and early 1980s, vasodilators were also used in the treatment of congestive heart failure and to lower blood pressure during surgical procedures. (Binkley, Tr. 87:13-24.) In the case of congestive heart failure, doctors began using vasodilators to reduce blood pressure in order to allow the weakened heart muscle to function more efficiently. (Binkley, Tr. 87:16-21.) Doctors also began using vasodilators to reduce blood pressure during surgery in order to reduce the risk of bleeding. (Binkley, Tr. 87:22-24.)

**RESPONSE: Though Dr. Binkley suggested at trial that adenosine infusions would have been considered for the treatment of congestive heart failure, that assertion is nowhere in his expert reports. (*See* TX-26, TX-43.) Moreover, Dr. Binkley, a heart failure specialist, admits that to this day he has never continuously infused adenosine to treat a heart failure patient. (Binkley 1490:5-11.) As discussed above, Plaintiffs object to this finding as irrelevant because the only theory of invalidity disclosed in Sicor's expert reports was invalidity in view of prior art concerning inducing controlled hypotension in surgical patients, not other uses of vasodilators. Plaintiffs' response to Sicor's specific allegations concerning alternative uses of vasodilators is set forth in Plaintiffs' Opposition Brief at Section II(B).**

### 4. Counterfindings Regarding Hemodynamic Parameters

DFF55.    For example, if MABP (*i.e.*, pressure) decreases and CO (*i.e.*, flow) increases or remains the same, then resistance in the arteries, *i.e.*, SVR, must have also decreased. (Binkley, Tr. 94:17-95:7; DTX 3011-B-C.)  This relationship between the hemodynamic parameters is summarized by the following equation:

$$\text{Pressure (P)} \bullet = \text{Blood Flow (F)} \bullet * \text{Resistance (R)} \bullet.$$

(Binkley, Tr. 94:6-95:7; DTX 3011-B.)  From such information, *i.e.*, if MABP decreases and CO increases or remains the same, a person of ordinary skill in the art would conclude that arterial vasodilation had occurred.  (Binkley, Tr. 94:17-95:13.)

**RESPONSE:  While Dr. Binkley describes in general the theory that attempts to explain the hemodynamics of blood pressure, Dr. Sollevi specifically addressed the changes in hemodynamic properties observed in actual patients that indicate selective arterial vasodilation.  Thus, the following, more relevant, counterfinding is proposed:**

**PCF55.    (*See* PFF146)  Dr. Sollevi described the hallmarks of selective arterial vasodilation following an adenosine infusion as involving a clear cut reduction in vascular resistance combined with essentially unaffected filling pressures to the heart and, without exception, an increase in cardiac output (the rate of blood flow pumping through the heart). (Sollevi 433:23-434:11.)  Indeed, he observed such a decrease in vascular resistance, maintained filling pressure, and an increase in cardiac output in patients administered adenosine infusions.  (TX-37; TX-1170; TX-1169 at 232; Sollevi 433:23-434:11.)**

DFF56.    In the same example as the one described in paragraph 55, since CO did not decrease, a person of ordinary skill would conclude that there was little or no venous dilation. (Binkley, Tr. 95:5-13.)  If venous dilation had occurred, a decrease in flow would be expected. (Binkley, Tr. 95:11-13.)

**PCF56.    *See* PCF55.**

DFF57.    All of the facts recited *supra* in paragraphs 30-56 would have been known to a person of ordinary skill in the art at the beginning of September 1985.  (Binkley, Tr. 96:14-18.)

**PCF57.    As discussed above, Plaintiffs object to this finding as irrelevant because the only theory of invalidity disclosed in Sicor's expert reports was invalidity in**

view of prior art concerning inducing controlled hypotension in surgical patients, not other uses of vasodilators.  (*See* Responses and Proposed Counterfindings to DFF38, 41, 42, and 55.)

### 5. Counterfindings Regarding Adenosine

DFF61.    Molecules of adenosine in the bloodstream can either be metabolized, *i.e.*, eliminated through a process of converting adenosine to another substance, or bound to receptors in the artery wall through which the adenosine will act.  (Binkley, Tr. 102:4-103:24; DTX 3014-A-C, *see* white "cones.")

**RESPONSE:  This finding does not completely explain the complex set of chemical reactions that occur in the body when adenosine is metabolized.  Thus, the following counterfinding is proposed:**

**PCF61.    Adenosine does not simply "pool" in the body, it is rapidly converted into other substances.  (Binkley 274:6-9.)  When adenosine is metabolized, it is taken up by the red blood cells or certain sites on the artery wall and acted on by an enzyme called adenosine deaminase, which breaks the adenosine down into molecules such as hypoxanthine, inosine, and ultimately the end product, uric acid .  (Binkley 103:7-18, 274:1-4.)  However, adenosine is a part of a more complex metabolic pathway in the body. In that pathway, adenosine is created, *inter alia*, by the breakdown of ATP.  The ATP pathway can also work in reverse, taking available adenosine in the body and using it to build AMP, ADP, and ATP.  (Binkley 272:15-25.)  Thus, adenosine can either be reformed into AMP, ADP or ATP, or broken down into other metabolites including hypoxanthine, inosine, and ultimately the end product, uric acid  (Binkley 272:15-274:9.) (*See also* PFF64, 65, 144.)**

DFF62.    When adenosine is metabolized, it is taken up by the red blood cell or certain sites on the artery wall and acted on by an enzyme called adenosine deaminase, which breaks the adenosine down into molecules such as hypoxanthine and inosine.  (Binkley, Tr. 103:7-18; DTX 3014-A-C, *see* green "pacmen.")

**PCF62.    *See* PCF61.**

DFF65.        The increase in adenosine in the bloodstream necessarily results in an increase of the amount of adenosine binding to the receptors in the arterial wall; the effect is an increase in the relative degree of arterial vasodilation.  (Binkley, Tr. 105:13-106:13; DTX 3014-C-E.)  The more adenosine that is produced, the greater the magnitude of arterial vasodilation. (Binkley, Tr. 103:25-104:13.)

**PCF65.        While prior art studies concerning the "Adenosine Hypothesis" identified endogenous adenosine as a vasodilator capable of regulating blood flow in the coronary arteries, those studies on adenosine physiology did not identify it as a selective arterial vasodilator, nor did they describe adenosine as playing the same role in regulating blood flow in other parts of the circulatory system outside of the heart.  (*See, e.g.,* Klabunde 1077:21-1078:19, 1085:20-1087:9.)**

DFF66.        All of the facts recited *supra* in paragraphs 58-65 would have been known to a person of ordinary skill in the art at the beginning of September 1985.  (Binkley, Tr. 99:4-7, 106:23-107:4.)

**PCF66.        *See* Responses and Proposed Counterfindings to DFF61 and 65.**

DFF67.        Adenosine's potent vasodilator effects were recognized in the art as early as 1929, when Drs. A.N. Drury and A. Szent-Gyorgy published an article in the *Journal of Physiology* entitled "Physiological Activity of Adenine Compounds with Especial Reference to their Action Upon the Mammalian Heart."  (Binkley, Tr. 99:4-22; TX 35.)  In this foundation article, Drs. Drury and Szent-Gyorgy observed that adenosine and adenosine nucleotides "lower general arterial pressure.  This is due in part to the cardiac slowing and in part to a general arterial dilation."  (Binkley, Tr. 99:23-101:17; TX 35 at 236; DTX 3055.)

**RESPONSE:  This finding is only a partial description what the Drury and Szent-Gyorgyi article (TX-35) would have conveyed to one of ordinary skill in the art.  For completeness, the following counterfinding is proposed:**

**PCF67.        (*See* PFF21)  Although demonstrating that adenosine was a vasodilator, the studies published by Drury and Szent-Gyorgyi also revealed adenosine's ability to slow or stop electrical conduction in the heart, resulting in "AV block."(TX-35) "AV block" is the interruption of conduction in the AV node of the heart, which was known to coordinate the beating of the upper chambers of the heart (the atria) and the**

lower chambers (the ventricles).  **(TX-35 at 236; TX-36 at 1254; Binkley 244:13-245:17;**

**Klabunde 517:6-17, 519:8-520:18.)**

DFF68.    As discussed *supra* in paragraph 42, during the time period from the early 1970s to the 1980s, there was an increasing focus on the use of selective arterial vasodilators (like adenosine) to treat a number of cardiovascular conditions, including congestive heart failure and hypertension.  (Binkley, Tr. 86:17-87:24.)

**RESPONSE:  Though Dr. Binkley suggested at trial that adenosine infusions would**

**have been considered for uses such as the treatment of congestive heart failure,**

**hypertension, or "limb ischemia," those assertions were nowhere in his expert reports.  (*See***

**TX-26; TX-43.)  Plaintiffs object to this finding as irrelevant because the only theory of**

**invalidity disclosed in Sicor's expert reports was invalidity in view of prior art concerning**

**inducing controlled hypotension in surgical patients, not other uses of vasodilators.  Indeed,**

**prior to Sollevi's invention, the continuous infusion of adenosine alone was not considered**

**a viable option for any medical condition.  (*See generally* Plaintiffs' Proposed Findings of**

**Fact at § III(A).)  Thus, the following counterfinding is proposed:**

**PCF68.    Concerns existed about administering a compound such as adenosine,**

**known to be capable of inducing slowing of the heartbeat (bradycardia), temporary cardiac**

**arrest, and extreme hypotension, to patients with heart disease.  Indeed, Dr. Sollevi was**

**sufficiently concerned about the effects of adenosine in heart patients that he excluded such**

**patients from his studies.  (TX-1170; Sollevi 441:16-42:2.)  Tellingly, Dr. Binkley, a heart**

**failure specialist, admitted that even today he has never used adenosine to treat heart**

**failure as he proposed would have been obvious to one of ordinary skill in the art in 1985.**

**(*See* Binkley 1490:5-11.)  Moreover, none of the prior art relied on by Sicor refers to a**

**medical use for infusing adenosine other than inducing controlled hypotension during**

**surgery.  (*See* Binkley 256:7-17.)  While adenosine had been known since the 1920s and**

**vasodilators had been used to treat hypertension in the 1950s, adenosine infusions were not**

8

used for any medical purpose prior to Dr. Sollevi's studies in the 1980s. (Sollevi 438:1-7; Strauss 765:17-767:18.)

DFF69.     A seminal publication in *Circulation Research* by Dr. Robert Berne in 1980, "The Role of Adenosine in the Regulation of Coronary Blood Flow," observed that "adenosine is a very active vasodilator." (Binkley, Tr. 110:21-111:3; TX 228 at 807; DTX 3056.)

**RESPONSE: Nowhere in the cited testimony does Dr. Binkley call Dr. Berne's 1980 article (TX-228) a "seminal publication." Indeed, on cross-examination Dr. Binkley referred to a paper published seventeen years earlier by Dr. Berne as a "famous paper from that era." (*See* Binkley 247:4-12.) Thus, the following counterfinding is proposed:**

**PCF69.     The seminal publication on adenosine was not Dr. Berne's 1980 publication, but instead his 1963 publication. (*See* TX-113) It was this "classic" paper in which Dr. Berne proposed that endogenous adenosine might be the physiological molecule responsible for coronary vasodilation in response to low oxygen levels (hypoxia) in cardiac tissue. (TX-113 at 317, 321; *see* Klabunde 1071:25-1072:25; Binkley 247:4-12.) Dr. Berne's proposition set forth in this 1963 paper became known as the "Adenosine Hypothesis." (Binkley 247:4-12.) (*See also* PFF30-33.)**

DFF70.     Dr. Berne's article resulted in numerous animal and clinical studies to explore adenosine's medical uses. (*See, e.g.*, TX 36, TX 37, TX 40, TX 45, TX 88, TX 236, TX 1170, TX 1187, TX 5000.)

**RESPONSE: Plaintiffs object to this finding to the extent that it relies on documents not discussed in Dr. Binkley's expert reports (TX-88, TX-236, TX-5000; Binkley 1442:16-1443:24, 1505:6-1505:20) or not disclosed at all prior to trial (TX-5000). (*See* PB at 37-38.) The following counterfinding is proposed:**

**PCF70.     Sicor contends that renewed interest in adenosine was spurred by a "seminal publication in 1980 in Circulation Research (TX-228)," referring to a review article by Dr. Berne concerning the "Adenosine Hypothesis" (DB at 10), which identified adenosine as a mediator of vasodilation in the coronary arteries. Notably, Sicor cites no**

testimony to support its contention.  In fact, the record does not support Sicor's assertion

that the 1980 article "placed adenosine squarely at the forefront" of research on

vasodilators.  (DB at 10.)  Both Dr. Klabunde and Dr. Binkley agreed that the real seminal

paper on the adenosine hypothesis was published *seventeen years earlier*, in 1963.  (*See*

Binkley 247:4-12; Klabunde 1071:25-1072:25.)  That no one between 1963 and the early

1980s tested or suggested the use of an adenosine infusion as a selective arterial vasodilator

is compelling evidence that the recognition of adenosine as an endogenous vasodilator

simply did not lead to the further recognition that it might be useful as an exogenously

administered pharmaceutical.  (*See also* PFF30-33.)

### 6.     Counterfindings Regarding ATP

DFF71.          Adenosine triphosphate ("ATP") is a substance that is found in the human
body and is composed of an adenosine molecule bound to a "tail" composed of three phosphate
molecules.  (Binkley, Tr. 106:14-18, 107:22-108:24; TX 228; DTX 3016-A, *see* blue triangles.)

**RESPONSE:  This finding minimizes the chemical importance of the three**

phosphate groups present in ATP.  As is not uncommon with chemical molecules, the

presence of these additional atoms of phosphorus and oxygen gives ATP important

biological properties that adenosine lacks.  (Klabunde 505:17-506:18, 1117:5-1118:21.)  The

following counterfinding is proposed:

**PCF71.          (*See* PFF56)  ATP (adenosine triphosphate) is a high energy molecule**

with a chemical structure that includes three "phosphate groups" (collections of

phosphorous and oxygen atoms) not found in adenosine itself.  (Klabunde 505:17-506:18.)

(*See also* PFF56-59.)  The presence of these phosphate groups confers important properties

on ATP that adenosine lacks.  For example, ATP is the primary energy source in all cells

and is particularly present in the muscular tissue of the heart.  (Klabunde 506:7-10,

1102:6-1103:7; TX-113 at 317.)  Adenosine and ATP were also known to bind to different

receptors in the body.  (Klabunde 510:8-513:24; TX-151; *see also* PFF58.)

DFF72.        Within the body, ATP is constantly converted to adenosine by a reaction that is fundamental to human metabolism.  (Binkley, Tr. 108:1-109:9; DTX 3016-A-H.)  An enzyme called 5'-nucleotidase sequentially clips each of the phosphates off of the "tail," first converting the adenosine triphosphate to adenosine diphosphate, then to adenosine monophosphate, and then ultimately to adenosine.  (Binkley Tr. 108:1-109:9, 113:17-114:3; Klabunde, Tr. 1083:9-16, 1107:3-7; DTX 3016-A-H.)

**RESPONSE:  This proposed finding does not fully reflect the cited testimony.**

**Specifically, Dr. Binkley describes that this reaction can continue to form further metabolites, mentioning hypoxanthine and inosine, or that the phosphate groups can be added back on to reform ATP.  (Binkley 108:25-109:9.)  Thus, the following counterfinding is proposed:**

**PCF72.        In addition to recognizing ATP as a direct acting vasodilator, prior art investigators knew that it could be broken down by enzymes in the bloodstream into more than six different metabolites.  (TX-126 at 612; Binkley 272:15-274:9.)  Furthermore, the adenosine that is formed as a breakdown product of ATP does not simply "pool" in the body, it is rapidly converted into other substances.  It can either be reformed into AMP, ADP, or ATP, or broken down into other metabolites including hypoxanthine, inosine, or ultimately the end product, uric acid.  (Binkley 108:1-109:9, 274:1-9; see also PPF64, 65, 144.)**

DFF73.        This conversion is nearly immediate, as noted in several references published in the early 1980s, including one co-authored in 1984 by Dr. Sollevi.  (Binkley, Tr. 109:10-15, 111:8-112:17, 1418:21-1419:5; TX 228 at 807-08; TX 236 at 547; TX 5000 at 1196.)  In 1980, Dr. Berne observed that "it is virtually impossible to make accurate measurements of ATP in venous blood *since the nucleotide is rapidly degraded in blood* and also can be released from the cellular elements of the blood."  (TX 228 at 807 (emphasis added); *see also* Binkley, Tr. 111:23-112:17.)  In 1984, Dr. Sollevi wrote that ATP was nearly immediately converted to adenosine following administration:

> Using a quantitative HPLC method for purine determination, we recently have demonstrated that ATP given by the iv route is degraded entirely to adenosine and its breakdown products during the transpulmonary passage.

(TX 236 at 547; *see also* Binkley, Tr. 109:10-15, 111:8-112:17, 1418:21-1419:5; TX 228 at 807-08; TX 5000 at 1196.)

11

**RESPONSE: Plaintiffs object to this finding as relying on documents and testimony not disclosed in Dr. Binkley's expert reports (TX-88, TX-236, TX-5000; Binkley 1442:16-1443:24, 1505:6-1505:20) or not disclosed at all prior to trial (TX-5000; Binkley 1505:6-20). (*See* PB at 37-38.) This proposed finding is contradictory to other testimony at the trial, including, *inter alia*, testimony from Dr. Binkley. For instance, testimony indicated that metabolism of ATP differed in prior art studies of different species.**

**PCF73.        Prior art investigators knew that effects of ATP and its degree of metabolism would be different in different species. (*See, e.g.*, Klabunde 1215:19-1216:25; Binkley 1465:5-1466:15; TX-126 at 613-614.) Moreover, Sicor cited a study in dogs in which ATP apparently acted by being completely metabolized to adenosine. (TX-88; Binkley 396:4-397:17.) A different study by Fukunaga in rabbits, however, showed ATP to be the more potent vasodilator, demonstrating that, in rabbits, ATP was having a direct effect. (Binkley 267:9-269:6, 1465:5-1466:15; TX-87 at 275.) Indeed, Fukunaga commented in that rabbit study that "[a]lthough much information about the extracellular, especially cardiovascular, effects of the adenine nucleotides has been accumulated, clinical uses will require more information in different species and under a variety of conditions." (TX-87 at 277.) (*See also* PFF71-74.)**

DFF74.        The reaction that causes ATP to be constantly converted to adenosine would have been known to a person of ordinary skill in the art in 1985. (Binkley, Tr. 107:22-109:20, 109:25-110:10, 111:8-22; Klabunde, Tr. 1043:21-23.)

**PCF74.        While a person of ordinary skill would have understood the general nature of ATP's metabolism, it would have been impossible to predict the specific amount of each of ATP's various metabolites that would be formed or to separate their individual effects because they rapidly interconverted with each other and several of the interconverted molecules, including ATP, ADP, AMP, and adenosine, caused vasodilation**

in their own right.  (Klabunde 507:8-508:3, 1116:5-1117:4, 1220:19-1221:10; Binkley

272:15-274:9.)

DFF75.        The conversion of ATP to adenosine is equimolar.  (Binkley, Tr. 1415:19-
1416:9; TX 88 at 174.)  "Equimolar" means that a certain number of ATP molecules are
converted to the same number of molecules of adenosine.  (Binkley, Tr. 1416:4-9.)

**RESPONSE:  Plaintiffs object to this finding as relying on information not properly**

**disclosed in Dr. Binkley's expert reports.  (*See* Binkley 1412:2-1417:21, *particularly at***

**1412:2-15 and 1417:14-21, *see also* PB37-38.)  Thus, the following counterfinding proposed:**

**PCF75.        *See* PCF74.**

DFF76.        A number of references disclosed that exogenous ATP is converted
rapidly and completely to adenosine following the administration of ATP.  In 1984, Dr. Sollevi
wrote as follows:

> The arterial plasma adenosine concentration during ATP infusions was similar to
> that found during an equimolar infusion of adenosine.  Moreover, similar arterial
> plasma concentrations of adenosine were found at similar hypotensive levels,
> whether adenosine or ATP was given . . .

(TX 88 at 173-175; *see* also Binkley, Tr. 1409:15-19, 1411:17-1414:6; Klabunde, Tr. 1125:23-
1126:13; TX 36 at 1262; TX 236 at 547.)

**RESPONSE:  Plaintiffs object to this finding as relying on exhibits (TX-88; TX-236)**

**and testimony not properly disclosed in Dr. Sollevi's expert reports.  (*See* PB37-38.)  This**

**finding is misleading as it does not specify the species studied in TX-88 or TX-236, which**

**was canine.  However, the testimony was that ATP metabolism differs between mammalian**

**species and that the rate of ATP breakdown in humans was low compared to other species.**

**(*See, e.g.*, TX-126 at 613; Klabunde 1215:2-1216:25.)  The cited portion of TX-36 also**

**refers to studies in rats.  While there is a discussion of human studies in TX-36, it concerns**

**ATP's effect on electrical conduction in the heart in treating PSVT, not its vasodilating**

**activity, which involves different receptors altogether.  (Klabunde 1210:1-1211:19.)  The**

**evidence showed that in humans, ATP had independent activity as a vasodilator that was**

not solely dependent on being broken down into adenosine. (*See, e.g.,* Klabunde 1117:13-1118:21.) (*See also* PFF71-74.) Thus, the following counterfinding is proposed:

PCF76.        (*See* PFF71.) Metabolism of ATP differed in prior art studies of different mammalian species. Consequently, prior art investigators knew that effects of ATP and its degree of metabolism would be different in different species. (*See, e.g.*, Klabunde 1216:18-25; TX-126 at 613.)

DFF77.        Like adenosine, ATP causes selective arterial vasodilation when administered intravenously. (Binkley, Tr. 396:20-24, 397:3-17. This property led to the use of ATP to induce controlled hypotension in surgical patients. (Binkley, Tr. 161:24-162:9.; TX 42.)

RESPONSE: This proposed finding is contrary to the evidence, which indicated that the hallmarks of selective arterial vasodilation, *i.e.,* consistent increased cardiac output together with clear-cut reduction in vascular resistance and maintained filling pressures (*see, e.g.*, TX-37; TX-1170; TX-1169 at 232; Sollevi 433:23-434:11; PFF146), were not shown when ATP was administered to humans according to TX-42. (*See, e.g.*, Klabunde 544:8-546:2; TX-42.) Thus, the following counterfinding is proposed:

PCF77.        The *Fukunaga 1982* abstract on ATP infusion does not report the consistent increase in cardiac output together with maintained filling pressure observed upon administration of adenosine to surgical patients indicative of selective arterial vasodilation. The abstract does not even report measurement of filling pressures, such as right atrial pressure. (Klabunde 544:8-546:2; TX-42.) Moreover, the cardiac output data in *Fukunaga 1982* is flawed and would not have allowed one of ordinary skill in the art to conclude that selective arterial vasodilation occurred in patients administered an ATP infusion. (Klabunde 548:9-20.) (*See also* PFF147-149.)

DFF78.        By the early 1980s, it was known that the vasodilative effects of ATP are due to its breakdown to adenosine – not the actions of the ATP itself. In June 1984, Dr. Berne wrote:

In the guinea pig heart the AV conduction delay and block caused by adenosine triphosphate is due to its degradative product, adenosine. Thus, it is probable that

14

in humans, as in the case of the guinea pig, adenosine triphosphate must be hydrolyzed to adenosine to exert its effect. *Hence, it is adenosine that is the active agent*.

(TX 5000 at 1196 (emphasis added); *see also* Binkley, Tr. 112:22-113:16, 115:2-116:3, 166:12-167:1, 179:13-180:6, 396:16-397:17, 1410:2-21, 1412:17-1413:11, 1414:23-1416:22, 1420:6-1421:10; Klabunde, Tr. 1107:3-12; TX 51 at A39; TX 88 at 174-175; TX 228 at 807; TX 236 at 547 n.6.)

**RESPONSE: Plaintiffs object to this finding as relying on exhibits (TX-88, TX-236, and TX-5000) and testimony not properly disclosed in Dr. Binkley's expert reports. (*See* PB at 37-38.) The exhibit which is the subject of and quoted in this proposed finding (TX-5000), and which was proffered by Sicor's expert at trial, was never disclosed in discovery and was neither discussed in Dr. Binkley's expert report nor cited in Sicor's 35 U.S.C. § 282 notice. (*See* PB at 37-38.) Moreover, Sicor has misapplied the quote from TX-5000. The statement is completely unrelated to the vasodilatory effects of ATP, and instead relates to the electrophysiological effects of adenosine on the AV node. (*See, e.g.,* Binkley 1510:18-22.) The effect of adenosine on the AV node is a completely separate activity from the vasodilating activity of ATP interaction with different receptors altogether. The recognition that ATP can work indirectly by breaking down into adenosine to cause AV block is not inconsistent with ATP having a role as a direct vasodilator. (Klabunde 1211:13-19.) If testimony regarding TX-5000 is permitted, the following counterfinding is proposed:**

**PCF78.          The effect of adenosine on the AV node is a completely separate activity from the vasodilating activity of ATP and involves interaction with different receptors altogether. The recognition that ATP can work indirectly by breaking down into adenosine to cause AV block is not inconsistent with ATP having a role as a direct vasodilator. (Klabunde 1211:13-19.) Moreover, the *Fukunaga 1984* abstract reported using a dose of 32 mcg/kg/min of ATP following dipyridamole pretreatment to reduce blood pressure by about 40%. (TX-51; Klabunde 549:4-550:24, 1044:5-25.) Dr. Sollevi**

needed approximately 140 mcg/kg/min to get the same effect with adenosine after pretreatment with dipyridamole.  (Klabunde 549:4-550:24, 1044:5-25.)  This requirement for significantly more adenosine than ATP to obtain the same effect was utterly inconsistent with the idea that ATP was merely acting as a precursor whose effects were being mediated primarily through adenosine.  (Klabunde 1044:5-25.)  In addition, prior art publications had shown that when ATP worked by being broken down into adenosine (as it did in the treatment of PSVT), ATP was less potent than adenosine, not more potent.  (TX-36 at 1262; Klabunde 1211:20-1212:18.)  For ATP to be more potent than adenosine as a vasodilator was indicative of a direct ATP-mediated vasodilator action in humans.  (Klabunde 551:20-552:3, 1044:5-25, 1117:5-1118:21, 1212:19-1213:8.)

DFF79.      In September 1984, Dr. A.F. Fukunaga wrote:

> ATP, a purine nucleotide, when administered parenterally is rapidly hydrolyzed to Ad[enosine] . . . Most of the hemodynamic effects of ATP, however, are attributed to Ad[enosine] because of the speed of this hydrolysis in the blood.

(TX 51 at A39; *see* Klabunde, Tr. 1107:3-12; DTX 3061.)  Dr. Fukunaga's 1984 article teaches a person of ordinary skill in the art in 1985 that ATP causes vasodilation through its conversion to adenosine.  (Binkley, Tr. 178:14-18; TX 51 at A39.)

**RESPONSE:  The quotation from *Fukunaga 1984* (TX-51) is misleading in that it crops the discussion of adenosine's further breakdown into inosine, hypoxanthine, and uric acid.  It also omits reference to the concern raised by Dr. Fukunaga about accumulating high levels of the metabolites phosphate and uric acid.  It was this concern that led Dr. Fukunaga to recommend dipyridamole pretreatment in connection with ATP infusion.  While Sicor focuses on the single statement in the abstract attributing most of the hemodynamic effects of ATP to adenosine, a comparison of the results of Dr. Fukunaga's ATP infusions and Dr. Sollevi's dipyridamole infusions in the presence of dipyridamole demonstrate a significant direct role for ATP in causing vasodilation.  (*See* PFF154, 186-189; PCF79.)  Thus, the following counterfinding is proposed:**

**PCF79.**    The Fukunaga 1984 abstract reported that, on average, 32 mcg/kg/min of ATP lowered blood pressure by about 40% in patients treated with dipyridamole.  (TX-51; Binkley 257:12-15; 258:10-13.)  If this were a teaching that ATP caused vasodilation solely through its conversion to adenosine, a corresponding equimolar (containing the same number of molecules) dose of 16 micrograms of adenosine should have had a similar effect.  (Binkley 258:25-260:1; Klabunde 549:4-550:14.)  However, Dr. Sollevi needed 140 micrograms of adenosine, nearly 10 times as much as Dr. Binkley's assumption predicted, to achieve a similar blood pressure reduction after dipyridamole pretreatment.  (Binkley 260:2-20; Klabunde 550:15-24; *see also* PFF154.)  Dr. Klabunde noted that, while metabolism of ATP into adenosine may have contributed to the vasodilation observed in *Fukunaga 1984*, because of the superior potency of ATP itself, even a small percentage of unmetabolized ATP could have a large effect as a direct vasodilator.  (Klabunde 1115:5-12; 1116:5-1118:1.)  Consequently, significant metabolism of ATP into adenosine does not mean that the majority of the observed vasodilatory effect of ATP is due to adenosine.  (Klabunde 1117:22-1118:1.)

