IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ITEM DEVELOPMENT AB, ASTELLAS US LLC, and ASTELLAS PHARMA US, INC. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-336 SLR |
| SICOR INC. and SICOR PHARMACEUTICALS, INC. | ) ) ) | |
| Defendants. | ) ) ) ) | |

**DEFENDANTS SICOR'S RESPONSIVE PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

Dated:   June 19, 2007                    *Attorneys for Defendants Sicor Inc. and
Sicor Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

Page

I.    PROPOSED RESPONSIVE FINDINGS OF FACT ................................................... 1

A.    The Asserted Claims of the '296 Patent are Invalid As Obvious ...................... 1

1.    The Asserted Claims of the '296 Patent .................................................... 1

2.    The Sollevi Abstracts Render the Asserted Claims of the '296 Patent
Obvious ................................................................................................. 2

a.    The Sollevi Abstracts Demonstrated That 140 µg/kg/min of
Adenosine Could Be Administered Safely To Humans By
Continuous Intravenous Administration Without Dipyridamole
Pretreatment ................................................................................. 3

3.    The Fukunaga 1982 Abstract Renders the Asserted Claims of the '296
Patent Obvious .......................................................................................... 4

a.    The Study Reported in the Fukunaga 1982 Abstract, Coupled
with the Knowledge of a Person of Ordinary Skill at the Relevant
Time, Would Have Led to the Use of Adenosine Infusion
Without Dipyridamole Pretreatment ................................................. 5

(i)    Fukunaga 1984 (TX 51) ....................................................... 6

(ii)    Moir and Downs (TX 199) .................................................... 7

(iii)    Burnstock (TX 151, TX 152) ............................................... 8

4.    The Dose Required to Produce a Desired Effect Could Have Been
Determined Through Routine Experimentation ........................................... 9

5.    The Prior Art Uses of Adenosine and Other Vasodilators Would Not
Have Taught Away from the Claimed Invention ........................................ 11

a.    The Use of Other Vasodilators During the Relevant Time Period
Would Have Encouraged Persons of Ordinary Skill to Look to
Adenosine ..................................................................................... 11

b.    Research Concerning Adenosine for Various Medical Uses
Exploded Following a 1980 Publication by Dr. Berne .................... 12

B.    Secondary Considerations Do Not Support the Non-Obviousness of the
Asserted Claims .................................................................................................. 14

1.    Plaintiffs Have Not Demonstrated Unexpected Results ............................ 14

a.    The Occurrence of Selective Arterial Vasodilation at the
Claimed Dosages Was Not Unexpected ......................................... 14

|  |  | b. | The Lack of AV Block Was Not Unexpected ................................. 15 |

|  |  | c. | The Lack of Uric Acid Build-Up Was Not Unexpected .................. 16 |

|  | 2. | Plaintiffs Have Failed to Provide Evidence of Skepticism .......................... 17 |

|  | 3. | Plaintiffs Have Failed to Show that the Alleged Commercial Success of Adenoscan® Has Any Nexus to the Asserted Claims ................................. 18 |

|  |  | a. | The Sales Levels of Adenoscan® Are Explained By the Interplay of Economic Factors, Not the Product's Clinical Attributes ............ 19 |

|  |  |  | (i) | Adenoscan® Entered the Pharmacological Stress Market at a Fortuitous Time ......................................................... 19 |

|  |  |  | (ii) | Fujisawa's Extensive Marketing and Promotion Drove Adenoscan®'s Market Share Growth Pharmacological Stressor .............................................................................. 20 |

|  |  |  | (iii) | Adenoscan®'s Increasing Sales Were Also Due to the General Growth of the Pharmacological Stress Market ....... 22 |

|  |  | b. | Dr. Hay's Analysis is Unsound and His Testimony Is Unreliable.... 23 |

| **C.** | **The Asserted Claims of the '296 Patent are Inherently Anticipated**................. 24 |

| **D.** | **Expert Testimony Issues** ........................................................................................ 25 |

|  | 1. | Dr. Binkley is Highly Qualified to Serve as an Expert in this Case............. 25 |

|  |  | a. | Dr. Binkley's Opinions Were Well Within the Scope of His Expert Report ...................................................................................... 26 |

|  |  | b. | Dr. Binkley Was Forced to Rebut Issues Raised by Plaintiffs for the First Time at Trial.................................................................. 28 |

|  | 2. | Dr. Leffler is Highly Qualified to Serve as an Expert in this Case ............. 28 |

|  | 3. | The Expert Testimony Offered By Plaintiffs is Not Credible...................... 31 |

|  |  | a. | Dr. Klabunde is a Physiologist Who Has Never Administered Any Vasodilator, Including Adenosine, To a Patient....................... 31 |

|  |  | b. | Plaintiffs' Last-Minute Decision Not to Call Their Only Expert Physician Witness Was Designed to Deprive Sicor of Favorable Admissions.................................................................................. 32 |

| **II.** | **PROPOSED RESPONSIVE CONCLUSIONS OF LAW** ............................................. 33 |

| **A.** | **Claims 1, 3, 7, and 9 of the '296 Patent Are Invalid As Obvious**........................ 33 |

|  | 1. | The Rigid "Teaching Suggestion Motivation" Test Relied Upon By Plaintiffs is Not the Proper Legal Standard for an Obviousness Analysis.... 33 |

2.   Sicor Has Shown Obviousness By Clear and Convincing Evidence............ 34

     a.   The Sollevi Abstracts Render the Asserted Claims Obvious .......... 34

     b.   The Fukunaga 1982 Abstract Renders the Asserted Claims
          Obvious......................................................................................... 35

     c.   The Dose Required to Produce a Desired Effect Could Have
          Been Determined Through Routine Experimentation...................... 36

     d.   The Prior Art Uses of Adenosine and Other Vasodilators
          Would Not Have Taught Away from the Claimed Invention.......... 37

3.   The Secondary Considerations Argued by Plaintiff Do Not Rebut
     Sicor's Strong Prima Facie Case of Obviousness ....................................... 39

     a.   Plaintiffs Have Not Demonstrated Unexpected Results.................. 40

          (1)   The Occurrence of Selective Arterial Vasodilation at the
                Claimed Dosages was Not Unexpected ............................... 41

          (2)   The Lack of AV Block Was Not Unexpected...................... 42

          (3)   The Lack of Uric Acid Build-Up Was Not Unexpected....... 42

     b.   Plaintiffs Have Failed to Provide Credible Evidence of
          Skepticism or Surprise................................................................... 42

     c.   Copying, Even If Shown, Is Irrelevant in the ANDA Context ......... 44

     d.   Any Commercial Success Enjoyed By Adenoscan® Does Not
          Rebut Sicor's Case of Obviousness ............................................... 45

          (i)   The Sales Levels of Adenoscan® Are Explained By the
                Interplay of Economic Factors, Not the Product's Clinical
                Attributes.......................................................................... 45

                (1)   Adenoscan® Entered the Pharmacological Stressor
                      Market at a Fortuitous Time ............................................ 46

                (2)   Fujisawa's Extensive Marketing and Promotion Drove
                      Adenoscan®'s Market Share Growth.............................. 46

                (3)   Adenoscan®'s Increasing Sales Were Also Due to the
                      General Growth of the Pharmacological Stress Market.... 47

          (ii)  Dr. Hay's Analysis Is Unsound and His Testimony Is
                Unreliable ......................................................................... 49

B.   Claims 1, 3, 7, and 9 of the '296 Patent Are Invalid As Inherently
     Anticipated....................................................................................................... 49

     1.   The Asserted Claims are Inherently Anticipated by the Fukunaga
          Abstract ...................................................................................................... 49

iii

C. **Expert Testimony Issues** ........................................................................... **50**

  1. Dr. Binkley is Highly Qualified to Serve as an Expert in This Case ............ 50

    a. Dr. Binkley's Opinions Were Well Within the Scope of His Expert Report .................................................................................. 51

    b. Dr. Binkley Was Improperly Forced to Rebut Issues Raised by Plaintiffs for the First Time at Trial ................................................. 51

  2. Dr. Leffler is Highly Qualified to Serve as an Expert in This Case ............. 52

  3. The Expert Testimony Offered by Plaintiffs is Not Credible ...................... 53

III. **<u>CONCLUSION</u>** ................................................................................................ **55**

# TABLE OF AUTHORITIES

**CASES**

**Page**

*ABB Air Preheater Inc. v. Regenerative Envtl. Equip.*,
  167 F.R.D. 668 (D.N.J. 1996) ............................................................. 52

*Abbott Labs. v. Baxter Pharmaceutical Prods., Inc.*,
  471 F.3d 1363 (Fed. Cir. 2006) .......................................................... 49

*Alpex Computer Corp. v. Nintendo Co.*,
  No. 86-1749, 1994 WL 681752 (S.D.N.Y. Dec. 5, 1994) .................... 43

*Amazon.com, Inc. v. Barnesandnoble.com, Inc. et al.*,
  239 F.3d 1343 (Fed. Cir. 2001) .......................................................... 50

*Aventis Pharms. Deutschland GmbH v. Lupin Ltd.*,
  2006 WL 1008962 (E.D. Va. July 17, 2006) ...................................... 44

*Cable Elec. Prods., Inc. v. Genmark, Inc.*,
  770 F.2d 1015 (Fed. Cir. 1985) .......................................................... 44

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) ................................................. 51-52

*Eli Lilly & Co. v. Barr Labs, Inc.*,
  251 F.3d 955 (Fed. Cir. 2001) ............................................................ 49

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*,
  122 F.3d 1040 (Fed. Cir. 1997) .......................................................... 50

*eSpeed, Inc. et al. v. Brokertec USA, LLC*,
  404 F. Supp. 2d 575 (D. Del. 2005) ................................................... 50

*Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.*,
  693 F. Supp. 114 (D. Del. 1988) ..................................................... 47-48

*In re Fla. Microsoft Antitrust Litig.*,
  2002 WL 31423620 (Fla. Cir. Ct. 2002)......................................... 29, 53

*In re Fulton*,
  391 F.3d 1195 (Fed. Cir. 2004) ....................................................... 37-38

*In re GPAC Inc.*,
  57 F.3d 1573 (Fed. Cir. 1995) ............................................................ 44

*KSR Int'l Co. v. Teleflex, Inc.*,
    127 S. Ct. 1727 (2007) ................................................................33-34, 36, 38

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997) ................................................................ 45

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ................................................................ 37

*In re Koller*,
    613 F.2d 819 (C.C.P.A. 1980) ................................................................ 38

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007) ................................................................33, 40

*McCarty v. Lehigh Val. R.R.*,
    160 U.S. 110 (1895) ................................................................ 41

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
    337 F.3d 1362 (Fed Cir. 2003) ................................................................ 47

*Medichem, S.A. v. Rolabo, S.L.*,
    437 F.3d 1157 (Fed. Cir. 2006) ................................................................ 37

*Merck & Co., Inc. v. Teva Pharms USA, Inc.*,
    405 F.3d 1338 (Fed Cir. 2005) ................................................................ 48

*Midwest Indus. v. Karavan Trailers, Inc.*,
    175 F.3d 1356 (Fed. Cir. 1999) ................................................................ 44

*Optivus Tech., Inc. v. Ion Beam Apps. S.A.*,
    469 F.3d 978 (Fed. Cir. 2006) ................................................................ 37

*Ormco Corp. v. Align Tech.*,
    463 F.3d 1299 (Fed. Cir. 2006) ................................................................ 35

*Pacifica Technica Corp. v. U.S.*,
    2 Cl. Ct. 170 (1983) ................................................................ 46

*Pfizer, Inc. v. Apotex, Inc.*
    480 F.3d 1348 (Fed. Cir. 2007) ................................................................ 33, 39-40

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
    461 F. Supp. 2d 271 (D.N.J. 2006) ................................................................29, 45, 53

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ................................................................ 40-41

*Revlon, Inc. v. Carson Prods. Co.*,
  602 F. Supp. 1071 (S.D.N.Y. 1985) ................................................................. 47

*Richardson-Vicks Inc. v. Upjohn Co.*,
  122 F.3d 1476 (Fed. Cir. 1997) ...................................................................... 39

*In re Rouffet*,
  149 F.3d 1350 (Fed. Cir. 1998) ...................................................................... 39

*Schering Corp. v. Geneva Pharm., Inc.*,
  339 F.3d 1373 (Fed. Cir. 2003) ...................................................................... 49

*Sentex Sys., Inc. v. Elite Access Sys., Inc.*,
  194 F.3d 1331 (Fed. Cir. 1999) ...................................................................... 45

*In re Soni*,
  54 F.3d 746 (Fed. Cir. 1995) ......................................................................... 40

*Speller v. U.S.*,
  14 Cl. Ct. 170 (1988) .................................................................................... 46

*Syntex LLC v. Apotex, Inc.*,
  407 F.3d 1371 (Fed. Cir. 2005) ...................................................................... 38

*Tec Air, Inc. v. Denso Mfg. Mich., Inc.*,
  192 F.3d 1353 (Fed. Cir. 1999) ...................................................................... 33

*U.S. v. Adams*,
  383 U.S. 39 (1966) ................................................................................... 42-44

*Vandenberg v. Dairy Equip. Co.*,
  740 F.2d 1560 (Fed. Cir. 1984) ...................................................................... 48

*Wash. Legal Found. v. Legal Found. of Wash.*,
  271 F.3d 835 (9th Cir. 2001) ................................................................... 29, 52-53

## STATUTES

35 U.S.C. § 282 ............................................................................................. 51

## OTHER AUTHORITIES

Rule 26(a)(3), Fed. R. Civ. P. ........................................................................... 52

Defendants Sicor Inc. and Sicor Pharmaceuticals, Inc. (collectively "Sicor") submit the following Responsive Proposed Findings of Fact and Conclusions of Law in response to Plaintiffs' Post-Trial Proposed Findings of Fact And Conclusions of Law Concerning U.S. Patent No. 5,731,296 ("Plaintiffs' Proposed Findings"). These Responsive Proposed Findings of Fact and Conclusions of Law Supplement Sicor's Proposed Findings of Fact ("D.I. 149 FOF") and Conclusions of Law ("D.I. 149 COL") (collectively "Sicor's Proposed Findings"), dated May 9, 2007.