DFF80.    Dr. Sollevi also published several papers in the early 1980s plainly stating that the vascular effects of ATP were due to its conversion to adenosine.  (TX 88 at 174-75; TX 236 at 547.)  In one paper, Dr. Sollevi expressly recommended the use of adenosine instead of ATP to induce controlled hypotension:

> We therefore consider it more appropriate to use adenosine instead of ATP to induce controlled hypotension.

(TX 236 at 547; *see* Klabunde, Tr. 1164:5-22.)

**RESPONSE:  Plaintiffs object to this finding because the two dog-study papers relied on in this proposed finding, TX-88 and TX-236, were not disclosed in Dr. Binkley's expert report and the testimony elicited at trial offered previously undisclosed opinions about them.  (*See, e.g.,* PB at 37-38.)  Thus, the following counterfinding is proposed:**

**PCF80.**          (*See* PFF73.)  Sicor's expert, Dr. Binkley, also attempted to rely on two dog studies using ATP that were not disclosed in his expert report and offered previously undisclosed opinions and testimony about them.  (TX-88; TX-236; Binkley 1412:1-1421:19.)  Yet the record shows very different levels of ATP metabolism and different effects of ATP in various animal species and in animals versus humans.  (*See, e.g.*, Binkley 1465:5-1466:15; TX-87 at 277; Klabunde 1215:2-1216:25; TX-126 at 613.)  Most importantly, the human data available in the prior art showed ATP to be a more potent vasodilator than adenosine, contradicting the notion that ATP was working solely through metabolic formation of adenosine.  (*See, e.g.*, Klabunde 1044:5-25, 1116:5-1118:21.)

DFF81.          In another paper, Dr. Sollevi stated several times that the effects of ATP were due to adenosine:

> Hence the vascular effects of parenterally administered ATP are due mainly to adenosine.

> [T]he present data suggest that adenosine mediates the vasodilatory effects of exogenously administered ATP.

> In conclusion, the present experiments demonstrate that intravenously administered ATP is eliminated from plasma before reaching the arterial vascular bed where it may cause hypotension. Furthermore, the vasodilatory effect of ATP and adenosine was directly proportional to the arterial adenosine level.

(TX 88 at 174-175; *see* Binkley, Tr. 396:4-23; Klabunde, Tr. 1128:15-17.)

**RESPONSE:  Plaintiffs object because the paper referred to in this finding, TX-88, is one of the same two referred to in Defendants' previous proposed finding and was not disclosed in Dr. Binkley's expert report.  The testimony elicited at trial offered previously undisclosed opinions about TX-88.  (*See, e.g.*, PB at 37-38.)  Thus, the following counterfinding is proposed:**

**PCF81.**          *See* **PCF80.**

DFF82.          The view that the vasodilative effects of ATP are due to its breakdown to adenosine was widely-held in the early 1980s, and would have been understood by a person of ordinary skill in the art in 1985.  (Binkley, Tr. 112:22-113:16, 115:2-116:3, 166:12-167:1, 178:14-19, 179:13-180:6, 181:17-22, 396:16-397:17, 1410:2-21, 1412:17-1413:11, 1414:23-

1416:22, 1420:6-1421:10; Klabunde, Tr. 1043:21-23, 1107:3-12, 1124:18-1126:13, 1127:18-1128:1, 1164:5-22, 1174:16-20; TX 51 at A39; TX 88 at 174-175; TX 151 at 107-111; TX 228 at 807; TX 236 at 547 n.6.)

**RESPONSE: Plaintiffs object to this proposed finding because Dr. Binkley's opinions concerning TX-88, TX-151, and TX-236 were not included in his expert reports. (*See* PB at 37-38; Binkley 1412:2-15, 1417:14-21, 1417:23-1418:6, 1435:6-11.) Dr. Binkley's opinions also failed to address the direct evidence in the prior art that ATP was not acting solely by being broken down to adenosine, but had a substantial vasodilating ability of its own. Thus, the following counterfinding is proposed:**

**PCF82.    The recognition that ATP can work indirectly by breaking down into adenosine to cause AV block is not inconsistent with ATP also having a role as a direct vasodilator in humans. (Klabunde 1211:13-19.) In addition to the evidence of direct action by ATP discussed in PCF79, other references described a direct ATP vasodilating effect. (*See* TX-151 at 108; Klabunde 1221:11-1222:21.) Notably, Dr. Binkley's opinions concerning TX-88, TX-151, and TX-236 were not included in his expert reports. (*See* Binkley 1412:2-15, 1417:14-21, 1417:23-1418:6, 1435:6-11.)**

DFF83.    A person of ordinary skill in the art in 1985 would know that this is because the receptors in the blood vessel walls that are responsible for vasodilation were known to bind primarily to adenosine, not ATP. (Binkley, Tr. 1434:4-1435:6, 1435:12-1438:2; Klabunde, Tr. 1169:8-1174:20; TX 151 at 110-111; TX 152 at 195, 196.)

**RESPONSE: This proposed finding is based on TX-151. Dr. Binkley's opinion concerning the distribution of receptors for ATP and adenosine was not disclosed in his report, nor was there any discussion of TX-151. (Binkley 1435:6-11; PB at 37-38.) Thus, the following counterfinding is proposed:**

**PCF83.    A person of ordinary skill in the art in 1985 would not have understood the vasodilative effects of ATP to be solely due to its breakdown to adenosine based upon the binding preferences of receptors in the blood vessel walls. (Klabunde 1117:5-1118:21, 1221:11-1222:21.) TX-151 merely indicated the predominant distribution**

19

of receptors, not exclusive sites, and indicated only that "some" of the actions of ATP were inhibited by methylxanthine inhibitors of adenosine.  (TX-151 at 110; Klabunde 1171:15-1173:10.)  The article also explicitly described an example in which ATP caused vasodilation that was not inhibited by an inhibitor of adenosine action.  (TX-151 at 108; Klabunde 1221:11-1222:21.)  Furthermore, Dr. Binkley conceded that the knowledge of the distribution of receptors was still in an imperfect state.  (Binkley 1455:9-1456:3.)

### 7.    Counterfindings Regarding Dipyridamole

DFF86.    A person of ordinary skill in the art in 1985 would have known that the administration of dipyridamole and the administration of adenosine have the same net result – an increase of adenosine in the bloodstream.  (Binkley, Tr. 117:16-118:13, 119:15-22, 131:1-14, 181:9-13, 355:16-356:8; Klabunde, Tr. 1092:22-1094:1, 1095:11-21, 1165:2-15; TX 101 at 21; TX 228 at 809.)

PCF86.    A person of ordinary skill in the art would not have viewed adenosine and dipyridamole as interchangeable or as having the same "net effect" as indicated by the fact that dipyridamole did not produce hypotension in Dr. Sollevi's studies, whereas adenosine did.  (Klabunde 1166:4-20.)  Moreover, adenosine had been shown to treat PSVT by interrupting electrical conduction in the heart.  (TX-36; TX-45.)

DFF87.    Dipyridamole functions as a "middle man" by blocking adenosine deaminase, an enzyme responsible for adenosine uptake and metabolism.  (Binkley, Tr. 117:16-118:13, 119:15-22, 131:1-14, 181:9-13, 355:16-356:8; Klabunde, Tr. 1092:22-1094:1, 1095:11-21, 1165:2-15; TX 101 at 21; TX 228 at 809; DTX 3020-A-D.)

RESPONSE:  None of the cited testimony uses the term "middle man."  Given the different effects of dipyridamole and adenosine and the fact that dipyridamole was known to act more effectively to vasodilate the heart than the peripheral vessels, one of ordinary skill would not have viewed dipyridamole merely as a surrogate for exogenously produced adenosine.

PCF87.    *See* PCF86.

DFF88.    As described *supra* in paragraphs 61-63, adenosine can either be taken up and metabolized or it can bind to receptor sites in the artery wall to cause vasodilation.

**RESPONSE:** *See* **PCF61 and 62.**

DFF89.        When dipyridamole is administered, endogenous adenosine is still able to bind to the receptor sites, but the dipyridamole blocks the uptake of any adenosine and its subsequent metabolism.  (Binkley, Tr. 131:16-132:13; DTX 3020-A-B, *see* purple semicircles.)  As a result, endogenous adenosine builds up within the body because it is no longer being rapidly eliminated from the bloodstream.  (Binkley, Tr. 117:16-118:13, 119:15-22, 131:1-14, 132:15-16, 136:18-22, 181:9-13, 356:1-8; Klabunde, Tr. 1095:11-21, 1165:2-15; DTX 3020-B.)

**PCF89.        It was known in the prior art that the heart produced relatively larger amounts of adenosine than other tissues in the body.  (Klabunde 1094:3-6.)  Therefore, dipyridamole would have a lesser effect in dilating peripheral vessels as opposed to vessels in the coronary circulation.  (Klabunde 1102:6-1103:7.)  Consequently, dipyridamole is less effective than adenosine at dropping systemic blood pressure because organs besides the heart do not make a large amount of adenosine.  (*See also* Response and Proposed Counterfinding to DFF87.)**

DFF90.        The build-up of endogenous adenosine following the administration of the dipyridamole leads to vasodilation, since the increase in the amount of adenosine that is binding to the receptor sites causes the walls of the arteries to relax.  (Binkley, Tr. 132:14-133:1; DTX 3020-B-D.)

**RESPONSE:  The evidence shows that the build-up of endogenous adenosine following dipyridamole administration occurs mainly in the heart, because organs besides the heart do not produce a large amount of adenosine.  (*See, e.g*., Klabunde 1094:3-6, 1095:11-17.)  Thus, the vasodilating effect seen would occur mainly in the heart.  To the extent the proposed finding implies the effect would be systemic, it is misleading in light of the evidence.  Thus, the following counterfinding is proposed:**

**PCF90.        The build up of endogenous adenosine following the administration of dipyridamole leads to vasodilation of the heart's arteries, since the increase in the amount of adenosine that is binding to the receptor sites causes the walls of the arteries of the heart to relax.  (Binkley 132:14-133:1; Klabunde 1094:3-6, 1095:11-17.)  This is confirmed by the evidence that dipyridamole is less effective than adenosine at dropping systemic blood**

**pressure because organs besides the heart do not produce a large amount of adenosine.**

**Thus, dipyridamole has a minimal effect in dilating peripheral vessels as opposed to vessels**

**in the coronary circulation.  (Klabunde 1102:6-1103:7.)**

DFF91.        While the net effect of the administration of adenosine and dipyridamole is the same, *i.e.*, the increase of adenosine in the bloodstream, a person of ordinary skill in the art in 1985 would have known that the effects of dipyridamole lasted much longer than the effects of adenosine, due to the much longer "half life" of dipyridamole.  (Binkley, Tr. 133:2-16.)

**RESPONSE:  The language in this proposed finding alleging that "the net effect of**

**the administration of adenosine and dipyridamole is the same, *i.e.,* the increase of**

**adenosine in the bloodstream," is not supported by the cited testimony and is contrary to**

**much of the evidence at trial.  Thus, the following counterfinding is proposed:**

**PCF91.        While it was known that the half-life of dipyridamole was longer than**

**the half-life of adenosine  (*See* Binkley 133:2-16), it was recognized in the prior art that**

**adenosine and dipyridamole were different compounds and that they had different effects**

**on the body.  For example, dipyridamole is less effective than adenosine at dropping**

**systemic blood pressure because organs besides the heart do not make a large amount of**

**adenosine.  (Klabunde 1102:6-1103:7.)  Consequently, dipyridamole did not induce**

**profound hypotension in Dr. Sollevi's studies, whereas subsequent administration of**

**adenosine did.  (Klabunde 1166:4-20.)  Also, it was a lack of interest and a lack of**

**recognition by those in the art that adenosine would be a safe or effective alternative to**

**dipyridamole in human patients that prompted researchers to choose dipyridamole rather**

**than adenosine as the first pharmacologic stress agent for use humans in myocardial**

**perfusion imaging studies.  (*See* Binkley 328:22-329:17; 332:3-14.)  Indeed, even Dr.**

**Strauss recommended the use of dipyridamole or ethyl-adenosine rather than adenosine**

**for use as a pharmacologic stress agent  (*See* Strauss 774:19-776:4; TX-232 at 248.)  (*See***

***also* PPF 50-53.)  In addition, unlike dipyridamole, adenosine had been shown to treat**

**PSVT by interrupting electrical conduction in the heart.  (TX-36; TX-45.)**

22

DFF93.        The half life of dipyridamole is 30 to 40 minutes.  (Binkley, Tr. 133:2-12, 1381:18-22, 1400:6-1402:14; TX 1173 at 167; TX 1177 at 1080.)

**RESPONSE: Dr. Binkley gave conflicting testimony on the half-life of dipyridamole, stating it was either 30 to 40 minutes (Binkley 1380:20-1381:7) or 40 to 80 minutes (Binkley 1472:16-1474:23).  Moreover, Dr. Binkley attempted at trial to raise a previously undisclosed theory concerning the so-called "functional half-life" of dipyridamole, which Dr. Binkley testified was between 30 and 40 minutes and corresponded to the half-life of the "physiological effect of the drug."  (Binkley 1380:20-1381:22.)  This new theory was contradicted, however, by Dr. Binkley's deposition testimony that "[t]he half-life of dipyridamole is 40 to 80 minutes and, therefore, you could have greatly prolonged effects of both the dipyridamole and the adenosine."  (Binkley 1474:8-23.)  (*See*, *e.g.*,  PFF179.)  On redirect, Dr. Binkley asserted that his deposition testimony was not referring to the "functional" half-life of dipyridamole, but that assertion is itself inconsistent with the entire thrust of his deposition testimony, which was that the 40 to 80-minute half-life of dipyridamole could lead to "greatly prolonged effects."  (Binkley 1507:81-2, 1474:8-23.)  Thus, the following counterfinding is proposed:**

**PCF93.        The half-life of dipyridamole can be as long as 40 to 80 minutes. (Binkley 1472:16-1474:23.)**

DFF94.        The half life of adenosine is about 10 to 30 seconds.  (Binkley, Tr. 107:11-21; Klabunde, Tr. 502:17-22.)

**RESPONSE:  This proposed finding is not supported by either of the citations.  Both Dr. Binkley and Dr. Klabunde testified, at the cited portions of the transcript, that the half life of adenosine was ten seconds or less.  Thus, the following finding is proposed:**

**PCF94.        The half life of adenosine is ten seconds or less.  (*See* TX-101 at 21 (abstract); Binkley 107:11-21; Klabunde 502:17-22.)**

## C.    Counterfindings Regarding Obviousness in View of the Prior Art

### 1.    Counterfindings Regarding the Scope and Content of the Prior Art

DFF96.    Claims 1, 3, 7, and 9 of the '296 patent are invalid as obvious in view of each of the following three references in combination with the general knowledge of a person of ordinary skill in the art in 1985:

(1)    A. Sollevi *et al., Cardiovascular effects of adenosine during controlled hypotension in cerebral artery aneurysm surgery*, Anesthesiology (Circulation II) 59(3): A9 (Sept. 1983) ("Sollevi I");

(2)    A. Sollevi *et al., Cardiovascular effects of adenosine in man*, Acta Physiol. Scan. 120(2): 11A (Feb. 1984) ("Sollevi II"); and

(3)    A.F. Fukunaga *et al., ATP-induced hypotensive anesthesia during surgery*, Anesth. & Anesthesiology, 57(3): A65 (1982) ("Fukunaga Abstract").

(Binkley, Tr. 119:23-121:2; TX 275; TX 1170; TX 37; TX 42.)

**PCF96.    Sicor asserts that its three primary references:**

**(1)    A. Sollevi *et al., Cardiovascular effects of adenosine during controlled hypotension in cerebral aneurysm surgery*, 59(3) Anesthesiology (Circulation II) A9 (1983) ("Sollevi I");**

**(2)    A. Sollevi *et al., Cardiovascular effects of adenosine in man*, 120(2) Acta Physiol. Scan. 11A (1984) ("Sollevi II"); and**

**(3)    A.F. Fukunaga *et al., ATP-induced hypotensive anesthesia during surgery*, 57(3) Anesth. & Anesthesiology, A65 (1982) ("Fukunaga Abstract")**

**invalidate the asserted claims.  None of these references, however, render the asserted claims obvious.  (*See* Klabunde 515:3-10.)  Indeed, all of these references were before the Examiner during the examination of the '296 patent and are listed on the face of the '296 patent.  (TX-37; TX-42; TX-1170; TX-275.)**

DFF102.    Following administration of adenosine, Sollevi I reported a mean reduction in mean arterial blood pressure ("MABP") of 43%.  (Binkley, Tr. 127:10-128:15, 129:17-19; Sollevi, Tr. 483:11-16; TX 1170 at A9; DTX 3027.)  Sollevi I teaches a person of ordinary skill in the art in 1985 that the significant decrease in MABP shows that the administration of adenosine resulted in selective arterial vasodilation, since arteries reduce pressure by dilating.  (Binkley, Tr. 128:3-12.)

**RESPONSE:  This finding is contrary to the evidence to the extent it implies that the adenosine alone was responsible for the drop in blood pressure reported by Dr. Sollevi,**

24

whereas the evidence clearly shows that in *Solevi I* a dipyridamole pretreatment was used

before the adenosine was administered.  (*See, e.g.*, Klabunde 527:12-20; Sollevi

438:17-439:6; TX-1170.)  In addition, determining whether selective arterial vasodilation

has occurred requires measurement of more hemodynamic parameters than MABP alone.

Thus, the following counterfinding is proposed:

PCF102.    Following administration of adenosine after dipyridamole

pretreatment, *Solevi I* reported a mean reduction in mean arterial blood pressure

("MABP") of 43%.  (Sollevi 442:15-23; TX-1170 at A9.)  Vasodilation in response to

adenosine is determined by systemic vascular resistance changes calculated from the

cardiac output and mean arterial blood pressure.  (Klabunde 546:6-16)  Determining

whether selective arterial vasodilation occurred would require measurement of changes in

venous function, such as central venous pressure or right atrial pressure.  (*Id.*)  Dr. Sollevi

took such measurements in his studies and concluded there was selective arterial

vasodilation based on clear-cut reduction in vascular resistance associated with essentially

unaffected filling pressures and "without exception" an increase in cardiac output.  (Sollevi

433:23-434:11.)

DFF103.    Following administration of adenosine, Sollevi I reported a relatively large
mean decrease in systemic vascular resistance ("SVR") of 61%.  (Binkley, Tr. 128:16-129:7,
129:20-22; TX 1170 at A9; DTX 3028.)  Sollevi I teaches a person of ordinary skill in the art in
1985 that the significant drop in SVR suggests that the administration of adenosine resulted in
selective arterial vasodilation, since arteries reduce resistance by dilating.  (Binkley, Tr. 128:24-
129:7.)

RESPONSE:  This finding is contrary to the evidence to the extent it implies that the

adenosine alone was responsible for the drop in blood pressure reported by Dr. Sollevi,

whereas the evidence clearly shows that in *Solevi I* a dipyridamole pretreatment was used

before the adenosine was administered.  (*See, e.g.*, Klabunde 527:12-20; Sollevi

438:17-439:6; TX-1170.)  In addition, determining whether selective arterial vasodilation

has occurred requires measurement of more hemodynamic parameters than SVR alone.

Thus, the following counterfinding is proposed:

**PCF103.** **Following administration of adenosine following dipyridamole**

**pretreatment,** *Sollevi I* **reported a mean decrease in systemic vascular resistance ("SVR")**

**of 61%. (TX-1170 at A9.) Vasodilation in response to adenosine is determined by systemic**

**vascular resistance changes calculated from the cardiac output and mean arterial blood**

**pressure. (Klabunde 545:6-16.) Determining whether selective arterial vasodilation**

**occurred would require measurement of changes in venous function, such as central venous**

**pressure or right atrial pressure. (***Id.***) Dr. Sollevi took such measurements in his studies**

**concluded there was selective arterial vasodilation based on clear-cut reduction in vascular**

**resistance associated with essentially unaffected filling pressures and "without exception"**

**an increase in cardiac output. (Sollevi 433:23-434:11.) (***See also*** PFF85, 90, 92, and 190-**

**191.)**

DFF104.      Following administration of adenosine, Sollevi I reported a large increase
in cardiac output of 43%. (Binkley, Tr. 129:8-16; TX 1170 at A9; DTX 3029.) Sollevi I teaches
a person of ordinary skill in the art in 1985 that the large increase in CO shows that the
administration of adenosine resulted in selective arterial vasodilation, since the increase in CO
indicates that there was no venodilation. (Binkley, Tr. 130:10-22.)

**RESPONSE: This finding is contrary to the evidence to the extent it implies that the**

**adenosine alone was responsible for the drop in blood pressure reported by Dr. Sollevi,**

**whereas the evidence clearly shows that in** *Sollevi I* **a dipyridamole pretreatment was used**

**before the adenosine was administered. (***See, e.g.***, Klabunde 527:12-20; Sollevi**

**438:17-439:6; TX-1170.) In addition, while the large increase in cardiac output (CO) was**

**an important factor for demonstrating selective arterial vasodilation. Dr. Sollevi's**

**conclusion was based on additional hemodynamic parameters. Thus, the following**

**counterfinding is proposed:**

**PCF104.       Following administration of adenosine following dipyridamole pretreatment, *Sollevi I* reported a large increase in cardiac output of 44%. (TX-1170 at A9.)  Determining whether selective arterial vasodilation occurred required measurement of changes in venous function, such as central venous pressure or right atrial pressure. (Klabunde 545:6-16.)  Dr. Sollevi took such measurements in his studies and concluded there was selective arterial vasodilation based on clear-cut reduction in vascular resistance associated with essentially unaffected filling pressures and "without exception" an increase in cardiac output. (Sollevi 433:23-434:11.) (*See also* PFF85, 90, 92, and 190-191.)**

DFF105.       Based on the disclosed changes in MABP, SVR, and CO, Sollevi I would teach a person of ordinary skill in the art at the relevant time that the intravenous administration of 140 µg/kg/min of adenosine would selectively dilate the arteries of a human patient without inducing significant venous dilation. (Binkley, Tr. 128:3-10, 130:10-22, 146:10-21; DTX 3030.) As described *supra* in paragraphs 56-57, a decrease in SVR coupled with a decrease in MABP and an increase in cardiac output a is a strong indication that dilation of arteries occurred. (Binkley, Tr. 94:17-95:7.)  An increase in cardiac output would also indicate that little or no venous dilation occurred. (Binkley, Tr. 94:22-95:13.)

**RESPONSE:  This finding is contrary to the evidence to the extent it implies that the adenosine alone was responsible for the drop in blood pressure reported by Dr. Sollevi, whereas the evidence clearly shows that in *Sollevi I* a dipyridamole pretreatment was used before the adenosine was administered. (*See, e.g.*, Klabunde 527:12-20; Sollevi 438:17-439:6; TX-1170.)  In addition, while a decrease in SVR coupled with a decrease in MABP and a large increase in cardiac output (CO) were important factors for demonstrating selective arterial vasodilation, Dr. Sollevi's conclusion was based on additional hemodynamic parameters.  Thus, the following counterfinding is proposed:**

**PCF105.       Based on the disclosed changes in MABP, SVR, and CO, along with unaffected filling pressures, *Sollevi I* would teach a person of ordinary skill in the art at the relevant time that the intravenous administration of 140 µg/kg/min of adenosine following a dipyridamole pretreatment would selectively dilate the arteries of a human patient without inducing significant venous dilation. (Klabunde 545:6-16; Sollevi 433:23-434:11.)**

27

**Determining whether selective arterial vasodilation occurred required measurements of**

**changes in venous function, such as central venous pressure or right atrial pressure.**

**(Klabunde 545:6-16.)  Dr. Sollevi took such measurements in his studies and concluded**

**there was selective arterial vasodilation based on a clear-cut reduction in vascular**

**resistance associated with essentially unaffected filling pressures and "without exception"**

**an increase in cardiac output.  (Sollevi 433:23-434:11.)  (*See also* PPF 85, 90, 92, and 190-**

**191; PCF102-104.)**

DFF106.      Almost one half-life of dipyridamole (30-40 minutes) elapsed by the time
the adenosine was administered (33 minutes into the treatment), yet the drop in blood pressure
was observed in the Sollevi I study within two minutes after the adenosine administration began.
(Binkley, Tr. 145:4-20; TX 1170 at A9; DTX 3064.)  The timing of this drop in blood pressure
indicates that the potency of the blocking action of dipyridamole described *supra* in paragraphs
88-91 would have decreased significantly by the time the adenosine administration began.
(Binkley, Tr. 143:25-145:3, 145:21-146:7; DTX 3064.)

**RESPONSE:  Plaintiffs object to the proposed finding because the opinion to which**

**it relates -- that the effect of dipyridamole had worn off before the end of the adenosine**

**administration -- was nowhere disclosed in Dr. Binkley's expert reports.  (Binkley**

**154:9-155:19, 261:12-262:14; TX-26; TX-43; *see also* PC at 37-38.)  This proposed finding**

**is also contradicted by the cited testimony.  Specifically, Dr. Binkley, at page 145 of the**

**transcript, described the average time for the adenosine infusion as being 33 minutes long.**

**Nowhere did he say that the adenosine was administered 33 minutes into the treatment,**

**and indeed both TX-1170 and Dr. Binkley's testimony specifically contradict this statement.**

**(*See, e.g.*, TX-1170; Binkley 145:4-20.)  In addition, Dr. Binkley gave conflicting testimony**

**on the half-life of dipyridamole, stating it was either 30 to 40 minutes (Binkley 1380:20-**

**1381:7) or 40 to 80 minutes (Binkley 1472:16-1474:23).  Moreover, Dr. Binkley attempted**

**at trial to raise another previously undisclosed theory concerning the so-called "functional**

**half-life" of dipyridamole, which Dr. Binkley testified was between 30 and 40 minutes and**

**corresponded to the half-life of the "physiological effect of the drug."  (Binkley 1380:20-**

1381:22.)  This new theory was contradicted, however, by Dr. Binkley's deposition

testimony that "[t]he half-life of dipyridamole is 40 to 80 minutes and, therefore, you could

have greatly prolonged effects of both the dipyridamole and the adenosine."  (Binkley

1474:8-23.)  Also, Dr. Klabunde testified that adenosine levels did not return to control

levels until 3 to 9 minutes after the adenosine infusion was discontinued at the end of the

surgical hypotensive period.  (*See, e.g.*, TX-37; Klabunde 530:9-531:10.)  This is a clear

indication of the continuing effect of dipyridamole.  (Klabunde 531:11-532:3)  The

continuing effect of dipyridamole is also illustrated in an article Dr. Sollevi published in

1984 concerning the effect of dipyridamole treatment in humans showing that even 75

minutes after administration of dipyridamole, the blood levels of adenosine were elevated

and the amount of dipyridamole in the blood was 0.8 micromolar.  (TX-1173 at 167;

Binkley 1480:4-22.)  At that concentration, the level of dipyridamole's inhibition of

adenosine's metabolism would have been slightly less than 90 percent.  (*See* Klabunde

1039:15-1040:14.)  Thus, the following counterfinding is proposed:

PCF106.    During the experiments described in the Sollevi abstracts, in the

presence of dipyridamole, adenosine levels did not return to control levels until 3 to 9

minutes after the adenosine infusion was discontinued at the end of the surgical

hypotensive period.  (TX-37; Klabunde 530:9-531:10.)  This is a clear indication of the

continuing effect of dipyridamole.  (Klabunde 531:11-532:3)  Based on adenosine's known

short half-life (< 10 seconds), one of ordinary skill in the art would have expected adenosine

blood levels to return to normal in only 30 to 40 seconds in the absence of dipyridamole

(Klabunde 531:1-532:3), and Dr. Binkley admitted as much on cross-examination,

contradicting his earlier testimony.  (*See* Binkley 265:13-23; *compare* Binkley

143:25-145:3.)  The slow return to normal of the adenosine levels (3 to 9 minutes versus 30

to 40 seconds) was thus a clear indication that dipyridamole had a strong and continuing

29

**effect on adenosine metabolism throughout the period of hypotension. (Klabunde**

**531:1-532:3) In addition, Dr. Sollevi published an article in 1984 concerning the effect of**

**dipyridamole treatment in humans showing that even 75 minutes after administration of**

**dipyridamole, the blood levels of adenosine were elevated and the amount of dipyridamole**

**in the blood was 0.8 micromolar. (TX-1173 at 167; Binkley 1480:4-22.) At that**

**concentration, the level of dipyridamole's inhibition of adenosine's metabolism would have**

**been slightly less than 90 percent. (*See* Klabunde 1039:15-1040:14.) (*See also* PCF93.)**

DFF107.     The decrease in MABP was sustained at the same level throughout the continuous adenosine administration – regardless of the varying level of dipyridamole present. (Binkley, Tr. 142:24-143:4, 143:25-146:8; DTX 3064.) Based on the teachings of the prior art, a person of ordinary skill in the art in 1985 would understand that the administration of adenosine alone would cause some degree of selective arterial vasodilation. (Binkley, Tr. 139:17 141:7, 160:1-21.) This understanding would be supported by the maintenance of controlled hypotension for each patient despite the different intervals between the dipyridamole and adenosine treatments and the different lengths of the overall treatment with adenosine. (Binkley, Tr. 139:17 141:7, 160:1-21.)