To the extent that any of the findings of fact set forth below or in Sicor's Proposed Findings is a conclusion of law, Sicor requests that it be adopted as such. To the extent that any of the proposed conclusions of law set forth below or in Sicor's Proposed Findings is a finding of fact, Sicor requests that it be adopted as such.

## I.    PROPOSED RESPONSIVE FINDINGS OF FACT

### A.    The Asserted Claims of the '296 Patent are Invalid As Obvious

#### 1.    The Asserted Claims of the '296 Patent

1. At trial, Plaintiffs asserted four claims of the '296 patent: claims 1, 3, 7, and 9. (D.I. 127, Ex. 10; D.I. 149 FOF at ¶¶ 21-26.)

2. None of the asserted claims recites a specific medical use for the claimed invention. (*See* TX 275.)

3. None of the asserted claims recites a specific degree of selective arterial vasodilation. (*See* TX 275.)

4. None of the asserted claims recites an optimal level of vasodilation. (*See id.*)

5. None of the asserted claims recites a functional requirement that atrioventricular block or increases in uric acid levels do not occur. (*See id.*)

6.    The asserted claims of the '296 patent claim "selectively vasodilating the arteries of a human patient without inducing significant venous dilation."  (TX 275.)

7.    The asserted claims of the '296 patent do not claim a "safe and effective dose [of adenosine] that would induce hypotension in the absence of [dipyridamole] pretreatment." (*Compare*, *e.g.*, D.I. 151 at 9 *with* TX 275.)

## 2.    The Sollevi Abstracts Render the Asserted Claims of the '296 Patent Obvious

8.    The Sollevi abstracts  (TX 37, "Sollevi I" and TX 1170, "Sollevi II") describe a human clinical study which disclosed nearly each and every element of the asserted claims: a method of selectively dilating the arteries of a human patient without inducing significant venous dilation, comprising administering adenosine intravenously at a rate of 140 µg/kg/min.  (D.I. 149 FOF at ¶¶ 96-123.)

9.    There is no dispute that the Sollevi abstracts disclose nearly all elements of the asserted claims.  (Zaret, Tr. 1941:18-1942:6.)

10.    As a consequence of Dr. Sollevi's disclosures, persons of ordinary skill, employing their knowledge of the prior art, their common sense, and their ordinary creativity, would have understood that the dipyridamole pretreatment in the Sollevi abstracts could be eliminated and that the continuous intravenous administration of adenosine to humans in the claimed range could be done safely and would be reasonably likely to cause selective arterial vasodilation.  (D.I. 149 FOF at ¶¶ 96-123.)

a.    **The Sollevi Abstracts Demonstrated That 140 µg/kg/min of Adenosine Could Be Administered Safely To Humans By Continuous Intravenous Administration Without Dipyridamole Pretreatment**

11.    The Sollevi abstracts are silent on Dr. Sollevi's reasons for the use of dipyridamole except to say that dipyridamole was "an adenosine uptake inhibitor" (TX 37) and "reduced the required ADO dose" (TX 1170).

12.    The Sollevi abstracts each conclude by recommending the use of intravenous adenosine for controlled hypotension and do not expressly state the need for pretreatment with dipyridamole.  (D.I. 149 FOF at ¶¶ 110-12, 122-23.)   The last sentence of Sollevi I states that the "hemodynamic and metabolic properties of **adenosine** make it a suitable agent for CH in man."  (TX 1170 at A9 (emphasis added).)   The last sentence of Sollevi I states that the "**adenosine** may be used to achieve controlled hypotension in man since it acts as a rather pure arteriolar vasodilator with rapid onset, sustained action and rapid elimination."  (TX 37 at 11A:C16 (emphasis added).)  There is no mention in either Sollevi I or Sollevi II that dipyridamole must be used.  (*See* TX 37 and TX 1170.)

13.    If Dr. Sollevi believed that dangerous side effects could occur if adenosine were administered without dipyridamole, a person of ordinary skill would have expected him to stress the importance of the dipyridamole pretreatment in the Sollevi abstracts.  (*See* TX 37 and TX 1170.)

14.    Dr. Sollevi did not mention that he had serious concerns about adenosine's safety when he disclosed his own experiments using adenosine without dipyridamole pretreatment. (TX 112 at fn.††).

15.    No serious side effects were reported in Fukunaga 1982, a study that Dr. Sollevi cited in his contemporaneous publications.  (*See* TX 37 and TX 1170.)

16.     The reasons that Dr. Sollevi now asserts for his use of the dipyridamole pretreatment in the Sollevi abstracts were not expressed contemporaneously by him in the public domain and would not have influenced the thinking of persons of ordinary skill at the time. (Binkley, Tr. 201:21-203:3, 224:6-226:7.)

17.     Dr. Sollevi purportedly conducted the first human trial concerning the intravenous administration of adenosine (with and without dipyridamole) on surgical patients suffering from cerebral aneurysms (*e.g.*, "a 'bulb' or bubble on a blood vessel in the brain that could rupture, causing bleeding and death").  (D.I. 151 at 8.)

18.     Dr. Sollevi's decision to forego the accepted protocol within the medical community to first conduct clinical trials in healthy volunteers, and instead conduct these trials on seriously ill patients, suggests that his contemporaneous concerns regarding the danger of adenosine were less serious than he now asserts.  (D.I. 149 FOF at ¶¶ 154-70.)

19.     Dr. Sollevi has an acknowledged financial interest in the outcome of this litigation.  (Sollevi, Tr. 473:19-474:8, 475:2-9.)

20.     Dr. Sollevi's testimony is not relevant to the Court's obviousness analysis because as the named inventor Dr. Sollevi claims to be an innovator and thus not a person of ordinary skill in the art in 1985.  (Sollevi, Tr. 475:10-24.)

### 3.     The Fukunaga 1982 Abstract Renders the Asserted Claims of the '296 Patent Obvious

21.     The Fukunaga 1982 Abstract (TX 42) discloses the intravenous administration of adenosine triphosphate ("ATP") at a dose of 200 to 600 µg/kg/min without dipyridamole pretreatment to induce controlled hypotension in anesthetized human patients undergoing surgery.  (Binkley, Tr. 162:6-13; TX 42 at A65; D.I. 150 at 19; D.I. 149 FOF at ¶¶ 124-28.)  The

dosage range overlaps each of the ranges recited in the asserted claims of the '296 patent. (Binkley, Tr. 171:6-15; TX 275; D.I. 149 FOF at ¶ 129.)

22.     The teachings of the Fukunaga 1982 Abstract would lead a person of ordinary skill in the art in 1985 to conclude that selective arterial dilation without significant venous dilation had occurred.  (D.I. 149 FOF at ¶¶ 130-33.)

23.     The substitution of adenosine for ATP was not inventive – it was based on the disclosure in the Fukunaga 1982 Abstract coupled with the knowledge of a person of ordinary skill in the art.  (D.I. 149 FOF at ¶¶ 124-38.)

> **a.     The Study Reported in the Fukunaga 1982 Abstract, Coupled with the Knowledge of a Person of Ordinary Skill at the Relevant Time, Would Have Led to the Use of Adenosine Infusion Without Dipyridamole Pretreatment**

24.     Plaintiffs primarily rely on the testimony of Dr. Klabunde, who focused almost exclusively on references from the 1970s (TX 151; TX 199) in an attempt to prove that the selective arterial vasodilation reported in the Fukunaga 1982 Abstract was not due to the actions of adenosine.  By the critical date, these references were nearly two decades old and had been superseded by more recent publications (*see*, *e.g.*, TX 36; TX 51; TX 88; TX 236; TX 228; TX 5000) by the '296 patent priority date.

25.     Persons of ordinary skill would have understood that the controlled hypotension reported in the Fukunaga 1982 Abstract following the intravenous administration of ATP was the result of the action of adenosine.  (*See* D.I. 149 FOF at ¶¶ 71-83, 134.)

26.     The evidence at the relevant time showed that the vasodilative effects of ATP were due to its rapid and complete conversion to adenosine.  (*Id.*)

27.     A person of ordinary skill would have understood, based on a number of relevant publications, that ATP breaks down to adenosine almost immediately following intravenous

administration.  (*See, e.g.*, TX 236 at 547; TX 51 at A39; TX 228 at 807-08; TX 5000 at 1196; D.I. 149 FOF at ¶¶ 71-83).

28.    For example, contemporaneous publications co-authored by Dr. Sollevi expressly stated that ATP that is intravenously administered is degraded "entirely to adenosine" during the transpulmonary passage.  (*See, e.g.*, TX 236 at 547.)

29.    A 1984 publication, also co-authored by Dr. Sollevi, disclosed that  "the arterial plasma adenosine concentration during ATP infusions was similar to that found during an equimolar infusion of adenosine."  (TX 88 at 174-75; D.I. 149 FOF at ¶¶ 80-81.)

30.    Dr. Sollevi expressly discussed the Fukunaga 1982 Abstract in another 1984 publication that discussed the same results set forth in the Sollevi abstracts.  (TX 112.)

31.    In TX 112, Dr. Sollevi described what was known to persons of ordinary skill at that time – that degradation of ATP to adenosine was rapid, complete, and resulted in "considerable phosphate formation" in the bloodstream.  (TX 112 at 403.)   Dr. Sollevi then cited another 1982 reference in support of the statement that "high levels of phosphate could cause arrhythmia" and concluded that "we consider it more appropriate to use adenosine in preference to ATP to induce hypotension."  (TX 112 at 403.)

32.    Dr. Sollevi's contemporaneous statements (*see* paragraphs 28-31 above) contradict Plaintiffs' assertions that skilled artisans would not have understood that in Fukunaga 1982 adenosine converted from ATP was the direct cause of controlled hypotension.

### (i)        Fukunaga 1984 (TX 51)

33.    The results in Fukunaga 1984 (TX 51) also demonstrated that adenosine (not ATP) was the direct-acting agent in Fukunaga 1982.  (D.I. 149 FOF at ¶ 134.)

34.    The pretreatment with dipyridamole in Fukunaga 1984 reduced the amount of ATP that was required to induce controlled hypotension.  (TX 51; D.I. 149 FOF at ¶¶ 136-38.)

Because dipyridamole blocks the uptake of adenosine, but not ATP, the result in Fukunaga 1984 meant that the vasodilatation was caused by adenosine that accumulated after its rapid conversion from the ATP.  (Binkley, Tr. 178:14-15, 179:13-181:22; D.I. 149 FOF at ¶¶ 136-38.)

35.     Fukunaga 1984 would confirm to a person of ordinary skill that adenosine – not ATP – was responsible for the vasodilation.  (D.I. 149 FOF at ¶ 137.)  Rather than discourage a skilled artisan from using adenosine without dipyridamole, Fukunaga 1984 would simply teach that dipyridamole could be a "potentially useful added agent," and is not a requirement for safe and effective selective arterial vasodilation.  (D.I. 149 FOF at ¶ 136.)

**(ii)**          **Moir and Downs (TX 199)**

36.     A study authored by Moir and Downs published in the early 1970s would not have led a person of ordinary skill to believe that ATP was a more potent vasodilator than adenosine.  ("Moir and Downs," TX 199.)

37.     Dr. Klabunde admitted that by the relevant time, a person of ordinary skill would have looked to more recent publications than Moir and Downs to understand the relationship between ATP and adenosine in vasodilation. (Klabunde, Tr. at 1118:8-12.)

38.     Later publications (*see, e.g.*, TX 36; TX 51; TX 88; TX 236; TX 228; TX 5000) would have led the skilled artisan to understand that adenosine, not ATP, was the direct-acting agent in Fukunaga 1982.  (*See* D.I. 149 FOF at ¶¶ 71-83.)

39.     The data in Moir and Downs do not support Plaintiffs' position that a person of ordinary skill at the relevant time would have viewed ATP as more potent than adenosine.  (TX 199.)  "There was really not a great difference" in coronary blood flow when comparing data from the dogs who had received ATP and the dogs who had received adenosine.  (Binkley, Tr. 1422:18-1425:25.)  In addition, p-values were not calculated, so a proper statistical analysis of the data was not available to a person of ordinary skill.  (Binkley, Tr. 1450:7-24.)

40.    There is a key difference in the manner of ATP administration in TX 199 and the manner of ATP administration in the Fukunaga 1982 Abstract.  (Binkley, Tr. 1426:19-1427:15.) In TX 199, ATP was administered directly into the artery to be dilated and did not cross the transpulmonary passage.  (Binkley, Tr. 1426:19-24; TX 199.)  In the Fukunaga 1982 Abstract, ATP was administered intravenously, and thus necessarily flowed through the transpulmonary passage.  (TX 42.)