**PCF107.          *See* Response to DFF106 and PCF106. *See also* PCF93.**

DFF108.     A person of ordinary skill in the art in 1985 would understand that dipyridamole alone did not cause the "profound" hypotension reported in Sollevi I. (Klabunde, Tr. 1166:4-9.) Therefore, a person of ordinary skill in the art in 1985 would conclude that the hemodynamic parameters observed in Sollevi I were mainly due to the action of exogenous adenosine, and not the action of dipyridamole. (Binkley, Tr. 143:25-145:3, 145:21-146:7; DTX 3064.)

**RESPONSE:  This proposed finding is premised upon Dr. Binkley's contradicted**

**testimony regarding the half-life of dipyridamole. (*See, e.g*., Response to DFF93.)**

**Moreover, Dr. Binkley admitted on cross-examination that, prior to the trial, he had**

**testified that one cannot really separate the effect of adenosine from the effect of**

**dipyridamole based on the data presented in the abstract. (Binkley 301:15-302:10.) Thus,**

**the following counterfinding is proposed:**

**PCF108.          *See* PCF93 and 106.**

DFF109.     Sollevi I reported that blood pressure rapidly returned to its baseline value after the adenosine administration was stopped. (Binkley, Tr. 143:17-24; TX 1170 at A9.) This rapid return to baseline would suggest to a person of ordinary skill in the art in 1985 that there

was very little dipyridamole remaining by the end of the adenosine administration, and would motivate such a person to conclude that the dipyridamole pretreatment could be omitted given that exogenous adenosine alone appeared to sustain the reduction in blood pressure.  (Binkley, Tr. 146:25-147:21.)

   **PCF109.**    *See* **Response to DFF106 and PCF93 and 106.**

   DFF110.    Sollevi I concludes by referring to the intravenous administration of adenosine without dipyridamole pretreatment and states:

>    ADO in low molar concentrations rapidly induced a remarkably stable and easy reversible CH in man (see Fig 1), by a profound reduction in SVR concomitant with increased CO . . . It is concluded that the hemodynamic and metabolic properties of adenosine make it a suitable agent for CH in man.

(Binkley, Tr. 136:23-137:8, 146:25-147:21; TX 1170 at A9; DTX 3030; DTX 3059; DTX 3064.) Sollevi I defines "ADO" as adenosine and "CH" as controlled hypotension. (TX 1170 at A9.)

   **RESPONSE:  The record reflects that the patients in *Sollevi I* (TX-1170) received a dipyridamole pretreatment.  For the proposed finding to imply otherwise is misleading.**

   **Thus, the following counterfinding is proposed:**

   **PCF110.**    ***Sollevi I* concludes the report of his experiments in which he administered adenosine following a dipyridamole pretreatment by stating:**

>    **ADO in low μmolar concentrations rapidly induced a remarkably stable and easily reversible CH in man (see Fig 1), by a profound reduction in SVR concomitant with increased CO . . . It is concluded that the hemodynamic and metabolic properties of adenosine make it a suitable agent for CH in man.**

**(Binkley, TX-1170 at A9.)  *Sollevi I* defines "ADO" as adenosine and "CH" as controlled hypotension. (TX-1170 at A9.)**

   DFF111.    There is no reference to the need for dipyridamole pretreatment in the conclusion in Sollevi I.  (TX 1170 at A9.)  A person of ordinary skill in the art in 1985 would understand, based on the conclusion set forth in Sollevi I, that adenosine could be administered without dipyridamole to cause selective dilation of the arteries of a human patient without inducing significant venous dilation.  (Binkley, Tr. 136:23-138:9, 139:17-140:8, 143:25-146:7, 146:25-147:21.)

   **RESPONSE:  The record reflects that the patients in *Sollevi I* (TX-1170) were all administered a dipyridamole pretreatment.  It would be impossible for one of skill in the art to read the abstract of less than one page without keeping that in mind.**

**PCF111.**    *See* **PCF110.**

DFF112.    A person of ordinary skill in the art in 1985 would understand that the investigators in the Sollevi I study had achieved a substantial amount of selective arterial vasodilation through the combination of the administration of dipyridamole and adenosine, and that eliminating dipyridamole and administering the same or a higher dose of adenosine would enable a physician to achieve selective arterial vasodilation, even if not to the same great (and often unnecessary) magnitude.  (Sollevi, Tr. 486:9-12; Binkley, Tr. 139:17-141:7.)

**RESPONSE:  By September 1985, researchers had tested only two potential uses for adenosine, (1) treatment of the abnormal heart rhythm known as "PSVT" and (2) inducing controlled hypotension during surgery in conjunction with dipyridamole pretreatment. The only reports on the use of adenosine for controlled hypotension in connection with dipyridamole were the two Sollevi abstracts (*Sollevi I* (TX-1170) and *Sollevi II* (TX-37).) Nothing in the prior art suggested other uses for adenosine.  Indeed, the only medical use of adenosine infusion in the prior art relied upon by Sicor in Dr. Binkley's expert reports concerned selective vasodilation for inducing hypotension.  (Binkley 285:11-20; Klabunde 528:12-529:1; DTX-2002.)  Moreover, in view of the potential for side effects associated with adenosine, nothing suggested removing the dipyridamole pretreatment, whose explicitly stated purpose was to minimize the necessary does of adenosine.  (TX-1170; Klabunde 529:6-530:8.)  Thus, the following counterfinding is proposed:**

**PCF112.    While a person of ordinary skill in the art in 1985 would understand that the investigators in the *Sollevi I* study (TX-1170) had safely achieved a substantial amount of selective arterial vasodilation through the combination of the administration of dipyridamole and adenosine, persons so skilled would have recognized (1) that a large degree of vasodilation was necessary to achieve the medical purpose of reducing the blood pressure to reduce the risk of rupture of a cerebral aneurysm during surgery (Sollevi 434:22-436:24), and (2) that the dipyridamole pretreatment was necessary to keep the adenosine dose down to a safe level.  (Sollevi 438:8-439:6; *see also* Klabunde 529:6-530:8.) The prior art relied on by Sicor in its expert reports did not identify any use other than**

**controlled hypotension (with a targeted 40% decrease in blood pressure) with a**

**dipyridamole pretreatment for adenosine infusion. (Binkley 285:11-20; Klabunde**

**528:12-529:1; DTX-2002.)**

DFF116.    Sollevi II teaches the administration of a continuous intravenous infusion of adenosine at a molar dose that is equivalent to 140 µg/kg/min to induce controlled hypotension in ten anesthetized patients undergoing surgery for cerebral aneurysms. (Binkley, Tr. 148:16-22; TX 37 at 11A:C16; DTX 3032; DTX 3033.) A dose of 0.5 µmol is equivalent to a dose of 138.62 µg (approximately 140 µg), based upon the molecular weight of adenosine provided in the Adenoscan package insert (267.24). (Binkley, Tr. 149:1-14; TX 75 at 1; DTX 3032.) A person of ordinary skill in the art in 1985 would have been able to perform this straightforward conversion calculation. (Binkley, Tr. 149:3-14.)

**RESPONSE: This proposed finding implies that adenosine was the only relevant**

**pharmaceutical given. That implication is contrary to the evidence, which clearly shows**

**that a dipyridamole pretreatment was administered prior to adenosine infusion. (*See, e.g.*,**

**Klabunde 527:12-20; Sollevi 438:17-439:6; TX-37.) Thus, the following counterfinding is**

**proposed:**

**PCF116.    *Sollevi II* (TX-37) teaches the administration of a continuous**

**intravenous infusion of adenosine, following a dipyridamole pretreatment. The molar dose**

**of adenosine administered was an amount equivalent to 140 µg/kg/min. (Sollevi 442:19-23,**

**443:12-15.) The purpose of the administration was to induce controlled hypotension in ten**

**anesthetized patients undergoing surgery for cerebral aneurysms. (TX-37 at 11A:C16.)**

DFF118.    Sollevi II reported a mean reduction in MABP of 43% and a relatively large mean decrease in SVR of 61%. (Binkley, Tr. 149:17-150:3; TX 37 at 11A:C16.) Sollevi II teaches a person of ordinary skill in the art in 1985 that the significant decrease in MABP and the large drop in SVR suggest that the administration of adenosine resulted in selective arterial vasodilation, since arteries reduce pressure by dilating. (Binkley, Tr. 150:8-19.)

**RESPONSE: This finding is contrary to the evidence to the extent it implies that the**

**adenosine alone was responsible for the drop in MABP and SVR reported by Dr. Sollevi,**

**whereas the evidence clearly shows that in *Sollevi II* a dipyridamole pretreatment was used**

**before the adenosine was administered. (*See, e.g.*, Klabunde 527:12-20; Sollevi**

**438:17-439:6; TX-37.) In addition, determining whether selective arterial vasodilation had**

33

occurred requires measurement of more hemodynamic parameters than MABP and SVR. Thus, the following counterfinding is proposed:

PCF118.        *Sollevi II* reported a mean reduction in MABP of 43% and a relatively large mean decrease in SVR of 61%.  (Binkley 149:17-150:3; TX-37 at 11A:C16.) Vasodilation in response to adenosine is determined by systemic vascular resistance changes calculated from the cardiac output and mean arterial blood pressure.  (Klabunde 545:6-16.)  Determining whether selective arterial vasodilation occurred would require measurement of changes in venous function, such as central venous pressure or right atrial pressure.  (*Id.*)  Dr. Sollevi took such measurements in his studies and concluded there was selective arterial vasodilation based on clear-cut reduction in vascular resistance associated with essentially unaffected filling pressures and "without exception" an increase in cardiac output.  (Sollevi 433:23-434:11; TX-37).)

DFF119.        Sollevi II also reported a large increase in cardiac output of 40%. (Binkley, Tr. 149:17-150:3; TX 37 at 11A:C16; DTX 3036.)  Sollevi II teaches a person of ordinary skill in the art in 1985 that the large increase in CO suggests that the administration of adenosine resulted in selective arterial vasodilation, since one would expect a *decrease* in CO if there was any venodilation.  (Binkley, Tr. 150:8-19.)

RESPONSE:  This finding is contrary to the evidence to the extent it implies that the adenosine alone was responsible for the increase in cardiac output reported by Dr. Sollevi, whereas the evidence clearly shows that in *Sollevi II* a dipyridamole pretreatment was used before the adenosine was administered.  (*See, e.g.*, Klabunde 527:12-20; Sollevi 438:17-439:6; TX-37.)  In addition, determining whether selective arterial vasodilation has occurred requires measurement of more hemodynamic parameters than CO alone.  Thus, the following counterfinding is proposed:

PCF119.        *Sollevi II* also reported a large increase in cardiac output of 40%. (Binkley 149:17-150:3; TX 37 at 11A:C16.)  Vasodilation in response to adenosine is determined by systemic vascular resistance changes calculated from the cardiac output and

mean arterial blood pressure.  (Klabunde 545:6-16.)  Determining whether selective

arterial vasodilation occurred would require measurement of changes in venous function,

such as central venous pressure or right atrial pressure.  (*Id.*)  Dr. Sollevi took such

measurements in his studies sand concluded there was selective arterial vasodilation based

on clear-cut reduction in vascular resistance associated with essentially unaffected filling

pressures and "without exception" an increase in cardiac output.  (Sollevi 433:23-434:11;

TX-37.)

DFF120.    Based on these results, Sollevi II would teach a person of ordinary skill in
the art at the relevant time that the intravenous administration of 140 µg/kg/min of adenosine
would selectively dilate the arteries of a human patient without inducing significant venous
dilation.  (Binkley, Tr. 150:8-151:24; DTX 3037.)  As described *supra* in paragraphs 55-56, a
decrease in SVR coupled with a decrease in MABP and an increase in cardiac output is a strong
suggestion that dilation of arteries occurred.  (Binkley, Tr. 94:17-95:7.)  An increase in cardiac
output would also indicate that little or no venous dilation occurred.  (Binkley, Tr. 94:22-95:13.)

RESPONSE:  This finding is contrary to the evidence to the extent it implies that the

adenosine alone was responsible for the increase in cardiac output reported by Dr. Sollevi,

whereas the evidence clearly shows that in *Sollevi II* a dipyridamole pretreatment was used

before the adenosine was administered.  (*See, e.g.*, Klabunde 527:12-20; Sollevi

438:17-439:6; TX-37.)  Thus, the following counterfinding is proposed:

PCF120.    Based on the disclosed changes in MABP, SVR, and CO, along with

the unaltered pulmonary vascular resistance, *Sollevi II* (TX-37) would teach a person of

ordinary skill in the art at the relevant time that the intravenous administration of 140

µg/kg/min of adenosine following dipyridamole pretreatment would selectively dilate the

arteries of a human patient without inducing significant venous dilation.  (Klabunde

545:6-16; Sollevi 433:23-434:11.)  Vasodilation in response to adenosine is determined by

systemic vascular resistance changes calculated from the cardiac output and mean  arterial

blood pressure.  (Klabunde 545:6-16.)  Determining whether selective arterial vasodilation

occurred would require measurement of changes in venous function, such as central venous

pressure or right atrial pressure. (*Id.*) Dr. Sollevi took such measurements in his studies

and concluded there was selective arterial vasodilation based on clear-cut reduction in

vascular resistance associated with essentially unaffected filling pressures and "without

exception" an increase in cardiac output. (Sollevi 433:23-434:11; TX-37.)

DFF121.    Sollevi II reports that the adenosine concentration in the plasma returned
to baseline levels within three to nine minutes of discontinuing the adenosine infusion. (Binkley,
Tr. 152:10-153:25; TX 37 at 11A:C16.) Sollevi II also reports that after the adenosine
administration was stopped, mean arterial blood pressure returned to its baseline values within
one to two minutes. (Binkley, Tr. 154:18-22; TX 37 at 11A:C16.) This data would suggest to a
person of ordinary skill in the art in 1985 that the blocking action of dipyridamole described
*supra* in paragraphs 87-90 would have decreased significantly by the time the adenosine
administration began, such that the changes in the hemodynamic parameters observed in Sollevi
II were due to the action of exogenous adenosine, not the action of dipyridamole. (Binkley, Tr.
154:1-17, 154:23-155:14.)

RESPONSE:  Plaintiffs object to this finding because it is based on Dr. Binkley's

previously undisclosed theory that the effects of dipyridamole would have worn off by the

end of the hypotensive period. (Binkley 154:9-155:19, 261:12-262:14; TX-26; TX-43; *see

also* PB at 37-38.) This proposed finding also misquotes from *Sollevi II* (TX 37), as did Dr.

Binkley in his testimony (Binkley 154:18-22). In *Sollevi II*, the abstract clearly states that

the "MABP [mean arterial blood pressure] returned [to baseline] (without any transient

overshoot) within *1 to 5* min[utes]." (emphasis added) rather than 1 to 2 minutes as alleged

in this proposed finding and in Dr. Binkley's testimony. (*See* TX-37.) The following

counterfinding is proposed:

PCF121.    During the experiments described in *Sollevi II*, in the presence of

dipyridamole, adenosine levels did not return to control levels until 3 to 9 minutes after the

adenosine infusion was discontinued at the end of the surgical hypotensive period. (TX-37;

Klabunde 530:9-532:3.) This is a clear indication of the continuing effect of dipyridamole.

(*See id.*) Based on adenosine's known short half-life (< 10 seconds), one of ordinary skill in

the art would have expected adenosine blood levels to return to normal in only 30 to 40

seconds in the absence of dipyridamole. (Klabunde 531:1-532:3; Binkley 265:13-23.)

Dr. Binkley admitted as much on cross-examination, contradicting his earlier testimony.

(*See* Binkley 265:13-23; *compare* Binkley 143:25-145.3.)  The slow return to normal of the

adenosine levels was thus a clear indication that dipyridamole had a strong and continuing

effect on adenosine metabolism throughout the period of hypotension.  (Klabunde

531:1-532:3.)  (*See also* PCF93 and PCF 106.)

DFF122.        Sollevi II concludes by referring to the administration of adenosine
without the use of a dipyridamole pretreatment:

> These results indicate that adenosine may be used to achieve controlled
> hypotension in man since it acts as a rather pure arteriolar vasodilator with rapid
> onset, sustained action and rapid elimination.

(TX 37 at 11A:C16; *see also* Binkley, Tr. 158:22-160:21; DTX 3037; DTX 3060.)

RESPONSE:  The record reflects that all the patients in *Sollevi II* (TX-37) received a

dipyridamole pretreatment.  For the proposed finding to imply otherwise is misleading.

PCF122.        *See* PCF123, below.

DFF123.        There is no reference to the need for dipyridamole pretreatment in the
conclusion in Sollevi II.  (Binkley, Tr. 159:8-18; TX 37 at 11A:C16.)  Therefore, a person of
ordinary skill in the art in 1985 would understand, based on the conclusion set forth in Sollevi II,
that adenosine could be administered without dipyridamole to cause selective dilation of the
arteries of a human patient without inducing significant venous dilation.  (Binkley, Tr. 154:1-
155:14, 158:5-160:21.)

RESPONSE:  The record reflects that all the patients in *Sollevi II* (TX-37) received a

dipyridamole pretreatment.  It would be impossible for one of skill in the art to read the

abstract of less than one page without keeping that in mind.  Thus, the following

counterfinding is proposed:

PCF123.        The reference in *Sollevi II* (TX-37) to adenosine's ability to induce

controlled hypotension is plainly made in the context of dipyridamole pretreatment and

would not have suggested to one of ordinary skill in the art that the dipyridamole

pretreatment could or should have been omitted.  To the contrary, one of ordinary skill in

the art would have understood that dipyridamole allowed lower doses of adenosine to be

**administered to the patients and would have expected that much higher (and potentially**

**unsafe) doses of adenosine would be required in the absence of dipyridamole pretreatment.**

**(Klabunde 529:6-530:8, 537:5-538:6, 1050:11-1051:8.)**

DFF129.    As discussed *supra* in paragraphs 71-83, since exogenous ATP rapidly and completely breaks down to adenosine shortly after its administration, a person of ordinary skill in the art in 1985 would have known to use a simple molar conversion calculation to calculate that 200 to 600 µg/kg/min of ATP is equivalent to doses of between 97 and 290 µg/kg/min of adenosine. (Binkley, Tr. 167:6-168:18; DTX 3039-A-B.)  This calculation is based upon the known molecular weights of those molecules. (Binkley, Tr. 167:20-169:7; DTX 3039-A-B.)  To perform this calculation, a person of ordinary skill would have multiplied the ratio of the molecular weights of adenosine (261) and ATP (551) by the dose of ATP that was administered:

$$261/551 * \text{Dose of ATP} = \text{Dose of Adenosine.}$$

(Binkley, Tr. 167:22-168:7; DTX 3039-B.)  This range overlaps each of the ranges recited in the asserted claims of the '296 patent.  (Binkley, Tr. 171:6-15; TX 275.)

**RESPONSE:  As discussed in connection with Plaintiffs' Responses to DFF71-83,**

**the premise of this proposed finding, *i.e*., that  "ATP rapidly and completely breaks down**

**to adenosine," is contrary to the evidence.  (*See, e.g.*, PCF71-83.)  The conclusions drawn**

**from this faulty premise are therefore flawed.  If Dr. Binkley's premise were correct, the**

**equation posited in this finding would teach someone that less adenosine (approximately**

**half) would be needed to obtain an equivalent response when compared to a dose of ATP.**

**However, the evidence has shown that this is not the case.  Specifically, when Dr. Fukunaga**

**conducted his experiments in humans with a dipyridamole pretreatment, he used a dose of**

**32 mcg/kg/min of ATP to reduce blood pressure by about 40%.  (*See, e.g.*, TX-51;**

**Klabunde 549:4-550:24, 1044:5-25.)  If Dr. Binkley's assumption about the conversion of**

**ATP to adenosine were true, then one would have predicted that only 16 mcg/kg/min of**

**adenosine would have been required for Dr. Sollevi to obtain a similar drop in blood**

**pressure in the presence of a dipyridamole pretreatment.  (Binkley 258:25-260:1; Klabunde**

**549:4-550:14.)  However, Dr. Sollevi needed almost ten times that much adenosine to obtain**

a similar hypotensive response.  (TX-37; TX-1170; Binkley 260:2-20; Klabunde 550:15-24.)

Thus, the following counterfinding is proposed:

PCF129.    As discussed *supra* in PCF71-83, since exogenous ATP is metabolized

as part of a complex set of reactions and is at the same time recreated from certain of its

metabolites, one of ordinary skill in the art would not have found it possible to predict an

equivalent dose of adenosine.  (Klabunde 507:8-508:3, 1116:5-1117:4, Binkley 273:1-274:9.)

*See also* PFF141-144.

DFF132.    The Fukunaga Abstract teaches a person of ordinary skill in the art in 1985
that cardiac output was "well maintained" or increased.  (Binkley, Tr. 165:16-21; TX 42 at A65;
DTX 3043.)

RESPONSE:  Sicor's proposed finding is contradicted by the testimony of

Dr. Klabunde.

PCF132.    The data presented in Figure 3 of the *Fukunaga 1982* abstract showed

that in two out of the five patients for which data is allegedly presented, cardiac output

actually decreased.  (Klabunde 546:3-18; TX-42.)  However, while the figure purports to

show data from five patients, the text of the abstract reports that cardiac output was only

measured in four.  (Klabunde 546:9-547:25; *See* TX-42.)  Consequently, the *Fukunaga 1982*

abstract's cardiac output data is flawed and does not support a finding of selective arterial

vasodilation in patients administered an intravenous infusion of ATP, much less a

consistent response in all patients.  (Klabunde 548:9-20.)  *See also* PCF77.

DFF133.    The teachings of the Fukunaga Abstract would lead a person of ordinary
skill in the art in 1985 to conclude that selective arterial dilation without significant venous
dilation had occurred.  (Binkley, Tr. 163:9-18; 165:22-166:7; DTX 3058.)  As described *supra* in
paragraphs 55-56, a decrease in SVR coupled with a decrease in MABP and an increase in
cardiac output is a strong indication that dilation of arteries occurred.  (Binkley, Tr. 94:17-95:7.)
Since cardiac output is maintained and is not decreasing, a person of ordinary skill would
conclude that little or no venous dilation occurred.  (Binkley, Tr. 166:3-7.)

PCF133.    The *Fukunaga 1982* abstract (TX-42) did not show increased cardiac

output.  (*See*, *e.g.*, PCF132.)  Moreover, the abstract does not even report measurement of

**filling pressures, such as right atrial pressure (Klabunde 545:6-546:2.)  Thus, one of**

**ordinary skill in the art would not recognize a teaching of selective arterial vasodoliation.**

**Moreover, the drug administered by Dr. Fukunaga was ATP, not adenosine.**

DFF134.    A person of ordinary skill in the art in 1985 would understand that the active agent causing the selective arterial vasodilation in the Fukunaga Abstract was adenosine. (Binkley, Tr. 166:12-17.)  Such a person would understand, as discussed *supra* in paragraphs 71-83, that ATP is rapidly and completely degraded to adenosine and that adenosine would be the mediator of arterial vasodilation.  (Binkley, Tr. 166:12-167:1.)

**PCF134.    *See* Plaintiffs' Responses and Counterfindings to DFF71-83.**

DFF136.    A subsequent publication by Fukunaga concerned the administration of ATP following a pretreatment with dipyridamole.  (TX 51, referred to herein as "Fukunaga 1984.")  Fukunaga 1984 would teach a person of ordinary skill in the art that dipyridamole could be a "potentially useful added agent," and is not a requirement for safe and effective selective arterial vasodilation.  (Binkley, Tr. 182:20-183:4.)

**PCF136.    *See* Plaintiffs' Responses and Counterfindings to DFF78, 79.**

DFF137.    The fact that administration of dipyridamole with ATP reduced the amount of ATP that was required to induce controlled hypotension, as reported in Fukunaga 1984, would confirm to a person of ordinary skill in the art that adenosine – not ATP – was responsible for the vasodilation.  (TX 51 at A39.)  A person of ordinary skill would understand that dipyridamole does not block ATP uptake in the blood, but dipyridamole does block adenosine.  (Klabunde, Tr. 1167:15-20.)  A person of ordinary skill would therefore understand that the ATP concentration would not be increased by dipyridamole, but the adenosine concentration would be.  (Klabunde, Tr. 1167:21-1168:1.)

**PCF137.    *See* Plaintiffs' Responses and Counterfindings to DFF78, 79.**

DFF138.    Common sense would tell a person of ordinary skill in the art that the reduction in the amount of ATP needed to induce controlled hypotension when a dipyridamole pretreatment was used would only be possible if adenosine was the active agent and played a substantial role in vasodilation following the administration of ATP.  (Binkley, Tr. 179:13-24; 181:17-22.)

**PCF138.    *See* Plaintiffs' Responses and Counterfindings to DFF78, 79.**

**2.    Counterfindings Regarding Motiviation to Administer Adenosine for Any Medical Use Other Than Inducing Controlled Hypotension**

DFF139.    Based on the teachings in Sollevi I, Sollevi II, and the Fukunaga Abstract,

a person of ordinary skill in the art in 1985 would understand that the controlled hypotension

observed in each of these abstracts following the administration of adenosine was a well-

understood and natural consequence of arterial vasodilation. (Binkley, Tr. 124:6-24, 137:20-138:9.)

**PCF139.        In the *Sollevi I* and *Sollevi II* abstracts, dipyridamole pretreatment preceded adenosine administration. Thus, they would not have taught one of ordinary skill in the art about administration of adenosine alone. *See* PCF 101-123. Moreover, the *Fukunaga 1982* abstract describes administration of ATP, not adenosine. (TX-151) This abstract would not have taught one of ordinary skill in the art about administration of adenosine.**

DFF140.        A person of ordinary skill in the art in 1985 would have realized that nearly maximal arterial dilation had occurred because controlled hypotension had been achieved. (Binkley, Tr. 124:6-24, 137:20-138:9.)

**RESPONSE: Plaintiffs object to the proposed finding as irrelevant and erroneous. Contrary to Sicor's suggestion, the cited testimony does not refer to "maximal arterial dilation" in the patients described in the *Sollevi I* and *II* abstracts. The degree of hypotension established in the patients was based on the needs of the surgeon performing the aneurysm surgery balanced against the patients' safety. (Sollevi 435:24-436:24.)**

DFF141.        A person of ordinary skill in the art in 1985 would have understood that arterial dilation occurs over a range – it is not an "all or nothing" phenomenon. (Binkley, Tr. 137:20-138:9.) Such a person would have realized that while controlled hypotension is conclusive evidence that arterial vasodilation was achieved (Klabunde, Tr. 1059:19-22), lesser degrees of arterial dilation would not necessarily cause controlled hypotension (Klabunde, Tr. 1059:23-1060:4), but could be important for other medical uses (Klabunde, Tr. 1079:21-1080:2).