41.    A person of ordinary skill would have understood that intravenously administered ATP would be degraded entirely to adenosine during the transpulmonary passage.  (*See*, *e.g.*, TX 236.)  Such a person also would have understood that the ATP administered in TX 199 (which reflected intra-arterial administration) bypassed the transpulmonary passage.  (Binkley, Tr. 1426:19-1427:15.)

42.    Therefore, a person of ordinary skill would have known the data in TX 199 did not represent the effects that would be expected if ATP was administered intravenously, because the conversion of adenosine to ATP in the transpulmonary passage could not occur.  (Binkley, Tr. 1427:4-10.)

### (iii)    Burnstock (TX 151, TX 152)

43.    Skilled artisans would understand that adenosine was the direct-acting agent in the Fukunaga 1982 Abstract based on a publication by Dr. Burnstock concerning the different cellular receptors for adenosine and ATP.  (TX 151; D.I. 149 FOF at ¶¶ 82-83.)

44.    Dr. Burnstock's research showed that the receptors for adenosine (P1) are predominant in sites where arterial vasodilatation can occur, *e.g.*, "in most cardiovascular beds" (like arteries), whereas the receptors for ATP (P2) are predominant in sites that play no role in arterial vasodilatation, *e.g.*, the gastrointestinal tract and the urinogenital system.  (TX 151 at 110; Klabunde, Tr. 1172:6-18.)

45.     Dr. Klabunde confirmed that a subsequent 1985 publication (also by Burnstock) would teach a person of ordinary skill that P1 receptors were associated with vasodilation. (Klabunde, Tr. 1174:25-1177:2; TX 152 at 195.)

46.     Given that adenosine receptors are present predominantly in arteries (and ATP receptors are not), a person of ordinary would understand that the arterial vasodilation that was observed following the administration of ATP was due to its conversion to adenosine. (Klabunde, Tr. 1437:11-1438:2; D.I. 149 FOF at ¶¶ 71-83.)

47.     The rapid conversion of ATP to adenosine would have suggested to a person of ordinary skill at the relevant time that little (if any) ATP would remain to bind to any ATP receptors that were present in the arterial vasculature.  (Klabunde, Tr. 1107:3-12; TX 5000 at 1196; TX 51 at A39.)

### 4.     The Dose Required to Produce a Desired Effect Could Have Been Determined Through Routine Experimentation

48.     Plaintiffs rely primarily on *in vitro* studies or studies in animals in support of their contention that a person of ordinary skill would not have been able to determine the dose of adenosine needed to cause vasodilation.  (D.I. 151 at 9-10.)  None of the studies cited by Plaintiffs concern a dose titration of adenosine in humans, even though such studies had been published during the same time period.  (TX 36; TX 45.)

49.     Selective arterial vasodilation is not an all or nothing phenomenon.  (Binkley, Tr. 137:20-138:9.)  Different degrees of vasodilation may occur depending upon the dose of vasodilator that is administered.  (D.I. 149 FOF at ¶ 141.)

50.     The asserted claims of the '296 patent do not claim a specific degree of vasodilation, and are directed to a method of selective arterial vasodilation generally.  (*See* TX 275.)

51.     Based on these human clinical studies, a person of ordinary skill would have understood that the dose of adenosine administered could be readily titrated until the desired level of vasodilation were achieved.  (D.I. 149 FOF at ¶¶ 150-51.)  Dr. Klabunde confirmed that such a dose titration would have been routine experimentation for a person of ordinary skill in the art at that time.  (Klabunde, Tr. 1132:21-1133:1; *see also* TX 36 at 1261.)

52.     Persons of ordinary skill at the relevant time would also be interested in medical uses of adenosine calling for less than maximal selective arterial vasodilatation.  (Binkley, Tr. 1370:15-1372:10, 1372:25-1374:3; D.I. 149 FOF at ¶¶ 139-46.)

53.     A person of ordinary skill could have used the amount of adenosine administered in the Sollevi abstracts as a guide and easily conducted a dose titration to determine the required dose.  (D.I. 149 FOF at ¶¶ 147-52.)

54.     A person of ordinary skill would have had a reasonable expectation that such a titration would be successful, given that publications at the relevant time concerning administration of adenosine in humans stated that "rapid uptake and metabolism of adenosine allow for easy dose titration."  (TX 45 at 423.)

55.     Plaintiffs cite an abstract by Biaggioni (TX 1187) in support of their argument that a person of ordinary skill would not believe that a dose of 140 µg/kg/min would be sufficient to cause "hypotension."  (D.I. 151 at 9.)

56.     However, none of the asserted claims set forth any specific medical use for adenosine.  (*See* TX 275.)  The claims recite only a method of causing selective arterial vasodilation.  (*See id*.)

57.     Hypotension is the result of near-maximal vasodilation.  (Klabunde, Tr. at 1059:15-1060:4).  A person of ordinary skill at the relevant time would have known that lower

levels of vasodilation would have been necessary for other medical uses, like myocardial perfusion imaging.  (D.I. 149 FOF at ¶ 142.)

58.     The Biaggioni abstract (TX 1187) cited by Plaintiffs demonstrated that 140 µg/kg/min adenosine could be safely administered to humans without dipyridamole pretreatment and without causing AV block or excessive build up of uric acid.  (D.I. 149 FOF at ¶ 146.)

59.     The pattern of side effects observed in Biaggioni (*e.g.*, flushing) confirmed that adenosine doses in the claimed range had a systemic effect.  (*See* TX 1187.)

**5.      The Prior Art Uses of Adenosine and Other Vasodilators Would Not Have Taught Away from the Claimed Invention**

60.     Plaintiffs allege that problems that were historically associated with adenosine would have taught away from its intravenous administration at the relevant time.  (D.I. 151 at 5-7.)  However, the Sollevi abstracts each disclosed the safe and effective use of intravenous adenosine in humans with dipyridamole.  Fukunaga 1982 and Biaggioni (TX 1187) effectively demonstrated the same without dipyridamole pretreatment.  (D.I. 149 FOF at ¶¶ 96-138, 144-52.)

**a.      The Use of Other Vasodilators During the Relevant Time Period Would Have Encouraged Persons of Ordinary Skill to Look to Adenosine**

61.     The use of other known vasodilators, dipyridamole and ATP, would not have taught away from adenosine administration.  Instead, the prior art use of dipyridamole and ATP, in view of the knowledge of a person of ordinary skill in the art concerning their mechanism of action through adenosine, would have motivated a person of ordinary skill to "cut out the middleman" and administer adenosine for the same purpose.  (D.I. 149 FOF at ¶¶ 71-95, 147-52.)

62.     Dipyridamole had long been known in the art as a vasodilator, and its mechanism of action had been understood since at least the late 1970s.  (D.I. 149 FOF at ¶¶ 84-95.)

11

63.    Persons of ordinary skill would have further understood that the use of dipyridamole had several drawbacks, including a slower onset and a longer duration, as compared to adenosine.  (D.I. 149 FOF at ¶¶ 84-95; Binkley, Tr. 133:21-134:9; Klabunde, Tr. 1096:11-25.)  Based on these drawbacks, a person of ordinary skill would have been motivated to administer adenosine alone to effect vasodilation.  (D.I. 149 FOF at ¶¶ 147-52.)

64.    Prior art publications about the use of ATP for vasodilation would have encouraged a person of ordinary skill to use adenosine for the very same purpose.  (D.I. 149 FOF at ¶¶ 80-83.)  Such a person would have understood that ATP that is intravenously administered rapidly and completely degrades to adenosine, and this adenosine – not its ATP parent – causes selective arterial vasodilation.  (D.I. 149 FOF at ¶¶ 71-83.)

65.    Dr. Sollevi's own work makes clear that a person of ordinary skill would have understood that the administration of ATP would result in an increase in phosphate (which would be formed during ATP's conversion to adenosine), and thus would be motivated to administer adenosine directly.  (TX 112 at 403.)

66.    At the relevant time, pharmaceutical adenosine was not readily available for intravenous administration, and a person of ordinary skill would have been forced to use dipyridamole and ATP as indirect-acting surrogates for what such a person would have understood to be the direct actions of adenosine.  (Binkley, Tr. 331:22-332:2; D.I. 149 FOF ¶¶ 78, 87.)

   **b.** <u>**Research Concerning Adenosine for Various Medical Uses Exploded Following a 1980 Publication by Dr. Berne**</u>

67.    In December 1980, Dr. Robert Berne published an article in Circulation Research entitled "The Role of Adenosine in the Regulation of Coronary Blood Flow" (TX 228; D.I. 149 FOF at ¶¶ 69-70.)

68.     Dr. Berne described adenosine as one of the "*principle contenders* that can serve as a mediator of coronary blood flow (CBF) regulation." (TX 228 at 807; emphasis added.)

69.     Soon after the publication of TX 228, the field of adenosine research exploded, as scientists and physicians searched for new uses for this "principle contender" in the field of vasodilation. (D.I. 149 FOF at ¶ 70.)

70.     Selective arterial vasodilators were considered for many different uses during the relevant time period, including treatment of hypertension, treatment of congestive heart failure, treatment of limb ischemia, diagnosis of coronary artery disease, and controlled hypotension. (D.I. 149 FOF at ¶¶ 70, 142.)

71.     Plaintiffs assert that Dr. Berne disclosed the "first human medical use" of adenosine in December 1983. (TX 36.) But by September 1983, Sollevi I had already disclosed the intravenous administration of adenosine to surgical patients, and shown that a dose of 140 µg/kg/min of intravenous adenosine was safe. (TX 1170.) Plaintiffs are therefore incorrect.

72.     Moreover, Dr. Berne's December 1983 publication (TX 36) would not have discouraged a person of ordinary skill from using intravenous adenosine administration. By December 1983, Dr. Sollevi had administered adenosine intravenously, Dr. Fukunaga had used its equivalent, and Biaggioni's work with adenosine was likely already underway. (TX 1170; TX 42; TX 1187.)

73.     The Sollevi abstracts would also have given rise to additional interest in the intravenous infusion of adenosine. (D.I. 149 FOF at ¶¶ 110-12, 122-23.) As Dr. Klabunde testified, the goal of one of his own publications (dated 1982) about the effects of adenosine *in vitro* was to stimulate others to find practical medical applications for adenosine. (Klabunde, Tr. 1079:21 1080:2.) If *in vitro* experiments could stimulate this level of interest, then the *in vivo*

clinical testing in humans at the relevant time (as disclosed in the Sollevi abstracts), would also increase interest in this area of research.  (*Id*.)

74.    Even before the Sollevi abstracts were published, the use of adenosine to induce controlled hypotension in humans was an area of interest to persons of ordinary skill in the art. (D.I. 149 FOF at ¶ 152.)  For example, other scientists suggested at the relevant time that adenosine could be administered to humans without dipyridamole to induce controlled hypotension:

> [W]e speculate that adenosine alone, without the potentiating effects of dipyridamole, may be sufficient to produce hypotension in higher primates and man without involving excessive volumes of fluid.

(*See* TX 40 at 73; *see also* Klabunde, Tr. 1197:13-1198:5.)

### B.    Secondary Considerations Do Not Support the Non-Obviousness of the Asserted Claims

#### 1.    Plaintiffs Have Not Demonstrated Unexpected Results

75.    There is no requirement in the asserted claims of the '296 patent that a specific degree of vasodilation be achieved, nor a functional requirement that AV block or increases in uric acid levels do not occur.  (*See* TX 275.)

##### a.    The Occurrence of Selective Arterial Vasodilation at the Claimed Dosages Was Not Unexpected

76.    Plaintiffs' contention that "the clear teaching of the prior art was that unacceptably high doses of adenosine would be required in the absence of dipyridamole pretreatment" (D.I. 151 at 34-35) is limited to the consideration of controlled hypotension for surgery, whereas the claims are not so limited.  (TX 275.)

77.    The asserted claims do not claim "a safe and effective dose [of adenosine] that would induce hypotension in the absence of [dipyridamole] pretreatment."  (*Compare* D.I. 151 at 9 *with* TX 275.)  The only "purpose" actually claimed in asserted claims of the '296 patent is

"selectively vasodilating the arteries of a human patient without inducing significant venous dilation."  (TX 275.)

78.    The evidence shows that a person of ordinary skill in the art at the relevant time would have expected the intravenous administration of adenosine to cause at least some selective arterial vasodilation at the claimed dose range and in the absence of dipyridamole pretreatment. (Binkley, Tr. 355:16-356:8; TX 37; TX 42; TX 1170.)

79.    Fukunaga 1982 (TX 42), viewed in the light of Fukunaga 1984 (TX 51), confirmed that the intravenous administration of adenosine in the claimed range, without dipyridamole pretreatment, caused maximal selective arterial vasodilation sufficient to induce controlled hypotension in surgical patients.  (D.I. 149 FOF at ¶¶ 124-38.)

80.    Plaintiffs' reliance on Dr. Sollevi's testimony in support of their "unexpected results" argument (D.I. 151 8-10, 34-35) is misplaced.  Dr. Sollevi is not a person of ordinary skill in the art (the proper standard for an invalidity analysis) (Sollevi, Tr. 475:10-24) and he has a strong financial interest in the outcome of this litigation (Sollevi, Tr. 473:19-474:8, 475:2-9).

### b.    The Lack of AV Block Was Not Unexpected

81.    A person of ordinary skill at the relevant time would understand that continuous intravenous infusion of adenosine at a rate of 140 • g/kg/min was not likely to cause AV block, particularly if the same dose of adenosine was administered in the absence of dipyridamole. (D.I. 149 FOF at ¶¶ 156-164.)