**PCF141.        *See* Response to DFF142 and PCF142.**

DFF142.        At the relevant time period, persons of ordinary skill were actively researching additional uses for selective arterial vasodilators, including uses in the treatment of hypertension (Binkley, Tr. 1372:25-1374:3), in the treatment of congestive heart failure (Binkley, Tr. 1370:15-1372:10), in the diagnostic procedure of myocardial perfusion imaging (Binkley, Tr. 1374:4-1375:7), and in the treatment of limb ischemia (Binkley, Tr. 1372:11-24).

**PCF142.        Plaintiffs object to this finding because Dr. Binkley's opinions regarding alternative medical uses for adenosine were not included in either of his expert reports. (PB at 37-38; POB at § II.B.) The only prior art Sicor and Dr. Binkley identified**

41

and relied upon prior to concerned surgical hypotension, not other medical uses. (Binkley 285:11-20; Klabunde 528:12-529:1; DTX-2002). Sicor did not offer into evidence any statutory prior art or other reliable evidence describing these other medical uses. (*See* DB at 8-10.) Nor could it have, because no such prior art, other evidence, or even the theory of invalidity had been disclosed in its expert reports or notice under 35 U.S.C. § 282. (*See* PB at 37-38.) Substantively and scientifically, Sicor's asserted alternative uses would not have been viewed as reasonably likely to succeed because of known properties and side effects of adenosine. (*See* PB at 26-28; POB at § II.(B)(4).)

PCF142.     While Dr. Binkley asserted that one of ordinary skill would have thought adenosine could be substituted for known vasodilators in patients suffering from congestive heart failure (Binkley 1371:12-24), he did not address concerns that would have existed about administering adenosine to patients with heart disease. Dr. Sollevi was sufficiently concerned about the effects of adenosine in heart patients that he excluded such patients from his studies. (TX-1170 ("Nine patients (35-58 years) without cardiopulmonary disease . . . ."); Sollevi 441:16-442:2.) Even in the 1990s, physicians were reluctant to administer adenosine infusions to patients with coronary artery disease because of concern over AV block. (Klose 1516:3-1517:1). Similarly, while Dr. Binkley suggested that adenosine would have been seen as a treatment for patients with hypertension (high blood pressure), the *Biaggioni 1985* abstract reported that administration of adenosine did not reduce mean arterial blood pressure in normal volunteers at a doses of 140 mcg/kg/min, and that higher doses were not tolerable. (*See* TX-1187; Klabunde 554:14-555:5.) Likewise, Dr. Binkley offered no testimony or corroborating evidence to suggest how or why adenosine would have been viewed as reasonably likely to succeed in treating limb ischemia when there were only "*some efforts*" to perform such treatment even with conventional vasodilators. (Binkley 1372:11-24, emphasis added.)

DFF143.        As part of this research, persons of ordinary skill in the art often studied the properties of arterial vasodilators in order to determine whether a specific vasodilator would be suitable for a particular use.  (Binkley, Tr. 1370:15-1375:7.)

**RESPONSE:  Plaintiffs object to this finding because Dr. Binkley's opinions**

**regarding alternative medical uses for adenosine were not included in either of his expert**

**reports.**

**PCF143.        *See* PCF142.**

DFF144.        The following prior art reference concerned a study of the hemodynamic properties of adenosine in man:

> I.O. Biaggioni *et al., Humoral and Hemodynamic Effects of Adenosine Infusion In Man, Clinical Res*., 33(2): 280A (April 1985) ("Biaggioni Abstract").

(TX 1187.)  The Biaggioni Abstract concerns a clinical study of the relationship between the cardiovascular effects of adenosine and inhibition of sympathetic nervous system activity.  (TX 1187 at 280A.)

**PCF144.        The Biaggioni abstract (TX-1187) investigated the hypothesis that the**

**effects of adenosine were due to inhibition of the sympathetic nervous system in five**

**healthy normal volunteers.  The data failed to support that hypothesis.  (*See* TX-1187)  The**

**abstract did not describe any human medical use for continuous infusion of adenosine.**

**(Klabunde 552:21-23.)**

DFF145.        The Biaggioni Abstract discloses the administration of continuous intravenous infusions of adenosine without dipyridamole pretreatment to five conscious volunteers at a rate of 10 µg/kg/min to 140 µg/kg/min, with no serious side effects reported.  (Binkley, Tr. 172:12-173:1, 174:19-22, 175:5-176:4; TX 1187 at 280A; DTX 3062.)

**PCF145.        The Biaggioni Abstract (TX-1187) did not report a medical use for**

**adenosine.  (Klabunde 552:21-23.)  Moreover, the side effects that were reported (headache,**

**nervousness, subjective flushing in the head and neck, and shortness of breath) were**

**serious enough in healthy volunteers to prevent higher doses from being used.  (Klabunde**

**555:9-17.)  Additionally, no data was provided in the abstract that would allow one to**

determine whether selective arterial vasodilation had occurred (Klabunde 553:19-554:13)

and no hypotension was reported (Klabunde 555:3-5).

DFF146.     The Biaggioni Abstract would teach a person of ordinary skill in the art at the relevant time that adenosine could be administered intravenously to humans at the claimed dose of 140 μg/kg/min without dipyridamole pretreatment and without the occurrence of serious side effects.  (Binkley, Tr. 172:12-173:1, 174:19-22, 175:5-176:4; TX 1187 at 280A; DTX 3062.)  This teaching would motivate such a person to seek additional uses for adenosine alone as a selective vasodilator.  (Binkley, Tr. 174:5-13, 1375:9-1377:17; Klabunde, Tr. 1079:21-1080:2.)

**RESPONSE:  Plaintiffs object to this finding because Dr. Binkley's opinions regarding alternative medical uses for adenosine were not included in either of his expert reports.  (*See, e.g.*, Binkley 307:2-14, 1444:5-25; POB at § II (B); *see also* PCF142.).  Dr. Binkley changed his testimony concerning the Biaggioni abstract (TX 1187) during his rebuttal testimony.  Having agreed on cross-examination during the first week of trial that the Biaggioni abstract did not show any medical use of adenosine, he offered contrary testimony during rebuttal.  (*Compare* Binkley 256:13-17 (2/12/07) *with* 1375:14-18 (2/26/07) *but see* 1484:17-1485:7.)**

**PCF146.     One of ordinary skill in the art at the relevant time would not have learned from the Biaggioni abstract (TX-1187) that adenosine could be administered intravenously to humans without dipyridamole pretreatment and without side effects for any medical purposes.  Rather, one would be taught that  (1) the doses administered were not high enough to induce hypotension in the five normal volunteers in the study (Klabunde 555:3-5) and (2) side effects serious enough to prevent higher doses occurred (Klabunde 555:9-17).**

### 3.     Counterfindings Regarding Motivation to Administer Adenosine Without Dipyridamole Pretreatment

DFF147.     A person of ordinary skill in the art at the relevant time would have been motivated to administer adenosine alone, without dipyridamole pretreatment, because such a person would believe that it is better, in general, to administer one drug rather than two, at least in order to reduce the possible risk of unfavorable or dangerous drug interactions.  (Binkley, Tr. 183:5-14, 183:19-184:5, 184:6-10, 184:18-185:2, 185:3-19; DTX 3045.)

**RESPONSE: Dr. Binkley's mere assertion on this point is belied by the evidence showing that those actually working in the field,** *i.e.,* **Drs. Sollevi and Fukunaga, used and recommended dipyridamole pretreatment.  (***See, e.g***., Sollevi 434:12-17, 477:15-478:1, 438:17-439:6, 440:18-441:5; TX 51; Klabunde 529:6-530:8; 540:15-541:16.)  Both would plainly have been aware that, in the abstract, one drug would be preferable to two, but each used dipyridamole pretreatment to avoid anticipated side effects.  (***See also*** POB at § II(A)(1).)  Thus, the following counterfinding is proposed:**

**PCF147.      A person of ordinary skill in the art at the relevant time would have believed dipyridamole pretreatment to be an important safety measure associated with adenosine infusion to humans and would not have eliminated it.  (Sollevi 438:17-439:6, 440:18-441:5; TX 51; Klabunde 529:6-530:8, 540:15-541:16.)  (***See also*** PCF148.)**

DFF148.      A person of ordinary skill in the art in the relevant time would have understood that the administration of dipyridamole with adenosine would prolong any side effects that might occur, given that dipyridamole had a longer half life than adenosine.  (Binkley, Tr. 200:5-201:4, 205:14-24; Klabunde, Tr. 1096:11-25.)

**PCF148.      Dr. Sollevi used dipyridamole to reduce the necessary dose of adenosine and stabilize the adenosine concentration gradient, making it less likely that side effects would occur in the first place.  (Sollevi 438:17-439:6.)  Dr. Sollevi testified that the administration of adenosine and dipyridamole together actually reduced the concentration gradient between the heart and the peripheral circulation.  (***Id.***)  In the absence of dipyridamole, this gradient would cause a higher concentration of adenosine to be experienced by the heart before the drug passes to the periphery, where it causes selective vasodilation.  Thus, dipyridamole pretreatment caused less adenosine to be present at the heart while still getting the same amount at the periphery.  This "stabilizing" of the gradient actually improved patient safety.  Moreover, even if dipyridamole would have potentiated side effects from high doses of adenosine, it was still clearly viewed as beneficial because it reduced the needed dose of adenosine to avoid such side effects in the first place.**

**Indeed, to suggest otherwise is to assume that both Drs. Sollevi and Fukunaga knew less than one of ordinary skill in the art and were foolish to include the dipyridamole in the first place.**

DFF149.      A person of ordinary skill in the art at the relevant time would understand that administration of adenosine and dipyridamole together would result in a greater increase in the circulating adenosine level in the blood stream, which would increase the likelihood that concentration-dependent side effects could occur. (Klabunde, Tr. 1096:11-25; Binkley, Tr. 209:7-14.)

PCF149.      *See* **PCF148.**

DFF150.      The dose of adenosine to be intravenously administered safely and effectively for a given medical use could be determined by a simple dose titration. (Binkley, Tr. 204:24-205:13, 208:20-209:6; TX 36 at 1261.)

**PCF150.      When the prior art studies (TX-36; TX-37; TX-51; TX-101; TX-10; TX-1170) were considered, they would have suggested that to achieve hypotension with adenosine in the absence of dipyridamole in the way Dr. Sollevi had at a dose of 140 mcg/kg/min in the presence of dipyridamole would require at least a 10-fold or greater increase in the dose of adenosine administered. (Klabunde 543:12-544:7.) Dr. Sollevi had concluded, based on his own studies, that as much as twenty times more adenosine would be required in the absence of dipyridamole than in its presence. (Sollevi 440:7-17.) In addition, Dr. Klabunde performed studies in the early 1980s demonstrating and quantifying the rapid breakdown of adenosine in human blood. (TX-101; Klabunde 501:16-503:20.) Dr. Klabunde found that, by inhibiting adenosine metabolism, dipyridamole dramatically increased adenosine's half-life in human blood, leading him to conclude in 1983 that "the usual therapeutic concentrations of dipyridamole are sufficient to inhibit adenosine metabolism by more than 90% in whole blood." (TX-101 at 25; Klabunde 503:21-504:2., s*ee generally* PFF101-108.) Administering such a large dose of adenosine (*e.g.*, in excess of 1,400 mcg/kg/min) would have been out of the question given the likelihood of causing bradycardia, cardiac arrest, or AV block, as well as potential**

kidney toxicity due to accumulation of the adenosine metabolite uric acid. (Klabunde

537:5-538:6, 1054:2-1055:1) Faced with such risks, a person of ordinary skill in the art

would have been discouraged from even attempting adenosine infusion without

dipyridamole pretreatment. (Klabunde 557:10-558:19.)

DFF151.     Dose titration of adenosine would have been a matter of routine
experimentation to a person of ordinary skill in the art in the relevant time period. (Binkley, Tr.
204:24-205:13; Klabunde, Tr. 1132:21-1133:1; TX 36 at 1261.) The short half life of adenosine
would enable a person of ordinary skill to titrate the dose of adenosine to be administered to a
patient individually with routine medical monitoring. (Binkley, Tr. 204:24-205:13, 208:20-209:6,
211:12-24, 216:17-23, 217:4-16, 219:2-220:2; TX 36 at 1261; TX 45 at 418-20; TX 46 at
1604-05; TX 48 at 2229.)

PCF151.     *See* PCF150.

DFF152.     As early as 1983, other published research expressly suggested the
administration of adenosine without dipyridamole:

> [W]e speculate that adenosine alone, without the potentiating effects of
> dipyridamole, may be sufficient to produce hypotension in higher primates and
> man without involving excessive volumes of fluid.

(TX 40 at 73 *see also* Klabunde, Tr. 1197:13-1198:5.)

PCF152.     The Kassell publication (TX-40) describes a study in dogs where an

unmanageably large volume of fluid carrier was needed to infuse the adenosine. To deal

with this problem, Kassell used a dipyridamole pretreatment to reduce the necessary dose

of adenosine by nearly 200-fold (compare dose of 3mg/kg/hr of adenosine with

dipyridamole pretreatment to 600 mg/kg/hr required without dipyridamole pretreatment)

(TX-40 at 73; Klabunde 532:7-534:25.) (*See* PFF106). Kassell speculated that such a large

fluid volume might not be required in humans, whereby the dipyridamole pretreatment

might be avoided. By the time of the invention in the '296 patent, however, there was no

need to speculate about the relationship between the amount of adenosine with

dipyridamole pretreatment needed to achieve a 40% reduction in blood pressure in dogs

(Kassell) versus humans. The *Sollevi I* and *Sollevi II* abstracts provided a basis for such

comparison. The issue was whether elimination of the dipyridamole in *Sollevi I* and *Sollevi*

47

**II would require infusion of a dangerously high level of adenosine.  The portion of Kassell relevant to this issue was his report of a dramatic increase in the amount of adenosine required in the absence of dipyridamole--two orders of magnitude more.  (TX-40 at 73.) The possibility of needing up to 200 times more adenosine than was used in *Sollevi I* and *Sollevi II* with dipyridamole pretreatment would have made elimination of that pretreatment in humans unthinkable.  (Klabunde 535:13-536:8.)  Thus, one of ordinary skill would have focused in Kassell on the dramatic difference in the amount of adenosine required in the absence of dipyridamole--two orders of magnitude more.  (TX-40 at 73.)**

### 4.    Counterfindings Regarding Secondary Factors

DFF153.    Plaintiffs have alleged a number of secondary considerations of non-obviousness, including unexpected results, skepticism of experts, and commercial success of its Adenoscan® product.  (*See* Plaintiffs' Opening Statement, Tr. 54:24-55:16, 67:24-68:18, 69:4-70:1.)  As discussed *infra* in paragraphs 154-224, none of this evidence shows that the '296 patent was not obvious.

**PCF153.    The record contains strong objective evidence of nonobviousness in the form of skepticism followed by praise by experts in the field, commercial success, unexpected results, and copying.  (*See generally* PFF110-115, 119-134, 190-213.)**

DFF154.    Plaintiffs rely upon three "side effects" associated with adenosine as evidence in support of their secondary considerations: (1) AV block, (2) uric acid build-up, and (3) excessive fluid load.  (*See* Plaintiffs' Opening Statement, Tr. 54:24-55:16, 67:24-68:18, 69:4-70:1.)  Each of these side effects – to the extent they are linked to adenosine  – are typically relatively mild and short in duration.  (Binkley, Tr. 198:9-14, 227:4-9; Klabunde, Tr. 1207:5-1208:3.)

**PCF154.    Sicor's contention that side effects associated with adenosine administration were "typically relatively mild and short in duration" and thus would not have discouraged one of ordinary skill in the art is belied by the history of adenosine development.  The ability of adenosine to interfere with electrical signals in the human heart was reported in the 1930s (TX-187).  Thereafter, human medical use of adenosine had been "precluded both by the transitory nature of its vasodilator effects and by its toxic actions on the heart."  (TX-214 at 415.)  In the half century between the first**

48

administration of adenosine to humans and the time of the invention of the '296 patent, the
only human medical uses of adenosine involved either intentional interference with the
heartbeat to treat PSVT or coadministration of dipyridamole to keep the adenosine dose
low enough to avoid such interference during controlled surgical hypotension.  (*See* TX-37,
TX-1170)  The refusal for 50 years to administer adenosine for any other human medical
use strongly confirms that persons of ordinary skill in the art were discouraged from doing
so by concerns over the safety of adenosine.  The effects characterized by Sicor as "mild"
were observed in circumstances where the doses were limited either by the length of the
injection (bolus doses for PSVT) or by coadministration of dipyridamole.  The side effects
observed in the Biaggioni abstract (TX-1187) were at doses that would have been perceived
as too low to induce the controlled hypotension for which adenosine was used in the prior
art and sufficiently severe that they prevented administration of higher doses.  (Klabunde
555:3-5, 9-17)  Moreover, Sicor's suggestion that the long failure of the prior art to adopt
adenosine for human medical use was "due to the lack of an approved pharmaceutical-
grade product suitable for human injection" (DB at 10) is not plausible.  The record here
reflects that adenosine for human use was readily available to researchers interested in
using it, including Jezer in the 1930s (TX-187), DiMarco in 1983 (TX-36), Sollevi in 1983
(TX-1170), and Biaggioni in 1985 (TX-1187).  (*See also* Binkley 332:3-14.)

DFF155.     None of these side effects would have discouraged a person of ordinary
skill in the art in 1985 from administering an intravenous infusion of adenosine at the claimed
rate in the absence of dipyridamole.  (Binkley. Tr. 200:5-201:4.)  Since dipyridamole lengthens
the duration of the side effects associated with adenosine, these side effects would have
motivated a person of ordinary skill to omit the dipyridamole pretreatment when administering
adenosine.  (Binkley. Tr. 200:5-201:4, 203:10-17, 204:13-23, 205:14-24, 209:7-14.)

PCF155.     While Sicor asserts that dipyridamole would prolong any side effects
that would occur because dipyridamole has a longer half-life than adenosine, Dr. Sollevi
believed such side effects would be less likely to occur due to the lower dose and smoother
adenosine concentration gradient attained with dipyridamole pretreatment. (Sollevi

438:17-439:6.)  **Moreover, the use of dipyridamole by both Drs. Sollevi and Fukunaga to reduce the dose of adenosine (or ATP) administered, thereby reducing the chance of side effects, clearly would have taught away from administering adenosine by infusion without dipyridamole pretreatment.  (*See* PCF 148.)**

DFF157.      AV block is a disruption in the electrical circuit from the top chamber of to the bottom chamber of the heart, and it generally progresses in stages.  (Binkley, Tr. 197:14-23.)  For example, Stage I of AV block is the most common form and, when it occurs, appears as an asymptomatic "blip" on a electrocardiograph ("ECG") monitor that usually cannot be felt by a patient.  (Binkley, Tr. 198:9-14.)

**RESPONSE:  This finding, to the extent it implies that first degree AV block is not of concern to physicians, is misleading.  Dr. Binkley did not refer to first degree AV block as merely a "blip" on an ECG monitor but stated that, while usually asymptomatic, it could cause slowing of the heart rate.  (Binkley 198:9-12.)  Moreover, Sicor's expert Dr. Strauss testified that even first degree AV block was a concern because it could be a precursor to other problems.  (Strauss 768:18-21.)  While Sicor dismisses AV block as a minor concern, the prior art noted that overdosage of adenosine "might lead to prolonged asystole [cardiac arrest], hypotension or other tachyarrhythmias."  (TX-45 at 423.)  Even years later, physicians remained concerned about AV block when Adenoscan[1] was first introduced into the marketplace.  (Klose 1516:3-1517:1.)  As Dr. Zaret noted, AV block does not necessarily proceed in an orderly fashion from first to third degree, but may first manifest as third degree.  (Zaret 1954:20-1955:12.)[2]  Thus, the following counterfinding is proposed:**

**PCF157.      "AV block" is the interruption of conduction in the AV node of the heart, which was known to coordinate the beating of the upper chambers of the heart (the**

---

[1]      **Adenoscan® (hereinafter "Adeoscan") is a registered trademark of Astellas.**

[2]      **Dr. Zaret was not called at trial by either party.  However, Sicor asserted that it should be allowed to offer portions of Dr. Zaret's deposition testimony into the record.  If the Court receives that designated testimony, Plaintiffs request that the additional sections designated by Plaintiffs be received as well.**

atria) and the lower chambers (the ventricles).  (Klabunde 519:8-520:18.)  There are three

degrees of AV block.  In "first degree" AV block, there is some delay in the conduction

going through the AV node, but all the impulses will travel through.  (Klabunde 519:8-

520:18.)  "Second degree" AV block is more severe and not all of the impulses will go from

the atria into the ventricles; therefore, the atrial rate may be higher than the ventricular

rate.  (*Id.*)  Third degree AV block, also known as "complete AV block," is the most severe

because the action potentials or electrical currents going through the AV node are

completely blocked, preventing any activity from the atria from getting into the ventricles.

(*Id.*)  (*See* PFF21-22.)  Even first degree AV block was a concern because it could be a

precursor to other problems.  (Strauss 768:18-21.)

DFF158.    If AV block were observed during adenosine administration by a person of
ordinary skill in the art in 1985, it would typically resolve shortly after the administration of
adenosine is stopped, due to the short half life of adenosine.  (Binkley, Tr. 200:5-18.)  In other
words, the doctor would simply need to turn the adenosine infusion off to stop the AV block
"very quickly."  (Klabunde, Tr. 1133:20-1134:2.)

PCF158.    Sicor posits that if a person of ordinary skill ignored five decades of

concern over the safety of adenosine infusion and nonetheless attempted to induce

controlled hypotension during cerebral aneurysm surgery by using adenosine without the

protective dipyridamole pretreatment disclosed in *Sollevi I* and *Sollevi II*, he might

nonetheless avoid killing the patient with the adenosine by quickly turning it off.  Of course,

immediately turning off the adenosine would also immediately turn off the hypotension

needed for the safe conduct of the surgery, perhaps at a critical juncture in the procedure.

(*See* Sollevi 434:22-436:24.)  The fact that the state of the art suggested that a huge

adenosine dose of at least 1,400 mcg/kg/min would likely be required to attain the needed

hypotension caused the perceived risk of encountering AV block or some other untoward

side effect to be too high to justify the experiment, *i.e.*, there was no reasonable expectation

of success.  (*See* Klabunde 543:12-544:7; 536:13-538:6.)  That is why the invention was

nonobvious.  Moreover, even "rapid" cessation of side effects after cessation of adenosine

infusion would not alleviate concerns.  An effect that terminated within one minute would

still plainly be of major concern if the patient's heart was not beating.  Even titration

would not eliminate concerns about risk.  (Zaret 1953:2-1954:18; 1963:4-9.)  For example,

there remained the possibility that the effect of adenosine would set off a chain reaction

that would not be easily terminated.  (*See* Zaret 1946:17-1947:14.)  Regardless, there was

no expectation that the vasodilator effect of adenosine would appear before the harmful

AV block effect.  Indeed, Dr. Berne clearly believed this, telling Dr. Sollevi he had thought

it "crazy" to administer adenosine as an infusion (Sollevi 453:13-454:3) and then later

writing to Dr. Sollevi to reiterate his surprise that Dr. Sollevi had not observed AV block in

his patients, because Dr. Berne had observed AV block with adenosine at levels that did not

cause hypotension.  (TX-49; Sollevi 459:3-22.)  (*See* PPF 35, 36, 41, and 42; *see also*

PCF157.)

DFF159.    Persons of ordinary skill at the relevant time would not have been
discouraged from administering intravenous adenosine without dipyridamole pretreatment
because they would have known that the dose of adenosine to be administered to a patient should
be gradually titrated to the desired level (which would be considered routine experimentation).
(Binkley, Tr. 200:5-18, 204:24-205:13, 208:20-209:6, 211:12-24, 216:17-23, 217:4-16, 219:2-
220:2.)

**PCF159.    *See* PCF158.**

DFF160**.**    A person of ordinary skill in 1985 could also monitor a patient with an
ECG to determine whether AV block had occurred and would know that adenosine
administration should be stopped if any signs of AV block (*e.g.*, a decrease in heart rate) were
observed.  (Klabunde, Tr. 1133:2-19.)

**PCF160.    *See* PCF158.  Moreover, ECG machines had been available since 1912**

**or 1917 and adenosine had been known to have vasodilating ability since 1929, but no one**

**performed adenosine infusions over the following 50 years.  (Binkley 266:2-267:1.)**

DFF161.    In addition, a person of ordinary skill would have known to administer an
adenosine agonist (*e.g.*, theophylline and aminophylline) to counteract the effects of adenosine if
AV block were to occur.  (TX 228 at 808.)

**PCF161.**    *See* **PCF158.**

DFF162.        AV block was not associated with the use of adenosine by the continuous intravenous infusion method used by Dr. Sollevi in Sollevi I and II and others in the prior art. (Binkley, Tr. 201:21-203:3.)

**PCF162.        While AV block was not reported in the *Sollevi I* and *Sollevi II***

**abstracts, those patients had received a dipyridamole pretreatment for the express purpose**

**of reducing the necessary dose of adenosine and lowering the likelihood of side effects like**

**AV block.  (*See* TX-37, TX-1170; Sollevi 438:17-439:6.)  Moreover, the Biaggioni 1985**

**abstract would have been perceived as indicating that a dose of 140 mcg/kg/min would not**

**have been sufficient to induce hypotension and that higher doses could not be administered**

**due to intolerable side effects.  (TX-1187; Klabunde 555:3-17.)**

DFF163.        AV block had only been observed in connection with administration of adenosine as a bolus injection.  (Binkley, Tr. 201:10-20; TX 36; TX 45.)  For example, no AV block was reported in the Biaggioni Abstract.  (TX 1187.)

**PCF163.        *See* PCF154 and 162.**

DFF164.        A person of ordinary skill in the art at the relevant time would understand that the risk of AV block would be reduced – if not eliminated – by steady administration of adenosine as a continuous intravenous infusion, instead of administration of the total adenosine dose as a single bolus injection.  (Binkley, Tr. 199:18-200:4.)

**PCF164.        One of ordinary skill would not have believed that the actions of**

**adenosine on the heart could be avoided merely by administering an infusion rather than a**

**bolus.  Dr. Berne, one of the leading experts in the field at the time, fully expected that AV**

**block would be observed in patients receiving an adenosine infusion.  (*See* Sollevi**

**453:13-454:3; 459:3-460:20.)  Indeed, he wrote to Dr. Sollevi that "[o]ne thing I don't**

**understand is how you avoid atriovientricular heart block with doses of adenosine that are**

**required to greatly lower arterial pressure.  We get AV block with doses of adenosine that**

**do not lower blood pressure . . . ."  (TX-49)  At the time he wrote to Dr. Sollevi, Dr. Berne**

**was fully aware that Dr. Sollevi's work involved administering adenosine infusions, not**

**bolus injections, yet even he remained surprised and perplexed as to why that difference in**

method of administration mattered.  (See TX-49, Sollevi 452:25-454:7, 459:1-460:22.)

Moreover, even in the 1990s cardiologists of ordinary skill were reluctant to infuse

adenosine into heart patients for fear of inducing AV block.  (Klose 1516:3-1517:1.)  Thus,

Sicor's contention that one of ordinary skill would have concluded that adenosine infusions

would not cause the AV block observed when adenosine was administered by bolus

injection is not supported by the record.

      DFF167.      Transient increases and fluctuations in uric acid levels, by themselves, are not harmful.  (Binkley, Tr. 227:4-9.)