82.    A person of ordinary skill would see that the Sollevi abstracts did not report any AV block.  (D.I. 149 FOF at ¶¶ 160, 162-63.)  The Sollevi abstracts would have taught a person of ordinary skill in the art that the intravenous adenosine administration of adenosine in the claimed range would not cause AV block, as Dr. Sollevi "carefully monitor[ed] the

electrocardiograms" when he administered adenosine with dipyridamole, and did not observe any evidence of AV block.  (Sollevi, Tr. 479:5-23; D.I. 149 FOF at ¶¶ 160, 162-63.)

83.    A person of ordinary skill would also understand that AV block is a transient effect that would be much more easily resolved in the absence of dipyridamole pretreatment, given that dipyridamole causes an additional increase in the adenosine concentration that lasts for a relatively longer period of time.  (D.I. 149 FOF at ¶ 155.)

84.    Dr. Sollevi's contemporaneous publications concerning the intravenous administration of adenosine without dipyridamole do not raise the possibility of AV block as a concern.  (*See*, *e.g.*, TX 37, 1170; D.I. 149 FOF at ¶¶ 162-63, 170.)  If Dr. Sollevi were so concerned about this issue, he would have addressed it in his publications at the time, but he did not.  (*See*, *e.g.*, TX 112.)

85.    In addition, Dr. Sollevi's testimony that he was surprised by the results is not credible because he relegated his report of his allegedly "unthinkable" experiment (eliminating dipyridamole pretreatment when administering adenosine to induce controlled hypotension) to a footnote to TX 112, which failed to mention any of the surprise at the results that he now asserts. (TX 112 at fn.††).

86.    Dr. Sollevi's testimony concerning his belief at the time of the alleged dangers of adenosine and his surprise at the results is also not credible because there is no reason to believe that the Karolinska Institute Hospital would permit such risk-taking by Dr. Sollevi with surgical patients.

### c.    The Lack of Uric Acid Build-Up Was Not Unexpected

87.    A person of ordinary skill would understand that the side effects that might be associated with adenosine, including a transient increase in uric acid levels, would be much less

likely to occur if dipyridamole were not administered with adenosine.  (D.I. 149 FOF at ¶ 155, 165-170.)

88.     The Sollevi abstracts do not report any uric acid build-up.  The Sollevi abstracts would have relieved any concerns that a person of ordinary skill in the would have had concerning the risk of uric acid build-up from intravenous adenosine administration because Dr. Sollevi "carefully . . . test[ed] the metabolite levels" when he administered adenosine with dipyridamole, but did not observe any evidence of prohibitive increases in uric acid levels. (Sollevi, Tr. 482:11-16; D.I. 149 FOF at ¶¶ 170.)

89.     Dr. Sollevi's contemporaneous publications concerning the intravenous administration of adenosine without dipyridamole do not state the risk of uric acid build-up as a concern.  (*See, e.g.,* TX 37; TX 1170; D.I. 149 FOF at ¶¶ 162-63, 170.)  If Dr. Sollevi were so concerned about this issue, he would have addressed it in his publications at the time, but he did not.  (*See*, *e.g.*, TX 112.)

### 2.     Plaintiffs Have Failed to Provide Evidence of Skepticism

90.     As "evidence" of skepticism in the field, Plaintiffs rely entirely on personal correspondence between Dr. Sollevi and Dr. Berne (Klabunde, Tr. 1201:7-10, 13-16; Zaret, Tr. 1974:12-14, 18-19), and other correspondence between and among Dr. Sollevi, a journal editor, and Dr. Francis Robicsek (Klabunde, Tr. 1201:11-16; Binkley, Tr. 363:14-364:4).

91.     The correspondence relied upon by Plaintiffs is not probative, let alone persuasive, evidence that experts were skeptical that adenosine could be administered without causing AV block or uric acid build-up.  (D.I. 149 FOF at ¶¶ 174-75.)

92.     The correspondence was private and therefore not publicly available to persons of ordinary skill in the art, not subject to public scrutiny or comment, and could not have influenced

17

(much less discouraged) persons of ordinary skill in the art at the relevant time. (Klabunde, Tr. 1201:7-10, 13-16; Binkley, Tr. 363:14-364:4.)

93.    The editor of the journal that published the study at the heart of the correspondence between Dr. Sollevi and Dr. Robicsek concluded that this correspondence did not merit publication, corroborating the view that this correspondence does not raise genuine scientific issues. (TX 412.)

94.    Dr. Sollevi's alleged subjective disbelief that adenosine could be administered intravenously in the relevant ranges without encountering certain adverse events runs counter to evidence in the prior art at the time. (D.I. 149 FOF at ¶¶ 153-73.)

95.    Dr. Sollevi's secondhand testimony that another scientist in the field considered him "a crazy Swede" is not evidence of skepticism that supports a finding of non-obviousness. (Sollevi, Tr. 453:13-454:1.)

### 3.    Plaintiffs Have Failed to Show that the Alleged Commercial Success of Adenoscan® Has Any Nexus to the Asserted Claims

96.    Plaintiffs have failed to demonstrate the requisite nexus between the claimed invention of the '296 patent and the alleged commercial success of the Adenoscan® product. (*See, generally,* D.I. 149 FOF at ¶¶ 184-242.)

97.    None of Plaintiffs' experts testified at trial that the requisite nexus existed. Plaintiffs' economic expert, Dr. Hay, devoted just one conclusory sentence of his expert report to the issue, stating in the penultimate paragraph that the sales of Adenoscan® are connected to the attributes of the product. (Hay, Tr. 1790:11-1792:15, 1793:7-14.) Dr. Hay otherwise ignored the issue in favor of describing the sales performance of Adenoscan®. (*Id.*)

a.    **The Sales Levels of Adenoscan® Are Explained By the Interplay of Economic Factors, Not the Product's Clinical Attributes**

98.    The sales levels achieved by Adenoscan® are explained by the interplay of four economic factors:

(1)    There was only one other FDA-approved competitor in the pharmacological stress-testing market at the time of Adenoscan® entry;

(2)    Adenoscan® became the only promoted product in the pharmacological stress testing market shortly after its entry;

(3)    Extensive marketing and promotion of Adenoscan® by Fujisawa; and

(4)    Growth in demand for pharmacological stress testing unrelated to the asserted inventions.

(*See* D.I. 149 FOF at ¶¶ 184-242.)

99.    The sales levels achieved by Adenoscan® are not explained not by any asserted innovation in the '296 patent.  (*See* D.I. 149 FOF at ¶¶ 224-25.)  Adenoscan® was marketed not on the basis of its ability to selectively dilate arteries rather than veins without pretreatment with dipyridamole (*i.e.*, the claimed '296 patent invention), but on the basis of its short half life and the concomitant rapid cessation of side effects.  (*See id.*)

(i)    **Adenoscan® Entered the Pharmacological Stress Market at a Fortuitous Time**

100.    Fujisawa had been working for years to secure FDA approval for and launch Adenoscan.  (*See*, *e.g.*, TX 1226 at AST0065726-727.)  In that time, the company developed countless strategic relationships with physician advocates and sponsored the activities of the American Society of Nuclear Cardiology ("ASNC").  (Leffler, Tr. 1611:10-15, 1612:9-1613:4;

White, Tr. 1252:17-25, 1339:4-15; TX 1078 at AST006674.)  Fujisawa was hardly the "new kid on the block."  (*See generally* D.I. 149 FOF at ¶¶ 197-225.)

  101. Fujisawa launched Adenoscan® in the pharmacological stressor market at a propitious time.  (D.I. 149 FOF at ¶¶ 185-196.)  Because the manufacturer of Persantine®, the only other directly-competing product, ceased promotion spending after Persantine® went generic in late 1996, Adenoscan® had the good fortune, not long after its launch, to become the only product being advertised to the prescribers of pharmacological stress tests.  (*See id.*)

  102. Furthermore, the audience for the Adenoscan® marketing message was relatively price insensitive.  The prescribing physicians do not themselves pay for the product and expect that their patients will be covered by federal or private health insurance.  (Leffler, Tr. 1694:18-1695:9.)

**(ii)** **Fujisawa's Extensive Marketing and Promotion Drove Adenoscan®'s Market Share Growth Pharmacological Stressor**

  103. The evidence shows that Fujisawa's promotion of Adenoscan was **not** "typical" in the industry.  (See D.I. 149 FOF at ¶¶ 197-225.)  Fujisawa's spending was devoted to extensive traditional and non-traditional marketing activities, including substantial detailing efforts; support of the American Society of Nuclear Cardiology ("ASNC"); support of physician advocates; provision of financial incentives such as trial product and pumps to prospective customers; sole sponsorship of industry "educational initiatives"; and promotion of Adenoscan® for new uses and user populations.  (*See id.*)

  104. On cross-examination, Dr. Hay admitted that the 6% industry-standard average promotion-to-sales ratio that he relied on for his testimony that Fujisawa's spending was

"typical" was essentially a concocted number and inappropriately applied to the pharmacological stress market.  (Hay, Tr. 1760:19-24, 1761:3-9, 1763:15-18, 1764:1-1765:6.)

105.    Dr. Hay's 6% was not based on reliable data; without any basis in fact, Dr. Hay "calculated" this 6% ratio as the "midpoint" between two other numbers that are based on reliable data: the 12% industry average for drugs sold primarily in retail pharmacies and the 3.1% industry average for drugs sold primarily in hospitals.  (Hay, Tr. 1761:12-1762:6.)

106.    Dr. Hay admitted that the appropriate average promotion-to-sales ratio for Adenoscan® is 3.1% because pharmacological stress products are sold primarily in hospitals and clinics, and not in retail pharmacies.  (Hay, Tr. 1760:19-24; Tr. 1761:3-9, 1763:15-18, 1764:1-1765:6.)

107.    Dr. Hay also admitted that if a line were drawn at the 3% mark on the misleading demonstrative used to illustrate his testimony, it would be clear that Fujisawa's marketing and promotional spending would exceed the average in every single year from 1995 through 2005. (Hay, Tr. 1766:18-1777:12; DTX 2041.)

108.    Fujisawa's advertising and promotional spending in at least the years 1996, 1999 and 2001 was in fact roughly twice as high as the average promotional spending for hospital-dominated products in those years.  (Hay, Tr. 1766:18-1777:12; DTX 2041.)  This is especially remarkable given that the pharmacological stress market is very concentrated, requiring fewer resources to reach the marketing audience.  (D.I. 149 FOF at ¶¶ 198-201.)  It is also remarkable in a market in which, as Plaintiffs argue, the consumers are "expert," and therefore "not swayed" by product promotion.  (D.I. 151 at 33.)

        **(iii)    Adenoscan's Increasing Sales Were Also Due to the General Growth of the Pharmacological Stress Market**

109.    Despite Plaintiffs' representations concerning relative market shares, Adenoscan® did not grow market share at the expense of dipyridamole, the incumbent product in the pharmacological stress market.  (Leffler, Tr. 1600:6-16, 1632:4-7; DTX 3132; D.I. 149 FOF at ¶ 237.)

110.    Although the market was ripe for a new entrant when Fujisawa launched Adenoscan®, it took over six years for the sales of Adenoscan® to overtake dipyridamole, even with the differential in the prices of the products.  (D.I. 149 FOF at  ¶¶ 229-230.)

111.    Dipyridamole retained significant usage after the launch of Adenoscan® and has experienced continuous growth since that time.  (Leffler, Tr. 1599:12-1600:16; TX 21; DTX 3132; DTX 3134.)

112.    The higher overall level of growth achieved by Adenoscan® can be attributed to the company's extensive marketing and promotion investment in creating and capturing additional user populations for the product.  (D.I. 149 FOF at ¶¶ 214-218.)

113.    The higher overall growth level is also attributable to a general growth in demand for pharmacological stress testing unrelated to the asserted invention, and due instead to demographic phenomena such as the increased aging of the American population and the rise in American obesity.  (D.I. 149 FOF at ¶¶ 226-238.)  As Plaintiffs' witness Mr. White pointed out, "rising water raises all the boats"—*i.e.*, dipyridamole as well as Adenoscan®.  (White, Tr. 1257:11-12.)

114.    Adenoscan®'s success is thus based on a fortuitous market occurrence and is not probative of non-obviousness.  (*See also* D.I. 149 FOF at ¶¶ 184-242.)

### b.    Dr. Hay's Analysis is Unsound and His Testimony Is Unreliable

115.    As demonstrated *infra*, the testimony of Plaintiffs' expert, Dr. Hay, was unreliable and his analysis of the economic issues in this case was inaccurate.

116.    A discussed *supra*, Dr. Hay relied on a concocted industry average that is inappropriate for the niche market of pharmacological stress agents.

117.    In addition, Dr. Hay did not conduct his analysis based on the actual facts in this case.  For example, in response to questions about Fujisawa's 86-member sales force, which Dr. Hay had earlier disagreed was twice the size of the sales force of its competitor, DuPont, Dr. Hay admitted when pressed that he "[didn't] know exactly what DuPont was doing."  (Hay, Tr. 1774:24-1776:19.)  Despite this lack of knowledge, Dr. Hay testified on direct to an opinion on the relative detailing efforts of Fujisawa and DuPont.  (*Id.*)

118.    Dr. Hay also used dollar-based market share as a preferred measure of the relative success of Adenoscan® and dipyridamole (Hay, Tr. 1777:11-1778:3) even though Astellas's own Senior Vice President of Marketing, Richard White, testified that the preferred measure used internally by Astellas to gauge the success of its products is market share of procedures performed.  (White, Tr. 1286:23-1287:9.)