      **PCF167.**      **Dr. Sollevi and others in the field were concerned over the potential**

**for adenosine infusion to cause a buildup of toxic metabolites, specifically uric acid, that**

**could cause kidney failure.  (Sollevi 433:7-22; see TX-308; TX-441 at 158; TX-255 at 19.)**

**Dr. Francis Robicsek of the Heineman Medical Research Center in Charlotte, North**

**Carolina, had expressed similar concerns about kidney toxicity due to uric acid**

**accumulation associated with adenosine administration in an article he co-authored and**

**published in 1982.  (Sollevi 463:6-464:12; TX-255 at 19.)  That earlier article described**

**administration of an adenosine infusion to dogs in a surgical setting, but warned that**

**"toxicity related to kidney dysfunction may limit the use of adenosine alone and may**

**require xanthine oxidase inhibition to prevent uric acid crystallization in the renal**

**tubules."  (TX-255 at 19.)  After reading Dr. Sollevi's 1985 article, Dr. Robicsek wrote a**

**letter to the editor of the medical journal in which it was published questioning whether Dr.**

**Sollevi had considered the potential toxic effects of uric acid on the kidney and whether he**

**had taken special precautions to prevent it.  (TX-410; Sollevi 464:13-468:7.)  Dr. Robicsek**

**went on to note that he had never applied the adenosine infusion method he had tested in**

**dogs to human patients because of concerns that uric acid accumulation would cause**

**kidney failure.  (See TX-410.)  The editor of the medical journal forwarded Dr. Robicsek's**

**letter to Dr. Sollevi and requested a response, stating that Dr. Robicsek was the chief of a**

leading thoracic surgical clinic in the United States, and that the letter raised a discreet "but still, in my view, justified question on possible effects of adenosine on kidney function." (TX-293; Sollevi 465:8-466:24.) Dr. Sollevi responded to Dr. Robicsek in a detailed scientific letter, prompting Dr. Robicsek to write back to Dr. Sollevi directly. (*See* TX-265; TX-412; TX-413; Sollevi 469:12-472:17.) In that response, Dr. Robicsek reiterated that he had never performed an adenosine infusion in humans because of concerns of uric acid accumulation and congratulated Dr. Sollevi on his "beautifully conducted work." (TX-265; Sollevi 472:2-17.) This exchange directly illustrates how even experts in the field, *i.e.*, the chief editor of a major medical journal and Dr. Robicsek, the chief of a leading thoracic surgical clinic, were skeptical about the safety of adenosine infusion. (*See* Klabunde 1053:5-1055:1.) Dr. Fukunaga was also concerned about uric acid and recommend pretreatment with dipyridamole to prevent buildup of the metabolite in patients receiving ATP infusions. (TX-51.) (*See also* PFF127-134.)

DFF168.    Changes in uric acid levels are only cause for concern (if at all) when substantially and persistently increased over time. (Binkley, Tr. 227:4-9.)

**PCF168.    *See* PCF167.**

DFF169.    A person of ordinary skill would also have known that another agent (allopurinol) could be administered to reduce an unwanted build-up of uric acid in the blood (Binkley, Tr. 358:11-22; Klabunde, Tr. 1200:2-7, 16-20.)

**PCF169.    *See* PCF167. In a 1982 article, Dr. Robicsek, an expert working in the adenosine field, noted that "toxicity related to kidney dysfunction may limit the use of adenosine alone and may require xanthine oxidase inhibition to prevent uric acid crystalization in the renal tubules." Dr. Robicsek went on to note, "our present experiments are addressing this possible problem." Moreover, Dr. Robicsek's later correspondence (TX-410; TX-265; Sollevi 467:20-468:7; 472:2-17) reveals that he never succeeded in addressing the "possible problem" of uric acid build-up but rather abandoned the project because of the perceived problem. Thus, plainly Dr. Robicsek did not believe**

**co-treatment with allopurinol would eliminate the problem.  (*Id.*)  Moreover, Dr. Fukunaga**

**also cited uric acid build-up as a risk of administration of ATP and did not suggest**

**coadministration with allopurinol.  (TX-51.)  He suggested limiting the dose by**

**pretreatment with dipyridamole instead.  (*Id*).  Thus, one of ordinary skill in the art would**

**not have been expected to assume that allopurinol would work to overcome the concerns**

**regarding kidney failure.**

DFF170.    There is no discussion in the published literature regarding the effects of high levels of uric acid following adenosine administration.  (Binkley, Tr. 224:6-226:7.)  For example, no uric acid build-up was reported in the Biaggioni Abstract.  (TX 1187.)

**PCF170.    *See* PCF167 and 169.**

DFF174.    There is no evidence of skepticism of experts that demonstrates the non-obviousness of the asserted '296 patent claims; Plaintiffs rely entirely upon personal, non-public correspondence between the inventor and others in the field, who may or may not be experts. (Klabunde, Tr. 1201:2-16; Binkley, Tr. 363:14-364:4, 364:19-365:7; Zaret, Tr. 1974:12-14, 18-19.)

**PCF174.    There is clear evidence of skepticism and surprise from three experts**

**in the field, Dr. Sollevi, Dr. Robert Berne, identified as an "outstanding physiologist and**

**scientist," a "well-recognized expert in cardiovascular physiology," and the dean of the**

**adenosine field (Binkley 317:19-318:15), and Dr. Francis Robicsek, the chief of a leading**

**thoracic surgical clinic in the United States (TX-293; Sollevi 466:11-18).  The fact that the**

**evidence is in the form of personal communications or personal testimony does not make it**

**any less probative as evidence.  (*See* PPF28 and 119-134; *see also* PB at 28-32.)**

DFF175.    The correspondence does not provide conclusive evidence that experts were skeptical that adenosine could be administered without causing AV block or uric acid build-up.  (Klabunde, Tr. 1197:7-1200:7.)  For example, the correspondence does not make clear (1) the study subjects (*e.g.*, humans or animals), (2) the dose of adenosine used, (3) the manner in which adenosine was administered (*e.g.*, bolus or intravenous infusion), and (4) the purposes of the study (*e.g.*, vasodilation or platelet aggregation).  (Klabunde, Tr. 1198:6-23.)

**PCF175.    Dr. Berne's statement in his February 1985 letter (TX-49) that "we**

**got AV block with doses of adenosine that do not lower blood pressure (see enclosed**

**reprint)" is clearly reflected in the 1983 DiMarco article (TX-36), which describes Dr.**

Berne's work in human patients and which Dr. Sollevi identified as the reprint referred to

in the letter.  (*See* Sollevi 459:3-460:20; TX-36 at 1259.) Similarly, the parameters of Dr.

Robicsek's studies in dogs were set forth in a published article by Masters in 1982

(TX-255.)  More importantly, however, both Drs. Berne and Robicsek were referring to Dr.

Sollevi's studies of adenosine infusion in patients.  Whether those studies involved Dr.

Sollevi's initial work with adenosine infusions for inducing hypotension or later work on

platelet aggregation is immaterial, as both applications involved adenosine infusion to

humans.  (*See, e.g.*, TX-37; TX-1170; TX-441 at 155.).  Thus, contrary to Sicor's assertions,

the parameters of the studies referred to in Dr. Sollevi's correspondence with Drs. Berne

and Robicsek are not in question.  Thus, there is clear evidence of skepticism of experts

that demonstrate the non-obviousness of the asserted '296 claims.  (*See* PFF28 and 119-

134.)

DFF176.     The correspondence was not publicly available, not subject to public scrutiny or comment, and would not have discouraged persons of skill in the art.  (Klabunde, Tr. 1201:2-16.)

**PCF176.     The surprise of experts expressed in contemporaneous correspondence has been recognized by courts, including the United States Supreme Court, as some of the best evidence that the patentee's invention was contrary to the thinking of experts in the field at the time.  (PB at 28-32.)**

DFF177.     As discussed *infra* in paragraphs 178-183, Plaintiffs have not demonstrated any unexpected results for the methods in the asserted claims.

**PCF177.     As discussed *infra* in PCF178-83, Plaintiffs have demonstrated unexpected results for the methods in the asserted claims.**

DFF178.     The lack of occurrence of AV block was not unexpected.  (Binkley, Tr. 200:5-18.)  There is no public reference in which the continuous intravenous administration of adenosine in humans resulted in the occurrence of serious AV block; for example, no AV block was reported in the Biaggioni Abstract.  (TX 1187.)

**PCF178.**    *See* **PCF154, 158, 162, and 164.  The lack of an occurrence of AV block, and the fact that a continuous intravenous administration of adenosine alone could safely and effectively induce hypotension, was entirely unexpected.  The literature prior to Dr. Sollevi's work consistently demonstrated adenosine's ability to cause AV block.  (TX-35, TX-187, TX-36, TX-45).  It was this fear of causing AV block that dissuaded a generation of researchers from continuing to investigate uses of adenosine.  (Klabunde 1134:21-1135:4, *see also* TX-47 at 1854, TX-214 at 415).  Furthermore, though Sicor discounts the concern in the field regarding AV block, an expert and the leader of the adenosine field in 1985, Dr. Berne, initially thought it "crazy" to administer adenosine by infusion (Sollevi 452:25-453:3) and then expressed genuine surprise that Dr. Sollevi did not observe AV block in his patients (TX-49; Sollevi 459:3-22), thereby indicating that persons of ordinary skill in the art would have expected adenosine infusions to cause AV block, especially at the doses expected to be required to induce hypotension.  (*See* Klabunde 1052:4-1053:4.)**

DFF179.    All of the references presented by Plaintiffs at trial that were published in 1985 or earlier concerned either bolus administration of adenosine or administration of adenosine to animals.  (TX 36; TX 40; TX 45; TX 48.)  A person of ordinary skill would have understood that there were limitations in the predictive values of animal studies, especially when inducing hypotension.  (TX 40 at 73.)

**PCF179.**    *See* **PCF164 and 178.**

DFF180.    Neither Sollevi I nor Sollevi II – the only prior art publications in which adenosine was administered to humans as a continuous intravenous infusion – discloses any evidence of AV block resulting from intravenous administration of adenosine and dipyridamole together.  (Binkley, Tr. 202:18-203:3, 206:3-207:5; TX 1170; TX 37.)  The administration of adenosine and dipyridamole together would actually result in a greater increase in the concentration of circulating adenosine than if adenosine were administered alone.  (Binkley, Tr. 200:5-201:4, 203:10-17, 204:13-23, 205:14-24, 209:7-14.)

**PCF180.**    *See* **PCF148, 150, 158 and 162.  While it is true that administration of adenosine with dipyridamole pretreatment results in an increase in the concentration of adenosine and that Dr. Sollevi did not report AV block in the 10 patients treated with adenosine after dipyridamole pretreatment, one of ordinary skill would have expected that**

**a much higher dose of adenosine (ten to one hundred-fold greater) would have been required in the absence of dipyridamole. (Klabunde 529:10-530:8.) Such higher doses would have presented real concerns that patients would exhibit the bradycardia, complete AV block, or "temporary cardiac arrest" reported in the prior art and discouraged elimination of dipyridamole. (Klabunde 537:9-538:6; TX-48 at 229; TX-45 at 417, 423; TX-36 at 1254.) Therefore, a person of ordinary skill in the art would have viewed dipyridamole pretreatment as a necessary safety precaution.**

DFF181.    A person of ordinary skill in the art in 1985 would have been more – not less – concerned about the possible side effects of adenosine if dipyridamole pretreatment were also administered. (Binkley, Tr. 200:5-201:4, 205:14-24, 209:7-14; Klabunde, Tr. 1096:11-25.) Since the effects of dipyridamole (including side effects) last longer than the effects of adenosine alone, if a side effect like AV block occurred during adenosine administration following dipyridamole pretreatment, a physician would not simply be able to stop the adenosine infusion to resolve the AV block, given that the dipyridamole would still be blocking adenosine breakdown. (Binkley, Tr. 200:19-201:4, 205:14-24.)

**PCF181.    *See* PCF148, 150, 154, 155 and 158. One of ordinary skill in the art would have been aware of the evidence of literally decades of concern about adenosine's effects on the heart. (*See, e.g.,* TX-35; TX-187; TX-36; TX-45; TX-48; TX-214.) Based on that evidence, one of ordinary skill in art would have understood that the reason to minimize the dose of adenosine by pretreatment with dipyridamole was to minimize the possibility of AV block and other toxic effects on the heart and to minimize the chance of accumulating uric acid and harming the kidneys. (*See* Klabunde 537:5-538:6, 1052:4-1055:1.) Therefore, one of ordinary skill in 1985 would not have been motivated to eliminate the dipyridamole pretreatment. (Klabunde 529:6-530:8.) (*See also* PFF165-174.)**

DFF182.    Plaintiffs did not point to any specific study data or results to support the claim that the lack of uric acid build-up was unexpected. (Binkley, Tr. 224:6-226:7.) Plaintiffs rely upon a single, unsupported background statement in the introduction of an abstract to support their position that a person of ordinary skill would have expected uric acid build-up to occur following adenosine administration. (TX 51 at A39.)

**PCF182.    *See* PCF167. Those who actually confronted the issue at the relevant time clearly were concerned that adenosine infusion would result in uric acid accumulation**

and kidney failure, as evidenced by the literature and correspondence created long before the litigation at hand.  (*See* **PFF134.**)

DFF183.    The only publication in the prior art that disclosed the adenosine metabolites formed following the continuous intravenous infusion of adenosine is Sollevi II. (TX 37.)  In that publication, even though adenosine metabolites were monitored, there is no mention of the occurrence uric acid build-up, or that uric acid build-up was anticipated to be a problem.  (TX 37.)

**PCF183.        Sicor notes that Dr. Sollevi did not report accumulation of large quantities of uric acid in his 1984 abstract (TX-37), but it misses the point that the study in the abstract included dipyridamole pretreatment for the express purpose of reducing the necessary dose of adenosine.  The real concern was whether uric acid levels would climb to toxic levels if patients were *not* pretreated with dipyridamole.  (PCF167, 169, and 182; *see also* PFF127-134.)**

DFF184.    The sales levels achieved by Adenoscan® do not provide evidence of any superiority of this drug.  (Leffler; Tr. 1631:12-1632:22.)  Rather, the sales levels achieved by Adenoscan® are explained by the confluence and interaction of four economic factors:

> (1)  There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;
>
> (2)  Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;
>
> (3)  Extensive marketing and promotion of Adenoscan® by Fujisawa; and
>
> (4)  Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

(Leffler, Tr. 1579:3-1582:13; DTX 3133.)

**RESPONSE:  Dr. Leffler, who provided the only testimony cited in support of DFF184, admitted that he did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product.  (Leffler 1631:5-11.)  He never consulted any physicians about the reasons why they purchase adenosine versus dipyridamole or conducted any surveys to determine why physicians choose Adenoscan over other pharmaceutical stress agents. (Leffler 1683:6-11.)  Dr. Leffler also did not provide any**

information about what percentage of sales were due to Adenoscan's merits and what percentage were due to promotion and advantageous market circumstances. (Leffler 1683:6-1684:12.)  Following a pattern recognized by other courts (PFF219), Dr. Leffler's opinion was also based on substantial mistakes, inaccurate calculations, and incomplete data (PFF215-218).  Dr. Leffler's opinions as to whether doctors purchased Adenoscan based on its merits are not, therefore, trustworthy or reliable.

**PCF184.**    Sales of Adenoscan were driven by the characteristics of the invention claimed in the '296 patent, not promotion. (Hay 1712:17-1713:20, 1738:22-1740:1, 1754:10-1757:19, 1796:22-1798:1.)  Adenoscan's sales grew because clinicians recognized significant advantages flowing from the use of Adenoscan.  (Hay 1796:22-1798:1; *see also* Hay 1754:10-1757:15.)  Sicor's arguments are inconsistent with the strong evidence that doctors recognized the significant therapeutic advantages of Adenoscan and used it because of those advantages. (Hay 1796:22-1798:1, 1754:10-1757:15; Strauss 784:6-786:6; White 1353:19-1354:16.)  The purchasers of Adenoscan and other pharmacologic stress agents are expert consumers, specifically cardiologists and nuclear medicine specialists, who are not swayed by pure promotion because their patients' health depends on their medical diagnosis and treatment decisions.  (White 1231:22-1232:7; Hay 1712:16-1713:25, 1754:14-1757:15, 1797:2-1798:1.)

DFF186.    In August 1995, when Adenoscan® entered the market, there was just one competing product, Persantine®, marketed by DuPont. (Leffler, Tr. 1577:10-16, 1580:4-7; White, Tr. 1307:14-16; DTX 3133.)  Persantine® is the brand name for the drug dipyridamole. (Leffler, Tr. 1577:13-16.)

**PCF186.**    Persantine® (dipyridamole) and dobutamine were the competing products in the market when Adenoscan was launched.  (TX-21.)  Adenoscan thus had two competitors in the market, not one, at the time of its launch. (TX-21; White 1343:11-22.)

DFF187.    The fact that there was only direct competitor to Adenoscan® made the pharmacological stressor market unique as compared to most pharmaceutical markets, which generally have many competitors engaged in promotional activity.  (Leffler, Tr. 1580:4-6.)

**PCF187.       While dipyridamole was the only primary competitor in the field of pharmacological stress agents, its absolute dominance was a substantial challenge to the market entry of Adenoscan in 1995.  (TX-21; White 1232:13-24; Hay 1732:9-25.) Not only was the Adenoscan product new at that time, Astellas itself was new to the pharmacologic stress market, having never sold a product in that market before. (White 1232:13-24.) Despite its newcomer status, Adenoscan's sales, both in terms of unit sales and sales revenue, experienced substantial and sustained growth after its launch. (TX-19; TX-21; Hay 1733:11-1734:22, 1714:13-1716:9; DTX-2032; DTX-2014.) Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005. (TX-19; Hay 1714:13-1716:9; DTX-2014.)**

DFF188.       In most pharmaceutical markets, the real difficulty is capturing the attention of the prescribers, who typically face numerous therapeutic alternatives and must filter through a lot of promotional "noise" in the marketplace.  (Leffler, Tr. 1602:11-21.)

**PCF188.       Sicor overstates the impact of promotion in pharmaceutical markets and fails to take into account testimony that the attributes of the claimed invention drove the sales of Adenoscan, not marketing and promotion.  (Hay 1738:22-1740:1; *see* Strauss 784:6-786:6.)  Sicor's sole support for this proposition about pharmaceutical markets is the opinion of their expert Dr. Leffler.  (Leffler 1602:11-21.)  Moreover, pharmacologic stress agents are purchased by expert consumers who are not swayed by pure promotion because their patients' health depends on their medical diagnosis and treatment decisions.  (Hay 1712:17-1713:25; 1797:2-8.)**

DFF189.       Unlike most pharmaceutical markets, the pharmacological stressor market was uncluttered. (Leffler, Tr. 1602:22.)  It was "ripe for the picking" for a new player to enter and launch a competitive challenge against the available product.  (Leffler, Tr. 1602:22-25.)

**RESPONSE:  The success of Adenoscan is not attributable to the market conditions independent of the merits of the claimed invention.  Sicor's recitation of market conditions is also incomplete, and therefore misleading, in that it omits any reference to competitive**

disadvantages faced by Adenoscan.  For example, Sicor's recited market conditions fail to

mention the substantial cost differential that favored dipyridamole (now sold by Sicor (Lea

2035:22-2036:9)), which is seven to ten times cheaper.  (Hay 1738:22-1740:1, 1754:10-

1757:19.)  Importantly, the purported conclusion is not based on any consideration of the

fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its

superiority.  (PFF204, 207.)

PCF189.    The clinical attributes of Adenoscan drove the sales of Adenoscan in

the market, not the circumstances of the market itself.  (Hay 1796:22-1798:1.)

DFF190.    As a result, Adenoscan® was able to succeed in capturing the ears and the
minds of doctors relatively quickly.  (Leffler, Tr. 1602:22-1603:2.)  There was just one other
serious competitor – Persantine® – with which Adenoscan® vied briefly for the attention of
prescribers.  (Leffler, Tr. 1602:2-4, 1603:12-14.)

RESPONSE: *See* Response to DFF189.

PCF190.    Adenoscan caught the interest of doctors because of its attributes and

the benefits doctors believed these attributes provided.  (Klose 1516:17-1517:25.)  The

record reflects that once clinicians learned about the benefits of Adenoscan and gained

experience with the drug, the sales of Adenoscan boomed.  (Klose 1516:17-1517:25,

1528:18-1529:14.)  (*See also* PCF189.)

DFF191.    For this reason, the pharmacological stressor market was an "ideal"
market for a new entrant such as Fujisawa, seeking to achieve sales.  (Leffler, Tr. 1602:11-
1603:4.)

PCF191.    Adenoscan had to compete with a significantly cheaper generic

dipyridamole in an extremely cost conscious health care environment.  (Hay 1738:22-

1740:1.)  Astellas's Vice President of Marketing and Sales for the Critical Care Unit, Rick

White, identified this as the biggest sales challenge facing Adenoscan.  (White 1246:1-11.)

This challenge made the pharmacologic stressor market far from an "ideal" market for

Astellas.

63

DFF192.     The second economic factor explaining the sales levels of Adenoscan[®] is that it became the only promoted product in the pharmacological stress testing market shortly after its entry.  (Leffler, Tr. 1580:14-21; DTX 3133.)

**PCF192.     The assertion that promotion relative to the incumbent generic product explains the Adenoscan sales levels presupposes that doctors are gullible consumers, yet the evidence is that the product has significant advantages and is used by expert consumers, including Defendants' expert Dr. Strauss, due to these advantages.  *See PFF204, 207.***

DFF196.     As a result, by late 1996, Adenoscan[®] found itself in the fortunate situation of being the only product advertising itself to the prescribers of pharmacological stress tests.  (Leffler, Tr. 1604:7-11.)  This advantage has continued to the present day.  (Leffler, Tr. 1604:12-22; White, Tr. 1308:1-11.)

**PCF196.     By late 1996, Adenoscan had the disadvantage of being seven to ten times more expensive than the generic dipyridamole competition.  (White 1246:1-17; Hay 1738:22-1740:1, 1754:10-1757:19; *see also* PCF188, 191.**

DFF197.     The third economic factor explaining the sales levels of Adenoscan[®] is Fujisawa's extensive and effective marketing and promotion of the product.  (Leffler, Tr. 1581:11-15; DTX 3133.)

**PCF197.     The level of promotion of Adenoscan was typical in the industry, and does not explain the product's remarkable success.  (*See* PFF208-213)  The success is due to the merits of the product, as judged by a market of expert consumers.  (*See* PFF204 and 207.)  Defendants have not established a link between the success of Adenoscan and the level of its promotion, nor have they offered any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.  *See also PFF204, 207.***

DFF198.     Typically, the pharmaceutical industry is very promotion-driven because companies compete to capture the attention of very busy prescribers, who act as agents for patients.  (Leffler, Tr. 1605:2-9.)  Many articles in the economic literature have demonstrated the significance and importance of marketing and promotion to the success of a pharmaceutical product.  (Leffler, Tr. 1605:9-12, 1606:15-25.)

**PCF198.** *See* **PCF188. The merits of a pharmaceutical product are often far more determinative of a pharmaceutical's success than promotion. Articles in the economic literature recognize that promotion is less important for products that are sold in a hospital and clinic environment, such as pharmaceutical stress agents, as opposed to those sold in a pharmacy setting. (TX 24 at 53-54.) Furthermore, doctors fully observe the effects of pharmaceutical stress agents in their patients and are not likely to be swayed by marketing, since they are responsible for their patients' health. (White 1231:22-1232:7; Hay 1712:17-1713:25, 1797:2-1798:1.)**

DFF202.    Fujisawa engaged in traditional and non-traditional promotion in its efforts to capture this narrow pharmacological stressor market. (Leffler, Tr. 1620:12-20; White, Tr. 1263:1-10, 1283:7-14.) Fujisawa's traditional marketing activities included, *e.g.*, detailing, or informational visits to doctors by pharmaceutical sales representatives; advertising; and sampling. (Leffler, Tr. 1605:13-1606:14, 1610:19-20; White, Tr. 1263:1-10.)

**PCF202.    Astellas promoted Adenoscan using a marketing program that was typical in the industry at the time. (TX-19; TX-24; TX-1165; Hay 1742:3-24, 1745:3-1749:10.)**

DFF204.    The concentration of the pharmacological stress test market notwithstanding, Fujisawa devoted a substantial sales force for the purpose of detailing prescribers regarding the Adenoscan® product. (Leffler, Tr. 1609:20-22.) The sales force employed by Fujisawa (86 sales representatives) was more than twice the size of the sales force DuPont had dedicated to the detailing of Persantine® to the same set of institutions and service providers (42 sales representatives). (Leffler, Tr. 1609:4-1610:3; White, Tr. 1294:22-25, 1303:22-1305:17; TX 1226 at AST0065741; TX 1242 at AST0185350.)

**PCF204.    Although the raw number of sales representatives employed by Astellas may have been higher, since Astellas' representatives spent only about half their time promoting Adenoscan, the size of the sales force promoting the Astellas and DuPont pharmacologic stress products was the same on an FTE (full time equivalent) basis. (Hay 1749:23-1750:20.) Moreover, Defendants have not established a link between the success of Adenoscan and the number of sales representatives, or offered any evidence to negate the**

fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority. *See also* **PFF204, 207.**

DFF205.     Fujisawa also engaged in non-traditional marketing activities that were not in the bailiwick of detailing, advertising, and sampling in its efforts to capture the pharmacological stressor market. (Leffler, Tr. 1610:15-20.; White, Tr. 1283:7-14, 1290:12-23.)

**PCF205.     All of Astellas's marketing and promotion activities for Adenoscan were typical in the industry. (Hay 1745:3-1749:10.)**

DFF206.     The first of the promotional activities that was not within the traditional set of promotional activities was Fujisawa's sponsorship of the American Society of Nuclear Cardiology ("ASNC"), a medical society that advised doctors about which pharmacological stress agents to prescribe. (Leffler, Tr. 1611:5-8, 1611:13-15, 1613:5-1614:13; TX 1045 at AST0083228; TX 1078 at AST0066744; TX 1128 at AST0043954; DTX 3148.)

**PCF206.     The American Society of Nuclear Cardiology ("ASNC") is a society that oversees the nuclear cardiology specialty and is involved primarily in educational endeavors to further the diagnosis and prognosis of cardiovascular disease. (White 1339:4-9.) Astellas's support of ASNC was educational, and included funding of tutorials on the nuances of myocardial perfusion imaging studies and journal subscriptions for cardiology fellows (physicians-in-training). (White 1253:6-1255:2.) ASNC educated doctors about pharmacological stress agents in general but did not advise doctors about which pharmacological stress agents to prescribe. (TX-92; TX-224; White 1252:17-1259:19.) Defendants have not established a link between the success of Adenoscan and Astellas's support of ASNC or other education groups, nor offered any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority. *See also* PFF204 and 207.**

DFF207.     The ASNC was perceived to be a "major strategic partner" and engaged in several marketing programs sponsored by Fujisawa that were designed to increase awareness of and demand for pharmacological stress testing. (Leffler, Tr. 1611:10-15; TX 1045 at AST0083228.) The goals of Fujisawa's partnership with the ASNC (and other medical societies) were to support market penetration of Adenoscan as well as achieve total market growth. (Leffler, Tr. 1612:9-1613:4; White; Tr. 1252:17-25, 1339:4-15; TX 1078 at AST0066744.)

**PCF207.        Astellas supported ASNC as part of its educational program, viewing**

**these efforts as supporting the overall pharmacological stress market.  Astellas did not look**

**to position Adenoscan or promote Adenoscan with this support.  (TX-92; TX-224; TX-365;**

**White 1252:17-1260:10, 1257:2-16; Hay 1751:13-1752:19).  These education efforts were**

**directed to supporting the market overall and were not focused on any particular product.**

**(White 1257:2-16.)  Competitors stood to also benefit from these efforts yet Adenoscan's**

**growth outpaced that of much cheaper dipyridamole in this growing market.  (Hay**

**1751:13-1752:2, 1731:11-1733:3.)**

DFF208.        One specific way in which Fujisawa supported the ASNC was by covering subscription costs to medical fellows, *i.e.*, young cardiologists in training.  (Leffler, Tr. 1614:14-1615:7; TX 1128 at AST0043954; DTX 3148.)  The covering of subscription costs was termed a "great strategic idea" that enabled Fujisawa and the ASNC to develop ground-floor relationships with the very individuals who would be prescribing pharmacological stress agents in the future. (Leffler, Tr. 1614:24-1615:7, 1630; TX 1128 at AST0043954; DTX 3148.)

**PCF208.        Astellas supported ASNC by covering subscription costs to cardiology**

**fellows as a way to provide educational support to physicians in training.  (TX-92; White**

**1253:1-1255:2.)  These efforts were directed to supporting the market overall and the**

**journals that were provided did not focus on any particular product.  (White 1257:2-16.)**

**These education efforts were directed to supporting the market overall and were not**

**focused on any particular product.  (White 1257:2-16.)**

DFF209.        Another way Fujisawa engaged in non-traditional marketing and promotion was to develop a physician advocacy program in which the company forged relationships with influential doctors who would advocate for the use of Adenoscan[®] as a preferred pharmacological stressor.  (Leffler, Tr. 1615:9-17.)