119.    Market share of procedures performed is a more appropriate measure of relative demand in a market because if one product is generic, and therefore lower-priced (*e.g.*, dipyridamole) and another is branded, and therefore priced much higher than the generic (*e.g.*, Adenoscan®), then even if both products sell just one unit, the branded product will appear to have a much higher dollar-based market share even though the products' respective market shares of procedures performed are **equal**.  (Hay, Tr. 1779:2-7.)

120.     Dr. Hay also inappropriately chose to use gross sales to calculate market shares and promotion-to-sales ratios, even though he admitted on cross examination that gross sales is an "inflated number" and that Mr. White testified that net sales "represents the money that the company actually takes in for the sales of its product" because it factors out "certain returns and allowances." (White, Tr. 1236:21-1237:3; Hay, Tr. 1788:2-15.)

121.     At several points throughout his testimony, Dr. Hay was intent on criticizing Dr. Leffler's testimony even though he had either incorrectly heard the testimony or had failed to listen to it altogether. (Hay, Tr. 1767:13-1768:14.) In one instance, Dr. Hay was forced to admit that his criticism on direct examination of Dr. Leffler's calculation of a promotion-to-sales ratio was based on a calculation that Dr. Leffler had revised since his opening report and had not presented to the Court at trial. (Hay, Tr. 1773:25-1774:23.) Dr. Hay's apparent personal bias against Dr. Leffler and his disregard of the facts make him an unreliable source for this Court to rely on. (*See id.*)

## C.     The Asserted Claims of the '296 Patent are Inherently Anticipated

122.     As discussed *supra*, the Fukunaga 1982 abstract disclosed the administration of ATP (without dipyridamole) to patients to cause controlled hypotension, one of the medical applications of selective arterial vasodilation. (TX 42.) The dose of ATP administered was equivalent to a dose of adenosine that falls within each of the claimed ranges of the asserted claims, and a person of ordinary skill would have made this common sense calculation in determining the amount of adenosine to administer for the same purpose. (*See id.*)

123.     While Fukunaga 1982 admittedly does not expressly disclose the administration of adenosine, a person of ordinary skill in the art at the relevant time would understand that "the natural result flowing from" the administration of ATP would be the rapid and virtually complete conversion of ATP to adenosine, as discussed *supra*. (*See* D.I. 149 FOF at ¶¶ 71-83.)

24

124.    As also discussed *supra*, the immediate and complete conversion of ATP to adenosine was, in fact, appreciated at the time, and repeatedly acknowledged by Dr. Sollevi. (*See* D.I. 149 FOF at ¶¶ 71-83.)

125.    Therefore, each and every element of the asserted claims was inherently disclosed in Fukunaga 1982.  (*See* D.I. 149 FOF at ¶¶ 243-246.)

D.    **Expert Testimony Issues**

1.    **Dr. Binkley is Highly Qualified to Serve as an Expert in this Case**

126.    As demonstrated *infra*, the record contradicts Plaintiffs' attempt to characterize Dr. Binkley as anything less than a highly qualified and credible expert witness in this case.

127.    Dr. Binkley is a highly-regarded cardiologist who has been a practicing physician for over 22 years and serves as Ohio State University's Wilson Professor of Medicine in Cardiology, Director of Cardiovascular Research in the Division of Cardiology, and Director of Clinical Programs in the Dorothy M. Davis Heart and Research Institute. (Binkley, Tr. 72:16-73:23.)

128.    Unlike Plaintiffs' only testifying expert on validity, Dr. Binkley treats patients and has administered or supervised the administration of adenosine for the purpose of pharmacologic stress testing.  (Binkley, Tr. 74:23-75:3.)

129.    Dr. Binkley also serves on the editorial board of the *American Heart Journal* and is a peer-reviewer for a number of other well-known journals in the field of cardiology, including *Circulation*. (Binkley, Tr. 76:25-77:8.)

130.    Dr. Binkley has authored over 140 peer-evaluated publications and several book chapters related to his cardiovascular research, and has earned several honors for his work in the field of cardiology.  (Binkley, Tr. 75:5-76:24, 77:9-17.)

131.    Unlike Plaintiffs' expert, Dr. Klabunde (the only validity expert proffered by Plaintiffs at trial), Dr. Binkley is a cardiologist who was in practice at the relevant time, so he squarely qualified as a person of ordinary skill in the art at the time of the alleged invention. (Binkley, Tr. 73:23-74:4, 75:23-76:4.)

132.    The parties have agreed that a person of ordinary skill in the art to which the '296 patent pertains is a cardiologist with a residency in internal medicine and two years of a cardiology fellowship, whose experience could also include nuclear cardiology imaging. (Binkley, Tr. 95:25-96:7; Klabunde, Tr. 515:15-25.)

133.    Dr. Binkley is a cardiologist and completed both a residency in internal medicine and a fellowship in cardiology in the mid 1980s.  (Binkley, Tr. 73:23-74:4, 75:23-76:4.)  Dr. Klabunde lacks these qualifications.  (Klabunde, Tr. 1057:4-19.)

134.    Having been a practicing cardiologist at the time, Dr. Binkley has much more relevant insight about what skilled artisans would have understood as compared to Dr. Klabunde, who is not a cardiologist, not a physician, was not teaching physicians at the relevant time, and only later came to teach at a school of osteopathy. (Binkley, Tr. 73:23-74:4, 75:23-76:4; Klabunde, Tr. 1056:12-1057:19.)

### a.    Dr. Binkley's Opinions Were Well Within the Scope of His Expert Report

135.    Plaintiffs' assertion that Dr. Binkley offered new theories of invalidity that were not previously disclosed in his expert reports is not borne out by the record.

136.    Dr. Binkley opined in his expert report that a person of ordinary skill would be motivated to administer adenosine without pretreatment by dipyridamole, in part because of the properties resulting from the difference in the half lives of dipyridamole and adenosine.  (TX 26, ¶¶ 64-67.)  In his report, Dr. Binkley expressly discussed the fact that the half-life of

26

dipyridamole is longer than that of adenosine and described the resultant difference in the residual effects of each compound after administration is stopped:

> Therefore, even after dipyridamole administration is stopped, the breakdown of adenosine would be inhibited for an additional period of time, resulting in a prolonged increase in the adenosine concentration and a persistence of undesirable side effects. In contrast, any side effect caused by the administration of adenosine alone would resolve shortly after adenosine administration was stopped, given that adenosine deaminase would be freely available to metabolize the additional adenosine and thereby lower the adenosine concentration.

(TX 26, ¶ 65.)

137.    In addition, Dr. Binkley opined in his expert report that the hemodynamic effects observed in the Sollevi abstracts would indicate to a person of ordinary skill that the administration of adenosine alone would produce selective arterial vasodilation. (TX 26, ¶¶ 47-48; TX 1170; TX 37.)

138.    At trial, Dr. Binkley explained, in a manner consistent with the opinions in his expert report, that a person of ordinary skill would attribute the hemodynamic effects observed in the Sollevi abstracts to the effects of the adenosine (and not to dipyridamole) because the amount of dipyridamole administered in the one-time pretreatment would have been nearly undetectable by the end of the adenosine infusion. (Binkley, Tr. 136:10-147:21.)

139.    Plaintiffs also argue that Dr. Binkley did not previously disclose his opinion that the hemodynamic parameters observed in the Biaggioni Abstract showed selective arterial vasodilation (D.I. 151 at 37; TX 1187), but as set forth in his expert reports, Dr. Binkley's opinion was that the Biaggioni Abstract would teach a person of ordinary skill in the art at the relevant time that adenosine could be safely administered intravenously to humans at the claimed dose of 140 µg/kg/min without dipyridamole pretreatment and without the occurrence of serious side effects. (TX 26, ¶¶ 82-84; Binkley, Tr. 175:5-176:4.)

27

### b.    Dr. Binkley Was Forced to Rebut Issues Raised by Plaintiffs for the First Time at Trial

140.    Plaintiffs contend that Dr. Binkley's assertion that a person of ordinary skill in the art in September 1985 would be motivated to find additional medical uses for adenosine as a selective arterial vasodilator was not disclosed in his expert reports.  (D.I. 151 at 37.)  However, Plaintiffs first raised the issue of other medical uses at trial, through Dr. Klabunde's testimony that that the only known use for intravenous adenosine in September 1985 in the prior art was controlled hypotension.  (Klabunde, Tr. 528:12-529:5.)

141.    Dr. Binkley had no previous opportunity to offer testimony on this issue and his rebuttal testimony was limited to the issue raised by Plaintiffs.  (*See*, *e.g.*, Binkley, Tr. 1375:9-1377:17.)

### 2.    Dr. Leffler is Highly Qualified to Serve as an Expert in this Case

142.    As demonstrated *infra*, the trial record contradicts Plaintiffs' attempt to characterize Dr. Leffler as anything less than a highly qualified and credible expert witness in this case.

143.    Dr. Leffler is an Associate Professor of Economics at the University of Washington, and he has been a practicing economist for over 32 years since receiving his Ph.D. in economics from the University of California at Los Angeles in 1977.  (Leffler, Tr. 1562:2-11, 17-18.)

144.    The focus of Dr. Leffler's teaching and research is the government regulation of business, which includes antitrust issues, patent issues, and contract issues.  (Leffler, Tr. 1562:19-24.)

145.    Dr. Leffler has extensive expertise in the economics of the pharmaceutical industry owing to work he completed in support of his doctoral thesis, a still frequently-cited

article he wrote on the role of advertising and promotion in the success of pharmaceutical products, a position as a resident scholar at Pfizer Pharmaceuticals, and consulting projects he has performed over the years for various pharmaceutical companies.  (Leffler, Tr. 1564:4-1566:10, 1568:7-23.)

146.    In addition to serving as a consultant to the Department of Justice, Dr. Leffler has been qualified as an expert witness in federal and state courts as well as before state agencies and federal regulatory agencies such as the Federal Trade Commission. (Tr. 1563:7-12, 1564:2-3.)

147.    Dr. Leffler's qualifications have been specifically acknowledged, and his economic analyses adopted, by several federal and state courts. *See, e.g.*, *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835 (9th Cir. 2001); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271 (D.N.J. 2006);  *In re Fla. Microsoft Antitrust Litig.*, 2002 WL 31423620 (Fla. Cir. Ct. 2002).

148.    Plaintiffs complain about a typographical error on one of the demonstrative exhibits that Dr. Leffler discussed during his testimony, (D.I. 151 at 38), but Dr. Leffler clearly explained to the Court that the data the exhibit (DTX 3131) was meant to display was also before the Court in DTX 3132 and DTX 3134, which did not contain the typographical error.  (Leffler, Tr. 1697:13-1698:23.)

149.    Plaintiffs also complain that Dr. Leffler used IMS data to calculate a promotion-to-sales ratio and considered IMS data in other sections of his economic analysis (D.I. 151 at 39), but Dr. Leffler openly acknowledged that because there is a certain level of underreporting in IMS sales figures, IMS data is not the most appropriate source of data for the calculation of a promotion-to-sales ratio, and he certainly did not present such a calculation to the Court.  (Leffler, Tr. 1673:9-12.)

150.    Dr. Leffler also educated the Court as to why IMS data is appropriate for the purpose of comparing the relative sales performance and market shares of the pharmaceutical products of concern in this suit. (Leffler, Tr. 1586:4-23, 1587:9-1589:7.) Other data sources, such as Astellas' internal sales figures and measures of scans performed in the market, are not sufficient for this purpose. (Leffler, Tr. 1589:8-19.)

151.    Plaintiffs incorrectly assert that Dr. Leffler "disavowed" his conclusion that there was a slowing of the revenue growth rate from the late 1990s through mid-2000. (D.I. 151 at 38-39.)

152.    First, Dr. Leffler pointed out that the gross sales figures on which Plaintiffs rely are not real numbers, but rather "accounting numbers" that do not include price concessions, returns, and other allowances and therefore do not truly reflect the amount of money the company has generated from a product. (Leffler, Tr. 1700:24-1701:6.)

153.    Second, Dr. Leffler explained that when looking at the net sales data, one sees a so-called "second wind" in or about mid-2000, which reflects "a therapeutic category explosion," resulting in an increasing, rather than declining, growth rate from that point forward. (Leffler, Tr. 1701:7-1702:17.)

154.    Dr. Leffler further pointed out that the Adenoscan® growth following mid-2000 was in part due to its ability to benefit from the category explosion to a greater extent than its competitor since it was the only product being promoted in the market. (Leffler, Tr. 1702:22-1703:3.)

155.    Plaintiffs are wrong when they criticize Dr. Leffler by asserting that "Dr. Leffler never consulted any physicians" about what product qualities or benefits drive their purchasing decisions, (D.I. 152 at ¶ 69). As an economist, Dr. Leffler's analysis is to determine whether

economic factors explain the sales levels, as in the case of Adenoscan®.  (Leffler, Tr. 1570:23-1571:21, 1631:5-11.)   Where economic factors do not explain the sales levels, it is appropriate for medical experts to analyze whether any commercial success is due to the alleged innovative therapeutic properties of the product.  (*Id*.)

### 3. The Expert Testimony Offered By Plaintiffs is Not Credible

156.    The only scientific expert witness offered by Plaintiffs at trial is neither a practicing physician nor even a person of ordinary skill in the art.  (Klabunde, Tr. 1056:12-1057:19.)