**RESPONSE:  Advocates have supported the use of Adenoscan, but physician**

**consultants are not advocates for Adenoscan because they are paid.  (White 1268:18-21.)**

**PCF209.        Adenoscan's advocates were clinicians that believed in the value of**

**Adenoscan and its utility for their patients, and they espoused these feelings to their peers.**

**(White 1268:12-17.)  Many companies had such physician advocacy programs since they**

were a common promotional practice in the industry. (Hay 1752:3-19.) Advocates have

supported the use of Adenoscan, but physician consultants are not advocates for

Adenoscan because they are paid (White 1268:18-21), but rather because they believed in

the attributes of Adenoscan (White 1290:3-6).

DFF210.     Physician advocates could be individuals at medical institutions who were called upon by Fujisawa to advocate for the institution's adoption of Fujisawa's product, or thought leaders who publish frequently, garner respect, and speak at symposia sponsored by Fujisawa. (White, Tr. 1268:18-1270:5.)

**PCF210.     See PCF209.**

DFF211.     Physician advocates were paid in the form of fees and other benefits for their work. (Leffler, Tr. 1617:12-23; TX 1151 at AST0178186.)

**PCF211.     See PCF209.**

DFF212.     Another example of Fujisawa's non-traditional marketing and promotional activities is its provision of financial incentives to physicians or institutions to try Adenoscan[®]. (Leffler, Tr. 1617:24-1618:18.) Through its trial support program , Fujisawa would subsidize the cost of Adenoscan at clinics or hospitals that had not adopted Adenoscan. (Leffler, Tr. 1618:3-8; White, Tr. 1275:9-15; TX 1045 at AST0083229-230.)

**PCF212.     Astellas's trial support program is the provision of a limited amount**

**of sample Adenoscan to give physicians the opportunity to try Adenoscan and to train their**

**staff with it. (White 1274:21-1275:23.) The trial support program typically provided only**

**enough Adenoscan to do 20 or 30 scans and physicians were only allowed to participate in**

**the program once, so the trial support program was not a financial incentive to use**

**Adenoscan. (White 1274:21-1275:23; Klose 1518:1-1519:12.) Furthermore, the provision**

**of samples is one of the most common promotional practices in the industry. (Leffler**

**1605:13-1606:14, White 1263:1-10.)**

DFF213.     Fujisawa also implemented a program in which it distributed, free-of-charge, the specialized volumetric pumps required for Adenoscan[®] administration to institutions that did not have them and might otherwise have been disincented to use Adenoscan[®] as a pharmacological stressor. (Leffler, Tr. 1618:19-1619:3; Klose, Tr. 1539:14-1540:12, 1540:18-1541:2.) The cost of a volumetric infusion pump was approximately $2,000, a significant up-front expense and hurdle to account conversion. (Leffler, Tr. 1618:19-1619:8; White, Tr. 1289:11-14.) No customer request for a pump was rejected, and Fujisawa's sales representatives

perceived that the pump program was "vital to the success of Adenoscan." (Klose, Tr. 1540:4-12; Leffler, Tr. 1619:9-1620:3; TX 1077 at AST0043166-167; DTX 3151.)

**PCF213.    Astellas was focused on safety as well as on education.  Since an infusion pump is necessary for the safe and effective administration of Adenoscan, Astellas instituted a pump program to make infusion pumps available at no charge to those using Adenoscan.  (White 1264:24-1265:9, 1266:8-17.)  This was not unusual in the industry because it enabled the safe and proper use of the product. (Hay 1752:21-1754:1.) Defendants have not established a link between the success of Adenoscan and Astellas's pump program, or offered any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.  *See also* PFF204, 207.**

DFF214.    Fujisawa also engaged in non-traditional marketing and promotion by sponsoring and implementing educational initiatives that not only had the objective of educating prescribing doctors and the public, but were also designed to increase the market for pharmacological stress testing, the sales of Adenoscan®, the revenues of Fujisawa, and the ultimate return on investment to the shareholders of Fujisawa.  (White, Tr. 1290:12-1291:6, 1311:11-18.)

**PCF214.    As many pharmaceutical companies did at the time, Astellas had an educational program that was focused on the pharmacological stress market in general as opposed to any particular product.  (TX-92; White 1253:1-1255:2.)  These education efforts were directed to supporting the overall market and were not focused on any particular product.  (White 1257:2-16.)  Competitors stood to also benefit from these efforts, yet Adenoscan's growth outpaced that of much cheaper dipyridamole in this growing market. (Hay 1751:13-1752:2, 1731:11-1733:3.)**

DFF215.    One of these initiatives was the "Chest Pain Initiative."  (Leffler, Tr. 1620:4-18.)  The Chest Pain Initiative was designed to introduce nuclear imaging into emergency room diagnostics for the purpose of identifying whether or not a patient complaining of chest pain is experiencing a heart attack.  (Klose, Tr. 1529:23-1530:12.)  Although the initiative was not successful, it represented an attempt by Fujisawa to expand the market for Adenoscan® at a time (2000-early 2001) when the product was beginning to reach market penetration and experience resultant slowed sales growth, as discussed *infra* in paragraph 230. (Klose, Tr. 1530:9-1531:6.)

**PCF215.** *See* **PCF213. Adenoscan did not experience slowed sales growth. In reality, sales continued to grow substantially and steadily in the years 1998-2001. (Hay 1725:8-1728:8; DTX-2043.) Moreover, Ms. Klose admitted that the "Chest Pain Initiative" was not successful (Klose 1530:9-1531:6) and, therefore, it could not be an explanation for the commercial success of Adenoscan.**

DFF216.        Another of Fujisawa's educational initiatives was the "Her Heart Initiative," which was designed not only to educate doctors and the public about the cardiovascular risks faced by women, but also to increase the use of stress testing for the diagnosis of cardiovascular problems in women, and therefore boost sales of Adenoscan[®]. (Leffler, Tr. 1620:19-1621:7, 1623:4-13; DTX 3143.) The Her Heart Initiative did in fact result in an increase in the sales of Adenoscan[®]. (Klose, Tr. 1532:9-16.)

**PCF216.        Astellas participates, along with the American Heart Association and many other companies, in the Her Heart campaign, which is an effort to increase the awareness of women's cardiovascular health issues. (TX-222; TX-359; White 1259:20-1261:19; Klose 1531:8-1532:8.) Astellas's competitors stood to also benefit from this participation since it was directed to the pharmaceutical stress market as a whole. (Hay 1751:13-1752:2 1731:11-1733:3) Yet, Adenoscan's growth outpaced that of the much cheaper dipyridamole in this growing market. (Hay 1731:11-1733:3.) Defendants have not established a link between the success of Adenoscan and Astellas's support of the Her Heart campaign nor do they offer any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.** *See also* **PFF204 and 207.**

DFF217.        A Regional Manager of Fujisawa's Hospital Sales Force in mid-2002 observed that "[d]octors really saw [the Her Heart Initiative] as a business expansion opportunity that can increase their number of scans." (Leffler, Tr. 1621:8-1623:13; DTX 3143.)

**PCF217.        *See* PCF216.**

DFF218.        The Her Heart Initiative represented another effort by Fujisawa to expand the use of Adenoscan[®] in order to achieve sales growth from the product. (White, Tr. 1290:12-23.)

**PCF218.        *See* PCF216.**

DFF219.    Another way in which Fujisawa engaged in non-traditional marketing and promotion was by supporting the publication, distribution, and presentation of educational materials that described the application of Adenoscan® in ways that would increase its use. (Leffler, Tr. 1624:17-1625:1.)  An example of such a publication, entitled "The Use of Myocardial Perfusion Imaging," was created by Rush Medical Center and funded by an unrestricted educational grant from Fujisawa.  (White, Tr. 1258:1-15.)  The document is a text for a Continuing Medical Education program contains a description of the potential advantages of combining limited exercise with adenosine.  (Leffler, Tr. 1623:14-1624:7; TX 224 at AST0094043.)

**PCF219.    TX-224 is a brochure that was put together by Rush Medical Center in Chicago, not by Astellas, who simply supported the Rush Medical Center with an unrestricted educational grant.  (White 1258:1-11.)  Defendants have not established a link between the success of Adenoscan and any education grant from Astellas, nor did they offer any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.  (*See also* PFF204, 207.)**

DFF220.    "The Use of Myocardial Perfusion Imaging" indicates that adenosine can be used for stress testing in ways that it was not typically used, *i.e.*, in conjunction with exercise as opposed to as a complete substitute for exercise, and represents another effort on the part of Fujisawa to expand the market of potential users of Adenoscan®.  (Leffler, Tr. 1624:12-1625:1; TX 224 at AST0094043.)

**PCF220.    "The Use of Myocardial Perfusion Imaging" indicates that pharmacologic stress agents, including but not limited to adenosine, could be used in stress testing in conjunction with exercise.  (*See* TX-224 at AST0094084.)  To the extent this is an expansion of the market for Adenoscan, Astellas's competitors stood to benefit from any expansion of the market as much as Astellas did, yet Adenoscan's growth outpaced that of the much cheaper dipyridamole.  (Hay 1751:13-1752:2, 1731:11-1733:3.)  (*See also* PCF219.)**

DFF221.    As described *supra* in paragraphs 184-219, Fujisawa's marketing and promotion was extensive and effective at expanding the market for pharmacological stress testing at a time when, absent a promoting competitor, Fujisawa could capture the bulk of the expanded market.  (Leffler, Tr. 1581:11-15, 1620:8-10, 1625:2-25, 1629:11-22.)

**PCF221.        (*See* PCF197.)  Astellas's marketing and promotion efforts were typical in the industry, and the success of Adenoscan is attributed to its superior properties. Moreover, Astellas's competitors stood to benefit from any expansion of the market as much as Astellas did, yet Adenoscan's growth outpaced that of the much cheaper dipyridamole  (Hay 1751:13-1752:2, 1731:11-1733:3.)**

DFF222.        The fact that Fujisawa's sales force was over two times the detail force used by DuPont to promote its competing product Persantine[®] indicates that Fujisawa's promotion of Adenoscan[®] was extensive.  (Leffler, Tr. 1625:2-11.)

**PCF222.        (*See* PCF197 and 204.)  When considering that only about 50% of their time was spent on Adenoscan, the Astellas sales force was not bigger in terms of "FTEs" than the incumbent DuPont sales force marketing Persantine[®], indicating that Astellas's marketing was typical for the industry.**

DFF223.        Fujisawa's promotional expenditure data also demonstrates that Fujisawa's promotion of Adenoscan[®] was extensive.  (Leffler, Tr. 1625:12-13.)  For the years 1998 through 2000, Fujisawa's promotional expenditures were over $28 million, or approximately seven percent of sales.  (Leffler, Tr. 1625:12-15.)  This ratio of promotion-to-sales is in the upper range for hospital-based products, and is particularly high in the pharmacological stress testing market where, as discussed *supra* in paragraphs 196 and 199, the market is concentrated in fewer institutions and there is no other promoted competing product. (Leffler, Tr. 1625:12-25.)

**PCF223.        The Astellas accounting figures designated as "marketing" include extensive educational efforts directed to support the field as a whole, yet these expenditures are not separately accounted for in Dr. Leffler's analysis of the ratio of promotion to sales. (*See, e.g.*, White 1257:2-20, 1260:19-22, 1262:16-21; Hay 1750:21-1751:6, 1751:13-1752:2.) Moreover, this finding focuses, for no justified reason, on promotional expenses during the limited period from 1998 to 2000 while the ratio of promotion to expenses over 10 years averaged only 4.7 percent.  (Hay 1743:7-19.)  Indeed, Astellas's efforts are "very typical, very customary in the pharmaceutical industry and certainly in terms of total effort… it's, if anything, somewhat on the low side for pharmaceuticals."  (Hay 1751:7-12.)**

DFF224.    There was nothing improper about Fujisawa's promotion of Adenoscan®. (Leffler, Tr. 1626:1-4.)  It was a well-managed promotional campaign that succeeded in raising awareness and adoption of the use of pharmacological stress testing – using Adenoscan® in particular – irrespective of any claimed superiority of the drug.  (Leffler, Tr. 1626:5-11, 1629:11-22, 1631:12-1632:22.)

**PCF224.    Defendants have not established a link between the success of Adenoscan and Astellas's education and promotional efforts, nor have they offered any evidence to negate the fact that doctors, including Defendants' expert Dr. Strauss, use Adenoscan based on its superiority.  (*See* PFF204 and 207.)**

DFF225.    Plaintiffs do not promote the features of the claimed invention in connection with the generation of sales of Adenoscan.  (*See, e.g.*, TX 75.)

**PCF225.    Plaintiffs promote Adenoscan (adenosine) as labeled for the continuous infusion, into human patients, at a dose of 140 mcg/kg/min, a dose within the claimed ranges of 0.35 mg/kg/min or less (claims 1 and 9); about 0.05 to about 0.3 mg/kg/min (claim 3); and 0.01 to 0.15 mg/kg/min (claim 7).  By their concession of infringement, Defendants admitted that such administration of adenosine results in selective arterial vasodilation.  *See* D.I. 129.**

DFF226.    The fourth economic factor explaining the sales levels of Adenoscan® is the growth in demand for pharmacological stress testing unrelated to the asserted inventions. (Leffler, Tr. 1581:19-20; DTX 3133.)

**PCF226.    Even though the total number of annual pharmacologic stress testing procedures steadily increased, the sales of Adenoscan increased disproportionally faster than sales of dipyridamole, whose market share dropped over a 10 year period from 76 percent down to 32 percent.  (Hay 1732:12-15, 1733:14-1734:5.)  The evidence shows that the growth in market share for Adenoscan over dipyridamole was due to the superiority of adenosine for MPI.  (*See* PFF204 and 207.)**

DFF228.    Trends in the sales of Adenoscan reflected this general market growth. (Leffler, Tr. 1628:18-25; DTX 3130.)

**PCF228.        The trend in Adenoscan's sales growth exceeds the general market growth.  Adenoscan's sales revenue increased year after year from approximately $36 million in 1996 to over $300 million by 2005. (TX-19; Hay 1714:13-1716:9; DTX-2014.) Adenoscan's dramatic sales growth is seen in its market share.  In December of 1995 Adenoscan held 16.5% of the market share of scans and dipyridamole held 76%.  (TX-21; Hay 1731:11-22; DTX-2029.)  By June of 2005 Adenoscan's market share had grown to 61.4% of scans and dipyridamole's market share had fallen to 32%.  (TX-21; Hay 1731:23-1733:3; Leffler 1674:8-21; DTX-2030;  DTX-2031.)**

DFF229.        After its entry into the marketplace in August 1995, Adenoscan[®] experienced relatively moderate sales from August 1995 through about mid-1999.  (Leffler, Tr. 1575:23-1576:8, 1630:12-1631:4; DTX 3130.)

**PCF229.        Adenoscan's sales revenue increased from approximately $36 million in 1996 to approximately $105 million by 1999. (TX-19; Hay 1714:13-1716:9; DTX-2014.)**

DFF230.        Adenoscan[®]'s growth then leveled out during the period from about mid-1999 through about mid-2001.  (Leffler, Tr. 1576:15-18.)  This flattened growth is typical of the life cycle of products in pharmaceutical markets.  (Leffler, Tr. 1576:8-10; DTX 3130.)

**PCF230.        Adenoscan's sales growth did not level out between 1999 and 2001.  In reality, sales continued to grow substantially and steadily in the years between 1999 and 2001 (Hay 1725:8-1728:8; DTX 2043), with the Japanese parent company reporting double digit growth in sales for the period in which Sicor contends sales were slowing.  (TX-330; TX-331; TX-332.)  Moreover, on cross-examination, Dr. Leffler disavowed the existence of any "plateau" in the sales and admitted that his calculated growth rate, now recharacterized as a "slowing," is an artifact of his calculation method.  (*See also* PFF216-217.)**

DFF231.        Beginning in about 2001 to 2002, the sales of Adenoscan[®] accelerated at a relatively substantial rate through mid-2005.  (Leffler, Tr. 1576:23-1577:4, 1628:18-1629:10; DTX 3130.)  Such a phenomenon is unusual in pharmaceutical markets; it is rare to see a product in its sixth year on the market suddenly show substantially increasing sales.  (Leffler, Tr. 1629:1-10; DTX 3130.)

74

PCF231.        As they had been in previous years, sales of Adenoscan continued to grow substantially and steadily in the years between 2001 and 2005.  (Leffler 1662:11-1666:9; Hay 1725:8-1728:8; DTX-2043.)

DFF233.        These demographic phenomena and guideline changes resulted in a growth in demand for pharmacological stress agents at a time that was very fortuitous for Fujisawa, because there was a general, substantial growth in demand for the product the company was marketing in a market in which Adenoscan® was the only promoted product. (Leffler, Tr. 1582:5-8, 1627:12-14; White, Tr. 1311:3-9.)

PCF233.        Adenoscan's sales grew because clinicians recognized significant advantages flowing from the use of Adenoscan.  (Hay 1796:22-1798:1; Strauss 784:6-786:6; see also Hay 1754:10-1757:15.)  Moreover, Astellas's competitors stood to benefit from any expansion of the market as much as Astellas did, yet Adenoscan's growth outpaced that of the much cheaper dipyridamole.  (Hay 1751:13-1752:2, 1731:11-1733:3.)  (See also PCF234.)

DFF234.        These demographic phenomena, combined with Fujisawa's role in generating growth through its educational initiatives and other forms of promotion, are reflected in the increasing sales growth experienced by Adenoscan® in recent years.  (Leffler, Tr. 1629:11-22; DTX 3130.)

PCF234.        The increase in the market for pharmaceutical stress agents and Astellas's educational efforts supporting the market as a whole would have benefited all pharmaceutical stress agents alike if the pharmaceutical stress agents were perceived to have equally advantageous attributes.  (See Hay 1739:8-1740:1.)  Adenoscan's market share is nearly twice that of dipyridamole, its significantly cheaper competitor, however, because physicians prefer the attributes of Adenoscan. (See White 1353:19-1354:16.)

DFF235.        It is notable that this general growth in the demand for pharmacological stressors also benefited Adenoscan®'s competing, non-promoting pharmacological stressor competitors, namely, dipyridamole.  (Leffler, Tr. 1628:23-1629:1.)

PCF235.        Despite being seven to ten times cheaper than Adenoscan, dipyridamole's sales growth significantly lagged that of both Adenoscan and the pharmaceutical stress agents market.  (Hay 1733:4-1734:11; DTX-2032.)  Dipyridamole's

**market share dropped from 76% in December of 1995 to 32% by June of 2005. (TX-21; Hay 1731:11-1733:3; DTX-2031.)**

DFF236.     Looking at the number of pharmacological stress tests performed using dipyridamole, from 1995 through 2005, it is clear that the use of dipyridamole was relatively constant with slight growth through about mid-2000, when an acceleration in the use of dipyridamole is observed. (Leffler, Tr. 1599:12-1600:5; TX 21; DTX 3132.) Then usage of dipyridamole experiences a rapid acceleration for about five quarters and then a general continued growth in use. (Leffler, Tr. 1600:1-5; TX 21; DTX 3132.)

**PCF236.     *See* PCF226, 234, and 235.**

DFF237.     The pattern in the usage of dipyridamole demonstrates that it clearly retained significant usage throughout the period during which Adenoscan has been on the market, such that the pharmacological stressor market does not display a dynamic in which a competitor enters the market and takes significant usage away from another product. (Leffler, Tr. 1600:6-16, 1632:4-7; DTX 3132.)

**PCF237.     Adenoscan in fact did enter the market and take significant usage away from dipyridamole. Indeed, Adenoscan's increases in market share came at dipyridamole's expense and Adenoscan displaced dipyridamole as market leader. (TX-21; Hay 1731:11-1733:3; DTX-2029; DTX-2030; DTX-2031.) Adenoscan gained market share when doctors switched from dipyridamole and also by taking an increasingly larger share of the growing market as doctors chose Adenoscan over dipyridamole. (Hay 1733:4-1734:11, 1739:20-1740:1; Klose 1528:18-1529:22; DTX-2032.)**

DFF238.     While the general growth in the demand for pharmacological stressors benefited Adenoscan®'s competing, non-promoting pharmacological stressor competitors, Adenoscan® differentially benefited from the growth in the marketplace because it was the only product being promoted. (Leffler, Tr. 1629:23-1630:11.)

**RESPONSE: There is no evidence that Adenoscan's growth in market share was due to its promotion as opposed to its superiority, which is merely an "expect[ation]" of Dr. Leffler. (Leffler 1630:9-11.) To the contrary, the growth in market share for Adenoscan over dipyridamole was due to the superiority of adenosine for MPI as evidenced by Dr. Strauss's testimony. (*See also* PFF204 and 207.)**

DFF239.     There is no nexus between the claimed superiority of Adenoscan® and the sales achieved by the product. (Leffler, Tr. 1631:5-11.)

**PCF239.       Dr. Leffler, whose testimony provides the only support for DFF239, did not conduct a sufficient analysis and is not qualified to opine based on this analysis that there is no nexus between the commercial success of Adenoscan and the merits of the claimed invention.  Indeed, Dr. Leffler admitted that he did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product. (Leffler 1631:5-11.)  He never consulted any physicians about the reasons why they purchase Adenoscan instead of dipyridamole or conducted any surveys to determine why physicians choose Adenoscan over other pharmaceutical stress agents.  (Leffler 1683:6-11.) Dr. Leffler also did not provide any information about what percentage of sales were due to Adenoscan's merits and what percentage were due to promotion and advantageous market circumstances. (Leffler 1683:6-1684:12.)  Following a pattern recognized by other courts (PFF219), Dr. Leffler's opinion was also based on substantial mistakes, inaccurate calculations, and incomplete data.  (*See* PFF215-218.)**

DFF240.       The sales of Adenoscan® are explained by the facts recited *supra* in paragraphs 184-238.  (Leffler, Tr. 1631:12-21.)

**PCF240.       (*See* PCF184-238.)  The sales of Adenoscan were plainly driven by the characteristics of the invention claimed in the '296 patent (Hay 1712:17-1713:25, 1738:22-1740:1, 1754:10-1757:19, 1796:22-1798:1) and are not at all explained by promotion and market circumstances.**

DFF241.       If Adenoscan® truly had significant advantages over the existing competitors in the pharmacological stressor market, it would have been expected to capture most of those competitors' sales and quickly dominate the marketplace, particularly in a situation where it was the only product being promoted.  (Leffler, Tr. 1631:22-1632:12, *see* Lipitor example at 1632:8-11.)  However, dipyridamole continued to generate significant growth in usage and sales alongside Adenoscan®.  (Leffler, Tr. 1632:5-7.)

**RESPONSE: Dr. Leffler admitted that he did not have an opinion as to whether or not Adenoscan does or does not have any superior qualities as a product. (Leffler 1631:5-11.)  The opinions he did offer were based on substantial mistakes, inaccurate calculations,**

and incomplete data. (PFF215-218.) Thus, having disavowed any opinion on the issue, Dr.

Leffler's flawed testimony—the only citations provided in DFF241—cannot support the

assertions that Adenoscan lacked significant advantages. To the contrary, qualified

physicians, including Defendants' expert Dr. Strauss, use Adenoscan based on its

superiority. (*See* PFF204, 207.)

PCF241.    Adenoscan had truly significant advantages over its competitors, and

it captured most of those competitor's sales. (TX-21; Hay 1731:11-1733:3; DTX-2029;

DTX-2030; DTX-2031.) Sicor's expectations of commercial sales for its proposed generic

version of Adenoscan are in contrast to its arguments and tellingly, Sicor offers nothing

more than the bare opinion of Dr. Leffler for its support. (*See* Leffler 1631:22-1632:12.)

DFF242.    Therefore, the sales pattern exhibited by Adenoscan[®] is well-explained by
the circumstances that existed in the marketplace and Fujisawa's recognition of and ability to
capitalize on those circumstances – irrespective of any claimed superiority of the product.
(Leffler, Tr. 1631:12-1632:22.)

PCF242.    Adenoscan's sales performance demonstrates that doctors recognize

advantages in Adenoscan to choose it over generic dipyridamole-a seven to ten times

cheaper product (Hay 1738:22-1740:1, 1754:10-1757:19), because Astellas's promotion of

Adenoscan and the circumstances that existed in the marketplace fail to explain

Adenoscan's sales performance.

D.    Counterfindings Regarding Anticipation

DFF243.    A person of ordinary skill in the art at the relevant time would conclude
that Fukunaga inherently discloses each and every element of the asserted claims of the '296
patent. (Binkley, Tr. 186:6-191:3; DTX 3045.)

**PCF243.  Proof of anticipation requires that "each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."** *Verdegaal Bros., Inc.* **v.** *Union Oil Co. of Cal.***, 814 F.2d 628, 631 (Fed. Cir. 1987) (internal citations omitted).  Dr. Binkley did not dispute that the Fukunaga Abstract [***Fukunaga 1982***] discloses the administration of ATP, whereas each of the asserted claims 1, 3, 7, and 9 recites a method that requires "administering . . . adenosine."  (TX-275; Binkley 243:14-22.)  Sicor's contention that ATP breaks down into a calculable "equivalent" amount of adenosine is based on an unwarranted "simplifying assumption" by Dr. Binkley which ignores the clear evidence that ATP had its own powerful vasodilating effect in humans separate and apart from any activity associated with breakdown into adenosine. (*See* PCF 77-83, 129; *see also* POB at § V.)**

DFF244.    Specifically, Fukunaga discloses selective arterial dilation without significant venous dilation following intravenous administration of ATP - which rapidly degrades to adenosine, as discussed *supra* at paragraphs 71-83 - within the claimed dosage ranges and without pretreatment with dipyridamole.  (Binkley, Tr. 186:6-191:3; DTX 3045.)

**RESPONSE:  The *Fukunaga 1982* abstract says nothing about selective arterial vasodilation and the cardiac output data is too convoluted for one of ordinary skill to have drawn a meaningful conclusion that the vasodilation was primarily arterial.  (Klabunde 548:9-20.)  More importantly, direct evidence from human patients shows that ATP was having its own effect, wholly apart from any effect due to adenosine.**

**PCF244.    *See* Response to DCL75 and PCC75; *see also* PFF146-149; PCF77, 79, 80.**

DFF245.    Moreover, the Fukunaga Abstract observes responses indicative of selective arterial dilation without significant venous dilation, including a decrease in MABP and SVR, coupled with a "well maintained" cardiac output.  (Binkley, Tr. 164:13-25, 165:16-21, 163:9-18, 165:22-166:7; TX 42 at A65; DTX 3044.)

**RESPONSE: This proposed finding is contrary to the evidence, which indicated that the hallmarks of selective arterial vasodilation, *i.e.,* consistent increased cardiac output together with maintained filling pressures (*see, e.g.*, TX-37; TX-1170; TX-1169 at 232; Sollevi 433:23-434:11; PFF146-149), were not shown when ATP was administered to humans according to TX-42. (*See, e.g.*, TX-42 Klabunde 544:8-546:2.) Thus, the following counterfinding is proposed:**

**PCF245.    The *Fukunaga 1982* abstract does not show responses indicative of selective arterial vasodilation without significant venous dilation. It does not report the consistent increase in cardiac output together with maintained filling pressure observed upon administration of adenosine to surgical patients nor even report measurement of filling pressures, such as right atrial pressure. (TX-42; Klabunde 544:8-546:2; *see also* PFF147-149.) Moreover, the cardiac output data in *Fukunaga 1982* is flawed and would not have allowed one of ordinary skill in the art to conclude that selective arterial vasodilation occurred in patients administered an ATP infusion. (Klabunde 548:9-20).**

DFF246.    The Fukunaga Abstract concludes that "ATP should potentially be considered for use among the vasoactive hypotensive drugs" which would have also indicated to a person of ordinary skill in the art in 1985 that adenosine should be considered for use as a vasodilator. (TX 42 at A65; DTX 3044.)