157.    Plaintiffs had a far more qualified witness, Dr. Zaret, a cardiologist whom they touted to the Court in their opening statement and had present in court while Dr. Binkley testified, but at the last minute opted not to call at trial.  (Tr. 45:20-47:18, 49:13-50:20, 1141:15-16.)

### a. Dr. Klabunde is a Physiologist Who Has Never Administered Any Vasodilator, Including Adenosine, To a Patient

158.    Dr. Klabunde, the only technical expert offered by Plaintiffs at trial, is a physiologist who has never administered any vasodilator (including adenosine) to a human or animal, nor has he never observed the administration of adenosine.  (Klabunde, Tr. 1057:4-19.)

159.    Unlike Dr. Binkley, Dr. Klabunde falls far outside the scope of the parties' agreed-upon definition of a person of ordinary skill in the art at the relevant time and thus is a less credible witness on what such a person would have understood at the relevant time. (Klabunde, Tr. 1056:12-1058:12.)

160.    While this fact does not automatically disqualify Dr. Klabunde as serving as an expert in this case, this discrepancy was readily apparent from Dr. Klabunde's testimony, in which he repeatedly opined upon what he – a physiologist – would know or understand at the

31

relevant time period, instead of couching his analysis in terms of the understanding of a person of ordinary skill in the art.  (*See*, *e.g.*, Klabunde, Tr. 1062:20-1064:9, 1086:23-9, 1110:6-21.)

> **b.    Plaintiffs' Last-Minute Decision Not to Call Their Only Expert Physician Witness Was Designed to Deprive Sicor of Favorable Admissions**

161.    At the last minute, Plaintiffs cancelled the trial testimony of their other scientific expert, Dr. Zaret, who like Dr. Binkley, is a practicing physician.  (Tr. 1141:15-16.)  The reason is apparent, because, as discussed *infra*, Dr. Zaret made several admissions during his deposition testimony that were favorable to Sicor's case for obviousness.

162.    First, Dr. Zaret confirmed that prior to the date of the filing of the '296 patent application, there was no published report of AV block occurring in human patients following the administration of adenosine by continuous infusion.  (Zaret, Tr. 1943:11 17.)   He also confirmed that that there is no prior art report that shows the occurrence of AV block in any other context involving adenosine other than with bolus administration.  (Zaret, Tr. 1974:6-11.)

163.    Second, Dr. Zaret conceded that a person or ordinary skill in the art at the relevant time would know that the routine practice of dose titration could be used to minimize the possibility of side effects during the continuous intravenous administration of adenosine, and would know that stopping administration of adenosine would quickly stop the observed signs of the side effects.  (Zaret, Tr. 1946:17-22.)

164.    Third, Dr. Zaret agreed that persons of ordinary skill in the art would understand that the selective vasodilation of the arteries could be useful in "many contexts" other than treatment for heart disease.  (Zaret, Tr. 1959:13-18, 1960:6-1961:10.)

165.    Fourth, Dr. Zaret testified that the correspondence between Dr. Sollevi and Dr. Berne, on which Plaintiffs heavily rely in support of their arguments concerning skepticism in the field, were private communications and therefore would not have served to discourage

persons of ordinary skill in the art at the relevant time because they would not have been available to them to review. (Zaret, Tr. 1974:12-24.)

166.    Plaintiffs' assertion that their decision not to call Dr. Zaret at trial was due to the "inexorable passage of [Plaintiffs'] allotted time" is not convincing. (Tr. 1141:13-16.)    In fact, Plaintiffs had at least five and a half hours of time remaining at the close of trial.  Plaintiffs made the strategic decision not to call Dr. Zaret  at trial because his opinions, as clearly expressed in his deposition testimony, were in direct conflict with several of Plaintiffs' key positions in this case.

## II.    PROPOSED RESPONSIVE CONCLUSIONS OF LAW

### A.    Claims 1, 3, 7, and 9 of the '296 Patent Are Invalid As Obvious

1.    The Court must determine whether Sicor "has met its burden by clear and convincing evidence by considering the totality of the evidence, including any rebuttal evidence presented by the patentee." *See Pfizer, Inc. v. Apotex, Inc.* 480 F.3d 1348, 1360 (Fed. Cir. 2007); *see also Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) ("'Whether the evidence presented [by the patentee] suffices to rebut the *prima facie case* is part of the ultimate conclusion of obviousness, and is therefore a question of law.'" (*quoting In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998))) (emphasis in original).

### 1.    The Rigid "Teaching Suggestion Motivation" Test Relied Upon By Plaintiffs is Not the Proper Legal Standard for an Obviousness Analysis

2.    The rigid "teaching-suggestion-motivation" test on which plaintiffs rely is not the legal standard for an obviousness analysis. *See generally KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727 (2007); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007).

3.      The correct analysis will employ a broader conception of the suggestion test, taking into account the common knowledge in the field of art and allowing for the skilled artisan's use of her common sense and ordinary innovation.  *KSR*, 127 S. Ct. at 1742.

4.      The Supreme Court recently held that a "expansive and flexible" approach should be used when assessing obviousness:

> As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill can employ.

*See KSR*, 127 S. Ct at 1739-41.

5.      The Supreme Court recognized the need to guard against hindsight bias, but cautioned against adopting a wooden approach that takes common sense out of the obviousness analysis:

> The Court of Appeals, finally, drew the wrong conclusion from the risk of courts and patent examiners falling prey to hindsight bias.  A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning.  **Rigid preventative rules that deny fact finders recourse to common sense, however, are neither necessary under our case law nor consistent with it.**

*See KSR*, 127 S. Ct. at 1742-43 (emphasis added; citations omitted).

### 2.      Sicor Has Shown Obviousness By Clear and Convincing Evidence

6.      Sicor has proved obviousness of the asserted claims by clear and convincing evidence.  Plaintiffs' evidence of certain secondary indicia of non-obviousness is insufficient to rebut Sicor's showing of obviousness.  Accordingly, Claims 1, 3, 7, and 9 of the '296 patent are obvious in light of the prior art at the time of the invention.

#### a.      The Sollevi Abstracts Render the Asserted Claims Obvious

7.      In this case, the application of common knowledge and common sense renders the asserted claims of the '296 patent obvious.  The disclosures in the Sollevi abstracts, in

combination with the knowledge of a person of ordinary skill in the art in 1985, would render each of the asserted claims of the '296 patent obvious.  (*See* D.I. 149 COL at ¶¶ 27-45.)

8.      Dr. Sollevi's testimony concerning nonobviousness is not credible because he has a strong interest in the financial outcome of the litigation and is therefore biased.

9.      Even if he were entirely free of bias – and he is not – Dr. Sollevi's testimony concerning nonobviousness as a purported inventor is not relevant to the obviousness analysis because, according to Plaintiffs, Dr. Sollevi was an innovator and thus not a person of ordinary skill in the art in 1985.

10.     The correct standard for determining obviousness is the understanding of a person of ordinary skill – not the understanding of the inventor – based on the information that was in the public domain at the time of the claimed invention.  *Ormco Corp. v. Align Tech.*, 463 F.3d 1299, 1306 (Fed. Cir. 2006).

### b.     The Fukunaga 1982 Abstract Renders the Asserted Claims Obvious

11.     The disclosures in the Fukunaga 1982 Abstract, in combination with the knowledge of a person of ordinary skill in the art in 1985, render each of the asserted claims of the '296 patent obvious.  (*See* D.I. 149 COL at ¶¶ 46-63.)

12.     Based on a correct and complete understanding of the prior art as a whole, the asserted claims would have been obvious to a person of ordinary skill in the art in view of Fukunaga 1982 (TX 42),  which disclosed the intravenous administration of 200 to 600 • g/kg/min of ATP, a range that a person of ordinary skill would have understood to be equivalent to about 97 to 290 µg/kg/min of adenosine.  (D.I. 150 at 19.)

13.     Fukunaga 1982 disclosed that the administration of ATP in this dosage range induced controlled hypotension, coupled with "well-maintained" cardiac output, which indicates that selective arterial vasodilation occurred.

14.     Plaintiffs have not rebutted Sicor's evidence that persons of ordinary skill would have understood that the controlled hypotension reported in the Fukunaga 1982 and 1984 Abstracts following the intravenous administration of adenosine triphosphate ("ATP") was the result of the action of adenosine.

15.     Contrary to Plaintiffs' arguments, persons of ordinary skill would not view the prior art robotically.  *KSR*, 127 S. Ct. at 1742.  They would use their expertise and common sense, rather than ignore the teachings of more relevant and recent prior art in favor of the less relevant and older prior art (which was relied upon by Plaintiffs).  *See id.*

16.     A person of ordinary skill would have understood, based on a number of relevant publications, including one co-authored by Dr. Sollevi in 1984, that ATP breaks down to adenosine almost immediately following intravenous administration.  Such a person would also understand that the arterial vasodilation that was observed following that administration of ATP was due to its conversion to adenosine.

### c.     The Dose Required to Produce a Desired Effect Could Have Been Determined Through Routine Experimentation

17.     The asserted claims of '296 patent do not claim a specific degree of vasodilation, and are directed to a method of selective arterial vasodilation generally.  Plaintiffs' attempt to insert new claim limitations, such as an implied requirement for a certain level of vasodilation, should be rejected.

18.    None of the asserted claims is limited to controlled hypotension, or any specific medical use, for adenosine.  Instead, the claims recite only a method of causing selective arterial vasodilation.

19.    A person ordinary skill at the relevant time would have known that lower levels of vasodilation would have been necessary for other medical uses, such as cardiac diagnostics.

20.    A person of ordinary skill would have understood, based upon the relevant literature available at the time, that the dose of adenosine administered could be readily titrated until the desired level of vasodilation were achieved.

21.    A person of ordinary skill would have had a reasonable expectation that such a titration would be successful.

### d.    The Prior Art Uses of Adenosine and Other Vasodilators Would Not Have Taught Away from the Claimed Invention

22.    A reference may teach away from the claimed invention "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant."  *Optivus Tech., Inc. v. Ion Beam Apps. S.A.*, 469 F.3d 978, 989 (Fed. Cir. 2006) (quoting *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).  Whether a reference "teaches away" should be considered based on the teachings of the prior art as a whole, and should not be based on isolated statements taken out of context.  *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166 (Fed. Cir. 2006) (holding that "the prior art must be considered *as a whole* for what it teaches") (emphasis in original).

23.    Whether the prior art teaches away from, or motivates toward, a combination is a question of fact.  *In re Fulton*, 391 F.3d 1195, 1199-1200 (Fed. Cir. 2004).

37

24.    The Federal Circuit has provided some guidance as to the types of things that do not "teach away." Disclosure in the prior art of variety of alternatives, without specific dissuasion from a particular choice, does not constitute teaching away from any one of the alternatives. *Id.* at 1201. In addition, a reference "that does not specifically refer to one element of a combination does not, per se, teach away." *Syntex LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005).

25.    References that are not prior art may be used only in limited circumstances to show the state of the art at the relevant time. *See In re Koller*, 613 F.2d 819, 824 (C.C.P.A. 1980).

26.    The prior art as a whole did not teach away from the use of intravenous adenosine for selective arterial vasodilation without significant venous dilation in 1985.

27.    Far from teaching away, the use of dipyridamole as a vasodilator would have taught a person of ordinary skill in the art that adenosine could be used for the very same purpose. Persons of ordinary skill would have understood dipyridamole's mechanism of action, and also would have known that the use of dipyridamole had several drawbacks, including a slower onset and a longer duration. (D.I. 150 at 11.) Due to these drawbacks, a person of ordinary skill would have been motivated to administer adenosine alone to effect vasodilation. *See KSR*, 127 S. Ct. at 1742 ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options with his or her technical grasp.").

28.    Similarly, prior art publications about the use of ATP for vasodilation would have encouraged a person of ordinary skill to use adenosine for the same purpose. Such a person would have understood that ATP that is intravenously administered rapidly and completely

degrades to adenosine, and that adenosine – not its ATP parent – causes selective arterial vasodilation. As with dipyridamole, a person of ordinary skill would have been motivated by common sense to remove the middleman and administer adenosine directly to effect vasodilation.

29.    Pharmaceutical-adenosine was not readily available at the relevant time for intravenous administration. Therefore, it was lack of availability – not lack of motivation – that would have forced persons of ordinary skill in the art to use dipyridamole and ATP as indirect-acting surrogates for what such a person would have understood to be the direct actions adenosine.

30.    The use of adenosine for selective arterial vasodilation without significant venous dilation, at the doses identified in the asserted claims, would have been obvious to a person of ordinary skill in at the art in 1985. (*See* D.I. 149 COL at ¶¶ 27-63.)

### 3.    The Secondary Considerations Argued by Plaintiff Do Not Rebut Sicor's Strong *Prima Facie* Case of Obviousness

31.    Secondary considerations of nonobviousness may include any of (1) copying; (2) long-felt but unresolved need; (3) failure of others; (4) commercial success; (5) unexpected results; (6) unexpected properties of the claimed invention: (7) licensing showing industry respect for the invention; and (8) skepticism of skilled artisans before the invention. *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998).

32.    Where, as here, the case for obviousness is strong, even substantial evidence of secondary indicia will fail. *See*, *e.g.*, *Richardson-Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1484 (Fed. Cir. 1997) ("The unexpected results and commercial success of the claimed invention, although supported by substantial evidence, do not overcome the clear and convincing evidence that the subject matter sought to be patented is obvious."); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d

1348, 1372 (Fed. Cir. 2007) (holding that even if patentee showed unexpectedly superior results, "this secondary consideration does not overcome the strong showing of obviousness in this case").