**PCF246.    The *Fukunaga 1982* abstract suggested only that ATP, not adenosine, should "potentially be considered" as a hypotensive drug. (TX-42.) As discussed in detail at PCF154-155, 157-164, 167-170, 174-183, one of ordinary skill would not have reasonably expected adenosine to be a safe and effective alternative to ATP as a vasodilator for controlled hypotension in the absence of dipyridamole pretreatment.**

## II.  PLAINTIFFS' COUNTERCONCLUSIONS TO DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

As an aid to the court, Plaintiffs have prepared responses and counterconclusions with an emphasis on issues believed to be most pertinent to this case.  Each response and counterconclusion is in bold text immediately following the conclusion to which it pertains. While each response and/or counterconclusion indicates specific reasons for Plaintiffs' disagreement with Sicor's proposed conclusion, such responses and/or counterconclusions do not necessarily encompass all of the bases for Plaintiffs' disagreement.  Moreover, the absence of a response or counterconclusion to any specific proposed conclusion or part thereof does not constitute an admission that Plaintiffs agree with or concede that the proposed conclusion or any part thereof is correct as stated.

Many of Sicor's proposed conclusions of law are actually or predominantly findings of fact.  To the extent this occurs, Plaintiffs have cross-referenced the relevant counterfindings of fact.  To the extent Sicor's proposed conclusions of law are not supported by the underlying evidence, Plaintiffs have also cross-referenced the relevant counterfindings of fact.

### A.     Counterconclusions Regarding Obviousness

### 1.     Counterconclusions Regarding Legal Standard

DCL3.        The factual inquiries underlying the legal determination of obviousness including the following four factors:  (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claimed invention and the prior art; and (4) the relevant secondary considerations.  *See Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006).

**PCC3.        Additional factual inquiries include determining what the prior art teaches and whether it "teaches away" from the claimed invention.  *In re Bell*, 991 F.2d 781, 784 (Fed. Cir. 1993).  The question of whether the teachings in the prior art would have encouraged or discouraged one of ordinary skill in the art is a subsidiary part of the required assessment of the scope and content of the prior art under *Graham v. John Deere*. *See Dystar Textilfarben GmbH & Co. v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir.**

2006).  These inquiries must be conducted viewing the invention in the context of the state of the art that existed at the time the invention was made.  *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988).  Moreover, it is improper to use hindsight to reconstruct the claimed invention from the prior art.  *ACS Hosp. Sys. Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984); *Uniroyal*, 837 F.2d at 1050-51.  (*See also* PCL 18-20.)  It is also necessary to judge obviousness based on the state of the prior art as a whole rather than by picking and choosing only so much of the prior art as supports the allegation.  *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965).

DCL4.        Any obviousness inquiry must address the subsidiary question of whether the art provides a suggestion or motivation to combine the references.  The Supreme Court recently rejected the rigid application of the "teaching-suggestion-motivation" ("TSM") test that had previously been employed by the Federal Circuit:

> The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents . . . .  In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends.

*KSR Int'l Co. v. Teleflex Inc.*, No. 04-1350, 2007 WL 1237837, at *14 (U.S. Apr. 30, 2007).

PCC4.        The Supreme Court in *KSR International Co. v. Teleflex, Inc.*, did not do away with the "teaching-suggestion-motivation" ("TSM") test employed by the Federal Circuit, stating that "[t]here is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis."  127 S.Ct. 1727, 1741 (2007).  The Court did, however, clarify that the test should not result in a "rigid rule that limits the obviousness inquiry."  *Id.*  Furthermore, while it is true that the Court cautioned against the "overemphasis on the importance of published articles and the explicit content of issued patents" (*id.*) when conducting the obviousness analysis, the Court also found "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *Id.* at 1740.  Additionally, the Court

concluded that prior art warnings about risks involved in the claimed invention and

obtaining unexpected results also support a conclusion of nonobviousness. *Id.* at 1740.

DCL5.        In lieu of the strict TSM test, the Court adopted a more flexible test that

places greater weight on the common sense of a person of ordinary skill:

> The same constricted analysis led the Court of Appeals to conclude, in error, that a patent claim cannot be proved obvious merely by showing that the combination of elements was "obvious to try." When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*KSR*, 2007 WL 1237837, at *15 (internal citations omitted).

**PCC5.        The Court in *KSR* noted that factfinders should not be denied**

**"recourse to common sense." *KSR,* 127 S.Ct. at 1742-43. However, the Supreme Court has**

**recognized for decades that after-the-fact assertions that a patented invention was the**

**result of mere "common sense" should be viewed skeptically, particularly where those**

**assertions are supported by little more than bare expert opinion:**

> **Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and 'in the light of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer . . . .' Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not.**

*Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* **220 U.S. 428, 434-35 (1911).**

**Moreover, it has long been the law that in unpredictable arts, proof of obviousness**

**requires proof of a reasonable expectation of success. *In re Rinehart*, 531 F.2d 1048, 1054**

**(C.C.P.A. 1976). The *KSR* decision did not change this aspect of the law of obviousness.**

**While the Supreme Court found error in the Federal Circuit's conclusion that the patent claim in *KSR* could not be proved obvious merely by showing that the combination of elements was "obvious to try," that finding was in the context of a mechanical invention where there was "a design need or market pressure to solve a problem" and "a finite number of identified, *predictable* solutions," not in the content of an *unpredictable* pharmaceutical invention. *See KSR,* 127 S. Ct. at 1742, emphasis added. Numerous aspects of the patent law are applied differently in predictable mechanical technologies than they are in unpredictable technologies, like human medicine. *See, e.g., In re Bowen,* 492 F.2d 859, 861-62 (C.C.P.A. 1974); *In re Cook,* 439 F.2d 730, 734 (C.C.P.A. 1971); *Capon v. Eshar,* 418 F.3d 1349, 1358 (Fed. Cir. 2005). The requirement for a reasonable expectation of success is such a patent law principle that is less easily satisfied where predictability is lacking, as it is here. *See, e.g., In re Shetty,* 556 F.2d 81, 86 (C.C.P.A. 1977); *In re Kratz,* 592 F.2d 1169, 1175 (C.C.P.A. 1979).**

DCL6.    The Court cautioned that the specter of "hindsight bias" should not trump simple common sense, stating that "[r]igid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it." *See KSR*, 2007 WL 1237837, at *16.

**PCC6.    While the Court concluded that fact finders should not apply rigid preventative rules that deny them recourse to common sense, the Court once again confirmed that fact finders must still avoid "the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR,* 127 S.Ct. at 1742-43 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966)). The Court also acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 127 S. Ct. at 1741.**

DCL7.          The Court also emphasized that an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."  *KSR*, 2007 WL 1237837, at *13.

**PCC7.           n *KSR* the Court concluded that prior art warnings about risks involved in the claimed invention and obtaining unexpected results also support a conclusion of nonobviousness.  *KSR*, 127 S. Ct. at 1740.  Thus, although the Court stated "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ," *KSR,* 127 S.Ct. at 1741, the Court also found, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *Id.* at 1740.**

DCL8.          Even before *KSR*, the Federal Circuit had had sought to clarify that the "suggestion test is not a rigid categorical rule.  The motivation need not be found in the references sought to be combined but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself."  *See Dystar*, 464 F.3d at 1361; s*ee also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (Fed. Cir. 2006) ("We do not have a rigid test that requires an actual teaching to combine before concluding that one of ordinary skill in the art would know to combine the references.").

**PCC8.           Regardless of the source of the motivation for combining or substituting a teaching in the prior art, "the question of whether such a substitution is obvious must be determined on the basis of the circumstances of each case, especially the extent to which similarity and equivalence between the substances involved are recognized in the prior art."  *In re Dowmani*, 281 F.2d 215, 217 (C.C.P.A 1960).  More than a bald allegation of "common sense" is required.**

DCL9.          The "suggestion, teaching or motivation to combine the relevant prior art teachings *does not have to be found explicitly in the prior art* . . . ."  *Alza*, 464 F.3d at 1290 (emphasis in original).  The motivation or suggestion can be found implicitly in the prior art as a whole and/or in the knowledge of a person of skill in the art.  *Id.* at 1290, 1294.

**RESPONSE:  Sicor does not provide the entire sentence in the quotation from the cited case law in DCL260.  Thus, the following counterconclusion is proposed:**

**PCC9.        "A suggestion, teaching or motivation to combine the relevant prior art teachings does not have to be found explicitly in the prior art, as 'the teaching, motivation, or suggestion may be implicit from the prior art as a whole, rather than expressly stated in the references.'"  *Alza Corp. v. Mylan Labs., Inc*. 464 F.3d 1286, 1290 (Fed. Cir. 2006) (quoting *In re Kahn*, 441 F.3d 997, 987-88 (Fed. Cir. 2006) (internal quotations and citatios omitted)).  The motivation or suggestion can be found implicitly in the prior art as a whole and/or in the knowledge "generally available" to a person of skill in the art.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1322 (Fed. Cir. 2005).  Of course, the claimed invention must be viewed in the state of the art that existed at the time of invention, *Uniroyal, Inc. v. Rudkin-Wiley Corp*., 837 F.2d 1044, 1050-51 (Fed. Cir. 1988), and it is improper to use hindsight to reconstruct the claimed invention from the prior art, *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984).**

DCL10.        The suggestion test "not only permits, but requires, consideration of common knowledge and common sense."  Dystar, 464 F.3d at 1367 (emphasis in original).

**PCC10.        While the Federal Circuit in *Dystar Textilfarben GmbH & Co. v. C.H. Patrick Co.*, stated that the suggestion test "not only permits, but requires, consideration of common knowledge and common sense," 464 F.3d 1356, 1367 (Fed. Cir. 2006),  the Supreme Court has recognized for decades that after-the-fact assertions that a patented invention was the result of mere common sense should be viewed skeptically, particularly where those assertions are supported by little more than bare expert opinion:**

> **Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and "in the light of the accomplished result," it is often a matter of wonder how they so long "eluded the search of the discoverer . . . ." Knowledge after the event is always easy, and problems**

> once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not.

*Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 434-35 (1911) (internal citation omitted); s*ee also Potts v. Creager*, 155 US 597, 608 (1895) ("The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before."); *Loom Co. v. Higgins*, 105 U.S. 580, 591 (1881) ("Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit."). Thus, resort to purported "common sense" that contradicts the clear teaching of the prior art should be recognized as nothing more than the same thinly disguised hindsight accused infringers have relied upon since the 1800s to minimize the perceived importance of a patented invention.

DCL11.    A presumption of obviousness exists where the ranges disclosed in a prior art reference overlap or encompass the claimed range. *See Ormco*, 463 F.3d at 1311; *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003); *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368 (Fed. Cir. 2007) ("[D]iscovery of an optimum value of a variable in a known process is usually obvious.") (citation omitted); *Medichem*, 437 F.3d at 1167 ("[S]electing a narrow range from within a somewhat broader range disclosed in a prior art reference is no less obvious than identifying a range that simply overlaps a disclosed range.") (citation omitted).

PCC11.    The *Ormco* Court provided more guidance than Sicor acknowledges. Immediately after the sentence relied upon by Sicor, the *Ormco* Court noted "[t]he presumption can be rebutted if it can be shown that the prior art teaches away from the claimed range, or the claimed range produces new and unexpected results." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (citations omitted).

DCL12.    A second subsidiary question necessary to the obviousness inquiry is whether a person of ordinary skill in the art would have had a reasonable expectation that the

combination of references would succeed for its intended purpose. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000). The standard is not "absolute predictability," but rather is whether a person of skill would have a "reasonable expectation" of success. *In re O'Farrell*, 853 F.2d 894, 903-904 (Fed. Cir. 1988); *see also Pfizer*, 480 F.3d at 1364 ("[O]nly a reasonable expectation of success, not a guarantee, is needed.").

**PCC12.    *See* PCC5.  Moreover, merely asserting that a teaching in a reference would "pique the scientist's curiosity, such that further investigation might be done as a result of the disclosure, but the disclosure itself does not contain a sufficient teaching of how to obtain the desired result, or that the claimed result would be obtained if certain directions were pursued" is not sufficient to establish obviousness. *See, e.g., Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed. Cir. 1990).**

DCL13.    The "case law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364.

**PCC13.    *See* PCC5.  The "reasonable probability of success" referred to in *Pfizer* must be understood in the context of the requirement in § 103 that "patentability shall not be negatived by the manner in which the invention was made." *See* 35 U.S.C. § 103; *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007).  Thus, the fact that a patent used an obvious methodology will not preclude patentability where the result of that methodology is unpredictable. *See In re Kratz*, 592 F.2d 1169, 1175 (C.C.P.A. 1979).**

DCL14.    In addressing obviousness, relevant secondary considerations must also be considered if they are present.  Secondary considerations do not, however, control the analysis when there is an otherwise strong case of obviousness. *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997).  Moreover, for secondary considerations to be relevant there must be a nexus between the secondary consideration and the claimed invention. *See Ormco*, 463 F.3d at 1311-12.

**PCC14.    The assessment of obviousness also requires examination of objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).  The Federal Circuit has emphasized the need for evaluating objective evidence of nonobviousness. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) (stating that "secondary considerations, when present, must be considered in determining obviousness").**

Moreover, "[i]t is the secondary considerations that are often the most probative and determinative of the ultimate conclusion of obviousness or nonobviousness." *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996). Courts must make this evaluation while considering whether the claimed invention is obvious, not once a determination is complete. *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir. 1984). *See also* PCL26-29.

Secondary considerations, when present, must be considered in determining obviousness. *Ruiz*, 234 F.3d at 667. Such secondary considerations include the extent of the commercial success of the patented invention, unexpected results compared to the prior art, skepticism in the field, and any copying of the invention by others. *Graham*, 383 U.S. at 17-18; *U.S. v. Adams*, 383 U.S. 39, 51-52 (1966); *Pro-Mold*, 75 F.3d at 1572.

Evidence of initial skepticism, surprise, or incomprehension upon learning of the invention and thereafter praising its value is strong evidence of nonobviousness. *Adams*, 383 U.S. at 52; *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 697-98 (Fed. Cir. 1983); *Ruiz*, 234 F.3d at 668 ("Proceeding contrary to the accepted wisdom . . . is strong evidence of unobviousness.") (internal citations omitted). This is particularly true where "the skepticism is expressed at the time of the invention, in a nonadversarial setting." *Burlington Indus., Inc. v. Quigg*, 229 U.S.P.Q. 916, 919 (D.D.C. 1986), *aff'd*, 822 F.2d 1581 (Fed. Cir. 1987).

Evidence of skepticism need not derive solely from the technical literature but also may include personal communications and comments by experts in the field. *See, e.g., Adams*, 383 U.S. at 44, 52 (crediting contemporaneous doubts expressed in correspondence by scientists and government expert who observed initial demonstration of claimed battery); *Burlington Indus.*, 229 U.S.P.Q. at 919 (crediting inventor's testimony that mill operators dismissed him as "crazy" upon first learning of his invention); *In re Dow*, 837

F.2d 469, 472-73 (Fed. Cir. 1988) (crediting evidence of skepticism expressed by expert

chemist in a report sent to company management around time the invention was made).

Commercial success of an invention is also evidence that the invention would not

have been obvious. *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.*, 321 U.S. 275, 279 (1944);

*Pro-Mold,* 75 F.3d at 1573. Commercial success is usually shown by significant sales in a

relevant market. *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed.

Cir. 1997). Additional evidence probative of commercial success includes growth in market

share, increases in sales, and replacing earlier units sold by others. *Tec Air, Inc. v. Denso*

*Mfg. Mich. Inc.*, 192 F.3d 1353, 1360-61 (Fed Cir. 1999); *Ruiz*, 234 F.3d at 668.

DCL16.        Assertions that an expert did not think of the idea in the patent at the time
are irrelevant. The "'fundamental issue' is whether a *hypothetical* person of ordinary skill in the
art, when confronted with the problem . . . would have been motivated" to make the connection.
*Sibia Neurosciences, Inc., v. Cadmus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000)
(emphasis added).

PCC16.        "Recognizing the difficulty of casting one's mind back to the state of

technology at the time the invention was made, courts have long recognized the usefulness

of evidence of the contemporaneous attitude toward the asserted invention. A retrospective

view of the invention is best gleaned from those who were there at the time." *Interconnect*

*Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed. Cir. 1985). The Supreme Court has

acknowledged that expressions of disbelief by experts in the field at or about the time of the

invention are evidence of nonobviousness. *Adams*, 383 U.S. at 52. Evidence that experts in

the field were skeptical or disbelieving of the claimed invention is acknowledged as

compelling objective evidence of nonobviousness. *See Dow Chem.*, 837 F.2d at 472-73;

*Burlington Indus.,* 229 U.S.P.Q. at 1584. Moreover, proceeding against the conventional

wisdom is strong evidence of nonobviousness. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721

F.2d 1540, 1545 (Fed. Cir. 1983). Even beyond writings, the Federal Circuit has explicitly

looked to the *actions* of those in actually working in the field to determine how they viewed

a prior art disclosure. *In re Oelrich*, 579 F.2d 86, 91 (C.C.P.A. 1978) ("In determining how the Oelrich disclosure was interpreted by those skilled in the art, we are more impressed by what those so skilled Did than by what they Said."). *See also* PCC14.

DCL17.    To establish obviousness, Sicor has the burden of proving any disputed facts by clear and convincing evidence. *See Brown & Williamson*, 229 F.3d at 1124. The Court must then make the ultimate legal conclusion as to obviousness based on the evidence presented. *Id.*

PCC17.    **Patents are presumed valid, and each claim within a patent is independently presumed valid, even if other claims within patent are held invalid. 35 U.S.C. § 282. In order to overcome the presumption of validity, the challenger bears the burden of proving invalidity by clear and convincing evidence.** *TP Labs., Inc. v. Prof'l Positioners, Inc.*, **724 F.2d 965, 971 (Fed. Cir. 1984). That burden is "constant and remains throughout the suit on the challenger" and "does not shift at any time to the patent owner."** *Id.* **Thus, to establish obviousness, Sicor has the burden of proving any disputed facts by clear and convincing evidence.** *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, **229 F.3d 1120, 1124 (Fed. Cir. 2000). Moreover, the challenger's "burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application."** *Al-Site Corp. v. VSI Int'l, Inc.*, **174 F.3d 1308, 1323 (Fed. Cir. 1999) (quoting** *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, **909 F.2d 1464, 1467 (Fed. Cir. 1990)). In other words, the challenger has the "added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job."** *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, **204 F.3d 1360, 1367 (Fed. Cir. 2000) (quoting** *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, **725 F.2d 1350, 1359 (Fed. Cir. 1984)). The Court must make the ultimate legal conclusion as to obviousness based on the evidence presented.** *See Brown & Williamson*, **229 F.3d at 1124.**

### 2.    Counterconclusions Regarding Differences Between the Claimed Invention Of the '296 Patent and the Prior Art

DCL20.    While the prior art and asserted claims are extremely similar (if not identical), the differences between them must be considered as part of a proper obviousness analysis. *See Dystar*, 464 F.3d at 1360.

**PCC20.    A proper obviousness analysis includes ascertaining the differences between the prior art and the asserted claims. *See Graham*, 383 U.S. at 17-18. Here, the prior art and asserted claims differ in very important and unobvious ways. (*See, e.g.*, PCF96, 101-112, 116, 118-123, 129-138.)**

DCL21.    Sollevi I and Sollevi II ("the Sollevi prior art") reports identical results from the same clinical study concerning administration of 140 µg/kg/min of intravenous adenosine to humans to cause selective arterial vasodilation, and both abstracts differ from the asserted claims in only one way:  the use of a dipyridamole pretreatment.

**PCC21.    *See* PFF161-164.**

DCL23.    A person of ordinary skill would understand based upon the methods and conclusions set forth in the Sollevi prior art, as well as the background knowledge in the art, that the prior art suggested the administration of intravenous adenosine without the use of any dipyridamole whatsoever.

**PCC23.    *See* PFF 165-189; PCF 147-152; POB § II(A). Safety concerns caused more than 50 years to elapse between the first test of adenosine administration to humans and the first test of continuous adenosine infusion in conjunction with dipyridamole pretreatment by Dr. Sollevi. (*See* PB at 4-5; TX-48 at 2229; Klabunde 520:2-17.) Moreover, Dr. Sollevi had specifically used dipyridamole pretreatment to reduce the dose of adenosine and prevent side effects, and an article by Dr. Fukunaga also recommended using dipyridamole as a way to reduce side effects in connection with ATP administration. (TX-1170; TX-42.) To suggest that both researchers were dangerously wrong, and that one of *ordinary* skill would have believed administration of adenosine *without* dipyridamole to be safer, strains credulity and is the purest form of hindsight.**

**The Supreme Court has recognized for decades that after-the-fact assertions that a patented invention was the result of mere common sense should be viewed skeptically,**

particularly where those assertions are supported by little more than bare expert opinion. *See Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 434-35 (1911); *see also C & A Potts & Co. v. Creager*, 155 U.S. 597, 608 (1895) ("The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before."); *Webster Loom Co. v. Higgins*, 105 U.S. 580, 591 (1881) ("Now that it has succeeded, it may seem very plain to any one that he could have done it as well.  This is often the case with inventions of the greatest merit.").

Sicor's unlikely conjecture, based on unsupported *ex post* expert opinions, cannot satisfy its burden of proving invalidity by clear and convincing evidence.  This is particularly so where, as here, most of those opinions were not properly disclosed during expert discovery and were contradicted by direct contemporaneous evidence presented at trial.  Plaintiffs, therefore, propose the following counterconclusion:

PCC23.     A person of ordinary skill would have understood based upon the prior art that administering a dipyridamole pretreatment prior to continuously infusing adenosine was necessary to reduce the required dose of adenosine.

(*See also* PCL33-37.)

DCL24.     The Fukunaga Abstract discloses the intravenous administration of a selective arterial vasodilator to humans.  The sole difference between Fukunaga and the asserted claims is that the vasodilator used in Fukunaga is ATP, whereas the asserted claims recite adenosine.

PCC24.     Plaintiffs object to this conclusion because it is a finding of fact. As an initial matter the *Fukunaga 1982* abstracts says nothing about selective arterial vasodilation and the cardiac output data is too convoluted for one of ordinary skill to have drawn a meaningful conclusion that the vasodilation was primarily arterial.  (Klabunde 548:9-20; *see also* PCF77.)  In addition, ATP is a different molecule than adenosine, with

93

**different properties, that acts on different inceptors.  (*See* PCF71.)  One of ordinary skill at**

**the time would not have been led to assume ATP and adenosine were interchangeable.**

DCL25.        ATP was known as the parent molecule to adenosine, and a person of ordinary skill would understand based upon various prior art publications that exogenous ATP is converted rapidly and completely to adenosine following administration.

**PCC25.        *See* PCC24; *see also* PCF71-76.**

DCL26.        Such a person would also understand that the selective arterial vasodilation that is observed following the administration of ATP is due to its breakdown to adenosine – not due to the direct action of ATP itself.

**PCC26.        *See* PCC24; *see also* PCF77-83.**

**3.        Counterconclusions Regarding the Sollevi Prior Art In Combination with the Knowledge of a Person of Ordinary Skill in the Art**

DCL27.        The disclosures the Sollevi prior art, in combination with the knowledge of a person of ordinary skill in the art, would render each of the asserted claims of the '296 patent obvious.

**PCC27.        The disclosure of *Sollevi I* and *Sollevi II*, in combination with the**

**knowledge of a person of ordinary skill in the art, would not have rendered each of the**

**asserted claims of the '296 patent obvious.**

DCL28.        The Sollevi prior art discloses or suggests each of the following:  (1) a method of selective vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates.

**PCC28.        *Sollevi I* and *Sollevi II* fail to disclose or suggest a method of**

**selectively vasodilating the arteries of a human patient without inducing significant venous**

**dilation and without pretreatment with dipyridamole, comprising continuously**

**administering adenosine at the claimed dosage rates.**

DCL29.        The Sollevi prior art discloses a method of selectively vasodilating the arteries with little or no venous dilation.

**PCC29.        *See* PCC28.**

DCL31.        The Sollevi prior art disclosed a decrease in MABP and SVR, along with an increase in cardiac output, which would indicate to a person of ordinary skill that arteries had been dilated with little or no venous dilation.

**PCC31.** *See* **PCF102-105, 118-120.**

DCL32.    The Sollevi prior art thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

**PCC32.** *See* **PCC28.**

DCL34.    The Sollevi prior art discloses the use of a dipyridamole pretreatment before the administration of adenosine. However, based on the disclosures of the Sollevi prior art and knowledge in the art at the time, it would have been obvious to a person of ordinary skill in the art to omit this dipyridamole pretreatment.

**PCC34.    The Sollevi prior art discloses the use of dipyridamole pretreatment before the administration of adenosine.  Based on the disclosures of the prior art, including *Sollevi I* and *Sollevi II*, and the knowledge in the art at the time, a person of ordinary skill in the art would have believed that such a dipyridamole pretreatment was critical for patient safety.  (*See* PCF112, 123, 154-155, 158.)**

DCL35.    Common sense would have motivated a person of ordinary skill in 1985 to omit the dipyridamole pretreatment and administer adenosine alone. *See KSR*, 2007 WL 1237837, at *15.

**PCC35.    A person of ordinary skill would have understood based upon the prior art that administering a dipyridamole pretreatment prior to continuously infusing adenosine was necessary to reduce the required dose of adenosine for the safety of the patient.  (*See* PCF112, 123.)  "Common sense" would not have made such an ordinary-skilled physician think otherwise.  (*See also* PCL33- 37; POB at § II(A).)**

DCL36.    The mechanism of action of dipyridamole was well-known at that time. Persons of ordinary skill in the art in 1985 knew that dipyridamole acted by increasing the endogenous concentration of adenosine.

**PCC36.    Dipyridamole was believed to act by several mechanisms, one of which was by preventing breakdown of endogenous adenosine.  (TX-93 at 758.)**

DCL37.    Omission of the dipyridamole pretreatment would be understood by a person of ordinary skill to solve the problem of the longer duration of side effects with dipyridamole.

**PCC37.**        *See* **PCF148.  Rather than viewing adenosine's short duration of action as a benefit, a person of ordinary skill in the art at the time of the invention would have viewed it as a liability that had to be overcome.  This was due to the belief that if much higher and likely harmful doses of adenosine were not administered, adenosine's short half-life would cause the vasodilatory effects caused by the compound to terminate prior to inducing the systemic vasodilation desired.  This is evident from the fact that in *Sollevi I* and *Sollevi II,* Dr. Sollevi specifically administered dipyridamole prior to adenosine to increase adenosine's duration of action and thereby lower the required dose.  (TX-37; TX-1170.)  This fact is further evidenced by the extensive research and attempts to develop adenosine analogs that possessed the "coronary vasodilatory activity of adenosine, but which ha[d] greater duration of action *in vivo* and which lack[ed] the cardiac depressant action of the parent compound."  (TX-214 at 415; Binkley 326:23-328:1; Strauss 770:16-20.)**

DCL38.        A person of ordinary skill in the art would have drawn the "natural" conclusion to administer adenosine as the direct-acting agent to product the same effect.  *See KSR*, 2007 WL 1237837, at *13 ("[A] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.").

**PCC38.        While the Supreme Court stated that "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions," it also noted, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *Id.*  KSR, 127 S. Ct. 1740.  Furthermore, prior art warnings about risks involved in the claimed invention and obtaining unexpected results also support a conclusion of nonobviousness.  *Id.*  Therefore, because the prior art of record both taught away from removing the dipyridamole and provided warnings about the risks of administering high doses of adenosine, a person of ordinary skill in the art would not have removed the dipyridamole pretreatment.  (*See also* PCF112, 123, 147, 148, 150, 154, 158.)**

DCL39.        A person of ordinary skill would also have been motivated to omit the dipyridamole pretreatment as unnecessary to achieve the desired selective arterial vasodilation at amounts less than the maximal dilatation that caused the controlled hypotension in the Sollevi prior art, because the Sollevi prior art taught that the continuous intravenous infusion of adenosine could maintain selective arterial vasodilation even as the effect of the dipyridamole pretreatment might be waning.

**RESPONSE: Plaintiffs object to this conclusion as irrelevant because the only theory of invalidity disclosed in Sicor's expert reports was invalidity in view of prior art concerning inducing controlled hypotension in surgical patients.  The expert reports in no way disclosed Sicor's new theory that the use of adenosine would be desirable to cause "selective arterial vasodilatation at amounts less than the maximal dilatation that caused the controlled hypotension."  *See* POB at § II(B)(2).  Plaintiffs further object to this conclusion as irrelevant because Sicor's expert reports also failed to present the theory that *Sollevi I* and *Sollevi II* taught that "the continuous intravenous infusion of adenosine could maintain selective arterial vasodilation even as the effect of the dipyridamole pretreatment might be waning."  (*See* POB at 12-15; *see also* PCF121.)**

DCL40.        The Sollevi prior art would therefore suggest to a person of ordinary skill in the art to administer adenosine "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

**PCC40.        *See* PCC34-38 and Response to DCL39.  *Sollevi I* and *Sollevi II* would not suggest the administration of adenosine "without pretreatment with dipyridamole," as recited in the asserted claims 1, 3, 7, and 9, to a person of ordinary skill in the art.  (*See* POB § (II)(A); *see also* PCF112, 123, 147, 148, 150, 152.)**

DCL42.        The Sollevi prior art thus discloses the claimed manner of administration, as set forth in asserted claims 1, 3, 7, and 9.