33.    The secondary considerations evidence relied upon by Plaintiffs falls far short of the not obvious mark.  *See Leapfrog*, 485 F.3d at 1162 (affirming that a patent was invalid where the "district court explicitly stated in its opinion that Leapfrog had provided substantial evidence of commercial success, praise, and long-felt need, but that, given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that claim 25 would have been obvious.").

### a.    Plaintiffs Have Not Demonstrated Unexpected Results

34.    One way to rebut a showing of obviousness "is to make a showing of 'unexpected results,' *i.e.,* to show that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the art would have found surprising or unexpected."  *See In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995).  Plaintiffs have made no showing of any unexpected results from any dose of adenosine for selective arterial vasodilation without significant venous dilation.

35.    "[B]y definition, any superior property must be *unexpected* to be considered as evidence of non-obviousness."  *Pfizer*, 480 F.3d at 1371 (emphasis in original).  Accordingly, to properly consider what properties were unexpected, the Court must consider what properties *were* expected.  *Id.*  Plaintiffs here have failed to prove that the result of selective arterial vasodilation without significant venous dilation using the claimed dosage range of adenosine infusion was unexpected.

36.    Plaintiffs' attempt to interject additional "functional" elements into the asserted claims is legally improper and must fail.  *See Renishaw PLC v. Marposs Societa' Per Azioni*, 158

F.3d 1243, 1248-49 (Fed. Cir. 1998) ("'We know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement.'" (quoting *McCarty v. Lehigh Val. R.R.*, 160 U.S. 110, 116 (1895))).

**(1)    The Occurrence of Selective Arterial Vasodilation at the Claimed Dosages was Not Unexpected**

37.    A person of ordinary skill in the art at the relevant time would have expected the intravenous administration of adenosine to cause at least some selective arterial vasodilation at the claimed dose range and in the absence of dipyridamole pretreatment.

38.    There is no requirement in the asserted claims of the '296 patent that a specific degree of vasodilation be achieved, nor a "functional" requirement that AV block or increases in uric acid levels do not occur.  *See Renishaw*, 158 F.3d at 1252 (declining to "plac[e] a functional limitation" in a claim, on the basis that "this limitation appear[ed] nowhere in the claims; rather it c[a]me[] from a concept of operability").

39.    Fukunaga 1982, viewed in the light of Fukunaga 1984, confirmed that the intravenous administration of adenosine in the claimed range, without dipyridamole pretreatment, caused maximal selective arterial vasodilation sufficient to induce controlled hypotension in surgical patients.  For this reason alone, the occurrence of selective arterial vasodilatation would not be unexpected.

40.    Dr. Sollevi's testimony concerning unexpected results is not relevant because he is not a person of ordinary skill in the art.

41.    Dr. Sollevi's testimony is not credible because he has a strong interest in the financial outcome of the litigation.

### (2)     The Lack of AV Block Was Not Unexpected

42.     A person of ordinary skill would understand that the Sollevi abstracts proved that continuous intravenous infusion of adenosine at a rate of 140 • g/kg/min was not likely to cause AV block, particularly if the same dose of adenosine was administered in the absence of dipyridamole.

43.     The person of ordinary skill would also understand that AV block is a transient effect that would be much more easily resolved in the **absence** of dipyridamole pretreatment, given that dipyridamole causes an additional increase in the adenosine concentration that lasts for a relatively longer period of time.

### (3)     The Lack of Uric Acid Build-Up Was Not Unexpected

44.     A person of ordinary skill would understand that the side effects that might be associated with adenosine, including a transient increase in uric acid levels, would be much less likely to occur if dipyridamole were not administered with adenosine.

45.     A person of ordinary skill at the relevant time would have understood that the net increase in adenosine concentration would have been greater – and that any side effects were more likely to occur – if dipyridamole were also intravenously administered along with adenosine, as compared to the increase when the same dose of adenosine was administered alone.

### b.     Plaintiffs Have Failed to Provide Credible Evidence of Skepticism or Surprise

46.     In the obviousness inquiry, the "relevant skepticism" is skepticism or doubt as to whether the invention will work as described or intended.  *See U.S. v. Adams*, 383 U.S. 39, 44 (1966) (concerning skepticism as to feasibility).

47.     Relevant skepticism is skepticism of a person of ordinary skill in the art.  *See Alpex Computer Corp. v. Nintendo Co.*, No. 86-1749, 1994 WL 681752, at *30 (S.D.N.Y. Dec. 5, 1994), ("[I]n the absence of a showing that the skeptics were people of ordinary skill in the art, evidence of their skepticism should be accorded little weight in the obviousness determination."), *aff'd in rel. part, rev'd in part*, 102 F.3d 1214 (Fed. Cir. 1996).

48.     Plaintiffs have not offered any evidence of actual skepticism.

49.     Plaintiffs rely entirely on personal correspondence between Dr. Sollevi and Dr. Berne and other correspondence between and among Dr. Sollevi, a journal editor, and Dr. Francis Robicsek in support of their argument of skepticism in the field.  The correspondence was private and thus not publicly available to persons of ordinary skill in the art and not subject to public scrutiny or comment.  It therefore could not have influenced (much less discouraged) persons of ordinary skill in the art at the relevant time.

50.     The Court questioned at trial whether the correspondence should be considered, stating that "when scientists don't express the same skepticism in public, [the Court is] concerned that a letter just like e-mails was written without scientific thought and was a transitory thought and not a reliable scientific thought."  (Tr. 421:8-13.)

51.     Plaintiffs cite *U.S. v. Adams*, 383 U.S. 39 (1966), in support of the argument that the private, personal correspondence relied upon by Plaintiffs proves skepticism of experts.  (D.I. 151 at 28-30.)   Two important distinctions exist between *Adams* and the instant case that call for a different result here.

52.     Unlike this case, private correspondence was not the only evidence relied upon by the Court in *Adams* to assess the possible skepticism of experts.  Instead, as the *Adams* briefs cited by Plaintiffs make clear (D.I. 151, Appendix 1 at 76-78), an issued patent and a published

article served as primary evidence of skepticism of experts. In *Adams*, the totality of the evidence, not just private correspondence, supported a finding of skepticism of experts. This is not the case here.

53.    Second, in *Adams*, the Court emphasized that the proffered evidence showed **continued** skepticism that the inventor accomplished what he claimed to have accomplished, even after the inventor disclosed his discovery. *See Adams*, 383 U.S. at 44 (emphasis added).

54.    The letters in the instant case evidence no such disbelief and merely congratulate Dr. Sollevi for accomplishing exactly what he said he had accomplished (an accomplishment that cannot be discerned from the correspondence).

55.    Dr. Sollevi's hearsay testimony that another scientist in the field considered him "a crazy Swede" also does not make scientific research patentable.

### c.    Copying, Even If Shown, Is Irrelevant in the ANDA Context

56.    "'[M]ore than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue.'" *In re GPAC Inc*., 57 F.3d 1573, 1580 (Fed. Cir. 1995) (quoting *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999)). Many reasons for copying are unrelated to any purported nonobviousness of the invention. *See Cable Elec. Prods.,* 770 F.2d at 1028.

57.    Evidence of copying is particularly weak in the context of an ANDA litigation such as this one. See *Aventis Pharms. Deutschland GmbH v. Lupin Ltd.*, 2006 WL 1008962, at *45 (E.D. Va. July 17, 2006). "[T]he ANDA process allows a generic drug company to challenge a drug patent by alleging the patent is invalid." *Id*. "[G]iven that there is a statute in place that encourages generic drug companies to challenge patents," a copying argument in the ANDA context is weak. *Id*.

44

58.     Evidence of copying in this context is not persuasive.

### d.     Any Commercial Success Enjoyed By Adenoscan® Does Not Rebut Sicor's Case of Obviousness

59.     The sales levels achieved by Adenoscan® are the product of various economic factors and without more do not demonstrate any superiority of this drug that would suggest that the '296 patent was not obvious. *Pfizer Inc. v. Teva Pharms. USA, Inc.,* 461 F. Supp. 2d 271, 274 (D.N.J. 2006) (commercial success alone does not demonstrate non-obviousness and must be the result of the product's features rather than other factors such as advertising); *see also Sentex Sys., Inc. v. Elite Access Sys., Inc.*, 194 F.3d 1331, at *7 (Fed. Cir. 1999) (unpublished opinion) (a patentee may not use sales figures alone to establish commercial success, but must establish a nexus between the sales and the claimed invention).

### (i)     The Sales Levels of Adenoscan® Are Explained By the Interplay of Economic Factors, Not the Product's Clinical Attributes

60.     Adenoscan® was marketed not on the basis of its ability to selectively dilate arteries rather than veins without pretreatment with dipyridamole (*i.e.*, the claimed '296 patent invention), but on the basis of its short half life and the concomitant rapid cessation of side effects.  (*See* D.I. 149 COL at ¶ 70.)

61.     The "advantages" of Adenoscan® touted in Fujisawa's marketing were expected characteristics of adenosine known in the prior art.  To be probative of non-obviousness, the commercial success must have some nexus with the asserted innovation, not merely with features that were known in the prior art.  *See J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

62.     In assessing commercial success , a court should

> "not be blinded to other factors which may contribute to the commercial
> success of an invention, such as extensive advertising campaigns, price

> discounts for the patented item, or promotional schemes which enhance
> the commercialization of the invention without in any way evidencing a
> long-felt need for the device."

*Speller v. U.S.*, 14 Cl. Ct. 170, 174 n.5 (1988) (quoting *Pacifica Technica Corp. v. U.S.*, 2 Cl. Ct.

170, 173 (1983)).  As described at length in Defendants' opening brief and proposed and

responsive findings of fact, the sales levels achieved by Adenoscan® were driven by the interplay

of four economic factors:

> (1)    There was only one other FDA-approved competitor in the
>        pharmacological stress-testing market at the time of Adenoscan®
>        entry;
>
> (2)    Adenoscan® became the only promoted product in the
>        pharmacological stress testing market shortly after its entry;
>
> (3)    Extensive marketing and promotion of Adenoscan® by Fujisawa;
>        and
>
> (4)    Growth in demand for pharmacological stress testing unrelated to
>        the asserted inventions.

(*See* D.I. 149 FOF at ¶¶ 184-242.)

### (1)    Adenoscan® Entered the Pharmacological Stressor Market at a Fortuitous Time

63.    For reasons described in Defendants' Proposed Findings  (D.I. 149 at ¶¶

185-196), shortly after its launch, Adenoscan® found itself the only product being promoted in a

concentrated, relatively price-insensitive market.  This benefit as the only product advertised in

the pharmacological stress market as continued up to the present day.  (D.I. 150 at 37.)

### (2)    Fujisawa's Extensive Marketing and Promotion Drove Adenoscan®'s Market Share Growth

64.    As described in detail in Defendants' Proposed Findings of Fact, Fujisawa's

spending was devoted to extensive traditional and non-traditional marketing activities, including

substantial detailing efforts; support of the American Society of Nuclear Cardiology ("ASNC");

support of physician advocates; provision of financial incentives such as trial product and pumps to prospective customers; sole sponsorship of industry "educational initiatives"; and promotion of Adenoscan® for new uses and user populations.  (D.I. 149 at ¶¶ 197-225.)

65.    Such an extensive marketing and promotion program "obscure[s] any nexus that might have existed between the merits of the product and its commercial success."  *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1370 (Fed Cir. 2003) (affirming district court's discount of Plaintiffs' asserted evidence of commercial success); *see also Revlon, Inc. v. Carson Prods. Co.*, 602 F. Supp. 1071, 1096-97 (S.D.N.Y. 1985) (finding that the success of Defendant's product was due to advertising campaign, product packaging, and choice of target audience for the marketing message – not to any claimed advantage of the patented invention).

66.    "[W]here the success of an invention is due to advertising, good business sense, the prior art, etc., rather than the advantages inherent in the discovery, it is ***irrelevant*** to a determination of obviousness."  *Friction Div. Prods., Inc. v. E. I. Du Pont de Nemours & Co., Inc.*, 693 F. Supp. 114, 131 (D. Del. 1988) (emphasis added).

67.    The Adenoscan® package insert does not promote the "advantages inherent in the discovery," *i.e.*, it does not advertise the claimed invention: selective vasodilation of the arteries without inducing significant venous dilation.  *Id.*

### (3)    Adenoscan®'s Increasing Sales Were Also Due to the General Growth of the Pharmacological Stress Market

68.    Adenoscan® did not grow market share at the expense of dipyridamole, the incumbent product in the pharmacological stress market.

69.    Although the market was ripe for a new entrant when Fujisawa launched Adenoscan®, it took over six years for the sales of Adenoscan® to overtake dipyridamole, even with the differential in the prices of the products.  Such a delay in the market's willingness to

embrace Adenoscan® is simply not probative of commercial success. *Friction Div. Prods.*, 693 F. Supp. at 131 ("More probative of nonobviousness [than sales, which may be attributable to advertising increases] would be evidence of commercial success **immediately following** the patenting of the invention.") (emphasis added).

70.    Dipyridamole retained significant usage upon the launch of Adenoscan® and has experienced continuous growth since that time.

71.    The higher overall level of growth achieved by Adenoscan® can be attributed to Fujisawa's extensive marketing and promotion investment in creating and capturing additional user populations for the product.