**PCC42.        *See* PCC28.**

DCL43.        The Sollevi prior art discloses the administration of adenosine at a rate of 140 • g/kg/min, which falls within each of the claimed rates of administration:  0.35 mg/mg/min or less (claims 1 and 9); about 0.05 to about 0.3 mg/kg/min (claim 3); or about 0.01 to 0.15 mg/kg/min (claim 7).

**PCC43.** ***Sollevi I*** **and** ***Sollevi II*** **do not disclose rates of administration of adenosine in the absence of a dipyridamole pretreatment, as required by the asserted claims.**

DCL44.　　　A presumption of obviousness exists where the ranges disclosed in a prior art reference overlap or encompass the claimed range. *See Ormco*, 463 F.3d at 1311; *Peterson*, 315 F.3d at 1330; *see also Pfizer*, 480 F.3d at 1368 ("[T]he discovery of an optimum value of a variable in a known process is usually obvious.").

**PCC44.** *See* **PCC11.**

DCL45.　　　In view of the teachings of the Sollevi prior art, coupled with the knowledge of a person of ordinary skill in the art in 1985, the asserted claims of the '296 patent are obvious.

**PCC45.　　　The prior art, including** ***Sollevi I*** **and** ***Sollevi II*** **, coupled with the**

**knowledge of a person of ordinary skill in the art in the art in 1985, would not have**

**rendered the asserted claims of the '296 patent obvious.**

### 4.　　　Counterconclusions Regarding *Fukunaga 1982* In Combination with the Knowledge of a Person of Ordinary Skill in the Art

DCL46.　　　The disclosures in the Fukunaga Abstract, coupled with the knowledge of a person of ordinary skill in the art in 1985, would render each of the asserted claims of the '296 patent obvious.

**PCC46.　　　The disclosures of the prior art, including** ***Fukunaga 1982*** **, coupled**

**with the knowledge of a person of ordinary skill in the art in 1985, would not render any of**

**the asserted claims of the '296 patent obvious.**

DCL47.　　　The Fukunaga Abstract discloses or suggests each of the following: (1) a method of selective vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates.

**PCC47.　　　** ***Fukunaga 1982*** **fails to disclose or suggest a method of selectively**

**vasodilating the arteries of a human patient without inducing significant venous dilation**

**and without pretreatment with dipyridamole, comprising continuously administering**

**adenosine at the claimed dosage rates.**

DCL48.　　　The Fukunaga Abstract discloses a method of selectively vasodilating the arteries with little or no venous dilation.

**RESPONSE:  Sicor's proposed conclusion is inaccurate.  Plaintiffs direct this Court's attention to PCF 77,** *supra***, and propose the following counterconclusion:**

**PCC48.        *See* PCF77; PCC49.**

DCL49.        In the Fukunaga Abstract, MABP (pressure) and SVR (resistance) decrease, and cardiac output (blood flow) is "well-maintained," and person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Fukunaga Abstract demonstrated selective arterial vasodilation with little or no venous dilation.

**PCC49.        The hallmarks of selective arterial vasodilation following an adenosine infusion involve a clear cut reduction in vascular resistance combined with essentially unaffected filling pressures to the heart and, without exception, an *increase* in cardiac output (the rate of blood flow pumping through the heart).  The *Fukunaga 1982* abstract does not report the same consistent increase in cardiac output together with maintained filling pressure.  The abstract does not even report measurement of filling pressures, such as right arterial pressure.  (Klabunde 544:8-546:2; TX-42; *see also* PFF147-149.)  Nor does it report an *increase* in cardiac output.  Moreover, the cardiac output data in *Fukunaga 1982* is flawed and would not have allowed one of ordinary skill in the art to conclude that selective arterial vasodilation occurred in patients administered an ATP infusion. (Klabunde 546:9-548:15).  Thus, the *Fukunaga 1982* does not disclose selective arterial vasodilation with little or no venous dilation.**

DCL50.        The Fukunaga Abstract thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

**PCC50.        *See* PCF77; PCC49.**

DCL53.        The Fukunaga Abstract discloses that dipyridamole was not used as a pretreatment before the administration of ATP.

**PCC53.        The Fukunaga Abstract discloses administration of ATP rather than administration of adenosine with no dipyridamole pretreatment.  (*See* PCF129-141.)  These are not the same.  Moreover, the 1984 Fukunaga publication (TX-51), published before the**

earliest effective filing date of the '296 patent (*compare* TX-51 *with* TX-275), teaches one of ordinary skill that, contrary to the experiments in the earlier *1982 Fukunaga* abstract, a dipyridamole pretreatment should be used when administering ATP to humans for patient safety. (*See* TX-51.)

DCL54.    The Fukunaga Abstract thus discloses the claimed limitation "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

**PCC54.        *See* PCC53.**

DCL56.    ATP is rapidly converted to adenosine when ATP is endogenously administered, which would have been well-known to a person of ordinary skill in the art at the relevant time.

**PCC56.        *See* Responses and Counterfindings to DFF71-76.**

DCL57.    Based on other references and knowledge in the art at that time, a person of ordinary skill in the art, as well as Dr. Sollevi himself, would also have understood that the conversion of ATP to adenosine is nearly complete.

**PCC57.        *See* Responses and Counterfindings to DFF71-76.**

DCL58.    Fukunaga 1984, as well as other references and knowledge in the art, also taught a person of ordinary skill that adenosine – not ATP – is responsible for the vasodilation that is observed following the administration of ATP, and this mechanism of action would have been understood by a person of ordinary skill.

**PCC58.        *See* Responses and Counterfindings to DFF71-83.**

DCL59.    The Fukunaga Abstract also concludes that "ATP should potentially be considered for use among the vasoactive hypotensive drugs" which would have also indicated to a person of ordinary skill that adenosine should be considered for use as a vasodilator, given that such a person would have known that the effects of ATP were due to the actions of adenosine.

**RESPONSE: Plaintiffs object to this conclusion because the paper from which the quote in this proposed conclusion was taken, specifically TX-236, was not disclosed in Dr. Binkley's expert report and the testimony elicited at trial offered previously undisclosed opinions about them. (*See, e.g.,* POB at 38.) Thus, the following counterconclusion is proposed:**

**PCC59.        *See* PFF73. Sicor's expert, Dr. Binkley, also attempted to rely on a dog studies using ATP that was not disclosed in his expert report and offered previously**

undisclosed opinions and testimony about them.  (TX-88; TX-236; Binkley 1412:1-1421:19.)  Yet the record shows very different levels of ATP metabolism and different effects of ATP in various animal species and in animals versus humans.  (*See, e.g.*, Binkley 1465:5-1466:15; TX-87 at 277; Klabunde 1215:2-1216:18; TX-126 at 613.)  Most importantly, the human data available in the prior art showed ATP to be a more potent vasodilator than adenosine, contradicting the notion that ATP was working solely through metabolic formation of adenosine.  (*See, e.g.*, Klabunde 1044:5-25, 1116:5-1118:21.)

DCL60.     The Fukunaga Abstract discloses the administration of ATP at a rate that is equivalent to the claimed rates of adenosine administration: 0.35 mg/mg/min or less (claims 1 and 9); about 0.05 to about 0.3 mg/kg/min (claim 3); or about 0.01 to 0.15 mg/kg/min (claim 7).

**RESPONSE:  As discussed in connection with DFF71 -83, the premise of this conclusion, *i.e.*, that  "ATP rapidly and completely breaks down to adenosine," is contrary to the presented evidence.  (*See, e.g.*, PCF72, 74.)  The conclusions drawn from this faulty premise are therefore flawed.  Moreover, Dr. Binkley's unsupported opinion is contradictory to the evidence.  If Dr. Binkley's premise were correct, the equation posited in this finding would teach someone that less adenosine (approximately half) would be needed to obtain an equivalent response when compared to a dose of ATP.  However, the evidence has shown that this is not the case.  Specifically, when Dr. Fukunaga conducted his experiments with a dipyridamole pretreatment, he used a dose of 32 mcg/kg/min of ATP to reduce blood pressure by about 40%.  (*See, e.g.*, TX-51; Klabunde 549:4-550:24, 1044:5-25; PCF78, 79.)  If Dr. Binkley's assumption about the conversion of ATP to adenosine were true, then one would have predicted that only 16 mcg/kg/min of adenosine would have been required for Dr. Sollevi to obtain a hypotensive drop in blood pressure in the presence of a dipyridamole pretreatment.  (Binkley 258:25-260:1; Klabunde 549:4-550:14.)  However, Dr. Sollevi needed almost ten times that much adenosine to obtain a similar hypotensive response.  (TX-37; TX-1170; Binkley 260:2-20; Klabunde 550:15-24.)**

101

Thus, the following counterconclusion which more accurately describes the disclosure of *Fukunaga 1982* is proposed:

**PCC60.** *Fukunaga 1982* **discloses the administration of ATP in doses of 0.2-0.6 mg/kg/min.**

DCL61.    To calculate the amount of adenosine that would have resulted from a given dose of ATP, a person of ordinary in the art in 1985 would have used a standard calculation and the known molecular weights of those molecules.

**PCC61.** *See* **Response to DCL60; PCC60.**

DCL62.    Based on this equation, a person of ordinary skill would have determined that a dose of 0.2 to 0.6 mg/kg/min of ATP is equivalent to doses of between 0.097 and 0.290 mg/kg/min of adenosine.

**PCC62.** *See* **Response to DCL60; PCC60.**

DCL63.    This adenosine dose is equivalent to a dose of 97 to 290 µg/kg/min, which includes or overlaps each of the ranges recited in the asserted claims of the '296 patent.

**PCC63.** *See* **Response to DCL60; PCC60.**

**5.    Counterconclusions Regarding Secondary Factors**

DCL64.    When, as here, the prior art sets forth a prima facie case of obviousness, the patentee bears the burden of presenting evidence, if any, that the claimed invention would not have been obvious to one skilled in the art.  *See, e.g., Newell Cos., Inc. v. Kenney Mfg. Inc.*, 864 F.2d 757, 768-69 (Fed. Cir. 1988); *see also Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir. 2000 (affirming finding of invalidity due to patentee's failure to rebut *prima facie* case with secondary considerations).  Such evidence might include the so-called "secondary considerations" of non-obviousness, including the failure of others to make the claimed invention, skepticism by others that the claimed invention could work, and commercial success attributable to the merits of the claimed invention.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

**RESPONSE:  The statute, 35 U.S.C. § 103, does not refer to "*prima facie* obviousness."  It refers to "obviousness," and the ultimate burden to prove obviousness by clear and convincing evidences remains always on Sicor.  Objective TP Labs., 724 F.2d at 971.  Objective evidence must always be considered in that analysis, not afterward.**

**Therefore, Plaintiffs propose the following counterconclusion:**

**PCC64.** The assessment of obviousness also requires examination of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17-18. The Federal Circuit has emphasized the need for evaluating objective evidence of nonobviousness. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) (stating that "secondary considerations, when present, must be considered in determining obviousness"). "It is the secondary considerations that are often most probative and determinative of the ultimate conclusion of obviousness or nonobviousness." *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996). Moreover, courts must make this evaluation while considering whether the claimed invention is obvious, not once a determination is complete. *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1461 (Fed. Cir. 1984). Such secondary considerations include the extent of the commercial success of the patented invention, unexpected results compared to the prior art, skepticism in the field, and any copying of the invention by others and when present, must be considered in determining obviousness. *See Ruiz,* 234 F.3d at 667. The Defendants have the burden of proof with respect to *all* of the *Graham* factors, including objective evidence of nonobviousness. *See Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*, 745 F.2d 1, 8 (Fed. Cir. 1984) (holding that burden is not on the patentee to prove new and surprising results, but is on the patent challenger to establish the lack of new and surprising results).

DCL66. Even if relevant, secondary considerations do not control the obviousness determination. *Pfizer*, 480 F.3d at 1372; *Richardson-Vicks*, 122 F.3d at 1483; *see also Newell*, 864 F.2d at 769. Indeed, it is well-established that such evidence will not save a patent when the prior art provides "strong evidence of obviousness." *Brown & Williamson*, 229 F.3d at 1131; *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed Cir. 1989); *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 317 (Fed. Cir. 1985).

**PCC66.** While secondary considerations do not necessarily control the obviousness determination, they must be considered, *Ruiz.*, 234 F.3d at 667, and "are often most probative and determinative of the ultimate conclusion of obviousness or nonobviousness." *Pro-Mold,* 75 F.3d at 1573.

DCL68.        To show commercial success as a secondary consideration of nonobviousness, Plaintiffs must demonstrate that there is "[a] nexus between commercial success and the claimed features." *Brown & Williamson*, 229 F.2d at 1130. If Plaintiffs show that "the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness [Sicor]," *id.*, to show that the commercial success was "due to other factors extraneous to the patented invention . . ." *See J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

**PCC68.        Plaintiffs have demonstrated that there is a nexus between the commercial success of Adenoscan and the claimed invention. A *prima facie* case of nexus is made out when the patentee shows both that there is commercial success and that the product that is commercially successful is the invention disclosed and claimed in the patent. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). Sicor admits that its proposed product infringes the asserted claims of the '296 patent and that it copied its Adenosine Injection USP from Adenoscan. (Hernandez 2061:24-2063:14.) As such, Sicor has conceded that the claims of the '296 patent cover Adenoscan's use in myocardial perfusion imaging. Thus, the demonstrated commercial success (*see* PFF196-213) due to the merits of Adenoscan is commercial success of the claimed invention.**

DCL69.        Plaintiffs have failed to demonstrate a nexus between the '296 patent claimed invention and the alleged commercial success of the Adenoscan® product. *See Ormco*, 463 F.3d at 1311-12 ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").

**PCC69.        *See* PCC68. *See also* Lea 2035:22-2036:9.**

DCL70.        Adenoscan® was marketed not on the basis of its ability to selectively dilate arteries rather than veins without pretreatment with dipyridamole (*i.e.*, the claimed '296 patent invention), but on the basis of its short half life and the concomitant rapid cessation of side effects. In short, the nexus is with characteristics of adenosine that were long known in the prior art, and not the claimed inventions.

**PCC70.        The nexus is with the commercial success of Adenoscan and the invention as claimed in the '296 patent. *See* PCC68, 69. The asserted claims of the '296 patent distinctly point out the matter that is patented, and Sicor has admitted that those claims cover Adenoscan by admitting infringement of its proposed copy-cat product. The short half life and rapid cessation of side effects of Adenoscan are advantages flowing from**

the practice of the invention as it is claimed. How Adenoscan was marketed is not relevant

to the inquiry of nexus. However, it is entirely proper for a court to take into account

advantages flowing directly from the patented invention in determining nonobviousness,

for such advantages are the foundation of commercial success. *Preemption Devices, Inc. v.*

*Minn. & Mining Mfg. Co.*, 732 F.2d 903, 907 (Fed. Cir. 1984).

DCL71.    Adenoscan® sales levels do not suggest any non-obviousness. The commercial sales of Adenoscan® are explained by the confluence and interaction of four economic factors: (1) the existence of just one other FDA-approved competitor in the pharmacological stress testing market at the time of Adenoscan® market entry; (2) the absence of marketing and promotion by the manufacturers of drugs that are competitive alternatives to Adenoscan®; (3) extensive marketing and promotional campaigns; and (4) growth in demand for myocardial perfusion imaging employing pharmacological stress agents occurring for demographic and marketing reasons unrelated to the asserted invention.

PCC71.    The sales and increased market share of Adenoscan, driven as they

were by the characteristics of the invention claimed in the '296 patent, are powerful and

persuasive evidence of nonobviousness. *Tec Air,* 192 F.3d at 1360-61. Adenoscan's sales

grew because clinicians recognized significant advantages flowing from the use of

Adenoscan. (Hay 1796:22-1798:1; *see also* Hay 1754:10-1757:15.) The record in this case

contradicts Sicor's arguments and confirms that the attributes of Adenoscan are far more

determinative of the demand for it than promotion. Furthermore, even genuinely

advantageous market circumstances will not sever a proper nexus between a product's

commercial success and its merits. *See, e.g., Insight Tech. Inc. v. Surefire, LLC*, 447 F. Supp.

2d 120, 134 (D.N.H. 2006). Sicor's own actions in seeking market approval for a generic

version of Adenoscan and provoking this lawsuit under the Hatch-Waxman Act also

contradict its arguments that Adenoscan is not a commercial success, particularly when it

is already selling the only competing compound in the market. (Lea 2035:22-2036:2.) *See*

*Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F. Supp. 2d 479, 496 (D. Del. 2006)("In the

Court's view, the copying of others is particularly telling in this case, because citalopram is

currently available as a generic drug.  Indeed, citalopram is sold generically by Defendants,

yet Defendants seek to copy and sell Lexapro®.").

DCL72.     Even if commercial sales were found not to be a product of promotion and market forces, commercial success is not sufficient to overcome the strong case of obviousness here.  *See Newell*, 864 F.2d at 769 ("[A]lthough the record shows a highly successful product, the record also establishes such a strong case of obviousness . . . that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion.")

**PCC72.     Adenoscan's sales resulted from clinicians recognizing significant**

**advantages flowing from the use of Adenoscan and not from promotion and market forces.**

**(Hay 1796:22-1798:1;** *see also* **Hay 1754:10-1757:15.)  This is compelling evidence of**

**nonobviousness.**

**B.     Counterconclusions Regarding Anticipation**

**1.     Counterconclusions Regarding Legal Standard**

DCL73.     A patent claim is invalid as anticipated under 35 U.S.C. § 102 when every limitation of the claim was contained, either expressly or inherently, in a single prior art reference.  *See* 35 U.S.C. § 102; *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

**PCC73.     A party seeking to invalidate a patent under § 102 for anticipation**

**must show that the allegedly invalidating prior art contains each and every element of the**

**claimed invention.** *Union Oil Co. of Cal. v. Atlantic Richfield Co.***, 208 F.3d 989, 994-95 (Fed.**

**Cir. 2000).  If even one element is not shown in the reference, then it does not anticipate.**

*See Structural Rubber Prods. Co. v. Park Rubber Co.***, 749 F.2d 707, 716 (Fed. Cir. 1984).**

**Additionally, it is important to remember that, as with express anticipation, anticipation by**

**inherency still requires that "each and every element as set forth in the claim is found,**

**either expressly or inherently described, in a single prior art reference."** *See Verdegaal*

*Bros., Inc. v. Union Oil Co. of Cal.***, 814 F.2d 628, 631 (Fed. Cir. 1987).**

DCL75.     An inherent characteristic is one that is the "natural result flowing from" the disclosure or teaching of the prior art.  *See Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003)*Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001).

**RESPONSE:  Sicor misapprehends the Federal Circuit's inherency analysis in** *Schering Corp. v. Geneva Pharm., Inc.*, **339 F.3d 1373, 1379 (Fed. Cir. 2003), and fails to acknowledge the controlling portion of that decision.  In** *Schering,* **the Federal Circuit invalidated** *compound* **claims to a metabolite that was necessarily formed from an antihistamine drug whose administration for treatment of allergic reactions was known in the prior art.** *Id.* **at 1380, 1382.  Thus, because the formation of the claimed** *compound* **was determined to be a natural result flowing from the prior art administration of the antihistamine, the claim to the compound itself was held to be anticipated.** *Id.* **at 1380.  Importantly, and not mentioned by Sicor, the** *Schering* **court explicitly distinguished compound claims from method claims, such as the asserted claims of the '296 patent at issue here.  The court stated that "this case does not preclude patent protection for metabolites of known drugs" and noted that claims to a method of administering the metabolite would not be anticipated by prior art administration of the precursor antihistamine.** *Id*.  **The court also specifically noted its approval of the district court's decision finding no anticipation of method and composition claims.** *Id.* **at 1381.  Thus, Plaintiffs propose the following counterconclusion:**

**PCC75.        Patent claims reciting a method of administering a metabolite are not anticipated, either expressly or inherently, by prior art disclosing the administration of a precursor compound to that metabolite.** *See Schering*, **339 F.3d at 1379 (Fed. Cir. 2003).**

DCL76.        A "reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time." *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006).  That is, "[i]nherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure." *Id.* at 1368 (citation omitted).

**PCC76.        While a person of ordinary skill in the art at the time need not have appreciated the inherent disclosure,** *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, **471 F.3d 1363, 1367 (Fed. Cir. 2006), inherency "may not be established by probabilities or**

possibilities." *In re Oerlich*, 666 F.2d 578, 581 (C.C.P.A. 1981).  Moreover, "the mere fact

that a certain thing may result from a given set of circumstances is not sufficient." *Id.*

### 2.    Counterconclusions Regarding *Fukunaga 1982*

DCL77.    A person of ordinary skill in the art at the relevant time would conclude that the Fukunaga Abstract inherently discloses each and every element of the asserted claims of the '296 patent.

**PCC77.    *See* POB at 38-40*; see also* Plaintiffs' Responses and Counterfindings to DFF243-46.  A person of ordinary skill in the art at the relevant time would conclude that the *Fukunaga 1982* does not either expressly or inherently disclose each and every element of the asserted claims of the '296 patent.  (*See* POB § V.)**

DCL78.    The Fukunaga Abstract discloses each of the following: (1) a method of selective vasodilating the arteries with little or no venous dilation; (2) of a human patient; (3) without pretreatment with dipyridamole; (4) by continuously administering adenosine; (5) within the claimed dosage rates.

**PCC78.    *Fukunaga 1982* fails to disclose, inherently or directly, a method of selectively vasodilating the arteries of a human patient without inducing significant venous dilation and without pretreatment with dipyridamole, comprising continuously administering adenosine at the claimed dosage rates.  (*See* POB § V.)  *See also* Plaintiffs' Responses and Counterfindings to DFF71-83, 129-138; Plaintiffs' Responses and Counterconclusions to DCL46-63.)**

DCL79.    The Fukunaga Abstract discloses a method of selectively vasodilating the arteries with little or no venous dilation.

**PCC79.    *See* PCF77, 132.**

DCL80.    A person of ordinary skill in the art in 1985 would understand that the changes in hemodynamic parameters disclosed in the Fukunaga Abstract demonstrated selective arterial vasodilation with little or no venous dilation.

**PCC80.    *See* PCF77, 132.**

DCL81.    The Fukunaga Abstract thus discloses the claimed limitation "a method of selectively vasodilating the arteries with little or no venous dilation," as set forth in asserted claims 1, 3, and 7, and effectively in claim 9.

**PCC81.    *See* PCF77, 132.**

DCL84.        The Fukunaga Abstract discloses that dipyridamole was not used as a pretreatment before the administration of ATP.

**PCC84.        *See* PCC53.**

DCL85.        The Fukunaga Abstract thus discloses the claimed limitation "without pretreatment with dipyridamole," as set forth in asserted claims 1, 3, 7, and 9.

**PCC85.        *See* PCC53.**

DCL87.        The *in vivo* conversion of exogenous ATP to adenosine is the "natural result flowing from" ATP administration.  *See Schering*, 339 F.3d at 1379; *Eli Lilly*, 251 F.3d at 970.

**PCC87.        As indicated by the court in *Schering,* patent claims reciting a method of administering a metabolite are not anticipated, either expressly or inherently, by prior art disclosing the administration of a precursor compound to that metabolite.  *See Schering,* 339 F.3d at 1379.  Thus, the '296 patent's method claims requiring the administration of adenosine are not anticipated, either expressly or inherently, at least because *Fukunaga 1982* discloses the administration of ATP rather than adenosine.  *See also* Responses and Counterfindings to DFF71-76 and Responses to DCL57, 58.**

DCL88.        A person of ordinary skill in the art at the relevant time would have understood that ATP rapidly degrades in the body to adenosine, and such a person would have also understood that adenosine is responsible for the arterial vasodilation effects associated with ATP.

**PCC88.        *See* PCC87.  *See also* Plaintiffs' Responses and Counterfindings to DFF71-83, 129-138.**

DCL89.        The Fukunaga Abstract thus inherently discloses the claimed limitation "by continuously administering adenosine," as set forth in asserted claims 1, 3, 7, and 9.

**PCC89.        *See* PCC87**

DCL90.        The Fukunaga Abstract discloses the administration of ATP at a rate that is equivalent to the claimed rates of adenosine administration.

**PCC90.        *See*  Plaintiffs' Responses and Counterfindings to DFF129; Responses and Counterconclusion to DCL60.**

DCL91.        Using the equation discussed *supra*, person of ordinary skill would have determined that a dose of 0.2 to 0.6 mg/kg/min of ATP is equivalent to doses of between 0.097 and 0.290 mg/kg/min of adenosine.

**PCC91.        *See* Plaintiffs' Responses and Counterfindings to DFF129; *see also***

**Response to DCL60, PCL60.**

DCL92.        This adenosine dose is equivalent to a dose of 97 to 290 µg/kg/min, which includes or overlaps the ranges recited in the asserted claims of the '296 patent.

**PCC92.        *See* Plaintiffs' Responses and Counterfindings to DFF129; *see also***

**Response to DCL60, PCL60.**

DCL93.        But even if a person of ordinary skill had not recognized that the administration of 0.2 to 0.6 mg/kg/min would have been equivalent to the claimed dose of adenosine, the Fukunaga Abstract would still inherently anticipated the asserted claims.  *See Abbott*, 471 F.3d at 1368 ( "[I]nherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure.").

**PCC93.        Since exogenous ATP is metabolized as part of a complex set of**

**reactions and is at the same time recreated from certain of its metabolites, it is impossible**

**to determine an equivalent dose of adenosine.  Thus, because inherency  "may not be**

**established by probabilities or possibilities," and "[t]he mere fact that a certain thing may**

**result from a given set of circumstances is not sufficient," Sicor cannot establish that the**

**disclosure of *Fukunaga 1982* contained, either expressly or inherently, the claimed dose**

**limitations of the asserted claims of the '296 patent.  *See In re Oerlich*, 666 F2d. 578, 581**

**(C.C.P.A. 1981).  *See also* Plaintiffs' Responses and Counterfindings to DFF129; Response**

**to DCL60, PCC60.**

**III.    CONCLUSION**

DCL94.        Defendants request that the Court adopt the foregoing findings of fact and conclusions of law and enter judgment that the '296 patent is invalid as obvious or inherently anticipated or both.

**PCC94.        Plaintiffs request that Court reject the Defendants' Proposed Findings of Fact and Conclusions of Law for the reasons noted in the foregoing Counterfindings of Fact and Counterconclusions of Law, adopt instead Plaintiffs' Proposed Findings of Fact and Conclusions of Law, and enter judgment that the asserted claims of the '296 patent are not invalid.**

Dated:  June 19, 2007

   /s/ Mary B. Matterer                           /s/ David E. Brand
Richard K. Herrmann #405                  Paul M Lukoff #96
Mary B. Matterer #2696                    David E. Brand #201
MORRIS JAMES LLP                          PRICKETT JONES & ELLIOTT, P.A.
500 Delaware Avenue, Suite 1500           1310 King Street
Wilmington, DE 19801                      Wilmington, DE 19801
(302) 888-6800                            (302) 888-6520
mmatterer@morrisjames.com                 debrand@prickett.com

Charles E. Lipsey                         John Scheibeler
FINNEGAN, HENDERSON, FARABOW,             WHITE & CASE LLP
  GARRETT & DUNNER, LLP                   1155 Avenue of the Americas
Two Freedom Square                        New York, NY  10036
11955 Freedom Drive                       (212) 819-8200
Reston, VA 20190-5675
(571) 203-2700                            *Attorneys for Plaintiff*
                                          *Item Development AB*
Susan H. Griffen
David P. Frazier
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue
Washington, D.C.  20001-4413
(202) 408-4000

*Attorneys for Plaintiffs*
*Astellas US LLC and*
*Astellas Pharma US, Inc.*