72.    The growth is also attributable to a general growth in demand for pharmacological stress testing unrelated to the asserted invention, and due instead to demographic phenomena such as the increased aging of the American population and the rise in American obesity. Any success of Adenoscan® based on a fortuitous market occurrence cannot be attributed to the claimed invention and thus is not probative of nonobviousness. *See Merck & Co., Inc. v. Teva Pharms USA, Inc.*, 405 F.3d 1338, 1339 (Fed Cir. 2005) (Lourie, J., dissenting from order denying rehearing *en banc*) (stating that once commercial success is established, "the only other question is whether the success is attributable to the claimed invention ('nexus'), rather than to other factors such as market power, advertising, **demand for all products of a given type**, a rising economy that 'lifts all boats,' etc.") (emphasis added); *see also Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) (concluding that any commercial success of the patented device could have been due to an increased use of herringbone milking systems, and not the claimed invention).

(ii)    **Dr. Hay's Analysis Is Unsound and His Testimony Is Unreliable**

73.    The testimony of Plaintiffs' expert, Dr. Hay, was unreliable and his analysis of the economic issues in this case was unsound.

B.    **Claims 1, 3, 7, and 9 of the '296 Patent Are Invalid As Inherently Anticipated**

1.    **The Asserted Claims are Inherently Anticipated by the Fukunaga Abstract**

74.    A person of ordinary skill in the art at the relevant time would conclude that the Fukunaga Abstract inherently discloses each and every element of the asserted claims of the '296 patent.

75.    While Fukunaga 1982 admittedly does not expressly disclose the administration of adenosine, a person of ordinary skill in the art and the relevant time would understand that "the natural result flowing from" the administration of ATP would be the rapid and virtually complete conversion of ATP to adenosine.  *See Schering Corp. v. Geneva Pharm., Inc.,* 339 F.3d 1373, 1379 (Fed. Cir. 2003); *Eli Lilly & Co. v. Barr Labs, Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001).  (D.I. 150 at 39-40.)

76.    A "reference may anticipate even when the relevant properties of the thing disclosed were not appreciated at the time."  *Abbott Labs. v. Baxter Pharmaceutical Prods., Inc.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006).  Here, the immediate and complete conversion of ATP to adenosine was, in fact, appreciated at the time, and repeatedly acknowledged by Dr. Sollevi.

77.    The Fukunaga abstract disclosed the administration of ATP (without dipyridamole) to patients to induce controlled hypotension, which is caused by near-maximal selective arterial vasodilation.  The dose of ATP administered was equivalent to a dose of adenosine that falls within each of the claimed ranges, and a person of ordinary skill would have

49

made this common sense calculation in determining the amount of adenosine to administer for the same purpose.

### C.  Expert Testimony Issues

#### 1.  Dr. Binkley is Highly Qualified to Serve as an Expert in This Case

78.  Dr. Binkley is a highly qualified and credible expert witness in this case.

79.  Plaintiffs' challenge to Dr. Binkley on the ground that he lacked contemporaneous experience with adenosine must fail as a matter of law.  "Whatever [an expert] did or did not *personally* realize at the time [of the alleged invention] based on his actual knowledge is *irrelevant*.  The relevant inquiry is what a hypothetical ordinarily skilled artisan would have gleaned from the cited references at the time that the patent application leading to the [ ] patent was filed." *Amazon.com, Inc. v. Barnesandnoble.com, Inc. et al.*, 239 F.3d 1343, 1364 (Fed. Cir. 2001) (second emphasis added).

80.  Unlike Dr. Klabunde, Dr. Binkley is a cardiologist who squarely qualified as a person of ordinary skill in the art at the time of the alleged invention.

81.  As this Court recently observed, "'[t]he "person of ordinary skill in the art" is a theoretical construct used in determining obviousness under § 103, and is not descriptive of some particular individual.'" *eSpeed, Inc. et al. v. Brokertec USA, LLC*, 404 F. Supp. 2d 575, 579 (D. Del. 2005) (quoting *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997)).  For this reason, an argument that an expert is unqualified to render an opinion is "falacious [sic]" where "'the record reflects his substantial credentials . . . , and the decision to permit him to testify was well within the discretion of the trial judge.'" *Id.* at 579-80 (citation omitted).

**a.    Dr. Binkley's Opinions Were Well Within the Scope of His Expert Report**

82.    Dr. Binkley did opine in his expert report that a person of ordinary skill would be motivated to administer adenosine without pretreatment by dipyridamole, in part because of the properties resulting from difference in the half lives of dipyridamole and adenosine.

83.    Dr. Binkley also opined in his expert report that the hemodynamic effects observed in the Sollevi abstracts would indicate to a person of ordinary skill that the administration of adenosine alone would produce selective arterial vasodilation.

**b.    Dr. Binkley Was Improperly Forced to Rebut Issues Raised by Plaintiffs for the First Time at Trial**

84.    Under 35 U.S.C. § 282, Sicor (as the party asserting invalidity) was required only to give notice in writing to Plaintiffs of any publication to be relied upon as an anticipatory reference or as showing the state of the art at the relevant time.  *See* 35 U.S.C. § 282 (2007). Section 282 does not include any mention of a defendant's obligation to provide notice of publications it intends to discuss in order to rebut the other party's interpretation.

85.    Five of the exhibits (TX 88, TX 126, TX 151, TX 199, TX 236) that Plaintiffs argue should be excluded were on Plaintiffs' exhibit list, which was submitted to the Court as part of the pretrial order (D.I. 127, Ex. 6).   These exhibits were introduced by Plaintiffs through their expert, Dr. Klabunde.  Pursuant to the Pretrial Order submitted to the Court by parties, "[e]ach party may use an exhibit that is listed on the other side's exhibit list, to the same effect as though it were listed on its own exhibit list."  (D.I. 127, ¶ 22.)

86.    Plaintiffs were also on notice that Sicor's expert witness could testify about these exhibits in his rebuttal testimony.  *See Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (explaining that the Third Circuit "does not automatically exclude anything an expert could have

included in his . . . original report" and "[a]ll that is required is for the information to repel other expert testimony").

87.    The sixth exhibit (TX 5000) was also properly discussed by Dr. Binkley. This publication was used by Sicor to impeach Dr. Klabunde's testimony. The use of this exhibit with Dr. Klabunde was proper, because pure impeachment evidence need not be disclosed before trial. Rule 26(a)(3), Fed. R. Civ. P.; *see also* Tr. 319:25-320:2. It was also appropriate for Dr. Binkley to return comment on TX 5000 in order to rebut the testimony offered by Dr. Klabunde. *Crowley*, 322 F. Supp. 2d at 551.

88.    Plaintiffs contend that Dr. Binkley's assertion that a person of ordinary skill in the art in September 1985 would be motivated to find additional medical uses for adenosine as a selective arterial vasodilator was not disclosed in his expert reports. (D.I. 151 at 37.) However, Plaintiffs first raised the issue of other medical uses at trial, through Dr. Klabunde's testimony that that the only known use for intravenous adenosine in September 1985 in the prior art was controlled hypotension.

89.    Because Dr. Binkley had no previous opportunity to offer testimony on this issue, and his rebuttal testimony was limited to the issue raised by Plaintiffs, Dr. Binkley's testimony was permissible rebuttal and consistent with and within the overall scope of the opinions in his expert reports. *See ABB Air Preheater Inc. v. Regenerative Envtl. Equip.,* 167 F.R.D. 668, 671 (D.N.J. 1996) (observing that the Third Circuit has a "distinct aversion to the exclusion of testimony").

## 2.    <u>Dr. Leffler is Highly Qualified to Serve as an Expert in This Case</u>

90.    Dr. Leffler is a highly qualified and credible expert witness in this case.

91.    Dr. Leffler's qualifications have been specifically acknowledged, and his economic analyses adopted, by several federal and state courts. *See, e.g., Wash. Legal Found. v.*

*Legal Found. of Wash.*, 271 F.3d 835, 859 (9th Cir. 2001) (en banc); *Pfizer Inc. v. Teva Pharms.*

*USA, Inc.*, 461 F. Supp. 2d 271, 274-75 (D.N.J. 2006); *In re Florida Microsoft Antitrust Litig.*,

2002 WL 31423620, at *6-7 (Fla. Cir. Ct. 2002).

92.    Plaintiffs incorrectly criticize Dr. Leffler by complaining that "Dr. Leffler never

consulted any physicians" about what product qualities or benefits drive their purchasing

decisions.  However, as an economist, it would have been "inappropriate" for Dr. Leffler to

engage in this research.  *Pfizer*, 461 F. Supp. 2d at 275.

93.    Even if therapeutic advantages of Adenoscan® over dipyridamole could be shown

by such an analysis, "this would not obviate [Dr. Leffler's] ultimate conclusion that factors such

as marketing and promotion, not these therapeutic benefits, were ultimately responsible for [the

product's] commercial success" if the evidence were to bear out this conclusion.  *Id.*  The

evidence does, indeed, bear out this conclusion, and no efforts on the part of Plaintiffs to

discredit Dr. Leffler can change that fact.

### 3.    <u>The Expert Testimony Offered by Plaintiffs is Not Credible</u>

94.    The only scientific expert witness offered by Plaintiffs at trial, Dr. Klabunde, is

not a practicing physician, has no medical degree, was not teaching medical students at the

relevant time, and only later came to teach in a school of osteopathy.  Thus, Dr. Klabunde is not

a credible witness on the understanding of a person of ordinary skill at the relevant.  Dr.

Klabunde's testimony was not credible because he repeatedly opined upon what he – a

physiologist – would know or understand at the relevant time period, instead of properly

focusing on the understanding of a person of ordinary skill, as appropriate.

95.    At the last minute, Plaintiffs cancelled the trial testimony of their other technical

expert, Dr. Zaret, who, like Dr. Binkley, qualifies as a person of ordinary skill in the art at the

relevant time and is a practicing physician, because he made several admissions during his deposition that were damaging to Plaintiffs' case.

96.    Dr. Zaret confirmed that there was no published report prior to the date of the filing of the '296 patent application of AV block occurring in human patients following the administration of adenosine by continuous infusion.

97.    Dr. Zaret confirmed that there is no prior art report that shows the existence or the occurrence of AV block in any other context involving adenosine other than with bolus administration.

98.    Dr. Zaret confirmed that a person or ordinary skill in the art at the relevant time would know that the routine practice of dose titration could be used to minimize the possibility of side effects during the continuous intravenous administration of adenosine, and would know that stopping administration of adenosine would quickly stop the observed signs of the side effects.

99.    Dr. Zaret confirmed that persons of ordinary skill in the art would understand that the selective vasodilation of the arteries could be useful in "many contexts" other than in treatment for heart disease.

100.    Dr. Zaret confirmed that correspondence between Dr. Sollevi and Dr. Berne, on which Plaintiffs heavily rely in support of their arguments concerning skepticism in the field, were private communications and therefore would not have served to discourage persons of ordinary skill in the art at the relevant time because they would not have been available to them to review.

## III.    <u>CONCLUSION</u>

101.    Defendants request that the Court adopt the foregoing responsive findings of fact and conclusions of law and enter judgment that the '296 patent is invalid as obvious or inherently anticipated or both.

Respectfully submitted,


/s/ *Karen E. Keller*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
kkeller@ycst.com

Of Counsel:

David M. Hashmall, P.C.
Annemarie Hassett
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

*Attorneys for Defendants Sicor Inc. and*
*Sicor Pharmaceuticals, Inc.*


Dated:  June 19, 2007

**CERTIFICATE OF SERVICE**

        I, Karen E. Keller, Esquire, hereby certify that on June 19, 2007, I

caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the

Court using CM/ECF, which will send notification that such filing is available for viewing and downloading

to the following counsel of record:

| | |
|---|---|
| Paul M. Lukoff, Esquire | Richard K. Herrmann, Esquire |
| David E. Brand, Esquire | Morris James Hitchens & Williams |
| Prickett Jones & Elliot, P.A. | 222 Delaware Avenue, 10th Floor |
| 1310 King Street | P.O. Box 2306 |
| P.O. Box 1328 | Wilmington, DE 19899-2306 |
| Wilmington, DE 19899 | |

        I further certify that on June 19, 2007, I caused copies of the foregoing document to be

served by hand delivery on the above-listed counsel and on the following in the manner indicated:

**BY E-MAIL ON JUNE 19, 2007 AND**
**FEDERAL EXPRESS ON JUNE 20, 2007**

| | |
|---|---|
| | Susan H. Griffen, Esquire |
| Charles E. Lipsey, Esquire | FINNEGAN, HENDERSON, FARABOW, |
| FINNEGAN, HENDERSON, FARABOW, |   GARRETT & DUNNER, LLP |
|   GARRETT & DUNNER, LLP | 901 New York Avenue, N.W. |
| Two Freedom Square | Washington, DC 20001-4413 |
| 11955 Freedom Drive | |
| Reston, VA 20190-5675 | |

John Scheibeler, Esquire
WHITE & CASE, LLP
1155 Avenue of the Americas
New York, NY 10036

                                   **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

                                   */s/ Karen E. Keller*
                                   Josy W. Ingersoll (No. 1088)
                                   John W. Shaw (No. 3362)
                                   Karen E. Keller (No. 4489)
                                   The Brandywine Building
                                   1000 West Street, 17th Floor
                                   Wilmington, DE  19801
                                   (302) 571-6600
                                   kkeller@ycst.com

                                   *Attorneys for Defendants*